E-FILED
Monday, 29 January, 2007  01:29:24 PM
Clerk, U.S. District Court, ILCD

# United States District Court

CENTRAL _____ DISTRICT OF _____ ILLINOIS

DEDRIC MOORE, #K-53438

v.

DONALD A. HULICK (WARDEN)

**APPLICATION TO PROCEED IN FORMA PAUPERIS, SUPPORTING DOCUMENTATION AND ORDER**

CASE NUMBER: 07-2015

---

I, DEDRIC MOORE, declare that I am the *(check appropriate box)*

- [x] petitioner/plaintiff
- [ ] respondent/defendant
- [ ] movant (filing 28 U.S.C. 2255 motion)
- [x] 28 USC 2254 HABEAS CORPUS PETITION
  *other*

in the above-entitled proceeding; that, in support of my request to proceed without being required to prepay fees, cost or give security therefor, I state that because of my poverty, I am unable to pay the costs of said proceeding or give security therefor; that I believe I am entitled to relief. The nature of my action, defense, or other proceeding or the issues I intend to present on appeal are briefly stated as follows:

**FILED**

JAN 2 9 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

In further support of this application, I answer the following questions.

1. Are you presently employed?          Yes [ ] No [x]

   a. If the answer is "yes," state the amount of your salary or wages per month, and give the name and address of your employer. (list both gross and net salary)

   I only received $10.00 state pay if we're not on lock-down and ever now and then a family member may send me some money to help me out because of all of the lock-downs. After copies and paying postage, I will be in the red quite a lot of money.

   b. If the answer is "no," state the date of last employment and the amount of the salary and wages per month which you received.   I haven't had a job since my arrival at this facility.

2. Have you received within the past twelve months any money from any of the following sources?

   a. Business, profession or other form of self-employment?   Yes [ ] No [x]
   b. Rent payments, interest or dividends?   Yes [ ] No [x]
   c. Pensions, annuities or life insurance payments?   Yes [ ] No [x]
   d. Gifts or inheritances?   Yes [ ] No [x]
   e. Any other sources?   Yes [ ] No [x]

REPORT CRITERIA  -  Date: 06/01/2006 thru End;      Inmate: K53438;      Active Status Only ? : No;      Print Restrictions ? : Yes;
Transaction Type: All Transaction Types;      Print Furloughs / Restitutions ? : Yes;      Include Inmate Totals ? : Yes;      Print
Balance Errors Only ? : No

**Inmate: K53438 Moore, Dedric T.**                                    **Housing Unit: MEN-SL-02-40**

| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
|------|--------|-----------------|-------|-------------|-------------|--------|---------|
| | | | | | **Beginning Balance:** | | 0.17 |
| 06/06/06 | Payroll | 20 Payroll Adjustment | 157159 | | P/R month of 05/2006 | 10.00 | 10.17 |
| 06/13/06 | Point of Sale | 60 Commissary | 164778 | 584486 | Commissary | -10.12 | .05 |
| 06/20/06 | Point of Sale | 60 Commissary | 171779 | 587579 | Commissary | 10.12 | 10.17 |
| 06/29/06 | Mail Room | 01 MO/Checks (Not Held) | 180245 | 4809077318 | Moore, Lillie | 50.00 | 60.17 |
| 07/07/06 | Payroll | 20 Payroll Adjustment | 188159 | | P/R month of 06/2006 | .68 | 60.85 |
| 07/11/06 | Point of Sale | 60 Commissary | 192779 | 589766 | Commissary | -15.97 | 44.88 |
| 07/18/06 | Point of Sale | 60 Commissary | 199779 | 592045 | Commissary | -17.69 | 27.19 |
| 07/19/06 | Mail Room | 01 MO/Checks (Not Held) | 200223 | 4809077327 | Holtzclaw, Patricia | 50.00 | 77.19 |
| 07/31/06 | Disbursements | 84 Library | 212359 | Chk #75200 | 12610, DOC - Library Copies,    Inv. Date: 07/18/2006 | -2.25 | 74.94 |
| 07/31/06 | Disbursements | 81 Legal Postage | 212359 | Chk #75201 | 4, DOC: 523 Fund Reimbursement, Inv. Date: 07/19/2006 | -1.11 | 73.83 |
| 07/31/06 | Disbursements | 81 Legal Postage | 212359 | Chk #75201 | 5, DOC: 523 Fund Reimbursement, Inv. Date: 07/19/2006 | -1.59 | 72.24 |
| 07/31/06 | Disbursements | 90 Medical Co-Pay | 212359 | Chk #75201 | 12337, DOC: 523 Fund Reimburse, Inv. Date: 07/17/2006 | -2.00 | 70.24 |
| 08/07/06 | Mail Room | 01 MO/Checks (Not Held) | 2192104 | 48090776008 | Moore, Lillie | 50.00 | 120.24 |
| 08/07/06 | Mail Room | 01 MO/Checks (Not Held) | 2192104 | 48090776019 | Holtzclau, Patricia | 20.00 | 140.24 |
| 08/15/06 | Point of Sale | 60 Commissary | 227749 | 596740 | Commissary | -48.63 | 91.61 |
| 08/16/06 | Disbursements | 80 Postage | 228359 | Chk #75532 | 1994, DOC: 523 Fund Reimbursem, Inv. Date: 08/11/2006 | -.02 | 91.59 |
| 08/16/06 | Disbursements | 80 Postage | 228359 | Chk #75532 | 1995, DOC: 523 Fund Reimbursem, Inv. Date: 08/11/2006 | -.02 | 91.57 |
| 08/22/06 | Point of Sale | 60 Commissary | 234779 | 598552 | Commissary | -15.24 | 76.33 |
| 08/31/06 | Disbursements | 84 Library | 243359 | Chk #75828 | 3777, DOC: 523 Fund Library,    Inv. Date: 08/28/2006 | -1.20 | 75.13 |
| 08/31/06 | Disbursements | 81 Legal Postage | 243359 | Chk #75829 | 4144, DOC: 523 Fund Reimbursem, Inv. Date: 08/29/2006 | -1.59 | 73.54 |
| 09/06/06 | Point of Sale | 60 Commissary | 249749 | 600417 | Commissary | -13.14 | 60.40 |
| 09/07/06 | Payroll | 20 Payroll Adjustment | 250159 | | P/R month of 08/2006 | .34 | 60.74 |
| 09/12/06 | Point of Sale | 60 Commissary | 255767 | 602497 | Commissary | -18.26 | 42.48 |
| 09/19/06 | Point of Sale | 60 Commissary | 262749 | 604618 | Commissary | -5.60 | 36.88 |
| 09/28/06 | Disbursements | 84 Library | 271359 | Chk #76348 | 6980, DOC - Library Copies,    Inv. Date: 09/22/2006 | -1.50 | 35.38 |
| 09/29/06 | Disbursements | 80 Postage | 272359 | Chk #76427 | 6872, DOC: 523 Fund Inmate Rei, Inv. Date: 09/22/2006 | -.63 | 34.75 |
| 10/03/06 | Point of Sale | 60 Commissary | 276767 | 606430 | Commissary | -26.69 | 8.06 |
| 10/05/06 | Payroll | 20 Payroll Adjustment | 278159 | | P/R month of 09/2006 | 5.78 | 13.84 |
| 10/10/06 | Point of Sale | 60 Commissary | 283767 | 608042 | Commissary | -13.84 | -.00 |
| 10/19/06 | Mail Room | 01 MO/Checks (Not Held) | 292223 | 08-590468847 | Moore, Lillie | 50.00 | 50.00 |
| 11/06/06 | Payroll | 20 Payroll Adjustment | 310159 | | P/R month of 10/2006 | 10.00 | 60.00 |
| 11/14/06 | Point of Sale | 60 Commissary | 318793 | 614487 | Commissary | -45.28 | 14.72 |
| 11/16/06 | Disbursements | 81 Legal Postage | 320359 | Chk #77166 | 11362, DOC: 523 Fund Reimburse, Inv. Date: 11/02/2006 | -.63 | 14.09 |
| 11/21/06 | Point of Sale | 60 Commissary | 325793 | 615803 | Commissary | -14.01 | .08 |

Date: 07/24/2015-MPM-DGB   # 1   **Menard Correctional Center**
Time:   12:19pm                    **Trust Fund**
d_list_inmate_trans_statement_composite          Inmate Transaction Statement

Page 2

REPORT CRITERIA  -  Date: 06/01/2006 thru End;      Inmate: K53438;      Active Status Only ? : No;      Print Restrictions ? : Yes;
        Transaction Type: All Transaction Types;      Print Furloughs / Restitutions ? : Yes;      Include Inmate Totals ? : Yes;      Print
                                  Balance Errors Only ? : No

**Inmate: K53438 Moore, Dedric T.**                    **Housing Unit: MEN-SL-02-40**

| | |
|---|---|
| **Total Inmate Funds:** | .08 |
| **Less Funds Held For Orders:** | .00 |
| **Less Funds Restricted:** | .00 |
| **Funds Available:** | .08 |
| **Total Furloughs:** | .00 |
| **Total Voluntary Restitutions:** | .00 |

DEDRIC T. MOORE
K53438

## CERTIFICATE

**TO BE COMPLETED FOR PRISONERS ONLY. THIS IS A STATEMENT BY THE PRISON AND NOT THE PRISONER**

I hereby certify that the plaintiff or petitioner in this action has the sum of $ .08 _____ in his trust fund account at this correctional center where he is confined.

I further certify that the plaintiff or petitioner has the following securities to his credit according to the records of this institution:

_____

_____

_____

_Geraldine Berry_
**Authorized officer**

MENARD CC
**Institution**

ACCT. TECH I
**Title**

12-4-06
**Date**

**IMPORTANT:**

THIS CERTIFICATE MUST BE ACCOMPANIED BY A COPY OF A SIX MONTH LEDGER

OF THE PLAINTIFF'S TRUST FUND ACCOUNT.

