**E-FILED**
Friday, 04 May, 2007  04:49:42 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. DEDRIC MOORE, | ) ) ) | |
| Petitioner, | ) ) | No. 07-2015 |
| v. | ) ) | The Honorable Michael P. McCuskey, |
| DONALD HULICK, | ) ) | Judge Presiding. |
| Respondent. | ) ) | |

### <u>ANSWER</u>

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, and this Court's March 27, 2007 order, respondent hereby answers the Petition for Writ of Habeas Corpus filed in the above-captioned cause and states as follows:

1.    Petitioner, Dedric Moore, is incarcerated at the Menard Correctional Center in Menard, Illinois, where he is in the custody of the warden of that facility, Don Hulick.  Petitioner is identified as inmate no. K52275.

2.    In March 1999, a Champaign County jury convicted petitioner of attempted first degree murder, home invasion, residential burglary, aggravated criminal sexual abuse, and aggravated arson.  The trial court sentenced petitioner to a 60-year extended prison term for attempted first degree murder, a concurrent 30-year sentence for aggravated arson, a concurrent 7-year sentence for aggravated sexual abuse, and a consecutive 15-year prison term for residential burglary, for a

total of 75 years' imprisonment. (Exh. A, Rule 23 Order in *People v. Moore*, No. 4-03-0790 (Ill.App. 4th Dist. Sept. 26, 2005)).

3.    The evidence at trial showed that when the victim returned home on February 25, 1998, petitioner came up to her from behind and forced his way into her duplex in Champaign, Illinois. (Exh. G, Rule 23 Order in *People v. Moore*, No. 4-99-0499 (Ill.App. 4th Dist. Dec. 22, 2000) at 2). Petitioner blindfolded the victim, bound her hands and feet, ransacked the duplex, and demanded to know where her purse, money, and ATM cards were. (*Id.*). After the victim gave petitioner her PIN numbers, he sat in her kitchen, drank a beer from her refrigerator, and smoked a cigarette. (*Id.* at 3). Petitioner then gagged the victim by wrapping tape around her head several times, hog-tied her hands to her feet, and tied her to a bar in the bathtub. (*Id.*). He threatened that if the PIN numbers were wrong, he would return and she would regret it. (*Id.*).

Petitioner later returned, lifted the victim out of the bathtub and began to untie her. The victim told petitioner to get out of the house. (*Id.*). In response, petitioner put a cord around her neck and began to strangle her, but ultimately removed the cord from the victim's neck. (*Id.*). Petitioner placed his hand up the victim's shirt, fondled her breasts, and placed his mouth on her right breast. (*Id.*). Finally, he urinated on the victim's head, saying, "When you drink that much beer, you got to take a piss." (*Id.*; Pet. at 4). Petitioner then poured a liquid that smelled like shoe polish over the victim. (*Id.* at 4). By this point, the blindfold had fallen and the victim could see that petitioner had started a fire in her living room. (*Id.*).

2

The victim tried to free herself but petitioner grabbed her and dragged her over the burning living room carpet. (*Id.*). The victim continued to fight to free herself, but petitioner punched and kicked her in the head, back, stomach, and legs. (*Id.*). After petitioner stopped kicking the victim, he flicked his lit cigarette at her and left the house. (*Id.*). The victim managed to free herself from the cords and escape the burning duplex. (*Id.*). When the victim returned to the burning unit to save her two cats, she found that petitioner had turned on the burners of her gas stove without lighting them, causing gas to leak into the room. (*Id.*). She turned off the burners but had to leave the unit without her cats. (*Id.* at 4-5). Thereafter, the victim was taken to the hospital for treatment for burns, smoke inhalation, and bruises. (*Id.* at 5).

4.    At petitioner's trial DNA evidence was admitted showing that petitioner had been present at the victim's duplex. He also testified at trial and was impeached with the fact that he was convicted of prior felonies (forgery and attempt burglary), but the precise offense of conviction was not revealed to the jurors ("mere fact method of impeachment"). Petitioner appealed his conviction and sentence to the Illinois Appellate Court, Fourth District, raising the following claims:

    1)    the revised DNA frequency calculations were unsubstantiated junk science which improperly compelled the conclusion that petitioner was the sole possible intruder at Lori Hansen's duplex; and

    2)    the use of "mere fact" impeachment constituted reversible error.

(Exh. B, Brief and Argument for Defendant-Appellant in *People v. Moore*, 4-99-0499).  On November 2, 2000, petitioner filed a supplemental brief and argument raising the following additional claim:

> 3)    the consecutive and extended-term sentencing provisions of 730 ILCS 5/5-8-4 and 5/5-3.2(b)(2) violate the right to due process and a jury trial by subjecting defendant to increased punishment without notice or a jury finding upon proof beyond a reasonable doubt of the facts necessary for imposition of the increased terms of imprisonment.

(Exh. C, Supplemental Brief and Argument for Defendant-Appellant in *People v. Moore*, 4-99-0499)).  On January 11, 2002, the state appellate court affirmed.  (Exh. G).  Petitioner filed a petition for rehearing, urging the court to consider the DNA issue under the plain error doctrine, as it had not been preserved for appellate review.  (Exh. F, Petition for Rehearing in *People v. Moore*, 4-99-0499).  The court denied the petition.  (*See* Exh. A).

5.    Petitioner then filed a petition for leave to appeal (PLA) in the Illinois Supreme Court, (Exh. H, PLA in *People v. Moore,* 93281), arguing:

> 1)    due process requires that [petitioner] receive appellate consideration as plain error of the DNA evidence which identified him as the sole perpetrator "on the face of this planet" of these serious crimes;

> 2)    ineffective assistance of appellate counsel for failure to present argument one to the appellate court; and

> 3)    his extended-term sentences violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

On February 5, 2003, the Illinois Supreme Court denied the petition but ordered the appellate court to vacate the judgment and reconsider in light of *People v. Swift*, 781 N.E.2d 292 (Ill. 2002). (Exh. V, Denial of PLA in *People v. Moore*, No. 93281).

6.    Upon reconsideration, the appellate court vacated defendant's extended-term sentences as violative of Apprendi v. New Jersey, and remanded the cause to the trial court for retrial or resentencing at the election of the People pursuant to 730 ILCS 5/5-5-3(d).  (Exh. I, Rule 23 Order in *People v. Moore*, No. 4-99-0499 (Ill.App. 4th Dist. Apr. 4, 2003)).

7.    On remand, the State elected to resentence petitioner.  On July 1, 2003, the trial court resentenced petitioner to 30 years' imprisonment for home invasion, a consecutive sentence of 30 years' imprisonment for aggravated arson, a concurrent sentence of 30 years' imprisonment for attempt first degree murder, a concurrent sentence of 7 years' imprisonment for aggravated criminal sexual abuse, and a consecutive 15-year sentence for residential burglary — an aggregate sentence of 75 years' imprisonment.  (Exh. A at 2).

8.    Petitioner appealed to the Illinois Appellate Court, Fourth District, (Exh. J, Brief and Argument for Defendant-Appellant in *People v. Moore*, No. 4-03-0790), arguing:

> 1)    by ordering formerly concurrent terms to run consecutively, the trial court improperly increased petitioner's sentences.

On September 26, 2005, the state appellate court affirmed.  (Exh. A, *People v. Moore*, 835 N.E.2d 980 (Ill.App. 4th Dist. Sept. 26, 2005)).

9.     Petitioner filed a PLA from this judgment in the Illinois Supreme

Court, raising the following issue:

> 1)     the majority of the appellate court erroneously distinguished the
> Illinois Supreme Court's decision in *People v. Kilpatrick*.
> *Kilpatrick* supports the petitioner's claim that the conversion of
> his sentence from a concurrent term to a consecutive term was
> an improper increase of sentence, despite the fact that the total
> amount of years the defendant is to serve remains unchanged.

(Exh. L, PLA in *People v. Moore*, 101500).   The PLA was denied on February 16,

2006.  (Exh. W, Denial of PLA in *People v. Moore,* 101500).

10.     During this time, petitioner filed a postconviction petition in the trial

court, alleging:

> 1)     ineffective assistance of trial counsel for giving incorrect advice
> concerning good-time credit; and

> 2)     ineffective assistance of appellate counsel for not urging the
> appellate court to apply the plain error doctrine to review the
> issue regarding the admission of the revised DNA frequency
> calculations.

(Exh. M, Petition for Postconviction Relief in *People v. Moore*, 98 CF 1558).  In May

2002, the trial court summarily dismissed the petition as frivolous and patently

without merit.  (Exh. N, Order Denying Postconviction Relief in *People v. Moore*, 98

CF 1558).

11.     Petitioner appealed the denial to the Illinois Appellate Court, Fourth

District, (Exh. O, Brief and Argument for Defendant-Appellant in *People v. Moore*,

4-02-0523), where he renewed his postconviction claims:

> 1)     ineffective assistance of trial counsel for giving petitioner
> incorrect advice concerning good-time credit; and

6

2)  ineffective assistance of appellate counsel for failing to urge the appellate court to apply the plain error doctrine to review the issue regarding the admission of the revised DNA frequency calculations.

On December 3, 2003, the state appellate court affirmed.  (Exh. R, Rule 23 Order in *People v. Moore*, No. 4-02-0523 (Ill.App. 4th Dist. Dec. 3, 2003)).

12.    Petitioner then filed a PLA in the Illinois Supreme Court (Exh. X, PLA in *People v. Moore*, 97733), alleging that:

1)  the trial court erred in summarily dismissing his postconviction petition, which presented two issues that stated the gist of a claim of a violation of petitioner's constitutional rights.

The PLA was denied on April 15, 2004.  (Exh. U, Denial of PLA in *People v. Moore*, 97733).

13.    Petitioner filed a second postconviction petition on July 18, 2006, raising the following claims:

1.    ineffective assistance of trial counsel for:

(A)  failing to raise the claim that the victim's injury did not satisfy the consecutive sentence requirement under 730 ILCS 5-8-4A;

(B)  not arguing that the trial court abused its discretion and erred in giving petitioner a consecutive sentence;

(C)  failing to argue that the trial court improperly "double enhanced" petitioner's sentence;

2.    ineffective assistance of appellate counsel for:

(A)  not raising trial counsel's ineffectiveness;

7

(B)    not arguing that the trial court erred in ordering petitioner's sentences to run consecutively because the victim did not suffer severe bodily injury;

(C)    not attacking petitioner's consecutive sentences;

(D)    not raising the circuit court's violation of double jeopardy when the court "double enhanced" petitioner's sentence;

3.    the trial court abused its discretion in sentencing petitioner to a consecutive sentence;

4.    730 ILCS 5/5-8-4(A)(1) does not apply in this case because the victim did not suffer severe bodily injury and consecutive sentences were not warranted in this case; and

5.    the People failed to prove the victim suffered severe bodily injury.

(Exh. S, Second Petition for Postconviction Relief in *People v. Moore*, 98 CF 1558). The petition was dismissed on July 28, 2006.  (Exh. T, Order  Denying Postconviction Relief in *People v. Moore*, 98 CF 1558).

14.    Petitioner's appeal from the judgment denying his second postconviction petition is currently pending in the state appellate court.  The Clerk's Office for the Illinois Appellate Court, Fourth District, indicated that the petitioner's brief is currently overdue.  Petitioner explains that because he does not know whether this second postconviction petition will toll the limitations period, following the Seventh Circuit's advice in *Dolis v. Chambers*, 454 F.3d 721, 725 (7th Cir. 2006), he filed in state and federal court simultaneously.  Pet. at 11.

15.    Petitioner filed this petition for a writ of habeas corpus in this Court on January 17, 2007, raising the following claims:

8

(1)     the revised DNA frequency calculation was unsubstantiated and improperly compelled the conclusion that defendant was the sole possible intruder in the victim's duplex;

(2)     due process and fundamental fairness require that petitioner receive appellate consideration as to plain error of the DNA evidence which identified him as the sole perpetrator "on the face of this planet;"

(3)     "mere fact" impeachment constituted reversible error;

(4)     the trial court erred in summarily dismissing petitioner's postconviction petition which presented two issues that amounted to the gist of a claim of a violation of petitioner's constitutional rights; and

(5)     the trial court erred in resentencing petitioner to a residential burglary sentence consecutive to his sentences for home invasion and aggravated arson when the residential burglary sentence was originally concurrent to the sentences for those other two crimes.

16.     Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, respondent files the following state court materials with this Court as attachments to this Answer:

**Exh. A:**     *People v. Moore*, 835 N.E.2d 980 (Ill.App. 4th Dist. Sept. 26, 2005);

**Exh. B:**     Brief and Argument for Defendant-Appellant in *People v. Moore*, 4-99-0499;

**Exh. C:**     Supplemental Brief and Argument for Defendant-Appellant in *People v. Moore*, 4-99-0499;

**Exh. D:**     Supplemental Brief and Argument for Plaintiff-Appellee in *People v. Moore,* 4-99-0499;[1]

---

[1] Respondent has not yet been able to obtain the Brief and Argument for Plaintiff-Appellee.  When respondent obtains that brief, it will be filed as a supplemental exhibit.

**Exh. E:**    Reply Brief to Supplemental Argument for Defendant-Appellant in *People v. Moore*, 4-99-0499;

**Exh. F:**    Petition for Rehearing filed by Defendant-Appellant in *People v. Moore*, 4-99-0499;

**Exh. G:**    Rule 23 Order in *People v. Moore*, No. 4-99-0499 (Ill.App. 4th Dist. Jan. 11, 2002);

**Exh. H:**    PLA in *People v. Moore,* 93281;

**Exh. I:**    Rule 23 Order in *People v. Moore*, No. 4-99-0499 (Ill.App. 4th Dist. Apr. 4, 2003);

**Exh. J:**    Brief and Argument for Defendant-Appellant in *People v. Moore*, 4-03-0790;

**Exh. K:**    Brief and  Argument for Plaintiff-Appellee in *People v. Moore*, 4-03-0790;

**Exh. K:**    PLA in *People v. Moore,* 101500;

**Exh. M:**    Petition for Postconviction Relief in *People v. Moore*, 98 CF 1558;

**Exh. N:**    Order Denying Postconviction Relief in *People v. Moore*, 98 CF 1558;

**Exh. O:**    Brief and Argument of Defendant-Appellant in *People v. Moore* 4-02-0523;

**Exh. P:**    Brief and Argument of Plaintiff-Appellee in *People v. Moore,* 4-02-0523;

**Exh. Q:**    Reply Brief and Argument of Defendant-Appellant in *People v. Moore,* 4-02-0523;

**Exh. R:**    Rule 23 Order in *People v. Moore,* No. 4-02-0523 (Ill.App. 4th Dist. Dec. 3, 2003);

**Exh. S**:    Second Petition for Postconviction Relief in *People v. Moore*, 98 CF 1558;

**Exh. T:**    Order Denying Second Postconviction Relief in *People v. Moore*, 98 CF 1558;

**Exh. U:**    Denial of PLA in *People v. Moore,* 97733;

**Exh. V:**    Denial of PLA in *People v. Moore,* 93281;

**Exh. W:**    Denial of PLA in *People v. Moore,* 101500;

**Exh. X:**    State court record for *People v. Moore,* 98 CF 1558; and

**Exh. Y:**    PLA in *People v. Moore*, 97733.

17.    As more fully set forth below, respondent denies that petitioner is entitled to relief.  This petition should be dismissed as petitioner still has state postconviction proceedings pending.  Should this Court choose to proceed on this petition, pursuant to Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts, upon the filling of this Answer, along with the attendant exhibits and any supplemental pleadings permitted by this Court, the petition should be denied.

## ARGUMENT

## I.    Exhaustion

Petitioner must meet several distinct procedural requirements before seeking federal habeas review. First, he must satisfy the exhaustion requirement.  Before a federal court can entertain a petition for writ of habeas corpus, a state prisoner must exhaust his state remedies by presenting his claims fully and fairly to the state courts.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  A federal habeas petition "should be dismissed if the prisoner has not exhausted available state court remedies as to any of his federal claims."  *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

11

Petitioner has exhausted his §2254 claims.  A petitioner has exhausted his state court remedies where he has previously presented the constitutional issue to each level of the state court for a decision on the merits.  *Dressler v. McCaughtry,* F.3d 908, 912 (7th Cir. 2001); *see* also 28 U.S.C. §2254(c).  The instant petition raises claims that are different from those asserted in petitioner's second postconviction petition; therefore, petitioner could choose to proceed on the claims raised herein.  *See Lane v. Richards*, 957 F.2d 363, 366 (7th Cir. 1992).

However in so doing, petitioner would forfeit any federal habeas corpus challenge to the claims still pending in state court (in petitioner's second postconviction appeal) in a successive federal habeas petition unless petitioner obtained leave to file from the Seventh Circuit (28 U.S.C. §2244 (3)(a)) and satisfied the requirements of 28 U.S.C. §2244(b)(2).

Petitioner indicates that he is filing this habeas petition now pursuant to the Seventh Circuit's advice in *Dolis v. Chambers*, 454 F.3d 721, 725 (7th Cir. 2006).  Presumably, petitioner refers to the court's statement that "it would be wise for a petitioner to file in both the state and federal court simultaneously, particularly where there is some procedural uncertainty about the state court post-conviction proceeding, and then ask the district court to stay the federal case until the state case concludes to ensure that she does not miss the one-year deadline."  *Dolis*, 454 F.3d at 725.  But, petitioner has neither asked nor demonstrated that this matter should be stayed.

12

Even assuming petitioner desired a stay, he does not satisfy the test in *Rhines v. Weber,* 544 U.S. 269 (2005). District courts have discretion to grant a stay where petitioner can demonstrate that: (1) he had good cause for his failure to exhaust his claims in state court, (2) his unexhausted claims are potentially meritorious, and (3) there is no indication that petitioner has engaged in intentionally dilatory litigation tactics. *Rhines v. Weber*, 544 U.S. at 278. There is nothing in the record demonstrating that petitioner has good cause for his failure to have already pursue in state court the claims asserted in his second postconviction petition, and he has not shown they have merit. In addition, district courts should place reasonable time limits (*e.g.*, 30 days) on petitioner's trip to state court and back. *Id.* In the alternative, this Court could dismiss the instant petition without prejudice, with leave to reinstate within 30 days of the conclusion of state court proceedings. Such a procedure also protects a habeas petitioner from unwittingly filing his or her petition outside of the one-year statute of limitations. When determining the propriety of staying a habeas petition pending a petitioner's return to state court to exhaust his claims, the Seventh Circuit has considered, as a factor strongly militating in favor of granting a stay, whether "the dismissal would effectively end any chance at federal habeas review," *Dolis*, 454 F.3d at 725, due to AEDPA's one-year statute of limitations on habeas corpus petitions. 28 U.S.C. § 2244(d)(1). Dismissing this federal habeas petition with leave to return would not effectively end petitioner's chance at federal habeas review.

13

Unless and until petitioner demonstrates his desire for an entitlement to a stay under *Rhines*, this Court should proceed to an adjudication of petitioner's claims.

## II.    Non-cognizable claims

### A.  Claim Three

Federal habeas relief is granted only to persons who can establish that their incarceration violates the Constitution, law or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67-78 (1991); *Haas v. Abrahmson*, 910 F.2d 384, 389 (7th Cir. 1990). Claims that a state court misapplied its own laws are not cognizable in habeas corpus. *See Smith v. Phillips*, 455 U.S. 209, 221 (1982); *Jones v. Thieret*, 846 F.2d 457, 459-61 (7th Cir. 1988).

Petitioner's claim three — "mere fact" impeachment created reversible error — is not cognizable because the claim involves state court evidentiary rulings. As explained in *Warren v. Pierce*, 2006 WL 2861039, *5 (N.D.Ill. 2006):

> the use of prior convictions for impeachment is constitutional and expressly authorized by the Federal Rules of Evidence promulgated by the Supreme Court of the United States and approved by Congress. *See also Spencer v. Texas*, 385 U.S. 554 (1967). For many years, the federal courts have sustained state court determinations as to the admissibility of prior crimes as largely, if not entirely, beyond the ambit of constitutional limitations. *See, e.g., Murphy v. Beto*, 416 F.2d 98 (5th Cir. 1969); *United States ex rel. Clawson v. Rundle*, 396 F.2d 778 (3rd Cir. 1968). This was the law even before Congress limited federal relief to cases in which the state court decision is contrary to, or an unreasonable application of, United States Supreme Court precedent.

14

> There is no precedent barring the use of "mere fact" proof of prior conviction for impeachment.

*Id.*

Because it is a matter of state law, such rulings will rarely serve as a basis for granting a writ of habeas corpus. *Haas*, 910 F.2d at 389; *see also Estelle*, 502 U.S. at 67 ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions").  Evidentiary rulings properly lie within the broad discretion of the trial judge, and should rarely be the basis of granting habeas relief. *Cramer v. Fahner*, 683 F.2d 1376, 1385 (7th Cir. 1982).  Moreover, a habeas petitioner challenging a state court's evidentiary ruling faces a high hurdle:

> To be of constitutional import, an erroneous evidentiary ruling must be so prejudicial that it compromises the petitioner's due process right to a fundamentally fair trial . . . This means that the error must have produced a significant likelihood that an innocent person has been convicted . . . Indeed, because of this high standard, evidentiary questions are generally not subject to review in habeas corpus proceedings.

*Howard v. O'Sullivan*, 185 F.3d 721, 723-724 (7th Cir. 1999) (citations omitted).

Petitioner was not deprived of a fundamentally fair trial as the state court explained after setting forth Illinois law on the matter (Exh. G at 9) which precludes impeachment by the mere-fact method (*e.g., People v. Harvey, 813* N.E.2d 181, 191-95 (Ill. 2004)):

> In the present case, the trial court found that allowing the State to impeach [petitioner] by naming [petitioner's] specific felonies would be more prejudicial than probative. The trial court attempted to alleviate this prejudice by

15

> allowing the State to use the mere-fact method, not naming the specific felony convictions. The trial court committed error by considering and utilizing the mere-fact approach. Nonetheless, reversible error does not result unless "the error has deprived defendant of substantial justice or influenced the determination of his guilt." *People v. Madison*, 56 Ill.2d 476, 488, 309 N.E.2d 11, 18 (1974). Accordingly, although the trial court erred, such error was harmless in light of the overwhelming evidence against [petitioner].

Exh. G at 9-11. The evidence in this case included a videotape of petitioner in the victim's truck at the drive-through ATM. *Id.* at 5. Enlarged photos from the video showed that the driver was missing two teeth to the left of his upper front teeth — the same two teeth petitioner is missing. *Id.* Forensics scientist Kevin Zeeb testified that he recovered DNA material from a nylon stocking petitioner took from the victim's home and wore as a disguise while using the victim's ATM cards to make withdrawals from her bank. *Id.* Zeeb testified that the DNA material matched that of the victim and petitioner. *Id.* Also, the cigarette found at the scene was a Newport, the brand of cigarette smoked by petitioner. (Exh. X at 876). Petitioner also had knowledge of the facts of the crime that would have been known only to the perpetrator. When the police come to talk to petitioner, he said the fire must have been caused by the mob because they are the ones who carry gasoline and set fires. (*Id.* at 876-77). At that point, petitioner knew something the detective and the state lab did not even know yet — that gasoline was used to start the fire. (*Id.* at 877). Further, petitioner's alibi defense was flawed. Two of petitioner's witnesses contradicted each other — both petitioner's brother and Ivory

16

Burrage testified that he or she was with petitioner the night in question. (Exh. B at 6). An innocent person was not convicted, and petitioner was not denied a fundamentally fair trial. Thus, petitioner's claim three, framed as a state law issue, is non-cognizable. At a minimum, the appellate court's holding was neither contrary to nor an unreasonable application of Supreme Court precedent.

**B. Claim Four**

Petitioner's claim four — that the trial court erred in summarily dismissing petitioner's postconviction petition which presented two issues that amounted to the gist of a claim of a violation of petitioner's constitutional rights — also does not raise a federal issue. Petitioner's argument, consisting of one paragraph, only lists the claims he raised in his postconviction petition. This argument appears to be a claim about state court procedure in dismissing his claim and therefore is not cognizable on habeas review. Because petitioner has no federal constitutional right to postconviction relief, *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987), alleging procedural errors in state postconviction proceedings fails to present a claim for which petitioner is entitled to relief in this Court. *See also Jackson v. Duckworth*, 112 F.3d 878, 880 (7th Cir. 1997). Even if this claim is viewed as presenting a federal constitutional claim, as explained below, it is without merit. *See* Section III of this Answer.

**C. Claim Five**

Petitioner's fifth claim — that the trial court improperly sentenced him under Illinois law — is not cognizable for federal habeas relief as it does not describe a

17

state court's violation of federal law. 28 U.S.C. § 2254(a); *Coleman v. Thompson*, 501 U.S. 722, 730 (1991); *see also Reed v. Clark*, 984 F.2d 209, 210 (7th Cir. 1993). Petitioner's sentencing claim is a state law issue that cannot be the subject of a federal habeas proceeding. A federal habeas court must defer to the prerogative of the state legislature to determine the length of a sentence imposed for a state crime. *See Rummel v. Estelle*, 445 U.S. 263, 275 (1980). Generally, if the trial court imposes a sentence within the range established by Illinois law, its severity is not grounds for habeas relief in federal court. *See Henry v. Page*, 223 F.3d 477, 482 (7th Cir. 2000); *see also United States ex rel. King v. Cahill-Masching*, 169 F.Supp.2d 849, 858 (N.D.Ill. 2001).

Petitioner was sentenced to a 60-year extended term for attempted first degree murder, a concurrent 30-year sentence for aggravated arson, a concurrent 7-year sentence for aggravated sexual abuse, and a consecutive 15-year prison term for residential burglary; for a total of 75 years' imprisonment. On remand, his 60-year extended-term sentence was reduced to a 30-year term and ordered to run consecutively to his 30-year sentence for aggravated arson and to his 15-year sentence for residential burglary. Petitioner argues that by ordering the attempted murder and aggravated arson sentences to run consecutively (rather than concurrently, as it had initially ordered those sentences to be served), the court improperly increased his sentence. But his sentence was entirely proper under Illinois law, and he has never claimed judicial vindictiveness in sentencing.

18

Accordingly, any such claim would be procedurally defaulted.  Furthermore, there is

nothing in this record indicating any judicial vindictiveness.

At the time of his sentence, a conviction under the residential burglary

statute prescribed a sentence of 4 to 15 years' imprisonment.  720 ILCS 5/19-3; 730

ILCS 5/5-8-1 (1998).  The sentence for home invasion and aggravated arson, both

Class X felonies, was 6 to 30 years' imprisonment.  720 ILCS 5/12-11; 720 ILCS

5/20-1.1; 730 ILCS 5/5-8-1.  Petitioner's individual sentences were within the proper

statutory range.  The state appellate court explained that the sentences did not

violate Illinois law:

> Illinois courts have held the length of the individual
> sentence, rather than the aggregate of several terms, is
> critical in determining whether a sentence was
> improperly increased under section 5-5-4(a) of the Unified
> Code.  *People v. Sanders*, 356 Ill.App.3d 998, 827 N.E.2d
> 17 (2005) (First District).  In *Sanders*, the trial court,
> upon remand, sentenced the defendant to three
> concurrent 25-year terms.  The defendant appealed the
> resentence, and the trial court sentenced the defendant to
> consecutive 10-year terms on each count.  The defendant
> again appealed, arguing the resentence violated section 5-
> 5-4(a) because the aggregate term of imprisonment was
> increased upon resentence.  *Sanders*, 356 Ill.App.3d at
> 1002-03, 927 N.E.2d at 20.  The appellate court affirmed,
> holding that although the defendant may serve a longer
> aggregate sentence upon remand, a 10-year term for each
> individual conviction is less than the previous 25-year
> term for each conviction.  *Sanders*, 356 Ill.App.3d at 1005,
> 827 N.E.2d at 22.  Therefore, the trial court did not
> improperly increase defendant's sentence in violation of
> section 5-5-4(a) of the Unified Code.
>
> Similarly here, upon remand, the court reduced the 60-
> year extended-term sentences for attempt and home
> invasion to 30-year terms.  Clearly, a [sic] 30-year prison

19

terms is less than a 60-year term. The aggregate of 75 years remains unchanged by the imposition of the 30-year home-invasion term, consecutive to the 30-year aggravated-arson term and the 15-year residential burglary term. Similar to the sentencing order in *Sanders*, defendant's individual terms were reduced, and his sentence was not improperly increased upon remand in violation of section 5-5-4(a) of the Unified Code when the trial court imposed consecutive sentences upon formerly concurrent terms of imprisonment.

* * *

As defendant's individual terms were reduced and the aggregate remained unchanged, the trial court's resentence complied with section 5-5-4(a) of the Unified Code and did not constitute an improper increase of his sentence.

Exhibit A at 3-6.

Because petitioner's sentence for attempted murder was not increased, because his total term of imprisonment fell within the prescribed statutory range, his fifth claim for habeas relief — that he received an improper sentence for his convictions under Illinois law — is not cognizable for habeas review.

## III.    Procedural Default

Before a federal court can consider a habeas petitioner's claim, the state courts must have a full and fair opportunity to consider constitutional objections to the inmate's imprisonment. *Farrell v. Lane*, 939 F.3d 409, 410 (7th Cir. 1991); *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1131-32 (7th Cir. 1990). The exhaustion requirement serves federal-state comity interests by ensuring that state courts have the first opportunity to address and correct perceived violations of petitioner's federal constitutional rights. *Perruquet v. Briley*, 390 F.3d 505, 513 (7th

20

Cir. 2004) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971) and *Boerckel*, 526 U.S. at 844-45).  Thus, a district court must first determine whether the petitioner fairly presented all his claims during the course of the state court proceedings.  *Farrell*, 939 F.2d at 410 (citing *Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir. 1988)).  This means that a habeas petitioner forfeits the right to raise an issue in his federal habeas petition if he failed to raise it, *inter alia*, on appeal to the state's highest court.  *Boerckel*, 526 U.S. at 845; *Hadley v. Homes*, 341 F.3d 661, 664 (7th Cir. 2003) (failure to take claim through complete round of appellate process results in procedural default); *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (applying *Boerckel* to state postconviction process).  Illinois treats a failure to appeal as a procedural default barring further review, and "no independent federal doctrine permits the district court to disregard a prisoner's failure to take an appeal under circumstances in which state law requires an appeal." *Jenkins v. Gramley*, 8 F.3d 505, 507 (7th Cir. 1993).  Similarly, claims not raised in any state court proceeding cannot be raised for the first time in a federal habeas petition.  *Rodriguez v. Peters*, 63 F.3d 546, 555 (7th Cir. 1995); *Burgin v. Broglin*, 900 F.2d 990, 996 (7th Cir. 1990).

The failure to fairly present a federal constitutional claim to the state courts also results in the procedural default of the claim on habeas review.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  To satisfy the fair presentment requirement, a petitioner must raise at all levels of state court review both the claim's operative facts and its controlling legal principals.  *Verdin v. O'Leary*, 972 F.2d 1467, 1474

(7th Cir. 1992). Fair presentment means that a petitioner alerts the state court to the federal nature of his claim — by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal" — in order to give the court an opportunity to correct the claimed constitutional error. *Baldwin*, 541 U.S. at 33.

Furthermore, a federal court may not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman*, 501 U.S. at 729. When a state court decides the merits and also asserts a procedural bar the federal court must respect both rulings. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002). A state is entitled to treat as forfeited a proposition that was not presented in the right court, in the right way, and at the right time — as state rules define those courts, ways, and times. *See Szabo v. Walls*, 313 F.3d 392, 395 (7th Cir. 2002) (citing *Wainright v. Sykes*, 433 U.S. 72 (1977)). Failure to comply with the state's procedural rules furnishes an independent and adequate state ground barring federal review. *See Harris v. Reed*, 489 U.S. 255, 261 (1989). A procedural default constitutes an independent basis for the state court's ruling if the last state court to consider the question actually relied on procedural default as the basis for its decision. *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000).

To overcome procedural default, petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the failure to consider the claims will result in a "fundamental miscarriage of justice."

*Coleman*, 501 U.S. at 750. "Cause" is defined as some external objective factor that impeded compliance. *Barksdale v. Lane*, 957 F.2d 379, 382 (7th Cir. 1992) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). The "fundamental miscarriage of justice" pathway is limited to the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 321 (1995); *see House v. Bell*, 126 S.Ct. 2064, 2076-2077 (2006). A petitioner who asserts actual innocence to excuse a default "must *demonstrate* innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict." *Buie v. McAdory*, 341 F.3d 623, 627 (7th Cir. 2003) (emphasis in original).

**A.    Petitioner procedurally defaulted his claim that the DNA frequency calculation was unsubstantiated and improperly compelled the conclusion that defendant was the sole possible intruder in the victim's duplex.**

This claim is defaulted on an "independent and adequate" state procedural ground. Petitioner presented this claim in his direct appeal, where the appellate court found it forfeited:

> An issue is forfeited on appeal unless a timely objection is made at trial and is specifically raised in a written posttrial motion. *People v. Robinson*, 167 Ill.2d 397, 404, 657 N.E.2d 1020, 1025 (1995). In the present case, defendant failed to make a timely objection or to raise the DNA issue in a written posttrial motion. Therefore, defendant forfeited this issue on appeal. *See People v. Moore*, 171 Ill.2d 74, 98, 662 N.E.2d 1215, 1226 (1996) (acknowledging that defendant forfeited his claim regarding statistical calculations for DNA tests); *see also People v. Oliver*, 306 Ill.App.3d 59, 70, 713 N.E.2d 727, 736 (1999) (stating that defendant's contention that

23

> probability statistics were more prejudicial than probative
> had been forfeited), *appeal denied*, 185 Ill.2d 654, 720
> N.E.2d 1102 (1999).

Exh. G at 7.

Because the state court's forfeiture determination rested on an adequate and independent state ground, federal review is precluded. "The independent and adequate state ground doctrine applies to 'bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'" *Franklin v. Gilmore*, 188 F.3d 877, 881 (7th Cir. 1999) (quoting *Coleman*, 501 U.S. at 729-30). When a state court declines to address a petitioner's federal claim because of a failure to meet state procedural requirements, "the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730 (citation omitted). Here, the appellate court relied on the procedural bar, but also went on to determine the claim's merits. In such a circumstance, the federal court must respect the procedural bar for purposes of procedural default. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002); *Gray v. Briley*, 305 F.3d 777, 779 (7th Cir. 2002).

Here, there is no question that the state law ground was independent of the federal claim presented and was adequate to support the judgment. Accordingly, petitioner has procedurally defaulted this claim.

This Court may consider the merits of the above claim if petitioner shows both cause for the failure to comply with state procedural requirements, as well as prejudice resulting therefrom. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000);

*Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003). Alternatively, petitioner can bypass the requirement of establishing cause and prejudice only if he can "demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *see also Ward v. Hinsley*, 377 F.3d 719, 725 (7th Cir. 2004). Petitioner does not argue that his default should be excused based on cause and prejudice or a fundamental miscarriage of justice. Accordingly, federal review of petitioner's second claim is precluded.

      **B.** **Due process and fundamental fairness require that petitioner receive appellate consideration as to plain error of the DNA evidence which identified him as the sole perpetrator "on the face of this planet."**

The claim is defaulted because petitioner raised it for the first time in his petition for rehearing in the state appellate court. *Wilson*, 243 F.3d at 328; *Cruz v. Warden of Dwight Correctional Center*, 907 F.2d 665, 668 (7th Cir. 1990) (presentation of a claim in a petition for rehearing would not appear to constitute fair presentment). His assertion of the claim in his direct appeal PLA, (Exh. H), does not help him. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (raising claim for first time in a discretionary appeal to state supreme court does not constitute a fair presentment of that claim, and it is defaulted on federal habeas review). Therefore, petitioner failed to give the state judiciary a fair opportunity to address it. As a result of the omission, the claim is defaulted. *Castille*, 489 U.S. at 351 ; *Wilson*, 243 F.3d at 328; *Cruz*, 907 F.2d at 668.

Petitioner does not appear to argue that his default should be excused. He simply notes in his petition that counsel failed to raise this issue on appeal, but then raised the issue in a petition for rehearing and in the direct appeal PLA. This might be a contention that ineffective assistance should excuse his default. But the assertion of ineffective assistance as cause to excuse a procedural default is, itself, a constitutional claim that must have been raised before the state court or it is also procedurally defaulted. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000). Petitioner alleged on postconviction review that his appellate counsel was ineffective for failing to raise this claim, but the state appellate court concluded that petitioner could not show prejudice from counsel's performance:

> Upon review of the record, we conclude that defendant cannot satisfy the prejudice prong under *Strickland*. While it is true that appellate counsel did not urge consideration of the plain error doctrine until the petition for rehearing, the fact remains that she did raise the issue on direct appeal. Our denial of the petition for rehearing amounts to a refusal to consider the issue under the plain error doctrine. Defendant's ineffective assistance of appellate counsel claim is, therefore, denied.

(Exh. R at 6). Petitioner could not show prejudice in the state courts for the appellate court clearly communicated its refusal to consider the issue under the plain error doctrine even if it had been raised in that context. For the same reason, he cannot show prejudice here. Accordingly, federal review of petitioner's second claim is precluded.

_____**C.**     **"Mere fact" impeachment created reversible error**.

Petitioner contends that it was error to permit the State to impeach him with the "mere fact" of his prior convictions, i.e. without informing the jury of the offense or the circumstances surrounding the offense.  In addition to being noncognizable (supra Argument IIA), this assertion is procedurally defaulted.  Petitioner raised this claim in his direct appeal but failed to raise the issue in his ensuing PLA. (Exh. B, H).  In order to satisfy the exhaustion requirement, a state prisoner must present his claims to a state supreme court in a petition for discretionary review when that review is part of the State's ordinary appellate review procedure. *Boerckel*, 526 U.S. at 847-48.  As petitioner did not present this claim to the Illinois Supreme Court, he has defaulted it.

Petitioner does not argue that his default should be excused based on cause and prejudice or a fundamental miscarriage of justice.  Accordingly, federal review of petitioner's claim is precluded.

## III.     Merits

### A.     Standard of Review

As previously discussed, petitioner's fourth claim — the trial court erred in summarily dismissing his postconviction petition — is not cognizable.  (Supra Argument IIB).  In any event, it is without merit.  Any federal habeas review of this claim on the merits is governed by 28 U.S.C. §2254(d), which provides that a habeas petition shall not be granted unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application

27

of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," §2254(d)(2). For purposes of section 2254(d)(1), clearly established Federal law, as determined by the Supreme Court of the United States, "refers to the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). *See also Young v. Walls*, 311 F.3d 846, 851 (7th Cir. 2002) (under §2254, only decisions of Supreme Court, rather than state or lower federal courts, are relevant).

A state court's decision is "contrary to" clearly established federal law within the meaning of section 2254(d)(1) if the court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *id.* at 405, or "decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions"; indeed, "a state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (quoting *Early v. Packer*, 537 U.S. 3, 7-8 (2002)).

A state court's decision involves "an unreasonable application" of federal law within the meaning of section 2254(d)(1) when the "state court identifies the correct

governing legal principle from the [Supreme] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

"[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application

must also be unreasonable." *Id.* at 410.  Put another way, where "the state court's

application of governing federal law is challenged, it must be shown to be not only

erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5

(2003).  "This is a difficult standard [for habeas petitioners] to meet; 'unreasonable'

means 'something like lying well outside the boundaries of permissible differences

of opinion.'" *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) (quoting

*Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002)).  "The state court decision is

reasonable if it is minimally consistent with the facts and circumstances of the

case." *Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (internal quotations

omitted).

      **B.** **The Illinois Appellate Court's rejection of petitioner's claim that the trial court erred in summarily dismissing petitioner's postconviction petition was not contrary to, or an unreasonable application of, Supreme Court precedent**.

      Petitioner's claim four is defaulted in part and without merit.  After

discussing the proper state law for dismissing a postconviction petition, the court

analyzed petitioner's underlying constitutional claims under the governing

standard in *Strickland v. Washington*, 466 U.S. 668 (1984), (Exh. R at 3-4) and then

explained:

> [Petitioner] argues that his trial counsel's assistance
> during the plea negotiation process was ineffective
> because she gave him incorrect advice concerning good-
> time credit. [Petitioner], however, failed to attach an
> affidavit or any documents to support his assertion that
> there was a plea offer and its terms, if there were an offer,
> and did not offer an explanation for the absence of such
> documentation as mandated by section 122-2 of the Act
> (725 IlCS 5/122-2 (West 1998)).  As a result, the trial
> court properly summarily dismissed [petitioner's]
> postconviction petition.  *Collins*, 202 Ill.2d at 66, 782
> N.E.2d at 198 (defendant's postconviction petition was
> unsupported by affidavits, records, or other evidence and
> offered no explanation for their absence, which, on that
> basis alone, justified the summary dismissal of
> defendant's petition).  Moreover, there is nothing in the
> record to corroborate petitioner's claim that he would
> "most likely" have taken the offer.
>                        * * *
> Defendant also argues that his appellate counsel was
> ineffective because she did not urge this court to apply the
> plain error doctrine to review the issue regarding the
> admission of the revised DNA frequency calculations, and
> this court found that the DNA issue had been forfeited.
> Appellate counsel further acknowledged she did not on
> direct appeal urge this court to consider the issue under
> the plain error doctrine.  However, appellate counsel also
> stated she had filed a motion to reconsider, urging this
> court to consider the issue under the plain error doctrine.
> The court denied defendant's petition for rehearing.  Upon
> review of the record, we conclude that defendant cannot
> satisfy the prejudice prong under *Strickland*.

(Exh.R. at 3-6).  The court explained the reason for this: its rejection of petitioner's

rehearing motion communicated its refusal to apply the plain error doctrine to

petitioner's claim.  (Exh. R at 6).  Accordingly, petitioner was not prejudiced, since

the appellate court's ruling would not have changed even if the lawyer had more timely raised the issue as plain error. The appellate court correctly determined that the state court properly dismissed the postconviction petition.

Regarding petitioner's assertion that he received ineffective assistance of counsel at the plea stage, because petitioner failed to comply with state law requiring that he attach affidavits or documents to support his assertions about a plea agreement, the court held that he had defaulted this portion of his claim. The state appellate court's holding constitutes an independent and adequate state law ground, barring federal habeas relief on this portion of petitioner's fourth claim. *See Harris*, 489 U.S. at 261; *Braun*, 227 at 912; *Spreitzer v. Schomig*, 219 F.3d 639, 647. Furthermore, the appellate court's holding that the failure to raise petitioner's DNA claim under the plain error doctrine caused petitioner no prejudice was reasonable under *Strickland*. Petitioner cannot show prejudice and, therefore cannot demonstrate, that the result of the Illinois Appellate Court's decision was an objectively unreasonable application of Supreme Court precedent. This Court should deny this claim.

To summarize, the state appellate court reasonably applied the governing *Strickland* standard to the facts and circumstances of petitioner's claims of ineffective assistance of appellate counsel. Therefore, even assuming that it is cognizable, relief should be denied on petitioner's fourth claim. Claims three, four, and five are noncognizable. Claims one, two, and three, and a portion of claim four are procedurally defaulted. And, even assuming that claim four is cognizable, it is

31

without merit, as the state appellate court reasonably applied the governing

*Strickland* standard to the circumstances at issue.

## <u>CONCLUSION</u>

This Court should deny the instant petition for writ of habeas corpus without granting an evidentiary hearing.  Should this Court determine that any of the issues not addressed on the merits are cognizable, or not procedurally defaulted, respondent requests the opportunity to address the merits of any such claims, in a subsequent submission.

May 7, 2007                                   Respectfully submitted,

                                              LISA MADIGAN
                                              Attorney General of Illinois

                                      BY:    /s/ Mary A. Fleming
                                              MARY A. FLEMING
                                              Assistant Attorney General
                                              100 W. Randolph, 12th Floor
                                              Chicago, Il. 60601
                                              (312) 814-3692
                                              Mfleming@atg.state.il.us
                                              Atty. Reg. #6242892

33

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| DEDRIC MOORE, | ) | |
| | ) | |
| Petitioner, | ) | No. 07-2015 |
| | ) | |
| v. | ) | The Honorable |
| | ) | Michael P. McCuskey, |
| DONALD HULICK, | ) | Judge Presiding. |
| | ) | |
| Respondent. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on Friday May 4, 2007, I electronically filed respondent's MOTION TO DISMISS the petition for writ of habeas corpus in the above-captioned matter with the Clerk of the United States District Court for the Central District of Illinois, Peoria Division, using the CM/ECF system, which will send notification of such filing to the following:  (not applicable). I hereby certify that on Monday May 7, 2007, I mailed by United States Postal Service the above-referenced MOTION TO DISMISS to the following non-registered party:

Dedric Moore, K52275
Menard Correctional Center
711 Kaskaskia Street
P.O. Box 711
Menard, Il 62259

LISA MADIGAN
Attorney General of Illinois

BY:   /s/ Mary A. Fleming
MARY A. FLEMING
Assistant Attorney General
100 W. Randolph, 12th Floor
Chicago, Il. 60601
(312) 814-3692
Mfleming@atg.state.il.us
Atty. Reg. #6242892

NO. 4-03-0790

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
SEP 2 8 2005
CLERK OF THE
APPELLATE COURT, 4TH DIST.

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DEDRIC T. MOORE, | ) | No. 98CF1558 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

Defendant, Dedric T. Moore, appeals from a July 2003 order of the trial court resentencing him to a total of 75 years' imprisonment. Defendant argues that the conversion of formerly concurrent sentences to consecutive sentences constitutes an improper increase in his sentence. We affirm.

I. BACKGROUND

In March 1999, a jury convicted defendant of attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 1998)), home invasion (720 ILCS 5/12-11(a)(2) (West 1998)), residential burglary (720 ILCS 5/19-3 (West 1998)), aggravated criminal sexual abuse (720 ILCS 5/12-16(a)(1) (West 1998)), and aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 1998)). In May 1999, the trial court sentenced defendant to a total of 75 years' imprisonment: a 60-year extended prison term for attempt (first degree murder), concurrent to a 60-year extended prison term for home invasion, concurrent to a 30-year prison term for aggravated arson, concurrent to a 7-year prison term for aggravated sexual

EXHIBIT A

abuse, consecutive to a 15-year prison term for residential burglary, for a 75-year prison term in total.

In May 1999, defendant appealed the convictions and sentences, and this court affirmed in People v. Moore, No. 4-99-0499 (January 11, 2002) (unpublished order under Supreme Court Rule 23). Thereafter, defendant filed a petition for leave to appeal. The Supreme Court of Illinois denied the petition but ordered this court to vacate the judgment and to reconsider in light of People v. Swift, 202 Ill. 2d 378, 392, 781 N.E.2d 292, 300 (2002). People v. Moore, 202 Ill. 2d 688 (2003) (nonprecedential supervisory order).

Upon reconsideration, this court vacated defendant's extended-term sentence and remanded for retrial or resentencing at the election of the State pursuant to section 5-5-3(d) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-3(d) (West 2002)). People v. Moore, No. 4-99-0499 (April 4, 2003) (unpublished order under Supreme Court Rule 23). The State sought resentencing. On July 1, 2003, the trial court resentenced Moore to a total of 75 years' imprisonment: 30 years for home invasion, consecutive to 30 years for aggravated arson, consecutive to 15 years for residential burglary, concurrent to 30 years for attempt (first degree murder), and concurrent to 7 years for aggravated criminal sexual abuse.

This appeal followed.

## II. ANALYSIS

On appeal, defendant argues that by ordering formerly

- 2 -

**A-2**

concurrent terms to run consecutively, the trial court improperly
increased his sentences.  The State argues that defendant
forfeited this issue by failing to raise it in a motion to
reconsider the sentence because section 5-8-1(c) of the Unified
Code requires that a defendant's challenge to his sentence be
made within 30 days of sentencing.  730 ILCS 5/5-8-1(c) (West
2002).

Typically, failure to raise a sentencing issue in a
postsentencing motion forfeits the issue on appeal.  <u>People v.
Reed</u>, 177 Ill. 2d 389, 393, 686 N.E.2d 584, 586 (1997).  However,
since the imposition of more severe sentences upon remand would
violate defendant's fundamental rights, this court will review
the sentences at issue to determine if the trial court
erroneously increased defendant's sentence under section 5-5-4(a)
of the Unified Code.  See 134 Ill. 2d R. 615.  Because the
question presented is one of law, our review is <u>de novo</u>.  <u>Woods
v. Cole</u>, 181 Ill. 2d 512, 516, 693 N.E.2d 333, 335 (1998).

As defendant correctly points out, section 5-5-4(a) of
the Unified Code prohibits a court from imposing a greater
sentence for an offense on remand and provides as follows: "Where
a conviction or sentence has been set aside on direct review or
on collateral attack, the court shall not impose a new sentence
for the same offense or for a different offense based on the same
conduct which is more severe than the prior sentence ***."  730
ILCS 5/5-5-4(a) (West 2002).

Illinois courts have held the length of the individual

- 3 -

**A-3**

sentence, rather than the aggregate of several terms, is critical in determining whether a sentence was improperly increased under section 5-5-4(a) of the Unified Code.  People v. Sanders, 356 Ill. App. 3d 998, 827 N.E.2d 17 (2005) (First District).  In Sanders, the trial court, upon remand, sentenced the defendant to three concurrent 25-year terms.  The defendant appealed the resentence, and the trial court sentenced the defendant to consecutive 10-year terms on each count.  The defendant again appealed, arguing the resentence violated section 5-5-4(a) because the aggregate term of imprisonment was increased upon resentence.  Sanders, 356 Ill. App. 3d at 1002-03, 927 N.E.2d at 20.  The appellate court affirmed, holding that although the defendant may serve a longer aggregate sentence upon remand, a 10-year term for each individual conviction is less than the previous 25-year term for each conviction.  Sanders, 356 Ill. App. 3d at 1005, 827 N.E.2d at 22.  Therefore, the trial court did not improperly increase defendant's sentence in violation of section 5-5-4(a) of the Unified Code.

Similarly here, upon remand, the court reduced the 60-year extended-term sentences for attempt and home invasion to 30-year terms.  Clearly, a 30-year prison terms is less than a 60-year term.  The aggregate of 75 years remains unchanged by the imposition of the 30-year home-invasion term, consecutive to the 30-year aggravated-arson term and the 15-year residential-burglary term.  Similar to the sentencing order in Sanders, defendant's individual terms were reduced, and his sentence was

- 4 -

**A-4**

not improperly increased upon remand in violation of section 5-5-4(a) of the Unified Code when the trial court imposed consecutive sentences upon formerly concurrent terms of imprisonment.

This court further notes that the cases relied upon by defendant are distinguishable. In <u>People v. Kilpatrick</u>, 167 Ill. 2d 439, 657 N.E.2d 1005 (1995), the trial court originally sentenced the defendant to consecutive sentences of six years for home invasion and nine years for attempted murder. Following the defendant's motion to reconsider, the court sentenced the defendant to a single 15-year sentence for both offenses. <u>Kilpatrick</u>, 167 Ill. 2d at 441, 657 N.E.2d at 1006. The supreme court reversed, holding that "although the total number of years defendant would be incarcerated was unchanged, consecutive sentences are not treated as a single sentence. Thus, the circuit court's action effectively increased defendant's sentences for each offense to 15 years." <u>People v. Carney</u>, 196 Ill. 2d 518, 530, 752 N.E.2d 1137, 1144 (2001) (interpreting <u>Kilpatrick</u>).

In the present case, the trial court did not attempt to convert more than one consecutive sentence into a single, longer sentence. In fact, the sentences for residential burglary, aggravated criminal sexual abuse, and aggravated arson remained unchanged, while the sentences for home invasion and attempt were both reduced from 60-year terms to 30-year terms. Therefore, <u>Kilpatrick</u> does not support defendant's argument.

<u>People v. Muellner</u>, 70 Ill. App. 3d 671, 388 N.E.2d 851

(1979) (Fifth District), is also distinguishable.  The defendant there was convicted of two counts of rape and two counts of deviate sexual assault and was sentenced to indeterminate sentences of four to eight years in prison on each count. Several days later, the trial court, upon the State's motion for rehearing, altered the sentence by ordering the terms imposed for rape to run consecutively to those imposed for deviate sexual assault.  Muellner, 70 Ill. App. 3d at 677, 388 N.E.2d at 856-57. The appellate court affirmed the judgment as modified, vacating the second sentence and reinstating the sentence originally imposed because the resentence increased the overall amount of time served from 4 to 8 years to 8 to 16 years.  Muellner, 70 Ill. App. 3d at 683-84, 388 N.E.2d at 861.

Here, no such increase occurred.  Therefore, Muellner also does not support defendant's position.

As defendant's individual terms were reduced and the aggregate remained unchanged, the trial court's resentence complied with section 5-5-4(a) of the Unified Code and did not constitute an improper increase of his sentence.

<div align="center">III. CONCLUSION</div>

For the reasons stated herein, we affirm defendant's sentence.

Affirmed.

McCULLOUGH, J., concurs.

COOK, P.J., dissents.

PRESIDING JUSTICE COOK, dissenting:

The key components of the May 1999 sentence were the 60-year extended term for attempt (first degree murder), the 60-year extended term for home invasion, and the consecutive 15-year prison term for residential burglary, which produced the 75-year total.  We affirmed, one judge dissenting, but the supreme court told us we were wrong, that extended-term sentences could not be imposed by a judge in this case.  Extended-term sentencing, requiring the factual finding that the crime was brutal and heinous, must be proved to a jury beyond a reasonable doubt. Swift, 202 Ill. 2d at 392, 781 N.E.2d at 300, citing Apprendi v. New Jersey, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 455, 120 S. Ct. 2348, 2362-63 (2000).

When the case returned to the trial court, that court looked for another way to impose its 75-year sentence.  The court did so by imposing the maximum 30-year nonextended sentence for home invasion, the previous 30-year sentence for aggravated arson, and the previous 15-year sentence for residential burglary, this time exercising its discretion to make all those sentences consecutive.  The court may impose discretionary consecutive sentences if "it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record."  730 ILCS 5/5-8-4(b) (West 2002).

This case does not involve sentences imposed in violation of section 5-8-4(a), requiring consecutive sentences

- 7 -

**A-7**

which are said to be void.  People v. Garcia, 179 Ill. 2d 55, 73,
688 N.E.2d 57, 65 (1997).  This case involves a situation where
the trial court had properly chosen to impose concurrent
sentences, but on remand changed its mind to impose discretionary
consecutive sentences, which it had not previously chosen to
impose.

Imposition of consecutive sentences has produced
difficulties.  In People v. Todd, 263 Ill. App. 3d 435, 636
N.E.2d 114 (1994), abrogated in Kilpatrick, 167 Ill. 2d 439, 657
N.E.2d 1005, the defendant was convicted of three counts of
criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 1992)).
Criminal sexual assault is a Class 1 felony, for which the
sentence shall be not less than 4 years and not more than 15
years.  730 ILCS 5/5-8-1(a)(4) (West 1992).  The trial court
determined a sentence of 12 years was appropriate.  Believing
that consecutive sentences were required, the trial court
sentenced defendant to four years on each count, to run
consecutively.  When it later developed that consecutive
sentences could not be imposed, the trial court resentenced
defendant to 12 years on each count, the sentences to run
concurrently.  The supreme court eventually held that the
resentencing, even though the total sentence was not increased,
was improper.

> "A defendant should not have to run the
> risk that a challenge to his consecutive
> sentencing will result in a resentencing of

- 8 -

**A-8**

increased length.  Such a risk would have

an improper chilling effect on a defendant's

decision to challenge a consecutive sentence

as imposed by the trial court and could vio-

late fundamental principles of due process

of law."  <u>Kilpatrick</u>, 167 Ill. 2d at 447,

657 N.E.2d at 1008.

I read <u>Kilpatrick</u> to express real concern about

increased sentences on remand, imposing strict rules even where

there is only a technical violation and the total sentence is not

increased.  I do not read <u>Kilpatrick</u> as endorsing a rule that

would somehow tolerate an increase in the total sentence on

remand.  <u>Kilpatrick</u> quoted with approval the language from

<u>Muellner</u> that "'the resentencing of defendant to consecutive

terms after originally imposing concurrent sentences was in the

very real sense an increase in the length of his sentence because

his earliest possible parole release will necessarily be delayed

to a later date in time.'"  <u>Kilpatrick</u>, 167 Ill. 2d at 444, 657

N.E.2d at 1007, quoting <u>Muellner</u>, 70 Ill. App. 3d at 683, 388

N.E.2d at 861.

I do not understand how <u>Sanders</u> can approve three

discretionary consecutive 10-year terms in place of three

concurrent 25-year terms.  How can an increase in the total

sentence from 25 years to 30 years comply with the broad

directive that the court "shall not impose a new sentence ***

which is more severe than the prior sentence" (730 ILCS 5/5-5-4

- 9 -

**A-9**

(West 2002))?  The <u>Sanders</u> court relied on <u>Carney</u>, but that decision only rejected defendant's argument that consecutive sentences must, under <u>Apprendi</u>, be treated as a single sentence. See <u>Carney</u>, 196 Ill. 2d at 531, 752 N.E.2d at 1144.

In the present case, the total sentence was unchanged. Under <u>Kilpatrick</u>, however, that is not a safe harbor.  After remand, the trial court made findings that it had not previously made and imposed a sentence that it had not previously imposed. Given the strict rules applied by <u>Kilpatrick</u>, I conclude that a more severe sentence was improperly imposed following remand in this case.

*0790*

NO. 4-03-~~0970~~

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

**F I L E D**

OCT – 5 2005

Clerk of the
Appellate Court. 4th Dist

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) ) | Champaign County, Illinois. |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC T. MOORE, | ) ) ) | Honorable, Thomas J. Difanis |
| Defendant-Appellant. | ) ) | Judge Presiding. |

---

**Affidavit of Intent to File Petition for Leave to Appeal**

**Notice and Proof of Service**

---

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL  62705-5240

KAREN MUNOZ
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

NO. 4-03-0970

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) ) | Champaign County, Illinois. |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC T. MOORE, | ) ) ) | Honorable, Thomas J. Difanis Judge Presiding. |
| Defendant-Appellant. | ) | |

## Affidavit of Intent to File Petition for Leave to Appeal

Now comes affiant, Karen Munoz, Assistant Defender, Office of the State Appellate Defender, Fourth Judicial District, and states on oath that she is counsel for the defendant-appellant in the above-entitled cause and that she in good faith intends to seek review by the Illinois Supreme Court of this Court's decision in the above-entitled cause by the filing of a Petition for Leave to Appeal pursuant to Supreme Court Rule 315; and therefore, requests this Court to stay the mandate in the above-entitled cause until disposition of the case by the Illinois Supreme Court.

Respectfully submitted,

Subscribed and sworn to
before me on this 5th
day of October, 2005.

KAREN MUNOZ
Assistant Defender

NOTARY PUBLIC

COUNSEL FOR DEFENDANT-APPELLANT

Official Seal
Melissa M. Redd
Notary Public State of Illinois
My Commission Expires 05/13/08

A-12

NO. 4-03-0970

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) ) ) | Champaign County, Illinois. |
| vs. | ) ) | No. 98-CF-1558 |
| | ) ) | Honorable, |
| DEDRIC T. MOORE, | ) ) | Thomas J. Difanis |
| Defendant-Appellant. | ) | Judge Presiding. |

## Notice and Proof of Service

TO: State's Attorneys Appellate
Prosecutor
725 South Second Street
Springfield, IL 62704

Dedric T. Moore
Register No. K-53438
Box 711
Menard, IL 62259

Julia Rietz, State's Attorney
Champaign County Courthouse
101 E. Main Street
Urbana, IL 61801

Please take notice that the original of the Affidavit of Intent to File Petition for Leave to Appeal is being delivered to the Clerk of the Appellate Court and that I am serving the SAAP by State of Illinois Messenger Service and the State's Attorney and appellant by depositing their copies in the mail in Springfield, IL, in envelopes with sufficient prepaid postage and addressed as indicated above on this _____ day of October, 2005.

MELISSA M. REDD
Legal Secretary

Subscribed and sworn to
before me on this ___5___
day of October, 2005.

NOTARY PUBLIC

Official Seal
Arlene Kay Montgomery
Notary Public State of Illinois

A-13

RECEIVED

OCT 2 6 2005

CRIMINAL APPEALS


RECEIVED

OCT 2 6 2005

CRIMINAL APPEALS

37720 E-FILED
Friday, 04 May, 2007  04:50:54 PM
Clerk, U.S. District Court, ILCD

NO. 4-99-0499

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT



**FILED**

MAY - 5 2000

CLERK OF THE
APPELLATE COURT, 4th DIST.

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. DiFanis, |
| Defendant-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, IL  62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

EXHIBIT B

# Points and Authorities

## I.

**The "Revised" DNA Frequency Calculations Were Unsubstantiated and Improperly Compelled the Conclusion That Dedric Moore Was the Sole Possible Intruder at Lori Hansen's Duplex.**

*People v. Eyler*, 133 Ill.2d 173, 549 N.E.2d 268 (1989) . . . . . . . . . . . . . . . . . . . . . 21

*People v. Hickey*, 178 Ill.2d 256, 687 N.E.2d 910 (1997) . . . . . . . . . . . . . . . . . 21, 22

*People v. Miller*, 173 Ill.2d 167, 670 N.E.2d 721 (1996) . . . . . . . . . . . . . . . . . . . . 21

*People v. Johnson*, 262 Ill.App.3d 565, 634 N.E.2d 1285 (4th Dist. 1994) . . . . . . . . 22

*People v. Lipscomb*, 215 Ill.App.3d 413, 574 N.E.2d 1345 (4th Dist. 1991) . . . . . . . 22

*People v. Miles*, 217 Ill.App.3d 393, 577 N.E.2d 477 (4th Dist. 1991) . . . . . . . . . . . 22

*People v. Pope*, 284 Ill.App.3d 695, 672 N.E.2d 1321 (4th Dist. 1996) . . . . . . . . . . 22

*Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C. Cir. 1923) . . . . . . . . . . . 26

## II.

**Use of "Mere Fact" Impeachment Created Reversible Error.**

*People v. Atkinson*, 186 Ill.2d 450, 713 N.E.2d 532 (1999) . . . . . . . . . . . . . . . 28, 29

*People v. McKibbins*, 96 Ill.2d 176, 449 N.E.2d 821 (1983) . . . . . . . . . . . . . . . . . . 28

*People v. Montgomery*, 47 Ill.2d 510, 268 N.E.2d 695 (1971) . . . . . . . . . . . . . . . . 28

*People v. Dixon*, 308 Ill.App.3d 1008, 721 N.E.2d 1172 (4th Dist. 1999) . . . . . . . 28, 29

*People v. Holloman*, 304 Ill.App.3d 177, 709 N.E.2d 969 (4th Dist. 1999) . . . . . . . . 28

## Nature of the Case

A jury found Dedric Moore guilty of the offenses of attempt (first-degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse and residential burglary.

The court sentenced Mr. Moore to a total of 75 years' imprisonment with the Department of Corrections on May 21, 1999. The court denied Mr. Moore's Motion to Reconsider Sentence on June 11, 1999.

Dedric Moore appeals his conviction.

No question is raised on the pleadings.

# Issues Presented for Review

I.

Whether the "revised" DNA frequency calculations improperly compelled the conclusion that Dedric Moore was the sole possible intruder at Lori Hansen's duplex.

II.

Whether use of "mere fact" impeachment created reversible error.

## Jurisdiction

Dedric Moore's appeal is from a final judgment of conviction, entered upon a jury verdict, in accordance with Article VI, Section 6 of the Illinois Constitution, and Illinois Supreme Court Rules 603 and 606.

Champaign County case No. 98-CF-1558 charged Dedric Moore with the February 25, 1998 offenses of:

- Count I, <u>attempt (first-degree murder)</u> (Vol. I, C. 1; 720 ILCS 5/8-4(a), 5-9-1(a)(1) (West 1998))
- Count II, <u>home invasion</u> (Vol. I, C. 2; 720 ILCS 5/12-11(a)(2) (West 1998))
- Counts III and IV, <u>aggravated arson</u> (Vol. I, C. 3-4; 720 ILCS 5/20-1.1(a)(1) (West 1998))
- Count V, <u>aggravated criminal sexual abuse</u> (Vol. I, C. 5; 720 ILCS 5/12-16(a)(1) (West 1998))
- Count VI, <u>residential burglary</u> (Vol. I, C. 6; 720 ILCS 5/19-3 (West 1998))

concerning his alleged acts of: (1) tying the feet and hands of Lori Hansen, pouring a flammable liquid onto her and her environs, setting fire to the surroundings, and flipping a cigarette onto Ms. Hansen – all with the intent to kill Lori Hansen; (2) entering Ms. Hansen's residence at 512A South New Street in Champaign, striking her head and body with his hands and feet, tying her hands, feet and neck, and choking, dragging and knocking her down; (3) partially damaging Ms. Hansen's residence by arson, knowing she was present; (4) partially damaging by arson the building owned by Harry Washburn, without his consent; (5) fondling Ms. Hansen's breast for his sexual arousal by force of striking her head and body with his hands and feet, causing her bodily harm, and by tying her hands and feet; and (6) entering Ms. Hansen's dwelling with the intent to commit theft. (Vol. I, C. 1-6) The jury found Dedric Moore guilty of all five offenses. (Vol. III, C. 728-32; Vol. XIII, R. 902-04)

On May 21, 1999, the court sentenced Dedric Moore to a total of 75 years:

- Count I, attempt (first-degree murder)                    60 years
- Count II, home invasion                    60 years, concurrent
- Count III, aggravated arson                    30 years, concurrent
- Court V, aggravated criminal sexual abuse                    7 years, concurrent
- Count VI, residential burglary            15 years, *consecutive to Count I*
  (Vol. IV, C. 760; Vol. XIV, R. 56-62)

The court awarded sentence credit of 184 days.  *(Ibid.)*

Counsel filed a Motion to Reconsider Sentence, and the court denied this motion on June 11, 1999.  (Vol. IV, C. 761; Vol. XV, R. 4-6)

Notice of Appeal was timely filed on June 16, 1999.  (Vol. IV, C. 763; Vol. XV, R. 7)

## Statement of Facts

Second-year University of Illinois law student Lori Hansen was subjected to a series of attacks during the early morning hours of February 25, 1998 at her rented duplex unit at 512A South New Street in Champaign.

*The First Entry – Residential Burglary*

On February 24th Lori left her duplex around 10:00 p.m. and visited two bars. She drove her friend Allison home around 1:30 a.m. and then returned home. (Vol. VII, R. 42-49) She opened her screen door, unlocked the front door and turned on the living room light; then, she said, "I heard a noise behind me and I turned and there was someone coming in the door right behind me. I tried to push the door closed, and I screamed, but it – he forced his way in." (Vol. VII, R. 49)

The intruder was hooded and appeared to be a man. He held his right hand over Lori's mouth and his left hand across her chest. The man demanded to know "Where's Chad?" and pushed her further into the duplex and down on her stomach. (Vol. VII, R. 50) She repeated that she did not know "Chad." The intruder also asked how much money she had, and he searched her clothing pockets. He bound her hands then her feet later. He also grabbed a pair of her shorts and placed them over her head as a partial blindfold. (Vol. VII, R. 51-53) She heard him ransack her unit, looking for her purse, additional money and her ATM cards. Although he did not speak clearly and he had turned the television on to a channel with only "snow," Lori heard him say that he was not going to hurt her. (Vol. VII, R. 53)

The man asked Lori whether her truck had a manual or automatic transmission, what the PINs were for her ATMs, and where her tape was. He wound some of her clear wide packaging tape around her head several times as a gag. She provided two PINs for

two of her ATMs. (Vol. VII, R. 53-57) She heard the man help himself to a beer from her refrigerator, and she could smell cigarette smoke. (Vol. VII, R. 57-58)

The intruder next obtained some cord and tied Lori's hands to her feet, carried her to the bathroom and deposited her in the bathtub. Using an extension cord he secured his previous ligatures to the bar over the soap dish in the tub. He told her if her PINs were correct, he would return and let her go – but if she lied, she would be sorry because he would return and hurt her. He turned off the bathroom light, shut the door, and left her unit, she surmised. (Vol. VII, R. 58-59)

*The Second Entry – Home Invasion*

After a period of time Lori could not measure, the bathroom light was switched on and the same man asked what she was doing. She told him she had urinated on herself from fear. The intruder took a table from the living room and placed it on Lori, still in the tub; she could not move. He left again, this time for a longer period than before. (Vol. VII, R. 60-61)

The intruder returned to the bathroom, removed the table from Lori and said, "You're cool." He freed her from the restraints to the soap dish, lifted her out of the tub and placed her on the floor between the bathroom and hallway. (Vol. VII, R. 61-62) As he started to untie her, she ordered him out of her house, thereby angering him. He approached her from behind and strangled her with a cord; her hands and feet were still bound. (Vol. VII, R. 62-64) While she lay on the floor he put his hand up her shirt, touched her breasts and put his mouth to her breast before he walked away. (Vol. VII, R. 65)

When the man returned, he stood at her head; Lori smelled something like nail or shoe polish. The intruder then unzipped his pants and urinated on her head, commenting, "When you drink that much beer, you got to take a piss." (Vol. VII,

-7-

R. 65-67)  The man walked away and returned to pour a cold liquid all over her still bound body; the liquid smelled like what she had detected minutes earlier.  The man was gone for a moment, and she turned her head to see a fire in her living room.  (Vol. VII, R. 67)  Not seeing the man, Lori said she:

> ducked into the bedroom next to where I was laying *[sic]* and tried to get undone, tried to figure out how to get out, and I saw a lamp that I was reaching to grab, and he showed up in the doorway, and before I could get ahold of the lamp, and he grabbed me by the arms and dragged me out of the room over the burning carpet into the living room.  I tried to push another lamp on him, and then he started punching me and knocked me down, and then he started kicking me in the head, back, stomach, and legs.

(Vol. VII, R. 67-68)

She had seen flames and smoke, and her pants were burned.  She struggled and tried to hit the man, whose face she could not see well.  He punched her.  (Vol. VII, R. 69)  She determined that he was African-American,  (Vol. VII, R. 70)

Lori fell to the floor, and the man stopped kicking her.  He flicked a lit cigarette at her head, which she was able to deflect from her face.  She got herself back in the bedroom and removed her restraints.  Unable to get the bedroom window open, she ran through her home toward the back door.  There was smoke and fire throughout her unit, and she had to jump over patches of fire on the carpet.  (Vol. VII, R. 70-72)  She ran to her neighbor's duplex where she was able to summon assistance.  (Vol. VII, R. 73-75)  Lori was treated at the hospital for burns to her finger and her knee, smoke inhalation, and additional injury where her burned jeans had adhered to her skin.  (Vol. VII, R. 75-77)

The arson investigator concluded that the fire at Lori Hansen's residence had been intentionally set.  (Vol. VIII, R. 168, 193)  Petroleum product from an ignitable liquid was present on some of the carpet tested from Lori's duplex.  (Vol. X, R. 484, 488-90, 497-98;

People's Exhibit No. 12B)  Petroleum product characteristic of gasoline was also found on Lori's bra.  (Vol. X, R. 492, 500; People's Exhibit No. 11)

*Police Interviews of Dedric Moore*

On March 4th Detective Don Shepard questioned Dedric Moore about his activities at the time in question.  Mr. Moore said he had been out of town, had no knowledge of what had occurred, and thought that maybe the "Mexican or Chinese mob" had been responsible "because they carry gasoline and beat people up."  Shepard said the defendant himself first mentioned "gasoline" in connection with the incident.  (Vol. IX, R. 334, 359-62)  Investigator Mark Strzesak had a similar recollection of the encounter with Mr. Moore.  (Vol. IX, R. 424, 439-40)

Mr. Moore told the detective that he then "stayed" at 108 East Healey Street with his brother, Dontay Moore, but had slept at the duplex adjoining Lori Hansen's while his grandmother Lillie had been out of town just before the fire.  (Lillie Moore was the tenant of the unit adjacent to Lori's.  (Vol. IX, R. 328))  Mr. Moore explained that he stayed at his grandmother's duplex intermittently but had moved out before Valentine's Day.  (Vol. IX, R. 362-63, 367)  At the time of the incident Lillie was in Mississippi, but she returned while the fire department was still in the process of extinguishing the fire.  (Vol. IX, R. 364)

Shepard re-interrogated Dedric Moore on March 5th at the Champaign Police Department, and the defendant explained that he had been in Urbana at the time of the incident after paging a "Jennifer" from a certain pay phone in the area.  (Vol. IX, R. 371-72)  The detective checked the pager number and found it "out of service."  He also checked the phone numbers made from the pay phones where and near where the defendant had indicated he had called.  Shepard could not verify Mr. Moore's accounting of his activities and whereabouts.  (Vol. IX, R. 372-73, 380-82)

-9-

*Scientific, Circumstantial and Inconclusive Evidence*

A forensic scientist matched Lori and <u>Dedric Moore's DNA</u> profiles to DNA recovered from Lori's stocking which had been used as a ligature during the assault. (Vol. XI, R. 592, 616, 620, 629; People's Exhibit No. 21B)  The scientist opined that the defendant's DNA profile "could be the major contributor . . . at the majority of the locations on *[sic]* the DNA. . . ." (Vol. XI, R. 633)

Partial body <u>hair fragments</u> recovered from Lori's jacket,  driver's seat of her truck, shorts and stocking were identified as "Negroid."  (Vol. X, R. 555, 566-67 [People's Exhibit No. 8A], 568-69 [People's Exhibit No. 68], 570-71 [People's Exhibit No. 17A] and 572-73 [People's Exhibit No. 21A])

A <u>Newport cigarette butt</u> was recovered from the crime scene.  (Vol. IX, R. 334, 343; People's Exhibit No. 19)  Police seized Newport cigarettes from Mr. Moore's residence.  (Vol. IX, R. 334, 365, 378; People's Exhibit No. 62)  Lori Hansen did not smoke Newports.  (Vol. VII, R. 42, 91-92)

A <u>handwriting</u> analysis between Dedric Moore's "voluntary" and "collected" known writing samples and a written notation of Lori's PINs retrieved from her truck proved inconclusive.  (Vol. IX, R. 334, 395; Vol. X, R. 460, 475)

- The questioned documents examiner found that the notation of PINs "1972" and "2810" (People's Exhibit No. 67; Vol. IX, R. 308) had "characteristics in common . . . with the defendant's "*voluntary*" writing samples contained in his jail request slips.  (People's Exhibit No. 71A-C)

- However, the handwriting exemplars which had been "*collected*" from the defendant (People's Exhibit No. 70A-C), the examiner described as awkward, unnatural, inconsistent and consciously disguised, and these made a comparison more difficult.  (Vol. X, R. 460, 469-70, 474)

The examiner ultimately made no identification of the questioned writings to Mr. Moore's. (Vol. X, R. 475)

At a police line-up, Lori Hansen was unable to identify her assailant by sight or voice, although she narrowed her selection to two men, one of whom was Dedric Moore. (Vol. VII, R. 79-83, 104; Vol. IX, R. 385-92)

A videotape taken from Lori Hansen's bank showed her truck at the drive-through ATM lane around 2:30 a.m. on February 25th. (Vol. VIII, R. 271, 277-81; Vol. IX, R. 424, 434-37; People's Exhibits No. 4-6) Still photographs were produced from the videotape. (Vol. VIII, R. 282-83, People's Exhibit No. 5A-5E) No positive identification of the defendant was made from these photographs, which were distorted when enlarged. (Vol. IX, R. 437) Bank records indicated that three attempts to remove cash from Lori's account were made at that time. (Vol. VIII, R. 283-86; Vol. IX, R. 318-19; People's Exhibit No. 7)

No latent fingerprints suitable for comparison from the scene or related sites were identified with the known prints of Dedric Moore or Lori Hansen. (Vol. IX, R. 456-57)

*The Defense*

Ivory Burrage, a friend of Dedric Moore's, provided an alibi for the defendant. (Vol. XI, R. 665-69) Dedric Moore's own testimony corroborated Ms. Burrage's account of their activities and location that night. (Vol. XII, R. 708, 713, 715-20, 739) (The police responded to this alibi during the State's rebuttal case that when questioned before trial, Mr. Moore had never provided Ms. Burrage's name as an alibi witness. (Vol. XII, R. 766, 769-70, 774))

The defendant's brother, Emmaniel Moore, provided an alibi at trial that differed from the one he had given for Dedric before trial. Emmaniel's alibi also differed from the one at trial that his brother and Ms. Burrage had offered. (Vol. XI, R. 676-89)

-11-

## Argument

### I.

### The "Revised" DNA Frequency Calculations Were Unsubstantiated and Improperly Compelled the Conclusion That Dedric Moore Was the Sole Possible Intruder at Lori Hansen's Duplex.

Identification of Lori Hansen's assailant was the primary trial issue in this case. Visual, aural, fingerprint, hair and fiber evidence was inconclusive, save for the DNA testing from one clothing item, a piece of the complaining witness' stocking which had allegedly been used as the assailant's face mask. The initial frequency calculation for this sample indicated that approximately 30 other African-American persons in the Champaign-Urbana area could possess a matching DNA profile, while a "revised" test made such a match impossible with virtually anyone else on the planet. The State's opportune revision of its frequency calculation methodology was not justified and necessitates a retrial.

*A Primer on DNA Testing*

Kevin Zeeb was the State's DNA expert. (Vol. XI, R. 592-00) (Zeeb's entire testimony is contained in Appendix A.) After discussing DNA generally, he described the protocol employed by the Illinois State Police for DNA testing, which included, *inter alia*:

- regular testing and certification of forensic scientists in the field
- "clean technique": wearing latex gloves (*i.e.*, never touching a sample with bare hands)
- being masked if sneezing or coughing
- bleaching countertops, utensils and "instrumentation"
- using pipette tips that have cotton plugs in the middle
- using "decappit" *[sic]* tools to open and close the tubes
- analyzing questioned samples with the least amount of material before analyzing the samples from the standards (or reference samples)

(Vol. XI, R. 603-05)

-12-

Zeeb himself did all the analysis in Dedric Moore's case, and his "technical leader," William Frank, reviewed Zeeb's file.   Eight other analysts performed peer review. (Vol. XI, R. 606)

Zeeb conducted "PCR" (polymerase chain reaction) DNA analysis, "a chemical method of copying or reproducing or replicating or amplifying specific areas of the DNA molecule that we're interested in, copying that segment over and over and over until we have millions and millions of copies to work with." (Vol. XI, R. 607)  PCR analysis has been accepted and validated in the scientific community.  (Vol. XI, R. 607-09)  Zeeb delineated the preliminary techniques for PCR method of DNA typing as:

> First of all, DNA has to be extracted from a sample.  So, I take a small portion of a stain, put it in some stain extraction buffer or detergent, add some other chemicals to it, put it in a[n] . . . incubator that's rather warm, and let it sit overnight.
>
> The next day, I would come in and do an organic cleanup of it, in other words, to remove all impurities, and then I would isolate the DNA molecule and recover it in a buffer.
>
> Once I've done that, I have to determine how much DNA is there and what quality is it.
>
> So, the next thing I would do is what . . . we call a yield gel[,] which allows me to get a rough estimate of the quantity of DNA, and it also tells me the quality of the DNA, if it's molecular weight grade or if it's degraded DNA.
>
> Then I would go ahead and do another quantitative test that's very more specific where I would identify anywhere between 10 nanograms of DNA down to .15 nanograms of DNA; and if I see any kind of reaction, that then I know that human DNA is present.
>
> (Vol. XI, R. 609-10)

Zeeb continued with his description of the "PCR technique":

• one nanogram (one billionth gram) to two and a half nanograms is combined with in a reaction mixture that comes with the kits

- this sample is put into a thermal cycler (computerized instrument that heats and cools the tubes on a programmed schedule) for 28 cycles during each one of which nine specific areas of the DNA molecule are replicated twice

(Vol. XI, R. 610)

The expert elaborated that:

> 99 percent of our [human] DNA is coating DNA, in other words, it has a function of producing some kind of a chemical enzyme protein or whatever. But one percent of our DNA molecule is filler DNA. Sometimes it's referred to as junk DNA. And this is the DNA that forensic scientists look at because it differs from one person to another.

(Vol. XI, R. 611-12)

Zeeb added that forensic scientists also examine two kind of polymorphism, sequence polymorphism and length polymorphism. (Vol. XI, R. 612) After identifying the four "building blocks" in DNA (adenine, guanine, cytosine and thymine), Zeeb defined "sequence polymorphism" in terms of the various sequences the four building blocks assume on each strand of DNA. (Vol. XI, R. 612-13) He described "length polymorphism" in terms of the number of repeat regions of the above sequences: "We look at variations of different lengths of the DNA molecule at different areas, specific areas of the DNA molecule to get our characteristics in our DNA profile." (Vol. XI, R. 613) The prosecutor summarized that "the length of those repeat sequences then vary from individual to individual." *(Ibid.)* Zeeb clarified that he conducted "STR analysis," referring to "short tandem [side by side] repeats." (Vol. XI, R. 614)

*Zeeb's Tests in This Case*

The forensic scientist tested samples from various items of evidence: a cigarette butt, pair of shorts, blood from a piece of glass, and a swatch of black stocking. (Vol. XI, R. 614-16) Zeeb did not detect the presence of human DNA on the <u>cigarette butt</u>.

-14-

(Vol. XI, R. 617-18) Although he found human DNA on the shorts, Zeeb could not conduct a PCR analysis because the amount was too small. (Vol. XI, R. 618)

Human DNA was also found in the blood sample from the piece of glass and stocking, and there was enough DNA in each for Zeeb to perform a PCR analysis. He compared these DNA samples to known standards of victim Lori Hansen (People's Exhibit No. 61A), defendant Dedric Moore (People's Exhibit No. 64A) and Dedric's brother Donrico Holtzclaw (People's Exhibit No. 66A). (Vol. XI, R. 620-23) The PCR testing protocol on these known samples concentrated on nine different chromosomes in the DNA strands. (Vol. XI, R. 627)

Using the PCR analysis, Zeeb identified DNA profiles on the blood from the glass and from the piece of stocking. From the blood on the glass Zeeb "identified a DNA profile that matche[d] the DNA profile of Lori Hansen." (Vol. XI, R. 628) In regard to the piece of stocking, the forensic scientist said:

> . . . I *identified a mixture of DNA* profiles. One DNA profile matche[d] the DNA profile of *Dedric Moore*. Another DNA profile matche[d] the DNA profile of *Lori Hansen*. An *additional* DNA profile was identified that *[did] not match Lori* Hansen, *Dedric* Moore, *or Donrico* Holtzclaw.
>
> (Vol. XI, R. 629) *(Emphasis added.)*

(Zeeb excluded Donrico Holtzclaw from being a contributor to the blood on the glass or to the DNA on the piece of stocking. *(Ibid.)*)

Over objection, the forensic scientist offered that a woman whose DNA profile was consistent with Lori Hansen's and who wore the stocking could leave a DNA profile consistent with what Zeeb found. (Vol. XI, R. 630) He added that if a person with a DNA profile consistent with Dedric Moore's pulled a cut piece of the stocking over his face, he could leave a DNA profile consistent with what was also found on the stocking. (Vol. XI, R. 630-31) Zeeb agreed with an explanation offered by the prosecutor for the third DNA

profile that did not match Lori Hansen's, Dedric Moore's or Donrico Holtzclaw 's. (Vol. XI, R. 631)

*Exploitation of the Above Findings*

Once Zeeb identified the DNA profiles on the stocking, he compared them to what the prosecutor termed "established population databases, in other words, to calculate the statistical frequency of encountering these profiles in the general population." (Vol. XI, R. 631) These frequencies we calculated separately for different racial groups, Zeeb said:

> Because each racial group, the characteristics are found in different frequencies. The frequencies found in Caucasians are different than Blacks, which are different than in the Mexican race *[sic]*, or the Native Indian race or Oriental race.

> (Vol. XI, R. 632)

Zeeb prepared two frequency calculations because he did not know from which race, African-American or white, the samples had originated. He also prepared two frequency calculations for the "mixed" or "combined" profiles" obtained from the stocking. *(Ibid.)* *The combined profiles*, Zeeb concluded, "which is a very conservative estimate, *could be found in approximately 1 in 27 hundred Blacks* or approximately 1 in 5 thousand Caucasians." (Vol. XI, R. 633) *(Emphasis added.)*

Zeeb also determined that *one profile could be identified as the major contributor*, "the one that *stood out at the majority of the locations* on the DNA," a "major profile on this case at the majority of the location": *Dedric Moore's. (Ibid.) (Emphasis added.)* The forensic scientist added that he identified Lori Hansen as a "medium contributor" at the majority of the locations of the DNA. *(Ibid.)* (A "leftover minor contributor" with the weakest DNA profile was never identified. (Vol. XI, R. 633-34)) No precise percentages distinguished between or among a "major, medium or minor contributor." (Vol. XI, R. 654-55)

-16-

Zeeb then created frequency calculations for the separate DNA profiles he found in terms of the general population. For the DNA profile on the stocking that matched Lori Hansen's, Zeeb calculated the frequency of finding that DNA profile in the general white population as approximately 1 in 1.6 trillion Caucasians, or approximately 1 in 660 billion African-Americans. (Vol. XI, R. 634) *For the "DNA profile on the stocking that was a major profile that matched Dedric Moore's*," Zeeb's frequency calculation was approximately 1 in 720 billion Caucasians, or *approximately 1 in 150 billion African-Americans*, or "about *25 times the number of people* in the population *of the earth*." (Vol. XI, R. 634-35) *(Emphasis added.)*

Cross-examination of forensic scientist Zeeb disclosed that he had prepared two different "statistical calculations" in describing the above frequencies, and at two discrete times. He explained:

> When I originally worked the case and written up a report, our procedures *[sic]* was that if I cannot differentiate between the different contributors at all nine loci [specific areas or addresses on the DNA molecule], then I would give a combination of all possible frequencies, and that's exactly what I did on the first set of statistics, and that's why the statistics are very small.
>
> On the second set of statistics that I gave, *after the report had gone out*, our procedures changed to where we could add more weight to our interpretations, meaning that if we can identify at least at five or more loci, then we can go ahead and separate out the contributors and give them individual statistics.
>
> (Vol. XI, R. 640-41, 651) *(Emphasis added.)*

(While Zeeb could state that a tested DNA sample "matched" a particular person and could give a statistical weight to the match, he could not say that any particular sample actually "came" from any designated person. (Vol. XI, R. 643)) The first report on the stocking – dated September 10, 1998 – considered the combined DNA profiles of Lori Hansen, Dedric Moore and one other, and produced a "combined profile index" of one in

-17-

2,700 African-Americans.  (Vol. XI, R. 641)  (In other words, in a city of approximately 100,000 persons, about 30 African-Americans would have a DNA profile that matched the DNA profile on the stocking.  (Vol. XI, R. 641-42, 649))

The second report – dated February 25, 1999 – was generated after a call from an Assistant State's Attorney.  (Vol. XI, R. 643-44)  Zeeb explained:

> It was my decision to call my superiors and inform them that a case that was worked with conservative statistics originally was going to court[,] and that since that time we gave more weight to the statistics or interpretations, and I inquired as to whether or not I should go ahead and submit a report stating those facts, and it was advised that I should.

(Vol. XI, R. 645)

The forensic scientist clarified that the "only thing different" for the second report was the statistical calculation, since by then he could identify who was the major, medium and minor contributors to the DNA sample in seven of the nine designated loci.  (Vol. XI, R. 645-46)

The change in the office policy that permitted the new calculation concerned the number of loci that had to be identified to differentiate between and among the DNA contributors.  The older policy had required all nine loci; the newer policy allowed for "five or more" loci.  An amended report was submitted on March 5, 1999.  (Vol. XI, R. 646)

The frequency calculation for African-American contributors of the DNA on the stocking that matched the DNA profile of Dedric Moore thus blossomed from one in 2,700 to one in 150 billion – "about 25 times the number of people in the population of the earth."  (Vol. XI, R. 635, 647)  With this second set of numbers, only an identical twin could possess matching DNA.  (Vol. XI, R. 647-48)  However, Zeeb offered, "Just because the numbers are very, very high doesn't mean that there's not someone out there that has that profile, but it just indicates to us that the chances of finding that person is [sic] very, very slim."  (Vol. XI, R. 648)

-18-

*The Revised Tests Results Should Not Have Been Considered*

<u>The standard of review is abuse of discretion</u>.  "The decision of whether to admit expert testimony about a new scientific technique is committed to the sound discretion of the trial court." *People v. Miller*, 173 Ill.2d 167, 187, 670 N.E.2d 721, 731 (1996), *citing People v. Eyler*, 133 Ill.2d 173, 212, 549 N.E.2d 268 (1989).

In *People v. Hickey*, 178 Ill.2d 256, 687 N.E.2d 910 (1997), our Illinois Supreme Court reiterated its earlier acceptance of RFLP profiling and the "product rule" for establishing frequency calculations in various populations:

> Shortly after defendant's initial brief was filed, this court addressed the challenges raised by defendant with respect to the admissibility of RFLP profiling in another case. In *People v. Miller,* 173 Ill.2d 167, 670 N.E.2d 721 (1996), we concluded that the forensic use of RFLP analysis is generally accepted by the relevant scientific community.  We also concluded that the product rule is a generally accepted method of calculating DNA profile frequencies. *Miller*, 173 Ill. 2d at 188-89, 670 N.E.2d 721.  Nothing has occurred in the short time since our decision in *Miller* was issued which would cast doubt upon the results reached in that case.  To the contrary, recent developments in the scientific community indicate continued support for the use of RFLP profiling and for the use of the product rule. . . .

> *Hickey*, 178 Ill.2d at 278.

See also *People v. Lipscomb*, 215 Ill.App.3d 413, 574 N.E.2d 1345 (4th Dist. 1991); *People v. Miles*, 217 Ill.App.3d 393, 577 N.E.2d 477 (4th Dist. 1991); and *People v. Johnson*, 262 Ill.App.3d 565, 634 N.E.2d 1285 (4th Dist. 1994) (Fourth District Appellate Court decisions upholding RFLP testing, "product rule" frequency calculations, or both), and *People v. Pope*, 284 Ill.App.3d 695, 672 N.E.2d 1321 (4th Dist. 1996) (upholding PCR amplification procedure).

The error in Dedric Moore's case is that forensic scientist Zeeb testified that the chances of someone else's DNA matching that profiled from Lori Hansen's stocking

mushroomed from one in 2,700 African-Americans to one in 150 billion African-Americans, or "about 25 times the number of people in the population of the earth."

Zeeb explained that Illinois State Police forensic scientists had historically examined nine different chromosomes: "The more different genetic marker systems that I look at, the more differentiating I can be to where I can add more and more weight to who the possible contributor of that stain is." (Vol. XI, R. 627) The following colloquy ensued concerning the timing and changing of the procedures to reduce that number to "five or more" loci:

> Q. [DEFENSE COUNSEL]: . . . Let me ask you this, in between September 10th of 1998, and February 25th of 1999, when you recalculated and got those completely different percentages, did you receive any phone calls from any law enforcement agencies or the Champaign County State's Attorney Office?
>
> A. [ZEEB]: Yes, I did.
>
> Q. Who did you receive phone calls from?
>
> A. I talked to Assistant State's Attorney Heidi Ladd.
>
> Q. And do you recall when you talked to her?
>
> A. What time frame are we talking about?
>
> Q. In between September 10th, 1998, and February 25th, 1999.
>
>         *     *     *
>
> A. I talked to Mrs. Ladd on October 8th of '98, to inform her [of] the status of analyzing Donrico Holtzclaw's blood standard.
>
> I called – I talked to Mrs. Ladd on March 4th during a pretrial conference that was held at the Morton lab, where I explained my findings.
>
> And I've been calling the State's Attorney Office the last couple of days to find out court status, court times and dates.

Q.  And in either of those, in any of those conversations, did you explain the percentages that you got in your first calculation before those second calculations were made?

A.  Yes.

Q.  Whose decision was it to create second calculations with these numbers?

A.  It was my decision to call my superiors and inform them that a case that was worked with conservative statistics originally was going to court[,] and that since that time we gave more weight to the statistics or interpretations, and I inquired as to whether or not I should go ahead and submit a report stating those facts, and it was advised that I should.

(Vol. XI, R. 643-45)

Zeeb performed no new evaluations or interpretations, he clarified:  "The only thing different are the statistical calculations." (Vol. XI, R. 645)  He continued:

A.  Well, like I said before, before I added all possible types, combined profiles.   And the second go-around, I – I determined that I can identify who was the major contributor, who was the medium contributor, and who was the minor contributor.

Q.  And you couldn't do that the first go-around?

A.  I could do it the first go-around, but *our policy was if I cannot differentiate between the contributors at all nine loci, then I had to give a combined statistics [sic].*

*And in this particular case, I could differentiate between the major and the medium contributors in seven of the nine loci and not all nine.*

Q.  And so then you recalculated it because your office policy changed regarding major, minor and medium contributors; is that correct?

A.    *Our office policy changed regarding when I can differentiate between contributors looking at five or more loci versus looking at all nine loci.*

Q.  And so on March 5th, 1999, you submitted what you called an amended report looking at that same material; correct?

A.  That's correct.

-21-

Q.  And you – And at that time, then, is it fair to say in these percentages or these numbers you gave greater weight to the fact that somebody was a major versus a moderate or a minor contributor?

A.  These interpretations were done originally, but, *yes, we did give more weight to this in the second report*, and that's one of the things that our group decided was that with all this new technology, we can give more weight to our findings[,] and we don't have to be as conservative as we were when we started out.

Q.  What do you mean by not having to be as conservative?

A.  In other words, we're seeing that we've got a lot of genetic information here that we could separate out contributors and add more weight to the statistics.  Where, if you combine all the possible statistics or frequencies, then that would kind of dilute down the stats.

(Vol. XI, R. 645-47)  *(Emphasis added.)*

The forensic scientist repeated his explanation:

. . .  Our policy was to be very conservative in the beginning. And through the evolution of technology and the evolution of seeing how – how informative this technique is and the instruments that we have, we later on agreed to add more weight to profiles like this if we can differentiate at five or more loci instead of all nine loci.

(Vol. XI, R. 651)

This "agreement" was reached "[b]ased on validation studies and peer review, discussion among ten analysts," one of whom was Zeeb himself.  However, "[s]ome analysts said we couldn't go any more, you know, if you cannot differentiate between three or more loci. Another one said, no, all nine.  And then checking through the forensic community, it was established that, yes, at five or more loci we can differentiate between the different contributors."  (Vol. XI, R. 652)  The prosecutor rephrased the testimony as:  ". . . this wasn't just people sitting in a room and deciding that they wanted to calculate statistics differently, this was based on validation studies and meetings in the forensic community[.]"  (Vol. XI, R. 653)  Zeeb agreed.  *(Ibid.)*

-22-

Although forensic scientist Zeeb suggested that the decision to reduce the number of matched loci from nine to five was made in an objective, scientific, verifiable setting, his conclusion was only his opinion.   Zeeb had a vested interest in offering that conclusion since he apparently was one of the scientists who had urged that the number of relevant loci matches be reduced.   There was no independent evidence that anything resembling a *Frye* test was applied when the trial court admitted this self-serving testimony from Zeeb.  (*Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (D.C. Cir. 1923))

The prejudice to Dedric Moore from the admission of this testimony is patent. Before the change in procedure, thirty other African-Americans from the immediate area could statistically have had DNA profiles that matched the intruder's; after the new procedure, no other African-American on Earth could statistically have had a matching DNA profile.   From the reasonable doubt inherent in the first calculation, "scientific certainty" was conveniently constructed from the second.

Identification was a problem in the State's case.  Lori Hansen could not identify the intruder-assailant in a line-up, after viewing and even after listening to the line-up participants.  Photographs from the ATM videotape were inconclusive.  Fingerprints were not helpful; hair fragments were not determinative.  The only evidence that directly linked Dedric Moore to the crime scene was the DNA profile on the complaining witness' stocking that, according to the revised frequency calculation, no other African-American on Earth except Dedric Moore could have contributed.  The State should not have been able to offer this revised methodology unless and until its reliability and general acceptance in the scientific community had been established other than by the testimony of its sole DNA witness.

-23-

## II.

### Use of "Mere Fact" Impeachment Created Reversible Error.

Defense counsel filed a Motion *in Limine* to prohibit the use of Dedric Moore's prior felony convictions (for forgery in 1995 and for attempt (burglary) in 1998) for impeachment should he testify. (Vol. III, C. 641-42; Vol. VII, R. 2-3) The prosecutor argued that the "mere fact" method of impeachment should be used. (Vol. VII, R. 4) The court apparently accepted the State's rationale and reasoned:

> Well, the Court must always weigh the probative value of a prior, using a prior conviction for impeachment versus the prejudicial impact.
>
> In the case before the Court, as Ms. [defense counsel] Lenik has said, some of the charges are similar to or very close to the prior convictions that this Defendant has.
>
> *I think it would be inappropriate to inform the jury that he has a prior forgery and a prior attempt burglary conviction.*
>
> But if the jury is to adequately weigh the credibility of the witnesses, and that would include the Defendant, I think they need to know that at some point in time the Defendant chose to violate the laws of society.
>
> So, what I will do is *if the Defendant testifies* and if the files are brought to the Court's attention, *I will let the jurors know that he had prior felony convictions* and leave it at that.
>
> (Vol. VII, R. 4-5) *(Emphasis added.)*

Thus, the court denied the Motion *in Limine* and employed the "mere fact" method of advising the jury about Mr. Moore's criminal history after he testified: " . . . the Court has taken judicial notice of some files from . . . Champaign County concerning this Defendant, and I will inform you that the Defendant has prior felony convictions. You will get an instruction as to what to do with that information." (Vol. XII, R. 778) Counsel preserved the issue of the outright denial of the Motion *in Limine* in Mr. Moore's post-trial motion. (Vol. III, C. 749, ¶9) In light of **People v. Atkinson**, 186 Ill.2d 450, 458,

713 N.E.2d 532, 536 (1999), the trial court committed reversible error when it considered admitting the "mere fact" of Dedric Moore's prior convictions for impeachment purposes and thereby improperly altered the *Montgomery* balancing test (*People v. Montgomery*, 47 Ill.2d 510, 516, 268 N.E.2d 695, 698 (1971)).

     The standard of review is abuse of discretion.   A trial court's decision to allow impeachment by a prior conviction should not be reversed absent an abuse of discretion. *People v. Dixon*, 308 Ill.App.3d 1008, 1017, 721 N.E.2d 1172, 1179 (4th Dist. 1999), citing *People v. McKibbins*, 96 Ill.2d 176, 187-88, 449 N.E.2d 821, 826 (1983).   Under *Montgomery*, a prior conviction is admissible to impeach a testifying defendant if (1) the conviction was for a crime punishable by death or imprisonment for more than one year; or (2) the conviction was for a crime involving dishonesty or false statement.   In either case, the prior conviction is not admissible if (1) it is more than 10 years old, or (2) the probative value of the conviction is substantially outweighed by the danger of unfair prejudice. *Dixon*, *ibid., citing Montgomery*, 47 Ill.2d at 516, 268 N.E.2d at 698.

     Under the mere fact method of impeachment, the jury hears only about the existence of a prior conviction and not the specific crime of which the defendant was convicted. *Dixon*, *ibid., citing People v. Holloman*, 304 Ill.App.3d 177, 182, 709 N.E.2d 969, 972 (4th Dist. 1999).   The mere fact method does not supplant the *Montgomery* analysis; however, in determining whether the probative value of the evidence sought to be admitted is substantially outweighed by the danger of unfair prejudice, the trial court considers mere fact impeachment as an evidentiary alternative.   *Dixon*, *ibid., citing People v. Atkinson*, 288 Ill.App.3d 102, 107, 679 N.E.2d 1266, 1269 (4th Dist. 1997), *rev'd* 186 Ill.2d at 463-64, 713 N.E.2d at 538-39.

     In the instant case, if the trial court had conducted the *Montgomery* balancing test exclusively in the manner required by *Atkinson* – that is, if it had not considered mere

-25-

fact impeachment as an alternative – then the evidence of Mr. Moore's prior convictions would not have been admitted because their probative value was outweighed by the risk of unfair prejudice.  The trial court here specifically found that the type of forgery and attempt (burglary) of which Mr. Moore had been convicted was prejudicially close to the type of ATM theft alleged in the instant case.  Therefore, had the *Montgomery* test been employed without the addition of applying the "mere fact" method, then the jury would not have been informed of these prior convictions.  Reversal is therefore required.

## Conclusion

For the above reasons, Dedric Moore respectfully asks this Court to reverse his convictions for attempt (first-degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse and residential burglary, and to remand his cause for a new trial.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth, Suite 102
P. O. Box 5750
Springfield, IL  62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

# (Volume XI)

MS. LADD:  Call Kevin Zeeb.

(Witness sworn.)

KEVIN L. ZEEB

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Let me interrupt for just a minute and collect the exhibits from the previous witness.

Could you please tell us your name.

A.  Yes.  My name is Kevin L. Zeeb.  My last name is spelled Z-e-e-b.

Q.  Where are you employed?

A.  I'm employed at the Illinois State Police Morton Forensic Science Laboratory located at 1810 South Main in Morton, Illinois.

Q.  And in what capacity then are you employed by the state lab?

A.  I'm a forensic scientist specialized in the field of forensic biology and forensic DNA analysis.

Q.  How long have you been employed then, Mr. Zeeb?

A.  A little over 12 1/2 years.

Q.  Can you describe for us then what are your

592

A-1

primary duties?

A.  My primary duties include receiving physical evidence from law enforcement agencies and fellow biologists and fellow DNA analysts, conducting a biological analysis or a DNA analysis on that evidence, taking copious notes and writing a summary report containing my findings and testifying in court when called upon.

Q.  Can you tell us what is forensic biology and what types of evidence then does it include?

A.  Forensic biology is a study of blood, semen, and other body fluids such as saliva, urine, feces, perspiration, things of that nature.

Q.  Then what is forensic DNA analysis and what type of evidence does that include?

A.  Forensic DNA analysis is a state-of-the-art technique that has been well established in the scientific, medical, and forensic community that's a very sensitive and informative technique that gives me a vast amount of information from a very small amount of sample.

Q.  Can you tell us then what type of comparisons can be made in the area of forensic DNA analysis?

A.  Yes.  DNA analysis generates genetic

593

information in the form of a DNA profile.  This DNA profile consists of genetic markers that have their own individual characteristics.  These characteristics are what I use to either include or exclude someone as a possible source of that bloodstain or stain.

Q.  And what percentage of your time then do you spend working in the area of forensic biology and forensic DNA analysis?

A.  I'm a full-time analyst.  I either spend -- I spend most of my time doing DNA analysis and a small amount of time doing biological analysis, but I'm a full-time analyst.

Q.  Can you describe your educational background for us?

A.  Yes.  I have a Bachelor of Science Degree in biology with a minor in chemistry.  I received my degree back in 1980 at McKendree College located in Lebanon, Illinois.

After that, I worked as a laboratory technician for five and a half years at St. Joseph's Hospital in Breese, Illinois.

In '91 and '92, I took a biochemistry class and a cell molecular biology class at Bradley University located in Peoria, Illinois.  And these two classes were two of three that are required in order for you to get

594

A-3

into DNA analysis.  The other class is genetics, and I had taken that class in college.

Q.  Now, can you outline then just in general your experience and training in the field, in addition to the educational background?

A.  Yes.  I had 26 months of intense formalized training at the Training and Applications Forensic Science Laboratory located in Carbondale, Illinois.

After I successfully completed my training, I was transferred to the Morton lab where I conducted seven years of biological analysis.

In April of '95, I attended a seven-day DNA workshop at the Perkin-Elmer Laboratory facility in Foster City, California.

After that, I received 11 months of training under the guidance of Dr. Pam Fish, who is a DNA coordinator in Chicago.

After that, I received six months of additional DNA training under Research and Development Coordinator William Frank.

In February of '96, I believe, I was sent to Lab Corporation of America.  It's a big commercial lab where they do paternity testing.  I was sent out there for a two-week visiting scientist program so that I

595

could observe how these people conduct their analysis, look at their files, look at their procedures manuals, their quality assurance, look at what kind of safety measures they entail and get a good feel for what other labs are doing.

Then I started in September of '97, I'm sorry, in '96 as a visiting scientist to the Research and Development Laboratory in Springfield. There, I started my supervised casework in DNA analysis, and, at the same time, I was allowed to help assist the R & D staff in working on different kinds of research projects, and, eventually, I was -- received additional training in DNA analysis that I'm conduct -- that I conducted on this case.

Q. Does your training include conducting the laboratory analysis as well as a statistical comparison and interpretation of DNA profiles then?

A. Yes, it does.

Q. Does it also include using the computer equipment and technology for the evaluations?

A. Yes, it does.

Q. How many DNA analyses have you conducted, if you can estimate?

A. I'm guessing several thousand.

Q. Do these analyses then include proficiency

596

testing of certification requirements?

       A.   Yes.

       Q.   And who actually requires you to take those?

       A.   There's -- There was a governed body called TWGDAM.  TWGDAM is an acronym that stands for Technical Working Group on DNA Analytical Methods.  This organization was founded back in 1988.  This organization was overruled by another committee called DAB, or DNA Advisory Board; and, basically, they make sure that all DNA analysts and all laboratories are following proper protocol, using proper quality assurance measures, and things of that nature.

       But TWGDAM and DAB require that each analyst take at least two external proficiency tests a year.  I received my tests from Cellmark, which is an international quality assessment scheme.  I also have to take a proficiency test that's given to me in-house.  One of those a year.

       Besides that, our laboratory has to take an SRM test, which stands for Standard Reference Material test, and this is given through NIST or National Institute of Standard and Technology.  Basically, we're given ten extracts of samples, and we have to amplify and type those.  We're also given two samples that we

597

have to extract, amplify, and type.  Once we get our
results, we compare the results to the manual of the
test to make sure that we have the right calls.  That
procedure tests the laboratory.  It tests the analyst
conducting the test.  It tests the instruments.  It
tests the reagents.  And it tests how we interpret our
results.

Q.  And have you successfully completed and
passed all these tests and requirements?

A.  Yes, I have.

Q.  And has the lab where you conducted your
analysis on this case also passed that testing and
requirements?

A.  Yes.  And the Illinois State Police
Laboratory Systems are accredited through a group called
ASCLD LAB, American Society of Crime Lab Directors Lab
Accreditation Board.  Every five years, all laboratories
in Illinois are accredited by an inspection.  The last
inspection that we had was in '97, September of '97, and
we passed that one.

Q.  Now, are you also a member then of
professional societies or academies related to forensic
science?

A.  Yes, I am.

Q.  And what are some of these?

598

A-7

A.   I'm a member of the Midwestern Association of Forensic Scientists, the American Academy of Forensic Sciences, and the International Association of Blood Pattern Analysts.

Q.   Have you also conducted, participated in research within your area of expertise in DNA analysis in forensic biology?

A.   I participated in research, but it was under the guidance of research and development coordinators.

Q.   Have you also published papers in scientific journals and delivered presentations at scientific academies and societies within your field?

A.   No, I have not.

Q.   Now, have you taught courses or trained other scientists in your area of expertise?

A.   Yes.  I taught three clean technique classes to law enforcement agencies on the importance of clean technique and proper evidence collection, handling, and preservation.  I also taught two classes to Illinois State Police Division of Operations Personnel concerning the applications of forensic DNA analysis; and in these two classes, the clean technique procedure was also discussed.

Q.   Now, have you been qualified as an expert

599

1

2      in court on prior occasions then within your field?

3          A.   Yes, I have.

4          MS. LADD:   At this time, Your Honor, I would

5      tender Mr. Zeeb to the Court as an expert within his

6      field.

7          THE COURT:   Ms. Lenik?

          MS. LENIK:   Oh, I have no questions.

8          THE COURT:   All right.   He may testify as an

9      expert.

10         MS. LADD:   Thank you, Your Honor.

11         Q.   (by Ms. Ladd)   Mr. Zeeb, I'd like to ask

12     you some preliminary questions, first of all, to

13     familiarize the jury with the principles of DNA.   Could

14     you briefly explain what DNA is?

15         A.   Yes.   DNA stands for deoxyribonucleic

16     acid.   It's referred to as the molecule of hereditary,

       or also as the genetic blueprint of all living things.

17         This is the molecule that determines if we're

18     gonna be a plant or an animal.   It's gonna determine if

19     we're gonna be a mammal, reptile, amphibian, fish, bird,

20     et cetera.   So, it's gonna determine that we are gonna

21     be human beings.   It's gonna determine our sex, if we

22     are gonna be male or female.   It's gonna determine

23     visual characteristics such as the color of your hair,

24     color of your eyes, your stature, if you're gonna be

                              600

1

2      tall, short, big build, short build.

3              The DNA molecule is broken into 23 different

4      compartments called chromosomes.  Half the DNA that we

5      receive comes from our mother.  Half the DNA that we

6      receive comes from our father.  This is the molecule

7      that determines if we're gonna inherit any kind of

       disease that our parents carry.

8              Q.  Now, can I ask you then where is DNA found

9      within the body, what type of cells?

10             A.  DNA is found in all nucleated cells in the

11     body.  And that's basically all cells except fat cells

12     that store nothing but fat and red blood cells that

13     store nothing but hemoglobin.  But it's found in all

14     nucleated cells that contains the nucleus that contains

       the DNA.  These cells would be the white blood cells in

15     blood, sperm or spermatozoa in seminal material, and

16     also in muscle tissue, in hair root sheaths, in bone

17     marrow.

18             Q.  Let me interrupt for just a moment.  You

19     now referred to hair roots.  Would it be in the shaft of

20     the hair?

21             A.  It would be in the hair root sheath or the

22     meaty portion of the hair.  That is the portion that has

       actual tissue present.

23             Q.  Then the shaft does not contain DNA?

24
                              601

                             A-10

1

2          A.   The shaft -- If it does contain genomic

3     DNA, it contains very little.   There's another kind of

4     DNA that the shaft contains, and that's referred to as

5     mitochondrial DNA.

6          Q.   With the hair shaft then, there's not

7     sufficient DNA to replicate using a PCR process?

8          A.   That's correct.   If -- If a microscopist

9     looks at a hair and determines that there is no hair

10    root sheath, then no further analysis is conducted in

11    Illinois through the DNA tests that we conduct.

12         Q.   Now, you mentioned red blood cells.   A

13    transfusion involves red blood then; is that correct?

14         A.   That's correct.

15         Q.   Would a transfusion then transfer DNA from

16    one person to another?

17         A.   No, it would not, because the transfusion

18    would not include white blood cells.

19         Q.   Does DNA vary then from tissue to tissue

20    within one person's body?

21         A.   No, it doesn't.   If I was to test one

22    pulled or plucked hair, I would get the same DNA results

23    as if I would test a swabbing of my mouth, a sample of

24    my seminal material, a sample of my blood, a sample of

      my tissue, a sample from a pulled tooth, or a sample

      from a cut piece of bone.

                              602

1

2          Q.  And does DNA remain the same then

3     throughout an individual's lifetime?

4          A.  Yes, it does.

5          Q.  Is it possible to turn one person's DNA

6     into another person's?

7          A.  No, it is not.

8          Q.  If a sample containing DNA were exposed to

      environmental conditions such as soil, plant material,

9     dirt, water, heat, would that change the DNA profile

10    into someone else's?

11         A.  It would not change the profile.  It would

12    just change our ability to detect the DNA.  Basically,

13    when DNA is broken down or degrades, this long strand is

14    chopped up into smaller and smaller segments, and the

15    segments get to so small that we're unable to work with

      the DNA molecule.

16         Q.  Now, how is DNA used then in forensic

17    science?

18         A.  DNA is used -- We, as forensic scientists,

19    look at characteristics within that DNA molecule.  As I

20    said, DNA gives us visual characteristics, but looking

21    at a bloodstain, I'm looking at characteristics that you

22    visually can't see.

23         Q.  Does the Illinois State Police Laboratory

24    have a protocol then to insure that the testing and

                              603

1

2    analysis that's conducted at your lab is reliable?

3            A.   Yes, it does.

4            Q.   Does that include then the regular testing

5    and certification that you've described?

6            A.   Yes, it does.

7            Q.   Are there also precautions that you follow

8    and are required to follow to insure that there's no

     contamination between samples?

9            A.   Yes.   As I mentioned before, clean

10   technique.   This is a procedure that Illinois State

11   Police has adapted as well as other DNA laboratories.

12   This clean technique has two main purposes.   The main

13   function is to preserve the integrity of the evidence.

14   The second purpose is to protect analysts from

15   bloodborne pathogens that might be present in that

     stain.

16

17           Things that would be included in clean

     technique would be always wearing latex gloves, never

18   touching a sample with your bare hands.   If you sneeze

19   or cough, make sure that you have a mask on.   Bleaching

20   down the countertops, the utensils, the instrumentation

21   with 10 percent household bleach.   Using pipette tips

22   that have cotton plugs in the middle of them so that

23   liquid cannot be transferred from one tube to another.

24   Using decappit tools to open up the tubes and close the

                            604

tubes without touching your -- the tube tops with your hands.

Q.  Well, let me ask you, when you're processing a series of exhibits or samples that are submitted to you, do you have a technique where you process them in a certain order so again that insures the integrity of what you're investigating?

A.  Yes.  I analyze question samples that have a smaller amount of material first, and then I analyze the samples from the standards or reference samples last.

I also would do my extractions in one area of the laboratory, my amplification setup in another area, and another area designated for amplified product.

I would also use different kinds of lab coats. In my extraction area, I would use a white lab coat, and that lab coat is used only in that area.  In the amplified product room, I would only use a blue lab coat, and that lab coat is only worn in that area.

Q.  In this case, then, in the analysis that you conducted on this case, did you follow all the laboratory guidelines and precautions that you've described?

A.  Yes, I did.

Q.  Did you conduct all the DNA analysis on

605

1

2      this case yourself?

3              A.  Yes, I did.

4              Q.  As part of the laboratory protocol, does

5      every case undergo what's called a technical review then

6      at the completion of your analysis or any scientist

7      analysis?

8              A.  Yes, it did.

        Q.  And who reviewed it in this case?

9              A.  William Frank, the R & D coordinator, was

10     my technical leader at the time, and he reviewed my case

11     file.

12              This case, with many other cases that are

13     analyzed in an Illinois State Police lab, was reviewed

14     by eight other STR analysts for peer review.

15              Q.  And were the results and your conclusions

       in this case then validated by both of those reviews?

16              A.  Yes, they were.

17              Q.  Were the samples of the original evidence,

18     the extracts and the amplified DNA, then, that you --

19     were they preserved, everything that you've worked on in

20     this case?

21              A.  Yes, they were.  They're presently being

22     preserved in freezer storage.

23              Q.  What is the importance then of preserving

       the evidence and the extracts that you created or drew

24
                              606

1

2    from the evidence?

3        A.   Yes, it's very important to preserve

4    whatever extracted DNA that I have remaining for several

5    reasons.   Number one, if somebody wants to have it --

6    this sample sent to another DNA lab for them to conduct

7    their analysis, it would be available.   If somebody in

8    my system would like to do a spot random reanalysis on

9    my case, they could take that extract and do their DNA

10   analysis to see if their results match mine.

11       Q.   Let me ask you, what type of DNA analysis

12   did you conduct on this case?

13       A.   I conducted what's referred to as the PCR

14   analysis.

15       Q.   And what's that mean?

16       A.   PCR is a term that stands for polymerase

17   chain reaction.   This is a chemical method of copying or

18   reproducing or replicating or amplifying specific areas

19   of the DNA molecule that we're interested in, copying

20   that segment over and over and over until we have

21   millions and millions of copies to work with.

22       Q.   Now, is that PCR analysis you've

23   described, is that accepted and validated in the

24   scientific community then?

         A.   Yes, it is.

         Q.   And is PCR used in other fields of science

                              607

besides forensics?

        A.  Yes.

        Q.  What types of things is PCR analysis used for?

        A.  Well, in forensics, it's used to indicate who deposit different kinds of stains.  It's used in paternity testing to determine who is the biological father of an infant.  It's used in paternity testing to determine who is the biological mother of an infant, baby, or fetus.  It's also used for identification of skeletal remains.  It's also used for identification of casualties of war such as in Desert Storm.  It's also used in identification of victims of mass destructions such as train crashes, plane crashes, so on and so forth.

        It's used in the medical field to identify and diagnose inheritable diseases.  It's also used to monitor the success rate of tissue transplants or bone marrow transplants.

        In the scientific community, it's used in the genome project where they're trying to map the exact sequence of all three billion based pairs found in a DNA molecule.

        Q.  And is that PCR a new science then?

        A.  No, it's not.  PCR was discovered or

608

developed back in 1983 by Dr. Kerry Mullis, who, after ten years later, received a Nobel Prize in chemistry for that discovery.

Q.  Can you then explain to us what the PCR method of DNA typing is?

A.  First of all, DNA has to be extracted from a sample.  So, I take a small portion of a stain, put it in some stain extraction buffer or detergent, add some other chemicals to it, put it in a -- well, incubator that's rather warm, and let it sit overnight.

The next day, I would come in and do an organic cleanup of it, in other words, to remove all impurities, and then I would isolate the DNA molecule and recover it in a buffer.

Once I've done that, I have to determine how much DNA is there and what quality is it.

So, the next thing I would do is what I -- what we call a yield gel which allows me to get a rough estimate of the quantity of DNA, and it also tells me the quality of the DNA, if it's molecular weight grade or if it's degraded DNA.

Then I would go ahead and do another quantitative test that's very more specific where I would identify anywhere between 10 nanograms of DNA down to .15 nanograms of DNA; and if I see any kind of

609

reaction, that then I know that human DNA is present.

Once I have identified how much DNA is present, then I would do the PCR technique. And basically what this means is I'm gonna take one to two and a half nanograms of DNA. A nanogram is one billionth of a gram. Okay? Very small amount.

I would take one -- one to two and a half nanograms, put it in some reaction mixture that comes in with these kits. I would put this sample in this instrument called a thermal cycler. This is a computerized instrument that heats and cools the tubes up on a program schedule, and it would go through 28 cycles of heating, cooling, warming up a little bit, heating, cooling, warming up a little bit. And during each one of these cycles, the DNA molecule is replicated by two.

Q. Now, let me interrupt. Does that change the DNA molecule at all or simply replicate it?

A. No, it doesn't change it. It just simply replicates nine specific areas of the DNA molecule that I'm interested in. It doesn't replicate all of it, just those nine areas. And it replicates it identically to the original template DNA.

Q. Is that duplicating the body's natural process when cells are reproduced?

610

1

2          A.  Yes.  This is something that happens in

3     our bodies.  The interesting thing about the DNA

4     molecule is that it can govern the repair of itself and

5     also the replication of itself, so this is something

6     that doesn't -- isn't out of the ordinary.  It occurs in

      our bodies.

7          Q.  Now, when you're talking about identifying

8     portions of DNA, are there specific things that you're

9     looking for then?

10         A.  Yes.  I'm looking for characteristics or

11    polymorphisms within a DNA molecule.  All right?

12         Let me jump back a little bit.

13         MS. LENIK:  Your Honor, I'm going to object to

      this.

14         THE COURT:  To what?

15         MS. LENIK:  There's no question, and the

16    witness is simply giving a lecture.  I think that the

17    witness has to answer the question that's asked.

18         THE COURT:  He is.  Over --

19         MS. LENIK:  And let me jump back a bit isn't

20    answering the question that's asked.

21         THE COURT:  He is.  Overruled.

22         A.  What I need to tell you is 99 percent of

23    our DNA is coating DNA, in other words, it has a

24    function of producing some kind of a chemical enzyme

                              611

protein or whatever.  But one percent of our DNA

molecule is filler DNA.  Sometimes it's referred to as

junk DNA.  And this is the DNA that forensic scientists

look at because it differs from one person to another.

And there's two types of polymorphisms that we look at.

Poly -- Polymorphism, poly meaning many,

morphism meaning different sizes and structures and

shapes.

I have some beads that I'd like to use to

demonstrate that.

MS. LENIK:  Your Honor, I'm going to object to

a demonstration without there being some question

pending regarding it.

THE COURT:  Overruled.

Q.  (by Ms. Ladd)  If you need to stand up,

Mr. Zeeb.

A.  Okay.  Let's pretend that these are DNA --

this is strand of DNA and this is filler DNA or junk DNA

that we all possess.  There's two types of

polymorphisms, sequence polymorphism and length

polymorphism.

Here we have a strand that's composed of our

four building blocks present in DNA, adenine, guanine,

cytosine, and thymine; and you could designate whatever

color bead that you want, but we have two strands of 20

612

A-21

1

2    beads, this same length; okay?

3         If I was to try and tell the difference in

4    length, I couldn't.  They would be the same length.  But

5    I can tell the difference in their sequence.

6         This strand has blue, green, yellow, red.

7    This strand red, yellow, blue, yellow, and so on and so

forth, so you can see that the length is the same, but

8    the sequence is different.

9         Another type of polymorphism is length

10   polymorphism.  And here we have the sequence is the

11   same; blue, green, yellow, red; blue, green, yellow,

12   red; blue, green, yellow, red.  But the difference in

13   these two strands is the length.  This has three repeat

14   regions of blue, green, yellow, red.  This one has five.

15   This is the type of polymorphism that I use in my

16   analysis.  We look at variations of different lengths of

17   the DNA molecule at different areas, specific areas of

18   the DNA molecule to get our characteristics in our DNA

profile.

19        Q.  And did the length of those repeat

20   sequences then vary from individual to individual?

21        A.  Yes.

22        Q.  And is that how you use it then to make

23   identifications or eliminations?

24        A.  That's correct.  And the type of DNA

613

analysis that I conduct is referred to as STR analysis. STR stands for short tandem repeats.  Tandem means side by side.

So, this would be a demonstration of STR's, where we have three, four regions repeated.  And in this strand, we have five regions.  And that's why they vary in length.

Q.  Thank you, Mr. Zeeb.  Let me ask you then, direct your attention to this case, in your professional capacity, did you conduct that PCR analysis on various items of evidence that were submitted to you from Dana Pitchford of the Springfield laboratory in March through December of 1998?

A.  Yes, I did.

Q.  Did this include various items of evidence identified as samples taken from a cigarette butt, material from a pair of shorts, a swab of blood from a piece of glass, and a piece of black stocking?

A.  Yes.

Q.  What I'd like to do then is show you those exhibits for identification purposes.  First of all, showing you the portion identified from the cigarette, which is People's Exhibit 19, your laboratory number 1A, do you recognize that from looking at that packet?

A.  Yes, I do.

614

A-23

Q. And, in fact, was it sealed with the blue seal on it at the time with Dana's initials on it?

A. Yes, it was.

Q. And then did you open it and examine it to conduct the analysis you've described?

A. Yes, I did.

Q. Thank you. Now, also, with regards to the item identified as a portion of shorts, I'd like to show you what's been marked as People's Exhibit 17B, which is your lab number 4B, again, ask you do you recognize your markings on that package?

A. Yes, I do.

Q. And is that, in fact, what that item contained?

A. Yes.

Q. And was that in a sealed condition with Dana Pitchford's seal on it intact at the time?

A. Yes, it was.

Q. Thank you. Now, also, with regard to swabbing of blood from glass, I'd like to show you what's been marked as People's Exhibit 22A which is your lab 31A. Ask you do you recognize that packet, Mr. Zeeb?

A. Yes, I do.

Q. And does that contain, in fact, what was a

615

swabbing of blood taken from glass?

A.  Yes, it does.

Q.  Was that also sealed with Dana Pitchford's seal when you received it?

A.  Yes, it was.

Q.  And, finally, did you receive what would have been identified as an exhibit prepared from a piece of stocking?

A.  Yes, I did.

Q.  Like to show you what's been marked as People's Exhibit 21B which is your laboratory number 12B.  Again, sir, ask you if you could take a look at that, and do you recognize that?

A.  Yes, I do.

Q.  And is that, in fact, the packet containing that portion that was preserved by Dana Pitchford from a piece of stocking?

A.  Yes, it is.

Q.  Again, was her seal intact on it when you received it?

A.  Yes, it was.

Q.  Did you then open up these seals to conduct further analysis?

A.  I opened up the packages in different areas.  I did not break Dana Pitchford's seals.

616

A-25

Q.  And then with regards to these items, is
the second seal now put on that your seal from when you
completed your analysis?

A.  Yes, they are.

Q.  When you conducted the analysis with each
type of -- or each one of these items of evidence, did
you conduct the preliminary testing you described to us
to determine, first of all, if human DNA was present?

A.  Yes, I did.

Q.  And then did you also conduct a
preliminary test to determine that if human DNA was
indicated there was a sufficient amount to conduct the
PCR analysis?

A.  Yes, I did.

Q.  Now, are there times when there is not a
sufficient amount to go on and conduct PCR analysis?

A.  Yes, there is.

Q.  And there is a threshold amount then that
you have to see to be able to continue?

A.  Yes.

Q.  Now, with respect then to the item that
was identified as the portion of the cigarette butt,
that would be your laboratory 1A or People's Exhibit 19,
what did you determine as far as the presence of human
DNA?

617

1

2          A.  I did not detect the presence of any human

3    DNA.

4          Q.  Now, with regard to that cigarette butt,

5    if you learned that that item had been exposed to

6    intense heat, for example, at the scene of a fire that

7    was capable of melting plastic, how would that affect

     any DNA that might have been left on it?

8          A.  The intense heat might have caused the DNA

9    molecule to adhere to the material to where I could not

10   extract it, so that is a possibility.

11         Q.  Now, with respect to the piece of -- or

12   the portion of DNA exhibit that was submitted to you as

13   identified coming from the shorts, and that would be

14   your laboratory 4B, People's Exhibit 17, did you

15   identify the presence of human DNA on that?

16         A.  Yes, I did.

17         Q.  And was there a sufficient amount then to

     conduct PCR analysis on that?

18         A.  There was an insufficient amount of DNA

19   for me to do further conducting of DNA analysis.

20         Q.  Again, would that be affected by factors

21   such as heat?

22         A.  That would be one factor.

23         Q.  Does moisture also affect whether or not

     DNA is going to break down or be recovered?

24
                        618

A.  Yes.  If the cigarette butt or the piece of short material was hosed down when they were putting out the fire, this could dilute the DNA material, causing it to wash away, so that might be a factor.

Q.  Now, is DNA normally found in urine?

A.  Yes, it is, because whenever we urinate, there's always some epithelial cells.  These are cells that line the ureter.  There's always some cells being sloughed off.  There's always occasional white blood cells in your urine.  If you have a bladder infection or a kidney infection, we would find a lot of white blood cells, so we would expect to find lots of DNA; but, generally speaking, there is DNA present; but, most of the time, it's so minute amount that we have a hard time detecting it.

Q.  Now, if urine was also diluted, say, by the consumption of beer, how would that affect the retrieval of any DNA?

A.  If the more fluids that you drink, soda, beer, water, whatever, then that would cause you to urinate more often, which would dilute the concentration of the urine down.

Q.  Would that then make it less likely to recover a sufficient amount of DNA to continue your testing?

619

A-28

1

2          A.  Yes, it would.

3          Q.  Now, with respect to the blood that was

4    taken from the piece of glass, and that's your

5    laboratory 31A, People's Exhibit 22, did you identify

6    the presence of human DNA?

7          A.  Yes, I did.

8          Q.  And was there a sufficient amount of DNA

     that you could proceed with PCR analysis?

9          A.  Yes, there was.

10         Q.  Finally, with respect to the piece of

11   evidence that was identified as being taken from a

12   stocking, and that's your exhibit 12B, People's Exhibit

13   21B, and that's a portion of a stocking, did you

14   identify human DNA?

15         A.  Yes, I did.

16         Q.  And was there a sufficient amount from

     that sample to proceed with your PCR analysis?

17         A.  Yes, there was.

18         Q.  Did you also then examine known standards

19   that were submitted to you to compare the evidence to?

20         A.  Yes, I did.

21         Q.  And did this involve the known standards

22   identified as being blood from Lori Hansen, blood of

23   Dedric Moore, and blood of Donrico Holtzclaw?

24         A.  Yes.

                          620

1

2        Q.  I'd like to show you then what's been

3    marked as People's Exhibit 61A, with respect to the

4    blood of Lori Hansen, and that's your laboratory number

5    26A1, and ask you -- If you need a moment to -- As you

6    look at that, do you recognize that as a known standard

7    or sample of blood that was taken from Lori Hansen?

8        A.  Yes, I do.

9        Q.  And was that in a sealed condition when

     you received it?

10       A.  Yes, it was.

11       Q.  Thank you.  And you recognize your

12   laboratory markings on that?

13       A.  I recognize the exhibit number, the case

14   number, the date that I received it, and my initials.

15       Q.  And, also, did you receive a standard from

     Dedric Moore?

16       A.  Yes, I did.

17       Q.  And show you what's been marked as

18   People's Exhibit 64 which is your laboratory number

19   44A1.  64A.  I'm sorry, Your Honor.  And do you

20   recognize that?

21       A.  Yes, I do.

22       Q.  And is that the blood that was identified

     to you -- or a portion as taken from Dedric Moore?

23       A.  Yes, it is.

24
                          621

FORM IL-24A ® PENGAD · 1-800-631-6989

1

2          Q.  And, again, do you recognize your markings

3    on that?

4          A.  Yes, I do.

5          Q.  And was it in a sealed condition with the

6    dark blue seal -- or is that your seal?

7          A.  The dark blue tape, evidence tape is my

    seal.

8          Q.  So, the lighter blue tape came from

9    Springfield?

10         A.  That's correct.

11         Q.  And it was in a sealed condition then?

12         A.  Yes.

13         Q.  Finally, were you given a portion that was

14   created from an exhibit identified as the known blood

    standard of Donrico Holtzclaw?

15         A.  Yes.

16         Q.  Like to show you 66A which is your lab

17   1A1A, and, again, sir, do you recognize that as well?

18         A.  Yes, I do.

19         Q.  And was that in a sealed condition when

20   you received it?

21         A.  Yes, it was.

22         Q.  And is that, in fact, what that contains?

23         A.  Yes.

24         Q.  And you recognize again your markings on

                          622

1

2        it?

3                A.   Yes.

4                Q.   All these items then again contain your

5        blue seal when you were completed -- had completed the

6        analysis?

7                A.   That's correct.

8                Q.   And this particular item actually was

8        sealed with a white seal from Springfield; is that

9        correct?

10               A.   That's correct.

11               Q.   But they were all in a sealed condition

12       when you received them?

13               A.   Yes.

14               Q.   Did you then proceed to extract DNA from

15       the three known blood standards as well?

15               A.   Yes, I did.

16               Q.   Now, because they were a known blood

17       standard, was there any need to determine if there was

18       sufficient DNA or if it was human?

19               A.   I analyzed questioned forensic samples

20       just the same way as I analyze reference or blood

21       standard samples.

22               Q.   Now, with respect to the DNA that was

23       extracted then both from the blood on the glass and the

24       piece of the nylon as well as the three known samples,

                              623

E-FILED
Friday, 04 May, 2007 04:51:50 PM
Clerk, U.S. District Court, ILCD

did you then proceed to conduct the DNA analysis using that PCR analysis you described?

A.   Yes, I did.

Q.   Once you've amplified the DNA using the technique involving the thermal cycler that runs the 28 cycles, how much amplification goes on?  Can you just describe the magnitude of what takes place?

A.   Yes.  Like I said, this amplification process goes through 28 cycles.  Every cycle that the amount of DNA is doubled.  So, I start out with 1 single strand, the next cycle 2, the next cycle 4, the next cycle 8, the next cycle 16, so on and so forth.  So, after 28 cycles, there's millions and millions of copies present in that amplified product.

Q.   After the DNA is amplified then, and each sample is handled separately, again; is that correct?

A.   That's correct.

Q.   And did you take precautions to insure throughout your analysis that there was no cross contamination?

A.   Yes, I did.

Q.   Then after you have the amplified samples for each exhibit, then, how are those pieces of DNA that have been amplified detected and measured?

A.   Okay.  The next thing I would do is put a

624

1

2    small amount of that amplified product on an instrument

3    called an ABI Genetic Analyzer 310 Capillary

4    Electrophoresis Instrument.

5            Basically, what this instrument does is it

6    separates out these fragments through what is called

7    electrophoresis.  Electro meaning electric current,

     phoresis meaning separation.

8            This -- The instrument applies 15 kilovolts of

9    electricity in the sample, forcing some of the DNA to go

10   into this capillary that's filled with the polymer or a

11   transport medium.

12           Q.  Now, why does DNA move in response to an

13   electrical charge?

14           A.  DNA molecule is negatively charged.  So,

15   whenever an electrical current is applied to it, it's

     gonna migrate towards the positive electrode or cathode.

16           Q.  And when you talk about a capillary, is

17   that actually a little glass tube?

18           A.  That's a very thin glass tube that's a

19   quarter of the diameter of a human head hair.

20           Q.  Is there a window then in that tube?

21           A.  Yes.  At the other end of the capillary,

22   there's a window.  Through 25 minutes of electrophoresis

23   with this electrical current, you've got all these

24   different DNA fragment -- fragments that are migrating

                            625

through this capillary.  The smaller fragments are gonna migrate faster because there's less resistance.  The larger fragments are gonna migrate slower.

So, whenever these fragments go across or through the instrument, the window of the capillary, there's a lasered light that shines through the window; and what I forgot to mention was that during this amplification process, the chemicals that we use, each area of DNA that I'm interested in is tagged with a fluorescent dye, either a blue dye, green dye, or yellow dye.

So, when the DNA fragment migrates through that window, the laser hits it, and it's carrying a green dye, green fluorescence is exposed or produced.

The instrument picks up that fluorescent activity and converts it into numerical data.

The numerical data is what software uses to give it its size and eventually allelic designations.

Q.  Now, the results then of that process when the laser is measuring or reacting to these fragments, is that then being recorded and designated by a computer at the time?

A.  Yes, it is.

Q.  And, again, is it the length of the fragment that you're using to discriminate between the

626

A-35

1

2          different DNA types?

3                  A.   Yes.

4                  Q.   Now, does it measure the DNA then several

5          different chromosomes?

6                  A.   Yes.

7                  Q.   How many?

8                  A.   Nine different chromosomes we're looking
           at.

9                  Q.   Can you explain then why the use of

10         looking at nine different chromosomes helps identify or

11         differentiate between individuals?

12                 A.   Yes.   The more different genetic marker

13         systems that I look at, the more differentiating I can

14         be to where I can add more and more weight to who the

15         possible contributor of that stain is.

16                 Q.   Now, when you conduct the PCR analysis as

17         you've explained then, are there tests that are built

18         into the analysis that you're running that tell you if,

19         in fact, the procedure is operating correctly?

20                 A.   Yes, there is.

21                 Q.   Can you explain this, please?

22                 A.   There's several internal controls that I

23         have to run.   I have to run an amplification positive
           control.   This is some DNA that's in the kit that I have

24         to amplify just like all of the other samples.   This

                                 627

positive control tells me if the amplification process
or the thermal cycler instrument worked properly.

There's also a neg -- amplification negative
control where I add nothing but water to the reagents.
This tells me that the reagents in the kit are pure,
pristine, and clean.  Okay?

If neither one of these work properly, then
all of my other tests are scratched, and I have to
troubleshoot to find out what the problem is and go back
and reamp new samples.

Q.  Were these controls then working as you
analyzed each one of these samples individually?

A.  Yes, they were.

Q.  And did they indicate to you that the
tests were running properly at the time?

A.  Yes, they did.

Q.  Now, using the PCR analysis you described,
then, were you able to identify DNA profiles on the
blood from the piece of glass and from the piece of
stocking?

A.  Yes, I was.

Q.  With respect to the blood on the piece of
glass, what was your conclusion?

A.  I identified a DNA profile that matches
the DNA profile of Lori Hansen.

628

A-37

1

2      Q.  Now, with respect to the piece of

3   stocking, then, what was your conclusion?

4      A.  The piece of stocking I identified a

5   mixture of DNA profiles.  One DNA profile matches the

6   DNA profile of Dedric Moore.  Another DNA profile

7   matches the DNA profile of Lori Hansen.  An additional

8   DNA profile was identified that does not match Lori

9   Hansen, Dedric Moore, or Donrico Holtzclaw.

10      Q.  Now, with respect to Donrico Holtzclaw,

11   then, were you able to eliminate him as a source of any

12   of that DNA on either of the glass or the mask?

13      A.  Yes.  Donrico Holtzclaw is excluded as

14   being a possible contributor to the blood on the glass

15   or to the DNA identified in the piece of black nylon

16   stocking material.

17      Q.  Now, with respect to the three profiles

18   that you identified then on the piece of the stocking,

19   was -- Let me ask you this, is DNA found in saliva?

20      A.  Yes, it is.

21      Q.  And is it actually in the chemical of

22   saliva, or what are you looking at when you're finding

23   DNA in saliva?

24      A.  Well, in saliva, your mouth or your oral

cavity is always sloughing off cells.  Again, these

cells are called epithelial cells.  They're nucleated,

629

and there's lots and lots of DNA in saliva.

Q.   Now, do you also -- can you find DNA then in skin cells such as facial skin?

A.   Yes.

Q.   Now, let me ask you then, for example, if a woman with a DNA profile consistent with Lori Hansen's wore the stocking that that --

MS. LENIK:  Your Honor, I'm going to object to this as an improper hypothetical, because this witness never said that she wore those stockings.  She said they hung around for approximately a year in her house.

THE COURT:  Overruled.

MS. LADD:  Thank you, Your Honor.

Q.   (by Ms. Ladd)  If a woman with a DNA profile consistent with Lori Hansen's wore the intact pantyhose that that piece was later cut from, especially, say, in the winter months when it's dry --

MS. LENIK:  Same objection.

THE COURT:  Overruled.

Q.   (by Ms. Ladd)  With her skin cells flaking off onto it, would that be consistent with the DNA profile that you found?

A.   Yes, it would.

Q.   If an individual then with a DNA profile consistent with Dedric Moore's, say, then pulled a cut

630

A-39

portion of the pantyhose over his face, could his saliva

and his skin cells leave a DNA profile consistent with

what you found?

A.   Yes, they could.

Q.   Now, if the individual identified as

Dedric Moore or the individual using that as a mask had

recently kissed or rubbed faces with someone else, would

that third profile that you observed, would that be an

explanation for that?

A.   That would be a possibility, yes.

Q.   How else would you account for that third

profile?

A.   If somebody else wore those nylons at one

time, or if somebody touched those nylons throughout --

before the offense or after the offense with bare hands,

that would be another explanation.

Q.   Now, that third profile you identified,

was that the weakest profile?

A.   It was very weak, yes.

Q.   Once you identified the DNA profiles that

you've described then, did you compare them to

established population databases, in other words, to

calculate the statistical frequency of encountering

these profiles in the general population?

A.   Yes, I did.

631

A-40

1

2    Q.  Are those frequencies calculated

3 separately for different racial groups?

4    A.  Yes, they are.

5    Q.  Why is that?

6    A.  Because each racial group, the

7 characteristics are found in different frequencies.  The

8 frequencies found in Caucasians are different than

9 Blacks, which are different than in the Mexican race, or

10 the Native Indian race or Oriental race.

11    Q.  Now, did you then prepare two calculations

12 on this case?

13    A.  Yes, I did, because I have no means of

14 determining what race the sample came from.

15    Q.  Now, in addition to determining then a

16 calculation for both established racial groups that

17 would be black and white populations, did you prepare

18 two calculations with regards to the mixed profiles you

19 identified?

20    A.  Yes, I did.

21    Q.  First of all, did you treat all the

22 profiles the same, in other words, you didn't

23 distinguish or separate out three profiles?

24    A.  That's correct.

    Q.  And when you combined all the profiles

together, what frequency did you determine with respect

632

1

2      to that total combined mixture?

3             A.  The combined profiles, which is a very

4      conservative estimate, could be found in approximately 1

5      in 27 hundred Blacks or approximately 1 in 5 thousand

6      Caucasians.

7             Q.  After that conservative calculation then,

       did you proceed to determine if there was one profile

8      which could be identified as the major contributor, the

9      one that stood out at the majority of the locations on

10     the DNA?

11            A.  Yes, I did.

12            Q.  And could you identify, in fact, a major

13     profile on this case at the majority of the location?

14            A.  Yes, I did.

15            Q.  Who did that match?

16            A.  Dedric Moore.

17            Q.  Were you also able to identify then a

       minor contributor at the majority of the locations of

18     the DNA?

19            A.  A medium contributor I identified as being

20     consistent with Lori Hansen.

21            Q.  And, finally, then, were you able to

22     identify a leftover minor profiler, a weaker profile?

23            A.  Yes, I was.

24            Q.  And was that the one that was

                           633

unidentified?

A. Yes.

Q. Once you determined that you were able to differentiate or separate the profiles in the manner you've described then, were you able to calculate the frequency of those separate profiles in the general population?

A. Yes, I was.

Q. And for the DNA profile on the stocking then that matched Lori Hansen's, did you determine the frequency of finding that DNA profile in the general white population?

A. Yes, I did.

Q. And what was that?

A. That frequency would be found in approximately 1 in 1.6 trillion Caucasians.

Q. And did you also calculate it if you were to look for it in the general black population?

A. Yes, I did.

Q. And what was the frequency?

A. That frequency would be found in approximately 1 in 660 billion Blacks.

Q. Now, for the DNA profile on the stocking that was a major profile that matched Dedric Moore's, did you determine the frequency of finding that in the

634

general white population?

      A.  Yes, I did.

      Q.  And what would that be?

      A.  That DNA profile would be expected to occur in approximately 1 in 720 billion Caucasians.

      Q.  Did you also calculate the frequency of encountering that profile in the general black population?

      A.  Yes, I did.

      Q.  And what was that?

      A.  That frequency of occurrence would have occurred in approximately 1 in 150 billion Blacks.

      Q.  Now, when you talk about encountering that profile that was a major profile you identified on the piece of mask in the general black population being 1 in 150 billion, what does that mean in practical terms?

      A.  That's about 25 times the number of people in the population of the earth.

      MS. LADD:  Thank you.  I'd tender this witness.

      THE COURT:  At this point, we're going to take a recess before cross-examination.

      Ladies and Gentlemen, please go to the jury room with Mr. Rasmus.  Don't discuss the case.

      (The following proceedings were had out of the

635

1

2          presence and hearing of the jury.)

3                    THE COURT:  Direct the witness not to discuss

4          your testimony during the break.

5                    All right.  We'll take a recess.

6                    (Recess taken.)

7                    THE COURT:  Ms. Lenik, are you ready for the

           jury to be brought in?

8                    MS. LENIK:  Yes.

9                    THE COURT:  Ms. Ladd?

10                   MS. LADD:  Yes.  Thank you, Your Honor.

11                   THE COURT:  All right.  Mr. Rasmus, bring the

12         jurors in, please.

13                   (The following proceedings were had in the

14         presence and hearing of the jury.)

15                   THE COURT:  You may be seated.

                     Cross-examination, Ms. Lenik?

16                   MS. LENIK:  Thank you.

17                          CROSS-EXAMINATION

18                          BY MS. LENIK:

19                   Q.  There are other things which can eliminate

20         the possibility of your finding DNA on materials

21         submitted to you besides heat; correct?

22                   A.  That's correct.

23                   Q.  What would some of those other situations

           be?

24
                                   636

                                  A-45

1

2          A.   Any type of environmental insult; light,

3    excess humidity, bacteria, a chemical, dirt, things of

4    that nature.

5          Q.   You cannot tell when you see an item and

6    cannot find DNA why it is that you can't find it;

7    correct?

8          A.   That's correct.  I can only speculate at

times, but I can't tell why I didn't find anything,

9    because one reason is there might not be any DNA

10   present.

11         Q.   Even if you have an item that a human

12   being normally wears like clothing, if you don't find

13   any DNA on it, you can't tell why that is; correct?

14         A.   That's correct.

15         Q.   And it could -- it's just as likely to be

that you couldn't find it because of something like

16   light, humidity, bacteria, or dirt than the heat;

17   correct?

18         A.   That's correct.

19         Q.   And so heat was suggested to you by the

20   State's Attorney, but that doesn't mean that that reason

21   is any more likely than any other; correct?

22         A.   Well, I believe my understanding of the

23   case is that heat was mentioned because there was a fire

at the site of the offense.

24
                              637

                             A-46

1

2      Q.  And that's something that was told to you

3   by other people and that information was simply given to

4   you with other information regarding these examinations?

5      A.  That's true.

6      Q.  And there's nothing more scientifically

7   validated in your results about heat than some other

    reason; correct?

8      A.  That's correct.

9      Q.  When you looked at this pair of shorts and

10  you decided and concluded that there was insufficient

11  DNA to do your further analysis with, you don't know why

12  there's insufficient DNA to do your further analysis

13  with; do you?

14     A.  I can never tell the true reason for that.

15     Q.  Let me ask you this about the shorts,

    you -- there was urine indicated on those shorts;

16  correct?

17     A.  That's my understanding, yes.

18     Q.  And you could not tell how that urine got

19  on those shorts, excuse me; could you?

20     A.  That's correct.

21     Q.  So that you couldn't tell whether the

22  person wearing them urinated in them or whether

23  somebody, not her, urinated on her; correct?

24     A.  That's correct.

                        638

Q.   You also couldn't tell how fresh or recent any of this material was; could you?

A.   That's correct.

Q.   Does DNA fade over time?

A.   The DNA molecules are very stable, very rigid molecule.  It's been identified in mummies, mummified material; but if it does undergo these environmental insults, then, yes, it could fade away to where we are unable to detect it.

Q.   And is there any method of dating the DNA that you find on a material?

A.   No, there's not.

Q.   So that you don't know when you find DNA matching somebody on a material whether that happened two days earlier or a year earlier?

A.   That's correct.

Q.   So that, for example, on that stocking where you found DNA belonging to three different people, you don't know whose DNA got there first; do you?

A.   No, I don't.

Q.   And you don't know whose got there second or third; do you?

A.   No, I don't.

Q.   And you don't know whether the DNA that got there first got there six months before the DNA that

639

got there second or third?

A.  That's correct.

Q.  And just because the DNA might be lighter or weaker, that doesn't necessarily mean that that DNA got there last; does it?

A.  By no means, no.

Q.  It could have been that that DNA got there first, but the touching was insufficient to leave more DNA than it did?

A.  That's correct.

Q.  Let me ask you about these percentages. You did two completely different analyses of these same materials; did you not?

A.  That's -- Different interpretations, yes.

Q.  What does that mean?

A.  I'm sorry, not different interpretations, different statistical calculations.

Q.  And why is that?

A.  The first -- When I originally worked the case and written up a report, our procedures was that if I cannot differentiate between the different contributors at all nine loci, then I would give a combination of all possible frequencies, and that's exactly what I did on the first set of statistics, and that's why the statistics are very small.

640

1

2          On the second set of statistics that I gave,

3     after the report had gone out, our procedures changed to

4     where we could add more weight to our interpretations,

5     meaning that if we can identify at least at five or more

6     loci, then we can go ahead and separate out the

7     contributors and give them individual statistics.

8          Q.  And so the first ones that you gave, the

      first numbers that you gave that you gave on September

9     10, 1998, indicate that the mixture identified in this

10    piece of black stocking matches the combined DNA

11    profiles of Dedric Moore, Lori Hansen, and one other

12    individual; and then you gave the combined profile index

13    of 1 in 27 hundred Black people or 1 in 5 thousand

14    Caucasians, that was looking at all three of those

      together?

15         A.  That was looking at all possible

16    combinations of the characteristics that I identified,

17    and that would include many, many people.

18         Q.  I don't -- All right.  Let me ask you a

19    question about the numbers then.  If a town had -- If

20    there were approximately a hundred thousand people in a

21    city and you had these percentages, what would be the

22    number of possible Black people or Caucasian people that

      this -- that this index or this profile would match?

23         A.  It -- About 30.

24                          641

1

2          Q.   So that in a town of about a hundred

3    thousand people, there would be about 30 people whose

4    DNA would be consistent with this profile that you

5    found?

6          A.   Thirty people that would -- Yes, that's

     correct.

7          Q.   And would those be 30 black people, white

8    people, or combination?

9          A.   That would be 30 Black people.

10         Q.   And do you have any idea who this

11   unidentified person is?

12         A.   No, I do not.

13         Q.   And you do know that the unidentified

14   person is a person, it's a human being; correct?

15         A.   That's correct.

16         Q.   I mean, it wouldn't be from an animal?

17         A.   That's correct.

18         Q.   Or -- Well, let's -- let me just stop it

     there.  It wouldn't be from an animal?

19         A.   That's correct.

20         Q.   If you knew that the woman named Lori

21   Hansen had cats in her house, it couldn't have been from

22   them; correct?

23         A.   That's correct.

24         Q.   And the exhibit that you numbered 31A

                         642

which is the swabbing of the piece of glass with the bloodstain, that only came from the individual named Lori Hansen; correct?

A.  The DNA profile that I identified matches Lori Hansen, and it could not have originated from Dedric Moore or Donrico Holtzclaw.

Q.  And, excuse me, but it matched close enough that you would say it was hers and not an unknown person?

A.  I'm not at liberty to say that that bloodstain came from Lori Hansen, nobody else.  All I can say is the DNA profile matches Lori Hansen.

Q.  And that's true generally when you do DNA analysis, that you cannot say that it is the person; you can only say that according to your training and experience it matches the person; correct?

A.  I can say that it matches that person and gives statistical weight to that match.

Q.  Then on -- Let me -- Let me ask you this, in between September 10th of 1998, and February 25th of 1999, when you recalculated and got those completely different percentages, did you receive any phone calls from any law enforcement agencies or the Champaign County State's Attorney's Office?

A.  Yes, I did.

643

Q. Who did you receive phone calls from?

A. I talked to Assistant State's Attorney Heidi Ladd.

Q. And do you recall when you talked to her?

A. What time frame are we talking about?

Q. In between September 10th, 1998, and February 25th, 1999.

Are you refreshing your recollection with your notes?

A. I'm sorry. Yes, I am.

Q. All right. And what do your notes indicate when you talked to Ms. Ladd?

A. I talked to Mrs. Ladd on October 8th of '98, to inform her the status of analyzing Donrico Holtzclaw's blood standard.

I called -- I talked to Mrs. Ladd on March 4th during a pretrial conference that was held at the Morton lab, where I explained my findings.

And I've been calling the State's Attorney's Office the last couple days to find out court status, court times and dates.

Q. And in either of those, in any of those conversations, did you explain the percentages that you got in your first calculation before those second calculations were made?

644

A.  Yes.

Q.  Whose decision was it to create second calculations with these numbers?

A.  It was my decision to call my superiors and inform them that a case that was worked with conservative statistics originally was going to court and that since that time we gave more weight to the statistics or interpretations, and I inquired as to whether or not I should go ahead and submit a report stating those facts, and it was advised that I should.

Q.  And who made that -- who advised you of that?

A.  My technical leader, Barb Llewellyn.

Q.  And so that was to recalculate the numbers based on the same material.  Did you do any new evaluations of the material?

A.  No new evaluations or no new interpretations.  The only thing different are the statistical calculations.

Q.  And when you -- How did you redo the statistical calculations?

A.  Well, like I said before, before I added all possible types, combined profiles.  And the second go-around, I -- I determined that I can identify who was the major contributor, who was the medium contributor,

645

1

2      and who was the minor contributor.

3              Q.  And you couldn't do that the first

4      go-around?

5              A.  I could do it the first go-around, but our

6      policy was if I cannot differentiate between the

7      contributors at all nine loci, then I had to give a

       combined statistics.

8              And in this particular case, I could

9      differentiate between the major and the medium

10     contributors in seven of the nine loci and not all nine.

11             Q.  And so then you recalculated it because

12     your office policy changed regarding major, minor, and

13     medium contributors; is that correct?

14             A.  Our office policy changed regarding when I

15     can differentiate between contributors looking at five

       or more loci versus looking at all nine loci.

16             Q.  And so on March 5th, 1999, you submitted

17     what you called an amended report looking at that same

18     material; correct?

19             A.  That's correct.

20             Q.  And you -- And at that time, then, is it

21     fair to say in these percentages or these numbers you

22     gave greater weight to the fact that somebody was a

       major versus a moderate or a minor contributor?

23

24             A.  These interpretations were done

                            646

1

2    originally, but, yes, we did give more weight to this in

3    the second report, and that's one of the things that our

4    group decided was that with all this new technology, we

5    can give more weight to our findings and we don't have

6    to be as conservative as we were when we started out.

7        Q.  What do you mean by not having to be as
     conservative?

8

9        A.  In other words, we're seeing that we've

10    got a lot of genetic information here that we could

11    separate out contributors and add more weight to the

12    statistics.  Where, if you combine all the possible

13    statistics or frequencies, then that would kind of

     dilute down the stats.

14        Q.  And so the second go-around, you decided

15    to increase those numbers from 1 in approximately 27

16    hundred Blacks or 5 thousand Caucasians to 1 in 150

     billion Blacks or 1 in 720 billion Caucasians; correct?

17        A.  That's correct.

18        Q.  That's an awfully big difference; isn't

19    it?

20        A.  Yes, it is.

21        Q.  And if you look at those huge numbers,

22    there's nobody else on the face of the earth that would

23    match those numbers now; correct?

24        A.  Identical twin would.

                       647

Q.  Not a brother?

A.  An identical brother to whoever --

Q.  An identical twin, though?

A.  Identical twin, yes.

Q.  But not a natural brother?

A.  It would have to be identical, yes.  But I'm -- That doesn't -- Just because the numbers are very, very high doesn't mean that there's not someone out there that has that profile, but it just indicates to us that the chances of finding that person is very, very slim.

Q.  So, you're saying that there could be someone out there who has that profile?

A.  But highly unlikely.

Q.  And you don't know what the likelihood of that is?

A.  Only by the statistics that I've generated.

Q.  But just prior to your office policy changing, you would have been willing to say that there'd be 30 people in a town of a hundred thousand whose profile was consistent with the first numbers that you gave; correct?

A.  That's because I was combining all possible profiles into one lump group.

648

Q.   But at the time that you -- If we had had this trial on September 11th of 1998, when you had those numbers, you would have told me that in a town of a hundred thousand, there would be 30 people who had that percentage; correct?

A.   At that particular time, yes.

Q.   And those would have been 30 Black people who had that percentage; correct?

A.   Correct.

Q.   You did not recalculate, when you recalculated the percentages on Mr. Moore and Ms. Hansen, you did not recalculate on the unknown person; did you?

A.   No, because it was an open profile, and our policy is not to give statistics to open profiles, 'cause we -- we have -- we cannot say that it matches anybody.

Q.   What's an open profile?

A.   An open profile is a profile that we cannot match to anybody.

Q.   And is that the same as you reported back in September?

A.   When I said the mixture of DNA profiles was identified in exhibit 12B which matches the combined DNA profiles of Dedric Moore, Lori Hansen, and at least

649

one other individual, that's considered the open
profile.

     Q.  And it could have been more than one other
individual; correct?

     A.  That's correct.

     Q.  And is there a maximum number of other
individuals it could have been?

     A.  I'm sure there is, but I never calculated
it.

     Q.  Okay.  Within a reasonable degree of
scientific certainty, could you state how many other
people it could have been?

     A.  No, I cannot.

     MS. LENIK:  No other questions.

     THE COURT:  Ms. Ladd?

     MS. LADD:  Thank you, Your Honor.

<center>REDIRECT EXAMINATION</center>

<center>BY MS. LADD:</center>

     Q.  Mr. Zeeb, so to put this time line in some
kind of frame, in September of 1998, when you conducted
the first calculation, is it correct that you had all
the analyses and results that you have today as you
testified?

     A.  That's correct.

     Q.  And were you able to look at and clearly

<center>650</center>

1

2     see a major, a medium, and a minor profile at the loci

3     you've described?

4             A.   Yes, I was.

5             Q.   And loci is a chromosome location?

6             A.   Loci, it means loci is plural for locus.

7     Locus is a specific area or address of the DNA molecule.

8             Q.   And even though you were looking at what

9     was clearly three ability or three ways to distinguish

10    this and separate them out, was it the Illinois State

11    Police policy at that point to be absolutely

12    conservative and not do that?

13            A.   Yes.  Our policy was to be very

14    conservative in the beginning.  And through the

15    evolution of technology and the evolution of seeing

16    how -- how informative this technique is and the

17    instruments that we have, we later on agreed to add more

18    weight to profiles like this if we can differentiate at

19    five or more loci instead of all nine loci.

20            Q.   Now, even as you were producing the report

21    on this case, then, were validation studies being

22    conducted by the State of Illinois to determine if, in

23    fact, it was valid to look at who was the major, the

24    medium, and the minor contributor?

              A.   Yes, they were.

              Q.   Ironically, just a few weeks after you

                              651

authored a report, did those studies, the results come through?

A.  Yes.  I believe the decision to look at, give statistic at five or more loci came around September 30th.

Q.  And was this based on validation studies and research that was being conducted even as you were conducting your analysis?

A.  Yes.  Based on validation studies and peer review, discussion among ten analysts, and I was one of those ten, as to how much weight we can apply to this. Some analysts said we couldn't go any more, you know, if you cannot differentiate between three or more loci. Another one said, no, all nine.  And then checking through the forensic community, it was established that, yes, at five or more loci we can differentiate between the different contributors.

Q.  Did I even talk to you at that point while this was going on?

A.  No.

Q.  And was I even aware that this was going on?

MS. LENIK:  Objection.

THE COURT:  Well --

MS. LENIK:  How could he state --

652

1

2          THE COURT:  Sustain the objection.

3          Q.  (by Ms. Ladd)  Well, did you have any

4    conversation at all with our office or with me about

5    that fact at that point?

6          A.  At that point in time, no.

7          Q.  And, again, this wasn't just people

8    sitting in a room and deciding that they wanted to

8    calculate statistics differently, this was based on

9    validation studies and meetings in the forensic

10   community?

11         A.  Right.  And after these meetings realized

12   there was some cases that we worked that would have to

13   be amended, but we were told to wait and address those

14   issues if and when these cases go to court.

15         Q.  Now, in that first calculation, then, so

     there's no confusion, you're assuming that none of the

16   profiles can be separated?

17         A.  That's correct.

18         Q.  Is that right?

19         A.  That's correct.

20         Q.  So, you're seeing a major, medium, and

21   minor and just ignoring for those calculations?

22         A.  That's correct.

23         Q.  And putting every combination of those

     together?

24

                              653

A.   They're throwing everything together and getting a combined frequency.

Q.   And is that why it appears still rather rare, but more frequent in the population?

A.   Yes, that is.

Q.   Now, then, when you are able to determine, as you have, that there's the major profile, that there's a medium profile, and a very minor profile, then, does that allow you to discriminate or separate out with far more accuracy the population statistics?

A.   Yes, it does.

Q.   And is that then how you arrived at your conclusion then that it was 1 in 150 billion Black individuals that would match the profile of Dedric Moore and the profile that was the major contributor on that stocking mask?

A.   That's correct.

MS. LADD:   Thank you.  I have no further questions.

THE COURT:   Ms. Lenik?

RECROSS-EXAMINATION

BY MS. LENIK:

Q.   When you say major, medium, and minor contributors, you don't allocate any percentages to those words; do you?

654

A.   No, I don't.

Q.   And so you're only using those words for the convenience of speaking in the English language that that makes it easier for you to convey those concepts; right?

A.   Well, major contributor means that I'm picking up the most intensity from that profile.  That's why it's called major.  And then there's some other DNA fragments that don't exhibit that much intensity, so that's considered the medium.  It would normally be minor if there was only two profiles, but since there was a third profile identified that was very, very minute or very weak, then I refer to that as a minor contributor.

MS. LENIK:  No other questions.

MS. LADD:  Nothing further.  Thank you.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

THE COURT:  Does that conclude the testimony, Ms. Ladd?

MS. LADD:  Yes.  Thank you.

THE COURT:  Ladies and Gentlemen, I'm going to ask that you go with Mr. Rasmus to the jury room at this point.  We'll get you out as soon as we can.

(The following proceedings were had out of the

655

37720 **FILED**
Friday, 04 May, 2007 04:52:17 PM
Clerk, U.S. District Court, ILCD

NO. 4-99-0499

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. Difanis, |
| Defendant-Appellant. | ) | Judge Presiding. |

## SUPPLEMENTAL BRIEF AND ARGUMENT
## FOR DEFENDANT APPELLANT



FILED

NOV 2 – 2000

Clerk of the
Appellate Court, 4th Dist.

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

EXHIBIT C

# Supplemental Point and Authorities

**The Consecutive and Extended-Term Sentencing Provisions of 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) Violate the Right to Due Process and a Jury Trial by Subjecting Defendants to Increased Punishment Without Notice or a Jury Finding upon Proof Beyond a Reasonable Doubt of the Facts Necessary for Imposition of the Increased Terms of Imprisonment.**

*People v. Fisher*, 184 Ill.2d 441, 705 N.E.2d 67 (1998) . . . . . . . . . . . . . . . . . . . . . . . 4

*People v. Latona*, 184 Ill.2d 260, 703 N.E.2d 901 (1998) . . . . . . . . . . . . . . . . . . . . . . 4

*People v. Duke*, 305 Ill.App.3d 169, 711 N.E.2d 484 (4th Dist. 1999) . . . . . . . . . . . . 4

720 ILCS 5/8-4(c)(1) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

720 ILCS 5/12-11(c) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

720 ILCS 5/19-3(b) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

720 ILCS 5/20-1.1(b) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

730 ILCS 5/5-5-3.2(b)(2) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

730 ILCS 5/5-8-2(a)(2) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

730 ILCS 5/5-8-4(a) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

730 ILCS 5/5-8-4(b) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## A.

**The Consecutive and Extended-Term Sentencing Provisions Contained in 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) Are Unconstitutional Under *Apprendi v. New Jersey*.**

*Apprendi v. New Jersey*, 530 U.S. ___, 120 S.Ct. 2348,
    147 L.Ed.2d 435 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) . . . . 7

U.S. Const., amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S. Const., amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

U.S. Const., amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

## B.

**The Supreme Court's Decision in *Apprendi v. New Jersey*
Applies Retroactively to Dedric Moore's Case.**

*Apprendi v. New Jersey*, 530 U.S. ___, 120 S.Ct. 2348,
    147 L.Ed.2d 435 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) . . 8

*Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) . . . . . . . . 8

*Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339,
    53 L.Ed.2d 306 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) . . . . . . . . . . . . 8

*Ivan V. v. City of New York*, 407 U.S. 203, 92 S.Ct. 1951,
    32 L.Ed.2d 659 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) . . . . . . . . . 9

*Sawyer v. Smith*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) . . . . . . . . . 8

*People v. Arna*, 168 Ill.2d 107, 658 N.E.2d 445 (1995) . . . . . . . . . . . . . . . . . . . . . . . 9

*People v. Bryant*, 128 Ill.2d 448, 539 N.E.2d 1221 (1990) . . . . . . . . . . . . . . . . . . . . . 9

*People v. Zeisler*, 125 Ill.2d 42, 531 N.E.2d 24 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Murphy*, (D. Minn., 4-95-103, August 7, 2000) . . . . . . . . . . . . . . . . . 9

730 ILCS 5/5-5-3.2(b)(2) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

730 ILCS 5/5-8-4(b) (West 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Supplemental Issue Presented for Review

Whether the consecutive and extended-term sentencing provisions of 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) violate the right to due process and a jury trial by subjecting defendants to increased punishment without notice or a jury finding upon proof beyond a reasonable doubt of the facts necessary for imposition of the increased terms of imprisonment.

### A.

Whether the consecutive and extended-term sentencing provisions contained in 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) are unconstitutional under *Apprendi v. New Jersey*.

### B.

Whether the Supreme Court's decision in *Apprendi v. New Jersey* applies retroactively to Dedric Moore's case.

## Supplemental Argument

**The Consecutive and Extended-Term Sentencing Provisions of 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) Violate the Right to Due Process and a Jury Trial by Subjecting Defendants to Increased Punishment Without Notice or a Jury Finding upon Proof Beyond a Reasonable Doubt of the Facts Necessary for Imposition of the Increased Terms of Imprisonment.**

The constitutionality of a statute is a question of law, and the <u>standard of review</u> accordingly <u>is de novo</u>. ***People v. Fisher***, 184 Ill.2d 441, 448, 705 N.E.2d 67, 71-72 (1998).

The Unified Code of Corrections contains a general prohibition against the imposition of consecutive sentences for offenses which occurred as part of a single course of conduct. 730 ILCS 5/5-8-4(a) (West 1998). Section 5-8-4(a) of the Code, however, contains an exception to that rule, making consecutive sentences mandatory for defendants: (1) convicted of multiple offenses which (2) occurred during a single course of conduct (3) during which there was no substantial change in the nature of the criminal objective (4) if one of the offenses was a Class X or Class I felony and (5) the defendant inflicted severe bodily injury. The legislative purpose behind this mandatory consecutive sentencing provision is to punish this type of offense more harshly than other offenses. ***People v. Latona***, 184 Ill.2d 260, 271, 703 N.E.2d 901, 907 (1998); ***People v. Duke***, 305 Ill.App.3d 169, 174, 711 N.E.2d 484, 488 (4th Dist. 1999). Subsection (b) of the statute authorizes a discretionary imposition of consecutive sentences if the court, "having regard to the nature and circumstances of the offense and the history and character of the defendant, . . . is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant. . . ." 730 ILCS 5/5-8-4(b) (West 1998).

The Code also restricts circumstances under which a defendant's sentence may be extended (essentially doubling the sentencing range) under 730 ILCS 5/5-8-2(a)(2) (West 1998), at the court's discretion, "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5-5-3.2(b)(2) (West 1998).

- 4 -

Dedric Moore was convicted of three separate Class X felonies and one Class 1 felony:

- attempt (first-degree murder) (a Class X felony); 720 ILCS 5/8-4(c)(1) (West 1998);

- home invasion (a Class X felony); 720 ILCS 5/12-11(c) (West 1998);

- aggravated arson (a Class X felony); 720 ILCS 5/20-1.1(b) (West 1998); and

- residential burglary (a Class 1 felony); 720 ILCS 5/19-3(b) (West 1998).

The court sentenced Mr. Moore to a total of 75 years' imprisonment: three concurrent terms of 60 years, 60 years and 30 years for attempt (first-degree murder), home invasion and aggravated arson, respectively, and a 15-year consecutive sentence for residential burglary. (Vol. IV, C. 760) The first two Class X felony sentences (*i.e.*, for attempt (first-degree murder) and home invasion) were extended terms, based upon:

- lack of mitigation

- aggravation of
  - the need for deterrence
  - Mr. Moore's prior convictions
  - these offenses being accomplished by exceptionally brutal or heinous behavior indicative of wanton cruelty

  (Vol. XIV, R. 56-61; Vol. XV, R. 4-5)

The consecutive sentence for residential burglary the court said was premised upon the need to protect the public. (Vol. XIV, R. 59, 61) The court specifically found that the first entry into the victim's duplex constituted residential burglary while the second entry comprised home invasion, which was not part of a "single course of conduct" for sentencing purposes. (Vol. XIV, R. 58)

These factors which enhanced Mr. Moore's sentence were not included in the charging instrument, submitted to the jury, or subjected to proof beyond a reasonable doubt. Therefore, Mr. Moore is entitled to have his sentence reduced.

## A.

### The Consecutive and Extended-Term Sentencing Provisions Contained in 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) Are Unconstitutional Under *Apprendi v. New Jersey*.

The United States Supreme Court's recent decision in ***Apprendi v. New Jersey***, 530 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), requires *vacatur* of Dedric Moore's consecutive and extended-term sentences and amendment of the mittimus to reflect the corrections. In ***Apprendi***, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d at 435. Such facts must be included in the charging instrument. *Apprendi*, 530 U.S. ___, 120 S.Ct. 2348, 147 L.E.2d at 446. The constitutional basis for this holding is of "surpassing importance" and two-fold: the fourteenth amendment protection against the deprivation of liberty without due process of law, and the sixth amendment right to a jury trial. ***Apprendi***, 503 U.S. ___, 120 S.Ct. 2348, 147 L.E.2d at 447; U.S. Const., amend. VI, XIV.

The Court in ***Apprendi*** invalidated a New Jersey statute that permitted a sentencing judge to enhance a defendant's sentence beyond the prescribed maximum if the judge found, by a preponderance of the evidence, that the crime was committed with a racially biased purpose. *Apprendi*, 503 U.S. ___, 120 S.Ct. 2348, 147 L.E.2d at 455. Historically, the Court noted, no distinction between an "element" and a "sentencing factor" existed; the elements of an "offense" included every fact that would increase the range of punishment. ***Apprendi***, 503 U.S. ___, 120 S.Ct. 2348, 147 L.E.2d at 448. Merely because the state legislature placed the additional factor within the sentencing provisions of the Criminal Code did not mean that the additional factor was not an essential element of the offense. ***Apprendi***, 503 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d at 458. As the Court clarified, "the relevant inquiry is one not of form, but of effect – does the required finding expose the defendant to a greater

- 6 -

punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 503 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d at 457.

The Court in *Apprendi* noted that its holding was foreshadowed by it opinion in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), regarding a statute legally indistinguishable from that at issue in the instant case, a federal car-jacking statute which provided increased sentence if the trial judge found that "severe bodily injury" had resulted from the offense. *Apprendi*, 503 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d at 446, *citing Jones*, 526 U.S. at 243, n 6, 119 S.Ct. 1215, 143 L.Ed.2d 311. Although the *Jones* Court avoided deciding the issue on constitutional grounds, it construed the statute to require that severe bodily injury be charged in the indictment, proved beyond a reasonable doubt, and submitted to a jury for verdict before a defendant could be subjected to increased punishment based upon that factor. *Jones*, 526 U.S. at 251-52, 119 S.Ct. 1215, 143 L.Ed.2d at 331. The Court found such a construction necessary in order to avoid grave constitutional questions. *Jones*, 526 U.S. at 239, 251-52, 119 S.Ct. 1215, 143 L.Ed.2d at 331.

Like the statutes at issue in *Apprendi* and *Jones*, the Illinois statutes converting otherwise concurrent sentences to consecutive and/or extended-term sentences based upon the trial court's findings does not provide a defendant with notice in the charging instrument, the right to have a jury determination of that fact, and a reasonable-doubt standard which the State must overcome, and thus runs afoul of the sixth and fourteenth amendments to the U.S. Constitution. *See* U.S. Const., amends. V, VI, XIV; *Apprendi*, 503 U.S. ___, 120 S.Ct. 2348, 147 L.E.2d at 455. The Court in *Apprendi* made clear that it is the effect of a sentencing provision and not the label attached to it which is controlling, and that this new rule of constitutional law is implicated whenever the defendant faces an increased loss of liberty as a result of the challenged statute. *Apprendi*, 503 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d 447, 451, 458.

## B.

### The Supreme Court's Decision in *Apprendi v. New Jersey* Applies Retroactively to Dedric Moore's Case.

Ordinarily, new constitutional rules of criminal procedure apply only to those cases pending on direct appeal at the time of pronouncement. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649, 661 (1987). Such new rules, however, will be applied retroactively on collateral review where the new rule affects those procedures which alter the understanding of bedrock procedural elements essential to the fairness and accuracy of criminal proceedings, without which the likelihood of an accurate conviction is seriously diminished. *Sawyer v. Smith*, 497 U.S. 227, 241-42, 110 S.Ct. 2822, 111 L.Ed.2d 193, 211 (1990); *Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828, 838 (1998). Such full retroactivity is applicable in those cases where it is necessary "to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted." *See Bousley*, 523 U.S. at 620, 118 S.Ct. 1604, 140 L.Ed.2d at 838.

The Supreme Court has already held that one of the constitutional principles which formed the basis for the court's holding in *Apprendi*, the *Winship* due process requirement of proof of every element of a crime beyond a reasonable doubt, *Apprendi*, 530 U.S. ___, 120 S.Ct. 2348, 147 L.Ed.2d at 447, 451, is just such a bedrock principle requiring full retroactive application. In *Ivan V. v. City of New York*, the Court recognized the reasonable doubt standard as a prime instrument for reducing the risk of factual error, "impress[ing] on the trier of fact the necessity of reaching a substantive state of certitude of the facts in issue," and providing "concrete substance for the presumption of innocence – that bedrock 'axiomatic and elementary' principle whose enforcement lies at the foundation of the administration of criminal law." 407 U.S. 203, 204-05, 92 S.Ct. 1951, 32 L.Ed.2d 659, 661 (1972), citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In *Ivan V.*, the Court held that *Winship* was fully retroactive because the primary purpose of the

constitutional standard of proof beyond a reasonable doubt was to "overcome an aspect of a criminal trial that substantially impairs the truth-finding function." 407 U.S. at 204-05, 92 S.Ct. 1951, 32 L.Ed.2d at 661; *see also Hankerson v. North Carolina*, 432 U.S. 233, 242-44, 97 S.Ct. 2339, 53 L.Ed.2d 306, 315-16 (1977) (holding *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), fully retroactive for same reasons).

Because the *Apprendi* rule that any factor which subjects a defendant to an increased maximum sentence is treated as an element which must be proved to a jury beyond a reasonable doubt serves the identical concerns as *Winship* and its progeny, *Apprendi* likewise should be accorded full retroactivity. At least one federal district court has held that *Apprendi* is accorded full retroactivity because the rule announced involves a "watershed rule of criminal procedure" which alters the "bedrock procedural elements essential to the fairness of the proceeding." *United States v. Murphy*, (D. Minn., 4-95-103, August 7, 2000) (Appendix at 6).

Dedric Moore is entitled to raise the constitutionality of 730 ILCS 5/5-8-4(b) and 5/5-5-3.2(b)(2) for the first time on direct appeal. The constitutionality of a statute may be raised at any time. *See, e.g. People v. Bryant*, 128 Ill.2d 448, 453-54, 539 N.E.2d 1221, 1223-24 (1990). An unconstitutional statute is void *ab initio*, meaning that it is, "in legal contemplation, as though no such law had ever been passed." *People v. Zeisler*, 125 Ill.2d 42, 46, 531 N.E.2d 24, 27-28 (1988). Void judgments can be attacked at any time. *People v. Arna*, 168 Ill.2d 107, 113, 658 N.E.2d 445, 448 (1995). Because Mr. Moore was sentenced pursuant to such an unconstitutional, and thus void, statute, he may raise this issue for the first time on direct appeal

# Conclusion

For the above reasons, Dedric Moore respectfully requests that this Court vacate his consecutive and extended-term sentences and order the mittimus amended to reflect concurrent and non-extended sentences.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, IL  62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

2ND CASE of Level 1 printed in FULL format.

United States of America, Plaintiff, v. Deshaun Raffles Murphy, Defendant.

Criminal No. 4-95-103(8)(DSD/FLN), Civil No. 99-2063 (DSD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

2000 U.S. Dist. LEXIS 11847

August 7, 2000, Decided

DISPOSITION:     [*1]     Defendant's motion to vacate, set aside, or correct his sentence granted in part and denied in part. Defendant's 300-month sentence on Counts I, II and III vacated.

CORE TERMS: sentence, quantity, cocaine base, conspiracy, sentencing, new rule, distribute, sentenced, crack cocaine, beyond a reasonable doubt, statutory maximum, retroactively, imprisonment, indictment, supervised, ineffective assistance of counsel, term of imprisonment, criminal procedure, reasonable doubt, grams, Sixth Amendment, Fifth Amendment, crack, specifically instructed, constitutional law, motion to vacate, carjacking, convicted, prisoner, maximum

COUNSEL: Henry J. Shea, Assistant U.S. Attorney, Minneapolis, MN, for plaintiff.

Deshaun R. Murphy, Pro se, Pekin, IL.

JUDGES: David S. Doty, Judge, United States District Court.

OPINIONBY: David S. Doty

OPINION: ORDER

This matter is before the court on defendant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. @ 2255 [Doc. No. 689]. Based on a review of the file and record, defendant's motion is granted in part and denied in part.

BACKGROUND

Defendant Deshaun Raffles Murphy was convicted by a jury on June 21, 1996 of: conspiracy to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. @ 846 (Count I); use of a minor to assist in a conspiracy to distribute and possess with intent to distribute cocaine base in violation of 21 U.S.C. @@ 841(a)(1), 841(b)(1)(A), 846 and 861(a)(1)(Count II); aiding and abetting the possession with intent to distribute cocaine base, in violation of 21 U.S.C. @@ 841 [*2]   (a)(1) and 841(b)(1)(A) and 18 U.S.C. @ 2 (Count III); and aiding and abetting the use or carrying of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. @@ 2 and 924(c) (Count IV). He was sentenced on January 10, 1997, to a term of 300 months imprisonment on Counts I, II and III, a consecutive term of 60 months imprisonment on Count IV and a term of supervised release of ten years. On appeal, the Eighth Circuit Court of Appeals affirmed. United States v. Davis, 154 F.3d 772 (8th Cir. 1998). The Supreme Court denied defendant's petition

2000 U.S. Dist. LEXIS 11847, *2

for writ of certiorari on February 22, 1999, Davis v. United States, 525 U.S. 1169, 143 L. Ed. 2d 91, 119 S. Ct. 1090 (1999), and this section 2255 motion for collateral relief followed.

DISCUSSION

Collateral relief is available to a federal prisoner to challenge the imposition or length of sentence on four grounds: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; (3) "the sentence was in excess of the maximum authorized by law";    [*3]    or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. @ 2255 (1994). Despite this apparently broad language, violations of federal law are only cognizable if they involve a "fundamental defect" resulting in a "complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346, 41 L. Ed. 2d 109, 94 S. Ct. 2298 (1974).

Defendant asserts four claims in his section 2255 motion. First, he alleges the government did not treat the drug type or quantity as elements of the conspiracy, in violation of his Fifth Amendment right to due process and Sixth Amendment right to a jury trial. Second, he contends his counsel was ineffective in failing to object to a sentencing enhancement for "crack cocaine" where the type of cocaine was not proven by a preponderance of the evidence, in violation of his Sixth Amendment right to trial counsel. Third, defendant asserts that the court incorrectly calculated the quantity of drug attributable to defendant, in violation of his Fifth Amendment right to due process. Fourth, defendant contends that the court improperly applied a supervisory role enhancement under U.S.S.G. @ 3B1.1(C), in violation  [*4]   of his Fifth Amendment right to due process.

I. Drug Type and Quantity

Defendant alleges that the government violated his Fifth and Sixth Amendment rights by using drug type and quantity to increase his statutory maximum penalty even though the jury made no specific finding as to the type or quantity of drug involved in the conspiracy. Specifically, defendant argues that absent such a jury finding he should have been sentenced under 21 U.S.C. @ 841(b)(1)(C), the "catch-all" penalty provision for drug crimes that with one exception contains no reference to specific drug type or quantity. An individual sentenced under section 841 (b)(1)(C) is not subject to a mandatory minimum sentence, and faces a maximum term of imprisonment of twenty years and a supervised release term of at least three years.

Instead of sentencing defendant under this provision, the court applied the harsher penalties of 21 U.S.C. @ 841(b)(1)(A), which provide in relevant part that where the offense involves five grams or more of cocaine base, the defendant is subject to a 10-year minimum term of imprisonment and maximum lifetime term of imprisonment and  [*5]   at least five years of supervised release. As part of its determination of relevant conduct, the court held defendant responsible for 800 grams of crack cocaine and sentenced defendant to a 300-month term of imprisonment on Counts I, II and III and a ten-year term of supervised release. Defendant asserts that under the Supreme Court's ruling in Jones v. United States, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999), this sentence is unconstitutional.

2000 U.S. Dist. LEXIS 11847, *5

In Jones, the Court addressed the question of whether the penalty enhancement section of a multipart federal statute (the federal carjacking statute) defined a separate crime or was merely a penalty provision. n1 The sentencing judge viewed the provision in question as a sentencing factor and accordingly, he enhanced defendant's sentence using facts that had not been submitted to the jury for a determination. On certiorari review, the Court reversed and remanded, concluding that each portion of the statute, including the provision setting forth the sentencing enhancement factor, defined a separate offense. 526 U.S. at 252.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Section 2119 of Title 18 of the United States Code provides that the maximum sentence for carjacking is fifteen years of imprisonment, but the same statute provides that if serious bodily injury resulted from the carjacking, the defendant can be sentenced to twenty-five years of imprisonment and that if death resulted, the defendant can be imprisoned for life.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -
[*6]

The Court explicitly stated in Jones that its decision did not announce a new principle of constitutional law, but "merely interpreted a particular federal statute in light of a set of constitutional concerns that have emerged" in prior decisions. Id. at 251 n.11. Nevertheless, the Court broached the broader question of whether the Fifth and Sixth Amendments allow "judicial factfinding by a preponderance [to] support the application of a provision that increases the potential severity of the penalty for a variant of a given crime." Id. at 242. In footnoted dictum, the Court stated:

Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior convictions) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

Id. at 243 n.6.

Defendant asserts that this footnoted language compels correction of his sentence. The government correctly responds that the Court did not articulate a new principle of constitutional law in Jones and argues   [*7] that even if it had articulated a new rule, the rule could not be retroactively applied to defendant's case. However, in the recent case Apprendi v. New Jersey, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), the Court reexamined its prior decisions in this area and confirmed as a rule the principle first expressed in Jones: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 120 S. Ct. at 2362-63.

In a subsequent appellate decision, United States v. Aguayo-Delgado, 2000 WL 988128 (8th Cir. July 18, 2000), the Eighth Circuit Court of Appeals concluded that "in Apprendi, the Supreme Court made it clear that the principle discussed in Jones is a rule of constitutional law." Id. at *4. Moreover, as the Aguayo-Delgado decision confirms, the Court's ruling in Apprendi means that in any drug case where the defendant is subject to penalties in excess of those

2000 U.S. Dist. LEXIS 11847, *7

prescribed by 28 U.S.C. @ 841(b)(1)(C), the government must charge drug quantity and [*8] prove that fact to the jury beyond a reasonable doubt. Id. at *6; see also Apprendi, 120 S. Ct. at 2366 n.21 (signaling the relevance of the new rule to drug cases by referring to the Court's recent commentary on sentencing beyond the statutory maximum in drug conspiracy cases).

The applicability of Apprendi to drug cases raises the question of whether this court must retroactively apply the new rule to defendant's case. In general, new constitutional rules of criminal procedure apply retroactively only to cases which are on direct state or federal appeal at the time the rule is announced. See Griffith v. Kentucky, 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987). A new rule is not to be applied retroactively on collateral review unless the rule falls within one of two narrow exceptions: (1) the new rule places certain kinds of primary conduct beyond the power of the criminal lawmaking authority to proscribe, or (2) the rule requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.'" Teague v. Lane, 489 U.S. 288, 305-310, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989) (citations [*9] omitted). Retroactivity under Teague is a "threshold matter" which must be addressed "before considering the merits of [a] claim." Caspari v. Bohlen, 510 U.S. 383, 389, 127 L. Ed. 2d 236, 114 S. Ct. 948 (1994). n2

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n2 In this case, although Apprendi had not yet been decided at the time the government submitted its brief, the government's argument against the retroactive application of Jones logically extends to Apprendi and therefore must be addressed at the outset.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

The first exception to the general rule prohibiting retroactivity applies only to rules that decriminalize a class of conduct or prohibit a certain category of punishment for a class of defendants because of their status or offense. See Saffle v. Parks, 494 U.S. 484, 495, 108 L. Ed. 2d 415, 110 S. Ct. 1257 (1990). The exception is inapplicable here. However, the Apprendi decision does implicate the second exception, which applies to those "watershed rules of criminal procedure" which "alter our [*10] understanding of the bedrock procedural elements essential to the fairness of a proceeding" and "without which the likelihood of an accurate conviction is seriously diminished." Sawyer v. Smith, 497 U.S. 227, 242-244, 111 L. Ed. 2d 193, 110 S. Ct. 2822 (1990)(quoting Teague, 489 U.S. at 311, 315); see also Bousley v. United States, 523 U.S. 614, 620, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998) ("The Teague doctrine is founded on the notion that one of the 'principal functions of habeas corpus [is] "to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted."'" (citations omitted)).

In Apprendi, the Supreme Court observed:

At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," ... and the guarantee that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," ... Taken together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of [*11] every element of the crime with

2000 U.S. Dist. LEXIS 11847, *11

which he is charged, beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 510, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995); see also Sullivan v. Louisiana, 508 U.S. 275, 278, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); winship, 397 U.S., at 364, 90 S. Ct. 1068 ("The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

120 S. Ct. at 2355-56.

    The Court ultimately concluded in Apprendi that the Constitution requires a jury finding on any fact which increases the statutory maximum penalty. This conclusion compels a radical shift in criminal procedure in federal drug cases. This court has presided over countless trials and sentencings in which the court has served as the ultimate decision maker as to drug quantity. Indeed, the jury is often specifically instructed that it is not necessary for the government to prove the exact or precise amount of the drug alleged in the indictment. As such, a jury finding as to quantity is rare. Cf. United States v. Sheppard, 2000 WL 988127, [*12]   at *2 (8th Cir. July 18, 2000)(upholding defendant's sentencing in a post-Apprendi appeal where the jury had made a special finding of drug type and quantity).

    After Apprendi, to the extent that the government seeks to subject a drug offender to the higher penalties under 841 (b)(1)(A) or (b)(1)(B), it must submit drug type and quantity to the jury, and the jury must find those facts beyond a reasonable doubt. The implications of the new rule are particularly significant in drug conspiracy cases. As the Court itself noted in Apprendi, "There is a vast difference between ... a judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof." 120 S. Ct. at 2366; see also In re winship, 397 U.S. 358, 363, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970) (quoting Coffin v. United States, 156 U.S. 432, 453, 39 L. Ed. 481, 15 S. Ct. 394 (1895)) ("The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It   [*13]   is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence--that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'").

    There can be little doubt that the sweeping new requirement announced by the Court in Apprendi is so grounded in fundamental fairness that it may be considered of watershed importance. Accordingly, the court concludes that the Apprendi decision falls under the second exception to the Teague nonretroactivity principle and must be applied to this section 2255 motion. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

    n3 The court is mindful of the potential impact of the conclusion that Apprendi is applicable retroactively. As Justice O'Connor asserts in her dissenting opinion, Apprendi "threatens to unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or in part on the authority of the Court's decision today." 120 S. Ct. at 2394-95 (O'Connor, J., dissenting). However, the court notes that with respect to federal drug cases, petitions for collateral review may be filed only in those cases in which the sentence exceeds the 20-year maximum imposed by 21 U.S.C. @

2000 U.S. Dist. LEXIS 11847, *13

841(b)(1)(C). See Apprendi, 120 S. Ct at 2361 n.13 (reaffirming the sentencing court's discretion under McMillan while expressly limiting McMillan to "cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict."); Aguaya-Delgado, 2000 WL 988128. Moreover, qualified petitioners will have to overcome the additional barriers imposed by the Antiterrorism and Effective Death Penalty Act (AEDPA), including the one-year statute of limitations, see 28 U.S.C. @@ 2244(d) & 2255, the restrictions on successive petitions, see 28 U.S.C. @@ 2244(b) & 2255, and the heightened standard of review for state prisoners, see 28 U.S.C. @ 2254(d)(1).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -
[*14]

Applying this new rule to defendant's case, the court further concludes that defendant's sentence violates the Apprendi requirements. The court has carefully reviewed the jury instructions in this case and observes that the jury was specifically instructed that, "It is not necessary for the government to prove the exact or precise amount of cocaine base alleged in the indictment." [Doc. No. 494, p. 36]. The court believes this initial instruction that the government need not prove quantity effectively foreclosed any meaningful jury deliberation on the issue of drug quantity.

It is true that the jury was also given an instruction regarding the elements of a conspiracy which contained the indictment's general quantity language "in excess of 50 grams of ... cocaine base." [Doc. No. 494, p. 41] and was told that it must find all elements of the conspiracy beyond a reasonable doubt. n4 However, in the latter part of that instruction, where the court set forth the elements of the distribution and possession charges underlying the conspiracy, there was no mention whatsoever of quantity.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 Instruction No. 35 reads in relevant part:
The crime of conspiracy as charged in Count 1 of the indictment, has three essential elements, which are: One: From September 1995, to on or about November 28, 1995, in the State and District of Minnesota two or more persons reached an agreement or came to an understanding to knowingly distribute or possess with intent to distribute in excess of 50 grams of a mixture or substance containing cocaine base ("crack")...

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -
[*15]

Viewing the instructions as a whole, the court concludes that the issue of drug quantity was not subjected to a reasonable doubt determination by the jury in defendant's case. Therefore, imposing a sentence under the harsher provisions of 841(b)(1)(A) was unlawful and defendant's motion as to this claim must be granted.

Upon granting a section 2255 motion, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial, or correct the sentence as may appear appropriate." 28 U.S.C. @ 2255. The remedy provided in section 2255 is broad and flexible, and entrusts the

2000 U.S. Dist. LEXIS 11847, *15

federal courts with the power to fashion appropriate relief. See Andrews v. United States, 373 U.S. 334, 339, 10 L. Ed. 2d 383, 83 S. Ct. 1236 (1963). In light of the conclusion that defendant's 300-month sentence under 841(b)(1)(A) is unlawful, the court vacates defendant's sentence as to Counts I, II and III and resentences defendant under the provisions of 841 (b)(1)(C) to a term of imprisonment of 240 months on Counts I, II and III. n5

- - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

    n5 The court's decision has no effect on the defendant's consecutive sentence of 60 months on Count IV. Similarly, the court notes that the supervised release term of 10 years falls within the 841 (b)(1)(C) penalty range and therefore does not require correction.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -
[*16]

## II. Ineffective Assistance of Counsel

    Defendant also raises an ineffective assistance of counsel claim. To prove ineffective assistance of counsel, defendant must show that: (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The court applies an objective standard of reasonableness; counsel's performance will be considered constitutionally deficient if he "failed to exercise the customary skills and diligence that a reasonably competent attorney would [have] exhibited under similar circumstances." Hayes v. Lockhart, 766 F.2d 1247, 1251 (8th Cir. 1985), cert. denied, 474 U.S. 922, 88 L. Ed. 2d 263, 106 S. Ct. 256 (1985). There is a strong presumption that counsel acted competently and provided reasonable assistance of counsel, Ford v. Lockhart, 904 F.2d 458, 462 (8th Cir. 1990), and defendant bears the heavy burden in overcoming that presumption, Bramlett v. Lockhart, 876 F.2d 644, 647 (8th Cir. 1989), cert. denied, 493 U.S. 941, 107 L. Ed. 2d 330, 110 S. Ct. 341 (1989). [*17]

    Defendant fails to meet this high standard. Although defendant claims his attorney failed to object to a "sentencing enhancement" for crack cocaine, defendant's attorney did in fact move for a downward departure, arguing that the government did not prove that the controlled substance which was seized was cocaine base. The court denied the motion, noting that the trial testimony of the forensic chemist conclusively established that the drugs seized comprised a mixture or substance containing cocaine base, [Sent. Tr., p. 36]. The record reflects that the chemist also testified that cocaine base is commonly referred to as "crack." [Trial Tr., Vol. VIII at 56]. Moreover, various lay witnesses testified they saw defendant cooking and selling "cocaine base" and "crack," [Trial Tr., Vol. VI at 53, 57-58, 99, 101-03], and the jury was specifically instructed that as a matter of law "cocaine base ('crack') is a controlled substance," [Doc. No. 494, p. 31]. In light of this record, there is no indication that defense counsel could have done anything to alter the inevitable conclusion that defendant had trafficked in crack cocaine. Absent evidence of either deficient performance or prejudice,    [*18]    defendant's motion as to the ineffective assistance of counsel claim is denied.

## III. Remaining claims

2000 U.S. Dist. LEXIS 11847, *18

Finally, defendant contends that the court incorrectly calculated the amount of crack cocaine attributable to defendant as a co-conspirator and that the court incorrectly assigned him a supervisory role at sentencing. Both issues were raised on appeal to the Eighth Circuit and rejected. See Davis, 154 F.3d at 788. It is well-settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion brought pursuant to @ 2255. See U.S. v. Shabazz, 657 F.2d 189, 190 (8th Cir. 1981). Therefore, defendant's motion as to these claims is denied.

CONCLUSION

Based on a review of the file and record, IT IS HEREBY ORDERED that:

1. Defendant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. @ 2255 [Doc. No. 689] is granted as to his claim that he was unlawfully sentenced under 21 U.S.C. @ 841(b)(1)(A).

2. Defendant's 300-month sentence on Counts I, II and III is vacated and in accordance with Apprendi v. New Jersey, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), [*19] he is resentenced under 21 U.S.C. @ 841 (b)(1)(C) to a term of imprisonment of 240 months on Counts I, II and III.

3. Defendant's motion to vacate, set aside or correct his sentence is denied as to his claims that he received ineffective assistance of counsel, that the court incorrectly calculated the amount of crack cocaine attributable to him as a co-conspirator and that the court incorrectly assigned him a supervisory role at sentencing.

Dated: August 7, 2000

David S. Doty, Judge

United States District Court



37720    **E-FILED**
Friday, 04 May, 2007  04:53:40 PM
Clerk, U.S. District Court, ILCD

ORIGINAL

NO. 4-99-0499

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

---

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit Court of |
| | ) the Sixth Judicial Circuit |
| Plaintiff-Appellee, | ) Champaign County, Illinois |
| | ) |
| vs. | ) No.  98-CF-1558 |
| | ) |
| DEDRIC MOORE, | ) Honorable |
| | ) Thomas J. Difanis |
| Defendant-Appellant. | ) Judge Presiding. |

---

<u>SUPPLEMENTAL BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE</u>

John C. Piland
State's Attorney
Champaign County Courthouse
Urbana, Illinois  61801


Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
Thomas R. Dodegge
Staff Attorney
State's Attorneys Appellate
    Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE



FILED

DEC 1 1 2000

Clerk of the
Appellate Court, 4th Dist.

EXHIBIT D

<u>POINT AND AUTHORITIES</u>                    <u>PAGE</u>

THE CONSECUTIVE AND EXTENDED-TERM SENTENCING

PROVISIONS SET FORTH IN THE UNIFIED CODE OF

CORRECTIONS DO NOT VIOLATE DUE PROCESS............... 1

<u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. ___, 120 S.Ct.

    2348, 147 L.E.2d 435 (2000).................... 1, 3,
    4, 6,
    7, 8,
    10, 12,
    13, 18

<u>Arangold Corp</u>. v. <u>Zehnder</u>, 187 Ill.2d 341, 240

    Ill.Dec. 710, 718 N.E.2d 191 (1999)............ 2

<u>Wilson</u> v. <u>Department of Revenue</u>, 169 Ill.2d 306, 214

    Ill.Dec. 849, 662 N.E.2d 415 (1996)............ 2, 19

<u>In re Branning</u>, 285 Ill.App.3d  405, 220 Ill.Dec.

    920, 674 N.E.2d 463 (4th Dist. 1996)........... 2

<u>People</u> v. <u>Vraniak</u>, 5 Ill.2d 384, 125 N.E.2d 153

    (1955)......................................... 5

<u>State in the Interest of J.L.A.</u>, 136 N.J. 370, 643

    A.2d 538 (1994)................................ 5

<u>Blockburger</u> v. <u>United States</u>, 284 U.S. 299, 52

    S.Ct. 180, 76 L.Ed.2d 306 (1932)............... 6

<u>United States</u> v. <u>Van Horn</u>, 798 F.2d 1166 (8th Cir.

    1986).......................................... 6

<u>State</u> v. <u>Buck</u>, 275 N.W.2d 194 (Iowa 1979)........... 6

People v. Kilpatrick, 167 Ill.2d 439, 212 Ill.Dec.

    660, 657 N.E.2d 1005 (1995).................... 8

Thomas v. Greer, 143 Ill.2d 271, 158 Ill.Dec. 1, 573

    N.E.2d 814 (1991).............................. 9

People v. Clifton, ___ Ill.App.3d ___, ___ Ill.Dec.

    ___, ___ N.E.2d ___ (No. 1-98-2126,

    1-98-2384, Cons., September 29, 2000).......... 9

People v. Carey, ___ Ill.App.3d ___, ___ Ill.Dec.

    ___, ___ N.E.2d ___ (No. 1-98-4677, November

    13, 2000)..................................... 11

United States v. Smith, 223 F.3d 554 (7th Cir. 2000). 13, 15

People v. Shuman, 226 Ill.App.3d 1065, 168 Ill.Dec.

    777, 590 N.E.2d 99 (3rd Dist. 1992)............ 14

People v. Hampton, 249 Ill.App.3d 873, 189 Ill.Dec.

    344, 620 N.E.2d 3 (2nd Dist. 1993)............. 14

People v. Lewis, 211 Ill.App.3d 276, 155 Ill.Dec.

    610, 569 N.E.2d 1221 (4th Dist. 1991).......... 14

McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct.

    2411, 91 L.Ed.2d 67 (1986).................... 16, 19

State v. Apprendi, 159 N.J. 7, 731 A.2d 485 (1999).... 16

People v. Joyner, ___ Ill.App.3d ___, ___ Ill.Dec.

    ___, ___ N.E.2d ___ (No. 2-99-0433, November

    8, 2000)...................................... 17

<u>People</u> v. <u>Beachem</u>, ___ Ill.App.3d ___, ___ Ill.Dec. ___, ___ N.E.2d ___ (No. 1-99-0852, November 8, 2000)........................................ 18

<u>Dobbins</u> v. <u>State</u>, 605 S.2d 922 (Fla. Dist. Ct. 1992)........................................ 19, 20

<u>People</u> v. <u>Marshall</u>, 2000 WL 1177576 (Cal.App.2d 2000)........................................ 20

730 ILCS 5/5-8-4.................................... 1

730 ILCS 5/5-5-3.2(b).............................. 1,11, 12

730 ILCS 5/5-8-4(b)................................ 2, 9

730 ILCS 5/5-8-2................................... 12

Supreme Court Rule 402(a)(2)....................... 14

## SUPPLEMENTAL ARGUMENT

THE CONSECUTIVE AND EXTENDED-TERM SENTENCING PROVISIONS SET FORTH IN THE UNIFIED CODE OF CORRECTIONS DO NOT VIOLATE DUE PROCESS.

By way of background, defendant, Dedric Moore, was found guilty of attempt (first degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse, and residential burglary after a jury trial. The trial court sentenced defendant to an extended term of 60 years for attempt (first degree murder) based "upon the heinous and brutal" nature of the offense. (R. Vol. XIV, 62) It imposed a consecutive sentence of 15 years for residential burglary, because it was "of an opinion that a consecutive term is required to protect the public from further criminal conduct by this defendant." (R. Vol. XIV, 59, 61)

In his supplemental brief, defendant primarily citing Apprendi v. New Jersey, 530 U.S. ___, 120 S.Ct. 2348, 147 L.E.2d 435 (2000), contends that the consecutive (730 ILCS 5/5-8-4) and extended-term (730 ILCS 5/5-5-3.2(b)) sentencing provisions violate the right to due process. The State will first address defendant's consecutive sentence argument.

1

All statutes carry a strong presumption of constitutionality. <u>Arangold Corp</u>. v. <u>Zehnder</u>, 187 Ill.2d 341, 240 Ill.Dec. 710, 718 N.E.2d 191, 197 (1999). The party challenging the constitutionality of a statute bears the burden of rebutting this presumption and clearly establishing a constitutional violation. <u>Arangold</u>, 718 N.E.2d at 197. A court must construe enactments by the legislature to uphold their validity whenever it is reasonably possible to do so. <u>Wilson</u> v. <u>Department of Revenue</u>, 169 Ill.2d 306, 214 Ill.Dec. 849, 662 N.E.2d 415, 417 (1996); <u>In re Branning</u>, 285 Ill.App.3d 405, 220 Ill.Dec. 920, 674 N.E.2d 463, 467 (4th Dist. 1996).

Section 5-8-4(b) of the Unified Code of Corrections (Code) states in part:

> (b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record;

730 ILCS 5/5-8-4(b).

The State submits that <u>Apprendi</u> does not apply to the imposition of consecutive sentences. In <u>Apprendi</u>, the Court stated:

2

At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." Amdt. 6. Taken together, these rights indisputably entitle a criminal defendant to a "jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."

\* \* \*

As we have unanimously explained, <u>Gaudin</u>, 515 U.S. at 510-511, 115 S.Ct. 2310, the historical foundation for our recognition of these principles extends down centuries into the common law. "[T]o guard against a spirit of oppression and tyranny on the part of rules," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbors. . . ." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added).

120 S.Ct. at 2355-2356.

The above quote demonstrates that the underlying purpose of <u>Apprendi</u> is to protect the powers of the jury as they existed at common law. There is absolutely nothing in the majority opinion to indicate that the Court sought to expand these common law powers. In fact, such an interpretation is refuted by the text, which is replete with references to the

3

historical basis for the Court's ruling and the common law tradition.  For example, the Court stated:

> The historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.
>
> We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fear "that the jury right could be lost not only by gross denial, but by erosion." <u>Jones</u>, 526 U.S. at 247-248, 119 S.Ct. 1215.  But practice must at least adhere to the basis principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond a reasonable doubt.

120 S.Ct. at 2359.

In footnote 10, the Court stated:

> In support of its novel view that this Court has "long recognized" that not all facts affecting punishment need go to the jury, *post,* 2380-2381, the principal dissent cites three cases decided within the past quarter century; and each of these is plainly distinguishable.  Rather than offer any historical account of its own that would support the notion of a "sentencing factor" legally increasing punishment beyond the statutory maximum--and Justice THOMAS' concurring opinion in this case makes clear that such an exercise would be futile--the dissent proceeds by mischaracterizing our account.

120 S.Ct. at 2359.

4

Given the Court's focus on the common law tradition, it is necessary to examine the authority of the trial court to impose consecutive sentences as it existed at common law. The State observes that <u>Apprendi</u> recognized the historic role of the trial court in sentencing. 120 S.Ct. at 2357-2358.

In <u>People</u> v. <u>Vraniak</u>, 5 Ill.2d 384, 125 N.E.2d 153 (1955), the Illinois Supreme Court stated:

> It has long been the rule in Illinois that a court may, in its discretion, impose consecutive sentences where the accused has, in fact, committed separate and distinct violations of the law.
>
> <p align="center">* * *</p>
>
> Defendant admits the great weight of authority in this country is that, without any contrary statutory provision, the power to impose consecutive sentence resides in the court.

120 N.E.2d at 515.

In <u>State in the Interest of J.L.A.</u>, 136 N.J. 370, 643 A.2d 538 (1994), the Supreme Court of New Jersey stated:

> [W]e necessarily recognize the inherent power of the judiciary, absent a statutory prohibition, to impose consecutive sentences for separate offenses. That power is derived from the common law, and has consistently been recognized by our courts. In <u>State v. Maxey</u>, 42 N.J. 62, 198 A.2d 768 (1964), we acknowledged that "[t]he judicial power to impose consecutive sentences in this State is not founded upon statute but rather upon our common law, derived from the common law of England. * * * Consequently, our courts have the discretion and power to impose consecutive sentences for terms of years."

<p align="center">5</p>

643 A.2d at 540.

As the above quotes indicate, trial courts had the discretion to impose consecutive sentences at common law, and the jury played no role in this determination. See Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed.2d 306 (1932) (imposition of consecutive sentences proper, where offenses constituted isolated acts). Further, this authority is subject to limitation by the legislature. See e.g., United States v. Van Horn, 798 F.2d 1166 (8th Cir. 1986) (no constitutional violation, where Congress made the imposition of consecutive sentences mandatory); State v. Buck, 275 N.W.2d 194, 197 (Iowa 1979) (trial court possessed inherent authority to impose consecutive sentences, where statutes authorizing imposition of consecutive sentences repealed).

Apprendi did not involve consecutive sentences. In Apprendi, the Court described its holding as follows:

> The New Jersey statutory scheme that Apprendi asks us to invalidate allows a jury to convict a defendant of a second-degree offense based on its finding beyond a reasonable doubt that he unlawfully possessed a prohibited weapon; after a subsequent and separate proceeding, it then allows a judge to impose punishment identical to that New Jersey provides for crimes of the first degree. N.J. Stat. Ann. section 2C:43-6(a)(1) (West 1999), based upon the judge's finding, by a preponderance of the evidence, that the defendant's "purpose" for unlawfully possessing the weapon was "to

6

intimidate" his victim on the basis of a particular characteristic the victim possessed.  In light of the constitutional rule explained above, and all of the cases supporting it, this practice cannot stand.

120 S.Ct. at 2361.

Cases involving section 5-8-4 are fundamentally different than Apprendi.  Here, the jury determines whether the State has proven the statutory elements of the offenses beyond a reasonable doubt.  These determinations establish a maximum penalty that the trial court may impose for each offense, which meets Apprendi requirements.  Whether the trial court imposes concurrent or consecutive sentences under section 5-8-4 has no bearing on the maximum term that may be imposed for each offense.

The inapplicability of Apprendi to consecutive sentences is made clear when the underlying rationale of the decision is considered.  As discussed, the purpose of the Apprendi holding is to protect the powers of the jury as they existed at common law.  Also, as discussed, the jury played no role in the imposition of consecutive sentences at common law, since these determinations were part of the trial court's inherent sentencing authority.  Since there is no reduction in the common law powers of the jury, when the legislature limits the discretion of the trial court to impose consecutive sentences, such legislation does not implicate Apprendi.

7

The State suggests that this conclusion is supported by additional language in _Apprendi_, holdings of the Illinois Supreme Court, and the language of the contested statute.

In _Apprendi_, the court stated:

> First, the State has argued that even without the trial judge's finding of racial bias, the judge could have imposed consecutive sentences on counts 3 and 18 that would have produced the 12-year term of imprisonment that Apprendi received; Apprendi's actual sentence was thus within the range authorized by statute for the three offenses to which he pleaded guilty. Brief for Respondent 4. The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased--indeed, it doubled--the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on counts 3 and 22 have no more relevance to our disposition than the dismissal of the remaining 18 counts.

120 S.Ct. at 2354 (emphasis added).

As the above quote indicates, the Court in _Apprendi_ was only addressing the constitutionality of an increase in the penalty for a single offense. It did not address consecutive sentences.

In _People_ v. _Kilpatrick_, 167 Ill.2d 439, 212 Ill.Dec. 660, 657 N.E.2d 1005, 1008 (1995), the Illinois Supreme Court concluded that consecutive sentences are not treated as single sentences under section 5-8-1(c) of the Code. Previously, in

8

Thomas v. Greer, 143 Ill.2d 271, 158 Ill.Dec. 1, 573 N.E.2d 814, 817 (1991), the court had held that when two sentences were made consecutive to each other, a new single sentence was not formed.   In other words, the imposition of consecutive sentences relates to the manner in which the sentences are served and not to the length of the individual sentence. Thus, Apprendi does not apply.

As to the statutory provision, section 5-8-4(b) allows the court to impose a consecutive sentence if "it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant."   This language does not relate to an element of any one of the offenses.   Rather, it relates to the exercise of trial court discretion.

The State notes that in People v. Clifton, ___ Ill.App.3d ___, ___ Ill.Dec. ___, ___ N.E.2d ___ (No. 1-98-2126, 1-98-2384, Cons., September 29, 2000), the court stated:

> Thus we hold that the requirement of section 5-8-4(a) of the Unified Code of Corrections that a defendant be sentenced to consecutive sentences for crimes arising out of the same course of conduct when the court makes a finding that he inflicted severe bodily injury is unconstitutional under Apprendi.   If consecutive sentences are to be imposed pursuant to a factual finding that severe bodily injury occurred, then severe bodily injury will have to be submitted to a jury and proved beyond a reasonable doubt.
>
> Clifton, Slip op. at 55.

9

It is submitted that _Clifton_ should not be followed in the case at bar for the following reasons: (1) _Clifton_ involves different statutory language; (2) it unjustifiably expands the holding in _Apprendi_; and (3) it fails to consider the underlying purpose of _Apprendi_.

First, unlike _Clifton_, the case at bar involved the imposition of consecutive sentences under section 5-8-4(b). Consequently, there was no required finding that a severe bodily injury occurred. As shown by the above quote, _Clifton_ focused on the severe bodily injury finding. Since such a finding is not at issue here, _Clifton_ does not apply.

Second, the holding in _Apprendi_ was that "any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." _Apprendi_, 120 S.Ct. at 2362-2363. As discussed, in cases involving the imposition of consecutive sentences, there is no increase in the statutory maximum for the crime, since the imposition of consecutive sentences relates to the manner in which the sentences are served, not to their length. Thus, _Clifton_ improperly expanded the holding in _Apprendi_.

Third, and most significantly, the court in _Clifton_ failed to consider the underlying rationale of _Apprendi_. As established _supra_, the purpose of _Apprendi_ was to protect the powers of the jury as they existed at common law from

10

encroachment by the legislature.  Since the trial court had discretion to impose consecutive sentences at common law without jury involvement, a statutory provision, such as section 5-8-4, which limits the discretion of the trial court in imposing consecutive sentences, cannot be said to encroach upon the common law powers of the jury.  Consequently, contrary to <u>Clifton</u>, <u>Apprendi</u> is not implicated in section 5-8-4.

People v. <u>Carey</u>, ____ Ill.App.3d ___, ____ Ill.Dec. ___, ____ N.E.2d ___ (No. 1-98-4677, November 13, 2000), followed <u>Clifton</u> when it concluded that the imposition of consecutive sentences under section 5-8-4(a) was unconstitutional.  As a result, the above statements are also directly applicable to <u>Carey</u>.

In conclusion, the inapplicability of <u>Apprendi</u> to section 5-8-4 is indicated by a consideration of the purpose of <u>Apprendi</u>, Illinois case law, and the language of the statute.

As to defendant's extended-term argument, section 5-5-3.2(b) of the Code provides in pertinent part:

> (b) The following factors may be considered by the court as reasons to impose an extended term sentence under Section 5-8-2 upon any offender.

> * * *

> (2) When a defendant is convicted of any felony and the court finds that the offense was

11

accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty;

730 ILCS 5/5-5-3.2(b).

Section 5-8-2 of the Code provides in part:

Extended Term.  (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5-8-1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5-5-3.2 were found to be present.  Where the judge finds that such factors were present, he may sentence an offender to the following:

* * *

(2) for a Class X felony, a term shall be not less than 30 years and not more than 60 years.

730 ILCS 5/5-8-2.

In Apprendi, the Court set forth its holding as follows:

Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt.

120 S.Ct. at 2362-2363.

The Court also stated:

We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion--taking into consideration various factors relating both to offense and offender--in imposing a judgment *within the range* prescribed by statute.  We have often noted that judges in this country have long

12

exercised discretion of this nature in imposing
sentence *within statutory limits* in the individual
case.

Apprendi, 120 S.Ct at 2358 (emphasis in original).

At issue then is what is the "prescribed statutory
maximum" for Apprendi purposes under the relevant statutory
provisions.  If the prescribed statutory maximum is the
maximum sentence set forth in section 5-8-2 (i.e., 60 years
for a Class X felony), there is no due process violation,
since the 60-year sentence was within the statutory range.  On
the other hand, if the prescribed statutory maximum is set
forth in section 5-8-1 (i.e., 30 years for a Class X felony),
there is a violation.

The State will contend that there is a single sentencing
range for each class of felony in Illinois with the minimum
contained in section 5-8-1 and the maximum contained in
section 5-8-2.  It submits that this is supported by the
statutory language, Illinois decisions construing the term
maximum sentence, and the recent decision in United States v.
Smith, 223 F.3d 554 (7th Cir. 2000).

Initially, the State suggests that the implications of
Apprendi are still far from clear.  For example, in Smith, the
court stated that it faced a "difficult inquiry" in deciding
whether a federal sentencing provision triggered the Apprendi
rule.  223 F.3d at 565.

13

First, section 5-8-2(a)(2) establishes the maximum
penalty for a Class X felony at 60 years. By definition,
section 5-8-1 cannot be said to establish such a maximum
penalty. In other words, under Illinois law, the minimum
sentence for a Class X felony is 6 years and the maximum is 60
years.

Second, Illinois courts have construed the term "maximum
sentence" to mean the maximum extended term for each offense.
This construction has been repeatedly adopted in connection
with the Supreme Court Rule 402(a)(2) requirement that the
court admonish the defendant of the "minimum and maximum
sentence prescribed by law" prior to accepting a guilty plea.
People v. Shuman, 226 Ill.App.3d 1065, 168 Ill.Dec. 777, 590
N.E.2d 99, 101 (3rd Dist. 1992); People v. Hampton, 249
Ill.App.3d 873, 189 Ill.Dec. 344, 620 N.E.2d 3, 5-6 (2nd Dist.
1993). Further, in People v. Lewis, 211 Ill.App.3d 276, 155
Ill.Dec. 610, 569 N.E.2d 1221 (4th Dist. 1991), this court
considered the propriety of a maximum extended-term sentence.
It stated: "When a sentence falls within the statutory range
and the court has not erred in the selection of information to
consider . . . ." Lewis, 569 N.E.2d at 1226 (emphasis added).

Third, in Smith certain gang members had been charged
with engaging in a continuing criminal enterprise and were

14

sentenced to life imprisonment.  In considering whether the statute implicated <u>Apprendi</u>, the court stated:

> With these cases in mind, we must decide whether § 848(b) has the kind of "increased punishment" effect that triggers the *Apprendi* rule. This is a difficult inquiry.  On the one hand, section 848(a) authorizes a range of imprisonment of 30 years to life, and § 848(b) simply eliminates anything in that range below a life sentence for the principal administrator, organizer or leader when the required quantities or values of drugs are involved.  Thus, at the time the Governor defendants went to trial, they knew they faced the risk of a life sentence.  On the other hand, as Justice Thomas wrote in his concurring opinion in *Apprendi*, at a certain level of generality one can surely say that a fact that increases the prosecution's entitlement is an element, not a sentencing factors.

> \* \* \*

> We must decide, therefore, whether the literal fact that these defendants faced at least a risk of a life term is enough to make § 848(b) a sentencing statute under *Apprendi*.  Such a decision would, of course, amount to a rejection of the theory of increased expected punishment articulated by Justices Thomas and Scalia in *Apprendi*–a theory that the other three justices in the majority had no occasion to discuss, given the nature of the New Jersey law actually before them.

> \* \* \*

> The language of the principal opinion refers not to the defendant's expected punishment, but to the "prescribed statutory maximum."  *Id.* at ___, 120 S.Ct. at 2363.  That sounds to us like a reference to the text of the statute, and there is no doubt here that a life sentence was *possible* under § 848(a), even if it was not a certainty.

223 F.3d at 565.

15

The State suggests that the case at bar is analogous to Smith. As in Smith, the Illinois extended-term statute provides a maximum term for an offense. Also, as in Smith, the finding of a statutory aggravating factor (i.e., brutal or heinous behavior) relates to the exercise of the trial court's sentencing discretion within this range. This does not violate Apprendi. See McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

The State's position is also supported by a comparison of the New Jersey statute found unconstitutional in Apprendi and the statutory provisions here at issue. In State v. Apprendi, 159 N.J. 7, 731 A.2d 485 (1999), which was reversed by the Supreme Court in Apprendi, the New Jersey statute was set forth as follows:

> The court shall, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime, . . . to an extended term if it finds, by a preponderance of the evidence, the grounds in subsection e. . . .

> e.    The defendant in committing the crime acted, at least in part, with ill will, hatred or bias toward, and with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation of ethnicity.

> 731 A.2d at 498 (Stein, J., dissenting).

Although not specifically addressed by the Supreme Court, the New Jersey statute contains three characteristics that are

16

not present in the Illinois law.  First, under the New Jersey statute, the prosecutor must make an application before the enhancing factor may be considered.  Under Illinois law, the trial court retains the power to determine the applicability of the factor.  Second, under the New Jersey statute, the imposition of an extended term is mandatory, if the "ground" is found.  On the contrary, under the Illinois scheme, the trial court retains the authority to sentence the defendant to any term within the range.  Third, the New Jersey court is required to find the "ground" necessary to impose an extended-term sentence by a preponderance of the evidence.  There is no such statutory requirement in Illinois.

As indicated, the New Jersey sentencing scheme contains characteristics that are not generally associated with the exercise of trial court discretion in sentencing.  Rather, the trial court is acting somewhat like a jury.  However, the Illinois sentencing statutes do not have these characteristics.

The State notes that People v. Joyner, ___ Ill.App.3d ___, ___ Ill.Dec. ___, ___ N.E.2d ___ (No. 2-99-0433, November 8, 2000), does not require a different result.  In Joyner, the defendant was sentenced to natural life imprisonment pursuant to section 5-8-1(a)(1)(b) of the Code.  The court held that this section was unconstitutional under Apprendi.  Joyner,

17

Slip op. at 22.  However, <u>Joyner</u> does not apply to the case at bar, since it involved a different statutory provision.

In <u>People</u> v. <u>Beachem</u>, ___ Ill.App.3d ___, ___ Ill.Dec. ___, ___ N.E.2d ___ (No. 1-99-0852, November 8, 2000), the court concluded that the procedure set forth in section 5-8-2 of the Code violated <u>Apprendi</u>.  The State suggests that <u>Beachem</u> was wrongly decided.

In <u>Beachem</u>, the defendant was found guilty of first degree murder and determined to be death-penalty eligible. Slip op. at 2.  Subsequently, she was sentenced to an extended term of 90 years for the murder conviction on the ground that the murder was accompanied by brutal or heinous behavior.  The appellate court determined that the trial court's exceptionally brutal or heinous finding violated <u>Apprendi</u>. <u>Beachem</u>, Slip op. at 24.

In <u>Apprendi</u>, the Court stated:

> We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion--taking into consideration various factors relating both to offense and offender--in imposing a judgment *within the range* prescribed by statute.  We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case.

<u>Apprendi</u>, 120 S.Ct. at 2358 (emphasis in original).

18

The State submits that there was no _Apprendi_ violation in _Beachem_, since the maximum penalty for the murder was established, when it was determined that the defendant was death-penalty eligible . Consequently, the sentence imposed (90 years) was within the statutory range (i.e., death to 20 years), and there was no violation of due process. See _McMillan_, 106 S.Ct. at 2414.

Moreover, even if this court rejects the above-stated argument, it does not mean that the contested provision is unconstitutional on its face. As noted, a court must construe a statute to uphold its constitutionality whenever it is reasonably possible to do so. _Wilson_, 662 N.E.2d at 417. This court could read the extended-term statute to provide that the aggravating factors allowing imposition of an extended term be found by the judge based on its findings beyond a reasonable doubt by the jury. Such a construction would uphold the statute's constitutionality and would not run afoul of _Apprendi_. For example, in _Dobbins_ v. _State_, 605 S.2d 922 (Fla. Dist. Ct. 1992), it was stated:

> This argument seems to concede that if the statute permits enhancement only upon proof, beyond a reasonable doubt, that appellant committed the battery motivated, in whole or in part, because Daly was Jewish, the enhanced penalty would be appropriate.

> This is precisely the way we read the statute. Section 775.08 provides:

19

The penalty for any felony or misdemeanor shall be reclassified as provided in this subsection if *the commission of such felony or misdemeanor evidences prejudice based on the race, color, ancestry, ethnicity, religion or other national origin of the victim.*

<u>Dobbins</u>, 605 S.2d at 923 (emphasis in original).

Finally, any possible error in imposing an extended-term sentence was harmless since there was overwhelming evidence that the offense was accompanied by brutal or heinous behavior indicative of wanton cruelty.    In describing defendant's conduct, the trial court stated:

The defendant, when he returned to the residence, returned for the purpose of inflicting injury, if not death, upon the victim in this case. He returned to the residence and the manner in which he treated the victim, by anyone's definition, trying to strangle her, urinating on her head, dousing her with a flammable liquid, kicking, punching, beating her, when she tried to somehow flee the flames, and then setting her house on fire, that conduct is heinous, brutal, indicative of wanton cruelty.

(R. Vol. XIV, 61)

The above description is fully supported by the victim's testimony. (See R. Vol. VII, 61-72)

Since no reasonable fact finder could have failed to find the existence of the statutory aggravating factor beyond a reasonable doubt, any possible error was harmless.  See <u>People</u> v. <u>Marshall</u>, 2000 WL 1177576 (Cal.App.2d 2000) (failure to

20

instruct on all elements of firearms use enhancement was harmless, beyond a reasonable doubt, where there was no dispute it applied).

37720 E-FILED
Friday, 04 May, 2007  04:54:16 PM
Clerk, U.S. District Court, ILCD

# ORIGINAL

FILED

DEC 2 2 2000

CLERK OF THE
APPELLATE COURT, 4th DIST.

NO. 4-99-0499

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. Difanis, |
| Defendant-Appellant. | ) | Judge Presiding. |

## Reply Brief to Supplemental Argument

## For Defendant-Appellant

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 S. 9th St., Suite 102
P.O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLEE

EXHIBIT E

## Argument

The State has generally answered Dedric Moore's argument by asserting that the consecutive and extended-term sentencing provisions of the Unified Code of Corrections do not violate due process. (State's brief at 1) Specifically, the State first addressed Mr. Moore's argument that discretionary consecutive sentences are now invalid under *Apprendi v. New Jersey*, 530 U.S. ___ , 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). (State's brief at 2-11) The State asserted unequivocally that "*Apprendi* does not apply to the imposition of consecutive sentences." (State's brief at 2) The State purported to premise its conclusion upon "a consideration of the purpose of *Apprendi*, Illinois case law, and the language of the statute." (State's brief at 11)

Arguing that *Apprendi* applied the common law tradition of imposing consecutive sentences, the State cited a number of pre-*Apprendi* decisions to assert, *inter alia*, that the common law recognized no limits on the trial court's authority to impose consecutive sentences. (State's brief at 5-6, 8) The State additionally noted that *Apprendi* itself did not involve consecutive sentences (State's brief at 6), and that "[c]ases involving section 5-8-4 [consecutive sentences] are fundamentally different than *Apprendi* because "[w]hether the trial court imposes concurrent or consecutive sentences under section 5-8-4 has no bearing on the maximum term that may be imposed for each offense." (State's brief at 7).

The State also attempted to distinguish two post-*Apprendi* decisions in support of its position, *People v. Clifton*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 2nd Div. 2000) (No. 1-98-2126, 1-98-2384, cons., 9/29/00) (slip op. at 55) and *People v. Carney*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 5th Div. 2000) (No. 1-98-4677, 11/13/00). (State's brief at 9-11) However, none of the cases cited or attempted to be distinguished by the State diminishes the holding of *Apprendi*: "Other than the fact of a prior

-1-

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. ___ , 120 S.Ct. at 2362-63, 147 L.Ed.2d at 455.  The meaning, then, of "a fact that increases the penalty for a crime beyond the prescribed statutory maximum" becomes paramount.

The Illinois Appellate Court has already interpreted *Apprendi* in a number of settings:

- *People v. Clifton*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 2nd Div. 2000) (No. 1-98-2126, 1-98-2384, cons., 9/29/00) (slip op. at 55) (*Apprendi* applies to make unconstitutional <u>mandatory consecutive sentences</u> under 730 ILCS 5/5-8-4(a) (West Supp. 1997).  *Accord*:  *People v. Carney*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 5th Div. 2000) (No. 1-98-4677, 11/13/00); *People v. Waldrup*, ___ Ill.App.3d ___, ___ N.E.2d ___ (2nd Dist. Div. 2000) (No. 2-99-0242, 11/30/00).  *Contra*:  *People v. Sutherland*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 6th Div. 2000) (No. 1-98-3802, 12/1/00) (*Apprendi* does not apply to mandatory consecutive sentences).  *Cf. People v. Kizer*, Order under Supreme Court Rule 23 (1st Dist., 1st Div.) (No. 1-99-0733, 11/6/00) (*Clifton*  not applied to void mandatory consecutive sentence in this *post-conviction* case).

- *People v. Lathon*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 1st Div. 2000) (No. 1-99-0261, 11/6/00) (<u>mandatory Class X felony sentencing</u> provision of 730 ILCS 5/5-5-3(c)(8) (West 1998) not unconstitutional -- comes within the recidivism exception of *Apprendi*).  *Accord*:  *People v. Ramos*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 4th Div. 2000) (No. 1-99-0091, 12/14/00).

- *People v. Thornton*, Order under Supreme Court Rule 23 (1st Dist., 4th Div.) (No. 1-99-1045, 11/2/00) (*Apprendi* applies to <u>extended-term sentences</u> under 730

ILCS 5/5-8-1(a)(1)(b) (West 1998) where "the offense was accompanied by exceptionally <u>brutal or heinous</u> behavior indicative of wanton cruelty" under 730 ILCS 5/5-5-3.2(b)(2); first-degree murder sentence in guilty plea reduced to maximum non-extended term of 60 years). *See also People v. Beachem*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 3rd Div. 2000) (No. 1-99-0852, 11/8/00) (*Apprendi* applies to timely filed post-conviction petitions to "brutal and heinous" enhancement for an extended-term sentence under 730 ILCS 5/5-8-2(a)(2), 5/5-5-3.2(b) (West 1996).

- *People v. Joyner*, ___ Ill.App.3d ___, ___ N.E.2d ___ (2nd Dist. 2000) (No. 2-99-0433, 11/8/00) (<u>natural life for first-degree murder</u> because of "brutal and heinous" conduct violates *Apprendi* under 730 ILCS 5/5-8-1(a)(1)(b) (West 1994)). *Accord People v. Lee*, ___ Ill.App.3d ___, ___ N.E.2d ___ (1st Dist., 4th Div. 2000) (No. 1-98-3631, 1-99-2203 cons., 12/14/00).

In Dedric Moore's case, the consecutive sentence for residential burglary the court premised upon its own finding of the need to protect the public. (Vol. XIV, R. 59, 61) The court further found that the first entry into the victim's duplex constituted a residential burglary while the second entry comprised a home invasion, which, therefore, the court concluded did not reflect a "single course of conduct" for sentencing purposes. (Vol. XIV, R. 58) These judicial findings of fact which enhanced Mr. Moore's sentence were not included in the charging instrument, not submitted to the jury, and not subjected to proof beyond a reasonable doubt. The State's analysis does not address how or why these judicial findings in Mr. Moore's case did not fall squarely within the ambit of *Apprendi*'s prohibitions.

The State secondly addressed Mr. Moore's argument that <u>extended-term sentences</u> based upon the "<u>brutal or heinous</u>" aggravating factor are likewise invalid

-3-

under *Apprendi*. (State's brief at 11-21) The State answered that there is but a "single sentencing range for each class of felony in Illinois with the minimum contained in section 5-8-1 and the maximum contained in section 5-8-2" of the Unified Code of Corrections. (State's brief at 13) The State's assertion is belied by the plain language of the sentencing statute itself:

- Dedric Moore was convicted of attempt (first-degree murder), a Class X felony. 720 ILCS 5/8-4(c)(1) (West 1998). The sentencing range for a Class X felony is from six to 30 years. The sentencing statute clearly states:

  > (a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under *this Section*, according to the following limitations:
  >
  >           *       *       *
  >
  > (3) except as otherwise provided in the statute defining the offense, for a Class X felony, the sentence shall be not less than 6 years and not more than 30 years; . . . .

  730 ILCS 5/5-8-1(a)(3) (West 1998). *(Emphasis added.)*

  Mr. Moore was sentenced to 60 years' imprisonment for attempt (first-degree murder) under §5-8-2(a)(2), an extended-term sentence comprising twice the statutory maximum contained in §5-8-1(a)(3) (West 1998). 730 ILCS 5/5-8-2(a)(2).

- Mr. Moore was also convicted of home invasion, another Class X felony. 720 ILCS 5/12-11(a)(2), (c) (West 1998). The sentencing range for a Class X felony remains from six to 30 years. Mr. Moore was again sentenced to 60 years' imprisonment under §5-8-2(a)(2), an extended-term sentence comprising twice the statutory maximum contained in §5-8-1(a)(3), for home invasion. 730 ILCS 5/5-8-2(a)(2) (West 1998).

-4-

Thus, it is patent that Mr. Moore was sentenced to a term for both of these Class X felonies (*i.e.*, 60 years each) that exceeded the penalty for Class X felonies beyond the prescribed statutory maximum (30 years).

Finally, in additional support of this thesis the State cited **People v. Smith**, 223 F.3d 554 (7th Cir. 2000). (State's brief at 13, 14-16) This support is misplaced. **Smith** questioned whether a federal continuing criminal enterprise statute, 21 U.S.C. §848(b), defined a separate offense or merely set forth factors to be used to enhance the sentence imposed for a violation of preceding §848(a). 233 F.3d 563. The Seventh Circuit held that subsection (b) – which required the imposition of a mandatory life sentence for those convicted of engaging in a continuing criminal enterprise *who were principal administrators, organizers or leaders of the scheme that involved certain requisite quantities or values of designated drugs* – set forth a sentencing factor, not an element of the offense, so that **Apprendi** did not invalidate the sentence imposed here. *Id.* at 566.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth, Suite 102
P. O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

-5-

ORIGINAL



**E-FILED**
Friday, 04 May, 2007  04:54:54 PM
Clerk, U.S. District Court, ILCD

NO. 4-99-0499

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT



JAN 18 2000

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois. |
| Respondent-Appellee, | ) ) | |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. Difanis, |
| Petitioner-Appellant. | ) ) | Judge Presiding. |

### Petition for Rehearing

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 102
Springfield, IL  62705
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

EXHIBIT F

NO. 4-99-0499

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois. |
| Respondent-Appellee, | ) ) | |
| vs. | ) ) | No. 98-CF-1558 |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. Difanis, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## Petition for Rehearing

Now comes petitioner-appellant Dedric Moore, by and through Judith L. Libby, one of his attorneys, and pursuant to Supreme Court Rule 367, hereby petitions the Court for rehearing in the cause, and in support of which alleges:

### Procedural History

1. A jury found Dedric Moore guilty of the offenses of attempt (first-degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse and residential burglary. The court sentenced Mr. Moore to a total of 75 years' imprisonment with the Department of Corrections on May 21, 1999. On direct appeal, in an Order entered January 11, 2002, in accordance with Supreme Court Rule 23, this Court affirmed Mr. Moore's convictions and sentences.

2. Mr. Moore raised three issues on appeal:

- The "Revised" <u>DNA Frequency Calculations</u> Were Unsubstantiated Junk Science Which Improperly Compelled the Conclusion That Dedric Moore Was the Sole Possible Intruder at Lori Hansen's Duplex;

- Use of <u>"Mere Fact" Impeachment</u> Created Reversible Error; and

- The <u>Mandatory Consecutive</u> and <u>Extended-Term</u> Sentencing Provisions of 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) Violate the Right to Due Process and a Jury Trial by Subjecting Defendants to Increased Punishment Without Notice or a Jury Finding upon Proof Beyond a Reasonable Doubt of the Facts Necessary for Imposition of the Increased Terms of Imprisonment (<u>*Apprendi*</u>).

3. This Court found the <u>DNA issue procedurally forfeited</u> for want of any trial objection or being raised in the post-trial motion. Slip op. at 7.

4. This Court found the use of the <u>mere-fact</u> method of impeachment to be <u>harmless error</u> "in light of the overwhelming evidence against Campbell [*sic*]."* Slip op. at 8. *See also* Slip op. at 11.

5. The majority of this Court found that Mr. Moore's <u>extended-term sentences</u> for attempt (first-degree murder) and home invasion did not violate *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), finding that <u>§5-5-3.2(b)(2)</u> of the Unified Code of Corrections [*i.e.,* the offense was accompanied by <u>exceptionally brutal or heinous</u> behavior indicative of wanton cruelty] "has many of the common indicia of sentencing provisions" not controlled by *Apprendi.* Slip op. at 15. *See also* Slip op. at 19 ("no <u>Apprendi</u> violation occurred"). In addition, the majority observed that "even if an <u>Apprendi</u> violation

---

*There is no "Campbell" in this case. Apparently the Court meant the instant defendant, Dedric Moore.

occurred here, the error is harmless beyond a reasonable doubt" because "[n]o reasonable juror, having already found the defendant guilty of the offenses charged, could have found that the defendant did not commit the offenses in an exceptionally brutal and heinous manner." Slip op. at 19, 20.

6. The <u>dissenting justice</u> disagreed with the above analysis, noting that a "finding that the crime was exceptionally brutal, heinous, and indicative of wanton cruelty * * * is a factual question which involves weighing of the evidence at trial" which "should not be taken away from the jury," despite that "the evidence here is very strong that the conduct was brutal and heinous." Slip op. at 22-23, Cook, J., dissenting.

7. On the remaining issue of the <u>consecutive sentences</u>, this Court denied Mr. Moore relief on the basis of *People v. Wagener*, 196 Ill.2d 269, 286, 752 N.E.2d 430, 441(2001). Slip op. at 20-21.

## Reasons for Rehearing

8. The Court based its affirmance on the State's case-in-chief having conclusively proved beyond a reasonable doubt that Dedric Moore was the assailant. This Court overlooked Mr. Moore's sole substantive argument on appeal attacking his conviction, namely, his identification as the assailant through faulty DNA methodology. Mr. Moore never argued at trial nor on appeal that the victim was not assailed; he argued on appeal solely that the <u>flawed DNA testing schema</u> failed to establish him as the assailant. This Court never addressed the DNA issue, finding it procedurally forfeited.

9. This Court has failed to appreciate the significance of the DNA evidence by not applying the doctrine of <u>plain error</u> in this case. While this Court has the power to discard Mr. Moore's DNA issue because it was not properly preserved in the lower court, this Court also has the equal power to consider the issue since a substantial right of the accused has been implicated. *People v. Rice,* 321 Ill.App.3d 475, 747 N.E.2d 1035 (1st Dist. 2001): "A reviewing court will examine an issue not properly preserved under the plain error doctrine where the evidence is closely balanced or the alleged error is so fundamental that it denies the defendant a fair trial," citing *People v. Thomas,* 178 Ill.2d 215, 235, 687 N.E.2d 892, 900-01 (1997).

10. See also *People v. Mendez,* 318 Ill.App.3d 1145, 745 N.E.2d 93 (3rd Dist. 2001):

> A procedural defect is plain error if the evidence of guilt was closely balanced or if the defendant was deprived of a substantial right. *People v. Keene,* 169 Ill.2d 1, 660 N.E.2d 901 (1995). A substantial right has been denied if the error affected the proceedings to such a degree that we cannot confidently state that the defendant's trial was fundamentally fair. [*Ibid.*] In other words, this court will act on error that is of such gravity that it threatens the very integrity of the judicial process. *People v. Blue,* 189 Ill.2d 99, 724 N.E.2d 920 (2000).

It is hard to imagine a right more substantial to a criminal defendant than whether he has accurately been identified as the culprit.

11. In addition, the majority decision of this Court has recognized that its holding the "brutal and heinous" language of §5-5-3.2(b)(2) not a violation of *Apprendi* differs from the conclusion of "other districts of the appellate court

-4-

[which] have found <u>extended-term sentences</u> unconstitutional in light of <u>Apprendi</u>." Slip op. at 19.

Wherefore, because this Court failed to reach the pivotal trial issue in Mr. Moore's case – his identification by DNA evidence as the assailant – and because this Court authorized extended-term sentences in violation of *Apprendi* in contradistinction to the results obtained in other districts of the Appellate Court, Dedric Moore respectfully asks this Court to rehear his cause.

Respectfully submitted,

JUDITH L. LIBBY
Assistant Appellate Defender
Office of the State Appellate Defender
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, Illinois  62705-5750
(217) 782-3654
COUNSEL  FOR  PETITIONER-APPELLANT

E-FILED
Friday, 04 May, 2007  04:56:03 PM
Clerk, U.S. District Court, ILCD



FILED
JAN 1 1 2002
CLERK OF THE
APPELLATE COURT, 4TH DIST.

NO. 4-99-0499

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from |
| Plaintiff-Appellee, | ) Circuit Court of |
| v. | ) Champaign County |
| DEDRIC MOORE, | ) No. 98CF1558 |
| Defendant-Appellant. | ) |
| | ) Honorable |
| | ) Thomas J. Difanis, |
| | ) Judge Presiding. |

ORDER

In November 1998, a grand jury indicted defendant, Dedric Moore, for attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 1998)), home invasion (720 ILCS 5/12-11(a)(2) (West 1998)), residential burglary (720 ILCS 5/19-3 (West 1998)), aggravated criminal sexual assault (720 ILCS 5/12-16(a)(1) (West 1998)), and aggravated arson (720 ILCS 5/20-1(a); 5/20-1.1(a)(1) (West 1998)). In March 1999, a jury found defendant guilty on all counts. Later that month, the trial court denied defendant's posttrial motion. In May 1999, the trial court sentenced defendant to a 15-year prison term for residential burglary to run consecutive to the defendant's concurrent 60-year extended prison term for attempted first degree murder, 60-year extended prison term for home invasion, 7-year prison term for aggravated criminal sexual assault, and 30-year prison term for aggravated arson. Later in May 1999, the trial court denied defendant's motion to reconsider his sentence. .

On appeal, defendant argues that the trial court erred

EXHIBIT G

in (1) permitting the State to introduce revised deoxyribonucleic acid (DNA) frequency calculations, (2) allowing the State to impeach him using the mere-fact method of impeachment, and (3) imposing upon him consecutive and extended-term sentences in violation of the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm.

### I. BACKGROUND

At defendant's March 1999 trial, the State produced the following evidence. The victim, L.H., returned to her rented duplex around 1:30 a.m. on February 25, 1998. L.H. unlocked her front door and turned on her living room light to enter. She heard a noise behind her, which caused her to turn and look. Although L.H. attempted to push the door closed, a black male came from behind her and forced his way into her duplex. Defendant, who wore a hood, held his hand over L.H.'s mouth and demanded to know where Chad was. After L.H. responded that she did not know a Chad, defendant pushed L.H. face down onto the floor and asked her how much money she had. Defendant searched L.H.'s clothing for money and bound her hands and her feet. Defendant placed a pair of L.H.'s shorts over her head as a blindfold. Defendant turned on L.H.'s television and began ransacking her duplex unit, asking L.H. where her purse, money, and ATM (automated teller machine) cards were. Defendant began asking L.H. if her truck had a manual or automatic transmission and asked for her ATM PINs (personal identification numbers).

- 2 -

After L.H. gave him her PIN numbers, defendant sat in L.H.'s kitchen, drank a beer from her refrigerator, and smoked a cigarette.

Defendant next asked if L.H. had any tape. L.H. cooperated with defendant, explaining to him where the tape was located. Defendant wrapped the tape around L.H.'s head several times as a gag. Defendant next found another cord which he used to pull L.H.'s hands up over her left shoulder and hog-tie them to her feet. He then took L.H. into the bathroom, placed her into the bathtub, and tied her to the bar running along the top of the built-in soap shelf. Defendant threatened L.H. that, if her PIN numbers were wrong, he would return and she would regret it. Defendant then turned off the bathroom light and left the apartment.

After some period of time, defendant returned to find L.H. bound and in the bathtub, having urinated on herself from fright. At that point, defendant lifted L.H. out of the bathtub and began to untie her. L.H. told defendant to get out of the house. In response to L.H.'s request to leave, defendant put a cord around her neck and began to strangle her. Defendant finally removed the cord from L.H.'s neck. He then placed his hand up her shirt, underneath her bra, and fondled her breasts. Defendant also placed his mouth on her right breast.

Defendant then left the room, but he returned in a few moments, unzipped his pants, and urinated on L.H.'s head. Defendant left the room again and returned this time with a

- 3 -

A - 3

liquid that L.H. testified smelled like shoe polish.  The in-
truder began pouring this liquid all over her body.  Defendant
disappeared again.  By this time, the pair of shorts had fallen
from L.H.'s head, and she could see that defendant had started a
fire in her living room.  L.H. continued to struggle to free
herself from the cords.  Defendant grabbed her and dragged her
over the burning living room carpet.  L.H. fought to free her-
self, but defendant began punching and kicking her in the head,
back, stomach, and legs.  After defendant stopped kicking L.H.,
he flicked his lit cigarette at her and left the duplex.

L.H. testified that smoke and fire were all around her
unit.  L.H. freed herself from the cords and escaped to a neigh-
bor's house for assistance.  When L.H. returned to the burning
unit to save her two cats, she found that defendant had turned on
the burners of her gas stove without lighting them, causing gas
to leak into the room.  L.H. turned the burners off and left the
unit without her cats.  Shortly thereafter, an ambulance arrived
and transported L.H. to a hospital where she was treated for
burns, smoke inhalation, and bruises.

L.H. testified that defendant was wearing a hood and
gloves throughout the incident, and she could not see his face
very well.  Although she could tell defendant was a black male,
she could not definitively identify defendant as the attacker
either in court or in a previous lineup.

Investigators found no latent fingerprints suitable for
comparison with defendant's known prints from the unit, L.H.'s

- 4 -

A - 4

truck, or other related sites.  Additionally, handwriting experts compared the paper on which defendant had written L.H.'s ATM PIN numbers to voluntary and collected handwriting samples from defendant.  This analysis proved inconclusive.

The State introduced a videotape from L.H.'s bank, which showed defendant in L.H.'s truck at the drive-through ATM lane at approximately 2:30 a.m. on February 25, 1998.  Enlarged photographs were produced from the video.  Although several people who reviewed the photographs claimed that the person in the photograph from the video resembled defendant, no one made a positive identification.  The photographs showed that defendant had two teeth missing to the left of his upper front teeth. Defendant has the same missing teeth.  The State also produced bank records of the unauthorized withdrawals.

The State introduced the testimony and lab results from forensics scientist, Kevin Zeeb, regarding deoxyribonucleic acid (DNA) evidence.  Zeeb testified that he recovered DNA material from a nylon stocking taken from L.H.'s unit and worn by defendant as a disguise while he used L.H.'s ATM cards to make the withdrawals from her bank.  Zeeb testified that the DNA material matched that of L.H. and defendant.  Zeeb testified that he compared the DNA profiles to established population databases to calculate the statistical frequency of encountering those profiles in the general population.  Zeeb performed two statistical calculations, one in which he combined the DNA profiles that he found on the stocking and one in which he separated the profiles.

- 5 -

Zeeb testified that combining the profiles produces a conserva-
tive estimate.  Zeeb found that conservative estimate of the
frequency of the combined profiles in the general population was
approximately 1 in 2,700 blacks.  Under the calculations in which
Zeeb separated the profiles, Zeeb estimated the frequency to be
approximately 1 in 150 billion blacks.  Defense counsel never
objected to the admission of this statistical evidence.

Ivory Burrage, defendant's friend, testified as an
alibi witness for the defendant.  Burrage testified that defen-
dant was at her house at approximately 1 a.m. on February 25,
1998.  She and defendant spent a couple of hours talking.

Emmaniel Moore, defendant's brother, testified that
defendant was with him the entire night of February 24, 1998, and
the morning of February 25, 1998, until around 3 a.m.  When asked
on cross-examination if he had made a previous contradictory
statement to officers about defendant's whereabouts on the
morning of the attack, Emmaniel could not remember having made
the statement to police.

Defendant testified in his own behalf that he was with
Burrage at the time L.H. was attacked.  Defendant's testimony
aligned with that of Burrage.  The jury returned a verdict of
guilty on all charges.

In March 1999, the trial court denied defendant's
posttrial motion.  In May 1999, the trial court sentenced defen-
dant to concurrent prison terms of 60 years for attempted first
degree murder, 60 years for home invasion, 7 years for aggravated

- 6 -

criminal sexual assault, 30 years for aggravated arson, and a consecutive 15-year term for residential burglary.  Later that month, the trial court denied defendant's motion to reconsider his sentence.  This appeal followed.

## II. ANALYSIS

### A. Improper Statistical Calculations on DNA Profiles

Defendant argues that the State's "'revised' DNA frequency calculations were unsubstantiated and improperly compelled the conclusion that [defendant] was the sole possible intruder at [L.H.'s] duplex."  The State argues that defendant forfeited this issue on appeal by failing to raise any objection either during the trial or in a posttrial motion.  We agree with the State.

An issue is forfeited on appeal unless a timely objection is made at trial and is specifically raised in a written posttrial motion.  People v. Robinson, 167 Ill. 2d 397, 404, 657 N.E.2d 1020, 1025 (1995).  In the present case, defendant failed to make a timely objection or to raise the DNA issue in a written posttrial motion.  Therefore, defendant forfeited this issue on appeal.  See People v. Moore, 171 Ill. 2d 74, 98, 662 N.E.2d 1215, 1226 (1996) (acknowledging that defendant forfeited his claim regarding statistical calculations for DNA tests); see also People v. Oliver, 306 Ill. App. 3d 59, 70, 713 N.E.2d 727, 736 (1999) (stating that defendant's contention that probability statistics were more prejudicial than probative had been forfeited), appeal denied, 185 Ill. 2d 654, 720 N.E.2d 1102 (1999).

- 7 -

B. Use of Mere-Fact Impeachment

Defendant next argues that the trial court erred by permitting the State to introduce evidence of his prior felony convictions using the mere-fact method of impeachment. We agree but find the error harmless in light of the overwhelming evidence against Campbell.

The Supreme Court of Illinois' "opinion in People v. Montgomery, 47 Ill. 2d 510[, 268 N.E.2d 695] (1971), governs the use of prior convictions to impeach a witness' credibility." People v. Atkinson, 186 Ill. 2d 450, 455, 713 N.E.2d 532, 535 (1999). Under the Montgomery rule, evidence of a witness' prior convictions is admissible to attack the witness' credibility where (1) the prior crime was punishable by death or imprisonment in excess of one year (felony) or involved dishonesty or false statement regardless of the punishment; (2) less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the prior conviction out-weighs the danger of unfair prejudice. Montgomery, 47 Ill. 2d at 516, 268 N.E.2d at 698. This third factor requires the trial judge to engage in a balancing test to weigh the prior convic-tion's probative value against any potential prejudice. Atkinson, 186 Ill. 2d at 456, 713 N.E.2d at 535. "If the trial judge determines that the prejudice substantially outweighs the probative value of admitting the evidence, then the evidence of the prior conviction must be excluded." Atkinson, 186 Ill. 2d at

- 8 -

456, 713 N.E.2d at 535.  Such a determination of admissibility for impeachment purposes is within the discretion of the trial court.  Atkinson, 186 Ill. 2d at 456, 713 N.E.2d at 535.  Absent an abuse of that discretion, a trial court's decision to allow evidence of prior convictions to be admitted for purposes of impeachment will not be disturbed.  People v. Dixon, 308 Ill. App. 3d 1008, 1017, 721 N.E.2d 1172, 1179 (1999).  Montgomery requires no specific format for conducting the balancing test.  However, "the record should reflect that the [trial] court understood it had discretion to admit the prior convictions for impeachment and that it considered the relevant factors in-volved."  People v. Paul, 304 Ill. App. 3d 404, 408-09, 710 N.E.2d 499, 502 (1999).

In the present case, the record indicates that the trial court weighed the probative value of defendant's prior convictions for forgery and attempted burglary against their prejudicial effect.  The trial court concluded that publishing the specific felony convictions would be more prejudicial than probative.  However, the trial court concluded that it would be proper simply to inform the jury of defendant's felony convic-tions using the mere-fact method.

Under the mere-fact method, only the "mere fact" of the felony conviction was brought to the jury's attention, rather than informing the jury of the precise offense of which the defendant had been convicted.  Recently, in People v. Cox, 195 Ill. 2d 378, 386-87, 748 N.E.2d 166, 171-72 (2001), the supreme

- 9 -

A-9

court addressed the mere-fact issue and reaffirmed its position in <u>Atkinson</u>, stating:

> "The State attempts to limit our holding in <u>Atkinson</u>.  The State contends <u>Atkinson</u> did not instruct that a trial court could not consider mere-fact impeachment as a means to lessen the prejudicial effect of a defendant's prior convictions within the context of the <u>Montgomery</u> balancing test.  In <u>Atkinson</u>, however, we held that 'trial courts <u>should</u> <u>not</u> consider the mere-fact method of impeachment.' (Emphasis in original.) <u>Atkinson</u>, 186 Ill. 2d at 461[, 713 N.E.2d at 532].  We find no suggestion in this unequivocal language that a trial court's discretion encompasses mere-fact impeachment.  Additionally, the State contends <u>Atkinson</u> only governs cases in which a trial court declined to consider a defendant's request for mere-fact impeachment.  Again, we see no such limitation.
>
> Admitting the mere fact of the defendant's prior felony convictions was error."

In the present case, the trial court found that allowing the State to impeach defendant by naming defendant's specific prior felonies would be more prejudicial than probative.  The

- 10 -

trial court attempted to alleviate this prejudice by allowing the State to use the mere-fact method, not naming the specific felony convictions.  The trial court committed error by considering and utilizing the mere-fact approach.  Nonetheless, reversible error does not result unless "the error has deprived defendant of substantial justice or influenced the determination of his guilt."  People v. Madison, 56 Ill. 2d 476, 488, 309 N.E.2d 11, 18 (1974).  Accordingly, although the trial court erred, such error was harmless in light of the overwhelming evidence against defendant.

C.  Constitutionality of Consecutive and Extended-Term Sentences

During the pendency of defendant's appeal, the United States Supreme Court issued its decision in Apprendi.  In light of Apprendi, defendant filed a supplemental brief, arguing that the trial court erred by (1) imposing extended-term sentences upon him for attempted first degree murder and home invasion under section 5-5-3.2(b)(2) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-3.2(b)(2) (West 1998)) and (2) ordering his 15-year sentence for residential burglary to run consecutively to his other sentences under section 5-8-4(a) of the Unified Code (730 ILCS 5/5-8-4(a) (West 1998)) because these sections are unconstitutional under Apprendi.

1. Extended-Term Sentences

Defendant contends that section 5-5-3.2(b)(2) of the Unified Code violates his rights to due process and a jury trial under Apprendi.  We review the constitutionality of a statute de

novo. <u>People v. Fisher</u>, 184 Ill. 2d 441, 448, 705 N.E.2d 67,
71-72 (1998). The applicability of <u>Apprendi</u> is a pure question
of law. <u>People v. Williamson</u>, 319 Ill. App. 3d 891, 900, 747
N.E.2d 26, 34 (2001), <u>appeal denied</u>, 195 Ill. 2d 597, 755 N.E.2d
483 (2001).

In <u>Apprendi</u>, a New Jersey statute provided that the
possession of a firearm for an unlawful purpose was a "second-
degree" offense, punishable by a 5- to 10-year prison sentence.
<u>Apprendi</u>, 530 U.S. at 468, 147 L. Ed. 2d at 442, 120 S. Ct. at
2351. Another statute, described as a "hate crime" law, provided
for an extended term of imprisonment if the trial judge found, by
a preponderance of the evidence, that "'[t]he defendant in
committing the crime acted *** with a purpose to intimidate an
individual or group of individuals because of race, color,
gender, handicap, religion, sexual orientation, or ethnicity.'"
<u>Apprendi</u>, 530 U.S. at 468-69, 147 L. Ed. 2d at 442, 120 S. Ct. at
2351, quoting N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999-
2000). This "hate crime" statute extended the sentence for a
second-degree offense to a 10- to 20-year prison term upon a
trial judge's finding that defendant was motivated by racial
bias. <u>Apprendi</u>, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S.
Ct. at 2351. Therefore, under that particular New Jersey stat-
ute, the trial judge unilaterally and automatically heard all
evidence of whether the defendant was motivated by bias and
entered correlating factual findings based upon his evaluation
under a preponderance of the evidence standard, potentially

- 12 -

doubling the maximum sentence available.  Apprendi, 530 U.S. at 471, 147 L. Ed. 2d at 443, 120 S. Ct. at 2352.

The United States Supreme Court found the "hate crime" statute unconstitutional.  Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.  The Court held that the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV) require that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

Apprendi noted its applicability only to situations in which the trial judge is charged by statute to enter additional factual findings so integral to the charged offense that they are "elemental" in nature and not merely sentencing factors.  Apprendi, 530 U.S. at 490, 494 & n.19, 147 L. Ed. 2d at 455, 457 & n.19, 120 S. Ct. at 2362-63, 2365 & n.19.  A sentencing factor is typically considered a factor that "neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it."  McMillan v. Pennsylvania, 477 U.S. 79, 87-88, 91 L. Ed. 2d 67, 77, 106 S. Ct. 2411, 2417 (1986).  Moreover, Apprendi explained that a "sentencing factor" describes a circumstance that supports a specific sentence within the statutory range for the particular offense, while an "ele-

- 13 -

A - 13

ment" or "sentence enhancement" describes an increase beyond the maximum authorized statutory sentence. <u>Apprendi</u>, 530 U.S. at 494 n.19, 147 L. Ed. 2d at 457 n.19, 120 S. Ct. at 2365 n.19. This distinction is important because judicial discretion in imposing a sentence <u>within</u> a <u>statutory</u> <u>range</u> has long been accepted in this country. <u>Apprendi</u>, 530 U.S. at 481-82, 147 L. Ed. at 449-50, 120 S. Ct. at 2358. Moreover, the legislature generally determines what factors comprise the elements of a crime. <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 228, 140 L. Ed. 2d 350, 358, 118 S. Ct. 1219, 1223 (1998).

Here, section 5-8-2 of the Unified Code provides:

"(a) A judge shall not sentence an of-fender to a term of imprisonment in excess of the maximum sentence authorized by [s]ection 5-8-1 for the class of the most serious of-fense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of [s]ection 5-5-3.2 were found to be present. Where the judge finds that such factors were present, he may sen-tence an offender to the following:

* * *

(2) for a Class X felony, a term shall be not less than 30 years and not more than 60 years * * *." 730 ILCS 5/5-8-2(a)(2) (West

- 14 -

1998).

Section 5-5-3.2(b) of the Unified Code provides:

> "The following factors may be considered
> by the court as reasons to impose an extended
> term sentence under [s]ection 5-8-2 upon any
> offender:
>
>        ***
>
>     (2) When a defendant is con-
> victed of any felony and the court
> finds that the offense was accompa-
> nied by exceptionally brutal or
> heinous behavior indicative of
> wanton cruelty ***."  730 ILCS 5/5-
> 5-3.2(b)(2) (West 1998).

In the present case, the trial court imposed extended-term sentences upon defendant for attempted first degree murder and home invasion.  Defendant argues that the imposition of extended-term sentences offends the principles outlined in Apprendi.  We disagree.  We find that section 5-5-3.2(b)(2) has many of the common indicia of sentencing provisions.

First, the language of section 5-5-3.2(b)(1) plainly identifies it as a sentencing provision.  See Jones v. United States, 526 U.S. 227, 232-34, 143 L. Ed. 2d 311, 319-20, 119 S. Ct. 1215, 1219-20 (1999).  Section 5-5-3.2(b)(1) applies only after a jury has convicted defendant of the underlying offense.  Therefore, section 5-5-3.2(b)(1) does not affect the underlying

- 15 -

A - 15

criminal conviction; this section merely allows the trial court to choose an appropriate sentence within that permitted by statute.

Second, section 5-5-3.2(b)(1) addresses special features of the manner in which the basic crime was carried out, features identified as traditional sentencing factors. <u>Castillo v. United States</u>, 530 U.S. 120, 125-26, 147 L. Ed. 2d 94, 100, 120 S. Ct. 2090, 2093-94 (2000); accord <u>Almendarez-Torres</u>, 523 U.S. at 243, 140 L. Ed. 2d at 368, 118 S. Ct. at 1230. "Traditional sentencing factors often involve either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime was carried out (<u>e.g.</u>, that the defendant abused a position of trust or brandished a gun)." <u>Castillo</u>, 530 U.S. at 126, 147 L. Ed. 2d at 100, 120 S. Ct. at 2093-94. Offender characteristics are not at issue under section 5-5-3.2(b)(2). Here, a trial court imposes extended-term sentences by viewing the manner in which defendant carried out the underlying crimes and the effects of defendant's criminal activity, typical of and consistent with traditional sentencing factors historically within the province of trial judges.

Third, the title and text of section 5-5-3.2, "[f]actors in [a]ggravation," identifies it as a sentencing provision. See <u>Almendarez-Torres</u>, 523 U.S. at 234, 140 L. Ed. 2d at 361-62, 118 S. Ct. at 1226. Section 5-5-3.2(a) states that the factors listed therein "shall be accorded weight in favor of imposing a term of imprisonment or may be considered by the

- 16 -

A - 16

[trial] court as reasons to impose a more severe sentence." 730 ILCS 5/5-5-3.2(a) (West 1998). Similarly, section 5-5-3.2(b) states that the factors therein "may be considered by the [trial] court as reasons to impose an extended[-]term sentence." 730 ILCS 5/5-5-3.2(b) (West 1998). Taken together, these factors indicate the nature of section 5-5-3.2(b) findings as being more akin to sentencing factors than elements of an offense.

Moreover, section 5-4-1(b) of the Unified Code requires trial judges to impose sentences based upon the judge's independent assessment. 730 ILCS 5/5-4-1(b) (West 1998). Section 5-4-1(c-1) requires trial judges to consider whether the conduct leading to the conviction for the offense resulted in great bodily harm to the victim and to enter that finding in the record. 730 ILCS 5-4-1(c-1) (West 1998). Furthermore:

> "[t]he sentencing judge in each felony conviction shall set forth his reasons for imposing the particular sentence he enters in the case, as provided in section 5-4-1 ***. Those reasons may include any mitigating or aggravating factors *** or the lack of any such circumstances, as well as any other such factors as the judge shall set forth on the record that are consistent with the purposes and principles of sentencing ***." 730 ILCS 5/5-8-1(b) (West 1998).

Here, section 5-5-3.2(b) has no mens rea element as did the

- 17 -

_Apprendi_ statute.   Section 5-5-3.2(b) merely instructs trial courts to consider the same elements for extended-term sentences as it does for nonextended terms under section 5-5-3.2(a).   In _People v. Carney_, 196 Ill. 2d 518, 526-27, 752 N.E.2d 1137, 1142 (2001), our supreme court stated:

> "Section 5-5-3,2(a) of the Code (730 ILCS 5/5-5-3.2(a) (West 1998)) identifies several aggravating factors that the circuit court may consider in imposing a more severe sentence on an offender.  Some of these statutory factors involve a determination by the judge of the nature or seriousness of the defendant's conduct. ***
>
> The fact-finding process implicated by these aggravating factors does not offend the constitutional protections identified in _Apprendi_ because, in applying the factors, the judge may not impose a sentence that exceeds the prescribed statutory maximum for each offense.  730 ILCS 5/5-8-1(a) (West 1996).  Thus, the defendant is not subjected to additional punishment not contemplated by the substantive offense statute or the sentencing statute associated therewith."

Therefore, a trial judge may look to the factors in section 5-5-3.2(a) and, by analogy, to the factors in section 5-5-3.2(b) to

- 18 -

determine the appropriate punishment as authorized by statute.

Under section 5-5-3.2(b), a trial court's observation that a defendant committed offenses in an exceptionally brutal or heinous manner merely gives it discretion to chose from among several statutory sentences available. For Class X offenses such as attempted first degree murder and home invasion, the statutory sentences range from a minimum 6-year prison term (730 ILCS 5/5-8-1(a)(3) (West 1998)) to a maximum 60-year extended prison term (730 ILCS 5/5-8-2, 5-5-3.2(b)(2) (West 1998)). Defendant was sentenced within that statutory range. Therefore, no Apprendi violation occurred.

We recognize that other districts of the appellate court have found extended-term sentences unconstitutional in light of Apprendi. However, our court has upheld extended terms under Apprendi. See People v. Rohlfs, 322 Ill. App.3d 965, 972, 752 N.E.2d 499, 504 (2001) (Myerscough, J., specially concurring) (finding that the trial court's imposition of an extended-term sentence upon defendant without presenting the age of the victim to jury may have been harmless error); People v. Givens, 319 Ill. App. 3d 910, 914, 747 N.E.2d 436, 439 (2001) (upholding trial court's imposition of a extended-term sentence although trial court failed to submit defendant's age or the fact of defendant's prior convictions to a jury), appeal denied, 195 Ill. 2d 585, 755 N.E.2d 480 (2001).

Further, even if an Apprendi violation occurred here, the error is harmless beyond a reasonable doubt. The facts were

- 19 -

uncontroverted that defendant hog-tied L.H.'s hands to her feet;
placed her into the bathtub; tied her to the built-in soap shelf;
urinated on her head; attempted to strangle her; punched and
kicked her in the head, back, legs, and arms; poured a flammable
chemical on her; attempted to set her on fire; set her duplex
unit on fire; drug her across a burning carpet, causing her jeans
to melt to her knee; turned on L.H.'s gas stove without lighting
the burners; and left L.H. tied up in this smoke- and fire-filled
unit to die.  L.H. required medical treatment for bruises, smoke
inhalation, and burns.  No reasonable juror, having already found
the defendant guilty of the offenses charged, could have found
that the defendant did not commit the offenses in an exception-
ally brutal and heinous manner.  Therefore, the outcome would not
have been different had a jury decided this issue.  People v.
Amaya, 321 Ill. App. 3d 923, 933, 748 N.E.2d 1251, 1259 (2001)
(finding harmless, if any, error under Apprendi when trial court
failed to submit the question of severe bodily injury to a jury
for the purpose of imposing consecutive sentences under section
5-8-4(a) of the Unified Code (730 ILCS 5/5-8-4(a) (West 1996))),
appeal denied, 196 Ill. 2d 547, ___ N.E.2d ___ (2001).

### B.  Consecutive Sentences

Defendant also argues that consecutive sentences under
section 5-8-4(a) are unconstitutional under Apprendi.  The
Supreme Court of Illinois has recently concluded that the
"Apprendi concerns are not implicated by consecutive sentencing."
People v. Wagener, 196 Ill. 2d 269, 286, 752 N.E.2d 430, 441

- 20 -

(2001).  Therefore, sections 5-8-4(a) and (b) remain unaffected by the _Apprendi_ decision.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH, J., with McCULLOUGH, P.J., concurring.

COOK, J., dissenting.

- 21 -

JUSTICE COOK, dissenting:

I respectfully dissent and would vacate defendant's extended-term sentences and remand for resentencing. In Apprendi, the United States Supreme Court found that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" (Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63). Extended-term sentencing "increases the penalty for a crime beyond the prescribed statutory maximum" within the meaning of Apprendi. Cf. People v. Vida, 323 Ill. App. 3d 554, 570, 752 N.E.2d 614, 628 (2001) (extended term and regular sentencing must be read together as part of an overall statutory sentencing scheme; an extended-term sentence is not a sentence beyond the prescribed statutory maximum).

Some cases involving clear facts hold that it is harmless error when the fact is determined by the sentencing court and not the jury. Rohlfs, 322 Ill. App. 3d at 972-73, 752 N.E.2d at 504 (clear that victim who testified at trial that she was 93 years of age was over 60 years old); Givens, 319 Ill. App. 3d at 914, 747 N.E.2d at 439 (objective, historical criteria that defendant was more than 21 years old). A finding that the crime was exceptionally brutal, heinous, and indicative of wanton cruelty, however, is a factual question which involves weighing of the evidence at trial. People v. Bryant, ___ Ill. App. 3d ___, ___, 758 N.E. 2d 430, 437 (2001). Although the evidence

- 22 -

here is very strong that the conduct was brutal and heinous, I believe that this issue should not be taken away from the jury.

- 23 -

NO.

IN THE

SUPREME COURT OF ILLINOIS



RECEIVED

FEB 1 9 2002

CRIMINAL APPEALS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, |
| Plaintiff-Respondent, | ) ) | No. 4-99-0499. |
| vs. | ) ) ) ) ) ) | There on appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois, No. 98-CF-1558 |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. Difanis |
| Defendant-Petitioner. | ) | Judge Presiding. |

## Petition for Leave to Appeal

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, IL  62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-PETITIONER

*ORAL ARGUMENT REQUESTED*

EXHIBIT H

NO.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, |
| Plaintiff-Respondent, | ) ) | No. 4-99-0499. |
| | ) | There on appeal from the |
| vs. | ) ) ) ) ) | Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois, No. 98-CF-1558 |
| | ) | |
| DEDRIC MOORE, | ) ) | Honorable Thomas J. Difanis |
| Defendant-Petitioner. | ) | Judge Presiding. |

## Petition For Leave to Appeal

*To The Honorable Justices of The Supreme Court of The State of Illinois*:

May It Please The Court:

### I.

### Prayer for Leave to Appeal

Now comes Dedric Moore by Judith L. Libby, one of his attorneys, and requests leave to appeal from the judgment of the Fourth District Appellate Court which affirmed Mr. Moore's convictions and combined 75-year sentence for attempt (first-degree murder), home invasion, aggravated arson and residential burglary. Mr. Moore seeks a reversal of that judgment.

## II.

### Status of the Case

The decision of the Appellate Court was filed as an unpublished Order entered in accordance with Supreme Court Rule 23 on January 11, 2002, and is attached as Appendix A (General No. 4-99-0499).

Mr. Moore's Petition for Rehearing was denied by the Appellate Court on February 5, 2002.

An Affidavit of Intent to seek review in this Court was filed February 7, 2002.

### III.

### Points Relied upon for Reversal of the Judgment of the Appellate Court

### A.

Due process "fundamental fairness" precepts require that Dedric Moore receive appellate consideration as plain error of the DNA evidence which identified him as the sole perpetrator "on the face of this planet" of these serious crimes.

### B.

*Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) requires reduction of Dedric Moore's 60-year extended-term sentences for attempt (first-degree murder) and home invasion to non-extended terms because he was not notified, nor was the jury required to find beyond a reasonable doubt, that the State would have to prove that "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" in order for him to be exposed to extended terms based upon this aggravating factor.

### IV.

### Reason for Granting Review by this Court

### A.

Leave to appeal should be granted because the Appellate Court affirmed that Dedric Moore was the assailant while overlooking the sole substantive argument on appeal, his identification as the assailant through faulty DNA methodology, finding the issue procedurally forfeited and declining to consider it as plain error. (Appendix A at A-7)

### B.

Leave to appeal should also be granted because even the majority of the Appellate Court recognized that its holding the "brutal or heinous" language of

-4-

§5-5-3.2(b)(2) of the Unified Code of Corrections not a violation of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), differs from the conclusion of "other districts of the appellate court [which] have found extended-term sentences unconstitutional in light of Apprendi." App. A at A-19.

## V.

### Statement of Facts

A jury found Dedric Moore guilty of the offenses of attempt (first-degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse and residential burglary. The court sentenced Mr. Moore to a total of 75 years' imprisonment with the Department of Corrections on May 21, 1999. On direct appeal, in an Order entered January 11, 2002, in accordance with Supreme Court Rule 23, the Appellate Court Fourth Judicial District affirmed Mr. Moore's convictions and sentences. Appendix A.

Mr. Moore raised three issues on appeal: (1) that the "revised" DNA frequency calculations were unsubstantiated junk science which improperly compelled the conclusion that Dedric Moore was the sole possible intruder at Lori Hansen's duplex; (2) that use of "mere fact" impeachment created reversible error; and (3) that the mandatory consecutive and extended-term sentencing provisions of 730 ILCS 5/5-8-4 and 5/5-5-3.2(b)(2) violated the right to due process and a jury trial by subjecting him to increased punishment without notice or a jury finding upon proof beyond a reasonable doubt of the facts necessary for imposition of the increased terms of imprisonment (*Apprendi*).

Initially, the Fourth District found that the DNA issue had been procedurally forfeited for want of any trial objection or being raised in the post-trial motion. (Appendix A at A-7) Next, the Appellate Court found the use of the

mere-fact method of impeachment harmless error "in light of the overwhelming evidence against Campbell [sic]."[1] (Appendix A at A-8, A-11) Finally, the majority of the appellate panel found that Mr. Moore's extended-term sentences for attempt (first-degree murder) and home invasion based upon "brutal or heinous" aggravation did not violate *Apprendi.* (Appendix A at A-15, A-19-20)[2]

## VI.

## Argument

### A.

**Due Process "Fundamental Fairness" Precepts Require That Dedric Moore Receive Appellate Consideration as Plain Error of the DNA Evidence Which Identified Him as the Sole Perpetrator "On the Face of this Planet" of These Serious Crimes.**

The Appellate Court based its affirmance of Dedric Moore's convictions on the State's case having conclusively proved beyond a reasonable doubt that he was the assailant. The Fourth District overlooked Mr. Moore's sole substantive argument on appeal which attacked his conviction, namely, his identification as the assailant through faulty DNA methodology. Mr. Moore neither argued at trial

---

[1]There was no "Campbell" in this case. Apparently the Appellate Court intended the instant defendant, Dedric Moore. The matter is moot, however, since Mr. Moore is not seeking review of this "mere-fact" / harmless error ruling.

[2]The dissent disagreed, noting that a "finding that the crime was exceptionally brutal, heinous, and indicative of wanton cruelty * * * is a factual question which involves weighing of the evidence at trial" which "should not be taken away from the jury," despite that "the evidence here is very strong that the conduct was brutal or heinous." (Appendix A at A-22 - A-23, Cook, J., dissenting)

On the remaining *Apprendi* issue concerning consecutive sentences, the Appellate Court denied Mr. Moore relief on the basis of this Court's opinion in *People v. Wagener*, 196 Ill.2d 269, 286, 752 N.E.2d 430, 441(2001). (Appendix A at A-20 - A-21) Mr. Moore is not seeking further review of his consecutive sentences.

nor on appeal that the victim was not assailed; he argued on appeal solely that the flawed DNA testing schema had failed to establish him as the perpetrator. The reviewing court never addressed the DNA issue, instead finding that it had been procedurally forfeited. The Fourth District, *sub silentio*, declined to apply the doctrine of plain error to this issue.

The Appellate Court failed to appreciate the significance of the DNA evidence by not considering the issue in this case as plain error. While a reviewing court has the discretion to ignore Mr. Moore's DNA issue because it was not properly preserved in the lower court, the reviewing court also has equal discretion to consider the issue since a substantial right of the accused has been implicated. *People v. Rice,* 321 Ill.App.3d 475, 747 N.E.2d 1035 (1st Dist. 2001): "A reviewing court will examine an issue not properly preserved under the plain error doctrine where the evidence is closely balanced or the alleged error is so fundamental that it denies the defendant a fair trial," citing *People v. Thomas*, 178 Ill.2d 215, 235, 687 N.E.2d 892, 900-01 (1997). See also *People v. Mendez*, 318 Ill.App.3d 1145, 745 N.E.2d 93 (3rd Dist. 2001):

> A procedural defect is plain error if the evidence of guilt was closely balanced or if the defendant was deprived of a substantial right. *People v. Keene,* 169 Ill.2d 1, 660 N.E.2d 901 (1995). A substantial right has been denied if the error affected the proceedings to such a degree that we cannot confidently state that the defendant's trial was fundamentally fair. [*Ibid.*] In other words, this court will act on error that is of such gravity that it threatens the very integrity of the judicial process. *People v. Blue*, 189 Ill.2d 99, 724 N.E.2d 920 (2000).

It is hard to imagine a right more substantial to a criminal defendant than whether he has accurately been identified as the culprit.

Counsel on appeal did not request the Appellate Court to consider the DNA issue as plain error. Therefore, this Court could also consider as ineffective

assistance appellate counsel's failure to present this "plain error" argument squarely to the Fourth District. In any event, Dedric Moore's sole substantive appellate issue should not be ignored because of appellate counsel's negligence.

**B.**

*Apprendi* **Requires a Reduction of Dedric Moore's 40-Year Extended-Term Sentences for Attempt (First-Degree Murder) and Armed Violence Because He Was Not Advised by the Pleadings or the Court Before Pleading Guilty That the State Had to Prove Beyond a Reasonable Doubt that the Offenses Were "Accompanied by Exceptionally Brutal or Heinous Behavior Indicative of Wanton Cruelty" in Order for Him to Be Exposed to Extended Terms Based Upon These Aggravating Factors.**

The Information and Indictment in this case did not charge that the various counts against Dedric Moore had been "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Yet, this finding was the basis upon which the court imposed extended-term sentences. (Vol. XIV, R. 61-62) This *Apprendi* violation should be redressed.

Attempt (first-degree murder) is sentenced as a Class X felony. 720 ILCS 5/8-4(c)(1) (West 1998). Home invasion is a Class X felony. 720 ILCS 5/12-11(c) (West 1998). The sentence for a Class X felony is not less than six years and not more than 30 years. 730 ILCS 5/5-8-1(a)(3) (West 1998). A judge may not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by §5-8-1 for the class of the most serious offense of which he was convicted (here, 30 years for the Class X felonies) unless factors in aggravation in 730 ILCS 5/5-5-3.2(b) (West 1998) are found to be present. 730 ILCS 5/5-8-2(a) (West 1998). If such factors in aggravation are found, then the judge may sentence the offender to a term of not less than 30 years and not more than 60 years for a Class X felony. 730 ILCS 5/5-8-2(a)(2) (West 1998). In Mr. Moore's case, his "maximum" 30-year sentences for attempt (first-degree

-8-

murder) and home invasion were aggravated to the maximum Class X 60-year extended-term sentences because of the judicial finding that they were "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" as contemplated in §5-5-3.2(b)(2) of the Unified Code of Corrections, 730 ILCS 5/5-5-3.2(b)(2) (West 1998).

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, 455 (2000), the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Apprendi*, the Supreme Court invalidated the New Jersey statute which permitted a sentencing judge to enhance a defendant's sentence on a crime beyond the prescribed maximum if the judge found by a preponderance of the evidence that the crime was committed with a biased purpose. *Apprendi*, 147 L.Ed.2d at 455-58. The Supreme Court reasoned that although sentencing judges do have discretion in imposing sentences, that discretion is limited to choosing a sentence within the range prescribed for the particular offense. *Apprendi*, 147 L.Ed.2d at 449-50.

A legislative scheme which removes from the jury the determination of a fact that, if found, increases the range of penalties beyond that dictated by the facts reflected in the jury verdict alone, violates the defendant's rights to due process, notice, and trial by jury. *Apprendi*, 147 L.Ed.2d at 450-51. The Supreme Court stated:

> If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not – at the moment that the State is put to proof

-9-

> of those circumstances – be deprived of protections that
> have until that point, unquestionably attached.

*Apprendi*, 147 L.Ed.2d at 451.

Thus, any fact other than a prior conviction which increases the prescribed range of penalties for an offense must be submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 147 L.Ed.2d at 455. Because the statute challenged in *Apprendi* did not contain these safeguards, the Supreme Court concluded that it was unconstitutional. 147 L.Ed.2d at 450-51, 455-58.

Thus, under *Apprendi* any fact, other than a prior conviction, which increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt. A state statutory scheme which allows for such an increase without the aforementioned procedural protections violates the Sixth and Fourteenth Amendments of the United States Constitution. When these legal principles are applied in the instant case, it becomes patent that §5-5-3.2(b)(2) – the "brutal and heinous" aggravating factor – fails to pass constitutional muster under *Apprendi.*

Neither §5-5-3.2(b)(2) nor any related sentencing statute requires that the extended-term provision be included in the charging instrument. Further, §5-5-3.2(b)(2) fails to require either that the "brutal and heinous" finding be determined by a jury or proved by the State beyond a reasonable doubt. Section 5-5-3.2(b)(2) is the mechanism for a maximum sentence to be doubled; however, §5-5-3.2(b)2) does not provide for any of the procedural protections required by *Apprendi.* Hence, §5-5-3.2(b)(2) is unconstitutional, and Mr. Moore's extended term resultant sentences based upon it are invalid.

The majority decision of the Appellate Court recognized in Dedric Moore's case that its holding the "brutal and heinous" language of §5-5-3.2(b)(2) not a

-10-

violation of *Apprendi* differs from the conclusion of "other districts of the appellate court [which] have found extended-term sentences unconstitutional in light of *Apprendi*." (Appendix A at A-19). The Fourth District thus remains unconvinced by the reasoning of its sister appellate courts. This Court, then, needs to resolve this important conflict between and among the various districts of the Appellate Court.

## VII.

## Conclusion

Wherefore, because the Fourth Judicial District of the Appellate Court failed to reach the pivotal trial issue in Mr. Moore's case – his identification by DNA evidence as the assailant – and because this Court authorized extended-term "brutal or heinous" sentences in violation of *Apprendi* and in contradistinction to the results obtained in other districts of the Appellate Court, Dedric Moore respectfully asks this Court to grant his Petition for Leave to Appeal and to reverse the decision of the Fourth District Appellate Court affirming his convictions and extended-term sentences for attempt (first-degree murder) and home invasion.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth, Suite 102
P.O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

JUDITH L. LIBBY
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

E-FILED

Friday, 04 May, 2007  04:56:58 PM
Clerk, U.S. District Court, ILCD

NO. 4-99-0499

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT



FILED

APR - 4 2003

CLERK OF THE
APPELLATE COURT, 4TH DIST.

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DEDRIC MOORE, | ) | No. 98CF1558 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

---

ORDER

In November 1998, a grand jury indicted defendant,
Dedric Moore, for attempt (first degree murder) (720 ILCS 5/8-
4(a), 9-1(a)(1) (West 1998)), home invasion (720 ILCS 5/12-
11(a)(2) (West 1998)), residential burglary (720 ILCS 5/19-3
(West 1998)), aggravated criminal sexual assault (720 ILCS 5/12-
14(a)(1) (West 1998)), and aggravated arson (720 ILCS 5/20-
1.1(a)(1) (West 1998)).  In March 1999, a jury found defendant
guilty on all counts.  Later that month, the court denied defen-
dant's posttrial motion.  In May 1999, the court sentenced
defendant to a 15-year prison term for residential burglary to
run consecutive to the defendant's concurrent 60-year extended
prison term for attempted first degree murder, 60-year extended
prison term for home invasion, 7-year prison term for aggravated
criminal sexual assault, and 30-year prison term for aggravated
arson.  Later in May 1999, the court denied defendant's motion to
reconsider his sentence.

On appeal, defendant argues that the trial court erred

EXHIBIT I                          C000807



in (1) permitting the State to introduce revised deoxyribonucleic acid (DNA) frequency calculations, (2) allowing the State to impeach him using the mere-fact method of impeachment, and (3) imposing upon him consecutive and extended-term sentences in violation of the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirmed in People v. Moore, 4-99-0499 (January 11, 2002) (unpublished order under Supreme Court Rule 23). Defendant filed a petition for leave to appeal, which the Supreme Court of Illinois denied but ordered this court to vacate our judgment and reconsider this case in light of People v. Swift, 202 Ill. 2d 378, 392, 781 N.E.2d 292, 300 (2002). People v. Moore, No. 93281 (February 27, 2003) (nonprecedential supervisory order).

In accordance with the supreme court's directions, we have reconsidered our decision, and we affirm in part, vacate in part, and remand for resentencing.

## I. BACKGROUND

At defendant's March 1999 trial, the State produced the following evidence. The victim, L.H., returned to her rented duplex around 1:30 a.m. on February 25, 1998. L.H. unlocked her front door and turned on her living room light to enter. She heard a noise behind her, which caused her to turn and look. Although L.H. attempted to push the door closed, a black male came from behind her and forced his way into her duplex. Defendant, who wore a hood, held his hand over L.H.'s mouth and

- 2 -

C000808

demanded to know where Chad was.  After L.H. responded that she
did not know a Chad, defendant pushed L.H. face down onto the
floor and asked her how much money she had.  Defendant searched
L.H.'s clothing for money and bound her hands and her feet.
Defendant placed a pair of L.H.'s shorts over her head as a
blindfold.  Defendant turned on L.H.'s television and began
ransacking her duplex unit, asking L.H. where her purse, money,
and automated teller machine (ATM) cards were.  Defendant began
asking L.H. if her truck had a manual or automatic transmission
and asked for her ATM personal identification numbers (PINS).
After L.H. gave him her PIN numbers, defendant sat in L.H.'s
kitchen, drank a beer from her refrigerator, and smoked a ciga-
rette.

      Defendant next asked if L.H. had any tape.  L.H.
cooperated with defendant, explaining to him where the tape was
located.  Defendant wrapped the tape around L.H.'s head several
times as a gag.  Defendant next found another cord which he used
to pull L.H.'s hands up over her left shoulder and hog-tie them
to her feet.  He then took L.H. into the bathroom, placed her
into the bathtub, and tied her to the bar running along the top
of the built-in soap shelf.  Defendant threatened L.H. that, if
her PIN numbers were wrong, he would return and she would regret
it.  Defendant then turned off the bathroom light and left the
apartment.

      After some period of time, defendant returned to find
L.H. bound and in the bathtub, having urinated on herself from

- 3 -

C000809

fright.  At that point, defendant lifted L.H. out of the bathtub and began to untie her.  L.H. told defendant to get out of the house.  In response to L.H.'s request to leave, defendant put a cord around her neck and began to strangle her.  Defendant finally removed the cord from L.H.'s neck.  He then placed his hand up her shirt, underneath her bra, and fondled her breasts. Defendant also placed his mouth on her right breast.

Defendant then left the room, but he returned in a few moments, unzipped his pants, and urinated on L.H.'s head. Defendant left the room again and returned this time with a liquid that L.H. testified smelled like shoe polish.  The intruder began pouring this liquid all over her body.  Defendant disappeared again.  By this time, the pair of shorts had fallen from L.H.'s head, and she could see that defendant had started a fire in her living room.  L.H. continued to struggle to free herself from the cords.  Defendant grabbed her and dragged her over the burning living room carpet.  L.H. fought to free herself, but defendant began punching and kicking her in the head, back, stomach, and legs.  After defendant stopped kicking L.H., he flicked his lit cigarette at her and left the duplex.

L.H. testified that smoke and fire were all around her unit.  L.H. freed herself from the cords and escaped to a neighbor's house for assistance.  When L.H. returned to the burning unit to save her two cats, she found that defendant had turned on the burners of her gas stove without lighting them, causing gas to leak into the room.  L.H. turned the burners off and left the

- 4 -

C000810

unit without her cats.  Shortly thereafter, an ambulance arrived and transported L.H. to a hospital where she was treated for burns, smoke inhalation, and bruises.

L.H. testified that defendant was wearing a hood and gloves throughout the incident, and she could not see his face very well.  Although she could tell defendant was a black male, she could not definitively identify defendant as the attacker either in court or in a previous lineup.

Investigators found no latent fingerprints suitable for comparison with defendant's known prints in the unit, L.H.'s truck, or other related sites.  Additionally, handwriting experts compared the paper on which defendant had written L.H.'s ATM PIN numbers to voluntary and collected handwriting samples from defendant.  This analysis proved inconclusive.

The State introduced a videotape from L.H.'s bank, which showed defendant in L.H.'s truck at the drive-through ATM lane at approximately 2:30 a.m. on February 25, 1998.  Enlarged photographs were produced from the video.  Although several people who reviewed the photographs claimed that the person in the photograph from the video resembled defendant, no one made a positive identification.  The photographs showed that defendant had two teeth missing to the left of his upper front teeth.  Defendant has the same missing teeth.  The State also produced bank records of the unauthorized withdrawals.

The State introduced the testimony and lab results from forensic scientist Kevin Zeeb regarding deoxyribonucleic acid

- 5 -

(DNA) evidence.  Zeeb testified that he recovered DNA material from a nylon stocking taken from L.H.'s unit and worn by defendant as a disguise while he used L.H.'s ATM cards to make the withdrawals from her bank.  Zeeb testified that the DNA material matched that of L.H. and defendant.  Zeeb testified that he compared the DNA profiles to established population databases to calculate the statistical frequency of encountering those profiles in the general population.  Zeeb performed two statistical calculations, one in which he combined the DNA profiles that he found on the stocking and one in which he separated the profiles.  Zeeb testified that combining the profiles produces a conservative estimate.  Zeeb found that conservative estimate of the frequency of the combined profiles in the general population was approximately 1 in 2,700 African-Americans.  Under the calculations in which Zeeb separated the profiles, Zeeb estimated the frequency to be approximately 1 in 150 billion African-Americans.  Defense counsel never objected to the admission of this statistical evidence.

Ivory Burrage, defendant's friend, testified as an alibi witness for defendant.  Burrage testified that defendant was at her house at approximately 1 a.m. on February 25, 1998.  She and defendant spent a couple of hours talking.

Emmaniel Moore, defendant's brother, testified that defendant was with him the entire night of February 24, 1998, and the morning of February 25, 1998, until around 3 a.m.  When asked on cross-examination if he had made a previous contradictory

- 6 -

C000812



statement to officers about defendant's whereabouts on the morning of the attack, Emmaniel could not remember having made the statement to police.

Defendant testified in his own behalf that he was with Burrage at the time L.H. was attacked. Defendant's testimony aligned with that of Burrage. The jury returned a verdict of guilty on all charges.

In March 1999, the trial court denied defendant's posttrial motion. In May 1999, the trial court sentenced defendant to concurrent prison terms of 60 years for attempted first degree murder, 60 years for home invasion, 7 years for aggravated criminal sexual assault, 30 years for aggravated arson, and a consecutive 15-year term for residential burglary. Later that month, the trial court denied defendant's motion to reconsider his sentence. This appeal followed.

## II. ANALYSIS

### A. Improper Statistical Calculations on DNA Profiles

Defendant argues that the State's "'revised' DNA[-] frequency calculations were unsubstantiated and improperly compelled the conclusion that [defendant] was the sole possible intruder at [L.H.'s] duplex." The State argues that defendant forfeited this issue on appeal by failing to raise any objection either during the trial or in a posttrial motion. We agree with the State.

An issue is forfeited on appeal unless a timely objection is made at trial and is specifically raised in a written

- 7 -

C000813



posttrial motion.  People v.  Robinson, 167 Ill. 2d 397, 404, 657
N.E.2d 1020, 1025 (1995).  In the present case, defendant failed
to make a timely objection or to raise the DNA issue in a written
posttrial motion.  Therefore, defendant forfeited this issue on
appeal.  See People v. Moore, 171 Ill. 2d 74, 98, 662 N.E.2d
1215, 1226 (1996) (acknowledging that defendant forfeited his
claim regarding statistical calculations for DNA tests); People
v. Oliver, 306 Ill. App. 3d 59, 69-70, 713 N.E.2d 727, 736 (1999)
·(stating that defendant's contention that probability statistics
were more prejudicial than probative had been forfeited), appeal
denied, 185 Ill. 2d 654, 720 N.E.2d 1102 (1999).

                    B. Use of Mere-Fact Impeachment

          Defendant next argues that the trial court erred by
permitting the State to introduce evidence of his prior felony
convictions using the mere-fact method of impeachment.  We agree
but find the error harmless in light of the overwhelming evidence
against Campbell.

          The Supreme Court of Illinois's "opinion in People v.
Montgomery, 47 Ill. 2d 510[, 268 N.E.2d 695] (1971), generally
governs the use of prior convictions to impeach a witness'[s]
credibility." People v. Atkinson, 186 Ill. 2d 450, 455, 713
N.E.2d 532, 535 (1999).  Under the Montgomery rule, evidence of a
witness's prior convictions is admissible to attack the witness's
credibility where (1) the prior crime was punishable by death or
imprisonment in excess of one year (felony) or involved dishon-
esty or false statement regardless of the punishment; (2) less

                              - 8 -

than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. Montgomery, 47 Ill. 2d at 516, 268 N.E.2d at 698. This third factor requires the trial judge to engage in a balancing test to weigh the prior conviction's probative value against any potential prejudice. Atkinson, 186 Ill. 2d at 456, 713 N.E.2d at 535. "If the trial judge determines that the prejudice substantially outweighs the probative value of admitting the evidence, then the evidence of the prior conviction must be excluded." Atkinson, 186 Ill. 2d at 456, 713 N.E.2d at 535. Such a determination of admissibility for impeachment purposes is within the discretion of the trial court. Atkinson, 186 Ill. 2d at 456, 713 N.E.2d at 535. Absent an abuse of that discretion, a trial court's decision to allow evidence of prior convictions to be admitted for purposes of impeachment will not be disturbed. People v. Dixon, 308 Ill. App. 3d 1008, 1017, 721 N.E.2d 1172, 1179 (1999). Montgomery requires no specific format for conducting the balancing test. However, "the record should reflect that the [trial] court understood it had discretion to admit the prior convictions for impeachment and that it considered the relevant factors involved." People v. Paul, 304 Ill. App. 3d 404, 408-09, 710 N.E.2d 499, 502 (1999).

In the present case, the record indicates that the trial court weighed the probative value of defendant's prior

- 9 -

C000815

convictions for forgery and attempted burglary against their prejudicial effect. The trial court concluded that publishing the specific felony convictions would be more prejudicial than probative. However, the trial court concluded that it would be proper simply to inform the jury of defendant's felony convictions using the mere-fact method.

Under the mere-fact method, only the "mere fact" of the felony conviction was brought to the jury's attention, rather than informing the jury of the precise offense of which the defendant had been convicted. Recently, in People v. Cox, 195 Ill. 2d 378, 386-87, 748 N.E.2d 166, 171-72 (2001), the supreme court addressed the mere-fact issue and reaffirmed its position in Atkinson, stating:

> "The State attempts to limit our holding
> in Atkinson. The State contends Atkinson did
> not instruct that a trial court could not
> consider mere-fact impeachment as a means to
> lessen the prejudicial effect of a defen-
> dant's prior convictions within the context
> of the Montgomery balancing test. In
> Atkinson, however, we held that 'trial courts
> should not consider the mere-fact method of
> impeachment.' (Emphasis in original.)
> Atkinson, 186 Ill. 2d at 461[, 713 N.E.2d at
> 537]. We find no suggestion in this unequiv-
> ocal language that a trial court's discretion

- 10 -

C000816·



encompasses mere-fact impeachment.  Addition-
ally, the State contends <u>Atkinson</u> only gov-
erns cases in which a trial court declined to
consider a defendant's request for mere-fact
impeachment.  Again, we see no such limita-
tion.

Admitting the mere fact of the defen-
dant's prior felony convictions was error."

In the present case, the trial court found that allow-
ing the State to impeach defendant by naming defendant's specific
prior felonies would be more prejudicial than probative.  The
trial court attempted to alleviate this prejudice by allowing the
State to use the mere-fact method, not naming the specific felony
convictions.  The trial court committed error by considering and
utilizing the mere-fact approach.  Nonetheless, reversible error
does not result unless "the error has deprived defendant of
substantial justice or influenced the determination of his
guilt."  <u>People v. Madison</u>, 56 Ill. 2d 476, 488, 309 N.E.2d 11,
18 (1974).  Accordingly, although the trial court erred, such
error was harmless in light of the overwhelming evidence against
defendant.

C.  Constitutionality of Consecutive and Extended-Term Sentences

During the pendency of defendant's appeal, the United
States Supreme Court issued its decision in <u>Apprendi</u>.  In light
of <u>Apprendi</u>, defendant filed a supplemental brief, arguing that
the trial court erred by (1) imposing extended-term sentences

- 11 -

upon him for attempted first degree murder and home invasion under section 5-5-3.2(b)(2) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-3.2(b)(2) (West 1998)) and (2) ordering his 15-year sentence for residential burglary to run consecutively to his other sentences under section 5-8-4(a) of the Unified Code (730 ILCS 5/5-8-4(a) (West 1998)) because these sections are unconstitutional under Apprendi.

### 1. Extended-Term Sentences

Defendant contends that section 5-5-3.2(b)(2) of the Unified Code violates his rights to due process and a jury trial under Apprendi. We review the constitutionality of a statute de novo. Swift, 202 Ill. 2d at 385, 781 N.E.2d at 296. In Apprendi, the United State Supreme Court held that the constitution requires that any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. In this case, defendant was sentenced to a 60-year extended prison term for attempted first degree murder and a 60-year extended prison term for home invasion based on a factual judicial finding that the crimes were committed in an exceptionally brutal and heinous manner.

In Swift, our supreme court held that, for purposes of Apprendi analysis, the sentence for first degree murder based on a jury verdict of guilt was 20 to 60 years' imprisonment. The court recognized the statutory authorization for extended-term

- 12 -

C000818

sentences to be imposed for that crime.  However, the supreme court held that, to impose a sentence longer than 60 years, additional factual jury findings were required.  <u>Swift</u>, 202 Ill. 2d at 392, 781 N.E.2d at 300.  The court noted that, according to <u>Apprendi</u>, facts that may subject a defendant to an extended term must be proved to a jury beyond a reasonable doubt.  In <u>Swift</u>, the circuit court made the factual finding that defendant's crime was brutal and heinous, and the State, therefore, was not held to the appropriate burden of proof.  The supreme court found that defendant's sentence could not stand, vacated his sentence, and remanded to the circuit court for resentencing.  <u>Swift</u>, 202 Ill. 2d at 393, 781 N.E.2d at 300.

Similarly, in the present case, the circuit court made the factual finding defendant committed the offenses of attempted first degree murder and home invasion in an exceptionally brutal or heinous manner.  In light of <u>Swift</u>, we are required and reluctantly must find that the court erred.  We, therefore, vacate defendant's extended-term sentences and remand for retrial or resentencing as the State prefers pursuant to section 5-5-3(d) of the Unified Code which provides, in part:

"In any case in which a sentence origi-
nally imposed is vacated, the case shall be
remanded to the trial court.  ***  If a sen-
tence is vacated on appeal or on collateral
attack due to the failure of the trier of
fact at trial to determine beyond a reason-

- 13 -

C000819

able doubt the existence of a fact (other
than a prior conviction) necessary to in-
crease the punishment for the offense beyond
the statutory maximum otherwise applicable,
either the defendant may be re[]sentenced to
a term within the range otherwise provided
or, if the State files notice of its inten-
tion to again seek the extended sentence, the
defendant shall be afforded a new trial."
730 ILCS 5/5-5-3(d) (West 2000).

### 2. Consecutive Sentences

Defendant also argues that consecutive sentences under
section 5-8-4(a) are unconstitutional under Apprendi.   The
Supreme Court of Illinois has recently concluded that the
"Apprendi concerns are not implicated by consecutive sentencing."
People v. Wagener, 196 Ill. 2d 269, 286, 752 N.E.2d 430, 441
(2001).   Therefore, sections 5-8-4(a) and (b) remain unaffected
by the Apprendi decision.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's
judgment in part, vacate in part, and remand for resentencing.

Affirmed in part, vacated in part, and remanded for
resentencing.

MYERSCOUGH, P.J., with COOK and McCULLOUGH, JJ.,
concurring.

C000870

E-FILED
Friday, 04 May, 2007  04:57:30 PM
Clerk, U.S. District Court, ILCD

FILE COPY

NO.  4-03-0790

IN THE

MAR - ? 2005

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the<br>) Circuit Court of the<br>) Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) Champaign County, Illinois. |
| vs. | ) No.  98-CF-1558 |
| DEDRIC T. MOORE, | ) Honorable<br>) Thomas J. Difanis, |
| Defendant-Appellant. | ) Judge Presiding. |

**BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

KAREN MUNOZ
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

## POINT AND AUTHORITIES

**THE TRIAL COURT ERRED, UPON RESENTENCING, IN IMPOSING MR. MOORE'S RESIDENTIAL BURGLARY SENTENCE CONSECUTIVE TO HIS SENTENCES FOR HOME INVASION AND AGGRAVATED ARSON, WHERE HIS RESIDENTIAL BURGLARY SENTENCE HAD BEEN ORDERED TO RUN CONCURRENT WITH THOSE TWO SENTENCES AT THE ORIGINAL SENTENCING HEARING. WHILE THE TOTAL NUMBER OF YEARS MR. MOORE IS TO SERVE, 75 YEARS, IS THE SAME TOTAL AS ORIGINALLY ORDERED, THE CHANGE IN ORDERING THE RESIDENTIAL BURGLARY CONSECUTIVE RATHER THAN CONCURRENT WAS AN IMPROPER INCREASE IN SENTENCE.**

*People v. Kilpatrick*, 167 Ill.2d 439, 657 N.E.2d 1005 (1995) . . . . . . . . . . . .   7

*People v. Muellner*, 70 Ill.App.3d 671, 388 N.E.2d 851 (5th Dist. 1979)  . . . . 7, 8

## NATURE OF THE CASE

Dedric Moore is appealing the resentencing order entered by the trial court following the remand by this Court.  Mr. Moore was sentenced on remand to 15 years' imprisonment for residential burglary, consecutive to 30 years' imprisonment for home invasion, consecutive to 30 years for aggravated arson, concurrent with 30 years for attempt, concurrent with seven years for aggravated criminal sexual abuse.

## ISSUE PRESENTED FOR REVIEW

Whether the trial court erred, upon resentencing, in imposing Mr. Moore's residential burglary sentence consecutive to his sentences for home invasion and aggravated arson, where his residential burglary sentence had been ordered to run concurrent with those two sentences at the original sentencing hearing. While the total number of years Mr. Moore is to serve, 75 years, is the same total as originally ordered, the change in ordering the residential burglary consecutive rather than concurrent was an improper increase in sentence.

## JURISDICTION

The defendant-appellant, appeals from a final determination of sentence in a criminal case.  He was resentenced on July 1, 2003.  (Vol. IV, C. 840)  Notice of appeal was filed on September 17, 2003.  (Vol. IV, C. 850)  Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

In Champaign County Case No. 98-CF-1558, Dedric Moore was convicted of aggravated criminal sexual abuse, home invasion, residential burglary, attempt (first degree murder) and aggravated arson. (Vol. III, C. 728-732). On May 21, 1999, he was sentenced to 75 years' imprisonment: concurrent terms of 60 years' imprisonment for attempt, 60 years for home invasion, 30 years for aggravated arson, 7 years for aggravated criminal sexual abuse and a consecutive 15 years for residential burglary. (Vol. IV, C. 760; Supp. Vol.)

On appeal, this Court affirmed Mr. Moore's convictions and sentences. (Gen. No. 4-99-0499) The Supreme Court denied the petition for leave to appeal but ordered the court to reconsider the case in light of *People v. Swift.* (No. 93281) After reconsideration, this Court, on April 4, 2003, affirmed the convictions but vacated the extended term sentences. (Vol. IV, C. 807-820) On remand, a new sentencing hearing was held on July 1, 2003, and Mr. Moore was sentenced to a total of 75 years' imprisonment: 15 years for residential burglary, consecutive to 30 years for home invasion, consecutive to 30 years for aggravated arson, concurrent with 30 years for attempt first degree murder and seven years for aggravated criminal sexual abuse. (Vol. IV, C. 840; Vol. VI) Mr. Moore filed a motion to reconsider sentence on July 2, 2003. (Vol. IV, C. 841-842) The motion was denied on September 5, 2003 (Vol. VII), and the defendant filed a notice of appeal on September 17, 2003. (Vol. IV, C. 850)

# ARGUMENT

**THE TRIAL COURT ERRED, UPON RESENTENCING, IN IMPOSING MR. MOORE'S RESIDENTIAL BURGLARY SENTENCE CONSECUTIVE TO HIS SENTENCES FOR HOME INVASION AND AGGRAVATED ARSON, WHERE HIS RESIDENTIAL BURGLARY SENTENCE HAD BEEN ORDERED TO RUN CONCURRENT WITH THOSE TWO SENTENCES AT THE ORIGINAL SENTENCING HEARING. WHILE THE TOTAL NUMBER OF YEARS MR. MOORE IS TO SERVE, 75 YEARS, IS THE SAME TOTAL AS ORIGINALLY ORDERED, THE CHANGE IN ORDERING THE RESIDENTIAL BURGLARY CONSECUTIVE RATHER THAN CONCURRENT WAS AN IMPROPER INCREASE IN SENTENCE.**

Dedric Moore was convicted of residential burglary, attempt (first degree murder), home invasion, aggravated arson and aggravated criminal sexual abuse. When Mr. Moore was first sentenced, the court imposed the following terms of imprisonment:

> 15 years' imprisonment for residential burglary, consecutive to 60 years' imprisonment for attempt (first degree murder), concurrent with 60 years' imprisonment for home invasion, concurrent with 30 years' imprisonment for aggravated arson, concurrent with 7 years' imprisonment for aggravated criminal sexual abuse.

Hence, Mr. Moore was to serve a total of 75 years' imprisonment. (Vol. IV, C. 760)

On appeal, Mr. Moore's extended term sentences were vacated after this Court found an *Apprendi* violation, and the cause was remanded for resentencing. At the resentencing hearing, Mr. Moore was sentenced as follows:

> 15 years' imprisonment for residential burglary, consecutive to 30 years' imprisonment for home invasion, consecutive to 30 years' imprisonment for aggravated arson, concurrent with 30 years' imprisonment for attempt (first degree murder), concurrent with 7 years' imprisonment for aggravated criminal sexual abuse.
>
> (Vol. IV, C. 840)

At first glance, there does not appear to be a problem with the sentences because the extended terms sentences were vacated and the new sentences once again add up to a total of 75 years' imprisonment. However, the trial court, by ordering formerly concurrent terms to run consecutively, has actually increased those sentences.

In the case of *People v. Kilpatrick*, 167 Ill.2d 439, 657 N.E.2d 1005 (1995), the Illinois Supreme Court found an improper increase of the defendant's sentence when the trial court vacated the defendant's consecutive sentences of nine and six years' imprisonment and replaced them with a sentence of 15 years' imprisonment. The court stated that: "[t]he circumstance that the total numbers of years' imprisonment remained the same, *i.e.*, 15 years, does not negate the fact that defendant's sentence was increased, from either six or nine years' incarceration to 15 years in prison." 657 N.E.2d at 1008.

The question presented in the instant case is whether there was an improper increase of sentence when the trial court resentenced Mr. Moore and former concurrent extended term sentences were modified to non-extended consecutive sentences. In *People v. Muellner*, 70 Ill.App.3d 671, 388 N.E.2d 851 (5th Dist. 1979), cited in the *Kilpatrick* case, the defendant was sentenced on two counts of rape and two counts of deviate sexual assault to concurrent terms of four and eight years' imprisonment. Eleven days later, the trial court, on the State's motion, ordered the rape sentences to run consecutively to the deviate sexual assault sentences. On appeal, the court ruled it was error to modify the sentences to consecutive sentences, and ordered them to run concurrently. The court stated:

> It is our opinion that the resentencing of defendant to consecutive terms after originally imposing concurrent

-7-

sentences was in the very real sense an increase in the length of his sentence because his earliest possible parole release will necessarily be delayed to a later date in time.

388 N.E.2d at 861.

In this case, the trial court made a finding, at the original sentencing and at resentencing, of consecutive sentences being necessary to protect the public. However, the court at the first hearing grouped the attempt, home invasion, aggravated arson and aggravated criminal sexual abuse convictions and ruled that concurrent sentences were appropriate. Only the residential burglary was ordered consecutive to the others. At resentencing, the trial court grouped aggravated arson, attempt and aggravated criminal sexual abuse and ordered concurrent terms for those convictions but then ordered residential burglary consecutive to home invasion and home invasion consecutive to the attempt, which was grouped with the other concurrent terms.

The change from concurrent terms consecutive terms was an improper modification of Mr. Moore's sentences, and the consecutive terms should be vacated by this Court.

# CONCLUSION

For the foregoing reasons, Dedric Moore asks this Court to vacate the consecutive sentences imposed on remand and order that they run concurrently with each other.

Respectfully submitted,

KAREN MUNOZ

Assistant Appellate Defender
Office of the State Appellate Defender
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, Illinois  62705-5750
(217) 782-3654

COUNSEL FOR DEFENDANT-APPELLANT

NO. 4-03-0790

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | the Sixth Judicial Circuit |
| Plaintiff-Appellee, | ) | Champaign County, Illinois |
| | ) | |
| vs. | ) | No.  98-CF-1558 |
| | ) | |
| DEDRIC T. MOORE, | ) | Honorable |
| | ) | Thomas J. Difanis |
| Defendant-Appellant. | ) | Judge Presiding. |

---

### BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE

Julia Rietz
State's Attorney
Champaign County Courthouse
Urbana, Illinois  61801

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
Thomas R. Dodegge
Of Counsel
State's Attorneys Appellate
        Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE

EXHIBIT K

<u>POINT AND AUTHORITIES</u>                    <u>PAGE</u>

THE TRIAL COURT'S IMPOSITION OF A 75-YEAR SENTENCE
ON REMAND DID NOT IMPROPERLY INCREASE DEFENDANT'S
SENTENCE......................................... 2

<u>People</u> v. <u>Moore</u>, No. 4-99-0499 (January 11, 2002)
    (unpublished order under Supreme Court Rule 23). 2
<u>People</u> v. <u>Moore</u>, No. 93281 (February 27, 2003)
    (nonprecedential supervisory order)............ 2
<u>People</u> v. <u>Swift</u>, 202 Ill.2d 378, 269 Ill.Dec. 495,
    781 N.E.2d 292 (2002).......................... 2
<u>People</u> v. <u>Moore</u>, No. 4-99-0499 (April 4, 2003)
    (unpublished order under Supreme Court Rule 23).. 3
<u>People</u> v. <u>Muellner</u>, 70 Ill.App.3d 671, 26 Ill.Dec.
    850, 388 N.E.2d 851 (5th Dist. 1979)........... 3, 5
<u>People</u> v. <u>Reed</u>, 177 Ill.2d 389, 226 Ill.Dec. 801,
    686 N.E.2d 584 (1997).......................... 4
<u>People</u> v. <u>Carney</u>, 196 Ill.2d 518, 256 Ill.Dec. 895,
    752 N.E.2d 1137 (2001)......................... 4
<u>People</u> v. <u>Giller</u>, 191 Ill.App.3d 710, 138 Ill.Dec.
    928, 548 N.E.2d 341 (5th Dist. 1989)........... 5, 6
<u>People</u> v. <u>Didier</u>, 306 Ill.App.3d 803, 239 Ill.Dec.
    876, 715 N.E.2d 321 (2nd Dist. 1999)........... 6
730 ILCS 5/5-5-3(d)................................ 3

i

730 ILCS 5/5-5-4.................................... 7

Supreme Court Rule 341(e)(7)........................ 4

ARGUMENT

THE TRIAL COURT'S IMPOSITION OF A 75-YEAR SENTENCE ON REMAND
DID NOT IMPROPERLY INCREASE DEFENDANT'S SENTENCE.

Defendant, Dedric Moore, was found guilty of attempt
(first degree murder), home invasion, aggravated arson,
aggravated criminal sexual abuse, and residential burglary
after a jury trial. (R. Vol. IV, C807)  He was sentenced by
the trial court to a 15-year prison term for residential
burglary to run consecutive to the defendant's concurrent 60-
year extended prison term for attempted first degree murder,
60-year extended prison term for home invasion, 7-year prison
term for aggravated criminal sexual assault, and 30-year
prison term for aggravated arson. (R. Vol. IV, C807)

In People v. Moore, No. 4-99-0499 (January 11, 2002)
(unpublished order under Supreme Court Rule 23), this court
affirmed defendant's convictions and sentences. (R. Vol. IV,
C0808)  However, in People v. Moore, No. 93281 (February 27,
2003) (nonprecedential supervisory order), the Illinois
Supreme Court ordered this court to reconsider its decision in
light of People v. Swift, 202 Ill.2d 378, 269 Ill.Dec. 495,
781 N.E.2d 292 (2002). (R. Vol. IV, C808)

2

On remand, this court again affirmed defendant's convictions in People v. Moore, No. 4-99-0499 (April 4, 2003) (unpublished order under Supreme Court Rule 23). However, it remanded to the trial court for retrial or resentencing as the State preferred pursuant to 730 ILCS 5/5-5-3(d). (R. Vol. IV, C819)

On remand, the State elected to proceed to a new sentencing hearing. (R. Vol. V, 3) On July 1, 2003, the trial court conducted a new sentencing hearing. (R. Vol. VI, 1) It sentenced defendant to 15 years for residential burglary, consecutive to 30 years for home invasion, consecutive to 30 years for aggravated arson, concurrent to 30 years for attempt murder, concurrent to 7 years for aggravated criminal sexual abuse (R. Vol. IV, C850), for a total sentence of 75 years.

Defendant filed a motion to reconsider sentence. (R. Vol. IV, C851) This was denied by the trial court on September 5, 2003. (R. Vol. VII, 6)

On appeal, defendant, primarily citing People v. Muellner, 70 Ill.App.3d 671, 26 Ill.Dec. 850, 388 N.E.2d 851 (5th Dist. 1979), contends that the trial court improperly increased his sentence because his "former concurrent term sentences were modified to non-extended consecutive sentences." (Deft. Br. 7) Since this is the only issue raised

3

by defendant, it is the only issue that will be addressed by the State. (See Supreme Court Rule 341(e)(7))

Initially, the State observes that this issue was not raised in defendant's motion to reconsider sentence. (R. Vol. I, C851-C852)   A sentencing issue that is not raised in a post-sentencing motion is waived.  People v. Reed, 177 Ill.2d 389, 226 Ill.Dec. 801, 686 N.E.2d 584, 587 (1997).  Defendant does not argue plain error.

On the merits, defendant quotes Muellner as follows:

> It is our opinion that the resentencing of defendant to consecutive terms after originally imposing concurrent sentences was in the very real sense an increase in the length of his sentence because his earliest possible parole release will necessarily be delayed to a later date in time.

> 388 N.E.2d at 861.

In People v. Carney, 196 Ill.2d 518, 256 Ill.Dec. 895, 752 N.E.2d 1137 (2001), the supreme court stated:

> The court held that the resentencing to consecutive terms was, for practical purposes, an increase in the length of defendant's sentence, because his earliest possible parole release would thereby be delayed to a later point in time. **Muellner, 70 Ill.App.3d at 683, 26 Ill.Dec. 850, 388 N.E.2d 851.**

> The statement by the **Muellner** court that an order imposing consecutive sentences on resentencing constituted an increase in the length of defendant's sentence was *dictum*, as such an order was not an issue in *Kilpatrick*.

4

752 N.E.2d at 1145.

As indicated, the supreme court considered the statement quoted by defendant to be dictum. Further, the case at bar is distinguishable from Muellner in that the trial court did not increase defendant's total sentence (75 years) when it resentenced him, while the trial court's action in Muellner increased defendant's total sentence. See Muellner, 388 N.E.2d at 857.

The State submits that the case at bar is directly analogous to People v. Giller, 191 Ill.App.3d 710, 138 Ill.Dec. 928, 548 N.E.2d 341 (5th Dist. 1989), where the court stated:

> Section 5-5-4 of the Unified Code of Corrections provides that once a sentence has been set aside on review or collateral attack, "the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence * * *." (Ill.Rev.Stat.1987, ch. 38, par. 1005-5-4.)
>
> * * *
>
> In the case now before us, defendant's sentence on remand was no more severe than his original sentence. His original sentence was for an extended term of 60 years' imprisonment, and his resentence totaled 60 years' imprisonment. The imposition of consecutive terms of 30 years' imprisonment was consistent with section 5-8-4 of the Unified Code of Corrections (Ill.Rev.Stat.1987, ch. 38, par. 1005-8-4), and could have been imposed in the original sentencing. Therefore we are

5

unable to find any impropriety in defendant's sentence on remand.

The cases cited by defendant are inapposite to the instant appeal because they involve situations in which the sentence imposed on remand was either a more severe sentence for the same conduct, or a sentence of the same severity for an offense which was reduced on remand.

548 N.E.2d at 242.

Under <u>Giller</u>, there is no improper increase in sentence where sentences for individual offenses are decreased and the total sentence remains the same because the sentences were made consecutive. Since the total sentence of 75 years was not increased, there was no violation here.

Additional support for the legality of the trial court's sentence is found in <u>People</u> v. <u>Didier</u>, 306 Ill.App.3d 803, 239 Ill.Dec. 876, 715 N.E.2d 321 (2nd Dist. 1999), where the court stated:

Here, upon reconsideration by the trial court, two of defendant's concurrent 10-year terms were reduced to consecutive 3- and 7-year terms. The aggregate of these consecutive terms does not exceed the original concurrent 10-year terms. Thus, the trial court did not increase the sentences on reconsideration. We therefore reject defendant's argument that the trial court lacked statutory authority to modify the concurrent sentences to consecutive sentences.

715 N.E.2d at 324.

6

In conclusion, the trial court did not violate 730 ILCS 5/5-5-4 by imposing a more severe sentence than the prior sentence, since the total sentence remained the same, and there was no increase in the sentences for the individual offenses.

7

<u>CONCLUSION</u>

WHEREFORE, the PEOPLE OF THE STATE OF ILLINOIS respectfully request this court to affirm defendant's sentence and to tax costs accordingly.

Respectfully Submitted,

THE PEOPLE OF THE STATE OF ILLINOIS

Julia Rietz
State's Attorney
Champaign County Courthouse
Urbana, Illinois  61801

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
Thomas R. Dodegge
Of Counsel
State's Attorneys Appellate
    Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE

8

**E-FILED**
Friday, 04 May, 2007  04:58:29 PM
Clerk, U.S. District Court, ILCD

No.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, No.  4-03-0790. |
| Respondent-Appellee, | ) ) | |
| vs. | ) ) ) ) ) | There on appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois, No.  98-CF-1558. |
| DEDRIC T. MOORE, | ) ) | |
| Petitioner-Appellant. | ) ) ) ) | Honorable Thomas J. Difanis, Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

KAREN MUNOZ
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

*ORAL ARGUMENT REQUESTED*

EXHIBIT L

No.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, |
| Respondent-Appellee, | ) ) | No. 4-03-0790. |
| vs. | ) ) ) | There on appeal from the Circuit Court of the Sixth Judicial Circuit, |
| DEDRIC T. MOORE, | ) ) ) | Champaign County, Illinois, No. 98-CF-1558. |
| Petitioner-Appellant. | ) ) ) | Honorable Thomas J. Difanis, Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

To the Honorable Justices of the Supreme Court of the State of Illinois:

May It Please The Court:

## I.

## PRAYER FOR LEAVE TO APPEAL

Dedric T. Moore, petitioner-appellant, hereby petitions this Court for leave to appeal, pursuant to Supreme Court Rules 315 and 612, from the judgment of the Appellate Court, Fourth Judicial District, affirming his resentencing to a total of 75 years' imprisonment for attempt first degree murder, aggravated criminal sexual abuse, aggravated arson and home invasion.

## II.

## PROCEEDINGS BELOW

The Appellate Court, one justice dissenting, affirmed Dedric T. Moore's sentences in an opinion filed on September 26, 2005. No petition for rehearing was filed. On October 5, 2005, Mr. Moore filed an affidavit of intent to seek leave to appeal. A copy of the appellate court's judgment is appended to this petition.

## III.

## POINT RELIED UPON FOR REVIEW

**The majority of the Appellate Court erroneously distinguished this Court's decision in *People v. Kilpatrick*. *Kilpatrick* supports the defendant's claim that the conversion of his sentence from a concurrent term to a consecutive term was an improper increase of sentence, despite the fact that the total amount of years the defendant is to serve remains unchanged.**

Review should be granted by this Court to decide whether the Appellate Court correctly interpreted this Court's decision in *People v. Kilpatrick*, 167 Ill.2d 439, 657 N.E.2d 1005 (1995). Mr. Moore maintains that there was an improper increase in his sentence for the trial court to convert previously imposed concurrent terms for attempt (first degree murder), home invasion, aggravated arson and aggravated criminal sexual abuse, consecutive to residential burglary, to residential burglary, consecutive to home invasion, consecutive to aggravated arson, which was concurrent with attempt and aggravated criminal sexual abuse.

# IV.

## POINT RELIED UPON FOR REVERSAL

**Under this Court's ruling in *People v. Kilpatrick*, the Court's modification of sentences from concurrent terms to consecutive terms, in order to fashion a situation where Mr. Moore would serve the same number of years in prison, was an improper increase of sentences.**

Justice Cook, in his dissent, quoted from this Court's decision in *Kilpatrick*: "I read *Kilpatrick* to express real concern about increased sentences on remand, imposing strict rules even where there is only a technical violation and the total sentence is not increased." (Opinion p. 9) In this case, the original extended term sentences had to be vacated because of an *Apprendi* violation. However, those particular sentences had not been made consecutive at the original sentencing hearing. The trial court could not simply order those previously designated concurrent sentences transformed into lesser length consecutive terms without running afoul of the prohibition against increased sentences on remand.

This Court should grant leave to appeal and reverse the Appellate Court's decision.

-4-

# V.

## STATEMENT OF FACTS

In Champaign County Case No. 98-CF-1558, Dedric Moore was convicted of aggravated criminal sexual abuse, home invasion, residential burglary, attempt (first degree murder) and aggravated arson. (Vol. III, C. 728-732)  On May 21, 1999, he was sentenced to 75 years' imprisonment: concurrent terms of 60 years' imprisonment for attempt, 60 years for home invasion, 30 years for aggravated arson, 7 years for aggravated criminal sexual abuse and a consecutive 15 years for residential burglary. (Vol. IV, C. 760; Supp. Vol. II)

On appeal, the Appellate Court affirmed Mr. Moore's convictions and sentences. (Gen. No. 4-99-0499)  This Court denied the petition for leave to appeal but ordered the Appellate Court to reconsider the case in light of *People v. Swift* (No. 93281).  After reconsideration, the Appellate Court, on April 4, 2003, affirmed the convictions but vacated the extended term sentences. (Vol. IV, C. 807-820)  On remand, a new sentencing hearing was held on July 1, 2003, and Mr. Moore was sentenced to a total of 75 years' imprisonment:  15 years for residential burglary, consecutive to 30 years for home invasion, consecutive to 30 years for aggravated arson, concurrent with 30 years for attempt first degree murder and seven years for aggravated criminal sexual abuse. (Vol. IV, C. 840; Supp. Vol. I)  Mr. Moore filed a motion to reconsider sentence on July 2, 2003. (Vol. IV, C. 841-842)  The motion was denied on September 5, 2003 (Vol. VII), and the defendant filed a notice of appeal on September 17, 2003. (Vol. IV, C. 850)

In an opinion filed on September 26, 2005, the Appellate Court, one justice dissenting, found that there had not been an improper increase in Mr. Moore's sentences when the formerly concurrent sentences were converted to consecutive sentences. (*See* Appendix)  Mr. Moore now seeks leave to appeal.

# VI.

# ARGUMENT

**The trial court erred, upon resentencing, in converting Mr. Moore's concurrent sentences to consecutive after making findings at resentencing that had not been made at the original sentencing hearing. While the total number of years Mr. Moore is to serve, 75 years, is the same total as originally ordered, the change in ordering the residential burglary consecutive to home invasion and the home invasion consecutive to other concurrent terms was an improper increase in sentence.**

Dedric Moore was convicted of residential burglary, attempt (first degree murder), home invasion, aggravated arson and aggravated criminal sexual abuse. When Mr. Moore was first sentenced, the court imposed the following terms of imprisonment:

> 15 years' imprisonment for residential burglary,
> consecutive to 60 years' imprisonment for attempt (first degree murder),
> concurrent with 60 years' imprisonment for home invasion,
> concurrent with 30 years' imprisonment for aggravated arson,
> concurrent with 7 years' imprisonment for aggravated criminal sexual abuse.

Hence, Mr. Moore was to serve a total of 75 years' imprisonment. (Vol. IV, C. 760)

On appeal, Mr. Moore's extended term sentences were vacated after the Appellate Court found an *Apprendi* violation, and the cause was remanded for resentencing. At the resentencing hearing, Mr. Moore was sentenced as follows:

> 15 years' imprisonment for residential burglary,
> consecutive to 30 years' imprisonment for home invasion,
> consecutive to 30 years' imprisonment for aggravated arson,
> concurrent with 30 years' imprisonment for attempt (first degree murder),
> concurrent with 7 years' imprisonment for aggravated criminal sexual abuse.

> (Vol. IV, C. 840)

-6-

At first glance, there does not appear to be a problem with the sentences because the extended terms sentences were vacated and the new sentences once again add up to a total of 75 years' imprisment.  However, the trial court, by ordering formerly concurrent terms to run consecutively, has actually increased those sentences.

In the case of *People v. Kilpatrick*, 167 Ill.2d 439, 657 N.E.2d 1005 (1995), this Court found an improper increase of the defendant's sentence when the trial court vacated the defendant's consecutive sentences of nine and six years' imprisonment and replaced them with a sentence of 15 years' imprisonment.  The court stated that:  "[t]he circumstance that the total numbers of years' imprisonment remained the same, *i.e.*, 15 years, does not negate the fact that defendant's sentence was increased, from either six or nine years' incarceration to 15 years in prison."  657 N.E.2d at 1008.

The question presented in the instant case is whether there was an improper increase of sentence when the trial court resentenced Mr. Moore, and former concurrent extended term sentences were modified to non-extended consecutive sentences.  In *People v. Muellner*, 70 Ill.App.3d 671, 388 N.E.2d 851 (5th Dist. 1979), cited in the *Kilpatrick* case, the defendant was sentenced on two counts of rape and two counts of deviate sexual assault to concurrent terms of four and eight years' imprisonment.  Eleven days later, the trial court, on the State's motion, ordered the rape sentences to run consecutively to the deviate sexual assault sentences.  On appeal, the court ruled it was error to modify the sentences to consecutive sentences, and ordered them to run concurrently.  The court stated:

> It is our opinion that the resentencing of defendant to consecutive terms after originally imposing concurrent sentences was in the very real sense an increase in the length of his sentence because his earliest possible

parole release will necessarily be delayed to a later date
in time.

388 N.E.2d at 861.

In this case, the trial court made a finding, at the original sentencing and at resentencing, of consecutive sentences being necessary to protect the public. However, the court at the first hearing grouped the attempt, home invasion, aggravated arson and aggravated criminal sexual abuse convictions and ruled that concurrent sentences were appropriate. Only the residential burglary was ordered consecutive to the others. At resentencing, the trial court grouped aggravated arson, attempt and aggravated criminal sexual abuse and ordered concurrent terms for those convictions but then ordered residential burglary consecutive to home invasion and home invasion consecutive to the attempt, which was grouped with the other concurrent terms.

The change from concurrent terms consecutive terms was an improper modification of Mr. Moore's sentences, and the consecutive terms should be vacated. by this Court. In his dissent, Justice Cook cited this Court's decision in *Kilpatrick* and stated:

> I read *Kilpatrick* to express real concern about increased sentences on remand, imposing strict rules even where there is only a technical violation and the total sentence is not increased. I do not read *Kilpatrick* as endorsing a rule that would somehow tolerate an increase in the total sentence on remand. *Kilpatrick* quoted with approval the language from *Muellner* [*People v. Muellner*, 70 Ill.App.3d 671, 388 N.E.2d 851 (5th Dist. 1979) that "the resentencing of defendant to consecutive terms after originally imposing concurrent sentences was in the very real sense an increase in the length of his sentence because his earliest possible parole release will necessarily be delayed to a later date in time." (Citations omitted)

Opinion p. 9.

-8-

As Justice Cook pointed out in his dissent, while the total sentence was unchanged, "[u]nder *Kilpatrick*, however, that is not a safe harbor.  After remand, the trial court made findings that it had not previously made and imposed a sentence that it had not previously imposed.  Given the strict rules applied by *Kilpatrick*, I conclude that a more severe sentence was improperly imposed following remand in this case."  (Opinion, p. 10.)

Justice Cook is correct in his analysis of the *Kilpatrick* decision and in his holding that an improper increase in sentence actually occurred on remand in this case.  Therefore, it is requested that this Court grant leave to appeal and reverse the decision of the Appellate Court.

## VII.

## CONCLUSION

Dedric T. Moore, petitioner-appellant, respectfully requests that this Court grant leave to appeal and reverse the decision of the Appellate Court of Illinois, Fourth Judicial District.


Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth West Monroe Street, Suite 303
P.O. Box 5240
Springfield, IL 62705-5240
(217) 782-3654

KAREN MUNOZ
Assistant Defender

COUNSEL FOR PETITIONER-APPELLANT

IN THE CIRCUIT COURT OF Champaign

PEOPLE OF THE STATE OF ILLINOIS    )
                                   )
                                   )    IND. NO.: 98-Cf-1558
            vs                     )
                                   )
Dedric Moore                       )

**FILED**
SIXTH JUDICIAL CIRCUIT

APR 2 2 2002

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

## PRO SE POST-CONVICTION PETITION

Now comes Dedric Moore , Defendant, pro se, and petitions this Honorable Court to grant him relief under the post-conviction act. [725 ILCS 5/122-1. 1992]

In support of this petition, Defendant states:

Aggravated arson, Attempt "First degree murder" Home Invasion

1. He/She was convicted of the offense(s) of: Resid. Burg after a jury trial, bench trial or entered a guilty plea before the Honorable Thomas Difanis and was sentenced to 75 years on May 24, 1999.

2. He/She did not appeal his/her conviction or he/she appealed his/her conviction to the Appellate Court of Illinois and that Court affirmed his/her conviction on Jan. 11 , 2002 (APPELLATE NO. 4 99 0499 ).

3. He/She did not petition the Supreme Court of Illinois to take his/her case or his/her petition for leave to appeal was denied on pending , ____.(SUPREME COURT NO.____ )

4. This petition was mailed to the clerk of the circuit court within the time frame enumerated under 725 ILCS 5/122-1.

5. Petitioner's constitutional rights were violated because (STATE ALL FACTS KNOWN TO PETITIONER THAT DEMONSTRATE THAT HIS/HER CONSTITUTIONAL RIGHTS WERE VIOLATED):

N/A enclosed

_____, Defendant, pro se, states, under penalty of perjury, that the facts set out in this petition are true and correct to the best of his/her knowledge and belief.

SIGNED: D. Moore

SUBSCRIBED AND SWORN TO BEFORE THIS THIS 12th DAY OF April , A.D., 2002.

Regina Summers
NOTARY PUBLIC

"OFFICIAL SEAL"
Regina Summers
Notary Public, State of Illinois
My Commission Exp. 07/21/2005

Form revised 11/1/01

EXHIBIT M

C000773

IN THE CIRCUIT COURT FOR THE _Sixth_ JUDICIAL COURT
_Champaign_ COUNTY, ILLINOIS

State of Illinois                    )
                Petitioner,          )
v.                                   )    No. _98-Cf-1558_
Dedric Moore                        )
_____,                    )
                Respondent.

**FILED**
SIXTH JUDICIAL CIRCUIT

APR 2 2 2002

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

-----------------------------------------------------------------

## APPLICATION TO SUE OR DEFEND AS A POOR PERSON

Applicant, _Dedric Moore_, respectfully requests the Court, pursuant to Illinois [ see 735 ILCS 5/5-105] and Rule 298 of the Illinois Supreme Court, to grant (him/her) leave to (sue/defend) as a poor person; in support applicant states that the following facts are true in substance and in fact:

1. I am the (Petitioner/Respondent) in the above captioned legal proceedings.
2. I am a poor person and unable to (prosecute/defend) this action and am unable to pay the costs, fees and expenses of this action.
3. My occupation or means of subsistence:
    (a) I am not currently employed due to my imprisonment at _Menard_ Correctional Center but I receive (a state stipend/nominal wages) of $ _10_ per month.
    (b) The amount and source of all other income or support are:
        _N/a_
        _____
4. My total income for the preceding year was $ _100-120_.
5. The sources and amount of income expected by me hereafter are:
    _____
6. The nature and current value of any property, real or personal, owned by me:
    (a) Real Estate: _N/A_
        value:_____
    (b) Motor Vehicle: _N/A_
        value:_____
    (c) Cash, saving, checking, etc. _N/A_
        value:_____
    (d) Prison trust account:_____ $8.00
        value:_____
    (e) Other (eg., T.V., etc.)_____ N/A
        value:_____
7. No applications for leave to sue or defend as a poor person were filed by me or on my behalf during the preceding year, except as follows:
    _N/A_
8. I believe in good faith that I have a meritorious (claim/defense).

                    _Dedric Moore_
                    (Your Signature)
                    Type or print name _Dedric Moore_
                    Register Number: _K53438_
                    _Menard_ Correctional Center
                    P. O. Box _711_
                    _Menard_, Illinois _62259_
                    (Petitioner/Respondent), Pro Se

Form revised 11/1/01

C000774

STATE OF ILLINOIS

COUNTY OF  Champaign



FILED
SIXTH JUDICIAL CIRCUIT

APR 2 2 2002

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

### AFFIDAVIT

I,  Dedric Moore_____, a prisoner incarcerated at the Menard

Correctional Center, in  Chester_____, Illinois, have read and understand the

above Petition for Post-Conviction Relief.  All of the facts presented in this Petition  are

true and correct to the best of my recollection.

_____ Dedric Moore  _Dri Moore_
AFFIANT

Subscribed and sworn to before me this _12th_ day of _April_ , _2002_.

_Regina Summers_
Notary Public

```
"OFFICIAL SEAL"
Regina Summers
Notary Public, State of Illinois
My Commission Exp. 07/21/2005
```

C000775



## Statement of Facts

A jury found defendant, Dedric Moore, guilty of the offenses of attempt (first degree murder), home invasion, aggravated arson, and residential burglary.  The court sentenced defendant to a total of 75 years imprisonment with the D.O.C. on May 21, 1999.

Defendant appealed

Points Relied Upon For Reversal

"Sixth Amendment Violation", a right to effective assistance of
counsel.

My appellate attorney, Judith Libby, was ineffective.  Ms. Libby
was my lawyer and the one who done my direct appeal.  Through her
negligence, she was the cause that the appellate court did not address
the DNA issue on the merits.  The Fourth (4th) District Appellate
Court stated that the DNA issue was forfeited on direct appeal.

Ms. Libby is the one responsible for forfeiting my one substantive
argument on appeal, thereby failing to provide the effective assistance
of counsel to which I am entitled to.

"Affidavit enclosed from Appellate Lawyer, Judith Libby."

" POINTS RELIED UPON FOR REVERSAL"

"SIXTH AMENDMENT VIOLATION" A RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

MY TRIAL LAWYER DIANA LENIK INFORMED ME OVER THE PHONE,AND IN PERSON THAT

I WAS UNDER THE TRUTH IN SENTENCING,MEANING ANY TIME I RECIEVE BE IT PLEA

BARGIN OR FROM A JURY VERDICT GUILTY WILL BE 85%.

NOW, THE STATE OFFERED ME A COP OUT ON THE ATTEMPT MURDER CHARGE. I WOULD

OF HAVE TO ACCEPT A BLIND PLEA ON THE CHARGE AND THE JUDGE COULD SENTENCE

ME ANYWHERE BETWEEN 6-30 YEARS IN THE D.O.C. AND THAT TIME WILL HAVE TO

BE SERVED 85%. GIVEN THE INFORMATION MY TRIAL LAWYER GAVE ME I DIDNT TAKE

THE PLEA BARGIN.

ON MAY 24,1999. I WAS INFORMED BY THE JUDGE AT MY SENTENCING HEARING

THAT I WASNT UNDE THE TRUTH IN SENTENCING, AND INFACT THE SENTENCE I

RECIEVE WII BE DAY FOR DAY. MY LAWYER THEN STOOD UP AND SAID SHE WAS

CONFUSED BY WHAT THE LAW WAS AT THE TIME AND SHE WASNT SURE.

FROM MY LAWYER FAILURE TO RESEARCH THE LAW AT THE TIME THESE

OFFENSE"S HAPPEN, SHE WAS INEFFECTIVE ASSISTANCE OF COUNSELOR. AND BY

BEING INEFFECTIVE SHE EXPOSE HER CLIENT "ME" TO A GREATER SENTENCE IN THE

D.O.C "75 YEARS"

AND IF I HAD OF KNOWN I WAS NOT UNDER THE TRUTH IN SENTENCING, I MOST

LIKELY WOULD OF TAKEN THE STATE PLEA BARGIN OFFER.

C000778

"POINTS RELIED UPON FOR REVERSAL"

MY FOURTEENTH AND SIXTH AMENDMENT WAS VIOLATED

ON MARCH NINTH 1998, TWO CHAMPAIGN POLICE DETECTIVES SHOWED UP AT MY
APARTMENT WITH A WARRANT ORDERING ME TO SHOW UP AT A LINE UP AT THE
CHAMPAIGN COUNTY JAIL, ON 3-10-98. AT 3:30 PM.

 I SHOWED UP AT THE LINE UP AT 3:00, ONLY TO E||ND OUT THAT THE LINE UP
WAS SUPPOSE TO BE AT 2:30 NOT 3:30. I WAS THEN PUT UNDER ARREST FOR
OBSTRUCTING JUSTICE.

 THE NEXT MORNIG AT 8:30.A.M, I WAS TRANSFERED BACK TO THE COUNTY JAIL
ON MAIN STREET TO CONDUCT A LINE UP. WHEN I ARRIVED I WAS MET BY
DETECTIVE DON SHEPARD. DET, SHEPARD GAVE ME A ORANGE UNIFORM TO PUT ON AND
A PIECE OF PAPER WITH A NUMBER ON IT.

 I HAD NO LAWYER PRESENT, I DIDNT TALK TO NO LAWYER, ABOUT THE LINE
UP. I WAS FORCE TO PARTICIPATE IN THE LINE UP WITHOUT A LAWYER PRESENT OR
WITHOUT CONSULTING WITH A LAWYER PR||OR TO THE LINE UP.

 AFTER THE LINE UP WAS FINISHED I WAS THEN TAKEN BACK TO THE COUNTY
JAIL ON LIERMAN FOR BOOKING ON THE OBSTRUCTING JUSTICE CHARGE. AT THAT
TIME I WAS ABLE TO TALK TO A LAWYER, BUT THAT WAS FOR TO BE ARRAIN ON THE
OBSTRUCTING JUSTICE CHARGE. I DID POST A $1000 BOND.

 A LINE UP CONFRONTATION FOR IDENTIFICATION PURPOSES, IS A CRITICAL
STAGE OF PROSECUTION AT WHICH AN ACCUSE NEEDS THE PRESENCE OF COUNSEL...
WHICH I WAS DENIED THAT RIGHT. DUE PROCESS OF THE LAW WAS VIOLATED.
I DIDNT HAVE A LAWYER PRESENT WITH ME I WAS THROWN INTO THAT LINE UP...

"POINTS RELIED UPON FOR REVERSAL"

MY SIXTH AND FOURTEENTH AMENDMENT WERE VIOLATED.THE RIGHT FOR EFFECTIVE COUNSELOR ,AND A TRIAL BY A FAIR AND IMPARTIAL JURY. DUE PROCESS

DURING VOIR DIRE JUROR NO.145 JEAN RENNELS WAS QUESTION BY THE COURT."HAVE YOU OR ANY MEMBERS OF YOUR IMMEDIATE FAMILY EVER BEEN A VICTIM,A WITNESS,OR A DEFENDANT IN A CRIMINAL CASE"? JUROR RENNELS ANSWERED NO! MS. RENNELS WAS THEN SELECTED TO SERVE ON MY JURY.ON HER WAY BACK TO THE JURY ROOM MS. RENNELS TOLD THE BAILIFF NOT THE JUDGE THAT SHE WAS ATTACKED AT A CONCERT YEARS AGO.

THE COURT BROUGHT MS.RENNELS BACK INTO COURT OUTSIDE OF THE JURY PRESENCE,FOR MORE QUESTIONING. MS RENNELS SAID THAT SHE WAS AT A CONCERTRIDING ON HER BIKE AND SHE WAS ATTACKED. SHE WAS BEATEN ON HER AND WAS KNOCKED UNCONSCIOUS. 13 HOURS AFTER SHE WAS ATTACKED SHE WOKE UP IN INTENSIVE CARE HARDLY REMEMBERING WHAT HAPPEN TO HER.

THE VOIR DIRE OATH ADMINISTERED TO JURORS PRIOR TO THEIR EXAMINATION ENJOINS THEM TO TELL THE COMPLETE AND ENTIRE TRUTH. AND MS. RENNELS LIED TO THE COURT,ALTHOUGH SHE DID HAVE A CHANGE OF HEART HOURS LATER. MS RENNELS SHOULD OF BEEN EXCUSED BY THE JUDGE FOR CAUSE. IF NOT BY THE COURT,MY LAWYER SHOULD OF EXCUSED HER. NOW,MS RENNELS DID FEEL AS THOUGH SHE COULD BE A FAIR AND IMPARTIAL JUROR, BUT SHE LIED.AND NOT ONLY THAT SHE WAS A VICTIM TO A VIOLENT CRIME,"I WAS CHARGE WITH A VIOLENT CRIME AGAINST A WOMAN". AND NO ONE HAS BEEN CHARGE OR CONVICTED IN MS. RENNELS CASE.

THEREFOR SHE COULD NOT OF BEEN A FAIR AND IMPARTIAL JUROR, SHE SHOULD OF NEVER OF BEEN LEFT TO SERVE ON MY JURY NOBODY FOR THAT MATTER. HENCE MY TRIAL LAWYER WAS INEFFECTIVE FOR NOT REMOVING MS RENNELS, THE TRIAL COURT ERRED, IN NOT EXCUSING THE JUROR.

## ARGUMENT

I, Dedric Moore, filed a timely post-conviction in the County which I was convicted in.

My Sixth (6th) Amendment and Fourtenth (14th) Amendment were violated numerous times. My trial lawyer, Diana Lenik, was incompeten at every turn, (e.g.) "misquoting me the time statue on the truth in sentencing".

The trial judge and trial lawyer erred at not removing a juror who lied.

I was denied a right to have a lawyer present at the line-up.

My appellate lawyer was ineffective. "affidavit enclosed"

At every turn my rights were violated starting at my trial lawyer - all the way to my appellate lawyer. "affidavits enclosed"

## CONCLUSION

Conclusion; the only conclusion that would deem appropriate is a post-conviction hearing.

The facts in this petition are true and can be proved.  The legal effect of these facts should result in a reversal on all charges and remanded for a new trial.




D428 MCC#1

12

1       THE COURT:  Ms. Lenik.

2       MS. LENIK:  Your Honor, before I begin argument, Ms. Ladd

3   did bring up the question which, I believe, her analysis is

4   correct on.  And, that is, that Mr. Moore will get day for day

5   on any sentence the Court fashions, and I think the record needs

6   to be clear on that, because we have all been somewhat confused.

7   I know, at least I have, about that window of time when a

8   defendant gets day for day and when he does not, and I want it

9   to be perfectly plain for his appeal which will follow and for

10  his family members who are in the courtroom and for anybody

11  else, that it is the contemplation of all of us, according to

12  the law, as we know it, that he will, in fact, receive day for

13  day good time credit for any sentence he receives.  I am correct

14  in that, am I not?

15      THE COURT:  Yes, when this offense was committed, the

16  Supreme Court determined that the truth in sentencing law that

17  was in effect was unconstitutional.  So, therefore, he will

18  receive day for day good time.

19      MS. LENIK:  Thank you.  Your Honor, it's always very

20  difficult when the State's Attorney stands up and gives an

21  impassioned argument like that, to follow her.  It's obvious

22  that the victim in this case is someone who is beloved of the

23  State's Attorney and, of course, is a person who deserves great

24  sympathy from the Court and society in general for having

State of Illinois            )
                            )
Sangamon County       )

## Affidavit of Counsel on Appeal

Judith L. Libby, Assistant Defender, Fourth Judicial District of the State of Illinois, being first duly sworn upon her oath, deposes and states:

1. She is the attorney assigned to represent Petitioner Dedric Moore in the direct appeal of his convictions and combined 75-year sentence in No. 4-99-0499 for attempt (first-degree murder), home invasion, aggravated arson and residential burglary.

2. Counsel on direct appeal raised as the sole substantive issue: *The "Revised" DNA Frequency Calculations Were Unsubstantiated Junk Science Which Improperly Compelled the Conclusion That Dedric Moore Was the Sole Possible Intruder at Lori Hansen's Duplex.*

3. On January 11, 2002, the Fourth District of the Appellate Court affirmed Mr. Moore's convictions and sentences in an unpublished Order entered in accordance with Supreme Court Rule 23. Slip op. at 2. In regard to the DNA issue above, the Fourth District opined:

> . . . The State argues that defendant forfeited this issue on appeal by failing to raise any objection either during trial or in a posttrial motion. We agree with the State.

> An issue is forfeited on appeal unless a timely objection is made at trial and is specifically raised in a written posttrial motion. [Citation omitted.] In the present case, defendant failed to make a timely objection or to raise the DNA issue in a written posttrial motion.

Therefore, defendant forfeited this issue on appeal. [Citations omitted.]

Slip op. at 7.

The Appellate Court, thus, did not address Mr. Moore's DNA issue on the merits.

4. Counsel on appeal petitioned the Fourth District for rehearing, asking the

Court to consider the issue as plain error:

### Reasons for Rehearing

8. The Court based its affirmance on the State's case having conclusively proved beyond a reasonable doubt that Dedric Moore was the assailant. This Court overlooked Mr. Moore's sole substantive argument on appeal attacking his conviction, namely, his identification as the assailant through faulty DNA methodology. Mr. Moore never argued at trial nor on appeal that the victim was not assailed; he argued on appeal solely that the <u>flawed DNA testing schema</u> failed to establish him as the assailant. This Court never addressed the DNA issue, finding it procedurally forfeited.

9. This Court has failed to appreciate the significance of the DNA evidence by not applying the doctrine of <u>plain error</u> in this case. While this Court has the power to discard Mr. Moore's DNA issue because it was not properly preserved in the lower court, this Court also has the equal power to consider the issue since a substantial right of the accused has been implicated. *People v. Rice,* 321 Ill.App.3d 475, 747 N.E.2d 1035 (1st Dist. 2001): "A reviewing court will examine an issue not properly preserved under the plain error doctrine where the evidence is closely balanced or the alleged error is so fundamental that it denies the defendant a fair trial," citing *People v. Thomas,* 178 Ill.2d 215, 235, 687 N.E.2d 892, 900-01 (1997).

10. See also *People v. Mendez,* 318 Ill.App.3d 1145, 745 N.E.2d 93 (3rd Dist. 2001):

A procedural defect is plain error if the evidence of guilt was closely balanced or if the defendant was deprived of a substantial right. *People v. Keene,* 169 Ill.2d 1, 660 N.E.2d 901 (1995). A substantial right has been denied if the error affected

-2-

C000785

the proceedings to such a degree that we cannot confidently state that the defendant's trial was fundamentally fair. [*Ibid.*] In other words, this court will act on error that is of such gravity that it threatens the very integrity of the judicial process. *People v. Blue*, 189 Ill.2d 99, 724 N.E.2d 920 (2000).

It is hard to imagine a right more substantial to a criminal defendant than whether he has accurately been identified as the culprit.

Petition for Rehearing, ¶¶8-10.

5. The Appellate Court denied rehearing on February 5, 2002.

6. On February 14, 2002, counsel on appeal petitioned the Illinois Supreme Court for leave to appeal. This matter has been docketed as No. 93281, and is currently pending before the Court. Counsel's first "Point Relied Upon for Reversal of the Judgment of the Appellate Court" was: *Due process "fundamental fairness" precepts require that Dedric Moore receive appellate consideration as plain error of the DNA evidence which identified him as the sole perpetrator "on the face of this planet" of these serious crimes.* Petition for Leave to Appeal, page 4, ¶III. A.

In argument on this issue, counsel on appeal noted that she had not requested the Appellate Court to consider the DNA issue as plain error. Counsel argued that the Supreme Court could also consider as ineffective assistance of appellate counsel her failure to present this "plain error" argument squarely to the Fourth District, and that Mr. Moore's sole substantive appellate issue should not remain unaddressed because of appellate counsel's negligence.

7. Counsel's not asking the Appellate Court to invoke the "plain error" doctrine was not a matter of appellate strategy. Counsel on appeal offers this Affidavit in

-3-

C000786

good faith because she fears she may be responsible for inadvertently forfeiting Mr. Moore's one substantive argument on appeal, thereby failing to provide the effective assistance of counsel on appeal to which Mr. Moore was and remains entitled.

FURTHER AFFIANT SAYETH NOT.

Judith L. Libby, Assistant Defender

Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P. O. Box 5750
Springfield, IL 62705-5705
(217) 782-3654

Subscribed and sworn to

before me this 2 9th day

of March, 2002.

Notary Public

> OFFICIAL SEAL
> NANCY S. CARDINALE
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES 11-8-2004

-4-

C000787

# J. G. TOWNSEND

### CIRCUIT JUDGE
### COURTHOUSE
#### 101 EAST MAIN STREET
#### URBANA, ILLINOIS 61801-2772

SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY

TELEPHONE 384-3707
AREA CODE 217

May 6, 2002

John Piland
State's Attorney
101 E. Main
Urbana, IL 61801

Dedric Moore
K53438
P.O. Box 711
Menard, IL 62259

RE: *People v. Dedric Moore*
Champaign County Cause No 98-CF-1558

Gentlemen:

I have today entered an oral order reflected in a minute entry upon the docket of the cause as follows:

> "The Court notes a filing for the Defendant entitled "Pro-se Post Conviction Relief and Application to Sue or Defend as A Poor Person", file-marked April 22, 2002. Matter assigned to the Honorable Jeffrey B. Ford for any proceedings required on the filing".

Very truly yours,

J.G. Townsend
Presiding Judge

JGT/nb

Cc:    The Honorable Jeffrey B. Ford

C000788

E-FILED
Friday, 04 May, 2007 04:59:06 PM
Clerk, U.S. District Court, ILCD

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

**FILED**
SIXTH JUDICIAL CIRCUIT

MAY 3 1 2002

| | |
|---|---|
| PEOPLE OF THE STATE<br>OF ILLINOIS,<br>    Plaintiff/Respondent | ) )<br>) )<br>) ) |
| v. | ) )<br>) ) |
| DEDRIC MOORE,<br>    Defendant/Petitioner | ) )<br>) )<br>) ) |

No. 98-CF
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

## ORDER ON PRO SE POST-CONVICTION PETITION

On April 22, 2002, the Defendant/Petitioner, Dedric Moore (hereinafter Petitioner) filed a pro se post-conviction petition. On May 6, 2002 the petition was assigned to this court. This Court has reviewed this petition and all of the attachments. Further, the Court has read the rule 23 Order filed January 11, 2002. The Court has also reviewed the docket sheets and part of the court file.

The petitioner raises four issues on his pro se post-conviction petition. The first issue is that his appellate attorney was ineffective and because of her negligence, the Appellate Court did not address a DNA issue on its merits. The second issue was that he would have accepted plea negotiations if his trial counsel was aware of the proper amount of good time that he would receive upon conviction. The third issue is that he was forced to appear in a line-up without assistance of counsel. And lastly, the petitioner alleges that one of the jurors lied during voir dire.

Attached to his petition for post-conviction relief, the petitioner has an affidavit of counsel on appeal. The affidavit of his appellate counsel quoted the Supreme Court Rule 23 Order stating that the DNA issue was forfeited



on appeal because an objection was not raised during trial or a post in trial motion. Appellate counsel's affidavit also states what she has tried to do to have the Appellate Court reconsider that issue and that she has appealed to the Illinois Supreme Court.

Regarding the first issue raised by the petitioner as to the ineffective assistance of his appellate counsel, the whole record shows that appellate counsel was effective. Appellate counsel raised an issue she believed was substantial in the Appellate Court. There is no showing that by any acts or omissions of the appellate counsel that the issue was forfeited. Further, the affidavit that the petitioner attaches from appellate counsel shows the other attempts that the appellate counsel has made to have this issue reviewed. It is clear from everything that the petitioner has provided that appellate counsel was not ineffective.

As to the second issue of ineffective assistance of trial counsel, because of the truth-in-sentencing law, the court would note that the charges here stem from an incident occurring February 28, 1998. The jury convicted the petitioner on March 18, 1999 and sentencing was held May 21, 1999. People v. Reedy 186 Ill. 2d 1 (1999) was filed January 22, 1999. That opinion was modified on rehearing March 29, 1999. Further, the court notes that the truth-in-sentencing legislation was reenacted by the legislature in the State of Illinois affective June 19, 1998. Thus, at the time of the trial for the petitioner, the Second District Appellate Court had found the legislation unconstitutional because it violated the single subject clause. The Illinois Supreme Court had apparently affirmed that decision, but counsel would have been aware that there was a rehearing pending. The opinion in Reedy was modified after the jury trial in this case had ended. Petitioner attaches a page of the transcript quoting his trial counsel which is apparently at a time

2

C000790



of the petitioner's sentencing. At that time, the law in the State of Illinois was clear because the <u>Reedy</u> decision had been modified and was available. Under the <u>Strickland v. Washington,</u> 466 U.S. 668, 80 L. Ed 2d 674 (1984) standard, one could not say that this individual counsel should not have been in doubt as to what the appropriate good time standard would be for her client. From January 1 through March 29 of that year, no one could be sure whether the Illinois Supreme Court would uphold the Second Districts opinion or reverse it. Thus, counsel has to be held to the same standard as every other attorney in the State of Illinois and none of them would have known any different information than petitioner's trial counsel.

Secondly the petitioner assumes that his offer would have been the same from the State's Attorney's Office, if the State's Attorney knew at the time that the offer was made that the good time credit would be 50% and not 85%.

Lastly, as to this issue, just because the state makes an offer and the petitioner now says that he would have accepted it, there is no showing under the real facts of this case that any negotiations would have been accepted by the trial court. Thus, the petitioner can not show any prejudice either.

The petitioner's third issue is a matter that occurred prior to trial and could have been raised on direct appeal. That issue is res judicata for purposes of the collateral attack of the post-conviction act.

Petitioner's last allegation is that juror number 145 during voir dire answered that neither she nor any member of her immediate family, was either a victim, a witness or a defendant in a criminal case. The petitioner alleges that this juror on her way back to the jury room, after being sworn in, advised the baliff that she recalled an attack at a concert years ago. In that

3

C000791



attack, the juror said she was beaten, knocked unconscious and woke up in the hospital hardly remembering what had happened to her. From this recitation, the petitioner alleges that the juror lied and should have been excused by the court for cause. Or, the petitioner's attorney should have excused the juror. All of these matters, could have been raised on appeal and are therefore, res judicata. Although, the petitioner alleges that the juror lied, there is no showing that she lied. In fact, by the petitioner's recitation, the juror brought it up on her own right after being selected. It is also clear that everyone was subsequently advised of this. From the petitioner's recitation, the jurors stated she hardly remembered what happened to her. The petitioner bald statement that this juror could not have been fair and impartial because she lied. There are no affidavits or documents attached by the petitioner as to this issue. There is no showing that the juror just did not subsequently, after thinking about it more, recall this incident that had happened a long time ago considering that Petitioner states that the juror didn't remember many things about the incident. Apparently, she was conscientious enough to bring it up immediately after she remembered it. All this goes to show that the juror was concerned to be as fair as possible and give everyone as much information as possible as opposed to show that she was trying to hide something. The petitioner also has not shown how he was prejudiced by this. He assumes he was prejudiced because the jury unanimously found him guilty. This however, was one juror who was apparently was trying to bend over backwards to be fair and advise everyone of everything she recalled. The petitioner has not showed a substantial denial of his constitutional rights.

From all of the above, the petitioner's claims are frivolous and patently without merit. The Pro Se Petition For Post-Conviction Relief is

4

C000792

denied and the Clerk of the Circuit Court of Champaign County is to serve a copy of this order upon the petitioner by certified mail within 10 days of its entry.  Further, the Clerk is to notify the petitioner of the disposition in this matter as provided for in Supreme Court Rule 651 (b).

DATE: _May 31, 2006_ ENTER: _____

C000793

**FILE COPY**

E-FILED
Friday, 04 May, 2007  04:59:27 PM
Clerk, U.S. District Court, ILCD

No. 4-02-0523

MAR 17 2003

SAAP FOURTH DISTRICT

# IN THE APPELLATE COURT OF ILLINOIS

## FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,**<br>  Plaintiff-Appellee,<br><br>-vs-<br><br>**DEDRIC T. MOORE,**<br>  Defendant-Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Appeal from the Circuit Court of the Sixth Judicial Circuit, Champaign County, Illinois.

No. 98-CF-1558

Honorable
Jeffrey B. Ford,
Judge Presiding.

## BRIEF AND ARGUMENT

## FOR

## DEFENDANT-APPELLANT

**DANIEL M. KIRWAN**
Deputy Defender

**LAWRENCE O'NEILL**
Assistant Defender

Office of the State Appellate Defender
Fifth Judicial District
730 E. Illinois Highway 15
P.O. Box 2430
Mt. Vernon, IL 62864-0047
(618) 244-3466

COUNSEL FOR DEFENDANT-APPELLANT

## ORAL ARGUMENT REQUESTED

EXHIBIT O

# POINT AND AUTHORITIES

*Page*

## I

THE TRIAL COURT ERRED IN SUMMARILY DISMISSING THE DEFEN-
DANT'S POST-CONVICTION PETITION, WHICH PRESENTED TWO ISSUES
THAT AMOUNTED TO THE GIST OF A CLAIM OF A VIOLATION OF
HIS CONSTITUTIONAL RIGHTS, I.E., THAT TRIAL COUNSEL'S ASSIS-
TANCE DURING THE PLEA NEGOTIATION PROCESS WAS CONSTITU-
TIONALLY INEFFECTIVE, AND APPELLATE COUNSEL PROVIDED
INEFFECTIVE REPRESENTATION BY FAILING TO ADVOCATE FOR
THE INVOCATION OF THE PLAIN ERROR DOCTRINE, THUS RESUL-
TING IN THE PROCEDURAL FORFEITURE OF DEFENDANT'S PRIMARY

SUBSTANTIVE ARGUMENT RAISED ON DIRECT APPEAL ..............................8

  Ill. Const., Art. 4, Sec. 8(d) ...........................................10

  720 ILCS 5/8-4(a) (West 1996)........................................9

  730 ILCS 5/3-6-3(a)(2)(ii) (West 1996).........................10

  730 ILCS 5/5-8-1(a)(3) (West 1996) ..............................9

  *Frye v. United States*, 293 F. 1013 (D.C. 1923) .........................18

  *People v. Edwards*, 197 Ill. 2d 239,
      757 N.E.2d 442, 258 Ill. Dec. 753 (2001) ........................9

  *People v. Blue*, 189 Ill. 2d 99,
      724 N.E.2d 920, 244 Ill. Dec. 32 (2000) .........................13

  *People v. Reedy*, 186 Ill. 2d 1,
      708 N.E.2d 1114, 237 Ill. Dec. 74 (1999) ......................10

  *People v. Coleman*, 183 Ill. 2d 366,
      701 N.E.2d 1063, 233 Ill. Dec. 789 (1998) ...................9

*People v. Curry*, 178 Ill. 2d 509,
    687 N.E.2d 877, 227 Ill. Dec. 395 (1997) .........................................9

*People v. Keene*, 169 Ill. 2d 1,
    660 N.E.2d 901, 214 Ill. Dec. 194 (1995).........................................12

*People v. Caballero*, 126 Ill. 2d 248,
    533 N.E.2d 1089, 128 Ill. Dec. 1 (1989) .........................................13

*People v. Enoch*, 122 Ill. 2d 176,
    522 N.E.2d 1124, 119 Ill. Dec. 265 (1988).........................................13

*People v. Porter*, 122 Ill. 2d 64,
    521 N.E.2d 1158, 118 Ill. Dec. 465 (1988) .....................................8

*People v. Mendez*, 318 Ill. App. 3d 1145,
    745 N.E.2d 93, 253 Ill. Dec. 319  (3d Dist. 2001) ......................................12,13

*People v. Reedy*, 295 Ill. App. 3d 34,
    692 N.E.2d 376, 229 Ill. Dec. 603 (2d Dist. 1998) .........................................10

*People v. Nix*, 150 Ill. App. 3d 48,
    501 N.E.2d 825, 103 Ill. Dec. 508 (3d Dist. 1986) .......................................9,11

*People v. Owsley*, 66 Ill. App. 3d 324,
    383 N.E.2d 271, 22 Ill. Dec. 795 (3d Dist. 1978)............................................11

# NATURE OF THE CASE

A jury found the defendant, Dedric Moore, guilty of attempt (first-degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse and residential burglary. This appeal is from the summary dismissal of his post-conviction petition. A question is presented on the pleadings, in that the defendant claims that his petition was sufficient to withstand summary dismissal.

# ISSUE PRESENTED FOR REVIEW

Whether the court erred in summarily dismissing the defendant's post-conviction petition, which presented the gist of a claim of a violation of his constitutional rights, namely, that trial counsel's assistance during the plea negotiation process was constitutionally defective, and appellate counsel provided ineffective representation?

# JURISDICTION

The defendant's appeal, from a final judgment dismissing his post-conviction petition, is brought pursuant to Article VI, Section 6, of the Constitution of the State of Illinois, and Supreme Court Rules 602, 603, 606(a) and (b), and 651(a). The defendant filed his petition on April 4, 2002 (R.C773), and the court dismissed it on May 31, 2002. (R.C789) The defendant filed his notice of appeal on June 19, 2002. (R.C795)

# STATEMENT OF FACTS

Dedric Moore was charged with the offenses of attempt (first-degree murder), home invasion, aggravated arson, aggravated criminal sexual abuse, and residential burglary. (R.C1-6) The matter proceeded to a jury trial, where the following evidence, in relevant part, was presented:

On February 25, 1998, University of Illinois law student Lori Hansen, who had been at a bar with friends, returned to her apartment at about 1:30 A.M. She opened the door, turned on the light, and a man, who was hooded, forced his way into the apartment behind her. (Vol.VII, R.49) The man pushed her down on her stomach, bound her hands and feet, and placed a pair of her shorts over her face, as a blindfold. (Vol.VII, R. 51-53) The man took her automatic teller machine (ATM) card, and forced Hansen to reveal her personal information number (PIN). (Vol.VII, R.53-57) Hansen was then secured in the bathroom, and tied to the bar over the soap dish in the tub; the man left the bathroom. (Vol.VII, R.58-59)

When the man later returned to the bathroom, he smelled like nail or shoe polish. He touched her breasts and put his mouth to her breasts. (Vol.VII, R.65-66) The man left, allowing Hansen to see a fire in the living room. Hansen managed to get into the bedroom; minutes later, the man confronted her, and beat her. She had seen flames and smoke coming from the living room. (Vol.VII, R.67-68) Hansen freed herself and ran to a neighbor's apartment. (Vol.VII, R.73-75) She was treated at the hospital for burns to her fingers and her knee and smoke inhalation. (Vol.VII, R.75-77)

-4-

An arson investigator concluded that the fire had been intentionally set. (Vol.VIII, R.168,193) A petroleum product from an ignitable liquid was present on some of the carpet tested from Hansen's apartment. (Vol.X, R.484,488-90)

On March 4, 1998, Detective Don Shepard questioned defendant about his whereabouts at the time of these events. Defendant claimed that he had been out of town. (Vol.IX, R.334,359-62) Defendant also stated that he lived with his brother, but on February 25, 1998, had stayed at his grandmother's house, who lived in Mississippi. (Vol.IX, R.364)

When Shepard questioned defendant again on March 5th, he stated that he had been in Urbana at the time of the crime. He also explained that he had paged a "Jennifer" that night, a claim that Shepard determined was untrue, after he found that defendant's alleged pager number had been "out of service". (Vol. IX, R.372-73)

A forensic scientist matched Hansen and defendant's DNA profiles recovered from Hansens's stockings which had been used as a ligature during the assault. (Vol.XI, R.592,616,620,629) The scientist opined that defendant's DNA profile "could be the major contributor...at the majority of the locations on the DNA" (Vol.XI, R.633) Body hair fragments recovered from Hansen's jacket, driver's seat of her truck and stocking were identified as "Negroid". (Vol.X, R.555,566-67)

A videotape taken from Hansen's bank showed her truck at the drive-through ATM lane around 2:20 A.M. on February 25th. No positive identification of the defendant was made from these photographs. Bank records indicated that three attempts were made to remove cash from Hansen's account. (Vol.VIII, R.283-86, Vol.IX, R.318-19)

-5-

Ivory Burrage, defendant's friend, provided an alibi for defendant. (Vol.XI, R.665-69)

The jury returned guilty verdicts on all charges. (Vol.III, R.C728-34) The court sentenced defendant to total of seventy-five years' imprisonment: three concurrent terms of sixty years, sixty years and thirty years for attempt (first-degree murder), home invasion, and aggravated arson, respectively, and a fifteen-year sentence for residential burglary; the sentences for attempt and home invasion were extended terms. (Vol.IV, R.C760)

Defendant appealed, and raised three issues, (1) the "revised" DNA frequency calculations were unsubstantiated and improperly compelled the conclusion that defendant was the sole possible intruder at Lori Hansen's apartment, (2) use of "mere fact" impeachment created reversible error, and (3) the consecutive and extended-term sentencing provisions of 730 ILCS 5/5-8-4 and 5/5-3.2(b)(2) violated due process under *Apprendi v. New Jersey*. This Court affirmed defendant's convictions and sentences, finding the DNA issue procedurally forfeited for want of any trial objection or being raised in the post-trial motion. Appellate counsel had not urged the Court to review the issue under the plain error doctrine, or as a matter of ineffective assistance of counsel. *People v. Moore*, 4-99-0499, January 11, 2002.

On April 22, 2002, defendant filed a petition for post-conviction relief, alleging, inter alia, (1) trial counsel had incorrectly advised defendant during the plea negotiation process that under the truth-in-sentencing statute, defendant would not have been eligible for day-for-day good time credit, had he pled guilty to attempt (first-degree murder), and (2) appellate counsel was ineffective for not urging the

-6-

application of the plain error doctrine to overcome waiver on the only substantive legal issue presented on direct appeal: the "revised" DNA frequency calculations were unsubstantiated and improperly compelled the conclusion that defendant was the sole possible intruder. (Vol.IV, R.C773-783) The petition included an affidavit from appellate counsel, in which she acknowledged being "responsible for inadvertently forfeiting Mr. Moore's one substantive argument on appeal". (Vol.IV, R.C787)

The trial court issued an order summarily dismissing the petition, finding it frivolous and patently without merit. (Vol.IV, R.C789-93)

# ARGUMENT

THE TRIAL COURT ERRED IN SUMMARILY DISMISSING DEFENDANT'S POST-CONVICTION PETITION, WHICH PRESENTED THE GIST OF A CONSTITUTIONAL CLAIM, I.E., TRIAL COUNSEL'S ASSISTANCE DURING THE PLEA NEGOTIATION PROCESS WAS CONSTITUTIONALLY INEFFECTIVE, AND APPELLATE COUNSEL PROVIDED INEFFECTIVE REPRESENTATION BY FAILING TO ADVOCATE FOR THE INVOCATION OF THE PLAIN ERROR DOCTRINE, THUS RESULTING IN THE PROCEDURAL FORFEITURE OF DEFENDANT'S PRIMARY SUBSTANTIVE ISSUE RAISED ON DIRECT APPEAL.

The defendant alleged in his pro se post-conviction petition that trial counsel had misinformed him during the plea negotiation process that if he pled guilty to the offense of attempt (first-degree murder) he would not, under the truth-in-sentencing statute, receive day-for-day good time sentence credit. Defendant also alleged that appellate counsel's failure to advocate for the application of the plain error doctrine caused the procedural forfeiture of the primary substantive issue raised on direct appeal. These statements presented the gist of a claim of a violation of defendant's constitutional rights. The court therefore should not have summarily dismissed the post-conviction petition, but instead should have allowed defendant to proceed with the petition, and appointed him an attorney. Since the court did not do so, its dismissal order should be reversed, and the cause remanded for further proceedings.

For a defendant to withstand summary dismissal of his post-conviction petition, he needs to present but the mere gist of a claim of a violation of his constitutional

-8-

rights. *People v. Porter*, 122 Ill. 2d 64, 521 N.E.2d 1158, 1161, 118 Ill. Dec. 465, *cert. denied*, 488 U.S. 837 (1988). In determining whether he has met this low threshold, his allegations are to be liberally construed and taken as true. *People v. Edwards*, 197 Ill. 2d 239, 757 N.E.2d 442, 258 Ill. Dec. 753, 756 (2001). This Court must provide plenary review of the circuit court's dismissal order. *People v. Coleman*, 183 Ill. 2d 366, 701 N.E.2d 1063, 233 Ill. Dec. 789, 801 (1998).

Liberally construed, the essence of defendant's first claim (Vol.IV, R.C778-80) is that he had wanted to plead guilty to the offense of attempt (first-degree murder) (720 ILCS 5/8-4(a) (West 1996))—a Class X offense, with a sentencing range of six to thirty years' imprisonment (730 ILCS 5/5-8-1(a)(3) (West 1996))—but had been dissuaded by trial counsel, who had told him, incorrectly, that he would have to serve 85% of a prison sentence, rather than receive day-for-day good time credit. Such a claim is cognizable in a post-conviction petition. *See People v. Nix*, 150 Ill. App. 3d 48, 501 N.E.2d 825, 827, 103 Ill. Dec. 508 (3d Dist. 1986) (petition was improperly dismissed without full evidentiary hearing of defendant's allegation of ineffective assistance of counsel's alleged failure to provide correct advise during the plea negotiation process). In *People v. Curry*, 178 Ill. 2d 509, 687 N.E.2d 877, 227 Ill. Dec. 395, 404-05 (1997), our Supreme Court reversed defendant's convictions where trial counsel had failed to accurately inform defendant about the consequences of accepting or rejecting a guilty plea offer.

The court in the present case, however, declined to address the merits of defendant's claim, finding that at the time of defendant's trial on March 18, 1999, because of the fluid, unsettled status of the law regarding the truth-in-sentencing

-9-

statute, counsel cannot be faulted for the inaccurate advice he had given defendant. (Vol.IV, R.C789-93) The court was wrong in this regard, however, as the law was not ambiguous during the months preceding defendant's trial.

A look at the relevant dates when the Appellate and Supreme Courts rendered their decisions in the seminal case on the constitutionality of the truth-in-sentencing statute reveals that defendant could have entered a guilty plea agreement to the offense of attempt (first-degree murder) without having been required to serve 85% of his sentence. On March 11, 1998, in *People v. Reedy,* 295 Ill. App. 3d 34, 692 N.E.2d 376, 229 Ill. Dec. 603 (2d Dist. 1998), the Second District Appellate Court found section 6-3(a)(2)(ii) of the Code of Corrections unconstitutional (730 ILCS 5/3-6-3(a)(2)(ii) (West 1996))—the truth-in-sentencing statute—as a violation of the state constitution's single subject clause. (Ill. Const. Art. 4, Sec. 8(d)). The State appealed, and the Illinois Supreme Court affirmed the ruling on January 22, 1999, which was modified on denial of petition for rehearing on March 29, 1999. *People v. Reedy*, 186 Ill. 2d 1, 708 N.E.2d 1114, 237 Ill. Dec. 74 (1999), *modified on denial or rehearing.* It is reasonable to presume that the most active and serious guilty plea negotiations would have occurred in the months immediately preceding trial. Hence, because the Supreme Court in *Reedy* had declared section 6-3(a)(2)(ii) unconstitutional in January, 1999, and trial in defendant's case was scheduled—and then took place—on March 18, 1999, trial counsel incorrectly advised defendant during this same time period that he would not receive day-for-day good time credit if he pled guilty to the offense of attempt (first-degree murder). Additionally, defendant's claim that counsel was mistaken about the law is supported by the record, where the prosecutor

-10-

explained at sentencing that the parties had previously, incorrectly, believed that defendant would be ineligible for day-for-day good time credit, but, by the date of the sentencing hearing, determined that he would, in fact, receive such credit because of the Supreme Court's ruling in *Reedy*. (Vol.IV, R.C783) Clearly, then, as defendant's claim at this stage of the postconviction proceedings must be considered to be true (i.e., trial counsel had misinformed defendant during the plea negotiation process about the amount of prison time he would have been required to serve if he pled to the offense of attempt (first-degree murder), causing him to pass on a favorable negotiated plea)), defendant did not receive constitutionally effective representation. Hence, defendant was entitled to advance beyond the first stage of the post-conviction proceedings. *Nix*, 501 N.E.2d 825, 826-27. *See People v. Owsley*, 66 Ill. App. 3d 324, 383 N.E.2d 271, 273, 22 Ill. Dec. 795 (3d Dist. 1978) (a defendant who has been misled by defense counsel has received ineffective assistance of counsel).

Defendant's other postconviction allegation also presented the gist of a claim: appellate counsel's ineffective representation resulted in the procedural forfeiture of the primary substantive issue raised on direct appeal. Specifically, counsel on appeal raised the following issue: The "Revised" DNA Frequency Calculations Were Unsubstantiated Junk Science Which Improperly Compelled the Conclusion That Dedric Moore Was the Sole Possible Intruder at Lori Hansen's Duplex.

On January 11, 2002, the Fourth District of the Appellate Court affirmed defendant's convictions and sentences in accordance with Supreme Court Rule 23. Regarding the DNA issue, the Court noted the following:

-11-

> The State argues that defendant forfeited this issue on appeal by failing to raise any objection either during trial or in a posttrial motion. We agree with the State.
>
> An issue is forfeited on appeal unless a timely objection is made at trial and is specifically raised in a written posttrial motion. [Citations omitted.] In the present case, defendant failed to make a timely objection or to raise the DNA issue in a written posttrial motion. Therefore, defendant forfeited this issue on appeal. [Citations omitted.]

*People v. Moore*, 4-99-0499, January 11, 2002, Slip op. at 7.

Hence, the Appellate Court did not address defendant's DNA issue on the merits.

Appellate counsel let defendant down by failing to urge the Court to consider the issue as plain error. Indeed, due to counsel's failure, the Court did not address defendant's primary claim that he was identified as the assailant through faulty DNA methodology. Defendant did not argue at trial or on appeal that the complainant was not assailed, rather, he urged that the flawed DNA testing schema failed to establish him as the perpetrator. However, as noted, the Court did not consider this issue, finding it procedurally defaulted.

Because of the substantial right to a fair trial implicated by this issue, it is likely that the Court would have considered the issue as plain error, had counsel so urged. A procedural defect is plain error if the evidence of guilt was closely balanced or if defendant was deprived of a substantial right. *People v. Keene*, 169 Ill. 2d 1, 660 N.E.2d 901, 214 Ill. Dec. 194, 199-200 (1995). A substantial right has been denied if the error affected the proceedings in such a degree that the reviewing court cannot confidently state that the defendant's trial was fundamentally fair. *People v. Mendez,*

-12-

318 Ill. App. 3d 1145, 745 N.E.2d 93, 253 Ill. Dec. 319, 325 (3d Dist. 2001). In other words, the Court will act on error that is of such gravity that it threatens the very integrity of the judicial process. *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920, 244 Ill. Dec. 32, 53-54 (2000). Such a substantial right was at issue in the present case, as it is difficult to imagine a right more fundamental and significant to a criminal defendant than whether he has been accurately identified as the culprit.

The standard of review for the claim that appellate counsel was ineffective for failing to raise an issue is stated in the case of *People v. Caballero*, 126 Ill. 2d 248, 533 N.E.2d 1089, 1096, 128 Ill. Dec. 1 (1989): "Where the defendant maintains, for example, that his attorney failed to argue a particular issue, he must show the failure to raise that issue was objectively unreasonable, as well as a reasonable probability that, but for this failure, his sentence or conviction would have been reversed." *Caballero*, 533 N.E.2d 1089, 1096.

The *Caballero* standard has been met. First, appellate counsel's failure to urge plain error was objectively unreasonable. Indeed, to preserve an issue for appeal, the issue must be both raised by an objection during the trial and placed in the post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124, 1129-30, 119 Ill. Dec. 265 (1988). Because the revised DNA frequency calculation was not objected to at trial, or included in the post-trial motion, in order to avoid waiver, appellate counsel was obliged to urge plain error. Appellate counsel's failure to do so forced the Appellate Court to find the issue procedurally forfeited. Additionally, the failure to argue plain error cannot be excused as sound strategy, as defendant had only to gain from such a claim. Moreover, counsel admitted in her affidavit, which is attached to defendant's

-13-

postconviction petition, that her "failure to invoke the plain error doctrine was not a matter of appellate strategy." (Vol.IV, R.C786)

Second, had the issue been properly presented, there is a reasonable probability that defendant's convictions would have been reversed. Identification of Lori Hansen's assailant was the primary trial issue in the case. Visual, aural, fingerprint, hair and fiber evidence was inconclusive, save for the DNA testing from one clothing item, a piece of the complainant's stocking which had allegedly been used as the assailant's face mask. The initial frequency calculation for this sample indicated that approximately thirty other African-American persons in the Champaign-Urbana area could possess a matching DNA profile, while a "revised" test made such a match impossible with virtually anyone else on the planet. Obviously, the presentation of the revised frequency calculation methodology was instrumental in the jury verdict.

The revised test results, however, should not have been considered. Forensic scientist Kevin Zeeb testified that in evaluating DNA evidence, scientists had historically examined nine different chromosomes, explaining, "The more different genetic marker systems that I look at, the more differentiating I can be to where I can add more and more weight to who the possible contributor of that stain is." (Vol.XI, R.C627) The following colloquy ensued concerning the timing and changing of the procedures to reduce that number to "five or more" loci:

> Q. [DEFENSE COUNSEL]: Let me ask you this, in between September 10, 1998 and February 25, 1999, when you recalculated and got those completely different percentages, did you receive any phone calls from any law enforcement agencies or the Champaign County State's Attorney's Office?

-14-

A. [ZEEB]: Yes, I did.

Q. Who did you receive phone calls from?

A. I talked to Assistant State's Attorney Heidi Ladd.

Q. And do you recall when you talked to her?

A. What time frame are we talking about?

Q. In between September 10, 1998 and February 25, 1999?

\* \* \*

A. I talked to Mrs. Ladd on October, 1998, to inform her of the status of analyzing Donrico Holtzclaw's blood standard.

I called—I talked to Mrs. Ladd on March 4th during a pretrial conference that was held at the Morton lab, where I explained my findings.

And I've been calling the State's Attorney Office the last couple of days to find out the court status, court times and dates.

Q. And in either of those, in any of those conversations, did you explain their percentages that you got in your first calculation before those second calculations were made?

A. Yes.

Q. Whose decision was it to create second calculations with those numbers?

A. It was my decision to call my superiors and inform them that a case that was worked with conservative statistics originally was going to court, and that since that time we gave more weight to the statistics or interpretations, and I inquired as to whether or not I should go ahead and submit a report stating those facts, and it was advised that I should.

-15-

(Vol. XI, R.C643-45)

Zeeb performed no new evaluations or interpretations, explaining "the only thing different are the statistical calculations." (Vol. XI, R.C645) He went on:

> A. Well, like I said before, before I added all possible types, combined profiles. And the second go-around, I–I determined that I can identify who was the major contributor, and who was the minor contributor.
>
> Q. And you couldn't do that the first go-around?
>
> A. I could do it the first go-around, but our policy was if I cannot differentiate between the contributors at all nine loci, then I had to give a combined statistics [sic].
>
> And in this particular case, I could differentiate between the major and the medium contributors in seven of the nine loci and not all nine.
>
> Q. And so then you recalculated it because your office policy changed regarding major, minor and medium contributors, is that correct?
>
> A. Our office policy changed regarding when I can differentiate between contributors looking at five or more loci versus looking at all nine loci.
>
> Q. And so on March 5, 1999, you submitted what you called an amended report looking at that same material, correct?
>
> A. That's correct.
>
> Q. And you–And at that time, then, is it fair to say in these percentages or these numbers you gave greater weight to the fact that somebody was a major versus a moderate or minor contributor?
>
> A. These interpretations were done originally, but, yes, *we did give more weight to this in the second report,* and that's one of the things that our group decided was with all this new technology, we can give more weight to our

-16-

> findings, and we don't have to be as conservative as we
> were when we started out.
>
> Q. What do you mean by not having to be as conservative?
>
> A. In other words, we're seeing that we've got a lot of
> generic information here that we could separate out of
> contributors and add more weight to the statistics. Where,
> if you combine all the possible statistics or frequencies,
> then that would kind of dilute down the stats.

(Vol.XI, R.C645-47) (Emphasis added.) Finally, Zeeb summed up as follows:

> Our policy was to be very conservative in the beginning.
> And through the evolution of seeing how–how informative
> this technique is and the instruments we have, we later on
> agreed to add more weight to profiles like this if we can
> differentiate at five or more loci instead of all nine loci.

(Vol.XI, R.C651)

This "agreement" was reached "[b]ased on validation studies and peer review,

discussion among ten analysts", one of whom was Zeeb. However, "[s]ome analysts

said we couldn't go any more, you know, if you cannot differentiate between three or

more loci. Another one said, no, all nine. And then checking through the forensic

community, it was established that, yes, at five or more loci we can differentiate

between the different contributors." (Vol.XI, R.C652) The prosecutor rephrased the

testimony as "this wasn't just people sitting in a room deciding that they wanted to

calculate statistics differently...this was based on validation studies and meetings

in the forensic community." (Vol.XI, R.C653)

Although Zeeb suggested that the decision to reduce the number of matched loci

from nine to five was made in an objective, scientific, verifiable setting, his conclusion

was only his opinion. Zeeb had a vested interest in offering that conclusion since he

-17-

apparently was one of the scientists who had argued that the number of relevant loci matches be reduced. There was no independent evidence that anything resembling a *Frye* (*Frye v. United States*, 293 F. 1013 (D.C. 1923)) test was applied when the trial court admitted this self-serving testimony from Zeeb.

The prejudice to defendant from the admission of this testimony was substantial. Before the change in procedure, thirty other African-Americans from the immediate area could statistically have had DNA profiles that matched the intruder's; after the new procedure, no other African-American on Earth could statistically have had a matching profile. From the reasonable doubt inherent in the first calculation, "scientific certainty" was conveniently constructed from the second.

Identification was a problem in the State's case. Lori Hansen could not identify the intruder-assailant in a line-up, after viewing and listening to the line-up participants. Photographs from the ATM videotape were inclusive. Fingerprints were not helpful, and hair fragments were not determinative. The only evidence that directly linked defendant to the crime scene was the DNA profile on the complaining witness' stocking that, according to the revised frequency calculation, no other African-American on Earth except defendant could have contributed. The State should not have been allowed to offer this revised methodology unless and until its reliability and general acceptance in the scientific community had been established other than by the testimony of its sole DNA witness.

Since defendant presented the gist of a claim of violations of his constitutional rights, i.e., trial counsel's representation during the plea negotiation process was ineffective, and appellate counsel's failure to advocate for the invocation of the plain

-18-

error doctrine, the court erred in summarily dismissing his post-conviction petition. He asks that This Court reverse the dismissal of the petition, and remand the cause for further proceedings, including the appointment of counsel.

# CONCLUSION

Mr. Moore presented in his pro se post-conviction petition the gist of the claim that he received ineffective representation at both the trial and appellate court levels. The circuit court nonetheless summarily dismissed the petition. He asks This Court to reverse that dismissal order, and remand the cause for further proceedings.

Respectfully submitted,

**DANIEL M. KIRWAN**
Deputy Defender


*Lawrence J. O'Neill*

**LAWRENCE O'NEILL**
Assistant Defender

Office of the State Appellate Defender
Fifth Judicial District
730 E. Illinois Highway 15
P.O. Box 2430
Mt. Vernon, IL 62864-0047
(618) 244-3466

COUNSEL FOR DEFENDANT-APPELLANT

-20-

NO.  4-02-0523

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | the Sixth Judicial Circuit |
| Plaintiff-Appellee, | ) | Champaign County, Illinois |
| | ) | |
| vs. | ) | No.  98-CF-1558 |
| | ) | |
| DEDRIC T. MOORE, | ) | Honorable |
| | ) | Jeffrey B. Ford |
| Defendant-Appellant. | ) | Judge Presiding. |

BRIEF AND ARGUMENT FOR PLAINTIFF-APPELLEE

John C. Piland
State's Attorney
Champaign County Courthouse
101 East Main
Urbana, Illinois  61801

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
Thomas R. Dodegge
Of Counsel
State's Attorneys Appellate
       Prosecutor
725 South Second Street
Springfield, Illinois  62704
(217) 782 - 8076

COUNSEL FOR PLAINTIFF-APPELLEE

ORAL ARGUMENT REQUESTED

EXHIBIT P

<u>POINT AND AUTHORITIES</u>                    <u>PAGE</u>

THE TRIAL COURT PROPERLY DISMISSED DEFENDANT'S

POST-CONVICTION PETITION . . . . . . . . . . . . . . . 2


<u>People</u> v. <u>Moore</u>, (No. 4-99-0499, April 14,

    2002)  . . . . . . . . . . . . . . . . 2, 3, 9, 10

<u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466, 120 S.Ct.

    2348, 147 L.Ed.2d 435 (2000) . . . . . . . . . . . 3

<u>People</u> v. <u>Morgan</u>, 187 Ill.2d 500, 241 Ill.Dec. 552,

    719 N.E.2d 681 (1999) . . . . . . . . . . . . . . 4

<u>People</u> v. <u>Collins</u>, 202 Ill.2d 59, 270 Ill.Dec. 1,

    782 N.E.2d 195 (2002) . . . . . . . . . . . . . 4, 5

<u>People</u> v. <u>Curry</u>, 178 Ill.2d 509, 227 Ill.Dec. 395,

    687 N.E.2d 877 (1997) . . . . . . . . . . 5, 6, 8, 9

<u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 104 S.Ct.

    2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . 5, 6

<u>People</u> v. <u>Maury</u>, 287 Ill.App.3d 77, 222 Ill.Dec.

    623, 678 N.E.2d 30 (1st Dist. 1997) . . . . . . 6, 7

<u>People</u> v. <u>Hobley</u>, 159 Ill.2d 272, 202 Ill.Dec. 256,

    637 N.E.2d 992 (1994) . . . . . . . . . . . . . . 7

People v. <u>Nicholson</u>, 299 Ill.App.3d 256, 233
    Ill.Dec. 667, 701 N.E.2d 517 (4th Dist.
    1998), <u>judgment vacated</u> in <u>People</u> v.
    <u>Nicholson</u>, 183 Ill.2d 587, 236 Ill.Dec.
    659, 707 N.E.2d 1229 (1999) . . . . . . . . . . . 7, 8

People v. <u>Pitts</u>, 295 Ill.App.3d 182, 229 Ill.Dec.
    451, 691 N.E.2d 1174 (4th Dist. 1998) . . . . . . . 7

People v. <u>Reedy</u>, 186 Ill.2d 1, 237 Ill.Dec. 74,
    708 N.E.2d 1114 (1999) . . . . . . . . . . . . . . 8

People v. <u>West</u>, 187 Ill.2d 418, 241 Ill.Dec. 535,
    719 N.E.2d 664 (1999) . . . . . . . . . . . . . . 11

People v. <u>Pope</u>, 284 Ill.App.3d 695, 220 Ill.Dec.
    309, 672 N.E.2d 1321 (4th Dist. 1996) . . . . . . . 12

People v. <u>Almighty Four Hundred</u>, 287 Ill.App.3d 123,
    222 Ill.Dec. 533, 677 N.E.2d 1332 (1st Dist.
    1997) . . . . . . . . . . . . . . . . . . . . . 12

People v. <u>Dalcollo</u>, 282 Ill.App.3d 944, 218 Ill.Dec.
    435, 669 N.E.2d 378 (2nd Dist. 1996) . . . . . . 12, 13

People v. <u>Hickey</u>, 178 Ill.2d 256, 227 Ill.Dec. 428,
    687 N.E.2d 910 (1997) . . . . . . . . . . . . . . 13

People v. <u>Rozo</u>, 303 Ill.App.3d 787, 237 Ill.Dec.
    189, 708 N.E.2d 1229 (2nd Dist. 1999) . . . . . . . 13

ii

<u>People</u> v. <u>Stremmel, II</u>, 258 Ill.App.3d 93, 197

    Ill.Dec. 177, 630 N.E.2d 1301 (2nd Dist.

    1994) . . . . . . . . . . . . . . . . . . 13, 14

<u>People</u> v. <u>Herrett</u>, 137 Ill.2d 195, 148 Ill.Dec. 695,

    561 N.E.2d 1 . . . . . . . . . . . . . . . . . . 14

P.A. 89-404 . . . . . . . . . . . . . . . . . . . . 7

P.A. 89-462, effective May 29, 1996 . . . . . . . . . . 8

Ill.S.Ct. Rule 367 . . . . . . . . . . . . . . . . . 8

## NATURE OF THE CASE

Defendant, Dedric Moore, was found guilty of attempt (first degree murder), home invasion, residential burglary, aggravated criminal sexual abuse, and aggravated arson. He was sentenced to a total of 75 years' imprisonment. Defendant's convictions and sentences were affirmed on direct appeal.

Defendant filed a pro se post-conviction petition, which was denied by the trial court. Defendant has appealed from this denial.

ARGUMENT

THE TRIAL COURT PROPERLY DISMISSED DEFENDANT'S POST-CONVICTION
PETITION.

In People v. Moore, unpublished order under Rule 23 (No.
4-99-0499, April 4, 2003), this court vacated defendant's
extended-term sentences and remanded for retrial or
resentencing under section 5-5-3(d) of the Unified Code. For
the purposes of this brief, counsel is proceeding on the basis
that the State will not seek a retrial.

By way of background, defendant was charged with attempt
(first degree murder), home invasion, aggravated arson,
aggravated criminal sexual abuse, and residential burglary.
(R. Vol I, C1-C6) The trial evidence is summarized in Moore.
A jury found defendant guilty on all counts. (R. Vol. III,
C728-C732) The trial court sentenced defendant to a total of
75 years' imprisonment. (Supp.R. Vol. XIV, 62-63)

Defendant appealed his convictions and sentences. He
argued that the trial court erred in (1) permitting the State
to introduce revised DNA frequency calculations, (2) allowing

2

the State to impeach him using the mere-fact method of impeachment, and (3) imposing consecutive and extended-term sentences in violation of <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). <u>Moore</u> at 1-2. This court rejected these contentions. <u>Moore</u> at 2.

Defendant filed a pro se post-conviction petition. (R. Vol. IV, C773) He claimed, inter alia, that appellate counsel was ineffective on direct appeal for failing to argue that the admission of the revised DNA calculations was plain error (R. Vol. IV, C777) and that trial counsel was ineffective, when she advised him that he would have to serve 85% of his sentence, if he pleaded guilty to attempt (first degree murder), thereby causing him to reject a plea agreement offered by the State. (R. Vol. IV, C778) Attached to defendant's petition was an affidavit from appellate counsel on direct appeal (R. Vol. IV, C784), and a page from the transcript of the sentencing hearing, where defense counsel said that everyone had been somewhat confused as to whether defendant would receive day-for-day good-time credit. (R. Vol. IV, C783) The trial court concluded that defendant's petition was frivolous and patently without merit in a written order. (R. Vol. IV, C789-C793)

On appeal, defendant contends that the trial court improperly dismissed the petition in that: (1) trial counsel's

3

assistance during the plea negotiation process was ineffective because she gave him incorrect advice concerning good-time credit; and (2) appellate counsel was ineffective for failing to argue plain error in regards to the admission of the revised DNA frequency calculations.  The State will address those contentions in the order listed.

An evidentiary hearing is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated.  People v. Morgan, 187 Ill.2d 500, 241 Ill.Dec. 552, 719 N.E.2d 681, 697 (1999).  A trial court's determination regarding the sufficiency of the allegations contained in a post-conviction petition are reviewed de novo. Morgan, 719 N.E.2d at 597.

In regards to the contention that trial counsel was ineffective in advising defendant concerning the amount of good-time credit he would receive if he pleaded guilty to attempt (first degree murder), the State observes that the only attachment concerning this issue was a page from the transcript of the sentencing hearing.  (R. Vol. IV, C783) This attachment does not discuss whether there was a plea agreement offered by the State.

In People v. Collins, 202 Ill.2d 59, 270 Ill.Dec. 1, 782

4

N.E.2d 195 (2002), the court stated:

> In this case, the circuit court properly dismissed defendant's *pro se* post-conviction petition. Contrary to the clear mandate of section 122-2 of the Act, defendant's petition was unsupported by "affidavits, records, or other evidence" and offered no explanation for the absence of such documentation. This fact alone justifies the summary dismissal of defendant's petition.

Collins, 782 N.E.2d at 198.

Here, as in Collins, defendant's petition was unsupported by an affidavit or other evidence establishing that he had been offered a plea agreement by the State. Given this omission, the trial court properly concluded that this contention was meritless.

On the merits, a criminal defendant has the right to be reasonably informed about the direct consequences of accepting or rejecting a plea offer. People v. Curry, 178 Ill.2d 509, 227 Ill.Dec. 395, 687 N.E.2d 877, 887 (1997). Defendant's right to the effective assistance of counsel extends to the decision to reject a plea offer, even if defendant subsequently receives a fair trial. Curry, 687 N.E.2d at 882. To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness, and (2) the deficient performance prejudiced defendant. Strickland v. Washington, 466 U.S. 668, 104 S.Ct.

5

2052, 2064-2065, 80 L.Ed.2d 674 (1984); <u>Curry</u>, 687 N.E.2d at 882.  When a defendant argues that his attorney's incompetent advice led him to reject the State's plea offer, the prejudice element is met if he can show a reasonable probability that, absent the incompetent advice, he would have accepted the State's offer.  <u>Curry</u>, 687 N.E.2d at 890.

Initially, the State suggests that this case is controlled by <u>People</u> v. <u>Maury</u>, 287 Ill.App.3d 77, 222 Ill.Dec. 623, 678 N.E.2d 30 (1st Dist. 1997).  In <u>Maury</u>, the defendant had pleaded guilty to a narcotics offense.  In his post-conviction, he claimed that trial counsel allegedly incorrectly informed him that he was eligible for certain programs offering early release from prison.  <u>Maury</u>, 678 N.E.2d at 32.  The trial court dismissed the petition.  In upholding the dismissal, the appellate court stated:

> In the case *sub judice*, we agree with the circuit court's well-reasoned conclusion that the relevant provisions of the early release statute are collateral to defendant's plea of guilty (see *People v. Menke*, 74 Ill.App.3d 220, 222, 28 Ill.Dec. 274, 390 N.E.2d 441 (1979)) and that *Menke* and *Huante* are controlling of the present case.

> <u>Maury</u>, 678 N.E.2d at 33.

> We are also mindful that the *Huante* court dealt with a situation where trial counsel simply did not advise an accused of a collateral consequence, while the instant case involves the communication of erroneous advise.  However, the fact remains that the issue of eligibility for early release a

6

*collateral* one and thus the correctness of the information defense counsel provided is irrelevant.

<u>Maury</u>, 678 N.E.2d at 34.

As indicated by the above quote, the court considered advice concerning early release to be irrelevant to the issue of whether counsel provided ineffective assistance. Therefore, under the reasoning of <u>Maury</u>, there was no ineffective assistance in the case at bar.

As to the competence prong of <u>Strickland</u>, ineffective assistance is judged at the time of the attorney's conduct. <u>People</u> v. <u>Hobley</u>, 159 Ill.2d 272, 202 Ill.Dec. 256, 637 N.E.2d 992, 1006 (1994). The offenses at issue occurred on February 25, 1998. (R. Vol. I, C1-C6) Defendant's trial began on March 15, 1999, and ended on March 18, 1999. (R. Vol. IV, C807-C809) Defendant was sentenced on May 21, 1999. (Supp. R. Vol. XIV, 1)

The truth-in-sentencing legislation was original enacted by P.A. 89-404. See <u>People</u> v. <u>Nicholson</u>, 299 Ill.App.3d 256, 233 Ill.Dec. 667, 701 N.E.2d 517, 524 (4th Dist. 1998), <u>judgment vacated</u> in <u>People</u> v. <u>Nicholson</u>, 183 Ill.2d 587, 236 Ill.Dec. 659, 707 N.E.2d 1229 (1999). P.A. 89-404 was held to be unconstitutional in <u>People</u> v. <u>Pitts</u>, 295 Ill.App.3d 182, 229 Ill.Dec. 451, 691 N.E.2d 1174 (4th Dist. 1998). However, in <u>Nicholson</u>, this court held that the truth-in-sentencing

7

provisions were validly reenacted by P.A. 89-462, which was effective May 29, 1996.  <u>Nicholson</u>, 701 N.E.2d at 524-526. Therefore, until <u>Nicholson</u> was overruled in <u>People</u> v. <u>Reedy</u>, 186 Ill.2d 1, 237 Ill.Dec. 74, 708 N.E.2d 1114 (1999), the law in this district was that truth-in-sentencing was effective for offenses committed after May 29, 1996.

As discussed by the trial court (R. Vol. IV, C790-C791), <u>Reedy</u> was decided on January 22, 1999, and modified on rehearing on March 29, 1999.  As a result, from January 22 through March 29, 1999, the period just prior to trial, the <u>Reedy</u> opinion was subject to withdrawal or modification.  See Supreme Court Rule 367. Since the law during this period was unsettled, defense counsel's uncertainty as to whether defendant was eligible for day-for-day good-time credit is understandable.  Certainly, it does not constitute a serious deficiency falling below an objective standard of reasonableness under prevailing professional norms so as to constitute ineffectiveness under <u>Strickland</u>.

In order to establish prejudice, a defendant must show a reasonable probability that, absent the incompetent advice, he would have accepted the State's offer.  <u>Curry</u>, 687 N.E.2d at 890.  In his petition, defendant stated, "If I had of known [sic] I was not under the truth in sentencing, I most likely would of taken the State plea bargain [sic] offer."  (R. Vol.

8

IV, C778)

In <u>Curry</u>, the Illinois Supreme Court concluded that a defendant's statement, standing alone, that he would have pleaded guilty except for incompetent advice, would be inadequate to satisfy prejudice because the statement was subjective and self-serving. <u>Curry</u>, 687 N.E.2d at 888.

Here, there is no evidence in the record to corroborate defendant's self-serving statement that he would most likely have pleaded guilty to attempt (first degree murder). The State also observes that defendant presented an alibi defense at trial. See <u>Moore</u> at 6. This is fully consistent with a rejection of a plea offer by the State.

The State is aware that well-pleaded allegations in a post-conviction petition are generally taken as true at the dismissal stage of post-conviction proceedings. However, <u>Curry</u> concluded that a defendant's self-serving claim that he would have pleaded guilty, except for counsel's errors, is inadequate as a matter of law. See <u>Curry</u>, 687 N.E.2d at 888.

Next, the State will address defendant's claim that appellate counsel was ineffective for failing to argue plain error on direct appeal in regards to the "revised" DNA frequency calculations.

In <u>Moore</u>, this court summarized the factual background of the DNA issue as follows:

9

The State introduced the testimony and lab results from forensics scientist, Kevin Zeeb, regarding deoxyribonucleic acid (DNA) evidence. Zeeb testified that he recovered DNA material from a nylon stocking taken from L.H.'s unit and worn by defendant as a disguise while he used L.H.'s ATM cards to make the withdrawals from her bank. Zeeb testified that the DNA material matched that of L.H. and defendant. Zeeb testified that he compared the DNA profiles to established population databases to calculate the statistical frequency of encountering those profiles in the general population. Zeeb performed two statistical calculations, one in which he combined the DNA profiles that he found on the stocking and one in which he separated the profiles. Zeeb testified that combining the profiles produces a conservative estimate. Zeeb found that conservative estimate of the frequency of the combined profiles in the general population was approximately 1 in 2,700 blacks. Under the calculations in which Zeeb separated the profiles, Zeeb estimated the frequency to be approximately 1 in 150 billion blacks. Defense counsel never objected to the admission of this statistical evidence.

Moore, at 5-6.


In his post-conviction brief, defendant states:


Although Zeeb suggested that the decision to reduce the number of matched loci from nine to five was made in an objective, scientific, verifiable setting, his conclusion was only his opinion. Zeeb had a vested interest in offering that conclusion since he apparently was one of the scientists who had argued that the number of relevant loci matches be reduced. There was no independent evidence that anything resembling a Frye (Frye v. United States, 293 F. 1013 (D.C. 1923)) test was applied when the trial court admitted this self-serving testimony from Zeeb.

(Deft. Br., 17-18)

10

Claims of ineffectiveness of appellate counsel are measured against the same standard as those dealing with ineffectiveness of trial counsel. People v. West, 187 Ill.2d 418, 241 Ill.Dec. 535, 719 N.E.2d 664, 674 (1999). A defendant who contends that appellate counsel rendered ineffective assistance must show that the failure to raise the issue was objectively unreasonable and that the decision prejudiced the defendant. West, 719 N.E.2d at 674.

As to prejudice, unless the underlying issue is meritorious, a defendant will not be said to have suffered prejudice from counsel's failure to raise it on appeal. West, 719 N.E.2d at 675. For the reasons set forth below, defendant has failed to show that the result of the direct appeal would have been different, if appellate counsel had argued this issue.

Defendant contends that appellate counsel was ineffective on direct appeal for failing to argue plain error in regards to the admission of the second set of probability calculations. The State suggests that not only was there no plain error, there was no error at all, in the admission of the contested testimony.

As noted, defendant's essential argument is that there was error, when the second set of DNA frequency calculations were admitted without a Frye test. However, this argument is

11

refuted by case law.

In <u>People</u> v. <u>Pope</u>, 284 Ill.App.3d 695, 220 Ill.Dec. 309, 672 N.E.2d 1321 (4th Dist. 1996), this court stated:

> Therefore, because we have concluded that the PCR-based techniques of DQ-Alpha typing and polymarker typing for DNA identification are admissible under the <u>Frye</u> standard, we also conclude the FBI's method of calculating the statistical probability of a random match, including its use of a smaller database in polymarker typing, is admissible. Thus, we hold that the trial court did not err by admitting the FBI's statistical probability evidence.
>
> <u>Pope</u>, 672 N.E.2d at 1328.

As the above quote indicates, the second statistical computation was admissible without a <u>Frye</u> hearing because the underlying methodology (PCR-based technique) was admissible. See <u>People</u> v. <u>Almighty Four Hundred</u>, 287 Ill.App.3d 123, 222 Ill.Dec. 533, 677 N.E.2d 1332, 1337 (1st Dist. 1997) (it was defendant's responsibility to challenge DNA statutes on cross-examination, as statistics are admissible as relevant to identification, and any challenges to their reliability go only to the weight to be given the evidence).

Moreover, even if a <u>Frye</u> hearing were required for the general methodology for calculating the probability statistics (see <u>People</u> v. <u>Dalcollo</u>, 282 Ill.App.3d 944, 218 Ill.Dec. 435, 669 N.E.2d 378, 385 (2nd Dist. 1996)), such a hearing still would not be required in the case at bar. Defendant does not

12

challenge the product rule method of calculating DNA profile frequencies or the underlying validity of the population database utilized. See <u>People</u> v. <u>Hickey</u>, 178 Ill.2d 256, 227 Ill.Dec. 428, 687 N.E.2d 910, 921 (1997). Rather, he challenges a specific procedure (i.e., statistical calculation based on individual profile, where person is identified as major contributor of DNA at a majority of loci). However, the specific procedures used in a particular case are not subject to a <u>Frye</u> test. <u>Dalcollo</u>, 669 N.E.2d at 386. Once it is determined that a scientific method is generally accepted, a <u>Frye</u> test is no longer required. <u>People</u> v. <u>Rozo</u>, 303 Ill.App.3d 787, 237 Ill.Dec. 189, 708 N.E.2d 1229, 1234 (2nd Dist. 1999). A defendant may attack the specific procedures used, but that is not the basis for a <u>Frye</u> hearing. <u>Rozo</u>, 708 N.E.2d at 1234.

This was an instance where it was appropriate for the jury to weigh the statistical testimony. The witness testified that he obtained one probability result, when he used combined profiles, and another when he used separate profiles. It was the role of the jury to evaluate these computations. See <u>People</u> v. <u>Stremmel, II</u>, 258 Ill.App.3d 93, 197 Ill.Dec. 177, 630 N.E.2d 1301, 1310 (2nd Dist. 1994) (a jury is capable of properly weighing DNA evidence).

Moreover, the doctrine of plain error is not applicable.

13

Plain error is a limited and narrow exception to the waiver rule to be invoked only where the evidence is so closely balanced that it might be said that the jury's verdict may have resulted from the error or that the error is so substantial that it deprived the defendant of a fair trial. People v. Herrett, 137 Ill.2d 195, 148 Ill.Dec. 695, 561 N.E.2d 1, 7-8 (1990).

As to the first part of the test, in Moore this court characterized the evidence against defendant as "overwhelming." Moore, at 11. The State observes that even if the "revised" frequency calculations were excluded, Kevin Zeeb still would have testified that the frequency in the general population was 1 in 2700 blacks. (Supp. R. Vol. XI, 632-633) This testimony, in conjunction with the other evidence, provided compelling evidence of defendant's guilt.

As to the fair trial part of the rule, the witness testified that he obtained one probability result, when he used combined profiles, and another when he used separate profiles. A jury is capable of properly weighing DNA evidence. Stremmel, II, 630 N.E.2d at 1310. Since the jury had the opportunity to evaluate these two computations, defendant was not deprived of a fair trial.

14

CONCLUSION

WHEREFORE, the PEOPLE OF THE STATE OF ILLINOIS respectfully request this court to affirm the order of the circuit court dismissing the defendant's petition for post-conviction relief and to tax costs accordingly.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS

John C. Piland
State's Attorney
Champaign County Courthouse
101 East Main
Urbana, Illinois 61801

Norbert J. Goetten
Director
Robert J. Biderman
Deputy Director
Thomas R. Dodegge
Of Counsel
State's Attorneys Appellate
         Prosecutor
725 South Second Street
Springfield, Illinois 62704
(217) 782-8076

COUNSEL FOR PLAINTIFF-APPELLEE

15



# FILE COPY

## No. 4-02-0523

# IN THE APPELLATE COURT OF ILLINOIS

## FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) | Champaign County, Illinois. |
| | ) | |
| -vs- | ) | No. 98-CF-1558 |
| | ) | |
| **DEDRIC T. MOORE,** | ) | Honorable |
| Defendant-Appellant. | ) | Jeffrey B. Ford, |
| | ) | Judge Presiding. |
| | ) | |
| | ) | |

# REPLY BRIEF AND ARGUMENT

## FOR

## DEFENDANT-APPELLANT

**DANIEL M. KIRWAN**
Deputy Defender

**LAWRENCE O'NEILL**
Assistant Defender

Office of the State Appellate Defender
Fifth Judicial District
730 E. Illinois Highway 15, P.O. Box 2430
Mt. Vernon, IL 62864-0047
(618) 244-3466

COUNSEL FOR DEFENDANT-APPELLANT

## ORAL ARGUMENT REQUESTED

EXHIBIT Q

# POINT AND ADDITIONAL AUTHORITIES

*Page*

THE TRIAL COURT ERRED IN SUMMARILY DISMISSING THE DEFEN-

DANT'S POST-CONVICTION PETITION, WHICH PRESENTED TWO ISSUES

THAT AMOUNTED TO THE GIST OF A CLAIM OF A VIOLATION OF HIS

CONSTITUTIONAL RIGHTS, I.E., THAT TRIAL COUNSEL'S ASSIS-

TANCE DURING THE PLEA NEGOTIATION PROCESS WAS CONSTITU-

TIONALLY INEFFECTIVE, AND APPELLATE COUNSEL PROVIDED

INEFFECTIVE REPRESENTATION BY FAILING TO ADVOCATE FOR

THE INVOCATION OF THE PLAIN ERROR DOCTRINE, THUS RESULTING

IN THE PROCEDURAL FORFEITURE OF DEFENDANT'S PRIMARY

SUBSTANTIVE ARGUMENT RAISED ON DIRECT APPEAL................................2

    730 ILCS 5/5-5-3(d) (West 2000)......................................................................2

*People v. Whitfield*, 40 Ill. 2d 308,
   239 N.E.2d 850 (1968) ...................................................................................3

*People v. Maurey*, 287 Ill. App. 3d 77,
   678 N.E.2d 30, 222 Ill. Dec. 623 (1st Dist. 1997).............................................3

# ARGUMENT

THE TRIAL COURT ERRED IN SUMMARILY DISMISSING DEFENDANT'S POST-CONVICTION PETITION, WHICH PRESENTED THE TWO ISSUES THAT AMOUNTED TO THE GIST OF A CLAIM OF A VIOLATION OF HIS CONSTITUTIONAL RIGHTS, I.E., THAT TRIAL COUNSEL'S ASSISTANCE DURING THE PLEA NEGOTIATION PROCESS WAS CONSTITUTIONALLY INEFFECTIVE, AND APPELLATE COUNSEL PROVIDED INEFFECTIVE REPRESENTATION BY FAILING TO ADVOCATE FOR THE INVOCATION OF THE PLAIN ERROR DOCTRINE, THUS RESULTING IN THE PROCEDURAL FORFEITURE OF DEFENDANT'S PRIMARY SUBSTANTIVE ARGUMENT RAISED ON DIRECT APPEAL.

Defendant concurs with the State (State's brief at 2) that because in *People v. Moore*, 4-99-0499 (April 4, 2003), This Court vacated defendant's extended-term sentences and remanded for retrial or resentencing under section 5-5-3(d) of the Unified Code (730 ILCS 5/5-5-3(d) (West 2000)), the subject appeal is relevant only in the event the State does not seek a retrial.

On page six of its brief, the State goes on to urge that defendant's claim must fail because he did not "show a reasonable probability that, absent the incompetent advice, he would have accepted the State's offer." Of course, though, at this stage of the post-conviction proceedings, to survive summary dismissal, defendant was only obliged to establish the "gist of a claim", a low threshold; additionally, defendant's allegations are to be liberally construed. *People v.*

-2-

*Edwards*, 197 Ill. 2d 239, 757 N.E.2d 442, 258 Ill. Dec. 753, 756 (2001). Thus, it mattered not, at this stage, that defendant, arguably, did not establish in his pro se petition that the outcome of the plea negotiations would have been different had counsel provided correct information about the amount of time he was required to serve in prison. The petition, did, though, establish "the gist of a claim" that his guilty plea was unknowingly entered due to counsel's ineffective representation.

The State then argues that the information counsel incorrectly advised defendant was collateral to the guilty plea, thus negating any claim of prejudice. (State's 6-7) As already mentioned, however, questions regarding the degree of prejudice caused by trial counsel's faulty advice is premature at this first-stage of the proceedings. The procedural posture of the present case, then, distinguishes it from *People v. Maurey*, 287 Ill. App. 3d 77, 678 N.E.2d 30, 222 Ill. Dec. 623 (1st Dist. 1997), the case relied on by the State for support of its claim that counsel's ill advice caused no harm. (State's brief at 6-7) Additionally, it is well established that the right to effective assistance of counsel extends to the decision to reject a plea offer, even if defendant subsequently receives a fair trial. *People v. Whitfield*, 40 Ill. 2d 308, 239 N.E.2d 850 (1968). Even more, in *People v. Curry*, 178 Ill. 2d 509, 687 N.E.2d 877, 227 Ill. Dec. 395, 406 (1997), where defendant made a similar claim as defendant does here, the Supreme Court rejected the State's argument that defendant cannot establish that he was prejudiced by his counsel's performance because he failed to show that there is

-3-

a reasonable probability that, absent his attorney's deficient advice, he would have accepted the State's plea offer.

The State also claims that trial counsel cannot be faulted, stating that "since the law during this period was unsettled, defense counsel's uncertainty as to whether defendant was eligible for day-for-day good time is understandable." (State's brief at 8) Defendant discussed this exact point on pages 10-11 of his original brief. Nonetheless, the important point is this: on January 22, 1999, in *People v. Reedy*, the Supreme Court declared unconstitutional the truth-in-sentencing statute at issue here, which, then, was modified on denial of petition for rehearing on March 29, 1999. *People v. Reedy*, 186 Ill. 2d 1, 708 N.E.2d 1114, 237 Ill. Dec. 74 (1999), *modified on denial of rehearing*. Consequently, as defendant's trial was scheduled for, and then took place, on March 18, 1999, contrary to trial counsel's advice, defendant would have received day-for-day good time credit, had he pled guilty during this time period.

Finally, on page 9 of its brief, the State argues that "there is no evidence in the record to corroborate defendant's self-serving statement that he would most likely have pleaded guilty to attempt (first degree murder)". First, well-pleaded facts are taken as true at the dismissal stage of post-conviction proceedings. *People v. Edwards*, 197 Ill. 2d 239, 757 N.E.2d 442, 258 Ill. Dec. 753, 756 (2001). Second, in *Curry*, the Supreme Court found both prejudice and ineffective representation, based only on defendant's post-conviction allegations. *Curry*, 227 Ill. Dec. 395, 406-07.

-4-

# CONCLUSION

Mr. Moore presented in his post-conviction the gist of the claim that he received ineffective representation at both the trial and appellate court levels. The circuit court summarily dismissed the petition. He asks This Court to reverse that dismissal order, and remand the cause for further proceedings.

Respectfully submitted,

**DANIEL M. KIRWAN**
Deputy Defender

**LAWRENCE O'NEILL**
Assistant Defender

Office of the State Appellate Defender
Fifth Judicial District
730 E. Illinois Highway 15, P.O. Box 2430
Mt. Vernon, IL 62864-0047
(618) 244-3466

COUNSEL FOR DEFENDANT-APPELLANT

E-FILED
Friday, 04 May, 2007 05:00:19 PM
Clerk, U.S. District Court, ILCD

NO. 4-02-0523

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
DEC 0 3 2003
CLERK OF THE
APPELLATE COURT, 4TH DIST.

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DEDRIC T. MOORE, | ) | No. 98CF1558 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Jeffrey B. Ford, |
| | ) | Judge Presiding. |

---

### ORDER

In May 2002, the trial court summarily dismissed defendant's postconviction petition, finding it frivolous and patently without merit under section 122-2.1(a)(2) of the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-2.1(a)(2) (West 1998). Defendant appeals, arguing that he received ineffective assistance of trial counsel and appellate counsel. We affirm.

### I. BACKGROUND

In March 1999, the jury found defendant, Dedric T. Moore, guilty of (1) aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 1998)), (2) attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a) (West 1998)), (3) aggravated criminal sexual abuse (720 ILCS 5/12-16(a)(1) (West 1998)), (4) home invasion (720 ILCS 5/12-11(a)(2) (West 1998)), and (5) residential burglary (720 ILCS 5/19-3 (West 1998)). The trial court sentenced defendant to a 15-year prison term for residential burglary to run consecutive to defendant's concurrent 60-year extended prison term for attempted first degree murder, 60-year extended prison term for

EXHIBIT R

Haynes, 192 Ill. 2d at 472, 737 N.E.2d at 188-89.

### 1. Trial Counsel

Defendant argues that his trial counsel's assistance during the plea negotiation process was ineffective because she gave him incorrect advice concerning good-time credit. Defendant alleged in his postconviction petition that the State made him an offer on the attempt (first degree murder) charge. His trial counsel erroneously told him that he was subject to the truth-in-sentencing guidelines, which required him to serve 85% of his sentence. Defendant further alleged that if he had known that he was not subject to the truth-in-sentencing guidelines, he "MOST LIKELY WOULD OF [sic]" taken the State's plea bargain offer.

Defendant attached a page from the transcript of the sentencing hearing that pertained to the discussions concerning day-for-day credit. Defendant, however, failed to attach an affidavit or any documents to support his assertion that there was a plea offer and its terms, if there were an offer, and did not offer an explanation for the absence of such documentation as mandated by section 122-2 of the Act (725 ILCS 5/122-2 (West 1998)). As a result, the trial court properly summarily dismissed defendant's postconviction petition. Collins, 202 Ill. 2d at 66, 782 N.E.2d at 198 (defendant's postconviction petition was unsupported by affidavits, records, or other evidence and offered no explanation for their absence, which, on that basis alone, justified the summary dismissal of defendant's petition). Moreover, there is nothing in the record to corroborate defen-

defendant's postconviction petition, finding it frivolous and patently without merit under section 122-2.1(a)(2) of the Act. 725 ILCS 5/122-2.1(a)(2) (West 1998).

This appeal followed.

## II. ANALYSIS

Defendant argues that both his trial and appellate counsel were ineffective.  We disagree.

### A. Postconviction Proceeding

In the present case, the trial court summarily dismissed defendant's postconviction petition.  The Act confers upon the trial court the ability to summarily dismiss a defendant's petition in its first stage of review if it is frivolous or patently without merit.  725 ILCS 5/122-2.1(a)(2) (West 2000).  A postconviction petition is considered frivolous or patently without merit if the petition's allegations, taken as true, fail to present the gist of a meritorious constitutional claim. People v. Collins, 202 Ill. 2d 59, 66, 782 N.E.2d 195, 198 (2002), citing People v. Gaultney, 174 Ill. 2d 410, 418, 675 N.E.2d 102, 106 (1996).  The "gist" standard is "a low threshold." People v. Edwards, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001).  The allegations in defendant's petition must be supported by the record or accompanying affidavits, and nonspecific and nonfactual assertions are insufficient to require an evidentiary hearing under the Act.  People v. Coleman, 183 Ill. 2d 366, 381-82, 701 N.E.2d 1063, 1071 (1998).  The failure to either attach the necessary "affidavits, records, or other

- 3 -

evidence" or explain their absence is "fatal" to a postconviction petition (People v. Turner, 187 Ill. 2d 406, 414, 719 N.E.2d 725, 729-30 (1999)) and by itself justifies the petition's summary dismissal (Coleman, 183 Ill. 2d at 380, 701 N.E.2d at 1071).  We review de novo the first-stage dismissal of a postconviction petition and may affirm such dismissal on any basis supported by the record.  People v. Patton, 315 Ill. App. 3d 968, 972, 735 N.E.2d 185, 189 (2000).

B. Defendant's Ineffective Assistance of Counsel Claims

In a postconviction proceeding, a defendant is entitled to a reasonable level of assistance of counsel.  People v. Guest, 166 Ill. 2d 381, 412, 655 N.E.2d 873, 887 (1995).  Claims of ineffective assistance of counsel are evaluated under the standard set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  A defendant who contends that his trial counsel rendered ineffective assistance of counsel must show that (1) his counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's errors, the result of the trial would have been different. People v. Enis, 194 Ill. 2d 361, 376, 743 N.E.2d 1, 11 (2000). The constitutional guarantee of assistance of counsel applies both at trial and on defendant's first appeal as of right. People v. Haynes, 192 Ill. 2d 437, 472, 737 N.E.2d 169, 188 (2000).  The test for ineffective assistance of appellate counsel is the same as the two-part standard established in Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

- 4 -

Haynes, 192 Ill. 2d at 472, 737 N.E.2d at 188-89.

### 1. Trial Counsel

Defendant argues that his trial counsel's assistance during the plea negotiation process was ineffective because she gave him incorrect advice concerning good-time credit. Defendant alleged in his postconviction petition that the State made him an offer on the attempt (first degree murder) charge. His trial counsel erroneously told him that he was subject to the truth-in-sentencing guidelines, which required him to serve 85% of his sentence. Defendant further alleged that if he had known that he was not subject to the truth-in-sentencing guidelines, he "MOST LIKELY WOULD OF [sic]" taken the State's plea bargain offer.

Defendant attached a page from the transcript of the sentencing hearing that pertained to the discussions concerning day-for-day credit. Defendant, however, failed to attach an affidavit or any documents to support his assertion that there was a plea offer and its terms, if there were an offer, and did not offer an explanation for the absence of such documentation as mandated by section 122-2 of the Act (725 ILCS 5/122-2 (West 1998)). As a result, the trial court properly summarily dismissed defendant's postconviction petition. Collins, 202 Ill. 2d at 66, 782 N.E.2d at 198 (defendant's postconviction petition was unsupported by affidavits, records, or other evidence and offered no explanation for their absence, which, on that basis alone, justified the summary dismissal of defendant's petition). Moreover, there is nothing in the record to corroborate defen-

dant's claim that he would "most likely" have taken the offer.

## 2. Appellate Counsel

Defendant also argues that his appellate counsel was ineffective because she did not urge this court to apply the plain error doctrine to review the issue regarding the admission of the revised DNA frequency calculations. Defendant attached to his petition an affidavit from his appellate counsel, which outlined how she had handled this issue. Appellate counsel acknowledged that the sole substantive issue raised on direct appeal concerned the revised DNA frequency calculations, and this court found that the DNA issue had been forfeited. Appellate counsel further acknowledged she did not on direct appeal urge this court to consider the issue under the plain error doctrine. However, appellate counsel also stated she had filed a motion to reconsider, urging this court to consider the issue under the plain error doctrine. This court denied defendant's petition for rehearing.

Upon review of the record, we conclude that defendant cannot satisfy the prejudice prong under Strickland. While it is true that appellate counsel did not urge consideration of the plain error doctrine until the petition for rehearing, the fact remains that she did raise the issue on direct appeal. Our denial of the petition for rehearing amounts to a refusal to consider the issue under the plain error doctrine. Defendant's ineffective assistance of appellate counsel claim is, therefore, denied.

- 6 -

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH, J., with COOK and MCCULLOUGH, JJ., concurring.

E-FILED
Friday, 04 May, 2007  05:00:39 PM
Clerk, U.S. District Court, ILCD

IN THE
*Circuit Court of the Sixth Judicial*
*Circuit, Champaign, County, Illinois*

Dedric Moore _____        )
Plaintiff,                           )
                                     )    Case No. 98-CF-1558
        v.                           )
                                     )
State of Illinois _____     )
Defendant                            )

# FILED
SIXTH JUDICIAL CIRCUIT

**JUL 2 1 2006**

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

## PROOF/CERTIFICATE OF SERVICE

TO: Linda Frank – 2 copies          TO:
                                     Julia Rietz, States Attorney – 1 copy
*Circuit Clerk Court House*          *Champaign County Court house*
*101 E Main Street*                  *101 E Main street*
*Urbana, IL* ~~62701~~               *Urbana, IL 61801*
       *61801*

PLEASE TAKE NOTICE that on *18 July* _____, 20*06* I have placed the
documents listed below in the institutional mail at *Menard* _____ Correctional Center,
properly addressed to the parties listed above for mailing through the United States Postal
Service: *Pro-se Post Conviction*
*Petition* _____
_____


Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of
perjury, that I am a named party in the above action, that I have read the above
documents, and that the information contained therein is true and correct to the best of my
knowledge.

DATE: *18 July 2006* _____        /s/ *Dedric Moore* _____
                                     NAME: *Dedric Moore* _____
                                     IDOC#: *K53438* _____
                                     *Menard* _____ Correctional Center
                                     P.O. BOX *711* _____
                                     *Menard* _____, IL *62259*

EXHIBIT S                    _C000882

IN THE CIRCUIT COURT OF *Champaign* COUNTY

PEOPLE OF THE STATE OF ILLINOIS )
                                 )
                                 )    IND. NO.: *9B-CF-1558*
                    vs           )
*Dedric T. Moore*                )

**FILED**
SIXTH JUDICIAL CIRCUIT

## PRO SE POST-CONVICTION PETITION

JUL 2 1 2006

Now comes *Dedric Moore*, Defendant, pro se, and petitions this
Honorable Court to grant him relief under the post-conviction act. [725 ILCS 5/122-1
1992]

CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

In support of this petition, Defendant states:

1. He/She was convicted of the offense(s) of: *See/2nd pg* after a jury trial, bench
   trial or entered a guilty plea before the Honorable *Thomas Difanis* and was
   sentenced to *75* years on *2 July*, *2003*.
2. He/She did not appeal his/her conviction or he/she appealed his/her conviction to
   the Appellate Court of Illinois and that Court affirmed his/her conviction on
   *26 Sept*, *2005* (APPELLATE NO. *4-03-0790*).
3. He/She did not petition the Supreme Court of Illinois to take his/her case or his/her
   petition for leave to appeal was denied on *26 Jan*, *2006*.(SUPREME COURT
   NO._____)
4. This petition was mailed to the clerk of the circuit court within the time frame
   enumerated under 725 ILCS 5/122-1.
5. Petitioner's constitutional rights were violated because (STATE ALL FACTS
   KNOWN TO PETITIONER THAT DEMONSTRATE THAT HIS/HER
   CONSTITUTIONAL RIGHTS WERE VIOLATED):
   *Ineffective assistance of Trial Counsel Sixth and*
   *Fourteenth amendments of the united States Constitution*
   *and article I, 8 of the Illinois Constitution.*
   *Ineffective assistance of appellate Counsel Violation*
   *of the Fourteenth amendment U.S. constitution.*
   *The trial Court erred in making Petitioner Sentences*
   *Consecutive Rather than concurrent*

_____, pursuant to 735 ILCS 5/109, Defendant declares,
under penalty of perjury, that the facts set out in this petition are true and correct to the
best of his/her knowledge and belief.

SIGNED: *Dedric Moore*

C000883

## VERIFICATION OF CERTIFICATION

I, Dedric Moore _____, the undersigned, certify and state that:

1. I am the (Petitioner/Respondent) in the above captioned legal matter;

2. I have read the foregoing application and have knowledge of its contents; and,

3. Under penalties as provided by law pursuant to Section 1-109 of the Civil Code of Procedure, I certify that the statements set forth in the forgoing motion and this affidavit are true and correct except as to matters therein stated to be on information and belief, as to such matters I certify that I believe the same to be true.

Dedric Moore _____
Defendant, pro se

Revised October 2005

IN THE CIRCUIT COURT FOR THE _Sixth_ JUDICIAL COURT
_Champaign_ COUNTY, ILLINOIS

Dedric Moore ,  )
    Petitioner,  )
v.  )    No. _98-CF-1558_
State of Illinois ,  )
    Respondent.  )

**FILED**
SIXTH JUDICIAL CIRCUIT

**JUL 2 1 2006**

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

------------------------------------------------------------------

### APPLICATION TO SUE OR DEFEND AS A POOR PERSON

Applicant, _Dedric Moore_ , respectfully requests the Court, pursuant to Illinois
[ see 735 ILCS 5/5-105] and Rule 298 of the Illinois Supreme Court, to grant (him/her)
leave to (sue/defend) as a poor person; in support applicant states that the following facts
are true in substance and in fact:

1. I am the (Petitioner/Respondent) in the above captioned legal proceedings.
2. I am a poor person and unable to (prosecute/defend) this action and am unable to
    pay the costs, fees and expenses of this action.
3. My occupation or means of subsistence:
    (a) I am not currently employed due to my imprisonment at _Menard_
    Correctional Center but I receive (a state stipend/nominal wages) of $ _10_
    per month.
    (b) The amount and source of all other income or support are:
    _N/A_

4. My total income for the preceding year was $_____.
5. The sources and amount of income expected by me hereafter are:

6. The nature and current value of any property, real or personal, owned by me:
    (a) Real Estate: _N/A_
    value:_____
    (b) Motor Vehicle: _N/A_
    value:_____
    (c) Cash, saving, checking, etc. _N/A_
    value:_____
    (d) Prison trust account: _00_
    value:_____
    (e) Other (eg., T.V., etc.)_____
    value:_____

7. No applications for leave to sue or defend as a poor person were filed by me or on
my behalf during the preceding year, except as follows:

8. I believe in good faith that I have a meritorious (claim/defense).

    _Dedric Moore_
    (Your Signature)
    Type or print name _Dedric Moore_
    Register Number: _K53438_
    _Menard_ Correctional Center
    Box _711_
    _Menard_ , Illinois _62259_
    (Petitioner/Respondent), Pro Se

Revised October 2005

### DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.

DATE: *18 July 2006*

/s/ *Dedric Moore*
NAME: *Dedric T. Moore*
IDOC#: *K53438*
*Menard* Correctional Center
P.O. BOX *711*
*Menard*, IL *62259*

IN THE CIRCUIT COURT ● ● E SIXTH JUDICIAL CIRCU ● ● MPAIGN
COUNTY, ILLINOIS

---

PEOPLE OF THE STATE OF ILLINOIS,
RESPONDENT,

**FILED**
SIXTH JUDICIAL CIRCUIT

**JUL 2 1 2006**

VS.

L~inda S. Franks
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

DEDRIC T. MOORE,
PETITIONER

HONORABLE
THOMAS J.
            DIFANIS,
JUDGE PRESIDING.
CASE NO.98-cf-1558

---

### POST CONVICTION PETITION

NOW COMES THE PETITIONER DEDRIC MOORE, PRO-SE AND PRESENT
HIS POST CONVICTION . AND PETITION THIS HONORABLE COURT TO
VACATE PETITIONER INVALID CONSECUTIVE SENTENCE. IN SUPPORT
OF HIS PETITION, PETITIONER STATES AS FOLLOWS:

1. PETITIONER WAS INDICTED IN CHAMPAIGN COUNTY UNDER INDICTMENT
98-cf-1558, FOR THE OFFENSES OF ATTEMPT(FIRST DEGREE MURDER),AGGRAVATED
ARSON, HOME INVASIO, AGGRAVATED CRIMINAL SEXUAL ABUSE, RESIDENTIAL
BURGLARY.

2. IN MARCH 1999, A JURY CONVICTED THE PETITIONER OF ATTEMPT
(FIRST DEGREE MURDER) AGGRAVATED CRIMINAL SEXUAL ABUSE, AGGRAVATED
ARSON, HOME INVASION, AND RESIDENTIAL BURGLARY. THE TRIAL COURT
SENTENCE THE PETITIONER TO A TOTAL OF 75 YEARS" IMPRISONMENT:60
YEARS EXTENDED TERM FOR ATTEMPT(FIRST DEGREE MURDER)MURDER,CONCURRENT
TO A 60 YEAR EXTENDED TERM FOR THE HOME INVASION, CONCURRENT
TO A 30 TERM FOR AGGRAVATED ARSON, CONCURRENT TO A 7 YEAR TERM
FOR THE AGGRAVATED SEXUAL ABUSE BUT TO A 15 YEAR TERM FOR RESIDENTIAL
BURGLARY.

3. THE PETITIONER TIMELY FILED A NOTICE OF APPEAL TO THE ILLINOIS APPELLATE COURT FOR THE FOURTH DISTRICT AND ON JANUARY 11, 2002, A RULE 23 ORDER WAS ISSUED AFFIRMING PETITIONERS CONVICTIONS AND SENTENCES IN PEOPLE V MOORE, NO.4-99-0499.THEREAFTER, THE PETITIONER FILED A PETITION FOR LEAVE TO APPEAL. THE ILLINOIS SUPREME COURT DENIED THE PETITION BUT ORDERED THE APPELLATE Court TO VACATE THE JUDGEMENT AND TO RECONSIDER IN LIGHT OF PEOPLEV. SWIFT, 202 ill.2d 378, 392,781 ne.2d 292,300 . people v moore 202 ill.2d 688 (2003).

4. UPON RECONSIDERATION, THE APPELLATE COURT VACATED THE PETITIONER EXTENDED TERM SENTENCES AND REMANDED FOR RETRIAL OR RESENTENCING AT THE ELECTOIN OF THE THE STATE PURSANT TO SECTION 5-5-2(D) OF THE CODE OF CORRECTIONS (UNIFIED CODE)730 ILCS 5~5-5-3(D). THE STATE SOUGHT RESENTENCING AND ON JULY 1, 2003, THE TRIAL COURT RESENTENSED THE PETITIONER TO A TOTAL OF 75 YEARS IMPRISONMENT: 30YEARS FOR ATTEMPT(FIRST DEGREE MURDER) ,CONCURRENT TO 15 YEARS FOR RESIDENTIAL BURGLARY, AND CONCURRENT TO A 7 YEAR TERM AGGRAVATED CRIMINAL ABUSE, 30 YEAR FOR HOME INVASION, CONSECUTIVE TO AGGRAVATED ARSON , CONSECUTIVE TO 15  YEARS FOR RESIDENTIAL BURGLARY.

5. THE PETITIONER APPEAL ONCE AGAIN CHALLENGING ONLY HIS SENTENCE, WHERE THE APPELLATE COURT AFFIRMED THE TRIAL COURT. PETITIONER FILED A PETITION FOR LEAVE TO APPEAL, THE ILLINOIS SUPREME COURT DENIED THE PETITION ON JANUARY 26, 2006. NOW THE PETITIONER IS FILING A PRO-SE POST CONVICTION.

6. THE PETITIONER RAISES SEVERAL ISSUES,INNEFECTIVE ASSISTANCE OF TRIAL COUNSEL. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. THE TRIAL COURT HAD ABUSED ITS DISCRETION IN FINDING THAT THE WOUND WAS A SEVERE BODILY INJURY FOR SENTENCING PURPOSES. THE CIRCUIT COURT FINDING IN THAT REGARD IS NOT SUPPORTED BY THE EVIDENCE.



Trial Counselor was Ineffective For Not Arguing that he Victim Injury Didn't Satisfy The Statutory Criteria or The Consecutive Sentence Requirement Under 730 ILCS 5-8-4 A; At Sentencing are in a Post trial Motion Counsel Failed to Preserve the Issue For Appeal. This is the Same Lawyer Who Defended the oringinal trial And First and Second Sentencing Hearings. Counselor Heard the Victim testimony and saw the Medical Records.

Trial Counselor Ineffective Not raising In a post trial motion the trial Court Abused its Discretion; Erred in Fashioning A Consecutive Sentence Also Failure For Not arguing the trial court Improperly Double Enhanced Defendant Sentence.

C000889

(Reasons For Granting The Petition) 

Appellate Counselor Was Ineffective For Not raising neffective on trial Counselor.

Appellate Counselor Failure Not to Argue the trial court Erred in ordering Defendant Sentences to run Consecutively Rather than Concurrently. The Victim Didnt suffer Severe Bodily Injury, to Warrant so.

Counselor Failure For not Attacking the Consecutive Sentences. A Sentence May Be Attack at any time IF they Dont Conform to a Statutory Requirement and therefor Are Void. People V. Arna 168 Ill. 2d 107, 113, 212 Ill. Dec. 963, 658 N.e. 2d 445. 1995.

Counselor Failure For Not raising The Circuit Court Violated the Double Jeopardy provision Double enhanced Defendant Sentence.

( Reasons For Granting the Petition )  ●●

The trial court Abuse its Discretion. The trial court erred In Fashioning a Consecutive Sentence. No additional testimony was taken at either Sentencing hearing. No medical testimony or hospitAl records Concerning the Severity of the InJury were offered at trial. The trial court pronounced its Sentence without mAking Any findings About the Severity of the InJury Suffered by the Victim. 730 ILCSS 5-8-4 A Reads In Part: The court shall not impose consecutive sentences for ffenses which were committed as part of A single course of conduct during which here was no substantial change in the nature of the criminal obJective, unless, ne of the offenses for which defendant was convicted was a class X or lass 1 Felony and the defendant inflicted Severe Bodily InJury." Surely + Skinned Knee Doesnt amount to Severe Bodily InJury. The trial Court is presumed to know the Law and act accordinly. People V. Sally 84 Ill. App 3d 167, 171, 39 Ill.Dec 654, 405 N.e. 2d 407   (1980)

C000891

Reasons For Granting the Petition

The trial court Improper Double enhance Defendant Sentence. An Improper Double enhancement of A criminal offense occurs when a factor Already used to enhance an offense or penalty is Reused to subject A Defendant to A further enhanced offense, Penalty, or Cobination of the two. Defendant was Convicted of aggravated ARSON A class X Felony. The State Contends that During that Felony the Victim Suffered Severe Bodily Injury. so therefor 730 ILCS 5/ -8-4 A applies. The State took A Simple Arson and enhanced it to agg, ARSON then the trial Court Used that aggravated ARSON, For triggering A Consecutive Sentence. This Violate the Double Jeopardy provision and Violate the Fourteenth Amendment of the U.S. Constitution Due process of law. Defendant Was Convicted and given a Sentence For the aggravated arson. Then the trial Court use that agg Arson Conviction again as a triggering offense to Impose a Consecutive Sentence. Double Jeopardy Bars Double punishment as Well as Double Prosecution. The trial court made the Finding that the Victim Suffered Severe Bodily Injury, Which Violates Due process, and the Sixth Amendment of The U.S. Constitution Trial by Jury proof Beyond a Reasonable Doubt.

C000892

AT THE DEFENDANT SECOND SENTENCING HEARING ON REMAND FROM THE FOURTH DISTRICT APPELLATE 2 JULY SECOND 2003. THE STATE ATTORNEY BROUGHT TO THE COURT ATTENTION 730 ILCS 5/5-8-4(A)1. THE STATE ARGUMENT WAS THAT THE VICTIM IN THIS CASE SUFFERED SEVERE BODILY INJURY SO NOW 730 ilcs 5/5-8-4 APPLIES. THAT THE VICTIM SUFFERED A KNEE INJURY DURING THE

AGG.ARSON VICTIM INJURY THAT BLUE JEANS HAD MELTED ON THE VICTIM SKIN.SO THE CONTENDS THAT IS SEVERE

BODILY INJURY. NEXT THE STATES CONTENDS THAT DURING THE COMMISSION OF HOME INVASION THE VICTIM SUFFERED

SEVERE BODILY INJURY. RESENTENCING TRANSCRIPT PG.24-28.

SECTION 5-8-4-A OF THE UNIFIED CODE OF CORRECTIONS AUTHORIZES CONSECUTIVE SENTENCES FOR THE OFFENSES

WHICH ARE COMMITTED AS PART OF A SINGLE OF COURSE OF CONDUCT IF "ONE OF THE OFFENSES FOR WHICH DEFENDANT

WAS CONVICTED WAS A CLASS X OR CLASS 1 FELONY AND THE DEFENDANT INFLICTED SEVERE BODILY."

IN THE INSTANT CASE THE DEFENDANT WAS CONVICTED OF CLASS 1 AND CLASS X FELONY.

DEFENDANT CONDUCT,HOW EVER, IN COMMITTING ALL OF THE OFFENSES DID NOT RESULT IN SEVERE BODILY TO

THE VICTIM OF ANY FELONIES. THEREFORE THE REQUIREMENTS FOR THE FIRST EXCEPTION UNDER 5-8-4-A HAS NOT BEEN

SATISFIED. CONSECUTIVE SENTENCES ARE NOT WARRANTED IN THIS CASE.

HOWEVER THE SENTENCING JUDGE IN THE INSTANT CASE AGREED WITH THE CHARACTERIZATION OF THE CRIME.

THE JUDGE FINDING IN THAT REGARD IS NOT SUPPORTED BY THE EVIDENCE. THE TRIAL COURT HAD ABUSED ITS

DISCRETION IN FINDING THAT THE VICTIM SUFFERED SEVERE BODILY INJURY.

C000893

THE ALLEGED SEVERE BODILY KNEE INJURY THE STATES CONTENDS THE VICTIM SUFFERED ISNT SO. THE VICTIM

TESTIMONY AT(SEE TRIAL TESTIMONY PACKAGE 3of11,PG 77). "HE DRAGGED ME ACROSS BURNING MELTING CARPET AND

THE BURNING CARPET GOT ONTO THE —MY JEANS AND IT MUST HAVE SOAKED THROUGH TO MY SKIN,BECAUSE THERE WAS A

HUGE BURN ON MY KNEE AND THEN WHEN I TOOK MY PANTS OFF,IT RIPPED A LOT OF SKIN OFF."

AFTHER SAID INJURY THE VICTIM STATES: TRIAL TESTIMONY PG.72   RAN OUT OF THE HOUSE,AND THEN RAN AGAIN

TO A NEIGHBORS.AND ASKED THE NEIGHBOR TO CALL THE POLICE.AND THEN RAN BACK TO THE DUPLEX TO LOCATE SOME

HOUSE CATS.VICTIM WENT IN THE BACK DOOR OF DUPLEX AND COULDNT FIND THE CATS. THE VICTIM THEN STATES THAT

THEIR WAS PATCHES OF CARPET ON FIRE AND HAD TO JUMP AROUND TO MISS THE PATCHES. THE VICTIM THEN STATES RAN

AGAIN OUTSIDE TO THE FRONT OF THE DUPLEX, BUT COULDNT GET IN, THEN RAN AGAIN BACK AROUND TO THE BACK WHERE

A NEIGHBOR AND THE VICTIM PICKED UP A RAILROAD TIE OR SOMETHING HEAVY AND BROKE OUT A WINDOW. THE VICTIM

THEN CLIMBED ON TOP OF A GAGBAGE CAN AND LEANED IN THE WINDOW AND COULDNT FIND THE CATS. THEN CLIMBED TO

WAIT FOR THE POLICE.

THE VICTIM WAS TAKEN TO THE HOSPITAL AND WAS ONLY TREATED FOR A SKINNED

KEE AND WAS GIVEN SOME BANDGES AND ANTIBIOTICS, AND WAS TOLD TO CLEAN THE AREA WITH

AP AND WARM WATER. AND WAS RELEASED WITHIN A HOUR AND HALF.

THE VICTIM WASNT TREATED FOR NO HEAD INJURIES, NO BROKEN BONES, NO FIRST

DEGREE, OR SECOND OR THIRD DEGREE BURNS. NO LIFE THREATING INJURIES AT ALL

THE VICTIM DIDNT SUFFER ANY SEVERE BODILY INJURY DURING THE COMMISSION OF

OF AGGRAVATED ARSON ARE HOME INVASION. YES THE VICTIM MAY OF SUFFERED SOME

INJURY. BUT NOTHING SUFFICIENTLY GRAVE TO QUALIFY AS SEVERE BODILY INJURY

UNDER THE SENTENCING STATUE. AFTER THE VICTIM WAS LEFT ALONE "L:H" THE VICTIM

AFTER THE  INJURIES WAS ABLE TO RUN ON FIVE DIFFERENT OCCASIONS, WAS ABLE TO

JUMP AROUND, AND ABLE TO CLIMB ON TOP OF A GARBAGE CANS. ABLE TO PICK UP

RAILROAD TIES.

THE STATE FAILED TO PROVE THE VICTIM SUFFERED SEVERE BODILY, AND THE

SENTENCING JUDGE ABUSED HIS DISCRETION.

C000894

PEOPLE V. JONES, 323 ill.app.3d 61,256 ill.dec.631,752.ne.2d 1015

PEOPLE V. RICE 321 ill.app3d 475 254 ill.dec.623, 747 ne.2d 1035

PEOPLE V. MURRAY 312 ill.app.3d 685,245 ill.dec.430,720 n.e.2d 512

PEOPLE V. DURHAM 312ill.app.3d 413,245 ill.dec 176,727 ne.2d 623

PEOPLE V. RUIZ 312ill.app.3d 49, 244 ill.dec.729,726 ne.2d 704

IN RE T.G. 285 ill. app .3d 838 221 ill.dec.126, 674 ne.2d 919

PEOPLE V. KIZER  741 ne.2d 1103, 318ill.app.3d 238

PEOPLE V. WHITNEY 241 ill.dec, 770,720 ne.2d 225

PEOPLE V. WILLIAMS 269 ill.dec. 777, 781 ne.2d 574


NO ADDITIONAL TESTIMONY WAS TAKEN AT THE SENTENCING HEARING. NO MEDICAL TESTIMONY

OR HOSPITAL OR HOSPITAL RECORDS CONCERNING ANY INJURIES WERE OFFERED AT TRIAL.

THE TRIAL COURT PRONOUNCED ITS SENTENCES WITHOUT MAKING ANY FINDINGS OR OBSERVATION

ABOUT THE SEVERITY OF THE INJURY SUFFERED BY THE VICTIM.

C000895

In Conclusion DefendANT Cite A slew of cases Backing his Arguments. That the trial court Erred in Fashioning a Consecutive Sentence. The triAl Court Violated the Double Jeopardy provision.

Ineffective assistance of Trial Counselor

Ineffective assistance of AppellAtE Counselor

As skilled Criminal Defense Lawyers Counselors should of known And acted accordinly that Defendant Sentence Doesnt Fit the Statutary Requirements Under 730 ILCS 5/5-8-4.A

Defendant Conduct, how ever In committing the offenses Did Not result n Severe Bodily InJury to the Victim. Therefor the Requirements For the exception nder 730 Ilcs 5/5-8-4 A hasnt Been Satisfied. A Sentence May Be Ittach At Any time If They Dont Conform to A StAtutory Requirement nd there for ARE Void. People V. ARNA 168, Ill. 2d 107, 113, 212. Ill. Dec. 963, )58 N.e. 2d 445.   Consecutive sentences ARE Not WarraNTed In this CASE. DefendANT ask this Court to Modify the Sentences to Run Concurrent.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1998-CF-1558 |
| | ) | |
| DEDRIC MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**
SIXTH JUDICIAL C.t

**JUL 2 8 2006**

Linda S. _____
CLERK OF THE _____
CHAMPAIGN COUNTY ILLINOIS B

## <u>ORDER</u>

The Defendant has filed a successive post-conviction petition on July 21, 2006.
The Court will not recite the facts of the case due to successive petitions by the
Defendant and successive Orders by the Appellate Court and supervisory Orders by the
Illinois Supreme Court.

The Defendant claims ineffective assistance of trial counsel as well as appellate
counsel for not arguing that although the Defendant's actions were heinous and brutal,
they did not result in severe bodily injury, 730 ILCS 5/5-8-4(a)(i).

The Defendant was sentenced to consecutive sentences by the Court pursuant to
730 ILCS 5/5-8-4(b). Under this section there is no requirement that the victim suffers
severe bodily injury. The trial court in fashioning consecutive sentences relied on sub-
paragraph b,

> "that consecutive sentences are required to protect the
> public from further criminal conduct by the Defendant ..."

The Appellate Court on September 6, 2005, affirmed the trial court's finding that
consecutive sentences were required based on the record in this case and pursuant to
730 ILCS 5/5-8-4(b).



Therefore, since trial counsel and appellate counsel never argued against a position that the trial court didn't take, they cannot be considered ineffective. The Defendant's petition is frivolous, patently without merit and outrageous given the record in this case. The Defendant's post conviction petition is therefore dismissed.


Date: _____7/28/06_____        _____
                                Thomas J. Difanis
                                Circuit Judge

 

Dedric Moore
Reg. No. K-53438
711 Kaskaskia St.
Menard, Il 62259-0711

August 25, 2006

Linda Frank / Clerk of the Court
Circuit Court of Champaign
101 East Main St.
Urbana, Illinois 61801

**FILED**
SIXTH JUDICIAL CIRCUIT

AUG 30 2006

RE:   **RETURNED STAMPED FILED COPY:**

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

Dear Ma'am:

I am writing this brief missive alone with the enclosed legal document (Motion For Reconsideration, or in the Alternative Notice of Appeal).

Unfortunately, this facility is presently on lock-down and we are unable to have physical excess to the library and upon having a staff come over, then did not give me the necessary copies that I requested.   So, I am only able to send this one copy, but i was able to send the state (1) copy.

Therefore, I respectfully ask of you to please foward me back a stamped filed copy.

While thanking you in advance for your time and assistance rendered in this legal endeavor.   I remain.

Cordially

Dedric Moore
Dedric Moore

C000899

**FILED**
SIXTH JUDICIAL CIRCUIT

IN THE
CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

**AUG 30 2006**

CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| PLAINTIFF-RESPONDENT, ) | |
| ) | |
| -VS- ) | CASE NO. 98 CF 1558 |
| ) | |
| DEDRIC MOORE, pro. se. ) | HONORABLE THOMAS J. DIFAMS |
| PETITIONER-DEFENDANT. ) | CIRCUIT JUDGE. |

### NOTICE OF FILING

TO:  JULIA RIETZ, STATES ATTORNEY
CHAMPAIGN COUNTY COURT HOUSE
101 EAST MAIN STREET
URBANA, ILLINOIS 61801

PLEASE TAKE NOTICE, that on this _25_ day of August 2006, I have
filed with the Clerk of the Court, LINDA FRANK, 101 East Main St,
Urbana, Illinois 61801, (1) One Original and (2) Two Copies of the
Petitioner's <u>Motion For Re-Consideration of Petitioner's Post-Con-</u>
<u>viction Petition, or In The Alternative Notice Of Appeal</u>, and you are
hereby served herewith.

/s/ _DEDRIC MOORE_
DEDRIC MOORE, pro. se.

STATE OF ILLINOIS   )
COUNTY OF CHAMPAIGN )  ss:

### CERTIFICATE OF SERVICE

The undersigning being first duly sworn upon oath, deposes and
states that the above <u>Notice</u> and <u>Motion For Re-Consideration Of</u>
<u>Petitioner's Petition For Post-Conviction Relief, or In The Alter-</u>
<u>native, Notice Of Appeal</u>, was served upon the above named party on
this _25_ day of August, 2006, by depositing the same and said in
the proper Prison Official Hands here at the Menard Corr. Ctr. 711
Kaskaskia St. Menard, Illinois 62259-0711, to affis the Proper First
Class Postage and placement in the U.S. Mail Service to be delivered.
and pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare
all of the above is true in fact and in substance.

/s/ _DEDRIC MOORE_
DEDRIC MOORE, REG. NO. K-53438
711 Kaskaskia St./Box-711
Menard, Illinois 62259-0711

C000900



## <u>VERIFICATION OF CERTIFICATION</u>

I, <u>DEDRIC MOORE K-53438</u>, the undersigned, certify and states the following in support thereof:

1.    I AM THE DEFENDANT-PETITIONER IN THE ABOVE ENTITLED CAPTIONED
MATTER:

2.    I HAVE READ THE FOREGOING APPLICATION?MOTION AND HAVE DIRECT
KNOWLEDGE OF ITS CONTENTS:

3.    UNDER PENALTIES AS PROVIDED BY LAW PURSUANT TO SEC. 1-109
OF THE CODE OF CIVIL PROCEDURE, I CERTIFY THAT THE STATEMENTS
SET FORTH IN THE FOREGOING DOCUMENTS ARE TRUE IN SUBSTANCE
AND IN FACTS AND CORRECT EXCEPT AS TO MATTERS HEREIN STATED
TO BE ON INFORMATION AND BELIEF, AND AS TO SUCH MATTERS I
CERTIFY THAT I BELIEVE THE SAME TO BE TRUE.

FURTHER, I SAYETH NOT.

/S/ _____
DEDRIC MOORE, K-53438

**SUPREME COURT OF ILLINOIS
CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

97733

March 24, 2004

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No.  97733 - People State of Illinois, respondent, v. Dedric T.
        Moore, petitioner.  Leave to appeal, Appellate
        Court, Fourth District.

   The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.

     The mandate of this Court will issue to the Appellate Court

on April 15, 2004.

EXHIBIT U

Westlaw.

783 N.E.2d 32                                                                    Page 1

202 Ill.2d 688, 783 N.E.2d 32, 270 Ill.Dec. 457
**(Cite as: 202 Ill.2d 688, 783 N.E.2d 32)**

**H**
People v. MooreIll.,2003.
Supreme Court of Illinois.
PEOPLE State of Illinois, respondent,
v.
Dedric MOORE, petitioner.
**No. 93281.**

Feb. 5, 2003.

Petition for leave to appeal denied.

In the exercise of this Court's supervisory authority, the Appellate Court, Fourth District, is directed to vacate its judgment in *People v. Moore,* case No. 4-99-0499 (01/11/02) and is further directed to reconsider its decision in light of *People v. Swift,* 202 Ill.2d 378, 269 Ill.Dec. 495 (2002).

Ill.,2003.
People v. Moore
202 Ill.2d 688, 783 N.E.2d 32, 270 Ill.Dec. 457

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT V

E-FILED
Friday, 04 May, 2007  05:01:35 PM
Clerk, U.S. District Court, ILCD

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

101500

January 25, 2006

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 101500 - People State of Illinois, respondent, v. Dedric T.
            Moore, petitioner.  Leave to appeal, Appellate
            Court, Fourth District.

     The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.

     The mandate of this Court will issue to the Appellate Court

on February 16, 2006.

EXHIBIT W