Page 2    E-FILED
Monday, 29 January, 2007 01:29:37 PM
Clerk, U.S. District Court, ILCD

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF

HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District CENTRAL |
|---|---|

| Name (under which you were convicted): DEDRIC MOORE | Docket or Case No.: 07-2015 |
|---|---|

| Place of Confinement: MENARD CORRECTIONAL CTR. | Prisoner No.: K-53438 |
|---|---|

Petitioner (include the name under which you were convicted)    Respondent (authorized person having custody of petitioner)

DEDRIC MOORE         v.         DONALD A. HULICK WARDEN

The Attorney General of the State of  ILLINOIS: LISA MADIGAN

**RECEIVED**

JAN 2 9 2007

U.S. CLERK'S OFFICE
URBANA, IL

### PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: _____
CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT, CHAMPAIGN COUNTY, ILLINOIS 101 EAST MAIN ST. URBANA, ILLINOIS 61801

   (b) Criminal docket or case number (if you know): _____ 98 CF 1558 _____

2. (a) Date of the judgment of conviction (if you know): March 19, 1999 _____

   (b) Date of sentencing: May 21, 1999 _____

3. Length of sentence: _____ (75) years total imprisonment sentence _____

4. In this case, were you convicted on more than one count or of more than one crime? Yes ☒ No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: (30) years for Home Invasion; consecutive to (30) years for Aggravated Arson consecutive (15) years for Residential Burglary; concurrent to (30) years for Attempt First Degree Murder; and (7) years con-current for Aggravated Criminal Sexual Assault

6. (a) What was your plea? (Check one)

   (1)    Not guilty ☒

   (2)    Guilty ☐

   (3)    Nolo contendere (no contest) ☐

   (4)    Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?_____

   _____ N/A _____

## S T A T E M E N T    O F    F A C T S

Lori Hansen was subjected to a series of attacks during the early morning hours of February 25, 1988 at her rented duplex unit at 512A South New Street in Champaign.

On February 24th Lori Hansen left her duplex around 10:00 p.m. and visited two bars. She drove her friend Allison home around 1:30 a.m. and then returned home. (Vol. VII, R.42-49) She opened her screen door, unlocked the front door and turned on the living room light; then, she said, "I heard a noise behind me and I turned and there was someone coming in the door right behind me. I tried to push the door closed, and I screamed, but it - he forced his way in." (Vol. VII, R. 49)

The intruder was hooded and appeared to be a man. He held his right hand over Lori's mouth and his left hand across her chest. The man demanded to know "Where's Chad?" and pushed her further into the duplex and down on her stomach. (Vol. VII, R. 50) She repeated that she did not know "Chad." The intruder also asked how much money she had, and he searched her clothing pockets. He bound her hands then and her feet later. He also grabbed a pair of her shorts and placed them over her head as a partial blindfold. (Vol. VII, R. 51-53) She heard him ransack her unit, looking for her purse, additional money and her ATM cards. Although he did not speak clearly and he had turned the television on to a channel with only "snow," Lori heard him say that he was not going to hurt her. (Vol. VII, R. 53)

-2-

The man asked Lori Whether her truck had a manual or automatic transmission, what the PINs were for her ATMs, and where her tape was. He wound some of her clear wide packaging tape around her head several times as a gag.   She provided two PINs for two of her ATMs.  (Vol. VII R. 53-57)   She heard the man help himself to a beer from her refrige-rator, and she could smell cigarette smoke.  (Vol. VII, R. 57-58)

The intruder next obtained some cord and tied Lori's hands to her feet, carried her to the bathroom and deposited her in the bathtub. Using an extension cord he secured his previous ligatures to the bar over the soap dish in the tub.   He told her if her PINs were correct, he would return and let her go - but if she lied, she would be sorry because he would return and hurt her.   He turned off the bathroom light shut the door, and left her unit, she surmised.   (Vol. R. 58-59)

The Second Entry - Home Invasion

After a period of time Lori could not measure, the bathroom light was switched on and the same man asked what she was doing.   She told him she had urinated on herself from fear.   The intruder took a table from the living room and placed it on Lori, still in the tub; she could not move.   He left again, this time for a longer period than before. (Vol. VII, R. 60-61)

The intruder returned to the bathroom, removed the table from Lori and said, "You're cool.:   He freed her from the restraints to the soap dish, lifted her out of the tub and placed her on the floor between the bathroom and hallway.   (Vol. VII, R. 61-62)   As he started to untie her

she ordered him out of her house, thereby angering him.    He approached her from behind and strangled her with a cord; her hands and feet were still bound.    (Vol. VII, R. 62-64)    While she lay on the floor he put his hand up her shirt, touched her breats  and put his mouth to her breast before he walked away.    (Vol. VII, R. 65)

When the man returned, he stood at her head; Lori smelled something like nail or shoe polish.    The intruder the unzipped his pants and urinated on her head, commenting, "When you drink that much beer, you got to take a piss."    (Vol. VII, R. 65-67)    The man walked away and returned to pour a cold liquid all over her still bound body; the liquid smelled like what she had detected minutes earlier.    The man was gone for a moment, and she turned her head to see a fire in her livingroom. (Vol. VII, R. 67)    Not seeing the man, Lori said she:

> ducked into the bedroom next to where I was laying [sic]
> and tried to get undone, tried to figure out how to get
> out, and I saw a lamp that I was reaching to grab, and he
> showed up in the doorway, and before I could get ahold of
> the lamp, and he grabbed me by the arms and dragged me out
> of the room over the burning carpet into the livingroom.
> I tried to push another lamp on him, and then he started
> punching me and knocked me down, and then he started kick-
> ing me in the head, back, stomach, and legs.
> (Vol. VII, R. 67-68)

She had seen flames and smoke, and her pants were burned.    She struggled and tried to hit the man, whose face she could not see well.    He punched her.    (Vol. VII, R. 69)    She determined that he was African-American. (Vol. VII, R. 70)

Lori fell to the floor, and the man stopped kicking her.    He flick ed a lit cigarette at her head, which she was able to deflect from her face.    She got herself back in the bedroom and removed her restraints.

-4-

Unable to get the bedroom window open, she ran through her home toward the back door.    There was smoke and fire throughout her unit, and she had to jump over patches of fire on teh carpet.    (Vol. VII, R. 70-72) She ran to her neighbor's duplex where she was able to summon assistance. (Vol. VII. R. 73-75)    Lori was treated at the hospital for burns to her finger and her knee, smoke inhalation, and additional injury where her jeans had adhered to her skin.    (Vol. VII, R. 75-77)

The arson investigator concluded that the fire at Lori Hansen's residence had been intentionally set.    (Vol. VII, R. 168, 193)    Petroleeum product from an ignitable liquid was present on some of the carpet tested from Lori's duplex.    (Vo. X, R. 484, 488-90, 497-98; People's Exhibit No. 12B)    Petroleum productuct characteristic of gasoline was also found on Lori's bra.    (Vol. X, R. 492, 500; People's  Exhibit No. 11)

**Police Interview of Dedric Moore**

On March 4th Detective Don Shepard questioned Dedric Moore about his activities at the time in question.    Mr. Moore said he had been out of town, had no knowledge of what had occurred, and thought that maybe the "Mexican or Chinese Mob" had been responsible "because they carry gasoline and beat people up."    Shepard said the defendant himself first mentioned "gasoline" in connection with the incident.    (Vol. IX, R. 334, 359-62)    Investigator Mark Stzesak had a similar recollection of the encounter with Mr. Moore.    (Vol. IX, R. 424, 439-40)

Mr. Moore told the detective that he then "stayed" at 108 East Healey Street with his brother, Dontay Moore, but had slept at the duplex

-5-

adjoining Lori Hansen's while his grandmother Lillie had been out of town just before the fire.    (Lillie Moore was the tenant of the unit adjacent to Lori's.    (Vol. IX, R. 328))    Mr. Moore explained that he stayed at his grandmother's duplex intermittently but had moved out before Valentine's Day.    (Vol. IX, R. 362-63, 367)    At the time of the incident Lillie was in Mississippi, but she returned while the fire department was still in the process of extinguishing the fire.    (Vol. IX, R. 364)

Shepard re-interrogated Dedric Moore on March 5th at the Champaign Police Department, and the defendant explained that he had been in Urbana at the time of the incident after paging a "Jennifer" from a certain pay phone in the area.    (Vol. IX, R. 371-72)    The detective checked the pager number and found it "out of service."    He also checked the phone numbers made from the pay phones where and near where the defendant had indicated he had called.    Shepard could not verify Mr. Moore's accounting of his activities and whereabouts.    (Vol. IX. R. 372-73, 380-82)

**Scientific, Circumstantial and Inconclusive Evidence**

A forensic scientist matched Lori and Dedric Moore's DNA profile to DNA recovered from Lori's stocking which had been used as a ligature during the assault.    (Vol. IX, R. 592, 616, 620, 629; People Exhibit No. 21B)    The scientist opined that the defendant's DNA profile "could be the major contributor . . . at the majority of the location on [sic] the DNA . . ."    (Vol XI, R. 633)

Partial body hair fragments recovered from Lori's jacket, driver's seat of her truck, shorts and stocking were identified as "Negroid." (Vol. X, R. 555, 566-67 [People's Exhibit No. 8A], 568-69 [People's Exhibit No. 68]. 570-71 [People's Exhibit No. 17A] and 572-73 [People's

-6-

Exhibit No. 21A])

A <u>Newport cigarette butt</u> was recovered from the crime scene.   (Vol. IX, R. 334, 343; People's Exhibit No. 19)   Police seized Newport cigarettes from Mr. Moore's residence.   (Vol. IX, R. 334, 365, 378; People's Exhibit No. 62)   Lori Hansen did not smoke Newports.   (Vol. VII, R. 42, 91-92)

A <u>handwritten</u> analysis between Dedric Moore's "voluntary" and "collected" known writing samples and a written notation of Lori's PINs retrieved from her truck proved inconclusive.   (Vol. IX, R. 334, 395; Vol. X. R. 460, 475)

The questioned documents examiner found that the notation of PINs "1972" and "2810" (People's Exhibit No. 67; Vol. IX, R. 308) had "characteristics in common . . . with the defendant's "voluntary" wroiting samples contained in his jail request slips. (People's Exhibit No. 71A-C)

However, the handwriting exemplars which had been "collected" from the defendant (People's Exhibit No. 70A-c), the examiner described as awkward, unnatural, inconsistent and consciously disguised, and these made a comparison more difficult.   (Vol. X, R. 460, 469-70, 474)

The examiner ultimately made no identification of the questioned writings to Mr. Moore's.   (Vo. X. R. 475)

At a <u>Police line-up</u>, Lori Hansen was unable to identify her assailant by sight or voice, although she narrowed her selection to two men, one of whom was Dedric Moore.   (Vol. VII, R. 79-83, 104; Vol. R. 385-92)

-7-

A <u>videotape</u> taken from Lori Hansen's bank showed her truck at the drive-through ATM lane around 2:30 a.m. on February 25th.   (Vol. VIII, R. 271, 277-81; Vol. IX, R. 424, 434-37; People's Exhibits No. 4-6) <u>Still photographs</u> were produced from the videotape.   (Vol. VIII, R. 282-83, People's Exhibit No. 5A-5E)   No positive identification of the defendant was made from these photographs, which were distorted when enlarged.   (Vol. IX, R. 437)   Bank records indicated that three attempts to remove cash from Lori's account were made at that time. (Vol VIII, R. 283-86; Vol. IX, R. 318-19; People's Exhibit No. 7)

No latent <u>fingerprint</u> suitable for comparison from the scene or related sites were identified with the known prints of Dedric Moore or Lori Hansen.   (Vol. IX, R. 456-57)

**The Defense**

Ivory Burrage, a friend of Dedric Moore's, provided an alibi for the defendant.   (Vol. XI, R. 665-69)   Dedric Moore's own testimony corroborated Mr. Burrage's account of their activities and location that night.   (Vol. XII, R. 708, 713, 715-20, 739)(The police responded to this alibi during the State's rebuttal case that when questioned before trial, Mr. Moore had never provided Ms. Burrage's name as an alibi witness (Vol. XII, R. 766, 769-70, 774)

The defendant's brother Emmaniel Moore, provided an alibi at trial that differed from the one he had given fro Dedric before trial. Emmaniel's alibi also differed from the one at trial that his brother and Ms. Burrage had offered.   (Vol. XI, R. 676-89).

-8-

_____
_____N/A_____

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☒X    Judge only ☐

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes ☐   No ☒X

8.  Did you appeal from the judgment of conviction?

Yes ☒X   No ☐

9.  If you did appeal, answer the following:

(a) Name of court: Appellate Court Fourth Judicial District_____

(b) Docket or case number (if you know): _4-99-0499_____

(c) Result: ~~Affirmed conviction and Sentence~~_____

(d) Date of result (if you know): January 11, 2002_____

(e) Citation to the case (if you know): Unpublished order under Suprme Court Rule 23

(f) Grounds raised: Whether Permitting the State to introduce revised deoxyribonercleis Acid (DNA) frequency calculations; (2) Allowing the State to impeach him using the mere fact-method of impeachment and (3) imposing upon him consecutive and extended-term sentences in violation of United States Supreme Court decision Apprendi vs. New Jersey.

(g) Did you seek further review by a higher state court?   Yes ☒X  No ☐

If yes, answer the following: Illinois Supreme Court (PLA)

(1) Name of court: _____

(2) Docket or case number (if you know): _No. 93281_____

(3) Result: _Denied Petition, but ordered the Appellate Court to vacate the judgment and to reconsider in light of People v. Swift (nonprecedential supervisory order; result date Feb. 27, 2003

(4) Date of result (if you know):

(5) Citation to the case (if you know): (nonprededential supervisory order

(6) Grounds raised: Whether Permitting the State to introduce revised deoxyribonercleis Acid (DNA) frequency calculations; (2) Allowing the State to impeach him using the mere fact-method of impeachment and (3) imposing upon him consecutive and extended-term sentences in violation of United States Supreme Court decision Apprendi vs. New Jersey

(h) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☐  No ☒X

If yes, answer the following:

(1) Docket or case number (if you know): _____N/A_____

-9-

(2) Result: _____

N/A

(3) Date of result (if you know): _____ N/A _____

(4) Citation to the case (if you know): _____ N/A _____

10. Other than the direct appeals listed above, have you previously filed any other petitions,

applications, or motions concerning this judgment of conviction in any state court?

Yes ☒ No ☐

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _Circuit Court of Champaign County, Sixth Judicial Cir._

(2) Docket or case number (if you know): _98 CF 1558_  ·

(3) Date of filing (if you know): _April 22, 2002, assigned May 6, 2002_

(4) Nature of the proceeding: _Post-Conviction Petition (While Direct Pending)_

(5) Grounds raised: _Both Trial and Appellate Counsel were Ineffective;_
_(2) Petitioner would have accepted the Plead negotiation if trial_
_counsel was aware of the proper amount of good time that he would_
_received upon conviction; (3) that he was compelled to partici-_
_pate in a line-up without the assistance of counsel; and (4) That_
_one of the jurors was untruthful during voir dire._

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or
motion?       Yes ☐   No ☒

(7) Result: _Petition was summarily denied_

(8) Date of result (if you know): _May 31, 2002_

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: _Circuit court of Champaign County Sixth Judicial_ Cir.

(2) Docket or case number (if you know): ____ _98 CF 1558_

(3) Date of filing (if you know): _July 21, 2006_

(4) Nature of the proceeding: _Post-Conviction Petition_

(5) Grounds raised: _Issues regarding the re-sentencing hearing_
_after Petitioner's case was remanded as a result of_
_Apprendi vs New Jersey._

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or
motion?        Yes ❑    No ☒☒

(7) Result: _Summarily denied Petition_____

(8) Date of result (if you know): _July 28, 2006_____

(c) If you filed any third petition, application, or motion, give the same information:

   (1) Name of court: ~~Circuit Court of Champaign, Sixth Judicial Cir.~~

   (2) Docket or case number (if you know): __98 CF 1558_____

   (3) Date of filing (if you know): _____

   (4) Nature of the proceeding: ~~Motion For Re Consideration of Post-Con~~viction

   ~~or Alternative Notice of Appeal.~~
   (5) Grounds raised: _____

   ~~Sentencing Issues regarding the final sentence, (2) that~~

   ~~the Petitioner's appeal process starts ANEW after the re-~~

   ~~sentencing regarding his Apprendi issues.  (See Attached~~

   ~~Exhibit - A)~~_____

   _____

   _____

   _____

   (6) Did you receive a hearing where evidence was given on your petition, application, or
   motion?        Yes ❑    No ☒☒

   (7) Result: ~~Denied Re consideration Motion Granted Notice of~~ Appeal

   (8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your
petition, application, or motion?

   (1)  First petition:       Yes ☒X  No ❑

   (2)  Second petition:    Yes ☒X  No ❑

   (3)  Third petition:       Yes ☒X  No ☒X

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

   __~~The last appeal haven't yet appeal to the State's Highest~~ court

   __~~because it is still pending before the Appellate Court.~~  But

   __~~Petitioner doesn't know if the time will toll with regards~~ to

   the final Post-Conviction Petition, so the Seventh Circuit suggest
   that where there is some "procedural uncertainty" about state
   court post-conviction proceedings, it would be wise to file in
   both state and federal court simultaneously. Dolis v. chambers
   454 F3d. 721, at 725 (7th Cir. 2006)

-11-

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

<u>CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.</u>

GROUND ONE: __WHETHER "REVISED" DNA FREQUENCY CALCULATION WERE UNSUBSTANTIATED AND IMPROPERLY COMPELLED THE CONCLUSION THAT PETITIONER WAS THE SOLE POSSIBLE INTRUDER AT LORI HANSEN'S DUPLEX__

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

__SEE ATTACHED PAGES 21-33 TRIAL FACTS / TESTIMONY ONLY__

(b) If you did not exhaust your state remedies on Ground One, explain why: __CLEARLY EXHAUSTED CLAIM THROUGHOUT THE STATE COURT__

(c) Direct Appeal of Ground One:

   (1) If you appealed from the judgment of conviction, did you raise this issue?

      Yes ⮽  No ☐

   (2) If you did <u>not</u> raise this issue in your direct appeal, explain why: __N/A__

(d) Post-Conviction Proceedings:

   (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?        Yes ☐  No ⮽

   (2) If your answer to Question (d)(1) is "Yes," state:

   Type of motion or petition: __N/A__

   Name and location of the court where the motion or petition was filed: __N/A__

-12-

Docket or case number (if you know): ___N/A_____

Date of the court's decision: _____N/A_____

Result (attach a copy of the court's opinion or order, if available): _____N/A_____


(3) Did you receive a hearing on your motion or petition?

    Yes ❏   No ❏   N/A

(4) Did you appeal from the denial of your motion or petition?

    Yes ❏   No ❏   N/A

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❏   No ❏   N/A

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ___N/A_____

Docket or case number (if you know): ___N/A_____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____N/A_____


(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____N/A_____


(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative

remedies, etc.) that you have used to exhaust your state remedies on Ground One: ___N/A_____


           DUE PROCESS "FUNDAMENTAL FAIRNESS" PRECEPTS REQUIRE THAT
THE PETITIONER RECEIVE APPELLATE CONSIDERATION AS PLAIN ERROR OF THE
GROUND TWO:

DNA EVIDENCE WHICH IDENTIFIED HIM AS THE SOLE PERPETRATOR "ON THE

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

FACE OF THIS PLANET" OF THESE SERIOUS CRIMES.

SEE ATTACHED PAGES 33-34

-13-

_____
_____
_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____N/A_____

_____
_____
_____

(c)  **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes **XX**  No ❏  ISSUE RAISED IN A PETITION FOR RE-HEARING.

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: ~~COUNSEL NEGATED TO~~
~~RAISED THIS ISSUE IN THE INITIAL BRIEF BUT LATER RAISED THIS~~
ISSUE IN A PETITION FOR RE-HEARING AND IN THE PLA PETITION.

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ❏  No **XX**

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____N/A_____

Name and location of the court where the motion or petition was filed: _____N/A_____

_____N/A_____

Docket or case number (if you know): _____N/A_____

Date of the court's decision: _____N/A_____

Result (attach a copy of the court's opinion or order, if available): _____N/A_____

_____
_____

(3) Did you receive a hearing on your motion or petition?

Yes ❏  No ❏      N/A

(4) Did you appeal from the denial of your motion or petition?

Yes ❏  No ❏      N/A

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ❏  No ❏      N/A

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____N/A_____

_____

Docket or case number (if you know): _____ N/A _____

Date of the court's decision: _____ N/A _____

Result (attach a copy of the court's opinion or order, if available): _____ N/A _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____ N/A _____

_____

_____

_____

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____ N/A _____

_____

_____

_____

GROUND THREE: ___MERE FACT IMPEACHMENT CREATED REVERSIBLE ERROR_____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____SEE ATTACHED PAGES 35-37_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____ISSUE FULLY EXHAUSTED_____

_____

_____

(c) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____ N/A _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?　　　Yes ❑　No X❌

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____N/A_____

Name and location of the court where the motion or petition was filed: _____N/A_____

_____

Docket or case number (if you know): _____N/A_____

Date of the court's decision: _____N/A_____

Result (attach a copy of the court's opinion or order, if available): _____N/A_____

_____

_____

(3) Did you receive a hearing on your motion or petition?

　　Yes ❑　No ❑　N/A

(4) Did you appeal from the denial of your motion or petition?

　　Yes ❑　No ❑　N/A

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

　　Yes ❑　No ❑　N/A

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____N/A_____

_____

Docket or case number (if you know): _____N/A_____

Date of the court's decision: _____N/A_____

Result (attach a copy of the court's opinion or order, if available): _____N/A_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____N/A_____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____N/A_____

_____

_____

-16-

TRIAL COURT ERRED IN SUMMARILY DISMISSING   Page 11
THE PETITIONER'S POST-CONVICTION PETITION, WHICH PRESENTED TWO ISSUES
GROUND FOUR: <u>THAT AMOUNTED TO THE GIST OF A CLAIM OF A VIOLATION OF
HIS CONSTITUTIONAL RIGHTS.</u>

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

<u>SEE ATTACHED PAGES 37</u>

(b) If you did not exhaust your state remedies on Ground Four, explain why: <u>EXHAUSTED THIS
ISSUE COMPLETELY</u>

(c) Direct Appeal of Ground Four:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☒

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: <u>ISSUE RAISED ON APPEAL
FROM THE DENIAL OF THE POST CONVICTION PETITION</u>

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a
state trial court?   Yes ☒ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: <u>POST-CONVICTION PETITION</u>

Name and location of the court where the motion or petition was filed: <u>CIRCUIT COURT OF THE
SIXTH JUDICIAL CIRCUIT, CHAMPAIGN COUNTY 101 EAST MAIN ST.</u>

Docket or case number (if you know): <u>98 CF 1558</u>

Date of the court's decision: <u>MAY 31, 2002</u>

Result (attach a copy of the court's opinion or order, if available): <u>PETITION WAS SUMMARILY
DISMISSED AS BEING FRIVOLOUS AND PATENTLY WITHOUT MERIT.</u>

(3) Did you receive a hearing on your motion or petition?

Yes ☐   No ☒

(4) Did you appeal from the denial of your motion or petition?

Yes ☒   No ☐

-17-

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes☒ No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: <u>APPELLATE COURT FOURTH</u> <u>JUDICIAL DISTRICT</u>

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): <u>APPELLATE COURT DENIED</u> <u>RELIEF AND PETITION FOR LEAVE TO APPEAL WAS FILED</u>

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: <u>N/A</u>

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

<u>N/A</u>

_____

_____

13. Please answer these additional questions about the petition you are filing:

  (a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    Yes ☐ No☒

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: <u>BECAUSE THE PETITIONER PRESENTLY HAS A</u> <u>DIRECT APPEAL PENDING REGARDING HIS LAST POST CONVICTION PETITION</u>

<u>AND HE ACTUALLY DON'T KNOW IF THE TIME WILL TOLLED CONSIDERING</u> <u>THAT THE CIRCUIT COURT SUMMARILY DISMISSED THE POST CONVICTION</u>

  (b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _____

_____

_____

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?    Yes ☐ No☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. __N/A__

15. Do you have any petition or appeal <u>now pending</u> (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    Yes ☒  No ☐
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. __APPELLATE COURT FOURTH JUDICIAL DISTRICT GROUNDS 4, 5, and 6__

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing: __I DIDN'T HAVE ONE / I WAS INDICTED__

(b) At arraignment and plea: __DIANA LENIK   URBANA 702 WEST GREEN, URBANA IL 61801__

(c) At trial: __DIANA LENIK__

(d) At sentencing: __DIANA LENIK__

(e) On appeal: __1ST DIRECT  APPEAL JUDITH LIBBY 2ND DIRECT APPEAL KAREN MUNOZ BOTH FROM THE 4TH APPELLATE OFFICE__

(f) In any post-conviction proceeding: __LAWRENCE O'NEIL, 5TH APPELLATE OFFICE__

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?         Yes ☐  No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: _____N/A_____

_____

(b) Give the date the other sentence was imposed: __N/A_____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?      Yes ❑   No ☒☒    N/A

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.* _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

-----------------------------

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —

(continued...)

I.

**WHETHER "REVISED" DNA FREQUENCY CALCULATIONS WERE UNSUBSTANTIATED AND IMPROPERLY COMPELLED THE CONCLUSION THAT PETITIONER WAS THE SOLE POSSIBLE INTRUDER AT LORI HANSEN'S DUPLEX.**

Identification of Lori Hansen's assailant was the primary trial issue in this case. Visual, aural, fingerprint, hair and fiber evidence was inconclusive, save for the DNA testing from one clothing item, a piece of the ocmplaining witness' stocking which had allegedly been used as the assailant's face mask. The initial frequency calculation for this sample indicated that approximately 30 other African-American persons in the Champaign-Urbana area could possess a matiching DNA profile, while a "revised" test made such a match impossible with virtually anyone else on the planet. The State's opportune revision of its frequency calculation methodology was not justiifed and necessitates a retrial.

**A Primer on DNA Testing**

Kevin Zeeb was the State's DNA expert. (Vol. XI, R. 592-00) After's discussing DNA generally, he described the protocol employed by the Illinois State Police for DNA testing, which included, inter alia:

*   regular testing and certification of forensic scientists in the field
*   "clean technique". wearing latex gloves (i.e., never touching a sample with bare hands)
*   being masked if sneezing or coughing
*   bleaching countertops, utensils and "instrumentation"
*   using pipette tips that have cotton plugs in the middle
*   using "decappit" [sic] tools to open and close the tubes

-21-

\*    analyzing questioned samples with the least amount of material
       before analyzing the samples from the standards (or reference
       samples) (Vol. XI, R. 603-05)

Zeeb himself did all the analysis in the Petitioner's case, and his
"technical leader," William Frank, reviewed Zeeb's file.    Eight other
analysts performed peer review.    (Vol. XI. R. 606)

     Zeeb conducted "PCR" (polymerase chain reastion) DNA analysis, "a
chemical method of copying or reproducing or replicating or amplifying
specific areas of the DNA molecule that we're interested in, copying
that segment over and over and over until we have millions and millions
of copies to work with."    (Vol. XI, R. 607)    PCR analysis has been
accepted and validated in the sc ientific community.    (Vol. XI, R.
607-09)    Zeeb delineated the preliminary techniques for PCR method of
DNA typing as:

          First of all, DNA has to be extracted from a sample.  So
          I take a small portion of a stain, put it in some stsin
          extraction buffer or detergent, add some other chemicals
          to it, put it in a[n]... incubator that's rather warm,
          and let it sit overnight.

          The next day, I would come in and do an organic cleanup
          of it, in other words, to remove all impurities, and then
          I would isolate the DNA molecule and recover it in a buffer.

     Once I've done that, I have to determine how much DNA is there
          and what quality is it.

          So, the next thing I would do is what... we call a yield
          gel],[ which allows me to get a rough estimate of the
          quantity of DNA, and it also tells me the quality of the
          DNA, if it's molecular weight grade or if it's degraded
          DNA.

          Then I would go ahead and do another quantitative test
          that's very more specific where I would identify anywhere
          between 10 nanograms of DNA down to .15 nanograms of DNA

-22-

>       and if I see any kind of reaction, that then I know that
>       human DNA is present.

>       (Vol. XI, R. 609-10)

Zeeb continued with his description of the "PCR technique:

*       One nanogram (one billionth gram) to two and a half nanograms is

        combined with in a reaction reaction mixture that ocmes with the

        kits

*       this sample is put into a themal cycler (computerized instrument

        that heats and colls the tubes on a programmed schedule) for 28

        cycles during each one of which nine specific areas of the DNA

        molecule are replicated twice

        (Vol. XI. R. 610)

The expert elaborated that:

>       99 percent of out [human] DNA is coating DNA, in other
>       words, it has a function of producing some kind of a
>       chemical enzyme protein or whatever.   But one percent
>       of our DNA molecule is filler DNA.   Sometimes it's
>       referred to as junk DNA.   And this is the DNA that
>       forensic scientists look at because it differs from one
>       person to another.

        (Vol. XI. R. 611-12)

Zeeb added that forensic scientists also examine two kind of

polymorphism, sequence polymorphism and length polymorphism.   (Vol.

XI, R. 612)    After identifying the four "building blocks" in DNA

(adenine, guanine, cytosine and thymine), Zeeb defined "sequence poly-

morphism" in terms of the various sequences the four building blocks

assume on each strand of DNA.   (Vol. XI, R. 612-13)    He described

"length polymorphism" in terms of the number of repeat regions of the

above sequences:  "We look at variations of different lengths of the

DNA molecule at different areas, specific areas of the DNA molecule

-23-

to get our characteristics in our DNA profile." (Vol. XI, R. 613)
The prosecutor summarized that "the length of those repeat sequences
then vary from individual to individual." (Ibid.)    Zeeb clarified that
he conducted "STR" analysis," referring to "short tandem [side by side]
repeats."    (Vol. XI. R. 614)

**Zeeb's test in this Case**

The forensic scientist tested samples from various items of
evidence: a cigarette butt, pair of shorts, blood from a piece of glass,
and a swatch of black stocking. (Vol. XI, R. 614-16)    Zeeb did not
detect the presence of human DNA on the cigarette butt. (Vol. XI, R.
617-18)    Although he found human DNA on the shorts, Zeeb could not
conduct a PCR analysis because the amount was too small. (Vol. XI, R.
618

Human DNA was also found in the blood sample from the piece of
glass and stocking, and there was enough DNA in each for Zeeb to perform
a PCR analysis.    He compared these DNA samples to known standards of
victim Lori Hansen (People's Exhibit No. 61A), Petitioner's (People's
Exhibit No. 64A) and Petitioner's brother Donrico Holtzclaw (People's
Exhibit No. 66A). (Vol. XI, R. 620-23)    The PCR testing protocol on
these known samples concentrated on nine different chromosomes in the
DNA strands. (Vol. XI, R. 627)

Using the PCR analysis, Zeeb identified DNA profiles on the blood
from the glass and from the piece of stocking.    From the blood on
the glass Zeeb "identified a DNA profiled that matche[d] the DNA profile
of Lori Hansen."    (Vol. XI, R. 628)    In regard to the piece of stock-

-24-

ing, the forensic scientist said:

> ...I identified a mixture of DNA profiles.   One DNA
> profile matche[d] the DNA profiled of Dedric Moore.
> Another DNA profile matche[d] the DNA of Liri Hansen.
> An additional DNA profile was identified that [did] not
> matched Lori Hansen, or the petitioner, or Donrico
> Holtzclaw.

(Vol. XI, R. 629) (Emphasis added.)

(Zeeb excluded Donrico Holtzclaw from being a contributor to the blood
on the glass or to the DNA on the piece of stocking.  (Ibid).))

Over objection, the forensic scientist offered that a woman whose
DNA profile was consistent with Lori Hansen's and who wore the stocking
could leave a DNA profile consistent with what Zeeb found.  (Vol., XI,
R. 630)   He added that if a person with a DNA profile consistent with
the Petitioner's pulled a cut piece of the stocking over his face, he
could leave a DNA profile consistent with what was also found on the
stocking.  (Vol. XI, R. 630-31)   Zeeb agreed with an explanation
offered by the prosecutor for the third DNA profile that did not match
Liri Hansen's, Petitioner's or Donrico Holtzclaw's.  (Vol. XI, R. 631)

**Exploitation of the Above Findings**

Once Zeeb identified the DNA profiles on the stocking, he compared
them to what the prosecutor termed "established population databases,
in other words, to calculate the statistical frequency of encountering
these profiles in the general population."   (Vol. XI, R. 631)   These
frequencywe calculated separately for different racial groups, Zeeb
said:

> Because each racial group, the Characteristics are found
> in different frequencies.   The frequencies found in
> Caucasians are different than Blacks, which are different
> than in the Mexican race [sic], or the Native Indian race
> or Oriental race.   (Vol. XI, R. 632)

-25-

Zeeb prepared two frequency calculations because he did not know which race, African-American or white, the samples had originated.    He also prepared two frequency calculations for the "mixed" or "combined" profiles from the stocking.   (Ibid.)    The combined profiles, Zeeb concluded, "which is a very conservative estimate, could be found in approximately 1 in 27 hundred Blacks or approximately 1 in 5 thousand Caucasians."    (Vol. XI, R. 633) (Emphasis added.)

Zeeb also determined that one profile could be identified as the major contributor, "the one that stood out at the majority of the locations on the DNA," a "major profile on this case at the majority of the locations": Petitioner's. (Ibid.)    (Emphasis added)    The forensic scientist added that he identified Lori Hansen as a "medium contributor" at the majority of the loacations of the DNA.   (Ibid.)    (A "leftover minor contributor" at the weakest DNA profile was never identified. (Vol. XI, R. 633-34)    No precise percentages distinguised between or among a "major, medium or minor contributor."    (Vol. XI, R. 654-55)

Zeeb then created frequenc calculations for the separate DNA profiles he found in terms of the general population.    For the DNA profile on the stocking that matched Lori Hansen's, Zeeb calculated the frequency of finding that DNA profile in the general white population as approximatel 1 in 1.6 trillion Caucasians, or approximately 1 in 660 billion African-Americans.    (Vol XI, R. 634)    For the "DNA profile on the stocking that was a major profile that matched the Petitioner's," Zeeb's frequency calculation was approximately 1 in 720 billion Cau-casions, or approximatle 1 in 150 billion African-Americans, or "About

-26-

25 times the number of people in the population of the earth." (Vol. XI, R. 634-35) (Emphasis added.)

Cross-examination of forensic scientist Zeeb disclosed that he had prepared two different "statistical calculations" in describing the above frequencies, and at two discrete times. He explained:

> When I originally worked the case and written up a report our procedures [sic] was that if I cannot differentiate between the different contributors at all nine loci [specific areas or addresses on the DNA molecule], then I would give a combination of all possible frequencies, and that's exactly what I did on the first set of statistics, and that's why the statistics are very small.
>
> On the second set of statistics that I gave, after the report had gone out, our procedures changed to where we could add more weight to our interpretations, meaning that if we can identify at least at five or more loci, then we can go ahead and separate out the contributors and give them individual statistics.
>
> (Vol. XI, R. 640-41, 651) (Emphasis added.)

(While zeeb could state that a tested DNA sample "matched" a particular person and could give a statistical weight to the match, he could not say that any particular sample actually "came" from any designated person. (Vol. XI, R. 643)) The first report on the stocking - dated September 10, 1998 - considered the combined DNA profiles of Lori Hansen, Petitioner's and one other, and produced a "combined profile index" of one in 2,700 African-Americans. (Vol. XI, R. 641) (In other words, in a city of approximately 100,000 persons, about 30 African-Americans would have a DNA profile that matched the DNA profile on the stocking. (Vol. XI, R. 641-42, 649))

The second report - dated February 25, 1999 - was generated after a call from an Assistant State's Attorney. (Vol. XI, R. 643-44)

-27-

Zeeb explained:

> It was my decision to call my superiors and inform them
> that a case that was worked with conservative statistics
> originally was going to court[,] and that since that time
> we gave more weight to the statistics or interpretations,
> and I inquired as to whether or not I should go ahead and
> submit a report stating those facts, and it was advised
> that I should.

(Vol. XI, R. 645)

The forensic scientist clarified that the "only thing different" for
the second report was the statistical calculation, since by then he
could identify who was the major, medium and minor contributor to the
DNA sample in seven of the nine designated loci. (Vol. XI, R. 645-46)

The change in the office policy that permitted the new calculation
concerned the number of loci that had to be identified to differentiate
between and among the DNA contributors.  The older policy had required
all nine loci; the newer policy allowed for "five or more" loci.  An
amended report was submitted on March 5, 1999. (Vol. XI. R. 646)

The frequency calculation for African-Americans contributors of
the DNA on the stocking that matched the DNA profile of the Petitioner's
thus blossomed from one in 2,700 to one in 150 billion - "about 25
times the number of people in the population of the earth." (Vol. XI,
R. 5 635, 647)   With this second set of numbers, only an identical
twin could possess matching DNA.    (Vol. XI, R. 647-48)    However, Zeeb
offered, "Just because the numbers are very, very high doesn't mean
that there's not someone out there that has that profile, but it just
indicates to us that the chances of finding that person is [sic] very,
very slim." (Vol. XI, R. 648)

The Revised Tests Results Should Not Have Been Considered

-28-

"The decision of whether to admit expert testimony about a new scienti-
fic technique is committed to the sould discretion of the trial court.

The error in the Petitioner's case is that forensic scientist
Zeeb testified that the chances of someone else's DNA matching that
profile from Lori Hansen's stocking mushroomed from one in 2,700 African
Americans to one in 150 billion African-Americans, or "about 25 times
the number of people in the population of the earth."

Zeeb explained that Illinois State Police forensic scientists had
historically examined nine different chromosomes: "The more different
genetic marker systems that I look at, the more diffentiating I can be
to where I can add more and more weight to who the possible contributor
of that stain is."    (Vol. XI, R. 627)    The following colloquy ensured
concerning the timing and changing of the procedures to reduce that
number to "five or more" loci:

> Q.  [DEFENSE COUNSEL] ... Let me ask you this, in between
> September 10th of 1998, and February 25th of 1999, when
> you recalculated and got those completely different per-
> centages, did you receive any phone calls from any law
> enforcement agencies or the Champaign County State's
> Attorney Office?
>
> A.  [Zeeb]: Yes, I did.
>
> Q.  Who did you receive phone calls from?
>
> A.  I talked to Assistant State's Attorney Heidi Ladd.
>
> Q.  And do you recall when you talked to her?
>
> A.  What time frame are we talking about?
>
> Q.  In between September 10th, 1998, and February 25th, 1999.
>
> A.  I talked to Mrs. Ladd on October 8th of 98, to inform
> her [of] the status of analyzing Donrico Holtzclaw's blood
> standard.

-29-

I called - I talked to Mrs. Ladd on March 4th during a
pretrial conference that was held at the Morton lab, where
I explained my findings.

And I've been calling the State's Attorney Office the last
couple of days to find out court status, court times and
dates.

Q.    And in either of those, in any of those conversations,
did you explain the percentages that you got in your frist
calculation before those second calculations ere made?

A.    Yes.

Q.    Whose decision was it to create second calculations
with these numbers?

A.    It was my decision to call my superiors and inform them
that a case that was worked with conservative statistics
originally was going to court[,] and that since that time we
gave more weight to the statistics or interpretations, and I
inquired as to whether or not I should go ahead and submit a
report stating those facts, and it was advised that I should

(Vol. XI, R. 643-45)

Zeeb performed no new evaluations or interpretations, he clarified:

"The only thing different are the statistical calculations." (Vol. XI

R. 645)    He continued:

A.    Well, like I said before, before I added all possible
types, combined profiles.    And the seocnd go-around, I - I
determined that I can identify who was the major contributor
who was the medium contributor, and who was the minor con-
tributor. tributor.

Q.    And you couldn't do that the first to-around?

A.    I could do it the first go-around, but our policy was
if I cannot differentiate between the contributors at all
nine loci, then I had to give a combined statistics [sic].

And in this particular case, I could differentiate between
the major and the medium contributors in seven of the nine
loci and not all nine.

Q.    And so then you recalculated it because your office
policy changed regarding major, minor and medium contributors
is that correct?

-30-

A.    Our office policy changed regarding when I can differentiate between contributors looking at five or more loci versus looking at all nine loci.

Q.    And so on March 5th, 1999, you submitted what you called an amended report looking at that same material; correct?

A.    That's correct.

Q.    And you - And at that time, then, is it fair to say in these percentages or these numbers you gave greater weight to the fact that somebody was a major versus a moderate or a minor contribuotor?

A.    These interpretations were done originally, but, yes, we did give more weight to this in the second report, and that's one of the things that our group decided was that with all this new technology, we can give more weight to our findings[,] and we don't have to be as conservative as we were when we started out.

Q.    What do you mean by not having to be as conservative?

A.    In other words, we're seeing that we've got a lot of genetic information here that we could separate out con-tributors and add more weight to the statistics.    Where, if you combine all the possible statistics or frequencies, then that would kind of dilute down the stats.

(Vol. XI, R. 645-47) (Emphasis added.)

The forensic scientist repeated his explanation:

... Our policy was to be very conservative in the beginning. And through the evolution of technology and the evolution of seeing how - how informative this technique is and the instruments that we have, we later on agreed to add more weight to profiles like this if we can differentiate at five or more loci instead of all nine loci.

(Vol. XI, R. 651)

This agreement was reached "[b]lased on validation studies and peer review, discussion amojng ten analysts," one of whom was Zeeb himself.

However, "[s]ome analysts said we couldn't go any more, you know if you cannot differentiate between three or more loci.    Another one

-31-

said, no, all nine. And then checking through the forensic community
it was established that, yes, at five or more loci we can differentiate
between the different contributors." (Vol. XI, R. 562) The prosecu-
tor rephrased the testimony as: "... this wasn't just people sitting in
a room and dedciding that they wanted to calculate statistics differently,
this was based on validation studies and meetings in the forensic
community[.]" (Vol. XI, R. 653) Zeeb agreed. (Ibid.)

Although forensic scientist Zeeb suggested that the decision to
reduce the nuber of matched loci from nine to five was made in an objec-
tive, verifiable setting, his conclusion was only his opinion. Zeeb
had a vested interest in offering that conclusion since he apparently
was one of the scientists who had urged that the number of relevant loci
matches be reduced. There was no independent evidence that anything
resumbling a Frye test was applied when the trial court admitted this
self-serving testimony from Zeeb.

The prejudice to the Petitioner from the admission of this testi-
mony is patent. Before the change in procedure, thirty other African
Americans from the immediate area could statistically have had DNA
profiles that matched the intruder's; after the new procedure, no
other African-American on Earth could statistically have had a match-
ing DNA profile. From the reasonable doubt interent in the first
calculation, "scientific certainty" was conveniently constructed from
the second.

Identification was a problem in the State's case. Lori Hansen
could not identify the intruder-assailant in a line-up, after viewinq
and even after listening to the line-up participants. Photographs

-32-

from the ATM videotape were inconclusive.    Fingerprints were not

helpful; hair fragments were not determinative.    The only evidence

that directly linked the Petitioner to the crime scene was the DNA

profile on the complaining witness' stocking that, according to the

revised frequency calculation, no other African-American on Earth

except the Petitioner could have contributed.    The State should not

have been able to offer this revised methodology unless and until

its reliability and general acceptance in the scientific  community

had been established other than by the testimony of its sole DNA

witness.

II.

**Due Process "Fundamental Fairness" Precepts Require That The
Petitioner Receive Appellate Consideration As Plain Error Of
the DNA Evidence Which Identified Him as the Sole Perpetrator
"On the Face of this Planet" of These Serious Crimes.**

The Appellate Court based its afirmance of the Petitioner's con-

viction on the State's case having conclusively proved beyond a reason-

able doubt that he was the assailant.    The Fourth District overlooked

that the Petitioner's sole substantive argument on appeal which

attacked his conviction, namely, his identification as the assailant

through faulty DNA methodology.    Petitioner neither argued at trial

nor on appeal that the victim was not assailed; he argued on appeal

solely that the flawed DNA testing schema had failed to establish him

as the perpetrator.    The reviewing court never addressed the DNA

issue, instead finding it had been procedurally forfeited.    The

Fourth District, sub silentio, declined to apply the doctrine of plain

error to this issue.

-33-

The Appellate court failed to appreciate the significance of the DNA evidence by not considering the issue in this case at plain error. While a reviewing court has the discretion to ignore the Petitioner's issue because it was not properly preserved in the lower court, the reviewing court also has equal discretion to consider the issue since a substantial right of the accused has been implicated.

It is hard to imagine a right more substantial to a criminal defendant than whether he has accurately been identified as the culprit.

Counsel on appeal did not request the Appellate Court to consider the DNA issue as plain error.    And thereafter the Petitioner asked of the Illinois Supreme Court to consider as ineffective assistance of Appellate Counsel for failure to present this "plain error" argument squarely to the Fourth District.    In any event, the Petitioner's sole substantive appellate issue should not have been ignored because of appellate counsel's negligence.

III

**USE OF "MERE FACT" IMPEACHMENT CREATED REVERSIBLE ERROR.**

Defense counsel filed a Motion in Limine to prohibit the use of the Petitioner's prior felong convictions (for forgery in 1995 and for attempt (burglary) in 1998) for impeachment should he testify. (Vol. III, C. 641-41; Vol. Vii, R. 2-3)   The prosecutor argued that the "mere fact" method of impeachment should be used. (Vol. VII, R. R.4) The court apparently accepted the State's rationale and reasoned:

> Well, the Court must always weigh the probative value of a prior, using a prior conviction for impeachment versus the prejudicial impact.
>
> In the case before the Court, as Ms. [defense counsel] Lenik has said, some of the charges are similar to or very close to the prior convictions that this Defendant has.
>
> I think would be inappropriate to inform the jury that he has a prior forgery and a prior attempt burglary conviction.
>
> But if the jury is to adequately weigh the credibility of the witnesses, and that would include the Defendant I think they need to know that at some point in time the Defendant chose to violate the laws of society.
>
> So, what I will do is if the Defendant testifies and if the files are brought to the Court's attention, I will let the jurors know that he had prior felongy convictions and leave it at that.
>
> (Vol. VII, R. 4-5 (Emphasis added.)

Thus, the court denied the Motion in Limine and employed the "mere fact" method of advising the jury about the Petitioner's criminal history after he testified: "... the Court has taken judicial notice of some files from . . . Champaign County concerning this Defendant, and I will inform you that the Defendant has prior felony convictions.   You will

-35-

get an instruction as to what to do with that information." (Vol. XII,
R. 778)    Counsel preserved the issue of the outright denial of the
Motion in Limine in Petitioner's Post-trial Motion.  (Vol. III, C.
749 ¶ 9).    In light of case law, the trial court committed reversible
error when it considered admitting the "mere fact" of the Petitioner's
prior convictions for impeachment purposes and thereby improperly altered
the Montgomery balancing test.

A trial court's decision to allow impeachment by a prior conviction
should not be reversed absent an abuse of discretion.    Under Montgomery
a prior conviction is admissible to impeach a testifying defendant if
(1) the conviction was for a crime punishable by death or imprisonment
for more than one year; or (2) the conviction was for a crime involving
dishonesty or false statement.    In either case, the prior conviction
is not admissible if (1) it is more than 10 years old, or (2) the pro-
bative value of the conviction is substantially outweighed by the danger
of unfair prejudice.

Under the mere fact method of impeachment, the jury hears only
about the existence of a prior conviction and not the specific crime of
a prior conviction and not the specific crime of which the defendant
was convicted.    The mere fact method does not supplant the Montgomery
analysis; however, in determining whether the probative value of the
evidence sought to be admitted is substantially outweighed by the
danger of unfair prejudice, the court considers mere fact impeachment
as an evidentiary alternative.

In the instant case, if the trial court had conducted the Mont-
gomery balancing test exclusively in the proper manner required - that

-36-

is, if it had not considered mere fact impeachment as an alternative –
then the evidence of the Petitioner's prior convictions would not have
been admitted because their probative value was outweighed by the risk
of unfair prejudice.    The trial court here specifically found that
the type of forgery and attempt (burglary) of the Petitioner's past
convictions was prejudicially close to the type of ATM theft alleged
in the instant case.    Thereofore the conviction should be reversed.

IV.

**The Trial Court Erred In Summarily Dismissing the Petitioner's
Post-Conviction Petition, Which Presented Two Issues That
Amounted To The HGist of a Claim of a Violation of His Con-
stitutional Rights, E.E. that Trial Counsel's Assistance
During the Plea Negotiation Process Was Constitutionally In-
effective, and Appellate Counsel Provided Ineffective Repre-
sentation by Failing to Advocate For The Invocation of the Plain
Error Doctrine, Thus Resulting In the Procedural Forfeiture
of Defendant's Primary Substantive Argument Raised On Direct
Appeal.**

Petitioner file his Post-Conviction Petition while his direct
appeal was pending, raising (2) issues of review: (1) That trial
counsel was ineffective for failing to properly inform his of the
proper sentence good time credit that he would receive if he plead
guilty to the charges, and (2) Ineffective assistance of appellate
counsel for failing to advocate for the invoacation of the plain
error doctrine, thus resulting in the procedural forfeiture of
the Petitioner's primary substantive argument raised on direct appeal.

-37-

V

The Trial Court erred, upon resentencing, in imposing Petitioner's Residential Burglary Senence Consecutive To His Sentences For Home Invasion and Aggravated Arson, Where His Residential Burglary Sentenc had Been Ordered to Run Concurrent With Those Two Sentences at the Original Sentencing Hearing.   While the Total Number of Years Petitioner is to serve, (75) years, is the Same Total as Originally Ordered, The Change In Ordering The Residential Burglary Consecutive Rather Than Concurrent Was An Improper Increase In Sentence.

Petitioner was convicted of residential Burglary, Attempt (First Degree Murder), Home Invasion, Aggravated Arson and Aggravated Criminal Sexual Abuse.   When Petitioner was first sentenced, the court imposed the following terms of imprisonment:

> 15 years' imprisonment for residential burglary, consecutive to 60 years' imprisonment for attempt (first degree murder), concurrent with 60 years' imprisonment for home invasion, concurrent with 30 years' imprisonment for aggravated arson, concurrent with 7 years' imprisonment for aggravated criminal sexual abuse.

Hense, Petitioner was to serve a tatoal of 75 years' imprisonment. (Vol. IV, C. 760)

On appeal, Petitioner's extended term sentences were vacated after the appellate court found an Apprendi violation, and the cause was remanded for resentencing.   At the resentencing hearing Petitioner was sentenced as follows:

> 15 years' imprisonment for residential burglary, consecutive to 30 years' imprisonment for home invasion, consecutive to 30 years' imprisonment for aggravated arson, concurrent with 30 years' imprisonment for attempt (first degree murder),

-38-

concurrent with 7 years' imprisonment for aggravated
criminal sexual abuse.

(Vol. IV, C. 840)

At first glance, there does not appear to be a problem with the
senences because the extended terms sentences were vacated and the new
sentences once again add up to a total of 75 years' imprisonment.
However, the trial court, by ordering formerly concurrent terms to
run consecutively, has actually increased those sentences.

The issue being presently raised in the instant case is whether
there was an improper increase of sentence when the trial court
resentenced the Petitioner and former concurrent extended term sentences
were modified to non-extemded consecutive sentences.

In this case, the trial court made a finding, at the original
senencing and at resentencing, of consecutive sentences being necessary
to protect the public.   However, the court at the first hearing
grouped the attempt, home invasion, aggravated arson and aggravated
criminanl sexual abuse convictions and ruled that concurrent sentences
were appropriate.   Only the residential burglary was ordered consecu-
tive to the others.   At resentencing, the trial court grouped agara-
vated arson, attempt and aggravated criminal sexual abuse and ordered
concurrent terms for those convictions but then ordered residential
burglary consecutive to home invasion and home invasion consecutive to
the attempt, which was grouped with the other concurrent terms.

The change from concurrent terms to consecutive terms was an improper
modification of the Petitioner's sentences, and the consecutive terms
should be vacated.

-39-

Page 15

Therefore, petitioner asks that the Court grant the following relief: THAT HIS CONVICTION BE REVERSED AND GRANTED A NEW TRIAL, OR THAT HIS SENTENCES BE REDUCED, OR THAT HIS CONSECUTIVE SENTENCED BE REDUCED TO CONCURRENT.

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on

17 January 2007 _____ (month, date, year).

Executed (signed) on _____ (date). 17 January 2007

_____

Signature of Petitioner

*(...continued)

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

**UNITED STATES DISTRICT COURT**
**CENTRIAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| DEDRIC MOORE, #K-53438 | ) |
| | ) |
| DEFENDANT-PETITIONER | ) |
| | ) |
| | ) |
| -VS- | ) |
| | ) |
| DONALD A. HULICK (WARDEN) | ) |
| | ) |
| PLAINTIFF-RESPONDENT, | ) |

### NOTICE OF FILING

TO:   U. S. DISTRICT COURT OF ILLINOIS
      URBANA DIVISION
      ROOM 218, U.S. COURTHOUSE
      201 SOUTH VINE STREET
      URBANA, ILLINOIS 61801

**PLEASE TAKE NOTICE** that on this /7 th/ day of 2007, that I mailed for filing (1) Original and (2) copies of the attached **PETITION FOR WRIT OF HABEAS CORPUS** and **MOTION IN FORMA PAUPERIS** and **MOTION FOR APPOINTMENT OF COUNSEL** with the clerk of the District Court Centrial District of Illinois.

/s/ _Dedric Moore_
DEDRIC MOORE, PRO. S.E

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF RANDOLPH   )

### CERTIFICATE OF SERVICE

I, **DEDRIC MOORE**, being fuly sworn aver that I have served copies of the foregoing to the able Clerk of the Court by placing the same and said in the proper Prison Official hands to affix the proper First Class Postage, and placement in the U.S. Mail Service to be mailed to the Court..    Under the penalty of perjury the foregoing is true and correct to the best of my knowledge and understanding, on this /7 day of _January_, 2007.  28 U.S.C. Section 1746.

/s/ _Dedri Moore_
**DEDRIC MOORE, K-53438**
**711 KASKASKIA STREET.**
**MENARD, ILLINOIS 62259-0711**

ex # A

E-FILED

Monday, 29 January, 2007 01:29:50 PM

Clerk, U.S. District Court, ILCD

IN THE

CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

**FILED**

SIXTH JUDICIAL CIRCUIT

AUG 30 2006

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) |
| | ) |
| PLAINTIFF-RESPONDENT, | ) |
| | ) |
| | ) |
| -VS- | ) |
| | ) |
| | ) |
| DEDRIC MOORE, pro. se. | ) |
| | ) |
| PETITIONER-DEFENDANT. | ) |

CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

CASE NO. 98 CF 1558

HONORABLE THOMAS J. DIFAMS
CIRCUIT JUDGE.

## NOTICE OF FILING

TO:   JULIA RIETZ, STATES ATTORNEY
      CHAMPAIGN COUNTY COURT HOUSE
      101 EAST MAIN STREET
      URBANA, ILLINOIS 61801

PLEASE TAKE NOTICE, that on this $25$ day of August 2006, I have filed with the Clerk of the Court, LINDA FRANK, 101 East Main St, Urbana, Illinois 61801, (1) One Original and (2) Two Copies of the Petitioner's <u>Motion For Re-Consideration of Petitioner's Post-Conviction Petition, or In The Alternative Notice Of Appeal</u>, and you are hereby served herewith.

/s/ _Dedric Moore_

DEDRIC MOORE, pro. se.

STATE OF ILLINOIS   )
                    ) ss:
COUNTY OF CHAMPAIGN )

## CERTIFICATE OF SERVICE

The undersigning being first duly sworn upon oath, deposes and states that the above <u>Notice</u> and <u>Motion For Re-Consideration Of Petitioner's Petition For Post-Conviction Relief, or In The Alternative, Notice Of Appeal</u>, was served upon the above named party on this $25$ day of August, 2006, by depositing the same and said in the proper Prison Official Hands here at the Menard Corr. Ctr. 711 Kaskaskia St. Menard, Illinois 62259-0711, to affis the Proper First Class Postage and placement in the U.S. Mail Service to be delivered. and pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare all of the above is true in fact and in substance.

/s/ _Dedric Moore_

DEDRIC MOORE, REG. NO. K-53438
711 Kaskaskia St./Box-711
Menard, Illinois 62259-0711

## VERIFICATION OF CERTIFICATION

I, **DEDRIC MOORE K-53438**, the undersigned, certify and states the following in support thereof:

1. I AM THE DEFENDANT-PETITIONER IN THE ABOVE ENTITLED CAPTIONED MATTER:

2. I HAVE READ THE FOREGOING APPLICATION?MOTION AND HAVE DIRECT KNOWLEDGE OF ITS CONTENTS:

3. UNDER PENALTIES AS PROVIDED BY LAW PURSUANT TO SEC. 1-109 OF THE CODE OF CIVIL PROCEDURE, I CERTIFY THAT THE STATEMENTS SET FORTH IN THE FOREGOING DOCUMENTS ARE TRUE IN SUBSTANCE AND IN FACTS AND CORRECT EXCEPT AS TO MATTERS HEREIN STATED TO BE ON INFORMATION AND BELIEF, AND AS TO SUCH MATTERS I CERTIFY THAT I BELIEVE THE SAME TO BE TRUE.

FURTHER, I SAYETH NOT.

/S/ _Dedric Moore_
DEDRIC MOORE, K-53438

IN THE
CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| PLAINTIFF-RESPONDENT | ) | |
| | ) | |
| -VS- | ) | CASE NO. 1998-CF-1558 |
| | ) | |
| DEDRIC MOORE, pro. se. | ) | HONORABLE THOMAS J. DIFAMS |
| | | CIRCUIT JUDGE |
| PETITIONER-DEFENDANT | ) | |

## MOTION FOR RE-CONSIDERATION OF PETITIONER'S
## POST-CONVICTION PETITION, OR IN THE
## ALTERNATIVE NOTICE OF APPEAL

NOW COMES, DEDRIC MOORE, pro. se. Petitioner-Defendant, and respectfully moves this Honorable Court to grant his, this Motion For Re-Consideration of Petitioner's Petition For Post-Conviction Relief, or In The Alternative, Notice of Appeal, and state the following in support thereof:

1. On March 18, 1999, a jury convicted defendant of Attempt (First Degree murder), Home Invasion, Residential Burglary, Aggravated Criminal Sexual Abuse, and Aggravated Arson.

2. On May 21, 1999, the trial court sentenced the defendant to a total of (75) years' imprisonment: a (60) year extended prison term for attempt (First Degree Murder), concurrent to a (60) year extended prison term for Home Invasion, concurrent to (30) year prison term for Aggravated Arson, concurrent to a (7) year prison term for Aggravated Sexual Abuse, consecutive to a (15) year prison term for Residential

Burglary, for a total of (75) year prison term in total.

    3.    In May of 1999, defendant appealed the convictions and
sentence to the Illinois Appellate Court Fourth District, which affirmed
his conviction and sentence, No. 4-99-0499 (January 11, 2002) (unpub-
lished order under Supreme Court Rule 23).

    Thereafter, defendant filed a Petition For Leave To Appeal.    The
Supreme Court of Illinois denied the Petition but order the Appellate
Court to vacate the judgment and reconsider in light of **People vs.
Swift**, 202 Ill.2d 378, 392, 781 N.E.2d 292, 300 (2002), **People  vs.
Moore**, 202 Ill.2d 688 (2003) (nonprecedential supervisory order).

    4.    Upon reconsideration, the Appellate Court vacated defendant's
extended-term sentence and remanded retrial or resentencing at the
election of the State pursuant to section 5-5-3(d) of the Unified Code
of Correction (Unified Code)(730 ILCS 5/5-5-3(d) (West 2002)).    **People
vs. Moore**, No. 4-99-0499 (April 4, 2003) (unpublished order under
Supreme Court Rule 23).    The State sought resentencing: On July 1,2003,
the trial court resentenced Petitioner to a total of (75) years'
imprisonment: (30) years for Home Invasion, consecutive to (30) years
for Aggravated Arson, consecutive to (15) years for Residential Burglary,
concurrent to (30) years for Attempt (First Degree Murder), and con-
current to (7) years for Aggravated Criminal Sexual Abuse.

    5.    While the Petitioner's direct appeal was still pending, this
Petitioner filed a Petition for Post-Conviction Relief on April 22, 2002,
and it was finally assigned to a judge on May 6, 2002, raising (4)
issues for relief as the following:

-2-

1.   Ineffective Assistance of Appellate Counsel

2.   Peitioner would have accepted a plea negotiation if trial counsel was aware of the proper amount of good time that he would recive upon conviction.

3.   That he was compelled to participate in a line-up without the assistance and presence of counsel.

4.   That one of the jurors was untruthful during voir dire.

6.   That the pro. se. Post-Conviction Petition was summarily denied on May 31, 2002, and the Petitioner then timely filed a Notice of appeal, and the appellate court denied relief, then the Petitioner filed a Petition For Leave to Appeal to the Illinois Supreme Court which denied the Petition in March of 2004.

7.   That the actions taken by Petitioner outlined in both ¶. 5 and 6, were initiated and denied throughout the Judicial System prior to the Appellate Court reversing the Petitioner's conviction and sentence stated in ¶. 4 regarding his (Petitioner's) Apprendi claims.

8.   That the Petitioner filed the instant Petition For Post-Conviction Relief on July 21, 2006, raising only (3) Constitutional issues as a direct result of his most recent sentence imposed as a direct result of the resentencing on July 1, 2003, and a Motion to Re-Consider sentence which was denied on September 5, 2003, and then therafter the Notice of Appeal was filed on September 17, 2003.

9.   The Petitioner has not raised any issues prior to the July 1, 2003 resentencing.

-3-

10.   After resentencing, this Petitioner filed a direct appeal 4-03-0790 which the appellate court Fourth District denied on September 26, 2005 and Petitioner sought Leave to Appeal to the Illinois Supreme Court, which denied such relief.

11.   Certainly, after any resentencing the appeal process starts anew.   Likewise, the collateral attack remedies would as well, and this Petition for Post-Conviction would not in of itself be successive Petition, and this Honorable Court's decision is totally and categorically an unreasonable application of of state law, and further contrary to and an unreasonable determination of facts in light of the State Court Records.

12.   This court's ruling in the July 28, 2006 wherein this court state in the last paragraph on page One "The Appellate Court on September 6, 2005, affirmed the trial court's finding that consecutive sentences were required based on the record in this case and pursuant to 730 ILCS 5/5-8-4(b)"., is totally contrary to the appellate court's order/opinion which never stated such.

Respectfully, this Petitioner ask of this Honorable Court to cite to the existence of such conclusion made by the Appellate Court.

13.   Petitioner asserts that this Honorable Court erroneously dismissed said Petition For Post-Conviction Relief, and that the Petition should have been docketted for additional proceedings and that counsel appointed and even an opportunity to amend and the State instructed to answer or plead to the Constitutional violations asserted therein.

-4-

14.    This Honorable Court upon remand, made sentencing findings
not previously made to maintain a sentence previously given after
initially properly inposing concurrent sentences, but changed its mind
to impose discretionary consecutive sentences, which it had not pre-
viously chosen to imposed.   "A defendant should not have to risk that
a challenge to his consective sentencing will result in a resentencing
of increased length.   Such a risk would have an improper chilling
effect on a defendant's decision to challenge a consecutive sentence as
imposed by the trial court and could violate fundamental principles of
due process of law."   <u>Kilpatrick</u>, 167 Ill.2d at 447, 657 N.E.2d at 1008.

15.    This Honorable Court found that this Petitioner was eligible
for consecutive sentences based upon 730 ILCS 5/5-8-4(b) and stated
the following to support said sentence based upon this statute in the
following manner:

> "Mr. McAvay's suggestion that the aggravated arson
> resulted in severe bodily injury, severe bodily
> injury I guess is in the eye of the beholder.   If
> one is burned on various areas of the body, is that
> severe bodily injury?   Does it have to be first
> degree, second degree, third degree?   I guess thats
> up to the trier of fact.   I don't know that, and
> since this involves consecutive sentences, Apprendi
> I don't believe is involved." (Sentencing Record at 39)

16.    This trial judge made a factual finding that was based upon
the prosecutor's suggestion that the aggravated arson resulted in
severe bodily injury, which failed to be alleged in the indictment
itself, or proved beyond a reasonable doubt, or presented in such
manner before the fact finders/jury.

-5-

17.    Illinois Courts has noted that the legislature chose the phase "great bodily harm" when it enacted the aggravated battery statute, 720 ILCS 5/12-4(a) (West 200), while it used "severe bodily injury" in section 5-8-4(a).    When the legislature uses certain words in one instance and different words in another, different results were intended.    **People v. Russell**, 143 Ill.App.3d 296, 303, 97 Ill.Dec. 301, 492 N.E.2d 960 (1986).    Because "severe bodily injury" defines mandates consecutive sentencing, we conculde "severe bodily injury" requires a degree of harm to the victim that is something more than that required to create the aggravated battery offense."

18.    In addition, various court cases has determined a failure to prove severe bodily include:    **People v. Jones**, 323 Ill.App.3d 451, 256 Ill.Dec. 631, 752 N.E.2d 511 (2001); **People v. Rice**, 321 Ill.App.3d 475, 254 Ill.Dec. 623, 747 N.E.2d 1035 (2001); **People v. Murray**, 312 Ill.App.3d 685, 245 Ill.Dec. 430, 728 N.E.2d 512 (2000); **People v. Durham**, 312 Ill.App.3d 413, 245 Ill.Dec. 176, 727 N.E.2d 623 (2000).

19.    In the case at bar, the Petitioner asserts that the victim never had to be admitted into the hospital, emergency surgery, or a major medical procedural or immediate medicaal attention.

Infact, the victim was able to move about and even clim ontop of a garbage can and clim into a window without any difficulties, which clearly indicates that she hadn't been severly injured as define by the statute, and therefore a consecutive based upon such is totally erroneouse and the trial court abused his descretion.

-6-

20.    In addition, the trial court's belief that sentencing the
Petitioner to concurrent sentences prior to the resentencing, again
recited those exact fact findings in an effort to maintain the (75)
year sentence previously inposed by stating the following:

> "Even were it not for the fact that Miss Hanson was burned
> in several areas of her body as a result of the fire, the
> court was of the opinion that consecutive sentences were
> necessary based upon the conduct of the defendant, his
> prior record, to protect the public from further criminal
> conduct by the defendant, and the basis of that was just
> look what happened to this victim.    Look what was done
> to this human being.    Look at the brutal and heinous manner
> in which this crime was carried out.    So this record speaks
> volumes for the fact that consecutive sentences were
> necessary to protect the public from further criminal con-
> duct by this defendant.    (Sent. Hearing at - 39)

21.    It is definitely clear from the trial court's statement
that the court felt that the crime was brutal and heinous, a fact that
the jury was never presented with and therefore never found to be guilty
of, even though the actual facts of the case would not in and of itself
be classified as such.

Secondly, the Petitioner's criminal background has never involved
any violence or an indication of violence, not to mention the Peition-
er's jail records shows that he hasn't even had a minor prison disci-
plinary infraction.

Third, that this Petitioner was only nineteen years of age at the
time of this offense convicted of, with so much of his life to live,
and the sentence itself would actually amount to a life sentence when
taken into consideration the life expectancy of human being.

Fourth, that it is certainly not true that giving one defendant
a lengthy sentence would act as an deterrant for others not to commit
crimes.    In all actualities, this is far from the truth, and data show

-7-

throughout the country clearly indicates that this is far from the truth of the matter, and such statute that's based upon a false premise should be ruled not only unconstitutional but a violation of due process and equal protect of the law.

22. The Petitioner abject    to the conviction and sentences for the offense of Home Invasion, and the burglary in that the indictment per se, doesn't outline the mere fact that the Petitioner allegedly left the permise dwelling place of said victim and then returned knowing that said victim was in fact at this residence.

23. These offenses would be a particular mental state involved and burglary would the lesser included offense of the Home Invasion, and the lesser must be vacated.

24. Likewise, the offense of Home Invasion has the exact same elements that are contain the the charging instrument as the offense aggravated criminal sexaul abuse, in that the same aggravating mental state are included, and therefore his conviction and sentence must be reversed and vacated.

25. Section 2-9 of the Criminal Code of 1961 defines an included offense as an offense which "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged."   720 ILCS 5/2-9(a) (West 2002).   In Illinois, the test for determining whether a particular offense is an included offense of another is the charging instrument approach. **People v. Novak**, 163 Ill 2d 93, 112, 205 Ill.Dec. 471, 481, 643 N.E.2d 762, 772 (1994).   This

-8-

approach looks to the facts alleged in the charging instrument, and an offense is deemed to be an included offense if it is described by the charging instrument. Novak, 163 Ill.2d at 107, 205 Ill.Dec. at 479, 643 N.E.2d at 770; People v. Bishop, 287 Ill.Dec. 461, 815 N.E.2d 1264 (2004).

26.   Both Trial and Appellate Counsels were ineffective by not raising this issue during litigation in the various past court proceedings.

### RELIEF SOUGHT

1.   That the Circuit court reconsideration the dismissal of the Petitioner's Post Conviction Petition.

2.   That the Petition itself be docketed for additional proceedings, and the appointment of counsel appointed to amend said petition.

3.   That the State thereafter be instructed to answer the merits of said Petition or move for dismissal.

4.   That the Petitioner be allowed to proceed as a poor person.

5.   That relief be granted with regarding the the Constitutional Claims outlined herein.

6.   That if this Honorable Court deny this Motion, that the Petitioner has set forth his Notice of Appeal Attached as Exhibit - A.

Wherefore, Petitioner pray that this Honorable Court grants him the relief sought herein in the injust of fairness and justice.

Respectfully summbitted

/S/ _____
DEDRIC MOORE. PRO. SE.

-9-

IN THE
CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAPAIGN COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| ) | |
|     PLAINTIFF-RESPONDENT, ) | |
| ) | |
| ) | CASE NO. <u>98 CF 1558</u> |
|         -VS- ) | |
| ) | |
| ) | |
| DEDRIC MOORE,. pro. se. ) | <u>HONORABLE THOMAS J. DIFAMS</u> |
| ) | PRESIDING JUDGE. |
|     PETITIONER-DEFENDANT. ) | |

<u>NOTICE OF APPEAL</u>

An appeal is taken from the Order of Judgment described below:

1.    Court to which appeal is taken:
    <u>Circuit Court of the Sixth Judicial Circuit, Chapaign</u>
    <u>County, Illinois</u>

2.    Name of the appellant and address to which Notices shall be
    sent:
    Dedric Moore, Reg. No. K-53438, Menard Corr. Ctr. 711
    Kaskaskia St. Menard, Illinois 62259-0711

3.    If appellant is indigent and has no attorney on appeal does
    he want one appointed by the Court?  <u>Yes</u>

4.    Date of Judgment or Order:  <u>July 28, 2006</u>

5.    Offense of which convicted:  First Degree Attempt Murder;
    Home Invasion; Burglary; Aggravated arson; Aggravated Sexual
    Abuse.

6.    Sentences:  Various concurrent and consecutive totalling
    (75) years.

7.    Type of proceeding:  Jury Trial; Denial of Post-Conviction
    Petition.

                                   DEDRIC MOORE

ATTACHED EXHIBIT- A