**E-FILED**
Friday, 04 May, 2007  05:05:29 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. DEDRIC MOORE, | ) ) ) | |
| Petitioner, | ) ) | No. 07-2015 |
| v. | ) ) | The Honorable Michael P. McCuskey, |
| DONALD HULICK, | ) ) | Judge Presiding. |
| Respondent. | ) | |

### TO THE CLERK OF THE DISTRICT COURT

Pursuant to Rule 5, 28 U.S.C. sect. 2254, the below-named Exhibits are being filed:

Exhibit X:    Trial court record.

Respectfully submitted,
LISA MADIGAN
Attorney General of Illinois

BY:    /s/ Mary A. Fleming
MARY A. FLEMING
Assistant Attorney General
100 W. Randolph, 12th Floor
Chicago, Il. 60601
(312) 814-3692
Mfleming@atg.state.il.us
Atty. Reg. #6242892

E-FILED
Friday, 04 May, 2007  05:06:16 PM
Clerk, U.S. District Court, ILCD

1

2          IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

3                      CHAMPAIGN COUNTY, ILLINOIS

4

5     THE PEOPLE OF THE            )
      STATE OF ILLINOIS            )          **FILED**
6                                  )          SIXTH JUDICIAL CIRCUIT
            vs                     )   98-CF-1558
7                                  )          NOV 1 0 1999
      DEDRIC MOORE                 )
8                                  )          Linda S. Frank
            Defendant             )          CLERK OF THE CIRCUIT COURT
9                                            CHAMPAIGN COUNTY, ILLINOIS

10          Report of Proceedings of the Motion to Continue before the

11    Honorable J. G. Townsend, on the 25th day of February, 1999.

12

13                          APPEARANCES:

14    MS. HEIDI LADD                     MS. DIANA LENIK
      Assistant State's Attorney         Attorney at Law
15    Appearing on behalf                Appearing on behalf
      of the People                      of the Defendant
16

17    Teresa R. Valdez,
      Official Court Reporter,
18    Sixth Judicial Circuit,
      State of Illinois.
19       Certificate Number
            84-1358
20

21

22

23

24

EXHIBIT X

1          THE COURT:  Dedric Moore, 98-1958.  Your name?

2          MR. MOORE:    Dedric Moore.

3          THE COURT:  Ms. Lenik for the defense.  Ms. Ladd for the

4     State.  This is a defendant's motion to continue.  The State's

5     position?

6          MS. LADD:    We object, Your Honor.

7          THE COURT:  Speak to your motion to continue, Ms. Lenik.

8          MS. LENIK:  Your Honor, two reasons why I believe it

9     would be appropriate to continue this matter.  I have been

10    specifically instructed by my client to ask for a continuance.

11    It is his personal request that the matter be continued.

12    Yesterday, I received supplemental discovery.  I received it at

13    such time and under such circumstances as I did not have the

14    opportunity before my pre-trial to consult with Mr. Moore about

15    the new materials contained in this discovery.  In addition, I

16    have been informed and believe that there is further discovery,

17    which has yet been forthcoming, because there were certain

18    samples and certain photographs taken of the victim.  And,

19    obviously, I am not ready to go to trial, if there are still

20    discovery matters outstanding.  In addition, my client has

21    informed me several times during the pendency of these

22    proceedings, that he has been speaking to another attorney and,

23    certainly, if he wishes another attorney to represent him, I

24    believe that it would be appropriate to give him a continuance

to allow that attorney to enter his appearance.  He has not done
so, but I have had conversations with my client about his
conversations with that attorney.

    THE COURT:  Your lawyer is asking for a continuance.  Is
that consistent with what you would like to have happen with the
case?

    MR. MOORE:    Yes, sir.

    THE COURT:  The State's position on the defendant's
motion, Ms. Ladd?

    MS. LADD:   Your Honor, the State objects.  This
defendant has been in custody since November 19th on these
matters.  Any representations that he wants another attorney, I
would suggest, are illusory at best.   He has had several months
to pursue that.  The State has some forty subpoenas now out on
this matter.  With regard to the discovery that was filed, the
bulk of that discovery is supplemental or cumulative.  The
discovery that was previously tendered.  The only new
information was a result of handwriting and DNA analysis.  The
informal representations in the newest discovery as to those
results of DNA, by the way, to another suspect, that eliminated
him.  The results of this defendant were on file quite sometime
ago.  Those results were neither a surprise or unexpected.  The
defendant has been put on notice for sometime that the State was
seeking those results.  I would note the State moved for a

1    continuance last time and the defendant objected.  There has

2    been no showing of prejudice or what the defendant needs the

3    continuance for, and I would suggest that if there is a need for

4    counsel to sit down and talk to her client, we could set it for

5    the second week and be ready to go then.  There is still some

6    two weeks and several days before that would then come to trial.

7         THE COURT:  Is there further discovery to be produced,

8    Ms. Ladd?

9         MS. LADD:  There will be the reports and notes that were

10    the basis for the laboratory results that have been previously

11    tendered.  The written reports are not completed by the lab yet.

12         THE COURT:  And, these are results that exclude another

13    suspect?

14         MS. LADD:  The defendant's brother is excluded by the

15    DNA results.  The handwriting results have neither eliminated,

16    nor, are consistent with that type of handwriting, and I have

17    tendered all of that orally to Ms. Lenik yesterday, as well as

18    in writing.  I don't have the actual report yet.

19         THE COURT:  Further on the motion, Ms. Lenik?

20         MS. LENIK:  Your Honor, this is an event which occurred

21    approximately a year ago and the State's Attorney did not arrest

22    my client for a period of perhaps ten months or so after the

23    events occurred, and it seems as if they had had an ample time

24    at that point and now that he is in custody, it seems like they

4

1    are trying to hurry this along when, in fact, this event

2    occurred a year ago.  I don't see what additional prejudice

3    there could be after this much time between the act occurring

4    and the trial.  The defendant simply needs more time to prepare.

5        THE COURT:  I have considered the arguments of counsel,

6    the contents of the motion.  I deny the defendant's motion to

7    continue.  Your client's case will be on the trial list for the

8    trial term, which begins March 8th.  Follow the officer's

9    instructions, Mr. Moore.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

I, Teresa R. Valdez, an Official Court Reporter of the Sixth Judicial Circuit, Champaign County, Illinois, do hereby certify that I reported the proceedings had in the above-entitled cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be true and accurate.

Dated this 10th day of November, 1999.

*Teresa Valdez*

Teresa Valdez, CSR
Official Court Reporter

1

2               IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

3                      CHAMPAIGN COUNTY, ILLINOIS

4

5     THE PEOPLE OF THE          )
      STATE OF ILLINOIS          )
6                                )
                 vs              )      98-CF-1558
7                                )
      DEDRIC MOORE               )
8                                )
           Defendant             )
9

**FILED**
SIXTH JUDICIAL CIRCUIT
**JUN 29 1999**
Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

10          Report of Proceedings of the Motion to Continue before the

11     Honorable J. G. Townsend, on the 25th day of February, 1999.

12

13                           APPEARANCES:

14     MS. HEIDI LADD                      MS. DIANA LENIK
       Assistant State's Attorney          Attorney at Law
15     Appearing on behalf                 Appearing on behalf
       of the People                       of the Defendant
16

17     Teresa R. Valdez,               **4-99-0499**
       Official Court Reporter,
18     Sixth Judicial Circuit,
       State of Illinois.
19          Certificate Number
               84-1358
20

21

22        **VOL. I**

23

24

**FILED**
**AUG 2 0 1999**
Clerk of the
Appellate Court, 4th Dist.

1

2    1           THE COURT:   Dedric Moore, 98-1558.   Your name?

2           MR. MOORE:      Dedric Moore.

3           THE COURT:   Ms. Lenik for the defense.   Ms. Ladd for the

4    State.   This is a defendant's motion to continue.   The State's

5    position?

6           MS. LADD:    We object, Your Honor.

7           THE COURT:   Speak to your motion to continue, Ms. Lenik.

8           MS. LENIK:   Your Honor, two reasons why I believe it

9    would be appropriate to continue this matter.   I have been

10   specifically instructed by my client to ask for a continuance.

11   It is his personal request that the matter be continued.

12   Yesterday, I received supplemental discovery.   I received it at

13   such time and under such circumstances as I did not have the

14   opportunity before my pre-trial to consult with Mr. Moore about

15   the new materials contained in this discovery.   In addition, I

16   have been informed and believe that there is further discovery,

17   which has yet been forthcoming, because there were certain

18   samples and certain photographs taken of the victim.   And,

19   obviously, I am not ready to go to trial, if there are still

20   discovery matters outstanding.   In addition, my client has

21   informed me several times during the pendency of these

22   proceedings, that he has been speaking to another attorney and,

23   certainly, if he wishes another attorney to represent him, I

24   believe that it would be appropriate to give him a continuance

2

1    to allow that attorney to enter his appearance.  He has not done

2    so, but I have had conversations with my client about his

3    conversations with that attorney.

4        THE COURT:  Your lawyer is asking for a continuance.  Is

5    that consistent with what you would like to have happen with the

6    case?

7        MR. MOORE:   Yes, sir.

8        THE COURT:  The State's position on the defendant's

9    motion, Ms. Ladd?

10       MS. LADD:   Your Honor, the State objects.  This

11    defendant has been in custody since November 19th on these

12    matters.  Any representations that he wants another attorney, I

13    would suggest, are illusory at best.   He has had several months

14    to pursue that.  The State has some forty subpoenas now out on

15    this matter.  With regard to the discovery that was filed, the

16    bulk of that discovery is supplemental or cumulative.  The

17    discovery that was previously tendered.  The only new

18    information was a result of handwriting and DNA analysis.  The

19    informal representations in the newest discovery as to those

20    results of DNA, by the way, to another suspect, that eliminated

21    him.  The results of this defendant were on file quite sometime

22    ago.  Those results were neither a surprise or unexpected.  The

23    defendant has been put on notice for sometime that the State was

24    seeking those results.  I would note the State moved for a

3

continuance last time and the defendant objected.  There has
been no showing of prejudice or what the defendant needs the
continuance for, and I would suggest that if there is a need for
counsel to sit down and talk to her client, we could set it for
the second week and be ready to go then.  There is still some
two weeks and several days before that would then come to trial.

THE COURT:  Is there further discovery to be produced,
Ms. Ladd?

MS. LADD:  There will be the reports and notes that were
the basis for the laboratory results that have been previously
tendered.  The written reports are not completed by the lab yet.

THE COURT:  And, these are results that exclude another
suspect?

MS. LADD:  The defendant's brother is excluded by the
DNA results.  The handwriting results have neither eliminated,
nor, are consistent with that type of handwriting, and I have
tendered all of that orally to Ms. Lenik yesterday, as well as
in writing.  I don't have the actual report yet.

THE COURT:  Further on the motion, Ms. Lenik?

MS. LENIK:  Your Honor, this is an event which occurred
approximately a year ago and the State's Attorney did not arrest
my client for a period of perhaps ten months or so after the
events occurred, and it seems as if they had had an ample time
at that point and now that he is in custody, it seems like they

4

1    are trying to hurry this along when, in fact, this event

2    occurred a year ago.  I don't see what additional prejudice

3    there could be after this much time between the act occurring

4    and the trial.  The defendant simply needs more time to prepare.

5        THE COURT:  I have considered the arguments of counsel,

6    the contents of the motion.  I deny the defendant's motion to

7    continue.  Your client's case will be on the trial list for the

8    trial term, which begins March 8th.  Follow the officer's

9    instructions, Mr. Moore.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

I, Teresa R. Valdez, an Official Court Reporter of the Sixth Judicial Circuit, Champaign County, Illinois, do hereby certify that I reported the proceedings had in the above-entitled cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be true and accurate.

Dated this 29th day of June, 1999.

Teresa Valdez, CSR
Official Court Reporter

1

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

2

CHAMPAIGN COUNTY, ILLINOIS

3

THE PEOPLE OF THE                    )
4  STATE OF ILLINOIS                     )
                                       )
5             vs                        )     98-CF-1558
                                       )
6  DEDRIC MOORE                         )
                                       )
7        Defendant                      )

8        Report of Proceedings of the Motions held in the

9  above-entitled cause on the 8th day of March, 1999, before

10  the Honorable Thomas J. Difanis, Judge Presiding.

11                         APPEARANCES:

12  MS. HEIDI LADD                      MS. DIANA LENIK
    Assistant State's Attorney          Attorney at Law
13  Appearing on behalf                 Appearing on behalf
    of the People                       of the Defendant

14

15  Teresa R. Valdez,
    Official Court Reporter,
16  Sixth Judicial Circuit,
    State of Illinois.                  **FILED**
17     Certificate Number
         84-1358
18                                      JUN 11 1999

19

20                                      Linda S. Franks
                                        **CLERK OF THE CIRCUIT COURT**
21  **4-99-0499**                       **SIXTH JUDICIAL CIRCUIT**
                                        **CHAMPAIGN COUNTY, ILLINOIS**
22

23

24  **vol. VI**
                                        FILED
                                        AUG 2 0 1999
                                        Clerk of the
                                        Appellate Court, 4th Dist.

18

1          THE COURT:  All right.  The case I have set is Mr. Moore.

2     Is Mr. Moore here?

3          MS. LENIK:  He is.

4          THE COURT:  98-CF-1558.  Where is Mr. Moore?  Mr. Moore

5     is present.

6          Lenik:  Your Honor, I have a motion in that matter that I

7     would like to take up now before we get too far along in it.

8          THE COURT:  First of all, this was a case that I thought

9     was going to be tried next week.  So, we will take this motion

10    up when I get done with my call.

11               (Whereupon, there was a recess held)

12         THE COURT:  All right.  Let's deal with 98-CF-1558,

13    Dedric Moore.  The defendant is present.  I have a motion to

14    withdraw as counsel on file.  Ms. Lenik, as to your motion?

15         MS. LENIK:  Your Honor, has the Court read it and the

16    attachments thereto?

17         THE COURT:  Yes.

18         MS. LENIK:  Your Honor, I am not suggesting that the

19    State's Attorney is doing anything purposely.  However, by the

20    natural act of setting my name as the name of a witness to a

21    statement and having the detective place my name in a police

22    report, my fundamental relationship with my client has been

23    undermined in a very, very profound way, and I don't think that

24    there is any way that it can be repaired at this date, because

18    1    it is certainly possible and plausible for this information to

2    be sought, to be testified to at the trial.   I'm not doing this

3    out of any frivolous notion or out of any spite.   I don't have

4    any personal animus, certainly, towards my client.   I don't have

5    any personal animus either toward the State's Attorney, nor,

6    toward the officer, but I believe now that I am in a position

7    where I am being held to be a witness.   If, for example, my

8    client testifies, and in order to ascertain his lack of

9    credibility, the State puts on Detective Shepard to say how he

10    behaved in a particular interview or, if there are questions

11    regarding these photographs, and I know there will be, because

12    the defense in this case is an identification defense.   He is

13    saying that it is not him, because of the identification.   Not

14    that the incident didn't occur or that the woman is lying about

15    the incident, but it is, basically, an identification defense.

16    With his identification at issue the way it is, the fact of

17    these photographs is crucial.   What happened during the taking

18    of them, whether the person depicted in the photograph is the

19    person who did this offense.   All of those things will be

20    particularly important testimony, and if I am being put in a

21    position where I know something different from what I would

22    ordinarily know through my attorney-client relationship with Mr.

23    Moore, then, I am being put in a position where my fundamental

24    relationship with him is undermined and, frankly, I don't do

3

8

1    this, again, out of animus.  I don't do it to cause problems for

2    the Court, but I do it because I don't think Mr. Moore can get a

3    fair trial, at this point, because I am being put in a situation

4    between Mr. Moore and the other witnesses for the State, and I

5    simply--I know that it's late.  I am not doing it, because I

6    want to.  I am doing it, because I feel I need to, and I simply

7    don't feel that I can fairly represent Mr. Moore, knowing that

8    if this incident is called into question, that he would either

9    want me to testify, or the State would want me to testify, and I

10   can't be, obviously, in a position to do that.  Nor, do I have

11   any other attorneys in my office who could try the case if I had

12   to be a witness, which, I suppose, would be the other

13   alternative.  So, I am asking at this time for the Court to

14   allow my motion to withdraw as counsel.  There are other

15   contract attorneys.  There is the Public Defender's Office.

16   This is a single defendant case.  I might also tell the Court

17   that, although, the incident was alleged to have occurred in

18   February of 1998, there was not a warrant issued until November

19   of 1998.  So, Mr. Moore was at large in the community for

20   approximately nine months, without the matter having been

21   brought to the attention of the Court at all.  So, that any

22   detriment that there might be to the alleged victim and to other

23   witnesses would be somewhat mitigated by that.  So, that the

24   fact that it is very late and the fact that we have announced it

4

8    1    for trial, ought not be the determinative factor in the Court's

2    decision.  I would simply ask the Court to allow my motion to

3    withdraw and appoint new counsel for Mr. Moore.

4         THE COURT:  Ms. Ladd.

5         MS. LADD:   If it please the Court and Counsel.  Your

6    Honor, the situation Ms. Lenik has brought to the Court's

7    attention exists in almost every case where there is some type

8    of physical evidence taken pursuant to the Supreme Court Rules.

9    It's, obviously, required that counsel stand by to protect their

10   client's rights.  This is no different than every other case

11   where counsel is present and blood is taken.  There is a lineup

12   that's conducted.  I suppose you could make the argument, then,

13   we would have to appoint two attorneys on every case.  That

14   counsel just stands by and doesn't know anything about the case,

15   to protect the client's rights, and then the counsel who is

16   handling the case.  That is not a requirement that's put on this

17   Court.  The State does not intend to call Ms. Lenik or elicit

18   any statements that she made.  Simply the fact that the pictures

19   were taken and the circumstances under which they were taken.

20   Ms. Lenik has yet to make a showing to this Court or any

21   representation of what she would testify to or where the

22   conflict exists.  I think there has to be some representation

23   that there is something she is contesting, so we can limit that,

24   if appropriate, but at this point, the fact that I am going to

5

8

1    call the detective to testify that he went to the jail pursuant

2    to a court order and took these photographs physically of the

3    defendant and this is what the defendant physically did and here

4    is the photograph, is completely appropriate, and I don't see

5    how that in any way creates any type of complication or any

6    conflict that's going to require that Ms. Lenik withdraw.  So, I

7    strongly oppose the motion.

8         MS. LENIK:  Your Honor, may I respond?

9         THE COURT:  Yes.

10        MS. LENIK:  Your Honor, I trust that Ms. Ladd wouldn't

11   call me, but then we are in a position where she has already

12   said she is calling Detective Shepard.  My client might want to

13   call me, because I presume that part of the information

14   contained in this material is my client's non-cooperation.  I

15   would be stunned if there were a police officer, who didn't wish

16   to inform the jury that my client was not cooperative and if he

17   relates the facts of my client's non-cooperation, then, I am in

18   a position where my client, at least, would want me to recite

19   the facts of his cooperation and there it is and in all of the

20   years that I have been doing this, I have never had, and it may

21   be true that this is similar in type to going to a lineup and to

22   attending those other various physical takings of evidence, but

23   never ever have I had my name listed as somebody in front of

24   whom a statement was taken.  I mean, in her supplemental

6

1    discovery, which I have attached. Ms. Ladd says the defendant

2    made oral statements witnessed by Don Shepard and Diana Lenik.

3    That's never happened. And, again, although, my name might be

4    mentioned occasionally in police reports in lineup situations,

5    in lineup situations, I am merely present. I am hanging around.

6    I am telling the defendants in the room before the witness gets

7    there, you know, things like, you know, don't laugh, that sort

8    of thing. Things that are pretty innocuous. This goes to the

9    ultimate heart of what we were there for. It goes to his

10   cooperation or lack thereof. It's not simply that I stood there

11   while Detective Shepard took a picture of my client. If that's

12   all it was, I wouldn't be concerned, because it is a fact that I

13   stood there while the photograph was taken, or that I sat there

14   while the photograph was taken, but that's not what I am

15   concerned about. What I am concerned about goes beyond that

16   sort of innocuous behavior. What I am concerned about is that

17   this goes to my client's behavior. Perhaps, arguably, his state

18   of mind and things that are going to be the ultimate issues in

19   this trial. In this police report, which I have attached to my

20   motion, where the detective says something in his final page--I

21   am looking for the exact language--he talks about how he didn't

22   cooperate the last time he tried to do it, and he was trying to

23   do it again, and that's the thing that I am concerned about. I

24   instructed him various things about his teeth and his missing

7

teeth and he acted as if he could not accomplish this, which I,
frankly, think is categorically not true, and now I am being put
in a position, where he would want to call me to say, no, that's
simply not true, because I know that the officer is going to
want to say and imply that he wasn't being helpful, because he
knew it was him and he was trying to disguise his appearance,
because he knew it was him.  This is more than just standing
there or sitting there or saying to a roomful of people, you
know, get serious.  This is serious stuff.  This goes to the
very heart of an identification defense and I simply don't
believe, at this point--I mean, I can't testify on my client's
behalf, even though, at this point, he might want me to, as a
rebuttal witness, when the officer implies that he wasn't
cooperative.  That he tried to hide his appearance, because,
obviously, his appearance is the main heart of his defense, and
that's why I am asking to withdraw at this time.

    THE COURT:  Well, at this point, I am going to deny the
motion to withdraw.  Ms. Ladd, I can foresee some problems, if
we get into Officer Shepard's subjective opinion as to
cooperation or lack thereof, then, Ms. Lenik, who was there,
may--I assume her client might want her to testify that he was
being cooperative.  I see no reason why we need to get into the
defendant's demeanor.  Officer Shepard or Detective Shepard,
according to this report, can testify as to the photos he took,

8

9    1    what the defendant did in response to questions, such as showing

2    your teeth, and things like that, but if we start to get

3    involved with whether or not the defendant was cooperative,

4    then, I think that might cause Ms. Lenik a problem.  I don't

5    know that you need any statements that the defendant made.  What

6    I am going to do is ask that, in the intervening week, you give

7    some thought as to how you can pare this down to sanitize as

8    much as possible, so that Ms. Lenik doesn't run the risk of

9    having her client want to call her as a witness.  If this is a

10   crucial portion of the case, then, I will re-visit the issue,

11   but I don't believe that, at this point, I am going to grant the

12   motion to withdraw.  The motion to withdraw is denied.

13        MS. LENIK:  Your Honor, I would renew my motion to

14   continue, which the Court asked that, because we had moved to

15   continue earlier, and I would renew my motion to continue at

16   this point.

17        THE COURT:  I thought we were going to try this next

18   week.

19        MS. LENIK:  Well, that doesn't mean I can't renew my

20   motion to continue.

21        THE COURT:  All right.  And, your basis for the motion to

22   continue?

23        MS. LENIK:  Your Honor, I have been presented with

24   several witnesses today from my client.  I have an insufficient

9

1    amount of time to contact them and to tender them to the State.

2    In addition, I received by facsimile transmission on Friday at

3    approximately 4:19, State Police evidence, which I received by

4    mail today.  Frankly, I don't believe that the discovery is

5    complete.  I keep getting discovery in the mail every day from

6    the States Attorney, either by mail or by facsimile, and I don't

7    see how I can be ready, if they keep throwing discovery at me up

8    until the minute of trial.

9        THE COURT:  What was the nature of the last discovery

10    that you got concerning the state police exhibits?

11        MS. LENIK:  Your Honor, I got a State Police report dated

12    March 5, 1999, from Forensic Scientist Kevin Zeeb, Z as in Zoo,

13    E-E-B, in which the DNA, which was calculated, was

14    re-calculated, and states that the profile would be expected to

15    occur in approximately one in one hundred and fifty billion,

16    that's billion with a B, blacks, or one in seven hundred and

17    twenty billion, with a B, Caucasians, etc, in the certain piece

18    of evidence that was given, and then there is some other DNA,

19    which they state couldn't have originated from my client or the

20    alleged victim and some other things regarding new validation

21    studies and new calculations and new frequencies regarding the

22    DNA, and that's dated March 5.  Came by facsimile Friday at

23    4:20.  Came in the mail today.  I think that there is

24    simply--there is simply too much in the way of evidence for me

10

1   to honestly say, in a case of this magnitude, that we can try it

2   on Monday.

3       THE COURT:  Well, Ms. Lenik, it appears that, from what

4   you are telling me, it was a re-calculation of the probability,

5   as opposed to the, for the first time finding out that the DNA

6   evidence points to your client, is that correct?

7       MS. LENIK:  That's correct.

8       THE COURT:  Ms. Ladd, anything you want to say to this

9   motion to continue?

10      MS. LADD:  Your Honor, I would object.  The Court has

11  summed it up.  It's simply a re-calculation.  Nothing new, in

12  terms of the physical evidence, other than that.  It could have

13  been testified to without a report.  I think it's only fair to

14  present the report, but it doesn't change anything.  We have

15  been ready for sometime and this case has been set for sometime

16  and I believe that continuing it to next Monday will allow ample

17  opportunity for counsel to be ready.

18      THE COURT:  All right.  I am going to deny the motion to

19  continue.  As I have indicated, this matter will be called for

20  trial on Monday, the 15th day of March 9:00, in this courtroom.

21      MS. LENIK:  9 or 8:30?

22      THE COURT:  9:00.

23      MS. LENIK:  Thank you, judge.

24      MS. LADD:  Thank you, Your Honor.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

I, Teresa R. Valdez, an Official Court Reporter of the Sixth Judicial Circuit, Champaign County, Illinois, do hereby certify that I reported the proceedings had in the above-entitled cause; that I thereafter caused the foregoing to be transcribed, which I hereby certify to be true and accurate.

Dated this 25th day of May, 1999.

_____
Teresa Valdez, CSR
Official Court Reporter

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,  )
                                        )
                Plaintiff,    )
                                          )
                      v.          )   No. 98-CF-1558
                                          )
DEDRIC T. MOORE,                   )
                                          )
                Defendant.    )

REPORT OF PROCEEDINGS of the Jury Trial

had in the above-entitled cause on March 15, 1999,

before the HONORABLE THOMAS J. DIFANIS, Judge Presiding.

APPEARANCES:

    MS. HEIDI LADD
    Assistant State's Attorney
    for the People

    MS. DIANA LENIK
    Attorney at Law
    for the Defendant

**FILED**
SIXTH JUDICIAL CIRCUIT

B JUL 2 8 1999

*Linda S. Frank*
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

*Vol. VII*

Melissa Clagg, RDR
License No. 84-2876
Official Court Reporter
Champaign County Courthouse
Urbana, Illinois  61801

FILED

AUG 2 0 1999

Clerk of the
Appellate Court, 4th Dist.

*4-99-0499*



1

2                              MARCH 15, 1999

3              THE COURT:  This is 98-CF-1558, People v.

4    Moore.  The Defendant is present personally with Ms.

5    Lenik.  Ms. Ladd is here on behalf of the People.

6              What's the deal with the motion in limine

7    filed by the Defendant concerning impeachment of the

     Defendant if he chooses to testify with his prior

8    criminal convictions, Ms. Lenik?

9              MS. LENIK:  Your Honor, I think that the

10   written motion is pretty much -- pretty much sets forth

11   what the situation is.  This is the standard motion.

12   Although, I think it is a little bit different in this

13   case because the charge that he is charged with is so

     profoundly serious that I think the Court needs to look

14   much more carefully at the question of what's going to

15   prejudice the jury.

16             He has two prior what we call impeachables.

17   He has a '95 forgery and a '98 attempted burglary.  He

18   is very young, and I believe the '95 case was committed

19   while he was only 17.

20             Understanding that that's an adult conviction,

21   I think that the Court should take that into

22   consideration as well, but he has those two cases.

23             And besides the normal considerations about

24   prejudice, I think there's an additional prejudice here,

                                  2

because the facts of this case are that the individual took from a home and from a person an automatic teller machine card and then went to an automatic teller machine and made a withdrawal on that card.

Those facts are very similar to the charges of both forgery and attempt burglary, and so I think that if the Court would advise the jury that he has those two priors, then that's the same as advising him, because of the facts of this case, the same as advising him of the fact that if he had committed the identical charge.

And so I think for those particular reasons in this particular case, the Court should allow the motion in its entirety and not just the fact-based inquiry that the Court sometimes permits.

If the Court simply permits the fact-based inquiry, then that leads to speculation among the jury; "Okay. We know he's a convicted felon. What do you think it is? Do you think he committed another sex offense? Do you think he committed another violent offense? Another home invasion?"

Because of the profoundly serious nature of the charges, I would ask the Court to look differently at this motion than the usual motion and ask the Court to allow it in its entirety.

THE COURT: Thank you. Ms. Ladd?

3

MS. LADD:  If it please the Court and Counsel?

Your Honor, I would suggest to the Court that the '98 conviction was a conviction of November 3rd, 1998.  The Defendant is still serving the sentence.

Certainly, the remoteness or closeness to this type of testimony or prospective testimony is one of the factors that the courts have directed this Court to weigh.

When you weigh the balance and the importance of evaluating credibility, I would suggest that the fact the Defendant stands convicted is information that the jury would be entitled to know.

Certainly, the prophylactic method of the mere fact test would be the most effective way to communicate that to the jury, and I would ask the Court to adopt that.

THE COURT:  Well, the Court always must weigh the probative value of a prior, using a prior conviction for impeachment versus the prejudicial impact.

In the case before Court, as Ms. Lenik has said, some of the charges are similar to or very close to the prior convictions that this Defendant has.

I think it would be inappropriate to inform the jury that he has a prior forgery and a prior attempt burglary conviction.

4

But if the jury is to adequately weigh the credibility of the witnesses, and that would include the Defendant, I think they need to know that at some point in time the Defendant chose to violate the laws of society.

So, what I will do is if the Defendant testifies and if the files are brought to the Court's attention, I will let the jurors know that he has prior felony convictions and leave it at that.

So, the motion in limine is denied to that extent.

Any other motions, Ms. Lenik?

MS. LENIK:  Yes, Your Honor.  I would move to exclude and separate witnesses.

THE COURT:  All right.  That motion will be allowed.

MS. LENIK:  Thank you.

THE COURT:  Ms. Lenik, you got a statement of the nature of the case.  You have any objection to it?

MS. LENIK:  Your Honor, I have not seen the statement of the nature of the case.

MS. LADD:  I had several motions as well, Your Honor.

THE COURT:  All right.

MS. LENIK:  Does the Court wish to address Ms.

5

1

2    Ladd's motions or the statement --

3    THE COURT:  Let's do the statement of the

4    nature of the case at this point.

5    MS. LENIK:  Okay.  No objection.

6    THE COURT:  All right.  Ms. Ladd, your
motions?

7

8    MS. LADD:  Your Honor, I had two oral motions
in limine.

9    My first one is in regards to information

10    about when the crime occurred and any delay in when the

11    Defendant was arrested.

12    I've heard that argument made by defense

13    counsel several times when we've been arguing pretrial

14    issues to the Court.

15    I would suggest to the Court that there's no

16    probative value to be drawn from that and that would be

17    an improper inference to suggest to the jury, that

18    because the Defendant wasn't arrested right away that

    somehow he wasn't the one or he didn't commit the crime.

19    When he was arrested is irrelevant; and, as a

20    matter of fact, he was in custody on this forgery

21    conviction, and that was one of the contributing factors

22    to making sure the case was well in order before it was

    brought to charges or to the Grand Jury.

23

24    So, there's no inference that the trier of

6

fact can draw about whether or not this Defendant committed these crimes from any time frame from that arrest to when the crime occurred.  And I believe it'd be absolutely improper to comment on that in any way in opening or questioning or closing argument.

THE COURT:  Ms. Lenik?

MS. LENIK:  Your Honor, the defense in this case is identification.  There is no question that these events occurred, that they occurred to this woman, but the defense is that this is not the man who did it.

And I do think that it's relevant that because of the question of identification and because there's a jury instruction which talks about identification and that one of the factors that the jury can consider in deciding the appropriateness of an identification is the length of time between the time that the witness viewed the Defendant and the Defendant's testimony.  I think that the question of the length of time is important.

This is an identification case.  The defense is that it could not be him because he was somewhere else, and I think that the fact that he wasn't picked out right away, he wasn't examined right away, even that he wasn't arrested right away, although he doesn't have to be arrested right away, but I think that the fact that there was this considerable length of time when he

7

was available in the community, living in the community, where the police knew where he was, as a matter of fact, frankly, he was on probation for part of that time, I believe, and did not arrest him for this, I think goes to bolster the defense that it was somebody else.  And so I do think it's relevant.

I would not say that in any case.  I wouldn't say it in every case, but in a case with an identification defense, the fact that it took the police and the State's Attorney's Office, I presume, approximately 11 -- no, 10 months between the time of this occurrence and the time of the arrest for this charge I think is relevant, and I think that the jury ought to be informed of it.

Now, I'm not gonna argue -- I mean, first of all, the jury's gonna know about it anyway, because when they're told when did this lineup occur, the lineup occurred in March of '98.  Well, the fact that the lineup occurred in March of '98, and the event occurred in February of '98, even if they're not told specifically, they're going to know, I believe, that it isn't gonna take over a year for somebody to come to trial on a particular charge, particularly one as serious as this.

But I do think it's relevant that they know

8

that there was this hiatus, because if this were a defense of consent, it wouldn't be relevant. If this were a defense of insanity, this wouldn't be relevant. But because this is an identification defense, I think it's relevant, and I don't intend to make a big argument out of it. I don't intend to go over it and over it. But I do think that the mere fact of it is relevant.

I think it would be relevant to bring out in opening statements so that the jury doesn't hold it against my client for having something happen more than a year ago and just having it brought to trial now.

People who -- who read and people who see things in the media think that all -- all delays attributable to the defense. Oh, well, it's those technical motions. Oh, well, it's those, you know, it's the sleaziness of the defense. And I think that in a case like this, the fact that the delay is not attributable to the defense is a legitimate point of inquiry.

Therefore, I would simply bring it up. I'm not gonna overdo it. I'm not gonna hammer it, and I think that as to the various witnesses, the various police officers who did certain things in this case a year ago and then didn't do anything for about six months or eight months, ten months, whatever it was, I

9

do think that's relevant.  And at least in argument, I

certainly intend, if allowed, bring up the fact that

there was this hiatus and that Mr. Moore was here,

present in the community.

THE COURT:  Well, we got two different issues

here.

Ms. Lenik, you've indicated that there is

going to be some testimony, you anticipate, about an

identification of the Defendant and a lineup that took

place this month; is that correct?

MS. LENIK:  No.  The lineup that took place a

year ago.  And then after that identification, which

was -- which is going to be the subject of much argument

because it was not a clear identification, but it was an

identification, it took them approximately eight months

to decide to arrest Mr. Moore for this charge.  And that

was after he was already in custody for some other

matter, as I understand it.

THE COURT:  Well, the length of time it took

for an investigation is, I think, irrelevant.  If there

was some question of the length of time between the

offense and the identification, then, obviously, that's

relevant and it is part of an instruction that the jury

might get.  But the fact that an offense occurred in

February and it wasn't charged until November I don't

10

think is relevant at any stage unless there is some

Brady material that has been provided that would

indicate during that period of time there might be some

evidence that would negate the guilt of the Defendant.

So, I'm not going to allow you to get into the

length of time that it took the police to investigate

this matter --

MS. LENIK:  Your Honor, while we're on this?

THE COURT:  Yes?

MS. LENIK:  During that period of time, there

was an officer who believed it to be someone else and

who had a photograph of someone else, which -- and he

wrote a police report suggesting that there were

similarities between this other person and this

particular offense.

Is the Court ruling then that that's

inadmissible?

MS. LADD:  Your Honor, if I might, that was my

second motion in limine.

THE COURT:  Well, what's your position on

that, Ms. Ladd?

MS. LADD:  Your Honor, in any investigation,

there are multiple individuals who officers presume or

target or think is a possibility may be involved.

That's inherent with any major investigation.

11

The case law is absolutely clear that an officer's subjective feelings or hints or concerns or insights are irrelevant.  There has to be some very clear nexus to the individuals being suggested as the alternative suspect.

So, to just simply stand up and ask an officer, "Well, you had a hunch it was somebody else because they may have been involved in a similar crime?" and I wouldn't concede that.

I'll suggest the crime that he was convicted of was groping a fellow worker at a fast food restaurant.

But, nonetheless, there has to be some limit.

The case law is very clear that even seeing someone of a similar description isn't enough.  There has to be more evidence to tie them up to the crime or, in essence, a trial would go on for months and we'd have nothing but a parade of everyone who didn't do it.  The State would have to prove they didn't do it.  That does not entitle the defense to bring in pictures or to ask officers hearsay about why did you think this person was a suspect.

She's certainly entitled to put on evidence that someone was seen, for example, with a gas can in the area, that someone else, if they fit the People v.

12

<u>Powell</u> doctrine, was heard making statements about their involvement in this crime, that someone else may have had some kind of physical evidence that tied them to the crime.

But there is no case law that supports and, in fact, all the case law's to the contrary that you can simply ask an officer, "Did you think it was this person? Did you suspect this person? Is this a booking photo of someone else who might have done it?"

So, my motion <u>in limine</u> is directed towards any kind of inquiry or wild-goose chase or red herring witch-hunt like that.

THE COURT: Well, it would require --

MS. LENIK: Your Honor, might I respond?

THE COURT: All right. Go ahead.

MS. LENIK: You know, it's always a little bit upsetting to be accused of things like red herrings and witch-hunts and all of those loaded words. I've been trying cases here and against Ms. Ladd and in front of this Court for a long time, and I believe that I do my work honestly, and I'm not engaging in anything illicit or improper, and I'm certainly not going on any tangents or anything of that nature; but Officer Shipley of the Champaign Police Department wrote a report in which he says he notes similar similarities between the suspect

13

in a separate case and the suspect in this case.  And those similarities are more than his looking at a picture.  Those similarities include that the individual in this other case had a very, and I'm quoting from Officer Shipley's report, "Has a very noticeable space in the left row of his lower teeth."  Now, that's a little bit more than a male of a certain race and a certain age and a certain weight.

He says that this person had a very noticeable space in the left row of lower -- not even the top of his teeth, but the left row of his lower teeth.

The pictures of the suspect in this case indicate the suspect may have had a similar spacing in his teeth.  Also, this other person has a very prominent jaw structure as the suspect did in the previous case. He has large lips, also similar to the suspect.  His nose is very rounded at the tip, much like the suspect in this case.  The victim of the case, regarding that other man, was a white female.  The victim in this case was a white female.  The suspect in the other case was smoking a thin cigar with a plastic tip.  The person in this case was a cigarette smoker.

So, that's more than simply some wild-goose chase or some herring that there's some very vague description.

14

And what other thing that's going to be shown to the jury in this case are photographs of an individual having driven up to an automatic teller machine, and those photographs are a series.

And in those photographs, the individual is disguised in some manner. The individual has a hat, has a hood pulled up. There is somewhat of a limited view of what you can see of that individual's face.

And so if you take those things which the officer believes and this photograph of this other person and you look at the photographs of the individual who drove up to the ATM machine like -- like he did, there are going to be many more similarities.

And I believe that it is relevant because it's an identification case, that there was a <u>modus operandi</u> or very close similarities that involved somebody else. And, obviously, it's not gonna be any other person of his age and height and race. I mean, I know better than that.

But this one particular thing I think is relevant to show in an identification case that there -- because the testimony is going to be that there's no other living human being on this planet that could have done it. I think that it is relevant to show that there is and that, in fact, there is because this officer

15

looked at some other photograph and said, you know, I
think it could be this person.  The MO is similar.  The
very specific description is similar, and I think that
that's relevant in deciding whether or not the jury
should identify this man as the man who did it.

THE COURT:  Well, Ms. Ladd indicated that the
other individual that is the subject of this suggested
identification was involved in some sexual conduct with
a coworker at a fast food restaurant, and although he
may have borne a physical resemblance to the Defendant
in this case, that, if you want to call it an MO, the
fact that he smokes cigars with tips and this person
involved in this case smokes cigarettes, that's not
close as far as an MO is concerned.

This, apparently, from reading the charges,
involves the entry into someone's residence and the home
invasion, residential burglary charge, as well as the
aggravated arson.

As far as the physical identification is
concerned, I suppose you could just take the last ten
years, go to the correctional center, pull booking
photos of individuals who resemble the Defendant and
probably find at least a dozen people who would very
likely resemble the Defendant.  And, again, that gets to
the point of proving the negative, that these other

16

people didn't commit that offense.

I don't believe that the testimony that would be provided by and through Officer Shipley is of the quality and has the weight to it that would go towards any Brady material, and I don't believe that that testimony would add anything to the case and isn't relevant.

So, I will grant the motion as to any testimony concerning some other individual that Officer Shipley may have thought committed this offense.

So, the motion in limine as far as that is concerned is allowed.

Are there any other motions, Ms. Lenik?

MS. LENIK:  Your Honor, in terms of the list of potential witnesses, I would ask that some names be stricken.

You can, therefore, strike Officer Shipley's name.

THE COURT:  Wait a minute.

MS. LADD:  Your Honor, we intend to call him, so --

THE COURT:  All right.  Any other names?

MS. LENIK:  Yes.  You can strike the names of John Thompson and Carolyn Thompson.

THE COURT:  Okay.  Let me find them first.

1

2          MS. LADD:  They're at the end, Your Honor, on

3     the second page.

4          MS. LENIK:  And I believe that's all.

5          THE COURT:  All right.

6          MS. LENIK:  Although, there are some
     misspellings.

7

8          THE COURT:  Well, I'm not gonna spell the
     names for the jurors.  I'm just now gonna pronounce

9     them.

10         MS. LADD:  Your Honor, may I ask one question?

11         THE COURT:  Let Ms. Lenik.

12         MS. LENIK:  Your Honor, there are three

13    correctional center officers' names who are on this list

14    whom I do not believe were tendered to me in discovery

15    and about whose testimony I don't have any knowledge,

16    and I would ask that their names be stricken unless the

17    State can provide for me what it is she expects them to
     say.

18         THE COURT:  Is that Anglin?

19         MS. LENIK:  Yes.

20         THE COURT:  Carpenter and Tarr?

21         MS. LENIK:  Yes.

22         THE COURT:  Ms. Ladd?

23         MS. LADD:  Your Honor, they were tendered in

24    subsequent discovery.  They're individuals who took

18

known handwriting samples from the Defendant.

MS. LENIK:  Oh, okay.

THE COURT:  Anything else, Ms. Lenik?

MS. LENIK:  No, Your Honor.  Thank you.

THE COURT:  Ms. Ladd?

MS. LADD:  With regards to the motion, we sort of jumped to the list of witnesses.  I just wanted to make clear my motion extends to any such inquiries as to any officers, because the reports refer to other individuals they initially developed a hunch on, but there's nothing to tie it up, so this could not be established through any legitimate evidence.

THE COURT:  Well, any other testimony that would be similar to what was proposed --

MS. LENIK:  Your Honor, then I would also ask that the State not be allowed to elicit information regarding the Defendant's brother who was considered a suspect and about whom various evidence or from whom various evidence was taken including blood samples that were sent to the laboratory, because if we can't argue about other individuals, then they can't argue about his brother.

His brother, because of the physical, geographical closeness of the place that the brother was living to the place that this occurred, the brother had

19

1

2    also been at one time a suspect and various physical

3    samples were taken from him.

4              THE COURT:  Ms. Ladd, as to the brother?

5              MS. LADD:  Your Honor, I don't even see the

6    connection.  That's a non sequitur.  The Defendant is

7    alleged to have been -- or had access to the duplex next

8    door to the named victim, as did a brother who was just

9    a few years younger.

10             As part of the investigation, police officers

11   gathered blood samples for elimination purposes from the

12   brother.  That's a totally different concept than what

13   the State is arguing.  I don't even see how the two go

14   hand in hand.

15             First of all, motions aren't one for the

16   other, one for the State, as the Court is well aware of,

17   but, certainly, the State does have the burden of

18   excluding other individuals who, because of their

19   proximity or opportunity, may have been a reasonable

20   suspect.

21             That's what we did.  It's been done in many

22   cases, and the State is entitled to put on physical

23   evidence.  It's much different because we're talking

24   about physical evidence, not hearsay hunches or

     speculation.

              THE COURT:  Well, if the testimony comes out

                                20

as Ms. Ladd has indicated that there was someone else
who had access to the victim's residence, lived in the
neighborhood or next door, and was related to the
Defendant, and I assume may bear a similar resemblance,
then I think the State is entitled to present that
testimony concerning what they did as far as the
investigation concerning the other suspect.

So, that will be allowed.

Any other pretrial motions that we need to
take up?

MS. LENIK:  No, Your Honor.

MS. LADD:  Not for the State.

THE COURT:  Let me go through the charges with
the Defendant and make sure he's aware of the charges
and the possible penalties.

Mr. Moore, in Count I of an indictment, you're
charged with the offense of attempt first degree murder.
That states that on the 25th of February, with the
intent to commit the offense of first degree murder, you
performed a substantial step toward the commission of
that offense, in that you tied the feet and hands of
Lori Hansen, poured a flammable liquid onto her and her
surroundings and then set the surroundings on fire,
flipped a lit cigarette onto Lori Hansen, with the
intent to kill Lori Hansen.

21

Now, that's a Class X felony.  Calls for a minimum 6 years, maximum 30 years in the penitentiary.

If the Court determines that the commission of the offense was heinous and brutal, indicative of wanton cruelty, then you shall be eligible for what's called the extended term, which would bring it up to 60 years.

The next count is home invasion, and it states that on the 25th of February, you, not a peace officer acting in the line of duty, knowingly and without authority, entered the dwelling of Lori Hansen, located at 512A South New Street in Champaign, knowing her to be present within that dwelling, and intentionally caused injury to her, in that you struck Lori Hansen about the head and body with your hands and feet, you tied Lori Hansen's hands and feet and neck, and choked Lori Hansen, knocked her down and dragged her.

Again, that's a Class X felony, 6 to 30 years in the penitentiary.  I suppose the possibility of an extended term might be appropriate.  There is a possibility that some of these charges, if you are convicted of all of them, some of the sentences could be made to run consecutive, one to the other.

If you're convicted of a Class X offense, where there's bodily harm or great bodily harm, and it's all part of the same course of conduct, some of these

22

sentences could be consecutive.   That means you have to serve one sentence before you could serve the other one.

The next charge is aggravated arson, and that's a Class X felony, same date, and it says that in committing an arson, you knowingly, and by means of fire, partially damaged a building of Lori Hansen, occupant, located at 512A South New Street in Champaign, knowing that she was present therein, without the consent of Lori Hansen.

The next count is also aggravated arson.   It's a Class X offense.   And the only difference is this alleges that the property, the building was owned by Harry Washburn.

Both of those are minimum 6, maximum 30 years sentences.

Aggravated criminal sexual abuse, as set forth in Count V, is a Class 2 felony.   States that by the use of force, you knowingly fondled and touched the breast of Lori Hansen for the purpose of the sexual arousal of yourself and, in doing so, caused bodily harm to Lori Hansen, by striking Lori Hansen about the head and body with your hands and feet, and tying Lori Hansen's feet and hands together.

Class 2 felony is not less than three nor more than seven years in prison.

23

The sixth count is residential burglary, and
it states that on the 25th of February, 1998, you
knowingly and without authority entered into the
dwelling place of Lori Hansen at 512A South New Street
in Champaign, with the intent to commit therein a theft.

That's a Class 1 felony, punishable by not
less than 4 nor more than 15 years in the penitentiary.

And, again, as I have indicated, some of these
sentences, if you were convicted of all of these
charges, may be ordered to be served consecutive to some
of the other sentences.

Show the Defendant is advised of the possible
penalties of the charges.

We'll have Mr. Rasmus go bring the jurors
over.

Ms. Lenik, as is my habit, I inform the jurors
prior to the voir dire of the burden of proof, their
duties to judge the credibility of witnesses, and I also
tell them that this Defendant, as does every citizen of
the United States, has an absolute right not to testify
if he so chooses.  If he chooses not to testify, that
fact must not be considered by them in any way in
arriving at their verdict.

Do you have any problem with my telling the
jurors that this Defendant does not have to testify?

24

1

2          MS. LENIK:  That's correct, Your Honor.  I

3     have no problem with it.

4          THE COURT:  All right.  All right.  Mr.

5     Rasmus, let's bring the jurors over.

6          (The voir dire examination was conducted and

      reported, but not transcribed.)

7          (Recess taken.)

8          (A continuation of the voir dire examination

9     was conducted and reported, but not transcribed.)

10         (The following proceedings were had out of the

11    presence and hearing of the jury.)

12         MS. LADD:  Your Honor, I had one matter before

13    we bring the jury in.

14         THE COURT:  Go ahead.

15         MS. LADD:  Ms. Lenik had alluded to this, and

16    I didn't want there to be any problem with eliciting

      testimony.

17         There was a lineup that was conducted in this

18    case.  The victim made an identification that was

19    tentative, in that she picked out two people who were

20    similar by voice and appearance, but could not narrow it

21    down more than that.

22         I intend to elicit that information, and I

23    didn't want to create any problems on the record.

      Obviously, nobody wants to do that in front of the jury.

24
                              25

So, if there were any concerns, I wanted to make it clear that's what the State intends to do.

THE COURT:  Well, I believe Ms. Lenik can cross-examine at least on the circumstances of the identification and the two people that she identified and whatever else.  I think that's an appropriate area for cross-examination.

All right.

MS. LENIK:  Your Honor, I assume, just for clarity, that the date of that lineup is also appropriate?

THE COURT:  When was the lineup?

MS. LADD:  March 11th, 1998.

THE COURT:  Some, what, two --

MS. LENIK:  One year ago.

THE COURT:  But the offense happened in February of '98; is that correct?

MS. LADD:  That's correct.

MS. LENIK:  That's correct.

THE COURT:  Right.  I mean, I assume Ms. Ladd is going to elicit when this identification took place, but I don't see anything we need to get into beyond the fact that it happened a couple of weeks after the offense.

Officer, could you bring our jurors out for

26

1

2        us, please.

3                    (The following proceedings were had in the

4        presence and hearing of the jury.)

5                    THE COURT:  You may be seated.

6                    Ladies and Gentlemen, when you come into the

7        courtroom, Mr. Rasmus will announce that everyone is to

         rise.  As soon as you get to your seat, be seated; and

8        when you're seated, then everyone else in the courtroom

9        will have a seat.

10                   This is the portion of the trial called the

11       opening statement.

12                   Opening statement for the People, Ms. Ladd.

13                   MS. LADD:  Thank you.  May it please the

14       Court?

15                   THE COURT:  Ms. Ladd.

16                   MS. LADD:  Counsel?

17                   MS. LENIK:  Ms. Ladd.

18                   MS. LADD:  Ladies and Gentlemen of the Jury,

         good afternoon.

19                   February 25th of 1998, seemed like a fairly

20       ordinary day in the beginning.

21                   The very wee hours about 1:30 to 2:00 in the

22       morning, Lori Hansen, a law student at the University of

23       Illinois, was coming home to the duplex where she lived

24       alone at 512A South New Street in Champaign.   She parked

                                    27

1

2    her truck and got her keys out and was walking up to the

3    front door, and everything seemed fine.  There was

4    nothing unusual that she noticed.

5           And as she got her door unlocked and went into

6    the living room, everything changed.  In just an

7    instant, a man came from behind her, pushed her down,

8    put his hand over her mouth, and forced her down to the

     floor of the living room.

9

10          And that was the beginning of an ordeal that

11    lasted over an hour and almost claimed the life of Ms.

     Hansen.

12          And the person responsible for inflicting that

13    ordeal on her sits before you, and it's the Defendant,

14    Dedric Moore.

15          When the Defendant got her into the living

16    room floor, he covered her head with a pair of shorts

17    that he found in the duplex.  And as she was laying on

18    the floor, he proceeded to tie her up with some cords

19    and laces, binding her hands at the wrists and her feet

20    at the ankles.  And he went through her pockets.  And he

21    got her keys and he got some money out of her coat

22    pockets.  And he found a roll of tape in the duplex, and

     he taped her head with the tape and around her mouth.

23          And then he proceeded to make himself at home

24    in her duplex.  He walked around.  He went through her

purse.  He asked her questions about her ATM account and got the PIN numbers for her ATM cards.  He proceeded to help himself to a beer, smoked a cigarette, dumped items out on the floor.

And, at one point, he went and put her in the tub, in the bathroom, and he took another cord and he tied her to the soap dish.  And then he opened and closed the front door, but he was watching her to see if she'd try and get out.

And then he went back and he took a table, an end table and he put it on top of her as she lay in the tub, bound by her hands and her wrists, with this tape around her mouth and the shorts on her head, and he put that table on top of her, and then he went and he took her truck keys and he took the truck that was parked out front and he drove to an ATM machine that was just down the street a couple of blocks on Springfield.  And he tried to use those PIN numbers, only they didn't work.

So, he came back to that duplex and went back inside and found Lori still tied up in the bathtub, and he took her out.  He got a knife and cut the one binding that tied her to the soap dish, took the end table off of her, and set her down in the hallway.  And he took one of those cord like things and he started to choke her.  And he started to demand why the PIN numbers

29

1
2    didn't work, and he was strangling her and choking her
3    as she was fighting him off; and as she lay there
4    fighting against him, he stopped.  And then he groped
5    her.  He fondled her breasts with his hands and his
6    mouth, and then he walked away, leaving her still tied
7    up in her hallway, still with the shorts partially on
     her head.
8
9            And then he came back.  And he urinated on
10   her.  And he urinated on her head, and she was trying to
11   keep it from coming down into her mouth.  And then he
     walked away again as she lay there soaked in his urine.
12
13           And then she could hear the sounds of another
14   liquid splashing around the living room.  And she could
     smell something chemical.  And then he splashed it on
15   her, and she could smell this chemical odor coming off
16   of her clothing, and then she could see flames coming
17   out of that living room; and as she lay in the hallway
     and the living room was starting to block her exit, the
18   Defendant took his lit cigarette and flicked it on her.
19           Now, she was lucky enough to brush it aside
20   and knock it off, and then she tried to get to her feet
21   and get to a bedroom so she could get away, only the
22   Defendant wouldn't let her.  He followed her in there,
     and he started to beat her.  And he tried to drag her as
23   she was screaming and resisting towards the flames that
24
                              30

were now engulfing the living room.  And she fought him off, and he started to beat her, and he beat her and he kicked her and he knocked her down to the ground and continued to kick her, and he left her there.  Left her to burn.  And he did one more thing; turned on the burners on the stove as he ran out the back door.

Now, he almost succeeded in killing the only eyewitness to his crimes, but she was too resourceful, and she never gave up, and she continued to fight to get out of the cords that were tying her, and she was able to get herself out of them.

She tried to get out one of the bedroom windows, but it wouldn't open, so then she worked her way through the living room and was able to run out through the door and to a neighbor's house and call for help.

And as the neighbor came to her assistance, and as the help arrived, it was the beginning of an exhaustive investigation then, and you're gonna hear about it even as the ambulance and the police department and the fire department are pulling up.

You're gonna learn how the officers gathered the evidence, starting with the clothing that she was wearing, which were taken by the ambulance drivers.  And then she was transported to Covenant Medical Center.

31

1

2          Mercifully, because of her willfulness and

3     because of her resourcefulness, she was able to escape

4     with minor burns, smoke, bruises and abrasions, and she

5     had the ligature marks where she had been tied up with

6     the cords.

7          And as Champaign Police Department was still

8     at the scene, even as the heat from that fire was

9     cooling, Lieutenant Eddie Bain was conducting an arson

10    investigation and gathering up information and evidence.

11    And that evidence was sent to the Illinois state lab.

12         And you're gonna learn that there was a

13    chemist who analyzed some of the samples taken and that

14    the Defendant doused that apartment not only with

15    gasoline, but with another flammable liquid, the same

16    liquid that he put on Lori's clothing.

17         You're last gonna learn that fibers were

18    collected, and those were analyzed by the state

19    laboratory.  And the fibers were not big enough to be

20    identified, but they were identified as hair that was

21    consistent with an African American, but they were

22    partial hairs, and there could be no complete

23    identification with anyone.

24         You're also gonna learn that handwriting was

      attempted, because there was a piece of paper with the

      PIN numbers left in Lori's truck which was returned and

                              32

parked up a side street.  And that was sent to the lab.
And the lab could find similarities and characteristics
in common with the Defendant's handwriting, but they
couldn't make an identification.  And one of the big
problems was they could determine one thing, and that
was when the Defendant was ordered to provide
handwriting samples, he disguised his handwriting, and
the scientist could tell that.  So, they had difficulty
making a comparison.

You're also gonna learn that that's a pattern
of deception that was carried out when the detectives
located the Defendant and interviewed him.

Just about a week later, they went to the
duplex next door to Lori Hansen's duplex, and lo and
behold, there was the Defendant.

And what they learned is the Defendant had
every opportunity to know Lori's comings and goings and
to know who was around, because his grandmother lived in
the next duplex.  And had been out of town when this
happened.

Now, the Defendant gave several versions of
what happened.  First, he claimed he was out of town.
Then he changed his story and said that he was with
friends in town, but he couldn't give them the last
name.  He didn't know the last name.

33

1

2        Now, you're also gonna see when you put

3   together all the evidence that the Defendant tried very

4   hard to disguise and cover up what he did.  And he tried

5   very hard to make sure that Lori Hansen would not be

6   able to identify him.  He kept her on the ground.  He

7   kept her head covered with the shorts as much as he

8   could.  He wasn't able to disguise his voice as well,

9   and Lori Hansen went to a lineup on March 11th of 1998,

10  and she looked at six individuals.  And she listened to

11  them talk.  And it was very difficult, because the only

12  way to hear them was through a microphone, so she

13  couldn't hear their voices naturally.  And she was able

14  to pick out two individuals who were similar to the man

15  who attacked her in her home, and one was the Defendant,

16  Dedric Moore.  And one was another individual who, it

17  turns out, was in jail at the time and couldn't have

18  done it.  But she couldn't be sure.  She was being very

19  honest.

20        The Defendant went to great lengths to make

21  sure that he couldn't be identified, but he couldn't

22  stop the ATM camera from identifying him.  And, in fact,

23  when he drove down to that ATM machine in her truck,

24  using her ATM cards and her PIN number, there was a

videotape that was running, a recorder.  And it took

pictures of that person, and it shows pictures of this

34

1

2    Defendant.

3          Now, he's trying to cover up again.  He's got

4    a hood on and a cap on, and he's trying to keep his face

5    away, but you can clearly see the characteristics of his

6    face, and there's something he couldn't cover up, and

7    that's the fact that there's a very prominent dark spot

8    where he's missing some teeth on the upper left part of

     his mouth, and that shows up in those photographs.

9          Now, when the Defendant tried to cover up, he

10   wore gloves so there weren't any prints.  He covered

11   Lori Hansen's face so she couldn't identify him.  He

12   disguised his handwriting so he couldn't be seen.  He

13   covered up in the ATM drive-up so it'd be hard to

14   identify him.  But there's one thing he overlooked.

15         In his effort not to get caught, he also made

16   a mask, and he made it from Lori Hansen's stockings, a

17   pair of pantyhose that she had in her bedroom, in the

18   dirty laundry, as a matter of fact, and he took them at

19   some point during this while she was tied up and he cut

20   one of the legs off to use as a mask, and he put it over

21   his head; and, at some point, he discarded it on the

22   street along with some of the other items he was

23   throwing away that he got from her apartment as he was

     fleeing the scene.

24         What he didn't realize is he not only left

                             35

behind that portion of the stocking he used as a mask, but he left behind his saliva.  And when the officers got out there to the scene that morning and found the mask, they sent it in to the state lab.  And they recovered saliva.

And, first of all, they made a comparison after recovering the saliva and they, in fact, confirmed that it was cut from that whole stocking that had been in Lori Hansen's apartment and, in fact, they recovered the rest of the stocking.  And then they sent it on for DNA analysis.  And it went up to the Morton laboratory, and Scientist Kevin Zeeb worked the DNA analysis part of the case, and you're gonna learn about how that analysis was conducted and the care that was taken to insure the integrity of the results and the controls that were in place so they could rely on interpreting those results.

And what they found was that there were multiple profiles on that stocking.  And one of those profiles matched the DNA of the victim, Lori Hansen. And the major profile from that saliva on that stocking matched the Defendant, Dedric Moore.  And the probability of encountering that profile that was on that stocking and that matches this Defendant is 1 in 150 billion African Americans.

Listen carefully to the evidence.  I am gonna

36

ask you to pay careful attention to all the witnesses and all the analysis and all the gathering of exhibits.

When you put all the evidence together and you look at the charges, you'll see that it fits.

The Defendant is charged with multiple offenses. He's charged with residential burglary for the first entry into her residence without authority, with the intent to commit the theft.

He's charged with the home invasion for the second entry into the residence where he inflicts the bodily harm on her.

He's charged with the attempted murder for pouring the flammable substance on her and then attempting to set her on fire.

He's charged with aggravated arson for setting her home or dwelling on fire, knowing she was inside, inside and tied up.

He's charged with aggravated criminal sexual abuse for fondling her as she was tied up.

The evidence that you're gonna hear this week over the next few days is going to prove to you that Dedric Moore is absolutely guilty of each and every one of those offenses.

Thank you.

THE COURT: Ms. Lenik, opening statement for

37

the Defendant?

MS. LENIK:   Thank you.   May it please the Court?

THE COURT:   Ms. Lenik.

MS. LENIK:   Ms. Ladd?

MS. LADD:   Counsel.

MS. LENIK:   Mr. Moore?

Ladies and Gentlemen of the Jury, it's a pretty small courtroom.   Sometimes it's hard to get from one place to the other so that I can see everybody.

The whole question in this case is not whether or not horrible things happened to Ms. Hansen, because we're not disputing that absolutely horrible, tragic things happened to Ms. Hansen.

What we are disputing is whether or not Mr. Moore is the one who did it.

Mr. Moore believes that the evidence will show that he was actually somewhere else that evening.   He was somewhere else, and he was with someone else, and that he himself was not the individual who did these horrible things to Ms. Hansen.

Yes, it's true that his grandmother lived in a duplex which was next door and that his grandmother was out of town.   Of course, we're not disputing those things; however, we are disputing that he was the one

38

who was there.

It is certainly true that Ms. Hansen viewed Mr. Moore in a lineup and that she did not pick him out. And the important thing about that is that there was a very short period of time between that lineup and this offense.

She has seen, we believe, Mr. Moore on several occasions because of the fact that his grandmother lived next door and he would visit on occasion.  She has even spoken to him on occasion.

And yet when she viewed a series of African American men in a lineup who were all of similar age and similar physical characteristics, she did not pick out Mr. Moore as the one who did this horrible thing to her.

She also heard him speak.  She heard him speak under the only conditions that were available in the situation of the lineup; and even after she heard him speak, she did not pick him out.

And, again, that was very close to the time that this incident occurred, which was a considerable period of time from now.

So, that in and of itself should be reasonable doubt in deciding whether or not he committed this offense.

Furthermore, we believe the evidence will show

39

that there were no fingerprints.  We believe the
evidence will show that there were -- that the
handwriting was simply not his.  We believe that the
evidence will show that although the -- although you
might believe that the DNA was his, that there are other
ways since his grandmother lived next door and since the
period -- there was a period of time over which -- or
after which this material was collected that it
certainly would have been possible for him to simply see
it on the street or to have contact with it in some
incidental way to leave his bodily fluids on it and
still not be the one who did this horrible thing to Ms.
Hansen.

　　　　　It is not up to Mr. Moore to prove his
innocence.  It's up to the State's Attorney to prove his
guilt.

　　　　　Mr. Moore stands before you presumed innocent
of the charge.

　　　　　He doesn't have to provide evidence.  He
doesn't have to provide testimony.  When the police come
to talk to him, he doesn't have to talk to them.  And so
whether or not he said one thing or said something else
is simply not evidence of his guilt of the offense with
which -- or the offenses with which he's charged.

　　　　　So, I would ask you to listen carefully to the

40

evidence, to consider the evidence in light of your

everyday experiences in life.

If somebody is a relative of your next door

neighbor and you've seen them repeatedly, if they did

something horrible --

MS. LADD:  Objection, Your Honor.  I believe

this is getting into argument.

THE COURT:  I'll sustain the objection.

MS. LENIK:  We believe that the evidence will

show that his grandmother lived next door; that she may

have seen him on occasion.  She may have seen him more

than once.

We believe the evidence will show at that

point then that there was some familiarity between those

two people, and we believe the evidence will show that

she did not pick him out of a lineup even after she

heard his voice.

So, we would ask you to consider these facts

in the question of whether or not the State has proven

him guilty beyond a reasonable doubt and considering

them in the question of identification, that is, not

just that these horrible things happened to her, but

that he's the individual who did them.

And in looking at that question, we believe

that the verdicts on all of the counts, since the same

41

person did all of this -- if he didn't do one, he didn't

do all of them -- we believe when you consider that

testimony, that evidence, that you'll find him not

guilty.

Thank you.

THE COURT:  Ms. Ladd, call your first witness.

MS. LADD:  Thank you.  I would call Lori

Hansen.

(Witness sworn.)

LORI HANSEN

called as a witness on behalf of the People,

being first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please tell us your name.

A.  Lori Hansen.

Q.  And what is your occupation?

A.  I'm a law student.

Q.  And where are you a law student at?

A.  University of Illinois.

Q.  I want you to think back to February of

last year, 1998.  Were you living at 512A South New

Street in Champaign at the time?

A.  Yes.

42

Q.  And is that -- is that in Champaign
County, Illinois?

A.  Yes.

Q.  What type of residence was that?

A.  It was a duplex.

Q.  And was it one story or two story?

A.  One story.

Q.  And when you say duplex, was there another
unit then to the other side of you?

A.  Yeah, to the south.

Q.  Now, did you know who resided in the unit
next to you?

A.  I had seen her, and my landlord told me
her name.  I think we said "Hello" on -- in passing a
couple times, but I didn't socialize with her.

Q.  And how did you know her, by what name?

A.  Lillie.  I think that's -- I don't know if
I knew her last name.

Q.  Now, did you ever see any other
individuals coming or going from her duplex?

A.  Yes.  Pretty often.  There were people
coming and going a lot of the time.

Q.  And how would you describe -- Let me ask
you, what race was Lillie?

A.  She was African American.

43

Q.   And the people who would come and go from the duplex, did you notice there if they were African American or white?

A.   Mostly African American.  There were a few white people I saw as well.

Q.   And were they male or female?

A.   Which ones?

Q.   The people coming and going --

A.   Oh.

Q.   -- from her residence.

A.   If they were -- I'm sorry, were they -- are you asking if they were residents or --

Q.   No.  The people that would come and visit her, were they men and women?

A.   Oh, both.  Both.  There were people who seemed kind of young hanging around a lot in the afternoons outside.

Q.   And how would you describe young, what age?

A.   High school, maybe right out of high school.

Q.   Now, did you ever talk to these people at length?

A.   Not at length.  No.

Q.   Would you know them if you ran into them

44

on the street somewhere else?

         A.   I might.

         Q.   And did you ever have them into your
apartment for any reason?

         A.   No.

         Q.   Now, did you know any of them by name?

         A.   No.

         Q.   Now, during the time that you lived there,
approximately how long were you residing at that duplex?

         A.   I moved in the beginning of August 1997.

         Q.   And then when you resided there, would you
at times study with your door left open?

         A.   Yes.

         Q.   And would you see people cutting across
the lawn then?

         A.   Yes.

         Q.   Now, I want you to think back to February
25th of 1998, at that time, were you residing there
then?

         A.   Yes.

         Q.   And were you residing with anyone else?

         A.   No.

         Q.   Now, specifically, I want you to think
back, first of all, to the evening, that Tuesday evening
of February 24th of 1998.  Do you remember leaving the

                          45

residence?

    A.  Yes.

    Q.  And about what time?

    A.  I think it was about 10 p.m.

    Q.  And, at that time, were you alone?

    A.  Yes.

    Q.  And did you go anywhere?

    A.  Yes, I did.

    Q.  And where was that?

    A.  I first went to the Blind Pig in downtown Champaign.  And from there, I went to Mike 'N' Molly's close by, a few blocks away.

    Q.  And did you meet any friends?

    A.  Yes, I did.

    Q.  And who was that?

    A.  At both places or -- either -- At the first place I went at the Blind Pig, I saw some friends there.  Joy Murch (phonetic) is the one person I spent most of the time talking to, and then at Mike 'N' Molly's, I met Ellen Hurd (phonetic), Allison Leverich (phonetic), and my brother, Eric Hansen.

    Q.  Now, at some point, did you give somebody a ride home then?

    A.  Yes, I gave Allison a ride home.

    Q.  And about what time was that?

A.  We left at 1:30 a.m.

Q.  Now, did you consume any alcoholic beverages while you were socializing?

A.  Yes.

Q.  And what?  Did you --

A.  I had one beer at the Blind Pig between 10:15 and 11:15, something like that, and then I had two beers at Mike 'N' Molly's.

Q.  Now, did you feel like you were affected at all by the beers then?

A.  No.

Q.  Did -- After you dropped Allison off then, did you return home?

A.  Yes, I did.

Q.  What were you driving?

A.  My truck, a gray Toyota.

Q.  Like to show you a series of exhibits.

Your Honor, may I have continuing permission to approach the witness?

THE COURT:  Yes.

Q.  (by Ms. Ladd)  Like to show you what's been marked as Exhibits 58A and 58B.

Now showing you 58A, do you recognize that?

A.  Yes, that's my truck.

Q.  And do you recognize the plate number?

47

1

2        A.  Yes.

3        Q.  And what number was on that truck?

4        A.  1459 JD.

5        Q.  And also showing you then 58B, do you

6   recognize that as another view of the side and back of

    that truck?

7        A.  Yes.

8        Q.  Do they truly and accurately depict the

9   way the truck looked then back on February 24th to 25th

10  of 1998?

11       A.  Yes.

12       Q.  Thank you.  When you got back home then to

13  the duplex, you were alone?

14       A.  Yes, I was.

15       Q.  And where did you park the truck?

16       A.  I parked it across the street from my

    front door on New Street.

17       Q.  Then as you exited the truck, did you lock

18  it?

19       A.  Yes, I did.

20       Q.  And where did you go?

21       A.  I crossed the street and walked up to my

22  front door.

23       Q.  As you got to the front door, did you

    notice anything unusual at all around the area?

24
                              48

1

2          A.   No.

3          Q.   And did you see anyone in the area?

4          A.   No.

5          Q.   Did you then have to unlock your front

6    door?

7          A.   Yes.

8          Q.   Is there a screen door that was in front
     of the front door itself?

9          A.   Yes.

10         Q.   Then did you have to open that first?

11         A.   Yes.

12         Q.   As you were unlocking the door, did you

13   actually get into the living room?

14         A.   Yes.

15         Q.   And did you turn on the living room light?

16         A.   Yes.

17         Q.   As you did so, what happened?

18         A.   I heard a noise behind me and I turned and
     there was someone coming in the door right behind me.   I

19   tried to push the door closed, and I screamed, but it --

20   he forced his way in.

21         Q.   Could you tell if this was a man or a

22   woman then?

23         A.   I suppose at first when he was first

24   coming in, I couldn't say for sure, but he -- it

                              49

appeared to be a man.  He had a hood over his head, but I wasn't sure until he started talking.

Q.  And then could you confirm it was a man?

A.  Yes.

Q.  Now, how did he grab you then when you got into the living room?

A.  He -- He had me -- He had his right hand over my mouth and his left hand across my chest, and he was holding me tight to his chest with my back to his chest.

Q.  So, he was behind you then?

A.  Yeah.

Q.  When he had his hand over your mouth, could you feel if he had anything on his hand?

A.  It felt like a soft glove, and I could kind of see it out of the corner of my eye.  It looked white or off-white.

Q.  Now, what did he do then?

A.  He started asking me, "Where's Chad?"  And he pushed me farther into the living room, right to the threshold between the living room and the kitchen, and told me to get on my back several times; and when I tried to get on my back, I think he meant get on your stomach, and so he ended up pushing me down onto my stomach.

50

Q.   At that point, then, were you cooperating with him?

A.   Yes.

Q.   And what did you think he wanted?

A.   I think he was -- I thought he was looking for Chad and didn't believe me when I said I didn't know who Chad was.  And I thought once he realized there was no Chad there that he would just leave.

Q.   Now, was there any Chad that lived there that you know of?

A.   Not that I know of.

Q.   Then what did he -- Did he continue to say anything to you?

A.   Yeah, he -- he kept asking for Chad and then wanted to know how much money I had, and I told him how much I had in cash, about what I thought I had in cash, but he kept saying I was lying.

Q.   Now, where were you when he was demanding your money?

A.   I was still on the floor on -- facedown on the floor between the living room and the kitchen.

Q.   Now, did he do anything to your coat pocket?

A.   Yeah, he went through all of my pockets, my coat pockets.  I had two -- There were two breast

51

pockets, and he went through those and all of my jeans pockets.

Q.  And did he get anything from your pockets?

A.  I seem to remember I had some cash in my jeans pockets, and I may have had a lighter in either my jeans pocket or my coat pocket.

Q.  What did you do with your truck keys?

A.  I think they were still in the door or they were in my hands when he forced his way in.  It happened so fast I don't really remember what I did with them, but they were not -- they had fallen out of my hands somehow.

Q.  Now, as you were laying on the floor then, did he get anything to tie you up with?

A.  Yes.  I'm not sure exactly what it was, but he did tie my hands together in front of me.

Q.  And did he do anything to your feet?

A.  Later, he tied my feet together.

Q.  And, at that point, were you still lying on your stomach?

A.  Yes.

Q.  Did he put anything on your head?

A.  Yeah, he grabbed a pair of my shorts.  I guess he got them from my bedroom, I'm not sure.  I think that's where they were.  And he put them over my

52

1
2      head.

3              Q.   Now, could you hear him doing anything
4      around you as you lay there?

5              A.   Yes.   He was going through different bags,
6      my backpack.  And I had a different kind of book bag
7      kind of like a briefcase.   He was looking for my purse
       that I had described to him.   He kept asking where my
8      money was and where my ATM cards were, and I described
9      the purse, but he couldn't find it in the apartment.   I
10     think it had fallen off my shoulder right outside the
11     front door.   And so he was -- Basically, it sounded like
12     he was ransacking the apartment.

13             Q.   Now, would he come back to where you were
14     and ask you questions then?

15             A.   Yeah.   He -- Basically, just to ask where
16     Chad was for a while.   There was a lot I couldn't
17     understand because he had turned on the television on to
18     a station that didn't have anything but snow and kept
       turning it up and down, and he didn't speak very
19     clearly.   He mumbled a lot, and so I couldn't understand
20     a lot of what he was saying, but most of what he said
21     was, "Where's Chad?" and "I'm not going to hurt you."

22             He at one point asked whether my car was
23     manual transmission or automatic, and he said he was
24     trying to decide whether he was gonna take me with him.

                                  53

He asked for my PIN numbers.

He commented that I had nice cats. He asked for a beer out of the refrigerator. He told me, "You shouldn't smoke. It'll kill you. You shouldn't drink beer. It'll kill you. That's not good for you," stuff like that.

Q. Now, during all this time, were you still lying facedown tied up on the floor?

A. Yes.

Q. At some point, did he get anything to cover your mouth?

A. Yes. He actually asked if there was any tape anywhere, and I told him where it was, and he got it. It was kind of like the clear, fat tape like you wrap packages with to mail, like mailing tape, but clear, and he got some of that and wrapped it around my head several times.

Q. Now, were you still in the area between the living room and the kitchen?

A. Yes.

Q. Did you see him get your phone from anywhere?

A. I -- I seem to remember when he first forced his way in and grabbed me, he -- I think that's also when he grabbed the phone, but I don't know what

54

1

2      he -- I can't really remember what he did with it after

3      that.  I just assumed that he got it so I couldn't call

4      for help.

5                  Q.  And what kind of phone was it?

6                  A.  It was a cordless phone.

7                  Q.  Now, did he continue to ask you about your

       money and your ATM machine?

8                  A.  Yes.

9                  Q.  And at some point, you mentioned PIN

10     numbers.  Did he ask you for those?

11                 A.  Yes, he did.

12                 Q.  And did he ask you once or more than once?

13                 A.  He asked me once and then a little later

14     he asked me again.

15                 Q.  And did you give them to him?

16                 A.  Yes, I did.

17                 Q.  And how many numbers were there?

18                 A.  Two.

19                 Q.  And what did they consist of, how many

       digits?

20                 A.  Four each.

21                 Q.  Now, at that point, then, did he also find

22     your ATM cards that go with that PIN number?

23                 A.  Yes.  There were two ATM cards on my

24     coffee table that didn't work anymore, and that my

                                55

student ID acts as an ATM card and that was in my wallet, and then I also had a bank card that works as a credit card and ATM card in my wallet.

Q.  And did he say anything about finding those or did you get the indication that he found them?

A.  He -- He had been asking for them for a while when he kept asking me how much money I had, and I told him they were in a bag that he couldn't find, and that's why I think he was dumping all the contents out of the other bags in the apartment.  And, eventually, he found it.  I'm not sure how he did, but I think my bag also fell right outside the front door when he forced his way in.

Q.  Did he ask about your checking account balance?

A.  Yes.  He had found my checkbook and he told me that I was lying to him by saying I only had 25 dollars, because, apparently, he meant to ask how much money I had overall, and he found my checkbook and found the balance.

Q.  Where was your checkbook?

A.  I think it was in the same bag with my wallet, but it may have been in one of the other bags he dumped out.

Q.  Now, did he bring up Chad and a person

56

E-FILED
Friday, 04 May, 2007  05:07:07 PM
Clerk, U.S. District Court, ILCD

named Eric again?

      A.  Yeah.  After a while of asking where Chad was, he threw in the name Eric as well.  He started asking, "Where's Chad and Eric?"

      Q.  Did you say anything to him about not knowing those people?

      A.  I told him that I only knew one person named Chad, and I described that person to him, and he said that didn't sound like the guy he was looking for, and I told him that I knew several people named Eric, so I didn't know which one he might be talking about.

      Q.  After you said that, did he ever bring up those two names again?

      A.  Well, before he brought up Eric, he'd asked me about Chad several times, and I told him the same thing every time, and he kept asking.  And after he brought up Eric and I told him I knew several Erics, I don't think he brought the names up again after that.

      Q.  Now, as you lay on the floor, could you hear him doing things in the kitchen area?

      A.  Yeah.  He was walking around, looking through cupboards, opening the refrigerator door.  Like I said, he asked me if he could have a beer, and I -- he went through and started naming the things in my refrigerator, and he closed the refrigerator door, and I

heard him open a beer.

Q. Now, could you hear him or see him light up a cigarette at some point?

A. From where I was laying, he sat in a chair right in front of me, and I could see his feet, and I smelled cigarette smoke, and his -- his hand, I think, hung down, you know, with the cigarette, but there was definitely the odor of cigarette smoke, and he was drinking a beer.

Q. Now, at some point, then, did he ask you about the shift that you had in your vehicle, if it was automatic or stick shift?

A. Yes.

Q. Sometime after that discussion, then, did he take you anywhere else in the residence?

A. After that, he -- he got some other sort of cord or something and tied my hands to my feet and picked me up and walked me into the bathroom and put me in the bathtub and then took an extension cord and wrapped whatever he had wrapped me up with before to the soap dish in the bathtub.

Q. So, were you still tied at the wrists and the ankles?

A. Yes.

Q. And then was there a cord that was tying

58

the two together now?

      A.  Yes.

      Q.  And then the soap dish has a way of tying that to the soap dish?

      MS. LENIK:  Objection.  Leading.

      THE COURT:  Overruled.

      A.  Yes, it has a bar going across -- I don't -- There's a dish and then a little bar, I guess, for hanging washcloths or something, and that's what he tied me to.

      Q.  (by Ms. Ladd)  Now, did he say anything to you while he was doing that?

      A.  At that point, I think he was -- he was telling me that if the PIN numbers were right, he would come back and let me go, and if I'd lied, I'd be sorry and he would come back and hurt me.

      Q.  Did you say anything back to him?

      A.  I don't remember.

      Q.  Now, what did he do after he tied you up in the bathtub?

      A.  He turned off the light in the bathroom and shut the door and left the bathroom and shut the door.

      Q.  And could you hear anything else?

      A.  I heard the front door, what I think was

1

2    the front door open and close after he left.

3          Q.   And then what happened?

4          A.   And then --

5          Q.   Were you alone for a period?

     MS. LENIK:   Objection.   Leading.

6    THE COURT:   Overruled.

7          A.   I was alone for a while.   I'm not sure how

8    long.

9          Q.   (by Ms. Ladd)   Then did he come back?

10         A.   Yes, he did.

11         Q.   And where did he appear?

12         A.   In the -- He came from outside of the

13   bathroom back into the bathroom.   I couldn't see him,

14   but I could tell the light had been turned on.   I, at

15   first, thought it was my cats trying to get into the

16   bathroom, and then he opened the door and came in and

17   asked me what I was doing.

18         Q.   Now, you had how many cats in the

     apartment?

19         A.   I had two.

20         Q.   Now, at that time, then, when he asked you

21   what were you doing, what did you say?

22         A.   Well, I told him I'd just urinated because

23   I was so scared, and that was all I said.

24         Q.   Now, at that point, did he do anything

else to you?

A.  He left the bathroom and went into the living room, and I heard a bunch of objects fall on the floor, and he came back in and he put a table on top of me.

Q.  And how did that feel then when he put that on you?

A.  It was painful.

Q.  And did that bind you down in the tub so you couldn't move?

A.  Yes.

Q.  Did he then leave again?

A.  Yes.

Q.  And how long was he gone?  Could you -- Just a short time or longer this time?

A.  It was -- He was gone a longer time, but I couldn't say how long.  I really wasn't paying attention to the time.

Q.  I understand.  Then did he come back?

A.  Yes, he did.

Q.  And what did he do?

A.  He came in the bathroom and he said, "You're cool."  And he took the table off me.  At some point, he got a knife, but I don't recall if he cut me loose from the soap dish or just untied me.  Then he

61

1

2    lifted me out of the bathtub and placed me on the floor

3    halfway between the bathroom and the hallway.

4         Q.  Now, at that point, did you say anything

5    to him about you could let yourself go?

6         A.  He started to un -- untie or try to cut

7    the binding on my feet, and I told him to get out of my

     house and leave me alone, and he said, "Why?  I'm going

8    to let you go," and I said, "I don't care.  I want you

9    out of my house."  And he seemed to get angry when I did

10   that, and he said something like, "Well, okay.

11   Whatever."

12        Q.  Let me interrupt you for just a minute.

13   At some point, did he make a comment about how sharp the

14   knife was?

15        A.  I think when he was trying to undo my

16   feet, he asked me if I had a sharper knife, because that

     one wasn't cutting the binding very well.

17        Q.  Now, after you told him to just leave and

18   you would get yourself free, what did he do?

19        A.  He stood up and he came from behind me.

20   And he put a cord around my neck and he started -- he

21   started strangling me.  (Crying.)

22        Q.  Would you like a minute?

23        A.  I think I'll be okay.

     Thank you.

24

1

2      Q.  As he was strangling you, what did you do?

3      A.  Well, I tried to struggle.  My hands were

4  still tied, so I was trying to pull the cord away from

5  me, but I couldn't, and I -- I would lay down and go

6  limp for a minute, and then since I couldn't breathe, I

7  would sit up, and I did that a few times, and I tried to

   make it as difficult as possible.

8      Q.  How tightly was he pulling the cord?

9      A.  I couldn't breathe.  He was pulling it

10 very tightly.

11     Q.  Was he saying anything?

12     A.  No.

13     Q.  How did he stop and what made him stop?

   What did you do?

14     A.  I think it was causing -- He -- He

15 realized it was gonna take too long and it was too much

16 trouble.

17     MS. LENIK:  Your Honor, I'm going to object to

18 the latter.

19     THE COURT:  Sustained.  I'll sustain the

20 objection.

21     MS. LENIK:  Could you instruct the jury to

22 disregard?

23     THE COURT:  The jury will be instructed to

24 disregard that response.

MS. LENIK:  Thank you.

Q.  (by Ms. Ladd)  At some point, did he then loosen up on the cord?

A.  Yes.

Q.  And were you fighting him the entire time he was trying to strangle you?

A.  I would fight and then relax, hoping that maybe he'd think I'd -- he'd think I'd passed out, but then when I realized that wasn't doing any good, I struggled again, so it was a little bit of both.

Q.  Could you breathe while he was doing that?

A.  No.

Q.  When he stopped then, what did he do?

A.  He walked away, and it seemed like he was gone for a little while, but then he came back.

Q.  Where were you at this point when he strangled you?

A.  I was still lying on the floor.  My head was in the hallway and my feet were in the bathroom.

Q.  And were your hands and feet still tied?

A.  Yes.

Q.  Could you feel him come back towards you then?

A.  Yeah.  I heard him, and I could still see through the shorts.  I could tell there was kind of a

64

1

2       shadow behind me, or looming over me.

3              Q.  Now, at that point, did he do anything

4       with your shirt?

5              A.  He put his hand up my shirt and under my

6       bra.

7              Q.  And then did he touch you?

        A.  Yes.

8              Q.  And did he touch your breasts?

9              A.  Yes.

10             Q.  Did he do anything else then with your

11      breast area?

12             A.  He put his mouth.

13             Q.  And was that on your breast?

14             A.  Yes.

15             Q.  After he did that, then, did he walk away

16      again?

        A.  Yes.

17             Q.  At some point, did he return or could you

18      feel him again around you?

19             A.  After that, I -- before I heard anything,

20      I smelled something that smelled like shoe polish.  And

21      then he came up -- He was standing right at my head.

22             Q.  Let me interrupt you for just a minute,

23      Lori.

24             A.  Okay.

                            65

Q.  Before the shoe polish, do you remember him putting anything else on your head?

A.  Well, not before I smelled the shoe polish coming from the other room.

Q.  I'm sorry.

A.  It was -- It was like he was behind me and I smelled something that smelled like shoe polish, but I couldn't hear him doing anything.  I just smelled something.

Q.  And where was that coming from?

A.  It seemed the living room, kitchen area.

Q.  Then did he come back over to where you were?

A.  Yes, he did.

Q.  And what did he do?

A.  Well, he unzipped his pants and he urinated on my head.

Q.  As he did so, where did the urine run?

A.  It ran all over my head, down my face, over and under the tape around my mouth, and it got on -- all in my hair.

Q.  Now, at that point, did you still have the shorts that were on your head?

A.  I think they'd slid off when he was trying to strangle me, and at one point, I'd tried to kind of

66

put them back on so he wouldn't think I was getting a
good look at him, but I didn't really ever get them back
on my head.

Q.   Now, after -- did he say anything to you
while he was urinating on your head?

A.   He said, "When you drink that much beer,
you got to take a piss."

Q.   After he got done then, what did he do?

A.   He walked away again and then he came
back, and there was another liquid.  This time it was
cold and it smelled like the shoe polish smell I'd
smelled before, and he was pouring that all over my
body.

Q.   At that point, then, were you still lying
there bound?

A.   Yes.

Q.   And then did you feel him do anything else
or could you sense that he was doing anything else?

A.   I -- I don't really remember exactly what
was going on at that time, because I was trying to
figure out what was going to happen, and I was so scared
that I was just thinking of ways to get out of the
situation, but I know he -- he disappeared for a moment
and I kind of turned my head and saw fire in my living
room.

Q.  At that point, then, what happened?

A.  Then I -- I didn't see or hear him anywhere around, so I ducked into the bedroom next to where I was laying and tried to get undone, tried to figure out how to get out, and I saw a lamp that I was reaching to grab, and he showed up in the doorway, and before I could get ahold of the lamp, and he grabbed me by the arms and dragged me out of the room over the burning carpet into the living room.  I tried to push another lamp on him, and then he started punching me and knocked me down, and then he started kicking me in the head, back, stomach, and legs.

Q.  When he was -- When he was dragging you, where was he dragging you towards?

A.  The living room.

Q.  And what could you see in the living room where he was dragging you?

A.  I couldn't really see -- Well, if I could see anything, I don't remember it.  I -- All I remember thinking was that I had to get out of there alive and that I had to defend myself however I could.

Q.  Could you see fire anywhere in the living room?

MS. LENIK:  Your Honor, I'm going to object to the leading nature of the question.

68

1

2          THE COURT:  Overruled.

3          MS. LENIK:  The witness said she couldn't

4  remember.

5          THE COURT:  The objection's overruled.  You

6  may ask.

7          A.  There was definitely smoke, and I'd seen
fire before.  Even if I didn't see it at that time, I

8  know there was a fire.  Burned through my pants.

9          Q.  (by Ms. Ladd)  Now, when he was dragging

10  you, what were you doing?

11          A.  I was struggling and trying to hit him.

12          Q.  Now, did the shorts come off your head at

13  that point?

14          A.  The -- The shorts hadn't been on my head
for a while, I don't think.

15

16          Q.  Could you see this person?

          A.  I never got a very good look at him.

17
          Q.  Could you see his face at all at that

18  point as you were struggling with him?

19          A.  He had his coat hood up over his head, and

20  I -- he -- since he had me by the wrists and was pulling

21  me, I couldn't see up to his head.  Then when he started

22  punching me, I don't think I could see his face.  I

23  saw -- I was face-to-face with him when I was in the

24  bedroom and he came in the door, but it was light behind

69

him and dark where I was and he had his hood pulled up
over his head.

Q.  Did that make it difficult to see specific features?

A.  It did.  I -- I'm sorry.

Q.  I'm sorry I interrupted you.  Could you tell what race he was at that point?

A.  He was African American.

Q.  As you were struggling with him and trying to fight him then, he started to beat you and kick you?

A.  Yes.

Q.  Were you able to fight back or defend yourself?

A.  Not very well.

MS. LENIK:  Your Honor, I'm going to object. This has been asked and answered.

THE COURT:  No.  Overruled.

A.  Not very well because my hands and feet were still tied, but I tried to do whatever I could manage.  However I could manage to move, I tried to defend myself.

Q.  (by Ms. Ladd)  Where did you fall to the ground then?

A.  Pretty much the same place I'd been laying before, but my head was in the bathroom and my feet were

70

in the hallway.

Q. At that point, then, as you were laying there, do you know how many times he kicked you?

A. A lot.

Q. Did he stop finally?

A. He stopped and then he flicked a cigarette at me.

Q. And when he flicked the cigarette at you, where were you lying? Were you faceup or facedown?

A. I was on my side.

Q. And where did this cigarette hit?

A. My head.

Q. And then where did it go?

A. It bounced onto the bathroom floor right in front of my face.

Q. Could you tell if the cigarette was lit or unlit?

A. It was lit.

Q. And how could you tell that?

A. It was smoking and glowing.

Q. At that point, then, what did you do?

A. I flicked -- I flicked the cigarette away from my face, and I stayed there for a short period of time because I wasn't sure if he was still around, but it couldn't have been very long, and I went back into

71

the bedroom I'd been in before and closed the door and got myself untied.  I took my shoes off and slipped the ties off my feet because he'd already loosened them a little, so that wasn't hard, and so then I managed somehow to get my hands untied.

I tried to open the window, but I -- I don't think I could get it open, much less climb through it, so I opened the bedroom door and ran through the house out, ran through the hallway and living room to the kitchen and out the back door.

Q.  Could you tell at that point, was there smoke or fire or --

A.  There was smoke and fire.

Q.  Where was it?

A.  It was all over.  The hallway, the carpet especially was on fire.  There was a plastic door -- kind of an accordion door on the closet in the hall, and there was a -- like a furnace closet across the hall from the linen closet.  They both had the plastic accordion doors, and they were melting and almost fell on me, and, really, the most I remember, it was very smoky and there was a lot of fire, and I kind of had to jump around to miss the patches of fire on the carpet.

Q.  What door did you get out of then?

A.  The back door.

72

Q.   And was it open or closed; do you remember?

A.   I think it was open, but I -- I'm not really sure.  I don't remember.

Q.   And where did you go once you got outside?

A.   I ran to the neighbors in the other duplex across the driveway and banged on their back door.

Q.   Now, did you know the neighbors by name?

A.   I knew them by their first names.

Q.   Now, the neighboring duplex, is that a two-unit duplex like yours?

A.   Yes, I believe it was almost exactly like mine.

Q.   And there's a duplex between you and then their duplex; is that right?

A.   Right, right.

Q.   And why didn't you run to the closest duplex?

A.   I didn't think the woman who lived there would be home, because she had a job that sometimes she worked nights.

Q.   Now, when you got to the duplex you went to, then, was anyone home?

A.   Yes.  David came to the door and opened it, and I was still trying to get the tape off my head

73

1

2     when he came to the door, but once I did, I told him

3     that someone had broken into my house and set it on fire

4     and asked him to call 9-1-1.

5          Q.  Did he then go back with you to your

6     duplex?

7          A.  He went into his house to call 9-1-1; and

8     when he was doing that, I ran back to my duplex and went

9     back in the back door to try to get my cats out, but I

10    couldn't see because there was so much smoke, and I

11    tried to turn on the lights, but they exploded, and

12    there was really no way I could get back to the bedroom

13    the cats were in, so I thought I might try another way;

14    and as I was leaving back through the kitchen, I heard a

15    noise, and he had left the gas on the stove on, so I

16    turned the gas off and ran back out the back door.

           Q.  And when you say he left -- he left the

      gas on, how did you know that?  What did you see?

17         A.  Well, I heard a hissing noise and I saw

18    that the knobs had been turned on.  I don't know if all

19    of them were on, but I remember turning at least three

20    knobs off.

21         Q.  Had you left it like that when you left

22    the duplex?

23         A.  No.

24         Q.  At that point, then, were you forced to

                              74

1

2   run back outside?

3       A.   Yes, I ran back outside.  I believe I ran

4   around the front to try to open the front door to get

5   air going through the apartment, but the door -- the

6   front door was locked, so I went back around to the

7   back, and the neighbor, Bob, picked up some -- I think a

8   railroad tie or some sort of something, a heavy thing,

9   and we broke the bedroom window open so I could try to
    get my cats out.

10      Q.   At that point, did you try to lean into

11  the window?

12      A.   Yeah.  I moved some of the glass out of

13  the way and climbed on top of the garbage can and leaned

14  in as far as I could, but I couldn't see anything in the

15  room, and I couldn't feel anything, and it was very hard

16  to breathe, so I got out, and by that point, the fire

17  department had arrived.

18      Q.   Did you cut yourself at all on that broken

19  glass?

20      A.   Yes.

21      Q.   Now, were you able to get the cats out

22  then?

23      A.   No.

24      Q.   Shortly after that, did the ambulance
    arrive?

75

A.   Yes.

Q.   And did paramedics then take care of you?

A.   Yes.

Q.   While you were in the ambulance, did they also have to remove your clothing?

A.   Yes.

Q.   And did they then wash you down with a saline solution?

A.   I think they -- they might have done some of that there in the ambulance, but not -- not much.  It was mostly my hands and my knee.

Q.   Were you taken then to Covenant Medical Center?

A.   Yes.

Q.   And were you then treated at Covenant Medical Center?

A.   Yes.

Q.   What type of injuries did you have?

A.   I had burned my finger, I think, opening the bedroom door when I was running out.  Smoke inhalation.  And bruises.  There were some bumps on my head.  And when I took my jeans off in the ambulance -- When he dragged me out of the bedroom into the living room, he dragged me across burning, melting carpet, and the burning carpet got onto the -- my jeans, and it --

76

it must have soaked through to my skin, because there was a huge burn on my knee, and then when I took my pants off, it ripped a lot of the skin off.

Q. Now, was that clothing then taken by the ambulance drivers and then taken into evidence? You never saw it again?

A. Yeah, I took it off and gave it to somebody.

Q. Now, I'd like to show you then some items of clothing.

And, again, with the Court's permission?

THE COURT: Yes.

Q. (by Ms. Ladd) First of all, like to show you what's been marked as People's Exhibit No. 9. Ask you if I pull that out, do you recognize that?

A. That's my shirt.

Q. And, also, Lori, I'd like to show you what's been marked as People's Exhibit No. 10. And do you recognize these?

A. Those look like my jeans.

Q. When your attacker poured the chemical-smelling fluid on you, did it get in your hair?

A. Probably. I'm -- He poured it all over me.

Q. So, was it all over from top to bottom?

77

1

2          A.   Yeah.   And probably not -- I wasn't 100

3     percent soaked, but there were spots from head-to-toe.

4          Q.   Now, you indicated -- Were you also

5     wearing a jacket then?

6          A.   Yes.

7          Q.   Like to show you then what's been marked

      as People's Exhibit No. 8.   Do you recognize this as

8     that jacket?

9          A.   Yes.

10         Q.   Now, was it also necessary to take off

11    your underwear?

12         A.   Yes.

13         Q.   And I'd like to show you then what's

14    marked as People's Exhibit No. 11.

           As you look inside there, do you recognize

15    that as your bra?

16         A.   Yes.

17         Q.   Now, the man who did this to you, you had

18    mentioned that you could hear his voice throughout this

19    attack?

20         A.   Yes.

21         Q.   How would you describe his voice?

22         A.   Well, like I said, he didn't speak very

23    clearly, and the T.V. was on, but it was low and -- it

      was low and not clear.

24

                              78

Q. Now, approximately how old would you --
did you think this person was?

A. Young. I don't think I ever told the
police an exact age range. They suggested age ranges to
me, and I agreed with them. It was -- It was so hard
for me to tell. He certainly wasn't over 30, and I
doubt he was under 17.

Q. Now, were you able to give any kind of
physical description?

A. Pretty much only that he was a black male,
what he was wearing. It was -- His clothes were baggie,
so it was hard to tell his body size, but he was
definitely strong. And I don't think he was very tall.

Q. If you saw that person today, do you
believe you'd recognize him?

A. I don't know.

Q. As you look around the courtroom, can you
identify anyone?

A. Should I -- Do you want me to
(pointing) --

Q. If you would look around all parts of the
courtroom. I know -- If you need to stand up, that's
all right.

A. (Stands.) I'm not positive, but I think
it's that man sitting over there.

79

1

2            MS. LADD:  May the record reflect

3    identification of the Defendant in those terms, Your

4    Honor?

5            THE COURT:  She's indicated --

6            MS. LENIK:  Your Honor, I'm going to object to

     it as being an identification.

7

             THE COURT:  Ms. Lenik, wait and let me finish.

8

             The record will reflect that she's indicated

9    the Defendant.

10           MS. LADD:  Thank you, Your Honor.

11           Q.  (by Ms. Ladd)  Now, Ms. Hansen, you went

12   to a lineup on March 11th of 1998; is that right?

13           A.  Yes.

14           Q.  And that was at the Champaign County

     Correctional Center?

15

             A.  Yes.

16

             Q.  At that time, was there a Detective Don

17   Shepard who was accompanying you?

18           A.  Yes.

19           Q.  Did he ask you to look at a series of

20   individuals then?

21           A.  Yes.

22           Q.  The room where you looked at them, was

23   there sort of a one-way mirror that you could look

     through?

24

                              80

A.  Yes.

Q.  Prior to looking at this lineup, did Detective Shepard present you with any papers instructing you on what to do?

A.  Yes.

Q.  And did he also read these to you?

A.  Yes.

Q.  I'd like to ask you then did you look at that lineup?

A.  Yes.

Q.  With regards to that lineup, was it just a visual lineup or did the individuals in the lineup actually speak?

A.  They -- They spoke.  They said the date. They said, "Where's Chad?"  And they said, "I'm not going to hurt you."

Q.  Now, as you listened to the lineup, did you ask to see any individuals again?

A.  Number three and number six.

Q.  And why was that?

A.  Because number three looked a lot like someone I had seen hanging around my neighbor's house, and number six kept saying the lines in a -- in a distorted way, like he -- he was trying to be overdramatic to disguise his voice.

81

1

2          Q.   Now, was there anything about the voice of

3     number three that you noticed?

4          A.   He didn't speak very clearly, but the --

5     the -- I don't think any of them except for the last guy

6     spoke extremely clearly, but he -- he had the same kind

7     of muttering style, but --

8          Q.   As what?  I'm sorry.

9          A.   As the attacker.  But the actual sound of

10    his voice, it was hard to say for sure because the sound

11    in the room I was in was terrible.

12         Q.   When you say the sound was terrible, could

13    you hear them the way I'm talking now or did it come

14    through a microphone?

15         A.   It must have come through a microphone in

16    a tiny little speaker on the wall of the room I was in.

17         Q.   At that time, then, were you able to

18    identify anyone positively?

19         A.   No.

20         Q.   Did you indicate to the detective the two

21    individuals that you thought were similar?

22         A.   I didn't indicate that I thought they were

23    similar.  I told them I just wasn't ready or I -- I

24    didn't feel confident that I could make a positive

      identification.

           Q.   Now, at that time, when you say you

                         82

weren't ready, why was that?

        A.  Well, I -- I never got a very good look at him and I didn't want to pick the wrong person.  In my mind, most of what my identification hinged on was the sound of his voice, and I couldn't get, like I said, I couldn't hear very well, but, um, I -- Does that answer your question or not?

        Q.  That's fine.  I'd like to show you that lineup sheet.  Did you actually fill it out then after viewing the lineup?

        A.  Yes.

        Q.  Like to show you then People's Exhibit 73.  Do you recognize your signature on that?

        A.  Yes.

        Q.  And with the instructions that are on the front of that, did the detective go over those with you prior to viewing the lineup?

        A.  Yes, he did.

        Q.  Now, on the back, there's some handwriting.  Do you recognize that as yours?

        A.  Yes.

        Q.  And is that handwriting that you filled out after viewing the lineup explaining the difficulty you've just explained to us?

        A.  Yes.

                          83

Q.  Now, all these exhibits that I showed you,
the clothing and this lineup sheet, do they appear to be
in just about the same condition or substantially the
same condition as when you last saw them?

A.  I'm sorry, can you --

Q.  In other words, the clothing that I showed
you, that has not been tampered with, as best you can
tell, other than there are laboratory marks on it and
evidence bags?

A.  Right, right.

Q.  And this lineup sheet, does that appear to
be the same with your writing and no one else has
tampered with it?

A.  Yes.

Q.  Now, do you have an account at the First
of America Bank?

A.  Uh, kind of.

Q.  Or did you at that time?

A.  Yes, yes.

Q.  And that was back in February of 1998?

A.  Yes.

Q.  Did you give anyone permission to use your
ATM on that account?

A.  Not voluntarily, no.

Q.  Like to show you what's been marked as

84

People's Exhibit No. 7, which is a bank record.  What
I'm gonna do is show you a series of numbers at the
bottom that start with the No. 4430017700038413, and
they're the bottom numbers.  If you could look at that.

As you look at those numbers, do they have any
significance to you or do you recognize that number?

A.   This one here (pointing)?

Q.   Yes, that's correct.

A.   Yes, I believe that was my ATM card
number.

Q.   And could you take this highlighter and
then just highlight that number so we know which one
you're referring to.

A.   (Witness complies.)

Q.   Thank you.  That number, was that one of
the ATM cards that you had then that the man was asking
you about?

A.   Yes.

Q.   The truck that you described it with that
license plate, I'd like to show you another photograph,
People's Exhibit 5A.  Ask you to look at that
photograph, Lori.  Do you recognize the truck in that
picture?

A.   That's my truck.

Q.   And do you recognize the plate number?

85

1

2          A.  Yes.

3          Q.  Did you give anyone permission to drive

4    your truck that night?

5          A.  No, not voluntarily.

6          Q.  Now, what I'd like to do is also ask you

     if you could look at two diagrams for us.

7
           With the Court's permission, I am gonna ask

8    the witness to step down and use the diagrams, Your

9    Honor.

10         THE COURT:  Yes.  Are you going to have them

11   over there?

12         MS. LADD:  Yes, if I might.

13         THE COURT:  Ms. Lenik, if you want to.

14         MS. LENIK:  Pardon me, Judge?

           THE COURT:  If you want to come up.

15
           MS. LENIK:  Yes, as long as we know where it's

16   gonna be.

17         THE COURT:  I think it's gonna be right there.

18         Q.  (by Ms. Ladd)  Lori, I wonder if you can

19   step down to the side.

20         MS. LENIK:  Your Honor, may we approach?

21         THE COURT:  Yes.

22         MS. LADD:  You may resume your seat.  Thank

23   you.

24         (A sidebar conference was held out of the

                          86

hearing of the jury.)

        MS. LADD:  Mr. Rasmus, I wonder if we could swap your chair for the diagram.

        I think it's gonna be difficult not to block it, Your Honor.

        If you could step down, Lori, and I'll stand to the side of you.  Could you just tell us -- Sorry. Could you tell us here, first of all, is this an overview of the neighborhood where your duplex was?

        A.  Yes.

        Q.  And as you look at what's marked 512, is that, in fact, the duplex where you lived back in February?

        A.  Yes.

        Q.  And does that appear to be a true and accurate layout of just the streets in that area?

        A.  As far as I know, yes.

        Q.  Can you show us where you parked your truck just by pointing to it when you got home that night?

        A.  (Pointing.)  Right about there.

        Q.  And I wonder if you could take this marker and just put a number one there.

        A.  Number one.  (Witness complies.)

        Q.  Thank you.  For the record, Your Honor,

87

that's People's Exhibit No. 2, the diagram number.

Ask you if you could stay right where you are, and I am gonna swap you with another diagram.

As you look at this, Lori, do you recognize that as the layout of your duplex as it looked back in February?

A. Yes.

Q. And can you show us then when you first came in the front door where it was that this man pushed you down on the ground, just by pointing to it?

A. Well, I came in here and he came in and he grabbed me right in here and then pushed me this way and made me get on the floor right there (indicating).

Q. And is that the area then where you lay while he was going through and ransacking your items?

A. Yes.

Q. And then after he put you in the tub and then left and came back and took you back out of the bathtub, where did he put you?

A. (Indicating.)  Right here.

Q. And you're pointing to an area where the hallway was?

A. Yes.

Q. Now, where were you when he flipped the cigarette on you?

88

A.   I was still in the same area, but my head was right inside the bathroom door (indicating).

Q.   And where were you when he strangled you and tried to choke you?

A.   Same place, but my head was in the hallway (indicating).

Q.   And when you struggled to go get the lamp, what bedroom did you go into?

A.   The front one (indicating).

Q.   And then when you then were finally knocked to the ground, can you show us where the struggle took place as he was dragging you into the living room?

A.   Yeah.   I -- I ducked in here and I was maybe right about here (indicating).

Q.   And, I'm sorry, that's the front bedroom?

A.   The front bedroom.   And he appeared in the doorway and stepped in -- I guess -- yeah, we were not very far apart, and he leaned over and grabbed me by the arm and dragged me this way, and the carpet out here was -- there was smoke and it was very hot, and he pulled me in here, and this is about where the lamp was that I tried to knock on him (indicating).

Q.   And you're indicating the bottom of the living room area?

89

1

2        A.  Right.  And then when he started punching

3   me, we kind of went back this way (indicating).  I was

4   kind of retreating.  And he knocked me down right in

5   here so that my head was right inside the bathroom door,

6   and then that's where he was kicking me (indicating).

7        Q.  When he flicked the cigarette on you,

    where did you knock the cigarette into?

8        A.  I flicked it farther into the bathroom,

9   and I just noticed that it kind of went away from me,

10  which was really all I was concerned with (indicating).

11       Q.  Could you put an arrow in the direction

12  you were laying when he poured that substance on you and

13  then put the lit cigarette on you, just put an arrow for

14  where your head is?

15       A.  When he put the lit cigarette on me?

     Q.  Right.

16       A.  So, arrow for my head like which way --

17       Q.  The way you were lying.

18       A.  Okay.  (Witness complies.)

19       Q.  Thank you.  If you could resume the

20  witness stand.  We're done with that.

21       Prior to this happening, had any part of your

22  residence been damaged from fire or soot?

23       A.  No.

24       Q.  Like to show you then a series of

90

photographs, 36B and 37A.  Looking at both of those photographs, was any of that damage in your residence prior to this attack?

A.  No.

Q.  Now, you also described for us at some point you had run in and tried to save your cats by breaking out the window?

A.  Yes.

Q.  I'd like to show you another photograph that's marked 35A.  Is that the window that you tried to get into?

A.  Yes.

Q.  And is that the garbage can you were describing?

A.  Yes.

Q.  There's some blood down there.  Do you think that's consistent with the hand cut you got?

A.  Yes.

Q.  Now, did you smoke cigarettes?

A.  Yes.

Q.  And what brand?

A.  Camel Lights.

Q.  Did you smoke Newports at all?

A.  No, never.

Q.  Did you know anyone who smoked Newports or

91

had Newports in your apartment?

    A.  No.

    Q.  Now, this cigarette that you knocked into the bathroom, was there any cigarette butt in that bathroom area prior to that, to your knowledge?

    A.  No.

    Q.  Like to show you what's been marked as People's Exhibit 47B.  And when you look at that photograph, Lori, does that look like the cigarette that he flipped onto you?

    A.  Uh, yeah, except it wasn't covered with soot when he flicked it on me, but, yes.

    Q.  Now, that shows an area behind the bathroom door; is that correct?

    A.  I -- That's what it looks like to me.

    Q.  Is that the general area where you knocked the cigarette into?

    A.  Yes.

    Q.  Now, you also had described that when he first came in he placed shorts over your head.  Were those your shorts?

    A.  Yes.

    Q.  And had they been somewhere around the duplex?

    A.  Oh, I'm sure.

Q.   Were they on your head when he urinated on your head?

A.   I really don't -- I don't think so, but details like that I really --

Q.   Sure.

A.   You know, I was too upset to remember those.

Q.   Were they in the general area?

A.   Yeah, they were.  If they weren't on my head, they were right in front of my face.

Q.   And like to show you some other exhibits. First of all, People's Exhibit No. 17.  As you look inside that bag, do you recognize those?

A.   Those look like my shorts, yeah.

Q.   And those the shorts that he put on your head?

A.   Yes.

Q.   Now, you also described that he tied you up with extension cords; is that right?

A.   Some extension cord.  At the very least, that's what he used to tie me to the soap dish.  And I -- I wasn't really sure what he'd used to tie me up -- what else.

Q.   I'm sorry.  And like to show you People's Exhibit No. 13.  Does that look like the type of

93

1

2      extension cord he used?

3              A.  Yes.

4              Q.  Now, one of those cords he cut from the

5      soap dish; is that right?

6              A.  I'm not sure if he cut it or untied it.

7              Q.  Now, at some point, you recall that he had

       a knife?

8              A.  Yeah.

9              Q.  Like to show you what's been marked as

10     People's Exhibit No. 14.  Do you recognize this knife?

11             A.  Yes, that was in my apartment.

12             Q.  And was that one of your knives then from

13     your silverware drawer?

14             A.  Yes.

15             Q.  Does that look like the kind of knife he

       was trying to use to cut your cords?

16

17             A.  I don't think I saw the knife when he was

       trying to cut the cords, so I don't know.

18             Q.  When he was doing that, trying to cut your

19     feet, where were you in the duplex?

20             A.  I was lying between the bathroom and the

21     hallway.

22             Q.  That same hallway area --

23             A.  Yeah.

24             Q.  -- you showed us?  Now, you also described

                                  94

1

2  that at some point you thought he took a lighter from

3  your pocket.  I'd like to show you People's Exhibit

4  No. 25.  Ask you as you look at that, do you recognize

5  the pattern on that?

6          A.  Yeah, that looks like my lighter.

7          Q.  Would that have been the one you had in
your pocket at the time?

8          A.  I think so, but --

9          Q.  You're not sure?

10         A.  I can't be 100 percent sure, no.

11         Q.  Now, you also described that there were

12  cords and laces that you got out of when you finally got

13  away to the bedroom?

14         A.  Yes.

15         Q.  Those were the ones when you took your
shoes off?

16         A.  Yes.

17         Q.  Did you leave them in the bedroom as best

18  you can remember?

19         A.  Yes.

20         Q.  Like to show you what's been marked as

21  People's Exhibit No. 18.  Do you recognize that?  Does

22  that look like what was used?

23         A.  I -- I think so.

24         Q.  You weren't paying attention to exactly

95

what he was tying you with?

    A.  No, no, I wasn't.

    Q.  Is there something in there that you do recognize?

    A.  I know the mylar, the colored mylar strips in the ball was a cat toy I made for my cat.  I think there was a shoelace in there, but there was one cord that I'd never seen before.

    Q.  Did you also have a cord that you kept in the kitchen area?

    A.  I had string.

    Q.  And did you subsequently find this roll of cord then in the kitchen?  After this happened or did you find some cord you turned over to the detectives?

    A.  I don't know that I did.  I -- The first time I -- The only time I went back to the apartment after it happened was several days after.

    Q.  Did detectives then show you some cord they'd recovered?

    A.  They showed me a lot of things, and I don't specifically remember the detectives showing me the cord.

    Q.  Let me show you what's been marked as People's Exhibit No. 23.  Did you keep anything like this in the duplex?

E-FILED
Friday, 04 May, 2007  05:07:34 PM
Clerk, U.S. District Court, ILCD

A.   Yes.

Q.   And where was that?

A.   I believe it was in the drawer where I kept the tape.

Q.   Now, you described for us the tape that was used on your mouth.  Like to show you what's been marked as People's Exhibit No. 15.  Do you recognize that?

A.   Yeah, it was tape like that, and that was probably my tape.

Q.   Did you have this in the duplex as well?

A.   Yes.

Q.   And where do you think that would have been kept?

A.   In the drawer to the left of the sink.

Q.   When you drove your truck, did you have any paper in this that had your PIN numbers on it?

A.   No.

Q.   I'd like to show you what's been marked as People's Exhibit No. 67.  As you look at that, do you recognize that as anything you have written?

A.   No, that's not my writing, and I wouldn't have written my PIN numbers on anything.

Q.   And do you recognize that as anyone's handwriting you would know?

97

A.  No.

Q.  Was that item in your truck when you parked it that night in front of the duplex?

A.  I can't -- Not with the numbers on it, and I'm not really sure exactly what it is.  I don't recognize it.

Q.  And it wasn't on the front seat or the console area where the stick shift is?

A.  No.

Q.  Now, with regards to those numbers, do you recognize those?

A.  Those are my PIN numbers, or were my PIN numbers.

Q.  And those PIN numbers, are those the numbers that you gave your attacker that night?

A.  Yes.

Q.  Now, you also described to us a purse that you thought you may have dropped right outside the front door.  What -- Was there anything that was special about this purse that you would identify it by?

A.  It had yellow camels, and there was a camel design in it.  It was kind of a gray with yellow camels.  A friend of mine made it for me.

Q.  Now, I'd like to show you then People's Exhibit No. 24 and ask you is this, in fact, that purse

98

1

2    you were describing?

3            A.   Yes.

4            Q.   Now, there's also a series of papers in

5    it.  Would you have had papers with your name on it?

6            A.   I had -- I think -- Well, what I remember

7    is when the detectives showed me items and asked if they

     were mine, I remember there were several papers they

8    showed me they found with the bag that I know were not

9    in the bag at the time, but had been in my backpack

10   and/or my other book bag.

11           Q.   Let me come around here, Ms. Hansen, so

12   that I can show you some of the items.  Ask you, for

13   example, if you would look at that notebook.  Do you

14   recognize that?

15           A.   This is -- I'm pretty sure -- Yeah, that's

     my handwriting.

16

17           Q.   Was that some of your homework then?

18           A.   Yeah.

19           Q.   Now, also in that bag then, did you have

     multiple items such as your checkbook and your wallet?

20           A.   I don't know if the checkbook was in

21   the -- that bag.  I didn't always like to take it out

22   with me.  It might have been.  It might have been

23   somewhere else in the apartment.  I'm really not sure.

24           Q.   Like to show you a series of items you've

described to us.  People's Exhibit 24A, and you had described a telephone that this man took.  Can you look at 24A.  Do you recognize that?

A.  That looks like my phone.

Q.  Now, all these items have soot and fingerprint powder on them.  That wasn't there when you last saw it; is that right?

A.  Right.

Q.  With that exception, do they appear to be your items then as you look at them?

A.  Yes.

Q.  Also showing you 24B, this is a beer bottle for a Honey Brown beer.  Have you ever seen this before?

A.  I probably -- I had some of that kind of beer in my refrigerator.

Q.  Well, the last time you saw that bottle, then, would it have been in your refrigerator?

A.  Yes.

Q.  Was it in your purse?

A.  No.

Q.  Or in that bag you described?

A.  No.

Q.  Now, also like to show you a series of items that pertain to that purse.  Showing you 24C, do

100

1

2    you recognize those as again discolored, but your

3    checks?

4              A.   Yes.

5              Q.   And showing you 24D, does that appear to

6    be your checkbook?

7              A.   Yes.

8              MS. LENIK:   Your Honor, I'm going to object to

     this as leading.

9              THE COURT:   Overruled.

10             Q.   (by Ms. Ladd)   Showing you what's been

11   marked as 24E, do you recognize that?

12             A.   Yes.

13             Q.   And what is that?

14             A.   That's my wallet.

15             Q.   And, finally, showing you 24F, and do you

16   recognize that?

17             A.   Yes.   I carried that on my keychain.

18             MS. LENIK:   Your Honor, I can't see it and

     don't know what it is.

19             THE COURT:   Ms. Ladd will show them to you.

20             MS. LENIK:   No, in packaging.   Okay.

21             Q.   (by Ms. Ladd)   Again, all these items,

22   were they cleaned up and without the soot and powder

23   when you last saw them?

24             A.   Yes.

                        101

1

2          Q.  And were they all, to the best of your

3     knowledge, in that purse you've described?

4          A.  They may have been.  They may have been in

5     a different bag.

6          Q.  And could they -- were they in that duplex

7     then that night?

8          A.  Yes.

9          Q.  Now, you, also, is it correct that you had

10    a pair of stockings that you had in your bedroom?

11         MS. LENIK:  Objection.  Leading.

12         THE COURT:  Overruled.

13         A.  Yeah, I had several pairs of tights.

14         Q.  (by Ms. Ladd)  Did you have a pair of

15    black stockings?

16         A.  Yes.

17         Q.  I'd like to show you then what's been

18    marked as People's Exhibit No. 20.  I'm gonna pull these

19    out and hold them up for you.  Lori, do you recognize

20    those?

21         A.  Can I --

22         Q.  Certainly.

23         A.  Yes, those look like mine.

24         Q.  When you last had them in your duplex,

      where were they?

           A.  I'm not sure.  I didn't wear them very

                            102

1

2    often.  I don't even know when the last time I wore them

3    was, so they could have been in the laundry basket or

4    even in the drawer somewhere.  I really don't know where

5    they were.

6             Q.  Now, do you believe they were clean or

     dirty?

7

8             A.  They could have been dirty.

              Q.  And with regards to these, were they cut

9    out at all?  Was a leg cut out of them the last time you

10   saw them?

11            A.  The last time I saw them, no.

12            Q.  Now, the man that you pointed to at

13   counsel table, Lori, did that man have any permission to

14   be in your dwelling on that night?

15            A.  No.

     MS. LENIK:  Objection.

16   THE COURT:  What's the objection?

17   MS. LENIK:  The objection is that it's without

18   foundation.  She did not identify this person.

19   THE COURT:  Why don't you rephrase, Ms. Ladd.

20            Q.  (by Ms. Ladd)  The individual that's

21   seated here at counsel table, next to Ms. Lenik, that

22   individual, did he have any permission to be in your

23   dwelling that night?

24            A.  No.

                          103

Q.  Did he have any permission to take any of your things?

A.  He didn't have my voluntary permission, no.

Q.  And did he have any permission or authority to damage any part of your dwelling?

A.  No.

Q.  The individual that you pointed to or that -- Well, she did point to him, Your Honor.  I don't know how to phrase the question.  I'm sorry.

THE COURT:  Well, that's appropriate.  Go ahead.

Q.  (by Ms. Ladd)  The individual that you did point to you can't be certain is that individual; is that right?

A.  Right.  I can't be certain.

Q.  Is there anything about this individual that's different from the man?

A.  I didn't see any glasses on the attacker when it was happening.  That's really all I can say.  He had his hood up when I actually saw him.

MS. LADD:  Thank you.  I'd tender this witness, Your Honor.

THE COURT:  Ms. Lenik, before we do cross-examination, we've been at this for little over an

104

hour and a half.  Let's take a brief recess.

        Ms. Hansen, I instruct that you not discuss your testimony with anyone during the recess.

        Ladies and Gentlemen, if you'll go back with Mr. Rasmus to the jury room, we'll bring you out about 10 or 15 minutes.  Don't discuss the case among yourselves or with anyone else.

        (Recess taken.)

        (The following proceedings were had out of the presence and hearing of the jury.)

        THE COURT:  Ms. Lenik, are you ready for the jury to be brought out?

        MS. LENIK:  I am, Your Honor.

        THE COURT:  Ms. Ladd?

        MS. LADD:  Yes.  Thank you.

        THE COURT:  Mr. Rasmus, bring in the jurors.

        (The following proceedings were had in the presence and hearing of the jury.)

        THE COURT:  You may be seated.

        Ms. Lenik, cross-examination.

                    CROSS-EXAMINATION

                    BY MS. LENIK:

        Q.  Ms. Hansen, you're a law student at the University of Illinois; is that correct?

        A.  Yes, ma'am.

                            105

Q.   What year are you in?

A.   I'm in my second year.

Q.   And have you taken the trial advocacy program yet?

A.   No, I haven't.

Q.   You're aware, are you not, that Ms. Ladd, who's the Assistant State's Attorney, teaches at the law school?

MS. LADD:   Objection.   Relevancy?

MS. LENIK:   I can tell you the relevancy if the Court is not gonna --

THE COURT:   Well, I'll allow her to ask.   The objection's overruled.

Q.   (by Ms. Lenik)   You're aware that she teaches in that program; are you not?

A.   I am now, yes.

Q.   Pardon me?

A.   I am now.

Q.   Okay.   Have you -- You've had several conversations with Ms. Ladd since this event occurred; have you not?

A.   I think two.

Q.   And were those conversations over the telephone or were they in the courthouse?

A.   Well, I had two in the courthouse and

106

one -- actually, two brief conversations over the
telephone.

Q.    And when you had conversations with her in
the courthouse, she actually showed you the courtroom;
did she not?

A.    The second time, yes.

Q.    And when she showed you the courtroom, she
told you where everybody would be sitting in the
courtroom; correct?

A.    No.  Well, we were only able to peer
through the little window.  The participants, she wasn't
sure where everyone would be sitting at counsel tables,
but she told me where the jury would be.

Q.    And she told you that she would be sitting
on one side with the boxes, and the Defendant and his
attorney would be sitting on the other side; correct?

A.    I don't know if she ever actually said
that.  I just kind of assumed.

Q.    And you knew based on your experience and
your training and education that the Defendant would be
sitting with his lawyer, and that we would be sitting on
one side of the table from where Ms. Ladd is sitting,
since she's the prosecution?

A.    I guess so.

Q.    When you looked around the courtroom to

107

1

2          see whether you could see the person, you noticed that

3          there are only two African American men in this

4          courtroom; correct?

5                    A.   Yes.

6                    Q.   And that one of them is of a completely

7          different complexion from the individual who's sitting

           next to me in court; correct?

8                    A.   I don't know what --

9                    Q.   The other African American man who's

10         sitting in the courtroom, do you know him?

11                   A.   Yes.

12                   Q.   And who is he?

13                   A.   Larry Thompson.

14                   Q.   And that person is definitely not the

15         person who did this attack; correct?

16                   A.   Correct.

17                   Q.   And so there's only one African American

           man in the courtroom whom you do not know; correct?

18                   A.   That's correct.

19                   Q.   And that's the man who's sitting next to

20         me in court; right?

21                   A.   Yes.

22                   Q.   And the -- there isn't anyone else sitting

23         at this table that the two of us are sitting at; is

           there?

24
                                  108

A.   Besides the three of you, no.

Q.   You didn't have this object on your head the entire time that this incident took; did you?

A.   No.

Q.   About how long would you say it took from start to finish?

A.   The only way I could gauge that is just knowing about what time I headed home and the time the police and fire departments arrived.  And so I would imagine it would have been over an hour and 15 minutes.

Q.   And during that time, how long did you have this object on your head?

A.   It's hard to say, because after he took me out of the bathtub, it was several times more traumatic than before, and it was very hard for me to tell how long it was taking, but I would say at least half of the time.

Q.   So, at least 45 minutes you -- at least for 45 minutes you had an unobstructed view of this individual?

A.   No.  He wasn't right in front of me when I didn't have the shorts on.  And I was laying facedown on the floor.  And he would go into other rooms.  So, it's not as if I was face-to-face with him for 45 minutes.

Q.   But you were, in fact, face-to-face with

109

him at various times?

      A.  Once very briefly.

      Q.  What did you notice about his face?

      A.  That it was dark.

      Q.  And what did you notice about his teeth?

      A.  I never saw his teeth.

      Q.  And what did you notice about the way he walked?

      A.  I don't think I ever really saw him walk, either.

      Q.  It's your testimony that you did all of these things over an hour and 15 minutes and he came and went and came and went and came and went and you never saw him walk?

      A.  I was facedown on the floor, and I was very afraid that he would seriously hurt me if I looked at him too long.

      At one point, I -- right after he came in, I turned my head and saw him from the back and then realized if he saw me look at him, he might just kill me then and there.

      Q.  You never saw a weapon like a gun or a knife; did you?

      A.  I don't think so, no.

      Q.  When he was dragging you or pushing you,

1

2      he was actually in an upright position and walking;

3      correct?

4              A.  I guess so, yeah.

5              Q.  And you didn't notice anything specific

6      about the way he walked?

7              A.  Well, I would think that you'd walk

8      differently when you're dragging a person than when

       you're just walking down the street.

9              Q.  And did you notice anything about the way

10     he walked?

11             A.  I was trying to save my life.  I didn't

12     notice.

13             Q.  You did not notice anything about the way

14     he walked?

15             A.  I couldn't -- I couldn't tell.  I wasn't

16     really paying attention.

17             Q.  When you went to the lineup and you viewed

18     the individuals, you noted that you did not identify

       anybody; correct?

19             A.  Yes, ma'am.

20             Q.  And you noted that, as a matter of fact,

21     there were two people who looked similar; correct?

22             A.  No.  I never said they looked similar.  I

23     said there were things about them that made me think

24     either one of them might have been the attacker, but

                               111

there was nothing similar about them, really.

Q.  Well, they were both African American men; correct?

A.  Except -- Yes.

Q.  And they were both of a similar age; correct?

A.  I think so.

Q.  And they were both of similar body type?

A.  I think number six was shorter than number three.

Q.  And so if you had been told that either one of them had done it, you might have gone along with that; correct?

A.  I don't think so.  Part of the reason I wouldn't say for sure was because I didn't know how -- how much influence actually seeing them had.  I would have preferred to have just listened to them.

Q.  And you did, in fact, listen to them; correct?

A.  Sort of.  Their voices were distorted over the -- through the speaker.

Q.  Their voices were not purposely distorted, though; there wasn't a machine like they do sometimes on television that purposely distorts voices; correct?

A.  No, it was just a bad sound system.

112

Q.  And you heard the voices of both of these men as well as four other men; correct?

A.  More or less, yes.

Q.  And after you heard those voices, you still couldn't discern who it was; correct?

A.  I wasn't 100 percent sure.

Q.  And you signed the sheet from the police that said you weren't 100 percent sure; correct?

A.  Yes, ma'am.

Q.  You've seen the -- You had seen the neighbor, the older woman who lived in the next duplex several times; correct?

A.  A few times, yes.

Q.  And you were aware that she had children and grandchildren who would frequent her duplex?

A.  I knew there were several relatives who stayed with her periodically, yes.

Q.  And you knew that some of them were younger men; correct?

A.  I assumed so, because I'd seen younger men there.

Q.  And they were African American men; correct?

A.  Yes.

Q.  And you had had conversations maybe of

113

a -- of an insignificant nature with them in passing;
correct?

    A.  I don't know that I had any conversations
with any of the young men.  Actually, I believe one time
I was backing out of a -- my parking space and someone
came up and asked if I needed any help, 'cause it was
icy, and I said, "No.  Thank you," and left.

    Q.  And that was one of the men whom you
recognize to be a relation to the woman who lived next
door?

    A.  Well, I couldn't say for sure whether he
was a relation, but he was one of the men I'd seen
around, yes.

    Q.  And you had seen them more than once kind
of coming in and out and perhaps nodded and said "Hello"
and that sort of thing?

    A.  Not even that much, really.  I -- I don't
know that, excuse me, that we were ever, you know, both
outside at the same -- You know, I would pull in in my
car, and there would be people outside, and we might say
"Hello" occasionally.  It was more with the woman who
lived there than with any of the children.

    Q.  But you had seen them perhaps more than
once?

    A.  Perhaps.

114

1

2          Q.   And about how many times would you say

3     you'd seen them?

4          A.   Oh, gosh, I don't -- I don't think I could

5     say one way or the other.

6          Q.   More than five, less than five?

7          A.   I really -- I don't think I can answer

      that question.  I really don't know.

8          Q.   This evening you had been to two bars;

9     correct?

10         A.   Yes, ma'am.

11         Q.   The evening this had happened?  And you

12    had approximately three beers total?

13         A.   I had three beers total, yes.

14         Q.   And that was over a period of how much

15    time?

16         A.   About three hours.

17         Q.   So, would it be fair to say approximately

      a beer an hour?

18         A.   I think so, yes.

19         Q.   Had you had anything to eat when you were

20    drinking those beers?

21         A.   Not when I was drinking those beers, but I

22    ate dinner probably around 8 o'clock.

23         Q.   The light was on in your house during this

24    occurrence?

                          115

A.  The living room light.

Q.  The whole time?

A.  I think so.

Q.  Was it dark in the apartment at all?

A.  I'm sure the bedroom lights might have been off.  The one that I was in when I tried to get away was off.

Q.  But the living room light remained on throughout the entire time?

A.  I think so.

Q.  Do you know what the size of those rooms is?

A.  I don't know the dimensions.

Q.  The living room is the largest room?

Where's the other diagram?

THE BAILIFF:  The other one's over there.

Q.  (by Ms. Lenik)  This is the diagram, People's Exhibit 1, which is the diagram of your home.  There's nothing obstructing -- This is not a wall or a door (indicating); is it?

A.  Well, the dark area is a wall, but the rest is open.

Q.  So, this room where the light -- where that was lit goes from this top to this bottom through the kitchen?

116

1

2          A.  Well, the light in the living room was an

3     overhead light in the center of the room, and so the

4     light -- some of it went into the kitchen.  It probably

5     wouldn't be easy to read in the kitchen with --

6          Q.  It would be easy to see, though; correct?

7          A.  Could be.

8          Q.  There wasn't anything else obstructing

      your vision in terms of lighting; was there?

9          A.  I don't think so, if I understand your

10    question.

11         Q.  There wasn't any curtains drawn or

12    anything like that, clothing or anything that were

13    blocking the lighting?

14         A.  No.

15         Q.  When you heard the person leave, either of

16    those times that you say you heard him leave, you didn't

      attempt to call the police; did you?

17         A.  I was tied up.

18         Q.  And so what you're saying is that you

19    could not have gotten out of the ties at that time to

20    call the police or call for help?

21         A.  No, and I was terrified.  I was afraid

22    that if I tried to move, he might be right outside the

      door and hurt me.

23         Q.  But you did hear the third time, you did

24

                              117

hear somebody -- you heard the door both open and close outside; correct?

A.  No.  I -- First of all, I'm not sure what you're talking about when you say the third time.  I only remember hearing the front door open and close once, and that was the first time he left me in the bathroom.

Q.  And at the time that you heard the front door open and close, at that point, then, you didn't try to get out; right?

A.  I think I moved a little to see how tight the binding was, and then I -- I really don't remember anything after that, because I was, like I said, I was very scared.

Q.  When you had these shorts on your head, you were able to look through the hole in the shorts; correct?

A.  I could at times, I could see a hole through the shorts, limited, but.

Q.  And that was the leg hole or the waist hole?

A.  One or the other, I'm not sure.

Q.  And when you did that, there was a light on in the room that you were looking through; correct?

A.  I don't remember.

118

Q.   You have good -- good vision; do you?

A.   Fairly.  I wear glasses to see far away.

Q.   But you were not wearing glasses at the time of the incident?

A.   No.  I asked him if I could take them off because they were hurting my head the way he was holding me.

Q.   And so you -- in the beginning, you saw him through the glasses and then you saw him without the glasses?

A.   I saw the back of him through the glasses, but he was close up, so the glasses didn't really matter.

Q.   Because you don't need your glasses for seeing close?

A.   Right.

Q.   When you talked to the police about this incident, the police told you or suggested to you certain things that they believed to be the case about this identification; correct?

MS. LADD:  Objection.  Foundation.

THE COURT:  I'll sustain the objection.

MS. LENIK:  Well, she testified on direct that the police suggested ID to her.

THE COURT:  Why don't you ask the question

119

specifically.

      MS. LENIK:  All right.

      Q.  (by Ms. Lenik)  What did the police suggest to you?

      MS. LADD:  Same -- When?  Who?

      THE COURT:  Ms. Lenik, you need to be more specific as to the time and what forms of identification you're talking about.

      Q.  (by Ms. Lenik)  At 6:30 on the 25th of February of 1998, you spoke to Detective Don Shepard while in the hospital at Covenant; is that correct?

      A.  I think at 6:30, I was actually in his office.  I did speak to him briefly at Covenant, and then I went into the police station to talk to him that morning.

      Q.  All right.  And so you -- Who else was present?

      A.  My mother.

      Q.  She was present during the interview?

      A.  Yes.

      Q.  Was anybody else present during the interview?

      A.  I don't think so.

      Q.  And it took place in the Champaign Police Department in Detective Shepard's office?

A.  Not in his office.  It was a conference room.

Q.  And that's on the first floor of the Champaign Police Department?

A.  I think it's on the second floor.

Q.  The second floor.  Okay.  And nobody else was around, nobody came in and out?

A.  I really don't remember.  People might have poked their heads in just to give a message, but I don't really remember.

Q.  And at that time and in that place, you made a statement to the police about what happened that morning; correct?

A.  Yes.

Q.  And one of the things that is in that statement -- Well, let me ask you this, have you read that statement?

A.  Yes, I have.

Q.  How many times have you read it?

A.  Twice.

Q.  And did you go over it with Ms. Ladd when she was preparing you to testify?

A.  We didn't go over it.  She showed it to me, and I read it for the first time there.

Q.  And did you have any discussions with her

121

about the contents?

     A.  I told her that there were a few inconsistencies and some incorrect parts of it, but that most -- for the most part, they were true.

     Q.  What were the inconsistencies?

     A.  One of the police reports said that I came home at 2:55 in the morning, which was not true. Another said there was no tree in my front yard, but there was.  Those are the only two I can -- I can --

     Q.  And are those both the inconsistencies and the correct part?

     A.  I'm sorry, those are the incorrect parts. The time may have been inconsistent from one report to the other, but certain specifics from -- The first officer I spoke to, I gave him a very brief synopsis of what had happened, because the fire department was still trying to put out the fire.  So, that seemed kind of jumbled.

     And the statement I gave to the officer in the ambulance, it was also -- I was still very much kind of in shock about the whole thing, and so it seemed like I would tell him one thing and then I'd remember something else and tell him later, so the way it came out in the report seemed like that was the chronology of events, but a lot of the details got mixed around as far as when

they occurred, but for the most part, it was correct, just little things like that.

Q.  Let me ask you this, you -- the report indicates that you gave a description of the suspect; is that correct?

A.  Yes.

Q.  And the report indicates that the description you gave was that he was a black male, approximately 18 to 32; is that correct?

A.  I never actually gave an age.  The police just -- I said he was young, probably -- he wasn't over 30, not under 17, or something like that, and so they kind of wrote up a description.  I guess they translated my vague statements to something a little more set.

Q.  So, you were rather vague about his age; correct?

A.  I -- I guess.  I knew he was young.

Q.  And the only statement that you gave of his age was that he was young; correct?

A.  Pretty much.  I think when the police said, "Would you say he was between whatever the age range?" I probably said, "Yeah, that sounds about right, I guess."

Q.  But you weren't positive and you're still not positive; are you?

123

1

2        A.   No.  I'm positive he was young, but what

3   that is changes, I suppose, from person to person, so.

4        Q.   And it depends what your age is, too?

5        A.   Yeah, I guess so.

6        Q.   Let me ask you this, when they asked you

7   how tall he was, did you say he was a minimum of 5'9" or

    5'10" or did they say that?

8        A.   He said.

9        Q.   And did you say you didn't think he was

10  real tall?

11       A.   Right.

12       Q.   And what does that mean to you?

13       A.   It means if -- I didn't think he was that

14  much taller than I was.  I guess that's pretty much what

    it means, that he probably wasn't over six feet tall is

15  what I thought.

16       Q.   How tall are you?

17       A.   5'8".

18       Q.   So that if, for example, you saw somebody

19  who was over six feet tall, that would go against your

20  belief that this was the person; correct?

21       A.   Against my belief; although, again, I --

22  except for the one time I was face-to-face with him

23  several -- few feet apart, it was so hard to tell how

24  tall he really was just because I was on the ground most

                          124

of the time.

Q. And you specifically told them that he didn't wear glasses; correct?

A. I never saw glasses on him.

Q. And you told him -- you told them that he was wearing baggie clothes and you didn't know what his body type was; correct?

A. Correct.

Q. And so you didn't know if he was muscular or flabby or very thin?

A. Right.

Q. And you described the clothes as a large, baggie jacket with a hood, mostly with black and white trim and long sleeves, and baggie blue jeans and olive green suede tennis shoes; correct?

A. Yes.

Q. Now, did you ever go back to the apartment to see what clothing was found or with -- with the police to collect what they thought was evidence?

A. Not with the police, no.

Q. Did you later see items of clothing that were given to you as possibly evidence in the case?

A. I'm sorry --

Q. All right. That's very inartfully phrased.

125

Other than your own clothing which you've
seen, did anybody ever show you clothing and ask if this
was the clothing he was wearing?

A.   No.

Q.   You told the police that you thought he
was wearing gloves; correct?

A.   Yeah.

Q.   Did anybody ever show you gloves and ask
if those were the gloves he was wearing?

A.   No.

MS. LENIK:   May I have a moment, Your Honor?

THE COURT:   Yes.

Q.   (by Ms. Lenik)   In regard to the tights
that you've described, you don't recall the last time
you wore them besides this incident, or before this
incident; do you?

A.   No.

Q.   They could have been hanging around for
quite a while in a bag; correct?

A.   I don't know why they would have been in a
bag, but they could have been hanging around -- they
could have been around for quite a while, yes.

Q.   And do you recall when you bought them?

A.   No, I don't.  I had them for quite a long
time.

126

Q.  Pardon me?

A.  I had them for quite a long time.

Q.  Over a year?

A.  Probably, yes.

MS. LENIK:  No further questions.

THE COURT:  Ms. Ladd?

REDIRECT EXAMINATION

BY MS. LADD:

Q.  Just briefly, Lori.  When you say hanging around as far as those nylon stockings, do you mean around in your duplex?

A.  Yes.

Q.  And that would be in your bedroom?

A.  Most likely, yes.

Q.  Now, you never met me in any capacity other than as a prosecutor on this case; is that right?

A.  Yes, that is.

Q.  I don't know you from school or anything like that?

A.  Right.

Q.  And when you met with the police officers, were they suggesting descriptions or were they clarifying what you were telling them?

A.  They were clarifying.

Q.  So, no one gave you a number and said, "Is

127

that what he is?"

      A.   Right.

      Q.   Would you give them a general description and they'd try and understand what you were saying?

      A.   Yes.

      Q.   Now, when you went to the lineup, did anyone tell you who to pick out in any way?

      A.   No.

      Q.   Did anyone tell you that you should pick out someone?

      A.   No.

      Q.   In fact, weren't you told the person may not even be there?

      A.   Yes.

      Q.   When you came to court, did anyone tell you to pick out anyone in any way?

      A.   No.

      Q.   Were you told you should pick out someone?

      A.   No.

      Q.   In fact, what were you told about telling the truth?

      A.   I was --

      MS. LENIK:  Objection.  Leading.

      THE COURT:  You may ask.  Overruled.

      A.   I was told to answer honestly, and if I

128

wasn't sure, I should say I'm not sure.

Q.   (by Ms. Ladd)  And did anyone tell you you had to make an identification?

A.   No.

Q.   In fact, were you told it was all right if you didn't?

A.   Yes.

Q.   And were you encouraged to tell the truth and testify honestly?

A.   Yes.

Q.   And have you?

A.   Yes.

MS. LADD:  Thank you.  I have no further questions.

THE COURT:  Ms. Lenik, anything else?

MS. LENIK:  No, nothing else.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

THE COURT:  Call your next witness.

MS. LADD:  Thank you, Your Honor.  I'd call Dale Grimm.  I'm sorry, I'd call David Perkinson.

(Witness sworn.)

DAVID PERKINSON

called as a witness on behalf of the People, being first duly sworn, was examined and testified as

129

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  David Perkinson.

Q.  And what is your occupation?

A.  I'm a waiter.

Q.  And where's that?

A.  Carlos O'Kelly's.

Q.  And ask you if you could keep your voice up so everyone could hear you, please.

I'd like to think back to February of 1998, at that time, where were you residing?

A.  510 South New.

Q.  And what type of a residence is that?

A.  It's a duplex.

Q.  Were you sharing that residence with anyone else then?

A.  Yes.

Q.  And who was that?

A.  I have a roommate, Robert Ricord.

Q.  And then was your mother also residing?

A.  She was visiting, yes.

Q.  Now, did you know any of the people who lived in the other duplex units?

130

A.    I knew the young lady that lived next to me.  I don't -- don't remember her last name very well. Her name is Missy.  Missy Welsh (phonetic).  And then that duplex next to mine was where Lori lived.

Q.    And is that 512 then?

A.    It's 512.

Q.    And how well did you know Lori?

A.    Just from passing, talked a little, and I do a lot of the yard work.

Q.    Now -- I'm sorry.

A.    So, we'd visit every now and then when she'd come home and I'd be working out in the yard or something like that.

Q.    Did you know the people who lived on the other side of Lori then in 512?

A.    I knew the lady that lived there.

Q.    What was her name?

A.    Lillie.  I'm not sure of her last name.

Q.    All right.  And did you know any of the other people that might have come or gone from her residence?

A.    She either had a daughter or daughter-in-law that stayed there off and on, and then I think a granddaughter.  I know Pat was either her daughter or daughter-in-law.  I wasn't sure of the

131

relationship.

Q. And did you see anyone else coming or going from that residence?

A. Just a couple of gentlemen. I believe I was told it was her either grandson or nephew, I'm not sure. I didn't really pay attention to, you know, who they were coming or going. I didn't want them to think I was, you know, being nosy, considering I did most of the yard, 'cause a lot of times I would be either in front of their windows, in the flower beds that I built up, or towards the back of the yard; and I put a garden in, and I always told them, you know, you're welcome to the garden, anything that's growing in there or the flowers, cut the flowers.

Q. Then let me direct your attention to the night of Wednesday, February 25th of 1998, and the night before, which would be Tuesday, February 24th, were you working that evening?

A. Yes.

Q. And about what time do you recall getting off of work?

A. At the time, I wasn't -- I was working as a manager at Colorado Steakhouse (phonetic), and a lot of evenings I closed, and depends on when I got my work into the computer and everything. Usually, I got home

132

around 1:00, 1:30.  And I believe I got home close

around 1:30 that night and went into the house.  I took

a shower to get the restaurant off of me and --

Q.  Let me back up for just a minute, sir.
When you got to your residence, then, where did you
park?

A.  I parked in the front.

Q.  And when you parked in the front, are you
familiar with the vehicles that your neighbors drive?

A.  Yes.

Q.  And are you familiar with the car that
Lillie drives?

A.  I've never really saw her drive it.  I saw
either her daughter or daughter-in-law drive it.  It was
a white -- It looked like a Ford Escort type style, but
I'm not sure of the make.

Q.  And was that anywhere around the duplexes
when you got home?

A.  No.

Q.  And are you familiar with the vehicle that
Lori Hansen drove?

A.  Yes.

Q.  And what was that?

A.  It was a truck.  I'm not sure if it was a
Toyota or a Dodge -- Dodge.  It was a small, midsize

133

truck.

Q.   And was it anywhere around the area when you pulled up?

A.   I don't recall.

Q.   Then where did you park?

A.   I always would park in front.   There's a house across the street, kind of right next to it and with a tree.   That's usually where I park.   Majority of the other tenants would either park in the back.   Every now and then, they'd park in the front, but majority of them parked in back.

Q.   After you got to your residence then and showered as you described, did you go to bed?

A.   No.   I usually, after I get off work and take a shower, I usually can't get right to sleep, so I was watching like CNN or the old movie channel.

Q.   Do you recall falling asleep at some point?

A.   I fell asleep on the couch.

Q.   What awakened you?

A.   Someone was banging on the back door.

Q.   And what time was it?

A.   It was close to 3 o'clock.   I'm not -- I want to say it was close to 3 o'clock.   I'm not real sure.   I didn't look at the clock.   I just -- I got up,

134

and I wake up pretty easily, but, still, I was like what, you know, who's -- at 3 o'clock in the morning, or, you know, it was late.

Q.   Was that your front door?

A.   It was the back door.

Q.   And then did you go to the back door?

A.   So I went to the back door and I noticed that I didn't have the light on.  Usually, I left it on, 'cause it was a motion detector and it would light up the whole backyard, 'cause, otherwise, the yard's really dark.

Q.   Did you see anyone outside?

A.   Well, I flipped on the light and I peeked through the blinds and I saw it was Lori, but I didn't recognize her at first, because her hair was all tousled, and then I proceeded to open up the door and like, you know, what's wrong, and she was like tearing tape out of her hair and stuff, and she looked kind of a mess, and I was what's wrong, and she said someone --

MS. LENIK:  Your Honor, I'm gonna object to what Lori said.

THE COURT:  Overruled.

MS. LADD:  You may continue.

A.   She said someone broke into her place and had beat her up and set her on fire, and I'm like, well,

135

get in here.  And she's like -- And by that point, I
heard someone behind me, and it was my roommate.  He had
come out of the bedroom.

            Q.  (by Ms. Ladd)  So, did you direct your
roommate to call 9-1-1?

            A.  Yes.  I said, "Call 9-1-1.  Someone has
set Lori's place on fire.  You better get -- have
them -- have the police."  I don't know, and, at that
point, she goes, "My cats," and she left, and I said,
"You better call an ambulance, too," and I proceeded to
follow after her.

            Q.  And where did Lori go?

            A.  She went to her apartment.

            Q.  And did she go inside?

            A.  She was inside by the time I got over
there, and all I saw was black smoke pouring out.

            Q.  And what door did she run in?

            A.  The back door.

            Q.  And then when she came, did she come back
out then?

            A.  No.  Not right away.  I had got down on my
knees and proceeded to crawl into the apartment, 'cause
the smoke was waist level.  And I was calling for her.
I'm like, "Lori, come out."  And I didn't see her.  All
I could see was a glow of what fire was in the hallway

136

E-FILED
Friday, 04 May, 2007  05:07:57 PM
Clerk, U.S. District Court, ILCD

area it looked like.  And I said, you know, I was gonna go in there, but I thought, well, that's where the water heater and the furnaces are.  I didn't know if there would be some kind of an explosion.

Q.  So, did she come back out?

A.  Then I saw her coming out, and she was, you know, she couldn't find her cats.

Q.  Did you go around to the back window then?

A.  We were at the back, at this point. That's where she was at the back door.  At that point, my roommate had came over, and she was, you know, I was trying to calm her down, 'cause she was worried about the cats, and I go, "You cannot go back in there."

Bob had looked in the back window, said, "I see the cats.  They're on the bed."  Well, we had a tree back there with some landscaping ties around it that were loose, and he picked them up and broke the window, and they were both trying to get the cats to the window.

At that point, I heard the sirens coming and realized I was in my boxers, decided to go back to my place to put some clothes on.

Q.  Then after that, did the fire trucks and the police arrive?

A.  They were there -- By the time I came back, I didn't see Bob or Lori anywhere, so I thought

137

1

2    they had went into the house, so I started to go into

3    the house to get them out and saw flashlights coming,

4    and I didn't know who they were.

5          Q.  And then did the police take over?

6          A.  And then they, yeah, they said who they

7    were, and I told them who I was, and they said, "Well,

     they're out front."

8          Q.  Now, let me ask you, as the fire was being

9    put out, did the residents from 512, the other side of

10   the duplex return?

11         A.  Yes.

12         Q.  And that would be Lillie?

13         A.  Lillie.

14         MS. LENIK:  Objection.  Leading.

15         THE COURT:  Overruled.

16         A.  Lillie and Pat got there.  Pat got there.

     They had pulled into the parking lot on the right side

17   of their -- which would be the house on the right side

18   of their duplex that was a parking lot for this house,

19   and they were parked there, and I was in the yard.  They

20   had given me oxygen to put on the cats, so I was holding

21   the cats, trying --

22         Q.  The firefighter had brought the cats out?

23         A.  Right.

24         Q.  And you took over to assist the cats?

                          138

A.   Right.

Q.   And did the cats make it?

A.   One -- They were both -- They seemed -- One was seemed okay.  The other one that I was holding the most was having a hard time with it, and it later didn't make it.

Q.   Now, I'd like to show you what is marked as People's Exhibit 26B.  As you look at that, Mr. Perkinson, do you recognize the person in that photograph?

A.   Yes, that's Lori.

Q.   And is that how she looked when she came to your door?

A.   Yes.

Q.   And did she also have tape around her face?

A.   She had tape in her hair.  It wasn't necessarily around her face.  At that point, most of it I think -- Some of it I found in the yard the next morning when an officer came over to, you know, investigate and --

Q.   So, let me interrupt you.  She was pulling the tape out of her hair at the time?

A.   She was pulling the tape out of her hair, and she came down there, 'cause I always tell everyone

139

that moves in, mostly women live in the other duplexes,
that if they ever have any trouble --

MS. LENIK:  Your Honor, I'm going to object to
this as being irrelevant.

THE COURT:  Sustained.

MS. LADD:  Thank you.  I have no further
questions.

THE COURT:  Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.  Mr. Perkinson, an investigator or
assistant from my office came to talk to you a couple of
times; correct?

A.  I heard that someone had came to my work
while I was working one day, and I couldn't talk, 'cause
I was busy.

Q.  And you -- there was messages left for you
on your home machine, correct, a couple of times?

A.  A couple times I got a couple messages.

Q.  And you never called back; did you?

A.  I didn't because the tone of the voice of
the lady was kind of irritated, and I didn't know if I
did something wrong, and she was kind of rude the way
she was speaking on my answering machine.

Q.  What time did you say this occurred?

140

A.   When she came to see me?

Q.   Lori.

A.   Oh, Lori?  I want to say it was around 3 o'clock.  I didn't look at a clock.  I just know that I had fallen asleep, and I want to say it was around 3 o'clock.  By the time I got back to the house -- I knew it was after three by the time I got back to the house to put some clothes on, 'cause I was only in boxers.

Q.   You were actually -- There were actually three people living in your residence at the time; correct?

A.   Two were living there.  One was visiting.

Q.   And so there were three people staying there at the time of this incident?

A.   Yes.

Q.   And those three people were your mother, your roommate, and yourself?

A.   Correct.

Q.   And your mother's name is Beverly?

A.   Yes.

Q.   And your mother was asleep at the time of this incident?

A.   She was asleep.  She did wake up when Bob was on the phone calling 9-1-1, but she is a nervous

141

person, so she didn't -- she just stayed in her room

until after everyone -- We brought the cats into our

place, and Lillie came in there.  She was the neighbor

at 512 1/2.

Q.  She came into your house?

A.  She came into our house to use the rest

room, because she'd, I guess, just got back into town,

from what she said, and she couldn't get into her place

because of the fire, and she came in to use our rest

room.

Q.  Did you tell the police that Lillie used

your rest room?

A.  The police were in there at the time.  One

officer was.  I don't remember his name.  And I think he

talked to her then, but I'm not sure.

Q.  And that would have been in your -- your

apartment?

A.  In our apartment.

Q.  In your unit?

A.  Because we had the cats in there waiting

for the vet to get there to take them to the vet

hospital.

Q.  You never saw the individual who was

supposed to have attacked Lori; did you?

A.  No, I did not.

142

1

2        Q.  Are you familiar with some of the

3  relatives who Lillie had who would come to see her from

4  time to time?

5        A.  Just her daughter and her -- I think was

6  her granddaughter.  I can't remember the young girl's

7  name.  She was probably 12, 13 at the time.  She a

8  couple times helped me water the yard.  It would take me

9  close to two hours to water the flowers around there,

10  and to give her something to do, I would, you know, give

11  her a couple dollars to water the yard and visit, but I

12  don't remember her name.

13        Q.  Those were all female relatives?

14        A.  Female relatives.  I did see male people

15  there, but I never met any of them.  They were always

16  coming or going.  I know that -- You know, I saw some of

17  them come out on the back patio with their shirts off

18  like, you know, they were resting or something, but I

19  don't know if they were staying there.

20        Q.  And there would be young men there from

21  time to time; correct?

22        A.  Yes.

23        Q.  And you would see young men there from

24  time to time?

        A.  Yes.

        Q.  And those would be African American young

143

men?

 A.  Correct.

 Q.  Did you -- Would you recognize any of them by their appearance or the way they would walk or what their facial features looked like?

 A.  Not really.  I didn't -- I didn't really look and pay attention, because I didn't -- We had a neighbor that lived there at one time that was kind of a busybody, and I didn't want to be accused of being, you know, nosy neighbor.

 Q.  Understandable.

 A.  Something like that.

 MS. LENIK:  No further questions.

 MS. LADD:  Nothing further.  Thank you.

 THE COURT:  Thank you.  You may step down.

                         (Witness excused.)

 MS. LADD:  May we approach for just a moment?

 THE COURT:  Yes.

 (A sidebar conference was held out of the hearing of the jury.)

 MS. LADD:  Call Dale Grimm.

                         (Witness sworn.)

                  DALE GRIMM

     called as a witness on behalf of the People, being first duly sworn, was examined and testified as

144

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  Dale Grimm.

Q.  What is your occupation?

A.  Paramedic.

Q.  For what department?

A.  Arrow Ambulance.

Q.  How long have you been employed as a paramedic?

A.  Approximately ten years.

Q.  And what does that title mean?

A.  Basically, I'm in charge of the patient in the back of an advanced life support ambulance.

Q.  Are there different levels of paramedic status you can achieve?

A.  No.  There are different levels of care starting with the basic, intermediate, paramedic; and the only level of care above mine is a field nurse.

Q.  Then are you licensed or certified by the State of Illinois in your field?

A.  Licensed.

Q.  Now, directing your attention to February 25th of 1998, were you working in that capacity as a

145

paramedic with Arrow Ambulance?

    A.  Yes.

    Q.  Around 3:09 a.m., did you have occasion to be dispatched to a fire call at 512 South New Street in Champaign?

    A.  Yes.

    Q.  At that time, did you arrive at approximately 3:12 a.m.?

    A.  Yes.

    Q.  Did you treat a patient that was later identified as Lori Hansen?

    A.  Yes.

    Q.  Like to show you what's been marked as People's Exhibit 26B.  Ask you, Mr. Grimm, do you recognize that?

    A.  Yes.

    Q.  And is that the lady that was named Lori Hansen?

    A.  Yes.

    Q.  Is that a true and accurate depiction of how she appeared when you were working with her?

    A.  As near as I can recall, yes.

    Q.  At that time, then, when you first attended to her, were you assisted by another emergency medical personnel?

146

A.   Yes.

Q.   Who was that?

A.   Jamie Rayburn (phonetic).

Q.   Did you make any initial observations about Ms. Hansen's condition?

A.   She had apparently been involved in some kind of a fire situation because of the soot on her face.

Q.   And could you tell if there was any strong odor about her?

A.   She did smell of a gasoline-like substance.

Q.   And could you tell what the source of that was?  Was there any particular area or all of her area, in other words?

A.   Her clothes and herself was saturated in it.

Q.   Did you have to remove the clothing then?

A.   Yes.

Q.   And when you did so, were the police officers from the Champaign Police Department present at the scene?

A.   Yes.

Q.   As you removed the items of clothing, what did you do with them?

147

1

2          A.  Put them in a brown paper bag that was

3     given to me by the police.

4          Q.  And did you immediately turn those items

5     over to the police officer then?

6          A.  Yes.

7          Q.  And when you did so, did you do anything

      to change the clothing at all?  Did you test it or rinse

8     it or do anything at all to the item of clothing, in

9     other words?

10         A.  No.

11         Q.  Now, after you turned over the clothing,

12    did you have to do anything to Ms. Hansen in terms of

13    rinsing off the substance you'd smelled?

14         A.  Yes.

15         Q.  And what was that?

16         A.  We rinsed her with some saline solution or

      sterile water, probably both.

17         Q.  And why was that?

18         A.  To get the substance off of her body so it

19    would not burn or affect her body.

20         Q.  Did you make any initial observations

21    about any injuries she'd sustained?

22         A.  She did appear to have some, if I recall

23    correctly, some abrasions around her wrists and ankles.

24         Q.  And did you also observe burn areas?

148

A.    I believe there was a burn to her knee area, I believe.

Q.    And then did you, at that time, also provide her oxygen?

A.    Yes.

Q.    And how was that done?

A.    If I could refer to my run ticket, could tell you if it was probably by nasal cannula or nonrebreather mask.  Probably in her case, a nonrebreather mask.

Q.    And is that just a mask that slips over her face then?

A.    Yes.

Q.    And why was that?

A.    Anytime anybody has been involved with a fire situation where there might be some inhalation, you'd place that person on a large quantity of oxygen.

Q.    Did you then transport her to Covenant Medical Center?

A.    Yes.

Q.    And, at that time, did you turn her over to personnel in the emergency room for further assessment and treatment?

A.    Yes.

MS. LADD:  Thank you.  I'd tender this

149

witness.

THE COURT:  Ms. Lenik?

MS. LENIK:  No questions.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

MS. LADD:  Call Sergeant James Summers.

(Witness sworn.)

JAMES P. SUMMERS

called as a witness on behalf of the People,

being first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  James P. Summers.

Q.  And what is your occupation?

A.  I'm a sergeant on the midnight shift at

the Champaign Police Department.

Q.  How long have you been a police officer?

A.  Thirteen years.

Q.  Were you so employed then on February 25th

of 1998?

A.  Yes, ma'am.

Q.  Shortly after 3 o'clock a.m. on that date,

did you respond to a call of a fire at 512A South New

150

Street in Champaign?

    A.  Yes, ma'am.

    Q.  Is that located in Champaign County, Illinois?

    A.  Yes, it is.

    Q.  And were you present then when a victim named Lori Hansen was being treated by ambulance crew there?

    A.  Yes, I was.

    Q.  I'd like to show you what's been marked as People's Exhibit 26B.  Do you recognize that as a photograph of Ms. Hansen?

    A.  Yes, I do.

    Q.  As the ambulance crew was treating her then, did they recover any items of evidence for you?

    A.  Yes, they did.

    Q.  And what was that?

    A.  Items of clothing that belonged to the victim.

    Q.  And how were these packaged?

    A.  They were in a brown paper bag.

    Q.  Did you then take that bag from the ambulance attendants?

    A.  Yes, I did.

    Q.  And did you remove anything from the bag

151

yourself?

      A.   No, I didn't.

      Q.   Did you add anything to the bag?

      A.   No, I didn't.

      Q.   Did you examine the clothing?

      A.   No, I didn't.

      Q.   Did you then secure that bag and keep it secure until you turned it over to another officer at the scene?

      A.   Yes, I did.

      Q.   And who was that?

      A.   Officer Atteberry.

      Q.   And would that be Timothy Atteberry?

      A.   Yes.

      MS. LADD:  Thank you.  I'd tender this witness.

      THE COURT:  Ms. Lenik?

      MS. LENIK:  No questions.

      THE COURT:  You may step down.  Thank you.

               (Witness excused.)

      MS. LADD:  Call Officer Timothy Atteberry.

               (Witness sworn.)

        TIMOTHY JAMES ATTEBERRY

      called as a witness on behalf of the People, being first duly sworn, was examined and testified as

152

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  Timothy James Atteberry.

Q.  And what is your occupation?

A.  I'm a police officer for the City of Champaign.

Q.  How long have you been a police officer?

A.  Eight years.

Q.  Were you so employed on February 25th of 1998?

A.  Yes, I was.

Q.  Sometime after 3 o'clock a.m., did you have occasion to respond to a call of a fire at 512 South New Street in Champaign?

A.  I believe it was 510.  It was where I was dispatched to.

Q.  And that would be the neighboring duplex?

A.  Yes.

Q.  Were you one of the first officers to arrive?

A.  Yes, I was.

Q.  And were you assisted by another Champaign police officer?

153

1

2          A.  Officer Martin, yes.

3          Q.  What type of residence is located at 510

4   and 512 South New?

5          A.  512 South New was a duplex, and I believe

6   510 is also a duplex, but I'm not certain.

7          Q.  Now, when you arrived there, were you able

8   to see any visible signs of fire to one of those

    duplexes?

9          A.  Yes, 512A, which is on the north side of

10  the duplex.

11         Q.  And what did you see?

12         A.  I saw the interior of the -- what I

13  believe was the living room.  It was glowing.  There

14  were flames inside of the apartment.

15         Q.  Now, while you were responding to that

16  call, did you identify a lady named Lori Hansen who was

    also at the scene?

17         A.  Yes.

18         Q.  And shortly after that, did you have

19  occasion to recover a bag of Lori Hansen's clothing from

20  Sergeant James Summers of the Champaign Police

21  Department?

22         A.  Yes, I did.

23         Q.  How did he turn that over to you?

24         A.  He handed me a bag containing the

                          154

clothing, a single bag.

Q. Did you remove anything from the bag?

A. No, I did not.

Q. Did you add anything to the bag?

A. No, I didn't.

Q. Did you examine the clothing yourself?

A. No, I didn't.

Q. Did you keep that clothing secure and intact then until you turned it over to another officer?

A. Yes.

Q. And were you able to detect any odor coming from the clothing while you had it?

A. Yes, there was an odor of some kind of an accelerant, a gassy type of a smell.

Q. And who did you then turn that bag over to?

A. Officer Bunyard.

Q. At that point, had the Champaign Fire Department also responded then to deal with the fire?

A. Yes.

Q. And were other officers arriving to assist with the scene?

A. Yes.

Q. And did you turn that scene over to them then?

155

1

2          A.   Yes.

3          MS. LADD:   Thank you.   I'd tender this

4    witness.

5          THE COURT:   Ms. Lenik?

6          MS. LENIK:   No questions.

7          THE COURT:   Thank you.   You may step down.

                         (Witness excused.)

8          MS. LADD:   I'd call Officer Mary Bunyard.

9                         (Witness sworn.)

10                    MARY BUNYARD

11         called as a witness on behalf of the People,

12   being first duly sworn, was examined and testified as

13   follows:

14                   DIRECT EXAMINATION

15                    BY MS. LADD:

16         Q.   Could you please state your name.

17         A.   Mary Bunyard.

18         Q.   What is your occupation?

19         A.   Police officer for the City of Champaign.

20         Q.   And how long have you been a police

     officer?

21         A.   Five years.

22         Q.   And what is your current assignment?

23         A.   I'm currently assigned to the Champaign

     Police Department walking unit.

24
                         156

1

2          Q.    Like to direct your attention back to

3    February 25th of 1998, were you employed as a Champaign

4    police officer on that date?

5          A.    Yes, I was.

6          Q.    And did you have occasion to respond to a

7    scene of a fire at 512A South New Street in Champaign?

8          A.    Yes, I did.

9          Q.    Now, when you arrived, were there other

10   Champaign Police Department officers already at the

11   scene?

12         A.    Yes, there were.

13         Q.    And were there also trucks from the

14   Champaign Fire Department responding?

15         A.    Yes, there were.

16         Q.    Now, did you assist in taking a bag of

17   clothing into evidence at that scene?

18         A.    Yes, I did.  Officer Tim Atteberry handed

19   me a paper bag with clothing in it.

20         Q.    Now, did you detect any unusual odors

21   coming from that bag?

22         A.    Yes.  It had an odor similar to gasoline.

23         Q.    While at that scene, then, did you keep

24   the clothing secure?

           A.    Yes, I did.

           Q.    And did you add anything to the bag that

                              157

contained the clothing?

    A.  No, I did not.

    Q.  Now, did you take out one piece of clothing or any pieces of clothing to show to Lieutenant Eddie Bain of the Champaign Fire Department?

    A.  Yes, I did.

    Q.  Why was that?

    A.  He wanted to take a piece into evidence, because he is the arson investigator, I think, to test for an accelerant.

    Q.  And what did you turn over?

    A.  I gave him a ladies 34A size bra.

    Q.  Now, then, did you keep the other items of clothing?

    A.  Yes, I did.

    Q.  And did he then take that piece of evidence with him?

    A.  Yes, he did.

    Q.  And, in fact, did he secure that in a can?

    A.  Yes, he did.

    Q.  Was that to preserve the odor and anything that would evaporate?

    A.  It's my understanding, yes.

    Q.  I'd like to show you a series of exhibits then, Officer, in regards to that clothing.

158

First of all, showing you what's been marked as People's Exhibit No. 10. Actually hand that item to you. Ask you to look at that. Do you recognize those?

A. Yes.

Q. And how do you recognize those?

A. I recall getting a pair of blue jeans out of the bag, and there's a tag on it that has my name and information on.

Q. And do they appear to be in substantially the same condition as when you took them?

A. They're dry, but, yes, substantially the same.

Q. And do you recall that area on the knee that appears to have been burned?

A. Yes, I do.

Q. Did you also have occasion to take a jacket?

A. Yes, I did.

Q. Like to show you then an additional item marked People's Exhibit No. 8. Again, pulling that out of the bag, ask you to look at that and tell us if you recognize that, Officer.

A. Yes, I do.

Q. And is that, again, the jacket that you recovered from that bag of clothing?

159

A.  Yes, it is.

Q.  And did you tag that and mark it with your identifiers as well?

A.  Yes, I did.

Q.  Does that appear to be in substantially the same condition as when you took it into evidence?

A.  Yes.

Q.  Also like to show you a shirt marked People's Exhibit No. 9 and ask you, again, if you could look at that.  Do you recognize the tag on that as well?

A.  Yes, I do.

Q.  And, again, do you recognize that as the shirt you took into evidence?

A.  Yes.

Q.  Does it appear to be in substantially the same condition, as with all of these, there may be some lab markings on it; is that correct?

A.  Yes.

Q.  With that exception, does it appear to be in substantially the same condition?

A.  Yes.

Q.  Now, you also took Ms. Hansen's underwear; is that correct?

A.  Yes.

Q.  And, specifically, that bra that you gave

160

to Lieutenant Bain, I'd like to show you what's been marked as People's Exhibit No. 11. Ask you as you look at that, do you recognize that?

A. Yes.

Q. And is that the bra that you turned over to Lieutenant Bain?

A. Yes.

Q. And, again, with the exception of lab markings, does that appear to be in substantially the same condition as when you took it into evidence?

A. Yes.

Q. Now, with regards to the other three items that you took into evidence, with the exception of the bra, did you then transport those to the Champaign Police Department?

A. Yes, I did.

Q. And did you secure those then in the evidence area?

A. Yes, I did.

MS. LADD: Thank you. I'd tender this witness.

THE COURT: Ms. Lenik?

MS. LENIK: No questions.

THE COURT: Thank you. You may step down.

(Witness excused.)

161

1

2          MS. LADD:  May we approach?

3          THE COURT:  Yes.

4          (A sidebar conference was held out of the

5     hearing of the jury.)

6          THE COURT:  Ladies and Gentlemen, that will

      conclude the testimony for this afternoon.

7          I'm going to excuse you, and I want you back

8     in the jury room by 9 o'clock tomorrow morning.

9          Don't discuss the case among yourselves or

10    with anyone else.  There may be some articles in the

11    newspaper about this trial.  There may be something on

12    the local news, on television or on the radio.  I'm

13    going to ask that during the course of the trial you not

14    read the local paper.  You can confine yourselves to the

15    section and maybe have somebody else set the rest of the

16    paper aside until you're done with this trial and then

17    you can look at the paper.  Try to avoid the evening

18    news on any of the T.V. stations.  We again want to make

19    sure that the decision you make is based upon the

20    evidence and not on anything you might have heard or

      read in the media.

21         So, you're excused for the rest of the

22    evening.

23         Tomorrow morning, 9 o'clock, in the jury room.

24         (The following proceedings were had out of the

                              162

presence and hearing of the jury.)

       THE COURT:  Officer, have the Defendant over here at the correctional center about 9 o'clock tomorrow morning.  We'll get him after we get the jurors in the jury room.

       Thank you.

       We'll be in recess.

       (The trial was continued to 9:00 a.m., Tuesday, March 16, 1999.)

163

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, )
)
                  Plaintiff,   )
)
              v.          )   No. 98-CF-1558
)
DEDRIC T. MOORE,         )
)
              Defendant.  )

       REPORT OF PROCEEDINGS of the Continued Jury

Trial had in the above-entitled cause on March 16, 1999,

before the HONORABLE THOMAS J. DIFANIS, Judge Presiding.

APPEARANCES:

        MS. HEIDI LADD
        Assistant State's Attorney
        for the People

        MS. DIANA LENIK
        Attorney at Law
        for th—

*Vol. XVIII*

*4-99-0499*

FILED

AUG 2 0 1999

Clerk of the
Appellate Court, 4th Dist.

FILED
SIXTH JUDICIAL CIRCUIT

B JUL 2 8 1999

Linda S. Frerichs
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

          Melissa Clagg, RDR
          License No. 84-2876
          Official Court Reporter
       Champaign County Courthouse
          Urbana, Illinois  61801

MARCH 16, 1999

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  All right.  We're back on 98-CF-1558, People v. Moore.

The Defendant is present with Ms. Lenik.  Ms. Ladd is here for the People.

Ms. Ladd, there was a matter you wanted to bring up concerning something that occurred at the end of the day yesterday?

MS. LADD:  That's correct, Your Honor, and I'm not suggesting there's anything improper about it, but I wanted to avoid the appearance of impropriety.

After the conclusion of the proceedings yesterday, Juror No. 167, Lois Thompson, was exiting. Apparently, right as she was going towards the stairway, she ran into one of the spectators who'd been watching the proceedings yesterday.  It was a spectator that was identified by the victim by name under cross-examination by defense counsel as someone she knew.

I then talked to this individual afterwards, and he indicated that they passed in the hallway; that the juror approached him and simply said, "Hi.  How are you doing?"  And they engaged in banalities and pleasantries; that it had nothing to do with the trial,

165

and there was no mention of the trial at all, and the discussion was simply, again, confirming just trivial matters from knowing each other from something completely unrelated to this trial.

THE COURT:  Ms. Lenik?

MS. LENIK:  Your Honor, I'm not going to object or ask that the witness (sic) be questioned, but I do have one question in regard to that.  I don't know who the spectators were or whether they were from some organized group; and if I could be told the answer to that question, I suppose at that point -- I mean, this is a small community.  I don't -- I mean, people see people they know, and I don't believe it has any negative impact on the trial or on Mr. Moore's right to a fair trial, and I'm not going to object, but I would like to know who the spectators were.

THE COURT:  Ms. Ladd, do you know where this young man is from?  Is he from the law school?

MS. LADD:  I don't know.  I know this was the African American that Ms. Lenik asked about in her cross-examination.

It's my understanding he's a friend of the victim.  That's all I can represent.

THE COURT:  Ms. Lenik, I'm going to ask at some point during the day that you get an answer to that

166

question.

      MS. LENIK:  Yes.

      THE COURT:  And we'll take this up again at the --

      MS. LENIK:  Yeah, until I know -- until I -- I was under the impression that they may have been law students, and if that's the case, then I might want to know more, because as we all recall from our way back days in law school, sometimes law students think they know more about the process than they do, and so I might have further commentary later on.

      MS. LADD:  Your Honor, I could probably find out if the Court would give me a moment.  The victim's mother is present in court.

      THE COURT:  Certainly.  Why don't we take a couple minutes and then let me know when you're ready.

      MS. LADD:  Thank you.

      (Recess taken.)

      THE COURT:  Ms. Ladd?

      MS. LADD:  Thank you, Your Honor, for that recess.  I inquired of the victim's mother.  She indicated this individual was a friend of the victim.  She's known him for a long time.  Has no connection to law school.  In fact, he's a bartender.

      THE COURT:  Ms. Lenik?

1

2          MS. LENIK:  That's fine.  I don't need any

3     further inquiry.

4          THE COURT:  All right.  Thank you very much,

5     counsel.

6          Ms. Ladd, are you ready for the jury to be

7     brought in?

8          MS. LADD:  I am.  Thank you, Your Honor.

8          THE COURT:  Ms. Lenik?

9          MS. LENIK:  Yes.

10         THE COURT:  Mr. Rasmus, bring in the jurors,

11    please.

12         (The following proceedings were had in the

13    presence and hearing of the jury.)

14         THE COURT:  You may be seated.

15         Good morning, Ladies and Gentlemen.

16         THE JURY:  Morning.

17         THE COURT:  Ms. Ladd, call your next witness,

17    please.

18         MS. LADD:  Thank you.  We call Lieutenant

19    Eddie Bain.

20                        (Witness sworn.)

21                   EDDIE BAIN

22         called as a witness on behalf of the People,

23    being first duly sworn, was examined and testified as

24    follows:

                        168

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  My name is Eddie Bain, B-a-i-n.

Q.  And what is your occupation?

A.  I'm a lieutenant for the Champaign Fire Department.

Q.  How long have you been with the fire department?

A.  Since the Spring of 1977.

Q.  And what are your job responsibilities or current duties?

A.  I'm Director of the Fire Prevention Bureau, which includes fire investigations.

Q.  Now, as a fire investigator, do you also investigate potential arsons?

A.  Yes, I do.

Q.  And what does an arson investigator, fire investigator do then?  Can you just describe the nature of your work?

A.  Well, the nature of the work determines what cause -- the origin and cause of the fire, to determine what caught on fire, what initiated that fire, and then the circumstances involved.

Q.  Now, do you actually get called out to

169

fire scenes then to do that?

A.  Yes, I do.

Q.  And what is your training and education then within this field?

A.  My training as a fire investigator began in 1978, with my appointment to the Fire Prevention Bureau as a fire inspector.

The initial training included five years of working alongside and under the close supervision of a chief officer in that area.

Ongoing training comes from participation in the International Association of Arson Investigators and attendance at their training programs.

My certification as a fire investigator comes from the Office of the Illinois State Fire Marshal. That includes classroom and practical exams.

And my experience includes examination of approximately 500 fire incident scenes in my 20-year career at the fire department.

Q.  Do you also teach within your field of fire inspection and investigation?

A.  Yes, I have taught fire investigation at the Illinois Fire Service Institute.

Q.  Now, Lieutenant Bain, I'd like to direct your attention to February 25th of 1998, in your

professional capacity as a fire inspector, did you have

occasion to conduct an investigation of the premises at

512A South New Street in Champaign, Champaign County,

Illinois?

A.  Yes, I did.

Q.  When you arrived, were fire department

teams already there?

A.  Yes.

Q.  And were firefighters then battling the

fire in that particular duplex?

A.  When I arrived, the fire had essentially

been extinguished and they were in the process of doing

what's called overhaul, which was ascertaining that the

fire is definitely extinguished and searching for hidden

fires.

Q.  Now, when you arrived then, did you gather

information from the battalion chief who was out there

in charge of the scene?

A.  Yes.  The battalion chief is the incident

commander.  He's in charge of the fire scene, and,

initially, I report in to that officer.

Q.  Now, did you also speak with Champaign

Police Department officers about their observations?

A.  Yes, I did.

Q.  And during the course of this

171

investigation, did you learn that the victim's clothing had been taken into evidence?

MS. LENIK:  Your Honor, I'm going to object to that.

THE COURT:  Overruled.

A.  Yes, I did.

Q.  (by Ms. Ladd)  As a result of that, did you meet with Officer Mary Bunyard of the Champaign Police Department to examine that clothing?

A.  Yes.

Q.  Where did this take place?

A.  The clothing had been taken and placed in a paper bag in the trunk of her squad car, and she opened the trunk and showed me the clothing, and I detected a strong odor of gasoline, and I seized one item of clothing and placed it in a metal container to trap any latent fumes that might be there.

Q.  And why was it necessary to put it in a metal container as opposed to keeping it in the paper bag?

A.  It was my opinion that these types of fumes or this odor would evaporate over a period of time.

Q.  The particular item you chose, was that a bra?

172

A.   Yes, it was.

Q.   And why did you choose that item?

A.   It had a very strong odor of gasoline, and I placed it in a one quart metal container, so it physically fit in my container.

Q.   I'd like to show you what's been marked as People's Exhibit No. 11.

And, again, Your Honor, may I have permission today to approach the witnesses to show exhibits?

THE COURT:  Yes.

MS. LADD:  Thank you.

Q.   (by Ms. Ladd)  Showing you People's Exhibit No. 11, Lieutenant, ask you if you could take a look at that and tell us if you recognize that?

A.   Yes.  That's the container in which I placed the bra.

Q.   Now, when you put it in the container, did you seal it so that no fumes or air could escape?

A.   Yes, I sealed the metal lid and then placed evidence sealing tape across the top.

Q.   And is that the red tape?

A.   That's the red tape, and it bears my initials.

Q.   And was that done at that time when you took it into evidence?

173

A.  Yes, it was.

Q.  At that time, was the blue seal from the lab on it?

A.  No, it was not.

Q.  Now, the bottom has been opened since. Was that intact when you used this can as an evidence collection can?

A.  Yes, it was.

Q.  Now, in opening that can, then, to show you the item inside, does that appear to be the bra then that you took into evidence?

A.  Yes, it does.

Q.  And does it appear to be in substantially the same condition as when you collected it?

A.  Yes.

Q.  Now, when you collected it, did you handle it in such a way as to insure that nothing else contaminated it?

A.  Yes, I did.

Q.  You use gloves when you're processing evidence from an arson or potential arson scene?

A.  Yes, I do.

Q.  And what did you subsequently do with this evidence then after you'd sealed it as you described?

A.  I placed it in my vehicle and locked my

174

vehicle.

Q. Now, did you also then, with regards to the rest of the clothing, did you take that or leave that with the officer?

A. I left that with the officer.

Q. Now, did you also examine then the scene that was surrounding that area?

A. Yes, I did.

Q. And did you examine it for any potential gas cans or anything that would be in that area?

A. Yes. Around the immediate structure, I did look for containers and didn't identify any at that time.

Q. Now, subsequently, were you asked about containers that were found at a dumpster behind the apartment or the duplex area?

A. Yes.

Q. And were those there when you had been there examining the scene that night?

A. I had not observed them at that time.

Q. Now, directing your attention then to the examination, there's another duplex that's attached to 512A?

A. Yes.

Q. Now, had the fire damage spread to that

175

duplex?

A.   No.   The fire damage had not.   They had an odor and a light smoke in the structure, but no fire damage.

Q.   Now, with regards to your investigation, then, as you were processing the outside, did you just walk around it visually on foot to examine the outside area?

A.   Yes.

Q.   And I'd asked you about that dumpster. I'd like to ask you about People's Exhibit No. 40.   Just so there's no confusion, as you look at that, is that the dumpster area you were referring to?   Did you examine that that night?

A.   No, I did not that night.   I believe this was taken the next day.

Q.   But did you examine it that night to make sure there were no gas cans?

A.   No, I did not.

Q.   Okay.   Did you just examine the back area?

A.   Yes.

Q.   And there were none in that vicinity then?

A.   That's correct.

Q.   Now, did you also speak to Champaign firefighters at the scene?

176

E-FILED
Friday, 04 May, 2007  05:08:34 PM
Clerk, U.S. District Court, ILCD

A.  Yes, I did.

Q.  And did you determine then the status of the fire from them?

A.  Yes, I did.  I spoke with Captain Oye, O-y-e.  He was the first officer that attacked the fire, and he told me upon --

MS. LENIK:  Your Honor, I'm going to object to what he told this witness.

MS. LADD:  I'll lay the foundation, Your Honor.

THE COURT:  All right.  Go ahead.

Q.  (by Ms. Ladd)  Is that the type of information that would regularly and reasonably be relied upon by an arson investigator to conduct their investigation?

A.  Yes, it is.

Q.  And what did you learn then from this firefighter?

MS. LENIK:  Your Honor, same objection.

THE COURT:  Overruled.

A.  They indicated when the fire truck first arrived at the location that they observed fire coming from the front window of this structure, and they proceeded to take their attack line into the back of the structure, and they observed the back door standing

177

open, and they went in from the back and extinguished
the fire.

Q.  (by Ms. Ladd)  Now, were you finally able
to enter the duplex then?

A.  Yes.

Q.  And about what time?

A.  It was probably around 3:30, and I would
just be guessing 3:30 a.m.

Q.  What type of a structure is that?

A.  It's a duplex structure.  It's a
wood-frame structure with a brick face.

Q.  And it's a single-story duplex?

A.  Yes, it is.

Q.  Now, when you entered that structure then,
what door did you use?

A.  I went into the back door into the
kitchen, which would have been on the east side.

Q.  As you entered, did you make any
observations then about the general condition of the
inside of the duplex?

A.  I noticed very heavy soot and a moderate
heat damage that had occurred in the kitchen.  And then
as I progressed into the living room, this is where I
noticed the heavier fire damage and most destruction
from the fire.

178

1

2      Q.  Now, when you say heat damage, what types

3  of things did you observe then in the kitchen?

4      A.  I noticed plastic items in the kitchen

5  that had melted from the heat of the fire.

6      Q.  As you proceeded into the living room

7  then, you indicated there was heavier damage.  What

observations did you make about that area?

8      A.  That area showed heavy signs of items in

9  the living room that had been destroyed by fire or

10 significantly damaged by fire.  Heavy burn patterns on

11 the wall indicating high heat had occurred, particularly

12 along the -- what would have been the southwest wall of

13 the living room.  And that is the area I concentrated my

14 investigation.

15     Q.  When you conduct an investigation, are

16 there different types of burn patterns that correlate to

the heat of the fire then?

17     A.  Yes, there are.

18     Q.  And what are you looking for when you make

19 that determination?

20     A.  What I'm looking for are areas where the

21 fire has burned the longest.  This is often where fire

22 originated.  And so I look for intense areas of burning,

often indicated by very whitish portions of burn

23 patterns on a wall.  It's called calcination.  And that

24

occurs when high heat burns off the soot and the smoke
that actually accumulates.

Q.   And did you see that in the living room
then?

A.   Yes, I did.

Q.   Where was that?

A.   That was on the south wall of the living
room.

Q.   Did you also make observations about any
type of low burn pattern or height, in other words, of
the burn pattern?

A.   Yes, I also observed along that same wall
that significant destruction from fire had occurred
along the baseboard of the wall and, actually, along the
carpet of the wall.  This, again, is an indication where
fire probably has been burning a long time.

Q.   Now, did you also examine an electrical
outlet that was along that same wall in the living room?

A.   Yes, I did.

Q.   And what was the purpose of that
examination?

A.   The purpose is to eliminate all potential
fire causes, and I disassembled that outlet, and I
looked at the interior portions of the receptacle, and
it's my opinion that they showed less signs of burning

180

1

2      on the inside than on the outside; and, therefore, it's

3      my opinion that it was not an electrical origin.

4            Q.  Now, did you also then examine the

5      remainder of the duplex?

6            A.  Briefly.

7            Q.  And did you make observations about the

       hallway leading to the bedroom and bathroom area?

8            A.  Yes, I observed again soot and smoke

9      stains and heat that had traveled into the hallway.

10           Q.  Now, I'd like to show you a series of

11     photographs.

12           First of all, showing you what's been marked

13     as 34A.  Is that an exterior view of that duplex the way

14     it looked that night?

15           A.  Yes, it is.

16           Q.  And then showing you 34B, is that a

       different perspective of the same duplex?

17           A.  Yes.

18           Q.  Is that the back or the front door?

19           A.  That is the front.

20           Q.  Now, also, I'd like to show you then

21     what's been marked as 36A, Lieutenant.  Could you tell

22     us what that depicts?

23           A.  That is a picture of the gas range in the

       kitchen.

24
                              181

Q.  And does that also show then some of the soot damage that you observed?

A.  That shows heavy soot accumulation on the walls above the range.

Q.  Showing you then 36B, is that a different view of the kitchen again?

A.  Yes.

Q.  Does that show any of the indications of the medium heat that you described?

A.  Yes, it shows plastic items that have melted and dripped, and, again, it shows heavy accumulation of soot.

Q.  Showing you then 37A, can you tell us what that is, please?

A.  That is a general view of the living room taken from the perspective of the kitchen.

Q.  And does that depict the wall that you were describing where you observed the calcination or the high heat?

A.  Yes, it does.

Q.  Now, also showing you 37B, then, is that a closer perspective of that same wall?

A.  Yes.

Q.  And what is a calcination?  How does it appear to just looking at it visually?

182

A.   Calcination is a term to describe the changes that take place in plaster or gypsum board that are typically used on residential structures.   When those products are exposed to high heat, the chemical changes that those products go through often leave the latent whitish or whitish-gray texture to the surface.

Q.   So, that's the white-gray portion of that photograph then?

A.   Yes, it is.

Q.   And was that, in fact, drywall that was used on that structure?

A.   Yes, it was.

Q.   Showing you then 37C, can you tell us what that depicts?

A.   That is a picture of carpet from which I had taken two carpet samples that smelled of combustible or flammable liquids.

Q.   And where were those samples taken from?

A.   A portion is out of the carpet, and the reason for taking the photograph is to indicate where the samples were taken from.

Q.   And what room was that?

A.   This is in the living room.

Q.   Was it towards the middle of that living room area?

183

A.  This is just very close to the wall that we've been discussing, approximately three feet from that wall.

Q.  What is the purpose of taking those samples?

A.  An odor was detected, what we would describe was a combustible or flammable odor.  And so the samples are taken to determine, so those could be sent to a laboratory to determine if, indeed, flammable or combustible liquids were present.

Q.  Now, I'd like to show you 37D.  What does that depict, please?

A.  That's still closer and a lower view of the wall in question, including the electrical receptacle.

Q.  Is that the receptacle where you determined that the origin was not from inside that receptacle?

A.  Yes, it is.

Q.  Then also showing you 38A, does that depict the hallway then leading to the back part of the duplex?

A.  Yes, that's looking into the hallway.

Q.  Now, also showing you 38B, does that show a closet that was in that hallway?

184

A.  That's the furnace room and hot water
heater and closet that was in that hallway.

Q.  From your investigation, were you able to
determine whether or not the fire originated from any
malfunction in those utilities?

A.  I -- I did not observe signs of heavier
destruction or heat in those areas, so I eliminated
those as possibilities.  I could not see any physical
damage that, in my opinion, would have caused the fire.

Q.  And, Lieutenant, in that photograph, there
also depicts strips of plastic that have actually melted
and fallen down?

A.  Yes.

Q.  Is that from a door that had been up, a
louver door that was --

A.  I believe that was a plastic louvered door
that hung across that doorway.

Q.  And also like to show you then People's
Exhibit 39.  Does that depict one of the back bedrooms?

A.  Yes.  This would have been the bedroom on
the southwest.

Q.  And did you determine if there was any
fire damage to that, the bedroom areas?

A.  There was no flame damage.  I did see a
light heat and, again, some soot damage.

185

Q.   Now, showing you then People's Exhibit
No. 41, does that depict the neighboring duplex as it
appeared that night, that would be 512B South New?

A.   Yes, it does.

Q.   And then, finally, showing you 42, is that
an overall depiction of the duplexes as they relate to
each other, in other words, the building that contains
them both?

A.   Yes, it is.

Q.   Do all those photographs truly and
accurately depict the way that scene looked that night
as you made your observations and conducted your
investigation?

A.   Yes.

Q.   And with the exception of 42 is a daylight
picture, is that correct, after the investigation was
concluded?

A.   That is -- That is daylight, yes, ma'am.

Q.   Now, you had described taking samples of
the carpet.  How did you do that?

A.   I cut those portions out with a razor
knife and placed them in a metal container.

Q.   And when you did that, did you use gloves?

A.   Yes.

Q.   And did you follow precautions to insure

186

that you didn't contaminate the samples?

A.   Yes.   Anytime you work in collecting samples, between samples you change gloves, dispose of the earlier pair, so as not to cross contaminate a sample.

Q.   Like to show you then two additional exhibits.

And, for the record, these are People's Exhibits 12A and 12B.

Ask you, first of all, showing you 12A, do you recognize that?

A.   Yes.

Q.   And can you tell us what that is?

A.   That is the sample I labeled item number two that is a sample of carpet.  I sealed it in this container.  It bears my initials and sealing tape.

Q.   And, again, did you package it in this particular type of can to preserve any potential fumes from evaporation?

A.   Yes.

Q.   And as you look at that, was the blue seal on it at the time?

A.   No.

Q.   Did you seal it that night after you took it into evidence?

187

A.  I sealed it with a red sealing tape that you see.

Q.  And also showing you People's Exhibit No. 12B, do you recognize that then as the can that you used to collect the second rug sample?

A.  Yes.

Q.  And do you recognize your seal again on that?

A.  Yes, I do.

Q.  Did you also seal that then immediately after you took it into evidence that night?

A.  Yes.

Q.  And as you look at those, was -- let me ask you, was the blue seal on that exhibit at the time?

A.  No.

Q.  Were both of these samples then totally sealed with your red tape on the top when you put them into evidence?

A.  Yes, it was sealed.

Q.  Thank you.  With regards to those three items that you took as physical evidence from the scene, the underwear that you had collected, as well as those two rug samples, did you subsequently turn those over then to the Champaign Police Department?

A.  Yes, I did.

188

Q.   And was that Investigator Don Shepard?

A.   Yes.

Q.   Now, I'd also like to direct your attention then to a diagram that's People's Exhibit No. 1.

With the Court's permission, Your Honor --

THE COURT:   Yes.

MS. LADD:   -- may I have the witness step down?

And, actually, what we'll do is we can have you stand right here, Lieutenant.  And Mr. Rasmus is gonna assist us in setting up the easel.

Can you, first of all, as you look at this, can you tell us what that depicts?

A.   That's the layout of the apartment where the fire occurred.

Q.   Does it truly and accurately depict the layout then of 512A South New?

A.   Yes, it does.

Q.   And is it correctly labeled with regards to the relationship of the rooms and the items that are depicted?

A.   Yes.

Q.   And then can you show us when you initially entered which way did you enter?

189

A.    I came in through this back door labeled "Back door" (indicating).

Q.    And then when you made the observations about the area of the high heat, where was that?

A.    The high heat area was located along this wall in the living room (indicating).

Q.    And is that what you refer to as a southwest wall?

A.    Yes.

Q.    Is that also where you observed the calcination that you described?

A.    Yes.

Q.    Now, you also indicated that you took samples of the carpet from that area?

A.    Yes.

Q.    And can you show us where those were?

A.    The samples were taken from a carpet that was placed underneath this coffee table, and one sample was taken approximately in this area, and the second sample in an area about here (indicating).

Q.    And could you take this pen then and mark 12 for those two areas where you took those samples from?

A.    (Witness complies.)

Q.    Could you put a 12 with that for us,

190

please?

A.  Twelve?

Q.  Yes.

A.  I'm sorry.  (Witness complies.)

Q.  And then can you put a dash and a one or two for which sample you took from where, if you recall?

A.  I believe this was the first sample directly across from the wall (indicating).  And 12-2 would have been this sample (indicating).

Q.  And can you also mark then with a larger X where, in your opinion, where you believe the fire originated?

A.  Well, the heaviest destruction, again, and the heaviest heat was located in this area (indicating).

Q.  And then without -- Let me -- If I could take that back from you, could you also show us then where you saw the melted louver doors that you'd pointed out in the photograph?

A.  They were observed here (indicating).

Q.  And you're indicating then a closet area in the middle of the duplex?

A.  Yes.

Q.  And where did the fire damage actually extend to then?

A.  Most of the fire, actual fire damage

191

stayed right in this area of the living room (indicating).

As the back door was left open, some of the heat and soot traveled this way, because the fire is seeking ventilation, so it's drawn this way (indicating).

As the fire progressed and this window was broken by the heat of the fire, again, ventilation caused some of the heat and fire damage to extend that direction (indicating).

Q.  And if the fire's located in this area, are there any doors to the back area where anyone could escape from?

A.  Yes, there's a door to each of these bedrooms and to the bathroom.

Q.  And is there any door from either of the bedrooms or the bathroom to the outside of the duplex?

A.  No, they are not.

Q.  So, the only two entrances or exits are the front door and the back door?

A.  That's correct.

Q.  Thank you.  And let me ask you, as you've marked this, does this truly and accurately reflect then the events you've testified to?

A.  Yes.

192

Q.   Thank you.   If you could resume the witness stand.

As part of your determination of the cause of the fire, were you also able to determine if it was intentionally or accidentally ignited?

A.   It's my opinion that the fire was intentionally ignited.

Q.   And how did you determine that?

A.   It's by elimination of accidental causes. I could not determine any other accidental cause that would attribute to the fire.

MS. LADD:   Thank you.   I'd tender this witness.

THE COURT:   Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.   Lieutenant, when you determined that a fire is intentionally caused, you don't determine who caused the fire; do you?

A.   That's correct.

Q.   There isn't anything about your investigation or your work in this case that could point to any one specific person; is there?

A.   That's correct.

Q.   And when you collected samples of the

193

1

2      carpet, you're merely looking for accelerants and things

3      which cause fire; correct?

4              A.  Yes.

5              Q.  You're not doing any police type sampling

6      to determine hair -- hair or fiber or anything like

7      that; are you?

8              A.  Well, when you say police type, it's --

9              Q.  You didn't turn over any of that carpet to

10     the police other than to store regarding the accelerant;

       did you?

11             A.  I turned both carpet samples and the bra

12     over to the police to transport to the crime lab.

13             Q.  And before you did that, your purpose in

14     having those samples was because they contained an

15     accelerant on them; correct?

16             A.  Yes, that was my opinion.

17             Q.  And there wasn't anything else contained

18     on them that you yourself felt important to this

       investigation; was there?

19             A.  No.

20             Q.  You didn't notice any debris that would

21     have belonged to any particular human being; did you?

22             A.  No.  My purpose in taking the samples was

23     for the fumes.

24             Q.  And you didn't see any containers in or

                                   194

around these premises that contained any type of fluid

that you thought might have ignited the fire; correct?

    A.  No, I did not.

    Q.  Where -- Where did you look?

    A.  Throughout the entire structure and

immediately surrounding the structure.

    Q.  The exterior of the structure?

    A.  Exterior, yes.

    Q.  And how far in either direction?

    A.  On the exterior?

    Q.  Yes.

    A.  Oh, approximately 50 feet, perhaps a

50-foot radius.  What I would consider immediately

adjacent the exterior.

    Q.  And you did that how soon after this fire?

    A.  Very early upon my arrival.

    Q.  And that would have been just an hour or

two after you believe the fire was set?

    A.  Yes.

    Q.  Could it have been less than an hour after

the fire was set?

    A.  Well, I don't know the time the fire was

set.  My times are based on fire department response.

    Q.  And do you know what the time was of the

fire department response?

A.    It's approximately 3 a.m.  I'd have to refer to the report.

Q.    And it could have been -- So, it actually could have been less than an hour; correct?

A.    Yes.  The alarm was received at 3 a.m., and my arrival was within 30 minutes of that.  And, initially, I'll conduct that type of investigation while firefighters are finishing up on the interior portions of the house.

Q.    And that happened in this case, correct, there were firefighters on the scene as you arrived?

A.    Yes.

Q.    And nobody -- neither the police nor the firefighters who were on the scene at that time when you arrived handed you anything that looked to you like it might have been or could have been the cause of the accelerant like a gas can or anything like that?

A.    No.

Q.    And that is -- that would have been your job had it been available, correct, that they would have given it to you?

A.    Typically, yes.

Q.    Could you determine whether it was gasoline or some type of paint thinner or some other type of accelerant by the odor?

196

A.   Which -- To which odor are you referring?

Q.   When you immediately entered, could you determine what the exact cause of the odor was?

A.   No, I could not.

Q.   And did the odor dissipate or become stronger?

A.   It dissipated.

Q.   And so you could not have told what the origin of the odor was at any time that you were in the residence; correct?

A.   No, I knew the general area of the origin. That's why I sampled the carpet.

Q.   But you didn't know the material that made up that --

A.   No --

Q.   -- material?

A.   -- I did not.

Q.   You didn't know whether it was gasoline or paint thinner or something else?

A.   That's correct.

Q.   And the fire was extinguished in a short time; correct?

A.   Yes.

Q.   And it did not damage anything outside of the structure where the fire began; correct?

197

A.  Well, the window, the front window of the unit was broken out by the fire, so there was some exterior damage seen there.

Q.  And it didn't spread beyond -- it didn't spread to any neighboring units; did it?

A.  No.

Q.  And it didn't spread to any trees or any living things outside of that particular unit; did it?

A.  No.

Q.  Are you able to tell when a window is broken whether it was broken by a person trying to get out or in or whether it was broken by heat damage?

A.  There are indicators that often exist to give you those indications.

Q.  Were you told that there was a window broken out by some people trying to get in to retrieve pets?

A.  Yes, I was.

Q.  And that -- was that that window or a different window?

A.  When we're referring to the exterior damage?  No, I'm referring to the front window that was damaged, broken out by the fire.

Q.  So, you're saying there was a window that was damaged by the fire in addition to the window that

198

1

2   was broken by the people attempting to get in?

3       A.  Yes.

4       Q.  And that was the only window that was

5   broken by the fire?

6       A.  As I recall.

7   MS. LENIK:  No other questions.

    THE COURT:  Ms. Ladd?

8   MS. LADD:  Just briefly, Your Honor.

9                   REDIRECT EXAMINATION

10                  BY MS. LADD:

11      Q.  So there's no confusion, let me show you

12  again People's Exhibit 34A, which is the front of the

13  duplex.  Does that depict the front window that was

14  broken out by the fire?

15      A.  Yes, it does.

16      Q.  What are the indicators that you can look

17  at to determine that that was broken by the fire and not

    a person?

18      A.  Glass that's broken by a fire will usually

19  and have, again, heavy soot and smoke stains accumulated

20  on the glass, even though it's broken.

21          If a person breaks a window, again, typically

22  before a fire, that glass will usually be of a cleaner

23  nature.

24      Q.  And when you looked at that area, then,

                        199

did you see those indications of the soot damage?

A.   That -- That glass shows signs of heavy soot damage, and it also shows signs of melting from the high heat of the fire, so it was actually beginning to melt and distort from the heat.

Q.   Now, showing you People's Exhibit 35A, then, does that depict the back window that counsel was asking you about?

A.   Yes, it does.

Q.   And is that the one that was broke out by a person?

A.   So I was told.

Q.   And is that consistent with the observations that you made?

A.   Yes, it is.

Q.   Now, the one that was broke out by the fire, the front window, what's the mechanism that actually causes that to break or burst like that?

A.   When the -- When heat from a fire has exposed -- exposed itself to the glass, it sets up a series of stresses in window glass that may be different than perhaps the edge of the glass versus the center of the glass, and those stresses cause cracks and fractures to occur.  If that heat continues, as in this case, they will continue to melt, soften, distort the glass, and it

200

will eventually fall out.

Q.   Would that also affect light bulbs in the household, perhaps?

A.   Yes, it could.   Any type of glass.

MS. LADD:   Thank you.   I have no further questions.

THE COURT:   Ms. Lenik?

MS. LENIK:   No questions.

THE COURT:   Thank you.   You may step down.

(Witness excused.)

MS. LADD:   I'd call Officer Charles Caudill.

(Witness sworn.)

CHARLES WILLIAM CAUDILL, JR.

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.   Could you please state your name.

A.   Charles William Caudill, Jr.   That's C-a-u-d-i-l-l.

Q.   What is your occupation?

A.   Police officer.

Q.   For what agency?

A.   City of Champaign.

201

Q.  How long have you been a police officer?

A.  I've been a police officer for ten years, five years of which have been with the City of Champaign.

Q.  And prior to that, where were you a police officer then?

A.  University of Illinois Police Department and then McDowd County Sheriff's Department (phonetic).

Q.  Now, were you employed then as a Champaign Police Department police officer on February 25th of 1998?

A.  I was.

Q.  Approximately 3:30 a.m., were you called to assist in the investigation of an arson at 512A South New Street in Champaign?

A.  That's correct.

Q.  Specifically, did you initially document the scene and help collect some of the evidence?

A.  I did.

Q.  Did you meet and coordinate your efforts with Lieutenant Eddie Bain of the Champaign Fire Department?

A.  That's correct.

Q.  Like to show you then a series of photographs.  I'm showing you, first of all, what's been

202

marked as 34A.  Do you recognize that, Officer?

        A.  Yes, ma'am, that's the residence in

question.

        Q.  And is that a true and accurate depiction

then of the way it looked then?

        A.  Upon my arrival, yes, ma'am.

        Q.  Did you then proceed to collect evidence

from inside that particular residence as well as

outside?

        A.  Yes, ma'am.

        Q.  And did you also make observations about a

broken window on the outside of that residence?

        A.  Yes, ma'am.

        Q.  Like to show you then additional

photographs.  Show you, first of all, Exhibit -- I

believe it's 35A, Officer.  And do you recognize that?

        A.  Yes, ma'am.

        Q.  Can you tell us what that is?

        A.  That's the bedroom window.  To the

apartment.

        Q.  And is that the outside of it?

        A.  That is from the outside looking in.

        Q.  Then as you look at 35B, is that a closer

perspective of that same window?

        A.  That is correct.

Q.  Did you make any observations about any
substance in that area?

A.  Yes, ma'am, there's shards of glass laying
there on the ledge.  Also some blood, what appeared to
be blood.

Q.  Also showing you 35C, is that a photograph
then of some of the glass beneath that window?

A.  Yes, ma'am.

Q.  Thank you.  Now, after making these
observations about the outside of the residence, did you
also have occasion then to go into that residence?

A.  Yes, ma'am.

Q.  And, at that point, was there still some
smoke present in the residence?

A.  Yes.

Q.  Did you make any observations specifically
about the bathroom area of that residence?

A.  Yes.

Q.  And can you describe the general condition
of the residence, first of all, when you entered it?

A.  The whole apartment was filled with --
still had smoke drifting in it.  The walls were
blackened.  The furniture that was in the apartment was
burnt.  There was appeared to be a couch there in the
living room, due to the springs that were laying there

204

1

2    on the floor.  Everything else was burnt up.

3         Proceeding through to the hallway into the

4    bathroom area, it was burnt as well.  The walls were

5    charcoaled and smoke covered.  The bathtub had soot in

6    it, smoke.  Also, an extension cord was laying there

7    inside.

8         Q.  Now, I'd like to show you then a series of

     additional photographs.

9         Did you observe any items that were at the

10   doorway to one of the bedrooms?

11        A.  Yes, ma'am.  The front bedroom at the --

12   on the floor, there at the doorway near the doorjamb

13   where the hinge on the door appeared to be a wood

14   handled knife.

15        Q.  Like to show you then, first of all,

     what's been marked as People's Exhibit 49A and ask you

16   is that a photograph of that knife as you recovered it?

17        A.  Yes, ma'am, that's the way I found it.

18        Q.  And then also showing you 47A, and direct

19   your attention to the bathroom you described, does that

20   depict the entrance area to the bathroom?

21        A.  Yes, ma'am, it does.

22        Q.  And then showing you 47B, does that show

23   the bathtub area?

24        A.  Yes, ma'am.

                          205

Q.  Does it also depict the soap dish in that area?

A.  Yes, ma'am.

Q.  Now, showing you then 47C, can you tell us what that shows us?

A.  That is a white extension cord that I found in the bathtub area.

Q.  And does that show exactly how you recovered it?

A.  Yes, ma'am.

Q.  Now, did you also examine then the bedroom area that correlated to the broken window you observed on the outside?

A.  I did.

Q.  I'd like to show you 50A.  Can you tell us then is that a photograph of that bedroom area?

A.  Yes, it is.  That is the inside of the bedroom looking out towards the window.

Q.  And then showing you 50B, is that a closer perspective?

A.  That is a table that's directly underneath the window.

Q.  And did you observe anything significant on that table?

A.  Yes, there's shards of glass and what

206

appear to be blood.

Q.  Now, all these photographs, do they truly and accurately depict then the way that scene looked when you were examining it and documenting it that night?

A.  Yes, ma'am.

Q.  Did you have occasion then to collect several items into evidence as well?

A.  I did.

Q.  I'd like to show you some of these items. First of all, showing you what's been marked as People's Exhibit No. 14.  Can you tell us what that is, please?

A.  This is the simulated wood cut handled knife that I found on the floor near the front bedroom that we'd spoke of.

Q.  And do you recognize your seal and packaging on that?

A.  Yes, ma'am.

Q.  Now, you also described an extension cord that you found in the bathtub, and I'd like to direct your attention to People's Exhibit No. 13.  Ask you, first of all, as you look at the outside of that evidence bag, do you again recognize your seal and markings on that bag?

A.  Yes, ma'am.

207

Q.    Then if you could pull out the contents of that and tell us what that contains, please?

A.    This is the extension cord that I found in the bathroom.

Q.    Did it have --

A.    Bathroom tub.

Q.    I'm sorry.  Did it have that portion of what appears to be a black shoelace tied on the end like that?

A.    Yes, ma'am.

Q.    Is that how you collected it into evidence?

A.    That is correct.

Q.    And did it have that black powder on it at the time?

A.    Yes, ma'am.

Q.    Thank you.  Now, did you also have occasion to look again on the outside area and locate what appeared to be a roll of tape outside this duplex?

A.    Yes, ma'am.

Q.    Where was that found?

A.    It was found on the street directly to the -- on the curb, laying against the curb.  The driveway is just north of the building, and it was found in the street just to the north of the driveway.

208

Q.  Did you also collect that into evidence
then?

A.  Yes, I did.

Q.  And when you collect these items of
evidence, did you use gloves to insure that you wouldn't
disturb the evidence?

A.  That is correct.

Q.  Like to show you then what's been marked
as People's Exhibit No. 15.  Again, could you tell us do
you recognize the outside of that bag?

A.  Yes, ma'am.

Q.  And then if you could pull out the
contents for us again, please, Officer.  I believe it's
opened on the side here (pointing).

A.  (Witness complies.)

Q.  Do you recognize that as that roll of tape
that you took into evidence?

A.  Yes, I do.

Q.  Did it have the fingerprint powder on it
at the time?

A.  No, ma'am.

Q.  Other than that, does it appear to be in
substantially the same condition as when you collected
it?

A.  Other than the markings on it, yes.

209

1

2          Q.  And those appear to be laboratory

3     markings?

4          A.  That is correct.

5          Q.  Now, with regards to the other two

6     exhibits I showed you as well, do those appear to be in

7     substantially the same condition as when you took them

      into evidence?

8          A.  Yes, ma'am.

9          Q.  And what I'd like to do, with the Court's

10    permission, is ask you then to approach the diagrams.

11         Again, if the Court will permit.

12         THE COURT:  Go ahead.

13         Q.  (by Ms. Ladd)  He'll have an easel set up

14    for you over here.

15         Officer, I wonder if you could just step down

      so you're standing to the side so everyone can see.

16         Do you recognize, first of all, this is marked

17    for identification as People's Exhibit No. 1?

18         A.  Yes, ma'am.

19         Q.  And could you tell us what that is?

20         A.  This is the apartment that I was called to

21    that night.

22         Q.  And is it a true and accurate depiction of

23    the layout of that apartment?

24         A.  That is correct.

                        210

Q.  And does it appear to be labeled correctly?

A.  Yes, ma'am.

Q.  And are the items labeled or shown in relationship to each other correctly?

A.  That's correct.

Q.  Now, as you look at this then, can you tell us, first of all, by pointing where you recovered that knife that you took into evidence?

A.  The knife was -- The front bedroom here right here where the door swings open, right here at the hinges on the floor (indicating).

Q.  And could you then take this green pen and write a No. 14 where you recovered that knife, please?

A.  (Witness complies.)

Q.  Now, could you also show us where you recovered the extension cord that you took into evidence?

A.  In the bathtub right here (indicating).

Q.  And could you then write a No. 13 for that extension cord where you found it?

A.  (Witness complies.)

Q.  Now, you also had indicated there was a broken out window?

A.  That's correct.

211

1

2          Q.   And which bedroom did that correlate to?

3          A.   That'd be the rear bedroom, the window

4     right here (indicating).

5          Q.   Could you just put an X on that window

6     then so we can keep that oriented?

7          A.   (Witness complies.)

8          Q.   Have you marked this diagram as truly and

9     accurately depicts then the items that you've taken, the

      events you've testified to?

10         A.   Yes, ma'am.

11         Q.   Also like to show you, if you'd stay right

12    there, a diagram as it's marked People's Exhibit No. 2.

13         And, Officer, ask you again if you could look

14    at that, can you tell us what that depicts, please?

15         A.   This is the area surrounding the

      apartment.

16         Q.   And can you show us then when you say the

17    area, is that in Champaign, Illinois?

18         A.   Yes, ma'am.

19         Q.   And can you show us where 512 is?

20         A.   512's right here (indicating).

21         Q.   And can you show us which one is A?

22         A.   512A would be on the north side

23    (indicating).

24         Q.   Could you put an A for us there, please?

                            212

1

2          A.   (Witness complies.)

3          Q.   And is that New Street then that's going

4     up and down?

5          A.   Yes, ma'am.

6          Q.   Are all these streets labeled correctly?

7          A.   Yes, ma'am.

8          Q.   And do they, well, not necessarily to

9     scale, show the relationship of the streets and the

10    buildings as labeled to each other?

11         A.   That's correct.

12         Q.   And is north correctly depicted going up

13    to the upper part of the diagram?

14         A.   Yes, ma'am, it is.

15         Q.   Does that truly and accurately reflect the

16    way it appeared then on February 25th of 1998?

17         A.   Yes, ma'am.

18         Q.   Can you show us then where you recovered

19    the roll of tape?

20         A.   Be right here (indicating).

21         Q.   Can you put, in fact, a No. 15 for that

22    particular item that you took into evidence?

23         A.   (Witness complies.)

24         Q.   And, again, as you've marked this, does

      this truly and accurately reflect then what you've

      testified to?

                          213

A.  Yes, ma'am.

Q.  Thank you.  If you could resume the witness stand.

The items that you took into evidence, did you subsequently turn -- or secure those at the Champaign Police Department?

A.  Yes, ma'am.

Q.  And did you then turn the scene over to other investigators and officers from the Champaign Police Department for further investigation?

A.  That's correct.

MS. LADD:  Thank you, Officer.  I'd tender this witness.

THE COURT:  Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.  You didn't lift any fingerprints from any of the items that you took; did you?

A.  No, ma'am.

Q.  You do know how to lift fingerprints; that knowledge is in your training; is it not?

A.  That's correct, ma'am.

Q.  But you took this roll of tape and the knife and these other items without having done that; correct?

214

A.   That's correct, ma'am.

Q.   Isn't it true that fingerprints most often appear on a flat surface?

A.   No, ma'am.

Q.   It's your testimony that you can get fingerprints from a rounded surface as easily as you can from a flat surface?

A.   Yes, ma'am.

Q.   And the knife was a flat surface and the roll of tape was a rounded surface, and you didn't take fingerprints from either one of those; did you?

A.   That's correct, ma'am.

MS. LENIK:   I have no other questions.

THE COURT:   Ms. Ladd?

REDIRECT EXAMINATION

BY MS. LADD:

Q.   Can you get fingerprints if someone's wearing gloves at the time?

A.   No, ma'am.

MS. LADD:   I have no further questions.

THE COURT:   Anything else, Ms. Lenik?

RECROSS-EXAMINATION

BY MS. LENIK:

Q.   You don't know whether the person who did this was wearing gloves; do you?

215

A.  No, I do not.

MS. LENIK:  Nothing further.

THE COURT:  You may step down.  Thank you.

THE WITNESS:  Thank you.

(Witness excused.)

MS. LADD:  I'd call Dena Sawka.

(Witness sworn.)

DENA SAWKA

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please tell us your name.

A.  Dena Sawka.

Q.  And could you spell your last name for us, please.

A.  S-a-w-k-a.

Q.  What is your occupation?

A.  I'm a registered nurse.

Q.  And where do you work?

A.  I work at Covenant Medical Center and I also work at Columbus Regional Hospital in Indiana.

Q.  And are you assigned to any particular department at both of these hospitals?

216

A.  I work in the emergency room in both places.

Q.  Now, do you have a degree then in nursing?

A.  Yes, I do.

Q.  And did you receive, first of all, a certified nursing assistance degree in 1988?

A.  Yes, I did.

Q.  Did you subsequently receive a Bachelor of Science in nursing?

A.  Yes.

Q.  And was that from Lakeview College of Nursing?

A.  Yes.

Q.  And then have you practiced as a nurse in the emergency room field of medicine for the last four years?

A.  Yes.

Q.  Now, I'd like to direct your attention to February 25th of 1998, last year, were you working at Covenant Medical Center as a registered nurse at the time?

A.  Yes, I was.

Q.  And that's located in Urbana, Illinois; is that correct?

A.  Correct.

217

Q.  And were you also assigned to the emergency room on that particular morning?

A.  Yes, I was.

Q.  Did you have occasion in your professional capacity to see a patient named Lori Hansen?

A.  Yes, I did.

Q.  How was she brought into the emergency room?

A.  She came in by Arrow Ambulance service.

Q.  Then did you take over her care?

A.  Yes, I did.

Q.  Initially, what treatment did you start up with her or continue?

A.  Well, when she first arrived to the room, she was placed on our cardiac monitor.  She was put on a pulse oximeter.

Q.  And what is a pulse oximeter?

A.  A pulse oximeter is just a device that is placed on the finger that reads the amount of oxygen -- oxygen that is in the blood.

Q.  And, in fact, what were the results of that then?

A.  Initially, her pulse ox, upon arriving to the emergency room, was 94 percent.

Q.  And what does that indicate to you?

218

A.  Slightly low.  Generally, a norm is between 95 and 100.  She was also, I believe, on oxygen coming into the hospital by the hospital service.

Q.  And did you continue that initially in the emergency room?

A.  Yes, we did.  She was placed on oxygen.

Q.  Now, did you make any observations about her physical appearance upon admission?

A.  Yeah.  It was obvious that she had been involved, something to do with smoke or fire.  She -- Her face was black.  She was a mess.

Q.  As you worked with her, did you notice any unusual odors?

A.  She smelled of smoke, some kind of gasoline or kerosene or some -- something of that nature.  I don't know specifically what it was.  And she also smelled like urine.

Q.  Now, did you make any observations then about any liquid or items in her hair?

A.  Her hair was wet, particularly on her right side of her hair, which is where she had stated that he had urin --

MS. LENIK:  Objection to what she had stated.

MS. LADD:  I'll lay the foundation, Your Honor.

219

THE COURT:  Go ahead.

Q.  (by Ms. Ladd)  Now, when you're treating a patient, do you obtain a history from the patient as to what happened?

A.  Yes, we do.

Q.  Is that the type of information that's regularly and reasonably relied upon by professionals in your field in order to provide treatment in emergency room setting?

A.  Yes, it is.

Q.  And what information did Lori Hansen then communicate to you about what had happened to her with regards to the observations you made about her hair?

MS. LENIK:  Your Honor, I'm going to object to this.

THE COURT:  Overruled.

MS. LENIK:  Your Honor, it's -- it's still without the appropriate foundation, because she hasn't said that she specifically relied on it.

THE COURT:  Overruled.

A.  She had stated that he had urinated on her head.

Q.  (by Ms. Ladd)  Now, did you also then make any observations about any injuries on her?

A.  Yes.

220

1

2          Q.  Now, I'd like to show you a series of

3     photographs.

4               First of all, I'd like to show you what's been

5     marked as People's Exhibit 26A, Ms. Sawka.  Do you

6     recognize that?

7          A.  Yes, this is a picture of her when she

      came in.

8          Q.  Is that an overall perspective of Lori

9     Hansen then?

10         A.  Yes, it is.

11         Q.  As you look at 26B, then, does that depict

12    how her head and face appeared?

13         A.  Yes.

14         Q.  And is that -- or also show the soot as

      well as the matted hair you described?

15

16         A.  Correct.

         Q.  Now, subsequently, did you wash off some

17    of that soot?

18         A.  Yes, we did.  She was cleaned up.

19         Q.  Like to show you 26C, then, is that a

20    picture of Ms. Hansen's face after she was cleaned up?

21         A.  Yes, it is.

22         Q.  Did you make any observations about any

23    redness to the face after the soot was washed away?

24         A.  Yeah.  Her face was red, and it was kind

                              221

of irritated, particularly around her mouth. She had

complained of it being kind of tender, her lips being

sore. And the rest of her face was a little red, too.

Q. Did she report what had happened to her

facial area then?

A. She had stated --

MS. LENIK: Objection, Your Honor.

THE COURT: Overruled.

MS. LENIK: Your Honor, may I have a

continuing objection to her recitation of what Ms.

Hansen told her?

THE COURT: Yes. Continuing objection is

overruled. You may answer.

A. She had stated that she had had a piece of

tape placed across her mouth.

Q. (by Ms. Ladd) And all this information

you're getting by report from Ms. Hansen you relied on

in providing treatment then and diagnosis to her?

A. Yes, we do.

Q. Then I'd also like to direct your

attention to her neck area. Did you make any

observations of any injury then?

A. Yes, we did. She had stated that he had

used the -- either a rope or some type of rope type

substance and had placed it around her neck in an effort

222

to choke her.

Q. And did she indicate he placed it or he actually did something with it?

A. Well, he -- she said that he tried to choke her with it.

Q. And did you observe any injury in that area?

A. Yes, we did. She had some ligature marks on both sides of the neck.

Q. Would that be consistent with what she described?

A. Yes.

Q. Like to show you People's Exhibit 27A, does that show then the marks to one side of her neck?

A. Mm-hmm.

Q. You have to say yes or no. I'm sorry.

A. Yes, these are the marks that we were referring.

Q. And then also showing you 27B, does that show the other side of her neck?

A. Yes, it does.

Q. And, again, does that show the ligature marks?

A. Yes, it does.

Q. Did you also make an observation about any

223

injury in the back top portion of her head?

A. Yes. She had complained of pain to the head, and she did have injury there. She had some swelling and abrasions.

Q. I'd like to show you People's Exhibit 27C, does that depict that injury to her head?

A. Yes, it does.

Q. And what did she describe had happened to her head?

A. She said that she had been kicked multiple times about the body and that she had fallen.

Q. And would that be consistent with either one of those descriptions of what happened?

A. Yes, it would be.

Q. She also have any injuries to her chest and upper chest area?

A. Yeah, she had some bruising.

Q. Like to show you People's Exhibit 28. Does that depict then that bruising?

A. Yes, this does depict that bruising.

Q. Now, there's also two tabs or monitors that are put there. What are those for?

A. Yeah. Those are the cardiac monitors. This is -- These -- There are three of these. There's one placed here, here, and then on the lower portion of

224

the ribs (indicating).

Q. And by here and here, you mean the upper?

A. Yeah, the upper chest and down on the lower rib (indicating).

Q. Now, with regards to these injuries, then, did she describe how she received those?

A. She did state that she was unsure -- I mean, she couldn't specifically point out what injury occurred where. She had just said that she had been, like I said, hit and kicked multiple times and kind of thrown around.

Q. And would those injuries be consistent then with that type of mechanism?

A. Yes, they would be.

Q. Now, did you also observe injuries to her back and torso area?

A. Yes, I did.

Q. Like to show you then People's Exhibit 29A. Does that depict the injuries to her back?

A. Yes, it does.

Q. Does 29B then show her back and torso?

A. Yes, it does.

Q. And 29C, is that a view of the side of her torso?

A. Yes, it is.

225

Q.  And what type of injuries did you observe there?

A.  She had bruising.  She had some abrasions. She was tender.  She had complained of pain to the area.

Q.  And what did she describe as a mechanism for that?

A.  Again, she just -- she said that she had been kicked, knocked around the room, and she also had stated that some of the injuries quite possibly were when she was placed into the bathtub.

Q.  Now, I'd also like to direct your attention then to her arm.  Did she have an abrasion on her arm as well?

A.  Which arm?

Q.  Let me show you Exhibit No. 30, if that will assist you.  Is that a picture of her arm?

A.  Yes, it is.

Q.  And was there an abrasion in that area?

A.  Yes, there was.

Q.  And was that again consistent with what she described?

A.  Yes, it was.

Q.  Did you also make observations about any marks on her wrists?

A.  Yes, we did.  She was red, abraded, and

226

slightly swollen to her wrists where she stated that she
had been tied up.

Q.   And did this encircle the entire wrist
then around the outside area?

A.   Yeah.  Yes, it did.

Q.   And would it be, in other words,
consistent then with a cord or cords rubbing against the
outside area of the wrists?

A.   Yes, it would be.

Q.   Like to show you People's Exhibit 31A,
does that depict then those abrasions you've described?

A.   Yes, it does.

Q.   Is that what's also referred to as
ligature marks?

A.   Yes, it is.

Q.   Did you also observe any injuries to the
inside portion of her hands?

A.   Yes.  She had a cut and --

Q.   And did you also observe a minor burn to
one of her hands?

A.   Yeah.

Q.   Like to show you 31B, then, does that
injury depict the injury to her hands?

A.   Yes, it did.  She was cut and burned, I
believe, on both hands.

227

1

2          Q.  Did she describe how she received the cut?

3          A.  I believe that she had stated that that

4   was from a broken window.  She was not totally sure,

5   though.  She was -- She came in.  She had blood on her

6   hands.  She knew she was cut, but she stated she wasn't

7   totally sure where it'd come from.

8          Q.  Did she say how she got burned on her
    hands?

9

10         A.  She stated in trying to get out, to get
    out of the house.

11         Q.  Did you also observe the same ligature

12  marks on her ankles then?

13         A.  Yes, we did.

14         Q.  Like to show you People's Exhibit 32, does

15  that photograph depict then the marks to her ankles?

16         A.  Yes, it does.

17         Q.  And did she report how she received those?

18         A.  She stated that that was from being tied
    up.

19

20         Q.  And, again, is that consistent with what

    she reported?

21         A.  Yes, it is.

22         Q.  Did she also have an injury to her knee?

23         A.  Yes, she had a burn to her knee.

24         Q.  Like to show you People's Exhibit No. 33.

                            228

Does that depict that injury to the knee?

          A.  Yes, it does.

          Q.  Did she describe how she received that?

          A.  I believe she stated that this was where
she had fallen and had burned herself on the floor
trying to get out.

          Q.  And is that consistent then with a burn
that she described?

          A.  Yes, it is.

          Q.  Thank you.  Now, all these photographs
that you've identified for us in court, do they truly
and accurately depict the injuries that you observed on
Lori Hansen and how she appeared as you treated her on
February 25th of 1998?

          A.  Yes, they do.

          Q.  Thank you.  Now, after you documented her
injuries then, did you proceed in providing treatment to
her?

          A.  Yes, I did.

          Q.  And what was her demeanor as you were
interviewing her?

          A.  She was distraught.  She was crying, at
times.  She appeared to be, at times, I think, in shock.
She was -- When family members would come in, she would,
you know, as she was recounting what had happened to

                              229

her, she would begin to cry again, and she was very obviously upset and distraught.

Q.  Did she report having difficulty breathing when she was initially admitted?

A.  Yes, she did complain of a little bit of shortness of breath.  She stated that the oxygen was helpful.

Q.  Now, what type of treatment did you then initiate?

A.  She had a blood gas drawn, which would help us indicate whether or not she was potentially hypoxic.

Q.  And what does hypoxic mean?

A.  That the oxygen in her blood would be low, related to the smoke inhalation.

Q.  And this was after she'd been given oxygen in the ambulance?

A.  Right.  For the blood gas, the oxygen is taken off and left off for a period of ten minutes so that you can get an accurate level.

Q.  And what was the result of the blood gas?

A.  It was slightly low as far as her oxygen was concerned.

Q.  Would that be consistent then with inhaling some amount of smoke?

230

A.  Yes, it would be.

Q.  Now, did you also treat the burns then?

A.  Yes, we did.

Q.  And did you also then provide her with information about treating a head injury?

A.  Yes, we did.

Q.  Now, while Ms. Hansen was at the hospital, did you also collect a blood standard from her?

A.  Yes, we did.

Q.  How was that done?

A.  As far as she was -- We drew blood from --

Q.  I'm sorry.  Let me back you up.  Are there standard evidence collection kits that are provided to you for that?

A.  Yes, there is.

Q.  And are they sterile, in other words?

A.  Yes, they are.  They come in a sealed container.

Q.  And then do you use a sterile vacutube and vacutainer to draw the blood as well as a sterile needle?

A.  Yes, we do.

Q.  Did you, in fact, take blood from her then?

A.  Yes, I did.

231

Q.  Did you preserve that on a piece of
sterile filter paper that's provided in an envelope in
the kit?

A.  Yes, I did.

Q.  And as you did that, did you take any
precautions to insure that nothing else contaminated it,
in other words?

A.  Yes.  It is -- The -- Once the blood is
drawn, it is placed on the paper, it's literally held in
my hand until it -- the sample is dry and then it is
placed inside the envelope and sealed.

Q.  And do you use gloves as you're --

A.  Yes.

Q.  -- obviously collecting this?

A.  Yes.

Q.  Did you, in fact, then seal the envelope
there at the hospital?

A.  Yes, I did.

Q.  Is it a self-sealing envelope?

A.  Yes, it is.

Q.  And was there an officer present then, an
Officer Shipley from the Champaign Police Department to
collect that?

A.  Yes, there was.  He was present.

Q.  And did you turn that over to him?

232

A.  Yes, I did.

Q.  Like to show you what's been marked as People's Exhibit No. 61.  And, Ms. Sawka, do you recognize that as the envelope that you used to collect that blood in?

A.  Yes, I do.

Q.  And did that contain then the dry piece of filter paper that contained the blood?

A.  Yes, it did.

Q.  And how did you actually put that on filter paper?

A.  It is dropped from the syringe onto -- There's like four, like four circles, and it is dropped onto the filter paper.  And dried.

Q.  I'm sorry.  Do you recognize your writing on that envelope then?

A.  Yes, I do.

Q.  Identifying it?

A.  That is mine.

Q.  And that's the envelope -- Was it sealed at the time?

A.  Yes, it was -- after I placed it inside, it was sealed.

Q.  And was this end that now has the blue seal on it, was that even on there at the time or was

233

that closed?

In other words, it was sealed at both ends at the time that you --

A.  It was sealed here, this is the flap (indicating); and once I placed it inside, I closed it.

Q.  And, at that point, you turned it over to the officer?

A.  Correct.

MS. LADD:  Thank you.  I'd tender this witness.

THE COURT:  Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.  No individual was identified as the perpetrator of this offense; were they?

A.  No.  She stated she did not know who it was.

Q.  And nobody who was with her said that they knew who it was; did they?

A.  No.

Q.  After she was treated by you, she was released from the hospital; correct?

A.  Correct.

Q.  That considered to be treated and released without a hospital stay; correct?

234

A.    That would be correct.

Q.    And the injuries that she had that you treated her for were pretty much surface injuries; were they not?

A.    As far as the burns and the abrasions, yes.  She was sent home with a head injury sheet due to the fact that she had been struck about the head, and she was instructed to stay with someone.  Someone had to stay with her and wake her up every couple of hours to make sure that she was okay.

Q.    And, to your knowledge, she was okay?

A.    When she left the emergency department, yes.

Q.    And if she were not okay, you would have asked that she be admitted to the hospital; correct?

A.    Correct.

Q.    And so you felt she was well enough to go home; right?

A.    She had received treatment and was well enough to go home with someone.

MS. LENIK:  No other questions.

MS. LADD:  Nothing further.  Thank you.

THE COURT:  You may step down.  Thank you.

(Witness excused.)

MS. LADD:  Call Officer Chad Shipley.

235

1

2                                      (Witness sworn.)

3                            CHAD SHIPLEY

4          called as a witness on behalf of the People,

5    being first duly sworn, was examined and testified as

6    follows:

7                         DIRECT EXAMINATION

8                         BY MS. LADD:

9          Q.   Could you please state your name.

10         A.   Chad Shipley.

11         Q.   And what is your occupation?

12         A.   I'm a police officer with the City of

13   Champaign.

14         Q.   How long have you been a police officer?

15         A.   Since January of '98.

16         Q.   And was that with the Champaign Police

17   Department?

18         A.   That's correct.  Before that, I did three

19   years Champaign County deputy.

20         Q.   Now, direct your attention to February

21   25th of 1998, were you employed as a Champaign Police

22   Department officer then?

23         A.   Yes.

24         Q.   Around 3:20 in the morning, did you have

     occasion to arrive at 512A South New Street to assist in

     the investigation of an aggravated arson?

                              236

A.   Yes, I did.

Q.   And did you meet with Lori Hansen?

A.   Yes, I did.

Q.   In fact, did you ride in the ambulance with her to Covenant Medical Center?

A.   Yes, I did.

Q.   Like to show you what's been marked as People's Exhibit 26B, ask you do you recognize that as a photograph of Lori Hansen?

A.   Yes, I do.

Q.   When you got to Covenant Medical Center then, was Ms. Hansen treated by medical personnel there?

A.   Yes, she was.

Q.   And did you subsequently have occasion to take custody of a blood sample that had been taken from Lori Hansen by a nurse named Dena Sawka?

A.   Yes.

Q.   Like to show you what's been marked as People's Exhibit No. 61.  Do you recognize that as the envelope that was turned over to you by Nurse Sawka?

A.   Yes, I do.

Q.   And do you then put your seal on it as well?

A.   Yes, I did.

Q.   And where is that?

237

1

2          A.   The yellow seal (indicating).

3          Q.   Did you mark it and date it then?

4          A.   Yes, I did.

5          Q.   And then was it in a sealed condition when

6   you received it already?

7          A.   Yes.  She had sealed it.

8          Q.   And --

8          A.   Prior to giving it to me.

9          Q.   Did you put the seal over that as well?

10          A.   Correct.

11          Q.   Was the blue seal broken or on it at the

12   time you took it into evidence?

13          A.   No.

14          Q.   Did you then secure this in the Champaign

15   Police Department evidence locker?

16          A.   Yes, I did.

17          MS. LADD:  Thank you.  I'd tender this

    witness.

18          THE COURT:  Ms. Lenik?

19                     CROSS-EXAMINATION

20                     BY MS. LENIK:

21          Q.   Is that your only -- your only work in

22   this case was what you've just described?

23          MS. LADD:  Objection, Your Honor.

24          THE COURT:  Sustained.

                         238

Q.  (by Ms. Lenik)  Did you take any fingerprints, Officer?

A.  No.

Q.  Did you -- Did you take any other evidence from the scene of this offense?

A.  No, I did not.

Q.  You do have the capability to take fingerprints and other evidence; do you not?

A.  Yes, I do.

Q.  You -- She didn't give you the name of anybody who did this to her; did she?

MS. LADD:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

Q.  (by Ms. Lenik)  In the course of your work, Officer, investigating offenses, if somebody gives you a name, does that help you in making an arrest in this case?

A.  Yes, it would.

Q.  And is that information which would be reasonably used by you in the course of your duties in investigating the crime that was reported to you?

A.  Yes, it would.

Q.  And did she give you the name of somebody who had done this to her?

MS. LADD:  Same objection.

239

1

2        THE COURT:  Sustained.

3        MS. LENIK:  Your Honor?  This is the same.

4   It's reasonably used in his occupation.  It's not

5   hearsay.

6        THE COURT:  It's beyond the scope of the

7   direct examination.  The objection is sustained.

8        Q.  (by Ms. Lenik)  Did you have a

9   conversation with Ms. Hansen while you were in the -- in

10   the ambulance with her?

11        A.  Yes, I did.

12        Q.  She was verbal; was she not?

13        A.  Yes, she was speaking.

14        Q.  And you could understand what she was

15   saying?

16        A.  Yes.

17        Q.  And her answers were responsive to your

18   questions?

19        A.  Yes.

20        Q.  And did you discuss with her at that time

21   who the perpetrator of the offense was?

22        MS. LADD:  Objection.  Hearsay.

23        THE COURT:  Sustained.

24        Q.  (by Ms. Lenik)  What did you discuss with

     her at that time?

         MS. LADD:  Objection.

                        240

THE COURT:  Sustained.

Q.  (by Ms. Lenik)  Did you -- Did you have any other conversation with her later?

A.  Yes, I did.

Q.  What was the subject matter of that conversation?

MS. LADD:  Same objection.

THE COURT:  Sustained.

MS. LENIK:  Your Honor, may we approach?

THE COURT:  No.

Q.  (by Ms. Lenik)  Did you meet with anyone else in regard to this?

MS. LADD:  Objection.

THE COURT:  Sustained.

MS. LENIK:  I'm not even finished with my question.

THE COURT:  Ms. Lenik, your questions are beyond the scope of the direct examination.

MS. LENIK:  Your Honor, I'm trying to avoid calling the officer back, but if that's --

THE COURT:  Ms. Lenik, that's --

MS. LENIK:  If that's --

THE COURT:  If that's what needs to be done --

MS. LENIK:  Fine.  We'll call the officer back, and I have no further questions.

241

THE COURT:  Anything else?

MS. LADD:  No, Your Honor.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

MS. LADD:  Court wish me to call another witness?

THE COURT:  Yes.

MS. LADD:  I call Detective Charlie Shepard.

(Witness sworn.)

CHARLES SHEPARD

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  Charles Shepard.

Q.  What is your occupation?

A.  I'm a detective with the City of Champaign Police Department.

Q.  How long have you been a police officer with the City of Champaign?

A.  About eight and a half years now.

Q.  And were you so employed as an investigator then on February 25th and 26th of 1998?

242

A.   Yes, I was.

Q.   Did you assist in the investigation of an aggravated arson that occurred at 512A South New Street in Champaign, Illinois?

A.   Yes.

Q.   Direct your attention to the morning of February 25th of 1998, did you assist in processing the scene of 512A South New for evidence?

A.   Yes, I did.

Q.   Were you working with any other detective from the Champaign Police Department?

A.   Yes.

Q.   Who was that?

A.   That was Detective Donald Shepard.

Q.   Now, I notice you both have the same last name.  Are you related in any way?

A.   Yes, we're brothers.

Q.   Is there anything about that that affected your professional work on this case or any case?

A.   No.

Q.   When you arrived then, was the building being secured by officers from the Champaign Police Department?

A.   Yes, it was.

Q.   And then did you make any observations

243

about the exterior portion of that building?

A. Yes.

Q. And what was that?

A. The building had been on fire. It had smoke damage and there was a window broken out.

Q. Now, did you have occasion then to focus your investigation on the interior of that duplex?

A. Yes.

Q. Like to show you then a series of photographs. First of all, Detective, I'd like to show you People's Exhibit No. 43. Does that depict then the outside of that residence?

A. Yes, it does. That's the front door as you enter the residence.

Q. And also showing you then 44A, can you tell us what that depicts?

A. This depicts the kitchen area of the residence on the inside.

Q. Now, there's an individual standing to the side of that picture. Who is that?

A. That was an intern that was working with Detective Donald Shepard at that time.

Q. And did he just stand by then during the processing of the evidence so he could learn as part of his educational program?

244

1

2          A.  Yes, he did.

3          Q.  Now, then, did you also observe a beer can

4  in that kitchen?

5          A.  Yes.

6          Q.  Like to show you People's Exhibit 44B.

   Does that depict that beer can?

7          A.  Yes, it does.

8          Q.  Where was it?

9          A.  It was sitting on the counter just to the

10 right of the refrigerator against the east wall of the

11 apartment.

12         Q.  And showing you 44C, is that a closer

13 perspective of that same item?

14         A.  Yes, it is.

15         Q.  Now, did you also make observations about

   the living room area then?

16         A.  Yes, I did.

17         Q.  Can you just describe the general

18 condition of the living room?

19         A.  Yes.  It was burnt very badly.  Walls,

20 ceiling, floor, any stereo equipment or any items in the

21 room were all damaged in accordance to a fire.

22         Q.  Like to show you People's Exhibit No. 46.

23 Can you tell us what that depicts, please?

24         A.  Yes.  This is the living room area that I

                          245

just spoke of.

Q.  And does it show that damage that you've described?

A.  Yes, it does.

Q.  Then I'd like to show you -- Did you also look at the bathroom area of that residence?

A.  Yes, I did.

Q.  I'd like to show you then 47B, does that show how the bathroom area appeared?

A.  Yes, it does.

Q.  And also 47A, is that another view of that bathroom area?

A.  Yes.

Q.  And did you also observe any type of soot damage in that area?

A.  Yes.  There's soot damage all over the room.

Q.  Now, was there a particular item that you located then on that bathroom floor?

A.  Yes, there was.

Q.  Can you describe what that was, please?

A.  Yes.  It was a cigarette butt, a Newport style, I believe, that was located behind the door in the bathroom.

Q.  Now, as you observed these items, did you

246

document them by photographing them?

    A.  Yes.

    Q.  And then what did Detective Don Shepard do?

    A.  He seized each item after I photographed them.

    Q.  Like to show you People's Exhibit 47D. What does that then depict?

    A.  This is the cigarette butt that I just spoke of.

    Q.  And, again, where was that located, actually?  What does that picture show us?

    A.  It's on the floor in the bathroom behind where the door would open up.

    Q.  Thank you.

    A.  Mm-hmm.

    Q.  Now, did you also observe various items that were in the hallway next to a utility closet?

    A.  Yes, I did.

    Q.  And when I say a utility closet, was there actually a furnace and hot water heater in that area?

    A.  Yes.

    Q.  Now, showing you then, first of all, 48A, is that an overall perspective of that area?

    A.  Yes, it is.

247

Q.   And 48B, is that a closer view of that same area then, Detective?

A.   Yes, it is.

Q.   Did you observe anything significant in that area?

A.   Yes.  There was a pair of pink shorts that were lying in the area in the hallway that is depicted in this photograph here.

Q.   Showing you then 48C, is that a closer perspective of those pink shorts?

A.   Yes.

Q.   Did you make any observations about their condition?

A.   Yes.  They were -- They had soot all over them.  They were also wet.

Q.   Now, did you also make observations then about the bedroom area?

A.   Yes.

Q.   And I'd like to show you then 49 -- First of all, showing you Exhibit 49B, can you tell us what that is, please?

A.   Yes.  This is the west bedroom area.

Q.   And what did you observe in that area?

A.   This area there was a wooden stand like a coffee table like end table.  There's also a ball of

248

string that was lying on the floor and some cards that
had footprints on them.

Q.   Then with regards to that ball of string,
did you observe that further?

A.   Yes.

Q.   And let me show you another perspective,
first of all, of that bedroom, showing you 39, is that
another overall view of that bedroom area?

A.   Yes, it is.

Q.   And then when you described the cords that
you referred to, I'd like to show you then 49C.  Does
that depict that what you thought was a ball of string?

A.   Yes.

Q.   And was there any significance as you
examined that further?

A.   It appeared that it had been used maybe to
tie somebody up with.

MS. LENIK:   Your Honor, I'm going to object to
that.

THE COURT:   I'm gonna sustain the objection.

MS. LENIK:   Thank you.

Q.   (by Ms. Ladd)  Was that comprised of
different items besides string, in other words?

A.   Yes, it was.

Q.   Then showing you what's been marked as

249

49D, is that a closer perspective of that item?

A. Yes, it is.

Q. And does that depict then the different things that it was made up of?

A. Yes.

Q. Was that also taken into evidence then by Detective Don Shepard?

A. Yes, it was.

Q. Then with regards to these items then, as he was collecting them, was he responsible for securing them into evidence?

A. Yes.

Q. Now, then, did you also have occasion to recover something later on further down the street on the outside of that residence?

A. Yes, I did.

Q. And when you were examining that area, let me ask you, did someone point out the fact that there was a truck parked outside the area?

MS. LENIK:  Objection.

THE COURT:  Overruled.

A. Yes.

Q. (by Ms. Ladd)  And with regards to that, what did someone point out to you?

MS. LENIK:  Objection.

250

THE COURT:  Overruled.

A.  It was pointed out that the victim's truck was parking -- parked on the 700 block of Arlington Drive, which is located just to the west of the residence.

Q.  (by Ms. Ladd)  As a result of that then, what steps did you take?

A.  I contacted Detectives Strzesak and Johnston who had came into the area to assist us and had them go secure the vehicle and prepare it for a towing into the police department for processing.

Q.  Did you then turn that particular matter over to them?

A.  Yes, I did.

Q.  Now, also, when you were examining the outside of this area, did you observe any items in the vicinity of where that truck had been seen on Arlington?

A.  Yes, I did.

Q.  Now, specifically, did you locate a lighter?

A.  Yes.

Q.  And where was that?

A.  It was approximately ten feet in front of the pickup truck in the direction back towards the residence.

251

Q.  I'd like to show you then additional photographs.

First of all, showing you 52, can you tell us what that depicts then?

A.  Yes.  This is an overall view of the truck with a lighter in accordance with the truck on the street.

Q.  And can you take this black marker then and just draw an arrow or somehow indicate where the lighter was and where the truck was, was identified as Ms. Hansen's truck?

A.  (Witness complies.)

Q.  As you've marked that, does that truly and accurately depict then what you've just described to us?

A.  Yes, it does.

Q.  Did you then take a photograph of a closer perspective of that same item?

A.  Yes.

Q.  Like to show you then what's been marked as People's Exhibit 53, and does that depict then that same lighter from a closer perspective?

A.  Yes, it does.

Q.  Did you actually take that into evidence yourself then?

A.  Yes.

252

1

2          Q.   Did you also -- Let me also show you with

3    regards to that truck People's Exhibit 54, is that a

4    closer view of that truck on the street?

5          A.   Yes, it is.

6          Q.   Then did you also make observations of

7    another item that was on the street, that same street

     that the truck was parked on?

8          A.   Yes, I did.

9          Q.   And what was that?

10         A.   It was a balled up black nylon hose type

11   stocking.

12         Q.   And did you then also take that into

13   evidence?

14         A.   Yes, I did.

15         Q.   Like to show you, first of all, what's

     been marked as 56A, what does that picture depict?

16

17         A.   This depicts the black nylon stocking in

     accordance with the truck and other vehicles on the

18   street.

19         Q.   Again, could you follow the same process

20   and draw an arrow then to the truck and the item that

21   you're referring to?

22         A.   Yes.   (Witness complies.)

23         Q.   And as you've marked that, again, does

     that truly and accurately then correspond to and depict

24

                              253

what you've described to us in your testimony?

A.   Yes, it does.

Q.   Now, did you also then take a close-up view of that?

A.   Yes.

Q.   Like to show you what's been marked as 56B, then, is that a closer perspective of that same item?

A.   Yes, it is.

Q.   Now, you collected these items in evidence then, Detective?

A.   Yes, I did.

Q.   And as you did so, did you use any precautions such as gloves to insure that they were not contaminated?

A.   Yes, I did.

Q.   And I'd like to show you then several exhibits.  First of all, with regards to the lighter, I'd like to show you what's been marked as People's Exhibit No. 25.  Do you recognize that?

A.   Yes, I do.

Q.   And is that, in fact, the lighter that you located on the street?

A.   It is.

Q.   Do you recognize your markings on that

254

package?

       A.  Yes, I do.  It's got my initials on it.

       Q.  And then did you seal that and place that in evidence?

       A.  Yes.

       Q.  Does that appear to be in substantially the same condition as when you collected it, with the exception of a powder on it?

       A.  Yes.

       Q.  From your experience as a detective, does that appear to be fingerprint powder?

       A.  Yes, it does.

       Q.  Now, you also described that piece of stocking that you recovered, and I'd like to show you then an exhibit in that regard.  Like to show you what's been marked as People's Exhibit No. 21.  First of all, ask you to take a look at the bag.  Do you recognize that?

       A.  Yes, I do.  This is the bag I sealed the stocking in.

       Q.  And when you collected that stocking, did you use then the gloves?

       A.  Yes, I did.

       Q.  And when you collected that particular item, then, can you pull it out and show us what it is,

255

please?

      A.    (Witness complies.)  It's this black stocking here on this piece of cardboard.

      Q.    Was it on the cardboard when you collected it?

      A.    It was not.

      Q.    Other than that, as you look at that, does it appear to be in substantially the same condition?

      A.    Yes, it does.

      Q.    Was it cut like it is now?

      A.    Yes.

      Q.    Thank you.  When you took this item into evidence then, do you recognize your seal on that red top seal?

      A.    Yes.  It's my seal, because it has my initials across it.

      Q.    Now, initially, when you collected it, did you put it in a plastic bag?

      A.    Yes.

      Q.    Did you subsequently then take it to the Champaign Police Department?

      A.    I did.

      Q.    Did you then transfer it to a paper bag to preserve any potential evidence from body fluids?

      A.    Yes.

E-FILED
Friday, 04 May, 2007  05:09:18 PM
Clerk, U.S. District Court, ILCD

Q.  And when you did that, did you again use gloves?

A.  Yes, I did.

Q.  And did you then secure the bag it was in in this paper bag?

A.  Yes.

Q.  And is that when you then sealed the paper bag?

A.  Yes, it is.

Q.  And then were any of these other seals on the bag at the time that you sealed it in evidence?

A.  No, they were not.

Q.  Thank you.  Now, did you later go back to the duplex then to look for the main part of that stocking?

A.  Yes, I did.

Q.  And did you then enter into the kitchen area of that duplex?

A.  Yes.

Q.  And did you, in fact, locate another item that corresponded to that?

A.  Yes, I did.

Q.  Like to show you what's been marked, first of all, as People's Exhibit 48A.  Can you tell us what that depicts?

1

2          A.   Yes.  This is the kitchen area, and there

3     is a black hose type stocking that is lying there on the

4     floor.

5          Q.   Then showing you 45B, does that also

6     depict that same item?

7          A.   Yes, it does.

8          Q.   And then showing you 45C, is that a closer

      perspective, yet, of that same item?

9          A.   Yes, it is.

10          Q.   Did you also take that item into evidence?

11          A.   I did.

12          Q.   And, again, did you put on a pair of

13     gloves when you did so?

14          A.   Yes, I did.

15          Q.   And as you collected, then, I'd like to

16     show you what's been marked as People's Exhibit No. 20.

      Again, as you look at that, could you, first of all,

17     tell us if you'd recognize your markings on the outside?

18          A.   Yes, these are my initials across the red

19     seal.

20          Q.   And then can you tell us what the contents

21     are, please?

22          A.   Yes.  This is the other piece of black

23     stocking that I located in the kitchen.

          Q.   And that was of 512A South New?

24
                           258

A.   Yes, it was.

Q.   Again, was it on the card at the time that you placed it into evidence?

A.   No, it was not.

Q.   Did it have what appeared to be a leg cut off of it at the time you took it into evidence?

A.   Yes, it did.

Q.   And does it appear to be then in substantially the same condition with the exception of the markings that the lab has put on it?

A.   Yes, the leg has been cut off here again.

Q.   Thank you.  If you could also then refer again to the bag, did you seal that into evidence then?

A.   Yes, I did.

Q.   And when you seal it, do you recognize that as the red seal with your initials at the top?

A.   Yes.

Q.   Were any of these other seals then on the bag at the time or was it intact?

A.   It was intact.  The seals were not there.

Q.   So, all these items were intact and sealed then when you secured them into evidence at the Champaign Police Department?

A.   Yes.

Q.   Now, what I'd like to do, Officer, is also

259

direct your attention to the exterior of that duplex.
That morning, did you locate what appeared to be a gas
can potentially at a dumpster?

A.  Yes.

Q.  And was it some distance from the duplex?

A.  Yes, it was.

Q.  Like to show you what's been marked as
People's Exhibit No. 40.  Does it truly and accurately
depict then those items?

A.  Yes.

Q.  All of the photographs that you've
identified here in court, do they truly and accurately
depict the events you've testified and the way they
appeared on the date in question?

A.  Yes, they do.

Q.  Now, I'd also like to direct your
attention then to an exhibit that's marked People's
Exhibit No. 1, again, with the Court's permission.

THE COURT:  Yes.

MS. LADD:  Ask the witness to use the diagram.

Gonna have to ask you to step down here for a
moment, Detective.

First of all, I'd like to direct your
attention to People's Exhibit No. 1.  Ask if you could
look at that.  Could you tell us do you recognize that,

please?

     A.  Yes.

     Q.  And is that a layout then of 512A South New as it appeared on February 25th of 1998?

     A.  Yes, it is.

     Q.  And what I'm gonna do is just move this over a little and ask you if you could step to the side so all the jurors can see.

     Does it truly and accurately depict the layout of the rooms and the items as it's marked?

     A.  Yes.

     Q.  And then as you went in, what I'm gonna do is ask you, first of all, could you mark with a 20 for Exhibit No. 20 where you located that piece of stocking in the particular duplex?

     A.  (Witness complies.)  It was right in this area.

     Q.  Then could you also show us then where you located the item that was taken into evidence, the cords?

     A.  Yes.

     Q.  And just point to that?

     A.  (Pointing.)  It was in this area right here.

     Q.  And that's the front bedroom?

A.  Yes.

Q.  Did you also notice if there was any broken window in either the front or what's marked as the rear bedroom?

A.  Yes.

Q.  And where was that?

A.  It was over in here, the window was broken (indicating).

Q.  Is that where the X is?

A.  Yes.

Q.  I'd like to show you what's been marked as People's Exhibit No. 2.  If you could just stand there for a moment for me.  Do you recognize this as a diagram of the overall layout of that area of Champaign, Illinois, as it appeared on February 25th of 1998?

A.  Yes, I do.

Q.  And, again, does it appear to be labeled correctly with the streets and the buildings in relationship to each other?

A.  Yes.

Q.  Now, can you show us, first of all, just by pointing where the truck was parked?

A.  (Pointing.)  Yes, it was in this area right here on Arlington.

Q.  Then could you put a T there for that

262

area?

        A.   (Witness complies.)

        Q.   And could you put a 2 after it?

        A.   (Witness complies.)

        Q.   Now, could you also show us then where you found the lighter on the street?

        A.   Yes.  The lighter was in this area right up here (indicating).

        Q.   And if you need to stand in front of the diagram to draw, that's fine.  Could you put then a No. 25 where you found the lighter, and it's all right to write on the street name if you need to.

        A.   (Witness complies.)

        Q.   If you could stand to the side, could you also show us, please, then, where you found the other portion of that stocking?

        A.   Yes.  It was in this area right in here -- where the N is (indicating).

        Q.   And could you mark that as well then with a 21?

        A.   (Witness complies.)

        Q.   And as you've marked this diagram and the diagram before it, People's Exhibit No. 1, do they both truly and accurately depict the events that you've described in your testimony today?

263

A.   Yes, they do.

Q.   Thank you.   If you'd resume the witness stand.

And did you secure all this evidence at the Champaign Police Department evidence locker then?

A.   Yes.

MS. LADD:   Thank you.   I'd tender this witness.

THE COURT:   Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.   Officer, when you collected the evidence, did you take fingerprints from it?

A.   I did not, no.

Q.   And were fingerprints taken in front of you in your presence?

A.   No, they were not.

Q.   You do have the capability both individually and in your department to take fingerprints; isn't that correct?

A.   We do have that ability, yes.

Q.   You also stated that you lifted some cards with footprints; is that correct?

A.   No.   There were cards laying on the floor that had footprints on them.

264

Q.  Oh, and those -- were those footprints
taken into evidence?

A.  Yes.

Q.  And did you make any observations about
the size of those footprints or the size of shoe that
the wearer must have had?

A.  I did not, no.

Q.  To your knowledge, did anybody in the
department do anything with those footprints?

A.  I do not know.  You'd have to ask someone
else.  I turned them in evidence is all I did with them.

Q.  And it is possible, is it not, to
determine basic information about a person like the size
of the person by the size of the footprint?

MS. LADD:  Objection.  This witness isn't
qualified to answer that.

MS. LENIK:  We don't know until he does.

THE COURT:  Well, he hasn't been qualified.
I'm gonna sustain the objection.

Q.  (by Ms. Lenik)  Do you have training in
footprint -- in what information can be gleaned from
footprints?

A.  Are you talking about shoe prints or
footprints?

Q.  Shoe prints.  I'm sorry.

265

A.   Just basic knowledge of shoe prints, yes.

Q.   What information can be gleaned from footprints?

MS. LADD:   Same objection.   Basic knowledge.

THE COURT:   I'll sustain the objection.

Q.   (by Ms. Lenik)   What does your basic knowledge consist of?

A.   Maybe the size of a person's foot, maybe the tread on the bottom of the footwear that is depicted.

Q.   And have you been trained through the course of your police work to work those things from looking at those things?

A.   We can make fairly accurate identifications on the type of footwear and that sort of thing.   I cannot make an identification on the size of a shoe unless it is labeled on the foot -- on the print itself.

Q.   And did you turn that information over to the Champaign Police Department after you collected it from the scene?

A.   I'm not sure I know what information you're talking about.

Q.   You turned over the impressions of the footwear that you received; correct?

266

1

2          A.   No.  Detective Don Shepard collected them.

3          Q.   Where is it, Officer, that you say you

4     found the cords?  Did you find them in the bathroom?

5          A.   No, they were located in the bedroom on

6     the west side.

7          Q.   And the truck was found in the immediate

      area outside the building; correct?

8          A.   About a block away to the west, yes.

9          Q.   And after you found the truck, you didn't

10    take any evidence or samples from the truck; did you?

11         A.   I did not, no.

12         Q.   And did anyone in your presence?

13         A.   No, they did not.

14    MS. LENIK:   May I have a moment?

15    THE COURT:   Yes.

16         Q.   (by Ms. Lenik)  Did you do other things in

      your investigation of this matter regarding searching

17    for a gas can or a can of some accelerant?

18         A.   We did locate two cans, yes.

19         Q.   And did you also after you located those

20    two cans go to the local -- the local stores where those

21    cans might have been sold?

22         A.   Yes.

23         Q.   And you did not determine through your

      examination of the videotapes in those local stores of

24
                              267

any --

MS. LADD:  Objection, Your Honor.

Q.  (by Ms. Lenik)  -- individual buying those cans?

MS. LADD:  Objection.  Hearsay.  There's no foundation for any of this.

MS. LENIK:  He saw it.

THE COURT:  Ms. Lenik.

MS. LADD:  Those videotapes are not in evidence.

THE COURT:  We are gonna need a little bit more specifics as to the questions.  I'm going to sustain the objection.

If you want to ask him what it is he looked at and the order it is he looked at them.

Q.  (by Ms. Lenik)  Did you go to Colonial Pantry?

A.  Yes.

Q.  Which Colonial Pantry did you go to?

A.  The one at Springfield and Prospect.

Q.  And that's in the City of Champaign and the County of Champaign and the State of Illinois; correct?

A.  Yes, ma'am.

Q.  And on what date and time did you go to

268

that Colonial Pantry?

A.  I don't recall for sure.  I believe it was the same day that we found the gas cans.  I don't recall whether it was right before or right after we found them, but Detective Strzesak and I both went there, yes.

Q.  And when you got there, you viewed a videotape; correct?

A.  We obtained a videotape of which we later viewed at the police department.

Q.  And by later, you mean sometime that same day; correct?

A.  Yes, ma'am.

Q.  And when you viewed that videotape later on that same day, the purpose of your doing that was to determine if you could see somebody purchasing items like the ones you believe started this fire; correct?

A.  That's correct.

Q.  And you did not see anybody in that videotape purchasing any similar items; did you?

A.  That's correct.

Q.  You didn't see anybody in that videotape that you recognized; did you?

A.  I don't believe so, no.

Q.  You didn't see anybody in that videotape that became a suspect to you in this offense; did you?

269

1

2          MS. LADD:  Objection.

3          THE COURT:  Sustained.

4          Q.  (by Ms. Lenik)  The purpose behind

5    packaging and repackaging an item of evidence is because

6    they need to be removed for the purpose of doing

7    scientific examinations; correct?

           A.  That's correct.

8          Q.  Did you also in your investigation talk to

9    neighbors around this area?

10         A.  I did not, no.

11         Q.  Did anybody in your presence?

12         A.  No, I do not believe so.

13         Correction.  Detective Don Shepard did talk to

14   a lady in my presence, located in an alley where a purse

     was found.

15         MS. LENIK:  May I have a moment, Your Honor?

16         THE COURT:  Yes.

17         MS. LENIK:  Nothing further.

18         MS. LADD:  Nothing further.  Thank you.

19         THE COURT:  You may step down.

20         THE WITNESS:  Thank you, Your Honor.

21                              (Witness excused.)

22         THE COURT:  Ladies and Gentlemen, we're going

23   to take a mid morning recess at this point.  I'm going

24   to ask that you go with Mr. Rasmus to the jury room.

                          270

1

2      Don't discuss the case among yourselves.

3              (Recess taken.)

4              (The following proceedings were had out of the

5      presence and hearing of the jury.)

6              THE COURT:  Ms. Ladd, are you ready for the

7      jury to be brought in?

8              MS. LADD:  Yes.  Thank you, Your Honor.

        THE COURT:  Ms. Lenik?

9              MS. LENIK:  I am.

10             THE COURT:  All right.  Mr. Rasmus, bring in

11     the jury.

12             Ms. Ladd, your next witness is gonna be --

13             MS. LADD:  Jo Brooks.

14             THE COURT:  Jo Brooks.

15             MS. LADD:  And then I will request that the

       Court read the stipulation as to Bob Gleeson.

16             THE COURT:  All right.

17             (The following proceedings were had in the

18     presence and hearing of the jury.)

19             THE COURT:  You may be seated.

20             Ms. Ladd, call your next witness.

21             MS. LADD:  Thank you.  I'd call Jo Brooks.

22                         (Witness sworn.)

23             JOELLEN BROOKS QUICK

24     called as a witness on behalf of the People,

                       271

being first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  JoEllen Brooks Quick.

Q.  And could you spell your first name for

us.

A.  J-o-E-l-l-e-n.

Q.  And what is your occupation or profession?

A.  I am a teller supervisor at First Midwest

Bank.

Q.  And is that here in Champaign and Urbana,

Illinois?

A.  Yes.

Q.  As a teller supervisor, then, are you

responsible for maintaining the records for the ATM

machines for that bank?

A.  Yes.

Q.  And where are the First -- or the First

Midwest Banks' ATM machines located in Champaign?

A.  They are on the far end of our drive-up

area.

Q.  And what's the location when you say our

drive-up area?

272

A.   It's 812 West Springfield.

Q.   Is that in Champaign, Illinois?

A.   Yes, it is.

Q.   And is that also the main bank facility where you work then?

A.   Yes.

Q.   Now, where the ATM machines are, are there any cameras that are located to monitor transactions at those ATM's?

A.   Yes, there are.

Q.   Are there drive-up ATM machines that you can approach by vehicle then?

A.   Yes.

Q.   And are there cameras that also monitor the transactions that go on there?

A.   Yes.

Q.   Are these then preserved on videotape?

A.   Yes, they are.

Q.   And are there different views that the cameras at First Midwest Bank take or different perspectives?

A.   Yes.

Q.   Can you describe some of the locations where the cameras are?

A.   As far as the ATM, there's one that is

273

positioned as the vehicle is approaching the ATM machine so it gets a frontal view of the car itself coming up. And then there is one that is coming out of the ATM towards the level of the person in the vehicle so it gets a view of the face of the person, usually.

Q.  So, is that, in other words, facing the driver's window then?

A.  Yes.

Q.  Now, does the camera film continually then?

A.  It films continually, but we have approximately eight different cameras throughout our facility, so it rotates between cameras.

So, at that -- on that particular camera, it's not continuous.

Q.  Now, is it your responsibility then as the teller supervisor to maintain those films or video cassettes that are taken from the cameras that monitor the ATM activity?

A.  Yes.

Q.  And when the ATM machine -- or the video camera, rather, is preserving this and making a video cassette transaction, is that a normal speed videotape, in other words?

A.  Pretty much, yeah.  It may be slowed down

274

just a slight bit, but it's --

Q. How many hours are put on a typical videotape then?

A. It's a full week that we -- we rotate the tapes every week, every Wednesday, so.

Q. And then if you put that tape into a regular VCR, would you be able to visualize it?

A. Yes.

Q. And what would it look like? Would it be flashing very rapidly between camera scenes?

A. Yeah. I mean, you would have to slow it down to actually have time enough to look at one particular camera.

Q. Now, as a supervisor then, you maintain the videotapes for the transactions that took place in February of 1998, at this ATM machine?

A. Yes.

Q. And that would be the 812 West Springfield in Champaign ATM?

A. Yes.

Q. Now, is it the regular course of business for First Midwest Banks to make these videotapes?

A. Yes, it is.

Q. And are they kept in the regular course of business?

275

1

2          A.   Yes.

3          Q.   In fact, are they maintained in a bank

4   vault at your facility?

5          A.   Yes, they are.

6          Q.   Are the videotapes made at the time of the

7   transaction that's being documented then?

8          A.   Yes.

9          Q.   And are they made by standard videotaping

10  equipment that's recognized as standard?

11         A.   Yes.

12         Q.   Does the video camera and the videotape

13  that's produced then produce an accurate record of what

14  took place at that particular transaction?

15         A.   Yes.

16         Q.   And does it also document the date and

17  time on the videotape?

18         A.   Yes, it does.

19         Q.   And was that equipment working properly on

20  February 25th of 1998?

21         A.   Yes.

22         Q.   And did it produce, in fact, a record?

23         A.   Yes, it did.

24         Q.   And, at that -- at this time, I'd like to

    show you then what's been marked as People's Exhibit

    No. 4.  Ask you if you could take a look at -- First of

all, this is a videotape that I'm presenting you.  As
you look at the outside of the box then, and the inside,
does it contain a videotape that you recognize?

Q.   A.   Yes, it does.

Q.   And what is that, please?

A.   It's the same brand that we do use at our
facility.

Q.   And are there also markings, if you'll put
that out for me, on the particular videotape itself, not
just the box, are there markings that allow you to
recognize as a videotape that was maintained by First
Midwest Bank?

A.   Yes, it does.

Q.   And does it also mark then the time and
the date of the transactions that videotape is
recording?

A.   Yes.

Q.   And what is that?

A.   This particular tape is -- was put in,
let's see here, okay, it was put in on 2-18-98, and it
was taken out on 2-25-98.

Q.   And you recognize that from the labeling
on the videotape then?

A.   Yes.

Q.   Now, that particular videotape, did you

277

have occasion to meet with officers from the Champaign

Police Department on the morning of February 25th of

1998, to show them this videotape?

     A.  Yes.

     Q.  And, at that time, then, it was being

maintained by the First Midwest Bank?

     A.  Yes.

     Q.  And did you have to have a special VCR as

we have described to be able to slow it down?

     A.  I wouldn't say it's a special one, no.  It

had a feature that it -- you could slow it down and stop

it on a frame of that video.

     Q.  Did you then view that tape at this time

to determine if there were any transactions that took

place at around 2:30 in the morning at that ATM machine

on West Springfield?

     A.  Yes, I did.

     Q.  Were you able to locate transactions for

that approximate time?

     A.  Yes.

     Q.  Now, were they also interspliced or

alternated with the other video shots from other cameras

as you've described?

     A.  Yes, it was.

     Q.  So, in other words, it'd be a view of the

video of the ATM --

MS. LENIK:  Your Honor, I'm going to object to the leading form of the question.

THE COURT:  Overruled.

Q.  (by Ms. Ladd)  Just to clarify, there would be a shot of the ATM machine and then a shot from another camera and then a shot from another camera and then back to the ATM machine?

A.  Correct.

Q.  And there are eight different camera perspectives that are mixed together?

A.  Yes.

Q.  Then did you view this with the officers at the bank?

A.  Yes, I did.

Q.  And then did you turn this over to the officers to take into evidence?

A.  Yes, I did.

Q.  Now, I also would like to show you what's been marked as People's Exhibit No. 5.  At my request, did you view a copy that was made from the videotape you've identified as People's Exhibit No. 4?

A.  Yes.

Q.  As just by looking at it now, you can't tell, but as best you can tell, does that appear to be

279

1

2    the same tape?

3        A.  Yes.

4        Q.  Now, you had looked at it again at my

5    request prior to coming to court?

6        A.  Yes.

7        Q.  And did that contain just the shots of the

8    ATM machine extracted from the total camera shots on

9    People's Exhibit No. 4?

10       A.  Yes.

11       MS. LADD:  At this time, Your Honor, what I'd

12   like to do is ask the Court's permission to have the

13   witness step down and play the tape and have her

14   identify it.

15       THE COURT:  All right.

16       Q.  (by Ms. Ladd)  And I don't know if you'll

17   be able to see from that perspective or not.  Do you

18   think you can see the screen?

19       A.  Yeah.

20       Q.  If you need to step down, Mrs. Brooks,

21   that's fine.

22       THE COURT:  What I'm going to do, as soon as

23   you're ready, Ms. Lenik, if you'll hit the light

24   switches over there.

         MS. LENIK:  Certainly.

         THE COURT:  Go ahead.

                        280

MS. LADD:  Thank you.

(Whereupon, the videotape was played.)

Q.  (by Ms. Ladd)  As you view that, then, is this a true and accurate copy of all those stills that correlated to the ATM machine in the drive-up at 812 West Springfield on February 25th of 1998?

A.  Yes, it was.

Q.  And do they all correlate to that approximate time period just around or before 2:30 a.m.?

A.  Yes.

Q.  Was the date and time then stamped on the bottom left-hand lower portion of the tape as it's being shown?

A.  Yes, it was.

Q.  Did you recognize from looking at that that that was, in fact, your facility just as well by seeing it on the tape?

A.  Yes.

Q.  Now, with regards to that particular videotape, then, I'd like to show you a series of still photographs as well.

Showing you then what's been marked, first of all, as People's Exhibit 5A, do you recognize that as a true and accurate copy of the still that was taken by the video camera on that videotape that you've

281

identified?

A.  Yes, it is.

Q.  And that would be a true and accurate copy then of a still from both People's Exhibit 4 and the copy People's Exhibit 5?

A.  Yes.

Q.  Then showing you People's Exhibit 5B, do you recognize that as, again, another still copy of another frame that was documented by that videotape?

A.  Yes, it is.

Q.  And then showing you 5C, is that another copy, again, of another still frame that you identified on the videotape?

A.  Yes.

Q.  Showing you 5D, is that another copy?

A.  Yes.

Q.  Showing you 5E, is that another copy of another still then?

A.  Yes.

Q.  Now, for each of those stills, again, is it the time down in the lower left-hand corner to correlate when that picture was taken then?

A.  Yes, they are.

Q.  And also on that last one I showed you, can you see camera two at the bottom of the left-hand

282

corner of writing?

A. Yes.

Q. And what does that tell you?

A. That tells me which camera is being actually in -- in working order at that particular time.

Q. And was it the camera that correlates to the drive-up of that ATM machine?

A. Yes, it is.

Q. And finally showing you 5F, is that a true and accurate copy, again, of that still from that videotape?

A. Yes.

Q. And all those correlate to the videotape we've just seen?

A. Yes, it does.

Q. Now, I'd like to show you, also, an additional -- two additional items, Mrs. Brooks, People's Exhibit No. 7 and 16A. First of all, showing you People's Exhibit No. 7, do you recognize that as business records of your First Midwest Bank?

A. Yes.

Q. And as you look at that, then, near the bottom, in fact, there's a highlighted number?

A. Mm-hmm.

Q. Can you tell us what that correlates to,

283

please?

A.  That is actually the card number of that card that's being used at the ATM machine.

Q.  Would that be an account number then?

A.  Yes.

Q.  As you read along that line then, what information can you tell from looking at that?

A.  Okay.  Let's see, there's a description showing that there was an attempt of a withdrawal from a checking account.  The sequence number.

Q.  What does that mean?

A.  That just basically tells you how many transactions have been going through that machine and the number that that one particularly is.  The date, the time of the transaction, and the amount of the transaction, along with a surcharge.

Q.  Now, with regards to that account number, how many activities took place on that account number that you can see on that business record?

A.  Let's see, looks like three at that particular time, three tries were made.

Q.  And what date were those?

A.  They were all on February 25th, 1998.

Q.  And what -- Is the time also documented?

A.  Yes.

284

Q.   And what was the approximate time?

A.   One was at 2:31.   One was at 2:32.   And the other was also 2:32.

Q.   And would this be a.m. then?

A.   Yes.

Q.   And in what types of transactions are they documenting for that account?

A.   The first one, evidently, looks like a balance inquiry was being made to that account.   The other two look like actual withdrawals from checking.

Q.   And can you tell if the withdrawal was successful or not from looking at that?

A.   Going by this, it looks like it was.

Q.   And those all correlate to approximately 2:30 to 2:31 on February 25th of 1998?

A.   Correct.

Q.   Now, I'd also like to show you then People's Exhibit 16A, which is a copy of a receipt.   Do you recognize the type of receipt in that exhibit?

A.   Yes.

Q.   And what is that?

A.   It's a receipt from our machine telling the location number, which shows 812 Springfield Road, the date, the time, the machine number, which this is our machine number.   Also, the record number, and this

285

one particular, this particular one shows that inquiry

of to the balance was being made from that account.

Q.  And that's the same account number that

you were discussing in the previous exhibit, People's

Exhibit No. 7?

A.  For security reasons, this does not give

the complete number, but the last few digits do look

like they match up.

Q.  And what date and time was that receipt

from then?

A.  This, again, is from February 25th, 1998,

and the time was 2:31 a.m.

Q.  And when you refer to machine, you're

referring to the ATM machine then?

A.  Yes.

MS. LADD:  Thank you.  I'd tender this

witness.

THE COURT:  Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.  The ATM machines that you've been

discussing, they have to be repaired on occasion due to

malfunction; correct?

A.  Yes.

Q.  And are they checked on a regular basis to

286

1

2    see whether they're functioning properly?

3        A.   Yes, they are.

4        Q.   What's the period of time in which they're

5    checked?

6        A.   I believe it's like approximately once

7    every six months that an actual technician comes in to

     check it.  We frequently check it on a daily basis, if

8    possible.  We turn the monitor on to make sure that the

9    time and date is corresponding to the actual time and

10   date.

11       Q.   When was this machine last checked before

12   the 25th in the early morning hours?

13       A.   It would have been, let's see, that would

14   have been on a Wednesday, so it would have been checked

15   the prior day as far as the time and date on the

     machine.

16       Q.   And did you yourself check it?

17       A.   Yes, I would probably say I did.

18       Q.   So that within the previous 24 hours if

19   there had been any errors, you would not have known it;

20   correct?

21       A.   I would not have known it?

22       Q.   Let me rephrase that.  Before the 25th at

23   2:30 when these transactions were made that you're

     testifying to?

24
                           287

A.  Mm-hmm.

Q.  The last time it was checked to see if it was performing properly was the previous day; correct?

A.  Correct.

Q.  So that if there had been any malfunctions between the previous day and that day, you would not have known about them; correct?

A.  Correct.

MS. LENIK:  Nothing further.

REDIRECT EXAMINATION

BY MS. LADD:

Q.  From all the exhibits that you've examined, was there any indication that there was any such malfunction?

A.  No.

Q.  In fact, all the dates and times correspond from each of these sources of records; is that correct?

A.  Yes, they did.

MS. LADD:  No further questions.

THE COURT:  Ms. Lenik, anything else?

MS. LENIK:  Yes.

RECROSS-EXAMINATION

BY MS. LENIK:

Q.  If -- The only information that you have

288

on those records about the time that these occurred was
the records themselves; correct?  You don't have any
independent knowledge of what time these things
occurred; do you?

    A.  No.

    Q.  So that if the malfunction was consistent
across the board, they would all show the wrong time;
correct?

    A.  I would -- Yeah, I would say probably
correct, yes.

        MS. LENIK:  Nothing further.

                FURTHER EXAMINATION

                BY MS. LADD:

    Q.  For clarification, different equipment is
recording the source of each one of these records; is
that right?

    A.  Yes.

    Q.  So, the video camera's recording date and
time separately from the receipt machine which is
separate from the business records' machine?

    A.  Yes, that's true.

        MS. LADD:  No further questions.

        THE COURT:  Ms. Lenik?

        MS. LENIK:  No, nothing further.

        THE COURT:  You may step down.  Thank you.

                        289

(Witness excused.)

MS. LADD:  Call Dorothy Cummings, Your Honor.

(Witness sworn.)

DOROTHY CUMMINGS

called as a witness on behalf of the People,
being first duly sworn, was examined and testified as
follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please tell us your name.

A.  Dorothy Cummings.

Q.  And where do you reside?

A.  705 1/2 West Springfield, Champaign.

Q.  Were you living there in February of 1998?

A.  Yes, ma'am.

Q.  Want you to think back to February 25th of
1998, sometime around 8:15 in the morning or so, do you
recall finding some items near your residence?

A.  Yes.

Q.  And where were these?

A.  In the alley behind my garage.

Q.  And were they sitting in anything?

A.  It was at the side of my garage.  They was
in a puddle of water.

Q.  Did you then remove this?  Well, let me

290

ask you, what type of item did you see?

A.   Well --

Q.   Was it a bag, in other words?

A.   It was a bag.  School children were going through it, and I got curious, went back to see, because it was throwed back into the water, and it was a backpack.  It had books, pencils, checkbook, carry telephone that you carry with you.

Q.   Now, did you then look at the checkbook to see if you could find out who this belonged to?

A.   Yes.

Q.   And did you see a name and an address?

A.   I did.

Q.   And what did you see?

A.   I'm sorry, I don't remember the name at all, but I knew the address.

Q.   What was the address that you remember?

A.   It was 500 and something.  There's four little apartments, two apartments to each thing on New Street.

Q.   Was this their duplexes joined together?

A.   Right, duplexes, and there were two of them.

Q.   Did you then walk down to the duplexes to the apartment you saw on the check?

291

1

2          A.   Yes.

3          Q.   And, at that time, did you observe police

4    officers in the area?

5          A.   Yes.

6          Q.   And did you turn these items over to the

     police officer?

7          A.   No, not at the moment.

8          Q.   What did you do?

9          A.   I just -- I had no idea what went on, and

10   I just asked where this lady lived or young lady,

11   whoever.  And that's when I encountered -- I don't know

12   whether he was a policeman, detec -- I don't know who he

13   was.

14         Q.   In other words, could have been a

     detective and not a police officer?

15         A.   Right.

16         Q.   A patrol?  Did you then tell them that you

17   had found these items?

18         A.   Yes.

19         Q.   I'm sorry.  Okay.  I'm sorry.  Did you

20   take them back to show them the rest of the items?

21         A.   They told me to go back and wait for them.

22         Q.   And then later did they show up to collect

23   the items?

24         A.   Yes.

                              292

Q.  And did you turn them over to them then?

A.  Yes.

Q.  And I'd like to show you then a series of items, Mrs. Cummings.  First of all, this is marked People's Exhibit 24.  Do you recognize this as the bag?

A.  Got camels or something on it?  Yes.

Q.  Yes.

A.  Yes.

Q.  And as you look in here, there's multiple notebooks and papers.  Is that consistent with the type of items that you found?

A.  Yes.

Q.  Now, did you also find individual items, you had indicated a telephone and a checkbook?

A.  Yes.

Q.  Like to show you some additional items then.  First of all, showing you People's Exhibit 24C, does that look like the checks that you found in the checkbook?

A.  Yes.

Q.  And they're a little dirtier now; is that right?

A.  Well, they were wet when I picked up the checkbook.

Q.  Okay.  And then you also found the

293

checkbook that went with it; is that right?

    A.  Yes.

    Q.  Let me show you 24D, does that look like that checkbook, as best you can tell?

    A.  Best I can tell, yes.

    Q.  Did you also find a keychain; do you recall?

    A.  I -- I don't recall a keychain.

    Q.  Now, did you go through everything or did you just --

    A.  No.

    Q.  -- turn it all over to the detective?

    A.  I just -- When I saw the phone and the books and the pack of cigarettes and pencils, I just picked up the checkbook, laid the -- well, no, I took it out of the water.

    Q.  And set it to the side?

    A.  And set it to the side.

    Q.  Now, let me show you then, you mentioned a phone, People's Exhibit No. 24A, does that look like a telephone?

    A.  Yes, it does.

    Q.  All right.  Now, all of this, then, you turned over to the police officers; is that right?

    A.  Right.  I put it in a sack I had and set

294

it up by the garage until he came.

Q.   Now, what I'd like to do, Mrs. Cummings, is have you look at an exhibit for us.  We are gonna set up an easel.

And with the Court's permission again, Your Honor?

THE COURT:   Yes.

MS. LADD:   If I may have the witness step down.

This is People's Exhibit No. 2.  And, Mrs. Cummings, I wonder if you could step down from the stand for us and take a look at this exhibit.

Now, do you recognize this as a map of that neighborhood where you live?

A.   I sure do, yes.

Q.   And can you show us where you live?

A.   Right here (indicating).

Q.   And, actually, if you could stand a little to the side, I'll put you over there, if I might, and, again, could you point to where your address is?

A.   (Pointing.)

Q.   Thank you.  And then could you also point to where you found these items then in the alley?

A.   See my garage, the alley, about right there (pointing).

295

Q.  Could you do me a favor then and take this marker and write a 24 on the diagram?  You can stand in front of it if you need to to write where you found those items of the camel bag.

A.  (Witness complies.)

Q.  And, Mrs. Cummings, as you mark that, then, does that truly and accurately show that area where you found the camel bag you've described to us?

A.  Yes.

MS. LADD:  Thank you.  If you could resume the witness stand.

And I'd tender this witness, Your Honor.

THE COURT:  Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.  You said that when you were first looking at those items there were kids going through it?

A.  Yes, ma'am.

Q.  Do you know whether the kids took anything out of it?

A.  Not to my knowledge.  I had just looked out the back window and I saw they were school children going on their way, middle school, and they were picking things up like this (indicating) and then --

Q.  Show -- With their two fingers together?

296

E-FILED
Friday, 04 May, 2007 05:09:39 PM
Clerk, U.S. District Court, ILCD

A.  Yeah, just picking it up and dropping it.
I did not see them take anything.  They just dropped it
back in the water.

Q.  And then you went out and the kids left?

A.  The kids had already gone to school, and I
went out to -- because the -- the bag was sticking up
out of the water.

Q.  And that's that black bag with the camels?

A.  Yes, ma'am.

Q.  And then you obviously touched it with
your hands when you removed it?

A.  Yes.

Q.  And then you put it somewhere to save for
the police?

A.  Yes, I put it in a sack.

Q.  And the police came and they took the sack
from you?

A.  Yes.

Q.  And you don't know what happened to it
after that?

A.  No, ma'am.

MS. LENIK:  Nothing further.

MS. LADD:  Nothing further.  Thank you.

THE COURT:  Thank you, ma'am.  You may step
down.

297

1

2                                        (Witness excused.)

3          MS. LADD:  Call Michael Kyrouac.

4                                        (Witness sworn.)

5                    MICHAEL KYROUAC

6          called as a witness on behalf of the People,

7     being first duly sworn, was examined and testified as

       follows:

8                    DIRECT EXAMINATION

9                    BY MS. LADD:

10         Q.  Could you please state your name.

11         A.  Michael Kyrouac.

12         Q.  Could you spell your last name for the

13     Court, please.

14         A.  K-y-r-o-u-a-c.

15         Q.  And what is your occupation?

16         A.  I'm a crime scene investigator for the

       Illinois State Police.

17         Q.  And how long have you been a police

18     officer with the Illinois State Police?

19         A.  I've been a trooper since 1985.  And last

20     three and a half years I served as a crime scene

21     investigator.

22         MS. LADD:  Your Honor, I'm sorry, does the

23     juror need water?

24         THE COURT:  Yes, I'll give her some water.

                              298

Mr. Rasmus, if you would give the juror some water, please.

(Bailiff complies.)

Q. (by Ms. Ladd) And how long have you been a crime scene technician?

A. Approximately three and a half years.

Q. And how long have you been a police officer again?

A. Fourteen years, since 1985.

Q. Now, what does a crime scene technician do then?

A. Crime scene technician or investigators responsible when called for evaluating, examining, and processing alleged crime scenes for any item that could be of evidential value in a case.

Q. Now, were you so employed then on February 25th of 1998?

A. Yes, I was.

Q. In your professional capacity, were you asked to process a truck that had been secured at the Champaign Police Department?

A. Yes, I was.

Q. What type of truck was this?

A. It was a -- I believe it was a 1984 -- I believe it was a Toyota pickup.

299

Q.  Like to show you People's Exhibit 58A and B which are photographs.  First of all, showing you 58A, do you recognize that?

A.  Yes, I do.

Q.  And what is depicted in that photograph?

A.  This is a photograph of the pickup that I was asked to examine on the 25th of February, 1998.

Q.  And what was the plate number on that truck?

A.  1459 JD.

Q.  Also showing you 58B, then, is that another perspective from the side and back of that same truck?

A.  Yes, it is.  This shows the passenger side and rear of the same vehicle.

Q.  And does this actually show it at the impound bay where you processed it?

A.  Yes, that is the condition it was in when I first examined it.

Q.  Now, did you attempt to process the truck for fingerprint evidence then?

A.  Yes, I did.

Q.  And what type of factors affect whether or not a print is left?

A.  There are numerous factors.  Weather

300

1

2       conditions, the surface that you're examining for

3       fingerprints, whether the surface is clean, whether or

4       not if a person who is suspect may have put prints on it

5       was wearing gloves.

6               Q.  Let me interrupt you.  How do gloves
        affect leaving a fingerprint?

7

8               A.  Wearing gloves, you're not gonna leave any
        fingerprints.  Your finger -- The fingerprints are left

9       by the ridge detail on your finger itself; and if you're

10      wearing gloves, then the glove is gonna cover the ridge

11      detail; therefore, you're not gonna leave any of the

12      ridge detail on the object that you touch.

13              Q.  Now, when you find a fingerprint, is there

14      any way of telling how long it's been on that surface?

15              A.  Not really.  There's really no way that
        you can actually date a fingerprint.

16

17              Q.  Now, did you recover two latent
        fingerprints from this truck?



18              A.  Yes, I did.

19              Q.  Where were they?

20              A.  I recovered one partial latent fingerprint

21      on the exterior of the driver's door.  It was to the

22      rear of the exterior mirror, and the second partial

23      print that I recovered was on a turn signal, the turn

        signal lever inside the vehicle.

24

FILED
SIXTH JUDICIAL CIRCUIT

B  JUL 2 8 1999

Linda S. Frank
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

FILED
AUG 2 0 1999
Clerk of the
Appellate Court, 4th Dis.

4-99-0499

1

2          Q.   And you had no way of determining then

3    when those fingerprints were left there?

4          A.   No, there's no way I could tell that.

5          Q.   Now, were there also keys in the ignition?

6          A.   Yes, there were.

7          Q.   Did you attempt to process them?

8          A.   Yes, I did.

9          Q.   And did you find any fingerprints?

10         A.   No, I did not get any prints with

11   identifiable detail on the keys or the keychain that was

12   attached.

13         Q.   Did you also process the truck for hair or

14   fiber evidence?

15         A.   I did an examination of the interior of

16   the vehicle for hair and fiber evidence.

17         Q.   And did you recover any evidence from that

18   truck?

19         A.   Yes, I did.  When I did an examination of

20   the interior of the driver's door, there was a fabric

21   that's attached to the interior of the driver's door.

22   On that fabric, below the arm rest or door handle, I

23   recovered two dark-colored, almost black-colored hairs.

24         Q.   Did you take those into evidence?

           A.   Yes, I did.

           Q.   How did you do that?

                          302

A.   They were collected using a pair of tweezers or forceps, and they were placed into a paper fold, which is simply a piece of paper that's folded in a manner that would preserve the item that's placed inside, keep it from falling out, and can be opened up at the lab without a chance of losing the contents.

Q.   Like to show you what's been marked as People's Exhibit No. 69.

When you recovered that hair from the carpeting on the side of the driver's door, did you then preserve it in an evidence bag?

A.   Yes, I did.

Q.   I'd like to show you People's Exhibit 69. Do you recognize the outside of that bag?

A.   Yes, I do.

Q.   And then when you recovered them, did you seal that bag?

A.   Yes, I did.

Q.   And do you recognize your red seal on that bag?

A.   Yes, it's the red seal across the top, and it is marked with my initials and the date of 2-25-98.

Q.   Now, were there any other openings on the bag at the time?

A.   No, this bag was unused at the time that I

303

first used it.

Q. So, the yellow seal on the bottom was not on it?

A. No.

Q. Do you recognize that as an Illinois State Police Forensic Science Laboratory seal?

A. Yes, they have their own tape.

Q. Now, did you also recover any other fiber or hair evidence from the truck?

A. I did. I did an examination of the driver's seat. After doing a visual examination, method I used to collect any hairs and fibers off of a seat when it's a large area is a method called taping.

We use a -- In our case, we use a four-inch wide, it's a book-binding tape manufactured by 3M.

What I do is roll a strip of the tape, place it across the fabric of the seat itself, and press it onto the seat and then lift it off. Any loose fibers or hairs that will be present on that seat will adhere to the glue on the tape.

And what I'll do is methodically go down the back of the seat and also the bottom portion of the seat itself, try to collect up any hairs or fibers that may be present.

That tape is then folded onto itself, is

304

packaged in an envelope or a paper fold, and it's

forwarded to the lab where it can be -- the glue can be

dissolved and any fibers or hairs present can be

collected for comparison.

Q.   And, in fact, is that a forensically

recognized method of collecting such evidence?

A.   Yes, it is.

Q.   And like to show you then People's Exhibit

No. 68, and ask if you recognize your markings on that.

A.   Yes, I do.

Q.   Can you tell us what that is, please?

A.   This is a manilla envelope containing the

taping of the driver's seat that I did on February 25th.

Q.   And as you look at that, do you again

recognize your red seal and your markings across the

seal?

A.   Yes, it has my initials and the date

across the back of the seal.

Q.   And was that exhibit totally sealed then

when you took it into evidence?

A.   Yes, it was.

Q.   And was the yellow seal again on the

bottom at the time?

A.   No.

Q.   Now, with both of these items, then, did

305

1

2      you turn these over to Champaign Police Department

3      Detective Don Shepard subsequently?

4              A.  Yes, I did, later that afternoon.

5              Q.  As you were processing the truck, did you

6      also observe a piece of yellow paper inside the truck?

7              A.  Yes, I did.

               Q.  Where was that?

8              A.  It was located in a center console area

9      between the two seats.  Truck was equipped with two

10     individual bucket type seats, and it was in between the

11     seats, kind of on the top of the console area.

12             Q.  And did you also locate Camel cigarettes

13     and a cassette tape?

14             A.  Yes, there was a -- well, there was a

15     Camel cigarette box which was on the floor of the

16     driver's side near the gas pedal, along with a cassette

       tape, I believe it was a Maxell brand, and there were

17     two -- there was two additional cigarette packages,

18     Camel cigarettes packages that were between the two

19     seats.  One of them was in the center console area, and

20     the second one was in the area of the driver's seat and

21     the center console.

22             Q.  Like to show you three more photographs,

23     Investigator.  First of all, showing you 59C, does that

       picture show the Camel cigarettes you're referring to on

24

                                306

the floorboard?

      A.   Yes, it does.

      Q.   And that also is the tape?

      A.   Yes.

      Q.   Now, with regards to that piece of paper, I'd like to show you 59A.  Does that depict where you found that piece of paper inside the truck?

      A.   Yes, it does.

      Q.   And then is 59B a closer perspective of that same piece of paper?

      A.   Yes, it is.

      Q.   All these photographs that you've identified here in court today, do they truly and accurately depict the way those things looked as you were processing the truck on February 25th of 1998?

      A.   Yes.

      Q.   Also like to show you then, finally, People's Exhibit No. 67, with regards to that yellow piece of paper, ask you to look at this.  Do you recognize that?

      A.   Yes, I do.

      Q.   And what is that?

      A.   This is the yellow piece of paper that was depicted in the photographs earlier.

      Q.   And what does it contain as far as

writing, if anything?

A.   There were two sets of numbers on it, 1972, and under that was 2810.

Q.   Now, at the time that you saw it in the truck, did it have the powder on it?

A.   No, it did not.

Q.   Do you recognize that from your training?

A.   Yes.  That would be as a result of chemical processing at the forensic laboratory in attempt to obtain any latent prints that might be present on the paper.

Q.   With the exception, then, of that processing, is the writing altered in any way?

A.   No.

Q.   And was that the only writing on it at the time?

A.   Yes.

MS. LADD:   Thank you.  I'd tender this witness.

THE COURT:   Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.   You're not the one who actually does the laboratory examination; are you?

A.   No, I am not.

308

Q. So that the only job that you have in this investigation was the actual collection of this evidence; correct?

A. The collection and the photography and preservation for later processing, yes.

Q. And so that when you completed your job, you turned the evidence over to someone else who actually examines it; correct?

A. Correct.

Q. And there wasn't anything on the evidence collected that -- Let me rephrase.

There was nothing on the evidence you collected that led to any particular individual in your mind; was there?

A. Not at the time that I collected, no.

Q. You could not say whose hair that was or whose prints those were or anything like that; could you?

A. No, I don't have that training.

Q. You also didn't do any examination of the -- of the handwriting on that paper to see if you could identify whose handwriting it was; did you?

A. No, ma'am, I have no training in that area.

Q. Could you tell from your -- from the

309

lifting that you made of the hair whether it was animal hair or human hair?

A.  No, I could not.

Q.  Could you tell whether it was Negroid or Caucasian hair?

A.  No, I could not.

Q.  Or Asian hair, for that matter?

A.  No, I -- when I see a hair, basically, I collect it up, and that's left to the forensic scientist.  They have the training and that background.

Q.  And so you recognize it as a hair, but you cannot recognize it any further than that?

A.  As some type of hair, yes.

MS. LENIK:  Nothing further.

MS. LADD:  I have no further questions.  Thank you.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

MS. LADD:  Call Investigator Robb Morris.

(Witness sworn.)

ROBB MORRIS

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

310

BY MS. LADD:

Q.   Could you please state your name.

A.   My name is Robb Morris.

Q.   And what is your occupation?

A.   I'm a detective with the Champaign Police Department.

Q.   How long have you been a police officer?

A.   About eight and a half years.

Q.   Were you so employed as an investigator with the Champaign Police Department then on March 7th of 1998?

A.   Yes, I was.

Q.   In your professional capacity, did you assist in the investigation of an aggravated arson at 512A South New Street?

A.   Yes, I did.

Q.   Specifically, did you meet with a Donrico Holtzclaw at his residence at 404 East Clark, No. 2, in Champaign, Illinois?

A.   Yes, I did.

Q.   And what was the purpose of going there?

A.   To interview him regarding the events that occurred on New Street.

Q.   Is he related to Dedric Moore?

A.   Yes, he is.

311

MS. LENIK:  Objection.  Hearsay.

THE COURT:  I'll sustain the objection at this point.

Q.  (by Ms. Ladd)  What was the significance of Donrico Holtzclaw with relationship to Dedric Moore?

MS. LENIK:  Objection.  Hearsay.

MS. LADD:  Not for the truth of the matter asserted, but why he did what he did, Your Honor.

MS. LENIK:  Same objection.

THE COURT:  Overruled.  You may answer.

A.  I believe it's his brother, half brother.

MS. LENIK:  Objection.

THE COURT:  Overruled.

Q.  (by Ms. Ladd)  Again, what was the significance?

A.  I believe it's his brother, half brother.

Q.  Did you then ask Donrico Holtzclaw for permission to take a sample of blood?

A.  Yes, I did.

Q.  And did you explain to him why?

A.  Yes, I did.

Q.  And what was that?

A.  That we wanted to eliminate him as a possible suspect in the case.

Q.  And was there anything about where he had

312

1

2    been known to stay that caused you to do that?

3           MS. LENIK:  Objection.  Hearsay.

4           THE COURT:  I'll sustain the objection.

5           MS. LADD:  Again, not for the truth of the

6    matter asserted, Your Honor.

7           MS. LENIK:  Your Honor, may we approach?

8           THE COURT:  No.

9           All right.  The objection's overruled.  You

may ask.

10           MS. LENIK:  Your Honor, may we --

11           THE COURT:  We'll make a record on this

12    afterwards, Ms. Lenik.

13           MS. LENIK:  Thank you.

14           A.  We received some information that several

15    young men that had been known to frequent that --

16           MS. LENIK:  Same objection.

17           THE COURT:  Overruled.

18           A.  And that Mr. Holtzclaw was one of them.

19           Q.  (by Ms. Ladd)  Were known to what?  I'm

sorry.

20           A.  Frequent the address on South New Street.

21           Q.  Would that be 512A -- I'm sorry.

22           MS. LENIK:  Objection.  Leading.

23           Q.  (by Ms. Ladd)  South New?

24           THE COURT:  Overruled.

PENGAD/INDY. MUNCIE. IN 47302

SF-IL-24A

A.  Yes, it would be.

Q.  (by Ms. Ladd)  Then did Mr. Holtzclaw consent to taking his blood?

A.  Yes, he did.

MS. LENIK:  Objection.

Q.  (by Ms. Ladd)  Where did you go?

MS. LENIK:  Hearsay.

THE COURT:  Overruled.

A.  I took him to Carle Hospital.

Q.  (by Ms. Ladd)  And did you meet with a nurse named Roger Hobbs?

A.  Yes, we did.

Q.  Were you present when Nurse Hobbs then drew blood from Donrico Holtzclaw?

A.  Yes, I was.

Q.  And did Mr. Hobbs then place those samples into a collection kit for evidence?

A.  Yes, he did.

Q.  And did he seal it in your presence?

A.  Yes, he did.

Q.  Did you then take that kit into evidence?

A.  I did.

Q.  Like to show you People's Exhibit 65 and 66.

First of all, showing you 65, which is a box,

314

as you look at that, do you recognize that, Detective?

A. Yes, I do.

Q. And what is that?

A. It's the box that the evidence -- the blood and hair fibers were collected in.

Q. And is that for Donrico Holtzclaw?

A. Yes, it is.

Q. And then as you open it up, do you find People's Exhibit No. 65, and I ask you to pull out the envelope, is that contained within?

A. It's marked as 66, but --

Q. I'm sorry.

A. Yes, it is.

Q. And the box is 65?  I misspoke.

A. Yes, it is.

Q. As you look at People's Exhibit No. 66, then, do you recognize the markings on that as well?

A. Yes, I do.

Q. And what is that?

A. It's blood sample on filter paper that the nurse took.

Q. And then are there also whole tubes of blood in there as well?

A. Yes, there are.

Q. Now, was that sealed and then placed into

315

1

2      the kit in your presence, in other words, People's

3      Exhibit 66, the sterile paper?

4              A.   Yes, it was.

5              Q.   And then was the kit also sealed?

6              A.   Yes, it was.

7              Q.   And did you sign the seals where the red

       seal is with your initials?

8              A.   Yes, I did here on this corner.

9              Q.   Did you then secure this entire exhibit

10     into evidence at the Champaign Police Department?

11             A.   Yes, I did.

12             Q.   And because it involved blood, in fact,

13     was it refrigerated?

14             A.   Yes, it was.

15             MS. LADD:   Thank you.   I'd tender this

       witness.

16             THE COURT:   Ms. Lenik?

17                      CROSS-EXAMINATION

18                      BY MS. LENIK:

19             Q.   Mr. Holtzclaw did not show you any birth

20     certificates; did he?

21             A.   No, he did not.

22             Q.   And the only information that you have

23     about his relationship to anybody is what he told you;

       correct?

24
                              316

A.  Yes.

Q.  You never checked the county clerk's office for birth certificate records; did you?

A.  No, I did not.

Q.  And you never checked any other kind of verification records to find out whether anything he told you was true; did you?

A.  I checked his ID.

Q.  And his ID had the same name on it that he gave you; correct?

A.  That's correct.

Q.  And it had an address; correct?

A.  I'm sure it did, though, I don't remember what it was at the time.

Q.  And it didn't have any information about parentage; did it?

A.  No, it did not.

Q.  And any infor -- You -- You had not been, in your capacity as a Champaign Police Department investigator, watching the residence next door to the residence that got burned; had you?

A.  Prior to the occurrence?

Q.  Right.

A.  No.

Q.  So, you don't know who, because you didn't

317

see anybody, was living or spending time at that
residence; do you?

       A.  I did not have personal knowledge of that,
no.

       Q.  You didn't see anybody on that porch or on
that -- in that house prior to this incident; did you?

       A.  No.

       Q.  So, any knowledge that you attained about
who might have been living there, staying there, or
visiting there you got from someone else; correct?

       A.  Correct.

       MS. LENIK:  Nothing further.

       THE COURT:  Anything else?

       MS. LADD:  No.  Thank you, Your Honor.

       THE COURT:  You may step down.

                 (Witness excused.)

       MS. LADD:  Your Honor, at this time, I'd like
to ask the Court to read two stipulations that would be
pertaining to Robert Gleeson and Roger Hobbs.

       THE COURT:  All right.  This is a stipulation
as to the testimony of Robert Gleeson.

       "Now come the People of the State of Illinois
by Heidi Ladd, Assistant State's Attorney, and the
Defendant, Dedric T. Moore, by his attorney, Diana
Lenik, who hereby stipulate and agree to the following:

318

No. 1, that Robert Gleeson is employed as Assistant Vice President for the First Midwest Bank.  As Assistant Vice President, part of Robert Gleeson's job responsibilities include being responsible for keeping and maintaining business records of transactions at First Midwest Bank ATM machines.  No. 2, Robert Gleeson would testify that People's Exhibit No. 7 is a true and accurate copy of the business records of February 24 and 25, 1998, for the First Midwest Bank ATM machine located at 812 Springfield, Champaign, Illinois.  No. 3, Robert Gleeson would testify that, A, it is the regular course of business to make this record; B, the record was kept in the regular course of business; C, the record was made at or near the time of the matter recorded; D, the record was made at or near the time of the events or transactions recorded; E, the record was made by recognized standard electronic computer equipment which produces an accurate record when it is properly employed and working, which it was on February 24 and 25 of 1998.

You are to consider this stipulation of facts in the same manner as if Robert Gleeson had testified in court."

The following is a stipulation as to the testimony of Roger Hobbs.

"Now come the People of the State of Illinois

319

by Heidi Ladd, Assistant State's Attorney, and the
Defendant, Dedric T. Moore, by his attorney, Diana
Lenik, who hereby stipulate and agree to the following:
No. 1, that Roger Hobbs is employed as a Licensed
Registered Nurse in the State of Illinois and was so
employed on March 5 of 1998.  No. 2, on March 5 of 1998,
at Carle Hospital, Urbana, Illinois, Nurse Hobbs
collected blood specimens from Donrico Holtzclaw in
specialized sterile vacutubes and on a sterile filter
paper following established medical and scientific
procedures to insure that the samples were not
contaminated.  Nurse Hobbs then sealed the filter paper
specimen in the sterile collection envelope, which is
identified as People's Exhibit No. 66.  He then placed
all the specimens in the evidence collection box, which
is marked as People's Exhibit No. 65, and turned it over
to Investigator Robb Morris of the Champaign Police
Department, who was present during this collection of
specimens.

        You are to consider this stipulation of facts
in the same manner as if Roger Hobbs had testified in
court."

        Ms. Ladd, are those the two stipulations?
        MS. LADD:  Yes.  Thank you, Your Honor.
        THE COURT:  Ms. Lenik?

320

1

2          MS. LENIK:  They are.

3          THE COURT:  All right.  Ms. Ladd, anything

4   else for the morning?

5          MS. LADD:  No.  Thank you, Your Honor.

6          THE COURT:  Ladies and Gentlemen, we are going

7   to take the noon break at this time.  Please don't

8   discuss the case among yourselves or with anyone else.

9          I've got some matters that I have to take care

10  of at 1 o'clock, but I want you back in the jury room by

11  1:15, and we'll get you out as quickly as we can

12  thereafter.

13         Again, don't discuss the case among yourselves

14  or with anyone else.

15         Be in recess for the morning.

16         (The following proceedings were had out of the

17  presence and hearing of the jury.)

18         THE COURT:  We'll show the following is out of

19  the presence of the jury.

20         MS. LADD:  At this time, could I move to admit

21  People's Exhibit No. 4, the original videotape?

22         THE COURT:  Ms. Lenik, any objection?

23         MS. LENIK:  No.

24         THE COURT:  All right.

           MS. LADD:  Thank you.

           THE COURT:  It'll be admitted.

                          321

We'll make sure that all of the jurors are in the jury room by the time we get Mr. Moore back over here.

Ms. Lenik, apologize, as to the objection concerning the testimony of Officer Morris?

MS. LENIK:  Your Honor --

THE COURT:  Go ahead.

MS. LENIK:  Regardless of what the State's Attorney says, and I'm not impugning her bona fides, it seems to me surprising that whenever somebody merely mouths the words "It's not for the truth," all of a sudden, an objection which had previously been sustained is now overruled.

It cannot be for anything other than the truth when an officer testifies that he found or that he received information that somebody was the brother or half brother of the Defendant.

Yes, certainly, it's information that he uses in the course of his investigation, but when I earlier asked a different officer about something that he learned in the course of his investigation, that objection was sustained, and I assumed it was sustained because it doesn't matter what the officer learns in the course of his investigation; that if it's hearsay, in fact, it's hearsay, and it is hearsay whether or not the

322

individual was his half brother, because, obviously, this -- this witness wasn't present at the birth, and the only way you know of a relationship if you're not present at the birth or that -- or have some other documentation is you learn it from hearsay.

He's not -- Even if you're a member of the family, technically, when you ask someone who their parents are, it's hearsay because you -- you know because you've been told that.

I mean, it seems to me that there's nothing which is a greater exemplification of what hearsay is than learning somebody's parentage or somebody's relationship to someone else.

Furthermore, whether or not several young men were, quote, known to frequent some other place is about as indicative of hearsay as somebody's relationship.

If this officer wasn't there and he wasn't there and he never was there beforehand, he didn't -- it's not a situation where the police had some interest in a residence and so stationed certain officers across the street to do surveillance and so they were watching a residence as they may do in drug cases and could say, "We watched this residence and we saw certain people go in and out and we know as a result of our own knowledge that certain people are known to frequent a certain

323

residence."  This is not the case.

This is hearsay information which was given to the officer by persons unknown for whatever means without any way to be able to cross-examine those persons as to how they knew and whether there was any accuracy to the information that they gave the police.

And to say that it isn't hearsay simply because the officer used it, any information the officer uses, therefore, is not hearsay, and I believe that to be an incorrect ruling, because it's about the greatest exemplification of hearsay, and just because Ms. Ladd says it's not being used for the truth doesn't stop the information that the jury gets from it which is the truth.

THE COURT:  Well, Ms. Lenik, it is hearsay, but there are exceptions to the hearsay rule.  And one of those exceptions is as occurs in just about every criminal case when police are dispatched, there's a question asked, "And what was the nature of the dispatch?"  All of the answers as far as those questions are concerned are hearsay, but they're not designed, they're not intended for the truth of the matter asserted.  They're intended to show what it is the police did and why they did it.

MS. LENIK:  And I didn't object to any of

324

those.

THE COURT:  Well, but that was the basis for the Court's ruling as far as Officer Morris is concerned.

The second portion of your objection dealt with the statement that he made that males were known to frequent the area.

Now, that is hearsay, but it is also cumulative.  We had testimony from the victim that she had seen other young men around the neighboring duplex as well as Mr. --

MS. LADD:  Perkinson, Your Honor.

THE COURT:  Perkinson was the other witness who lived in the duplex down the way.

So, we already had two witnesses who had seen people around that duplex, 512B.

Officer Morris was again responding to a question.  The answer which was hearsay.

But, again, it was designed to show why it was that he went to see Mr. Holtzclaw and why it is he did what he did.

Hearsay, but I am ruling that it's an appropriate exception to the hearsay ruling.

And, also, that the testimony from Officer Morris as far as anybody, the young males hanging around

325

the area was cumulative and that we already had the testimony of two eyewitnesses.

MS. LENIK:  Your Honor, there is a difference, though, between two neighbors saying that they've seen certain people and a police officer, because whenever a --

(Interruption.)

THE COURT:  Sir, please step out.

MS. LENIK:  That's seen certain people that always contains the ominous possibility that the police were looking for or had knowledge of or that there was something wrong with those individuals, and I know that the Court can understand the concern that there's a qualitative difference between the police having information about something and a neighbor simply seeing other people there, and so I don't think it's the same.

I don't think it's qualitatively the same as simply having the neighbor say, "Yeah, well, I used to see some guys there and they were this and they were that."

The police saying that they received information makes people think it came from an informant, it came from a confidential source, it came from someone else who had been arrested; but people have a different belief about information when the police say

326

they got that information.

And I think that the Court should recognize that and instruct the jury that just because the police say they got the information that there isn't anything necessarily sinister about it and it doesn't mean that either this individual or my client or someone else has a record, was arrested, is a subject of the police curiosity, or anything like that.

THE COURT: Ms. Lenik, the jury will also get an instruction as part of IPI 1.01 that any evidence that was received for a limited purpose should not be considered by you for any other purpose.

You're free to argue in your closing argument that paragraph seven of 1.01 deals with the type of hearsay that you're objecting to. And I think the argument you're making to the Court is an appropriate argument in closing argument when you are explaining what that limiting paragraph means.

I am not going to change the Court's ruling, and your objection is noted; and as I've indicated, I think the jury will be properly instructed as to what to do with evidence that was admitted for a limited purpose.

All right. We'll take a break.

Officer, if you'd leave the correctional

327

center about 1:15.

        (Recess taken.)

        THE COURT:  Ms. Ladd, are you ready for the jury to be brought out?

        MS. LADD:  Yes.  Thank you.

        THE COURT:  Ms. Lenik?

        MS. LENIK:  I am.

        THE COURT:  All right.  Mr. Rasmus, bring in the jury.

        (The following proceedings were had in the presence and hearing of the jury.)

        THE COURT:  You may be seated.

        Afternoon, Ladies and Gentlemen.

        THE JURY:  Afternoon.

        THE COURT:  Ms. Ladd, call your next witness.

        MS. LADD:  Thank you.  I'd call Harry Washburn.

        (Witness sworn.)

        HARRY WASHBURN

        called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

        DIRECT EXAMINATION

        BY MS. LADD:

        Q.  Could you please state your name.

A.   Harry Washburn.

Q.   Could you spell your last name for us, please.

A.   W-a-s-h-b-u-r-n.

Q.   And what is your occupation?

A.   I'm a realtor and own income property here in Champaign-Urbana.

Q.   Is one of the properties you own a duplex that's located at 512 South New Street in Champaign?

A.   Yes, ma'am.

Q.   Direct your attention back to February 25th of 1998, were you the owner of that duplex at that time?

A.   Yes, ma'am.

Q.   Like to show you a photograph of People's Exhibit No. 42.  Mr. Washburn, as you look at that, do you recognize that as a photograph of that duplex?

A.   Yeah, that's it.

Q.   Now, is it correct then that the north side of that duplex was rented in February to a single occupant?

A.   Yes, ma'am.

Q.   And who was that?

A.   Lori Hansen.

Q.   And then was the south side also rented to

someone?

            A.   Yes.

            Q.   And who was that?

            A.   A Lillie Moore.

            Q.   Now, direct your attention to that date, February 25th of 1998, did anyone have permission or authority to damage any portion of that building by the use of fire?

            A.   No, ma'am.

            Q.   And ask you if you would look at the gentleman seated at counsel table in the plaid shirt. Did that individual have any permission to damage any portion of your building located at 512 South New Street in Champaign?

            A.   No, ma'am.

            MS. LADD:   Thank you.   I'd tender this witness.

            THE COURT:   Ms. Lenik?

                        CROSS-EXAMINATION

                    BY MS. LENIK:

            Q.   You don't know who this individual sitting next to me is; do you?

            A.   I do now.

            Q.   And on the 25th of February of 1998, you didn't know him; did you?

                        330

A. No.

Q. And you know who he is now because the State's Attorney told you who he was; correct?

A. Yes, ma'am.

Q. You didn't know through any other knowledge; correct?

A. No, not to look at him, no.

Q. And the State's Attorney told you that she was gonna be asking you to look at the person who's gonna be sitting at this side of the table next to the defense attorney; correct?

A. Yes.

Q. And she told you that that person would be the person charged with the crime; correct?

A. I don't recall that, but.

Q. Well, she told you he'd be the Defendant; right?

A. He's the Defendant, yes.

Q. And you know that the Defendant is the person who's charged with the crime?

A. Yes.

Q. And so you know in looking around the courtroom that this is the person you're supposed to pick out?

MS. LADD: Objection, Your Honor. It's not a

picking out.  It's asking --

THE COURT:  Sustained.

Q.  (by Ms. Lenik)  You know that this is the person who was charged with burning down this house; right?

A.  If his name's Dedric Moore.

Q.  Well, I'm asking you -- Let me -- Let me go back one.  The name Dedric Moore didn't mean anything to you on February 25th; did it?

A.  No.

Q.  The name Dedric Moore doesn't mean anything to you today except that if this person is that person, then he's the one who's charged with burning down the house; right?

A.  Um, gee, I don't even know how to answer that.  You want to try again?

Q.  All right.  You don't have any other connection to him; do you?

A.  To -- To this gentleman?

Q.  To a person -- To a person named Dedric Moore?

A.  I didn't know who Dedric Moore was until I talked to the State's Attorney's Office last week.

Q.  You didn't see him burn down that house; did you?

332

A.  No.

Q.  You didn't see anybody burn down that house; did you?

A.  Nope.

Q.  And you were not there on the 24th or the 25th of February until after the fire; correct?

A.  Correct.

Q.  And do you recall what time you got there on the morning of the fire?

A.  I was woken up at my house around 4 o'clock in the morning by the Champaign Police Department telling me that there is a fire at 512 South New.

Q.  And, at that point, you --

A.  I got up and went over there.

Q.  Got dressed and went to the fire?

A.  Yes, ma'am.

Q.  And when you got there, you didn't see anybody present?

A.  The firemen, the police.

Q.  That's it?

A.  Yes, ma'am.

Q.  And nobody was pointed out to you at the scene as being the person who started it; correct?

A.  No.

333

1

2          MS. LENIK:  No other questions.

3          THE COURT:  Ms. Ladd?

4          MS. LADD:  I have nothing further, Your Honor.

5   Thank you.

6          THE COURT:  Thank you.  You may step down.

7                              (Witness excused.)

8          MS. LADD:  May the record reflect that the

9   person being referred to was the Defendant?

10         THE COURT:  That's correct.

11         MS. LADD:  Thank you.  I'd call Detective Don

12  Shepard.

13                              (Witness sworn.)

14                       DONALD SHEPARD

15         called as a witness on behalf of the People,

16  being first duly sworn, was examined and testified as

17  follows:

18                     DIRECT EXAMINATION

19                      BY MS. LADD:

20         Q.  Could you please state your name.

21         A.  Donald Shepard.

22         Q.  And what is your occupation?

23         A.  I'm a detective at the City of Champaign

    Police Department.

24         Q.  And how long have you been so employed?

           A.  Approximately 12 1/2 years.

                          334

Q.  And in your current assignment as an investigator, were you so employed on February 25th of 1998?

A.  Yes, ma'am.

Q.  On that date, were you called out to assist in investigating an aggravated arson that occurred at 512A South New Street in Champaign?

A.  Yes, ma'am.

Q.  And did you initially respond to that scene at around 3:55 a.m.?

A.  Yes, ma'am.

Q.  Were there other officers from the Champaign Police Department and Champaign Fire Department present already?

A.  Yes, ma'am.

Q.  Now, did you make an examination then of the exterior of that duplex area?

A.  Yes, I did.

Q.  And I'd like to show you several photographs.  Let me ask you, with regards to the window area, did you observe if any windows were broken?

A.  Yes, there was a window broke out which would be on the east side of the house.  That's the back of the house.

Q.  And did you also observe a broken front

335

window?

A.  Yes, the large window on the front was also broken out.

Q.  With regards to the window broken out in the back of the house or the east side, like to show you a series of photographs starting with People's Exhibit 35A.  Do you recognize that, Detective?

A.  Yes, ma'am, I do.

Q.  And can you tell us what that is?

A.  That is the window on the east side of the house that was broken out.

Q.  Now, showing you 35B, then, can you explain what that shows us?

A.  That's another photograph of the same window, but it's a closer shot, moved in for closer up.

Q.  Did you observe any substance in the area of that broken window?

A.  Yes, there was several pieces of glass debris laying on the ground below the window.  There was also pieces of glass debris laying on the windowsill. There was spots of what appeared to be blood on the windowsill and on some of the glass on the ground.

Q.  And showing you 35C, then, is that another picture that pertains to that same broken window?

A.  Yes, ma'am.

336

**E-FILED**
Friday, 04 May, 2007  05:10:07 PM
Clerk, U.S. District Court, ILCD

1

2      Q.   And what is that?

3      A.   That's also some of the pieces of the

4   glass debris with what appears, also, to be blood spots

5   on the ground.

6      Q.   Thank you.  Did you then collect some of

7   those pieces of glass into evidence?

       A.   Yes, I did.

8      Q.   And when you did so, did you use gloves to

9   insure that they were not contaminated?

10     A.   Yes, I did.

11     Q.   And I'd like to show you then what's been

12  marked, if I may have just a moment, Your Honor?

13     THE COURT:  Yes.

14     Q.   (by Ms. Ladd)  As People's Exhibit 22, and

15  ask you to look at this.  And do you recognize this from

16  looking at your markings?

17     A.   Yes, ma'am.

18     Q.   And is that, in fact, some of the glass

19  that you collected from the ground underneath that

20  window?

       A.   Yes, it is.

21     Q.   And when you collected the glass, did you

22  look for any substance on the glass pieces you picked up

23  for that exhibit?

24     A.   There were spots of what I believed to be

337

blood, yes.

      Q.  And were those included then on those pieces of glass?

      A.  Yes, ma'am.

      Q.  Did you then seal that package when you took it into evidence?

      A.  Yes, I did, and I also dated and initialed the seal.

      Q.  And do you recognize your markings on that red seal?

      A.  Yes, ma'am, that's my writing.

      Q.  Were there any other openings on the bag at that time?

      A.  No, there were not.

      Q.  And then there's a blue seal now on the bottom.  Was that there at the time?

      A.  No, it was not.

      Q.  Now, after you made that cursory examination of the outside of the scene, did you leave the scene to the other individuals that were processing it?

      A.  Yes, I did.

      Q.  And was Lieutenant Eddie Bain of the Champaign Fire Department then conducted in investigating his fire investigation?

338

A.   Arson investigation, yes, he was.

Q.   Did you proceed to Covenant Medical Center to meet with Lori Hansen?

A.   Yes, ma'am.

Q.   And did you interview her at that time?

A.   Yes, I did.

Q.   Did you subsequently then return to 512A South New to collect evidence that same morning, February 25th of 1998?

A.   Yes.

Q.   Was anyone with you?

A.   Yes.

Q.   Who was that?

A.   That was my brother, Charles Shepard, who is also a detective at the Champaign City Police Department.

Q.   Was there anything about the fact that you were brothers affected or would have affected the way you handled this case?

A.   No, ma'am.

Q.   Then did you document and preserve evidence from the interior of this residence?

A.   Yes, we did.

Q.   Like to show you then a series of photographs.

339

1

2          First of all, showing you what's marked

3     People's Exhibit 42, do you recognize that as being the

4     exterior of the duplex containing both duplexes?

5              A.   Yes.

6              Q.   Does that show then the residence at 512

7     South New Street, both A and B?

8              A.   Yes, it does.

9              Q.   And what residence was the one you focused

10    your investigation on then?

11             A.   It would be the one that's on the left

12    side of the picture as you're looking at this picture,

13    which would be the north end of that duplex.

14             Q.   And was that picture actually taken in the

15    morning after everything was boarded up and the

16    investigation concluded?

17             A.   Yes, it was.

18             Q.   Now, did you also examine the exterior

19    portion of 512A?

20             A.   Yes, I did.

21             Q.   And showing you 43.  People's Exhibit 43,

22    does that show the front door as you are entering?

23             A.   Yes, it does.

24             Q.   Again, has the front window been boarded

      up?

             A.   Yes, it has.

                        340

Q.  Did you also proceed into the kitchen area?

A.  Yes, I did.

Q.  What type of damage did you observe in the kitchen area?

A.  There was obvious water damage from the firefighters being there.  There was also items that were strewn about, and obvious damage from fire on several items throughout the entire duplex.

Q.  Showing you 44A, then, is that a depiction of the kitchen area?

A.  Yes, it is.

Q.  And also showing you 44B, is that a closer view of that area?

A.  Yes, it is.

Q.  Did you locate a beer can in that area?

A.  Yes, ma'am.

Q.  And showing you 44C, then, is that a can of beer?

A.  Yes, that's a Miller High Life beer can, 12-ounce beer can that was located there on the counter.

Q.  Did you take that into evidence?

A.  Yes, I did.

Q.  Now, were there other empty cans that had been knocked out of a recycling bag in the refrigerator?

341

1

2          A.   Yes, there were four laying on the floor.

3          Q.   Now, I'd also like to show you what's been

4    marked as 45A, do you recognize that as another view of

5    that same kitchen area?

6          A.   Yes, it is.

7          Q.   And showing you 46A, does that then take

     you into the living room area?

8          A.   Yes, it does.

9          Q.   And then did you observe extensive damage

10   in that area as well?

11         A.   Yes.

12         Q.   And is that what's depicted in the

13   photograph?

14         A.   Yes, it is.

15         Q.   Then did you also examine the bathroom

     area?

16         A.   Yes, ma'am.

17         Q.   Like to show what's been marked as, first

18   of all, 47A, does that depict the bathroom area?

19         A.   Yes, it does.

20         Q.   And 47B, does that specifically show the

21   bathtub and soap dish area in that bathroom?

22         A.   Yes, it does.

23         Q.   Now, did you locate any piece of evidence

     in that bathroom area?

24
                              342

1

2          A.  Yes, ma'am.

3          Q.  And what was that?

4          A.  That was a cigarette butt that was laying

5     on the floor.  Be on the right side of the doorway as

6     you walked into the bathroom.

7          Q.  If I could ask you if I could collect

      those photographs from you, Detective.

8          Did you then take that cigarette butt into

9     evidence?

10         A.  Yes, ma'am.

11         Q.  And, again, with all the collection of

12    evidence, were you using the gloves to make sure that

13    you didn't contaminate the evidence?

14         A.  Yes, ma'am.

15         Q.  When you took that cigarette into

16    evidence, were you able to determine the make of the

      cigarette?

17         A.  Yes, ma'am.  It had Newport on the -- up

18    close to the filter.

19         Q.  I'd like to show you what's been marked as

20    People's Exhibit No. 19.  First of all, ask you to take

21    a look at the outside packaging.  Do you recognize that?

22         A.  Yes, ma'am.  Again, it's my handwriting on

23    it.

24         Q.  And is that what you filled out, again, as

                              343

you collected it at the scene on February 25th of 1998?

A.   Yes, ma'am.

Q.   Do you recognize your seal on that bag?

A.   Yes, I do, and, again, it has my initials and the date across the seal where I sealed it.

Q.   And was it broken or unsealed in any other place?

A.   No, ma'am.

Q.   Was the blue seal on it at the time?

A.   No, ma'am.

Q.   Now, what I'm gonna do is open it up. Now, there's a little package in here.  Was that your seal or was that put on there by the lab?

A.   That was -- The blue seal is not mine. The red seal is mine.

Q.   And, again, is this an envelope then that you used to collect that cigarette butt in?

A.   Yes, it is.

Q.   And, again, did you seal that using the same technique you described?

A.   Yes, I did.  I initialed it and dated on all of the seals that I put on it, two seals.

Q.   And was it broken or opened in any way after you sealed it?

A.   No, ma'am.

344

1

2          Q.  As you look inside that then, do you see

3    the cigarette butt that you recovered and took into

4    evidence?

5          A.  Yes, ma'am.

6          Q.  And you were able to read the writing on

     that cigarette butt?

7          A.  Yes, ma'am.

8          Q.  And what did it say?

9          A.  Said Newport.

10         Q.  Now, you also then secured this in

11   evidence; is that correct?

12         A.  Yes, ma'am.

13         Q.  Also like to show you a photograph with

14   respect to that cigarette butt.  Showing you People's

     Exhibit 47D, does that show where the cigarette butt was

15   collected from?

16         A.  Yes, it does.

17         Q.  And that area that's shown in that

18   photograph, where is that?

19         A.  That's in the bathroom on the right side

20   of the door as you enter the door.

21         Q.  Thank you.  Now, did you also make any

22   observations about the hallway area of the residence?

23         A.  Yes, ma'am.

24         Q.  And what did you observe in the hallway?

345

A.   Again, there was that obvious water damage as well as fire damage.  There were also items strewn about.

Q.   Did you take, in fact, one of those items into evidence?

A.   Yes, I did.

Q.   I'd like to show you another series of photographs.  Showing you 48A, is that a picture of the hallway with the items you've described?

A.   Yes, it is.

Q.   And showing you 48B, is that a closer perspective?

A.   Yes, it is.  Actually, the first one is a view looking down the hallway into the bathroom.  The second one is where the hallway turns to the left in front of the bathroom to enter a bedroom, and that second one shows the hallway going down toward the bedroom.

Q.   And finally showing you 48C, can you tell us what's in that photograph?

A.   That's a pair of pink shorts with a drawstring at the top.

Q.   What condition were the shorts in?

A.   Wet as well as very dirty and wrinkled and crumpled.

346

Q.  Did you take those into evidence then?

A.  Yes, I did.

Q.  I'd like to show you another exhibit then.
Showing you People's Exhibit 17, first of all, I'd ask
you to look at that packaging.  Do you recognize, again,
your packaging?

A.  Yes, ma'am.

Q.  And did you seal it, again, after you took
it into evidence?

A.  Yes, I did.

Q.  And as you open that up, do you recognize
the shorts as you look into that package?

A.  Yes, they are the shorts that I collected
in the hallway that day.

Q.  And did you again seal this package so
there were no other seals or openings on it other than
your red one?

A.  Yes, ma'am.

Q.  Now, did you also make any observations
about the bedroom area of the house?

A.  Yes, I did.

Q.  Can you describe what you observed?  Are
there two bedrooms in this -- Actually, it's a duplex.
I misspoke.  Are there two bedrooms?

A.  Yes, ma'am, there are.

347

1

2          Q.  And did you recover anything from the two

3   bedrooms?

4          A.  I recovered items of evidence from the

5   southwest bedroom.

6          Q.  And what was that?

7          A.  There was an end table sitting there.

8   There was a ball of what appeared to be shoestrings and

    other small cords, and there was four pieces of white

9   paper that also appeared to have what was shoe

10  impressions on them.

11         Q.  And I'd like to show you then a series of

12  photographs.  Showing you what's been marked, first of

13  all, as 49B, do you recognize that?

14         A.  Yes, I do.  That's a picture of that

15  bedroom with the end table and the strings and the

    papers.

16         Q.  Then showing you 49C, is that a closer

17  perspective?

18         A.  Yes, it is.

19         Q.  And, again, does that show the strings

20  that you saw?

21         A.  Yes, it does.

22         Q.  Then showing you 49D, is that a close-up

23  of those strings?

24         A.  Yes, it is.

348

1

2      Q.   And you also refer to the paper that

3    appeared to have partial footwear tread on it?

4      A.   Yes, ma'am.

5      Q.   Was it complete imprint or partial?

6      A.   They were multiple partials.

7      Q.   And did you have any footwear that you

     could use to send for a comparison?

8      A.   No, I did not.

9      Q.   Now, you indicated you did take that ball

10   of string into evidence then?

11     A.   Yes, ma'am.

12     Q.   Like to show you what's been marked as

13   People's Exhibit No. 18.  Do you recognize your writing,

14   first of all, on that bag?

15     A.   Yes, ma'am, that's my writing.

16     Q.   And, again, do you recognize your seal on

     that?

17     A.   Yes, it is.

18     Q.   And was it sealed after you took it into

19   evidence with no other openings?

20     A.   Yes, ma'am, it was.

21     Q.   As you look at that, then, does it contain

22   that ball of strings and items that you described

23   finding in the bedroom?

24     A.   Yes, it does.

349

1

2          Q.  Thank you.  With regards to the bedroom

3     where you found the broken window, did you also observe

4     findings on the interior that corresponded to that

5     broken window?

6          A.  Yes, ma'am.

7          Q.  Like to show you what's been marked as

8     People's Exhibit No. 50A.  Is that an interior picture

9     that corresponds to that bedroom then?

10         A.  Yes, ma'am, that is.

11         Q.  And did you find broken glass and blood in

12    the interior portion near that window?

13         A.  Yes.

14         Q.  All these photographs that you've

15    identified, do they truly and accurately depict the way

16    that residence looked then on the morning of February

17    25th of 1998?

18         A.  Yes, ma'am.

19         Q.  The items that you collected into evidence

20    then, did you secure those at the Champaign Police

21    Department?

22         A.  Yes, ma'am.

23         Q.  And I'd like to ask you at this point to

24    step down, again, with the Court's permission, Your

Honor?

          Gonna show you a diagram marked People's

                              350

1
2      Exhibit No. 1.  And ask you if you could just step down.

3               As you look at that, do you recognize that as

4      a diagram showing the overall layout of 512A South New

5      Street?

6          A.  Yes, ma'am, it is.

7          Q.  Does that truly and accurately depict the

       way it looked on February 25th of 1998?

8          A.  Yes, it does.

9          Q.  And is it labeled correctly with regards

10     to the rooms and the different items?

11         A.  Yes, ma'am.  This would be the bathroom

12     here (indicating).

13         Q.  And while not necessarily to scale, is it

14     an accurate representation of the approximate size and

15     relationship?

16         A.  Yes, it is.

17         Q.  Then as you entered into it, can you show

       us, first of all, in the kitchen area or the back door,

18     is that what's labeled on the bottom as kitchen and back

19     door?

20         A.  Yes, it is.

21         Q.  Now, where you see this rear bedroom then,

22     does that correspond to the broken window with the

23     broken glass?

24         A.  Yes, down here where the green X is

                              351

PENGAD/INDY.  MUNCIE.  IN  47302

SF-IL-24A

(indicating).

Q.  Could you take this marker and put a 22 then for where you collected People's Exhibit 22, the broken glass with what appeared to be blood?

A.  (Witness complies.)

Q.  You can stand in front of it if you need to write.

Then can you also show where you collected the shorts that you identified as People's Exhibit No. 17 just by pointing to it, first of all?

A.  (Pointing.)  Be right here around the corner.

Q.  And then can you mark a 17 then to correspond to where you collected that evidence?

A.  (Witness complies.)

Q.  Now, you also described a cigarette butt. Can you show us where that was recovered from?

A.  (Pointing.)  Be right here behind the door along the wall.

Q.  Is that the one where you found the writing that corresponded to Newport?

A.  Yes, it was.

Q.  Could you put on there a number 19 for where you found People's Exhibit 19, the Newport cigarette butt?

352

1

2          A.   (Witness complies.)

3          Q.   Now, you also identified the cords that

4    you located.  What bedroom were those found in?

5          A.   They were in the front bedroom here on

6    this scale.

7          Q.   And could you then write a number 18 where

8    you located those cords that you identified?

8          A.   (Witness complies.)

9          Q.   As you marked this exhibit, then, does it

10   truly and accurately depict those items then where you

11   found them as you testified to them?

12         A.   Yes, ma'am.

13         Q.   Thank you.  If you could resume the

14   witness stand.

15         A.   Thank you.

16         Q.   Now, did you also have occasion to recover

     some items that morning from Dorothy Cummings?

17         A.   Yes, I did.

18         Q.   How did that take place?

19         A.   Actually, as Detective Charles Shepard and

20   I were leaving the duplex, I was approached by Dorothy

21   outside the duplex.  She walked up and handed me a

22   checkbook.  She told me that it had the name of Lori

23   Hansen --

24              MS. LENIK:  Your Honor, I'm going to object to

                              353

what she told him.

THE COURT:  I'll sustain the objection.

Q.  (by Ms. Ladd)  Was there information you received that you relied on in taking it into evidence?

A.  Yes, ma'am, there was.

MS. LENIK:  Your Honor, same objection.

THE COURT:  There's no hearsay there.  The objection's overruled.

Q.  (by Ms. Ladd)  And did you then proceed to her residence to collect those items?

A.  Yes, I did.

Q.  Then I'd like to show you a series of items.  First of all, showing you People's Exhibit No. 24, do you recognize this then?

A.  Yes, I do.

Q.  And can you just tell us what that is?

A.  That is a black bag which has camel shapes on it, and it was a handbag that was recovered from a mud puddle.

Q.  Now, there are also notebooks and papers in there.  Were those also from that mud puddle?

A.  Yes, there were -- in fact, there were other forms of identification with the name Lori Hansen on it.

Q.  Like to show you then additional exhibits.

354

1

2          First of all, showing you People's Exhibit 24A, do you

3    recognize that?

4          A.  Yes.  That's a cordless phone that was in

5    that camel bag when it was recovered out of the mud

6    puddle.

7          Q.  Did you then put it in a separate evidence

     bag for packaging?

8          A.  Yes, I did.

9          Q.  Did it have the fingerprint powder on it

10   at the time?

11         A.  No, it did not.

12         Q.  Other than that, does it appear to be in

13   substantially the same condition?

14         A.  Yes, it was.

15         Q.  And with each of these, did you seal them

     as you've previously described to us?

16         A.  Yes, I did.

17         Q.  Now, did you also recover other items then

18   from that camel bag?

19         A.  Yes, I did.

20         Q.  Showing you 24B, and let me show you, do

21   you recognize, first of all, your writing on that as

22   well?

23         A.  Yes, I do.

24         Q.  And what's contained in that?

                         355

A.    A Honey Brown beer bottle, I would imagine.  Yes, it's a Honey Brown beer bottle, 12-ounce.

Q.    And did you recover that as well from the camel bag?

A.    Yes, I did.

Q.    Then did you also recover a coin purse or what appeared to be a wallet?

A.    Yes, I did.

Q.    Like to show you 24E, ask you to look at your packaging and the item in it.  Do you recognize that as the wallet that you recovered?

A.    That is my packaging.  It's my seal.  And, yes, that is a wallet that was found in the camel bag.

Q.    And were there also some papers in that wallet?

A.    Yes, there were.

Q.    Did you also recover what appeared to be a checkbook as well as some checks?

A.    Yes, ma'am.

Q.    And did Mrs. Cummings, in fact, show you the checks herself?

A.    Yes, she handed those to me.

Q.    Like to show you then 24C, do you recognize those as the checks?

A.    Yes, those are the checks.

356

Q. And do you also recognize your writing on the package?

A. Yes, I do.

Q. Showing you 24D, do you recognize that as the checkbook that correlated to those checks?

A. Yes, it is.

Q. And does it have an address and a name on the checks?

A. Yes, it does.

Q. And what is that?

A. It's 512 South New Street in Champaign, and the name is Lori K. Hansen.

Q. Thank you. And, finally, did you recover a keychain from inside that purse?

A. Yes, I did.

Q. Like to show you what's been marked as People's Exhibit 24F, and ask you to look at the item in the bag, and do you recognize that as the keychain?

A. It's my packaging, my writing and seal, and, yes, that's the keychain with the Illini, University of Illinois holder on it.

Q. Now, with regards to all these items, are they in substantially the same condition, with the exception of any fingerprint processing that may have gone on?

357

1

2          A.   Yes, they do, ma'am.

3          Q.   Now, did you also receive various items of

4    evidence from Lieutenant Eddie Bain that was being

5    contained in metal cans?

6          A.   Yes, I did.

7          Q.   And did you also receive evidence from

8    Investigator Michael Kyrouac that was already sealed?

9          A.   Yes, I did.

10         Q.   Were all these items then secured in

11   evidence at the Champaign Police Department for

12   transport to the Illinois Forensic Science Laboratory?

13         A.   Yes, ma'am.

14         Q.   During your investigation, did you also

15   receive into evidence a piece of paper that had PIN

16   numbers on it?

17         A.   Yes, I did.

18         Q.   Like to show you what's been marked as

19   People's Exhibit No. 67.  And do you recognize, again,

20   your writing on that?

21         A.   Yes, I do.  It's my seal.

22         Q.   Would you pull that out, and do you

23   recognize that then as the piece of paper you recovered?

24         A.   Yes, I did.  I found that in Lori Hansen's

pickup truck when I was releasing it to her with two

4-digit numbers written on it.

                              358

1

2      Q.  As you look at the writing, does the

3  writing appear to be in the same condition as when you

4  took it into evidence?

5      A.  Yes, it does.

6      Q.  Now, it has been processed and the color

7  has changed on the paper; is that correct?

8      A.  Yes, ma'am.

9      Q.  With that exception, is there anything

10 else that's different about it?

11     A.  No, there's not.

12     Q.  Does that appear in substantially the same

13 condition then?

14     A.  Yes, ma'am.

15     Q.  Thank you.

16     A.  Mm-hmm.

17     Q.  Now, I'd like to direct your attention to

18 March 4th of 1998.  Did you go to 512B South New Street

19 in Champaign?

20     A.  Yes, I did.

21     Q.  And is that the duplex that's attached to

22 512A?

23     A.  Yes, it is.

24     Q.  And were you with anyone at the time?

    A.  Yes, I was.

    Q.  Who was that?

359

A.   That was Detective Mark Strzesak and a Mr.
Sherrick (phonetic).   I don't remember his first name.
I believe it's David.

Q.   And who is David Sherrick?

A.   He is a -- He was doing an intern through
the Champaign City Police Department at the time.

Q.   Now, when you went there, then, to 512
South New Street, did you knock on the door?

A.   Yes, we did.

Q.   And did anyone answer?

A.   Yes.   Dedric Moore answered.

Q.   And do you see Dedric Moore in the
courtroom today?

A.   Yes, ma'am, I do.

Q.   Will you please point him out?

A.   He's seated at the defendant's table
wearing a pair of gold-frame eyeglasses (indicating).

MS. LADD:   May the record reflect
identification of the Defendant?

THE COURT:   It will.

Q.   (by Ms. Ladd)   Now, did you or Detective
Strzesak then ask him if he'd seen anything peculiar
around the neighbor's house at the time this happened?

A.   Yes, Detective Strzesak asked that
question.

360

Q.  And was he asked if he had any knowledge
of the incident on February 25th of 1998?

A.  Yes, he was.

Q.  What was his response?

A.  He stated that he was out of town and was
not there the night this happened.  He had no knowledge
of who would have done it.  He'd not seen anything
suspicious.

Q.  Now, then did Detective Strzesak ask him
if he had any idea who did it?

A.  Yes, he did.

Q.  And what did he say?

A.  He said that he thought the mob did it.

Q.  And did he go on to say anything further?

A.  Actually, then I interrupted -- After he
said, "I thought the mob did it," I interrupted with the
next question and asked what he meant by the mob.  He
told me he thought the Mexican mob or the Chinese mob.
I asked him why he thought the Mexican mob or the
Chinese mob, and his response was because they carry
gasoline and beat people up.

Q.  Now, at that time, did you have the lab
results from the tests of the chemicals used?

A.  No, I did not.

Q.  Did you know if gasoline was used?

361

1

2      A.  I had no -- I didn't even suspect gasoline

3  was used at that point from information I'd been given.

4      Q.  Had anyone brought up gasoline in the

5  conversation with Mr. Moore?

6      A.  No, they had not.

7      Q.  Now, did Dedric Moore also state where he

   stays?

8      A.  Yes, he did.

9      Q.  What'd he say?

10     A.  He said that he stayed over at 108 East

11  Healey Street.

12     Q.  I'm sorry.

13     A.  With his brother.

14     Q.  And who's that?

15     A.  That was, oh, Don -- Dontay Moore, I

   believe is his -- who he referred to him as.

16     Q.  Now, did he indicate if he ever stays at

17  512B South New Street?

18     A.  In fact, he stated that he had been

19  staying there for the past two nights since his

20  grandmother had left town.  His grandmother lived in

21  that residence.  And he stated that -- I asked him when

22  he had stayed there last prior to this visit, and he

23  told me that he'd not stayed there since before

   Valentine's Day.

24
                        362

Q.  Did he indicate that he did stay there periodically?

A.  Yes, he did.  He said he used to live there, actually.

Q.  Did he also talk about another brother named Donrico Holtzclaw?

A.  Yes, he did.

Q.  And what did he say about his brother, Donrico Holtzclaw?

A.  Stated that Donrico used to live there, also, for a period of time; however, Donrico had since recently moved out and that Donrico had a key to the apartment.

Q.  Did he indicate Donrico Holtzclaw had moved out some one and a half to two weeks ago?

A.  Yes, he did.

Q.  Now, did he state where his grand -- Well, did he indicate who his grandmother was?

A.  Lillie Moore was his grandmother, yes.

Q.  Did he state where she was at the time of the incident on February 25th?

A.  He stated that she had left the state a few days before the incident to go to Mississippi to visit with his mother, Dedric's mother, Patricia Holtzclaw.  And that grandma and mom had returned home

363

the same night that this incident occurred.  At about
the same time the fire department was responding to the
call.

Q.  Did you make any observations about the
Defendant's speech?

A.  Yes, I did.

Q.  And what was that?

A.  He did not enunciate his words clearly,
and he spoke kind of low, kind of mumbled.

Q.  Did you make any observations about his
teeth?

A.  Yes, I did.

Q.  And what was that?

A.  On the upper gum, just to his left side of
his center of his teeth (indicating), was two teeth
missing.  There was a space there.

Q.  Was the Defendant wearing glasses at any
time during this interview?

A.  No, he was not.

Q.  Now, later that same date, March 4th of
1998, did you serve a search warrant upon Dedric Moore
for his residence and to take his blood?

A.  Yes, I did.

Q.  And did you locate the Defendant still at
512B South New?

364

A.   Yes, I did.

Q.   And was there anyone else present at the time?

A.   Yes, there was.

Q.   Who was that?

A.   That was a Jennifer Stevens, whom both of them identified as his girlfriend.

Q.   While you were in the residence serving search warrants, then, did you observe any cigarettes on the kitchen table?

A.   Yes, there was a package of Newports laying on the kitchen table when I entered the east door which walked directly into the kitchen.

Q.   Did you take these into evidence?

A.   Yes, I did.

Q.   Like to show you People's Exhibit No. 62. Ask you do you, first of all, recognize your packaging on that?

A.   Yes, ma'am, that's my seal and my writing.

Q.   And as you look inside, then, can you pull out the contents?

A.   It's a package of Newport cigarettes.

Q.   Do they appear to be in substantially the same condition as when you took them into evidence?

A.   Yes, they are.

365

1

2          Q.   Now, did you also observe two jackets in

3    the residence?

4          A.   Yes.   Actually, Jennifer Stevens had one,

5    and the other one was found behind the couch in the

     living room.

6          Q.   When you say Jennifer Stevens had one, was

7    she wearing it?

8          A.   Yes, she was.

9          Q.   Then did you have occasion to subsequently

10   compare the pattern on those jackets to a video that was

11   taken from an ATM machine?

12         A.   Yes, I did.

13         Q.   And did the jackets match?

14         A.   No, they did not.

15         Q.   Did the Defendant identify whose jackets

     they were?

16         A.   The Defendant said that the one behind the

17   couch he wasn't sure who it belonged to.   He thought it

18   was his grandmother's.   And the one that Jennifer

19   Stevens was wearing was Jennifer's.

20         Q.   Now, did you ever recover any coats that

21   were identified as the Defendant's?

22         A.   No, I did not.

23         Q.   Now, did you also recover an Illinois

24   identification card from that residence?

                          366

A.   Yes, ma'am.

Q.   Where was that?

A.   I got that from Dedric.

Q.   And he handed it to you then?

A.   Yes, he did.

Q.   And did you ask him for it?

A.   Yes, I did.

Q.   Like to show you then People's Exhibit No. 63.  Again, do you recognize your writing on that evidence package?

A.   Yes, ma'am, that's my writing and my seal.

Q.   And if you could open it and pull out the card then, is that the identification card you took from the Defendant?

A.   Yes, ma'am.

Q.   And does it list an address?

A.   Lists the address at 512 1/2 -- 512 1/2 South New Street.

Q.   Now, is that another address that was used for 512B South New Street?

A.   Yes, it is.

Q.   Now, as you look at those, are you familiar with ID cards?

A.   Yes, I am.

Q.   Are they set up on the same format as

367

1

2    driver's license?

3              A.   Yes, ma'am, they are.

4              Q.   And then on a driver's license or an

5    identification card, is there a space then where it

6    lists if an individual has restrictions such as

7    eyeglasses?

8              A.   Yes, there is.

9              Q.   And do you see that on this identification

     card?

10             A.   Yes, I do.

11             Q.   And where is it located?

12             A.   Located at the bottom and about right in

13   the middle, just above the signature.

14             Q.   And what does it indicate with regards to

15   whether or not the Defendant wears eyeglasses?

16             A.   Says there are no restrictions.

17             Q.   Now, if an individual did wear glasses,

     what would be indicated there?

18             MS. LENIK:   Objection.  Foundation.

19             THE COURT:   He may answer, if he knows.

20             A.   There would be a B there on your driver's

21   license.  On the back of all driver licenses, there is a

22   category which lists all restrictions for the basis of

23   your driver's license.

24             Q.   (by Ms. Ladd)  As you look at this

                              368

identification card, does that appear to be in
substantially the same condition as when you took it
into evidence?

A.  Yes, ma'am.

Q.  Now, as part of the execution of this
search warrant, did you also take this individual down
to Carle Hospital?

A.  Yes, ma'am.

Q.  And was that to collect blood samples?

A.  Blood and hair, yes, ma'am.

Q.  And was that done in the presence of a
nurse then?

A.  Yes, it was.

Q.  Was that William Kilpatrick?

A.  Yes, it was.

Q.  I'd like to show you then what's been
marked as People's Exhibit No. 64.

Ask you do you recognize, first of all, your
marking on that package?

A.  Yes, ma'am, that's my writing and my seal.

Q.  Now, when Nurse Kilpatrick collected the
blood samples, were you present?

A.  Yes, I was.

Q.  And then did you take them immediately
from him?

369

A.  Yes, I did.

Q.  Now, were these particular samples in vacutubes?

A.  Yes, they were.

Q.  Again, when he handed them to you, did you immediately put them into an evidence bag?

A.  Yes, I did.

Q.  And did you seal it as shown on the outside of that evidence bag?

A.  Yes, I did.

Q.  As you look at the contents, does that appear to be the blood tubes that you took?

A.  Yes, it is.

Q.  And, in fact, are they labeled by the nurse?

A.  Yes, they are.

Q.  Now, as you look at the packaging, were there any other breaks in the seal other than the red seal you put on here?

A.  No, there were not.

Q.  So, the -- the blue seal was subsequently put on after you took it into evidence by the lab?

A.  Yes, ma'am.

Q.  Direct your attention to the next day then, March 5th of 1998, did you have occasion to

370

interview the Defendant again?

A. Yes, I did.

Q. Was this at the Champaign Police Department?

A. Yes, it was.

Q. And did he come in to talk to you at your request?

A. Yes, he did.

Q. Who was present for this interview?

A. Mr. David Sherrick was also there.

Q. Did you again ask him his whereabouts when the incident on February 25th of 1998, occurred?

A. Yes, I did.

Q. And what was his reply?

A. He stated, "Actually, I wasn't out of town. I was in Urbana."

Q. Did you ask him then about what he was doing in Urbana?

A. Yes. Actually, I asked him how he got to Urbana, and he told me that he paged a girl by the name of Jennifer to come pick him up. I asked him what Jennifer's last name was. He didn't know that. I asked him how old she was. He stated that she's about 28 years old and that she has a 9 year old daughter. I asked what her address was. He didn't know her address.

371

He said she lived over by MTD.  I asked what her phone

number was.  He didn't know that.  I asked what the

pager number was.  He provided 292-2400.

Q.  Did you --

A.  I asked --

Q.  I'm sorry, let me interrupt you.  Did you

actually try to call that number yourself?

A.  Yes, I did.

Q.  And what did you learn?

A.  That the number was not in service.  In

fact, I called that day.

Q.  And, now, I'm sorry, then take you back to

the interview then, after he gave you the pager number,

what else did he state?

A.  He stated that he paged her from Ken --

from the pay phone at First and Springfield Avenue,

First Street and Springfield Avenue in Champaign.  I

asked which pay phone.  He told me Ken Lee's Convenient

Store, which, after checking, that is the only pay phone

in that area.

Q.  So, you went out and actually checked that

area?

A.  Yes, I did.

Q.  And there is a pay phone at Ken Lee's

Convenient Store?

372

A.   Yes, ma'am.

Q.   And is there a pay phone at any of the other businesses or in that area of that intersection?

A.   There's a pay phone two blocks -- two and a half blocks south of there at First and Green, but there's none up around First and Springfield, no.

Q.   Did you also then ascertain the phone number for Ken Lee's pay phone?

A.   Yes, I did.

Q.   What is that?

A.   It's 398-9671.

Q.   Then direct you again to this interview, what did the Defendant then tell you?

A.   He told me that he called at about 12:30 a.m., shortly after midnight.

Q.   And what number did he call?

A.   The 292-2400.

Q.   And then what happened?

A.   Said that she called him back at the Ken Lee's store and she picked him up at Piccadilly Liquor parking lot, which is in the 700 -- or the 600 block of South First Street.  It's about a block and a half south of Ken Lee's.

Q.   Now, did he indicate where they went?

A.   Yes.  I asked him where they went to in

373

Urbana.  And he said that they went to a Malcolm's house

to help Malcolm move.  He said that Malcolm was evicted

the 1st of March, and Malcolm needed some help cleaning

up and moving out.  So, I asked him --

Q.  I'm sorry, about what time was this,

according to the Defendant?

A.  He said that they went there shortly after

12:30 a.m. when Jennifer picked him up.  He also made it

clear that Jennifer was not Jennifer Stevens, his

current girlfriend.  This is another girl that he had

known for approximately three years.

Q.  So, he'd known her for three years, but he

didn't know her last name?

A.  That's correct.

MS. LENIK:  Objection.  Argumentative and

asked and answered.

THE COURT:  Sustained.

Q.  (by Ms. Ladd)  Did you specifically ask

him if he knew her last name?

A.  Yes, I did.

MS. LENIK:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  Yes, I did.

Q.  (by Ms. Ladd)  And any time during that

conversation, was he able to give you a last name?

374

A.   No, he was not.

Q.   Then after he indicated that this Jennifer picked him up, what happened?

A.   I asked him where they went to in Urbana. He told me that they went to Malcolm's house, and he helped Malcolm move and clean out his house.  He stated that Malcolm had been evicted approximately March 1st, and I asked him what Malcolm's last name was.  He did not know Malcolm's last name.  I asked him how old Malcolm was and what his race was.  He said he was a black male.  He had turned 23 years old on February 14th of 1998.  And I asked him what the address was.  He told me that Malcolm lived on Vine Street.

Q.   And did he say in what town?

A.   Not at that point, no.

Q.   And then did you question him further about that?

A.   Yes.  I asked him if he was on Vine Street, which way would we need to go to find his house, what were the relation -- the intersections in relationship to his house.  He stated that it was between Prairie and Prospect.

At that point, I knew Vine Street in Urbana has no Prairie and Prospect that intersect.  Champaign does.

375

1

2          So, I asked him if he was on Vine Street

3    driving west toward Prospect Avenue from Prairie, which

4    side of the street was Malcolm's house on.  He told me

5    it was on the left side of the street.  I asked him to

6    describe the house.  He told me it was a two-story gray

7    house.  And then he said, "Oh, this is in Champaign, not
     Urbana."

8          Q.  Now, did you subsequently go out and

9    attempt to locate a gray house in the area where he

10   described it would be?

11         A.  Yes.  In fact, I located 405 West Vine

12   Street.

13         Q.  Was it on the left side of the street as

14   he described?

15         A.  It is the only two-story gray house on

16   Vine Street between Prairie and Prospect Avenue.  And it

17   is on the left side of the street, yes.

18         Q.  And then was he ever able to give you any

19   last name of this Malcolm person so you could locate
     them?

20         A.  No, he was not.

21         Q.  Were you ever able to locate any such

22   person?

23         A.  No, I was not.

24         Q.  Now, did you ask him if at the time of the

                              376

E-FILED
Friday, 04 May, 2007  05:10:30 PM
Clerk, U.S. District Court, ILCD

incident on February 25th where his grandmother was again?

    A.   Yes, I did.

    Q.   And did he again confirm she was out of town?

    A.   Yes, he said she was back in Mississippi.

    Q.   Did you ask him when the last time was that he'd stayed at 512B?

    A.   Yes, I did.

    Q.   What did he say?

    A.   He stated that he had not stayed there since Valentine's Day, shortly before Valentine's Day.

    Q.   Did you ask him or did he make a statement about drinking beer?

    A.   Yes, I did.

    Q.   And what did you ask him?

    A.   Actually, I asked him if he had any drug problems or drug habits.  His response was that he drank beer, he liked to drink beer and he liked to drink cigarettes.

    Q.   Drink cigarettes?

    A.   Or, I'm sorry, smoke cigarettes.

    Q.   In fact, did he state, "I like my beer"?

    A.   Yes, he did.

    Q.   And did he indicate if he smoked a lot of

cigarettes?

       A.  He said he smoked several cigarettes, and I asked him what brand he smoked, and he told me he smoked Newport.

       Q.  Did you ask him if those were his Newports on the table?

       A.  Yes, I did.

       Q.  And what did he tell you?

       A.  He told me that they were his.

       Q.  Did you ask him again who he thought committed the crime, the aggravated arson?

       MS. LENIK:  Your Honor, I'm going to object to this as asked and answered as well, and, at this point, it's merely argumentative and cumulative.

       THE COURT:  Overruled.

       A.  Yes, I did ask him.

       Q.  (by Ms. Ladd)  And, at that time, what did he tell you?

       A.  Again, he stated that he thought it was the mob that did it.  He thought it was either the Mexican or the Chinese mob.  Again, I asked him what made him think that.  And his response was, "Because the mob carries gasoline and beats people up.  Maybe I watch too many movies."

       Q.  Now, during this conversation, did you ask

378

him if you could photograph him?

A.  Yes, I did.

Q.  And did you start to get out a 35 millimeter camera?

A.  Yes.  In fact, I was taking the camera out of the bag when I asked him to take a few photographs of him.

Q.  And what was his response?

A.  He said that he was not gonna let me take photographs of him and that he had to leave.

Q.  And did he then leave and end the interview?

A.  Yes, he did.

Q.  Now, as part of your investigation, then, did you review telephone records that you obtained on this case?

A.  Yes, I did.

Q.  And were there particular numbers that you attempted to follow-up on then?

A.  Yes, there were.

Q.  Like to show you an exhibit, Detective, marked People's Exhibit No. 72.  Ask you, first of all, as you look at these, do you recognize those as the telephone records you reviewed?

A.  (Reviewing.)  Yes, ma'am.

379

Q.  And what do those records correspond to?

A.  These are both the incoming calls and the outgoing calls from the pay phone at Ken Lee's on First and Springfield Avenue.

Q.  And I'm wondering as you look through those records, can you mark with this highlighter then Ken Lee's telephone number for the appropriate date February 25th of 1998?

A.  The first place I'm gonna highlight will be February 25th at 2:19 and 22 -- or 28 seconds a.m. on the 25th day of February.

Q.  And what does that record show as you're reading across then?

A.  Shows 98- -- or slash mark 02/25, 217-398-9671.

Q.  And what is that?

A.  That is the phone number where the call was made from.

Q.  And do you recognize that number?

A.  Yes, that is the phone number for the pay phone at Ken Lee's.

Q.  And then as you read across, what else does it tell you then?

A.  Says 217-352-3182.  That is the phone number that was called, and the time would have been

380

02:19:28.0.  And then 3, with a colon, 04.2.

Q.  Well, let me, with regards to those telephone numbers then, does it show as you read down then any other calls that were transmitted from Ken Lee's phone number?

A.  There were two other calls.  One of them was at 12:57 and 28 seconds p.m.  And the last call on this page on the 25th was at 1:39 p.m. -- 1:39:45.

Q.  So, those would both be in the afternoon?

A.  Yes, they would, on the 25th.

Q.  Now, did you follow-up to check and see where that number went to then that was called?

A.  Yes, I did.

Q.  And where did it go to?

A.  That phone number rang in at an order company which was like a menu for placing an order by telephone.

Q.  And was it, in fact, a Spanish ordering company?

A.  Yes, it was.

Q.  Now, do you see any number then in those records that correspond to the pager number that the Defendant gave you, 292-2400?

A.  No, that number's nowhere on here.

Q.  As you read on then through those records,

381

does it also show any calls that were received in at Ken

Lee's phone on February 25th of 1998, again?

A.  Yes, it does.

Q.  And can you again highlight those, please?

A.  (Witness complies.)

Q.  And what do those records show as far as

calls received?

A.  Shows the call received came on 98/02/25

at 22:07:50, which would be 10:07 p.m. on the 25th, and

the number that called that pay phone was 359-2852.

Q.  And did you call that number?

A.  Yes, I did.

Q.  And what did you find out?

A.  I found out that that is the phone number

of a Mr. Steinman (phonetic), which was the residence

of --

Q.  That's a citizen in Champaign, in other

words?

A.  A citizen in Champaign.

Q.  Now, did you also then see another phone

call?

A.  Yes, there's one more below that which is

also to the same phone number, one minute later.  Than

the first one.

Q.  And those are both on February what date?

382

A.   25th.

Q.   And they're at 10 o'clock p.m. or sometime after 10 o'clock p.m.?

A.   Shortly after 10 p.m., yes, ma'am.

Q.   Now, when did the Defendant say he made this phone call from that phone?

A.   12:30 a.m.

Q.   And when did he say he received the call back for the pickup?

A.   He just said that she called him back right after that.

Q.   And then those are the only calls that you see correlating to that telephone number?

A.   Yes, ma'am.

Q.   Thank you.  Thank you.  During the second interview where the Defendant came down to talk to you, did you ever see him wearing glasses?

A.   No, he did not have glasses.

Q.   Now, I'd like to direct your attention next to March 10th of 1998.  Around 3:30 p.m. or at 3:30 p.m., was there a lineup that was scheduled to be conducted at the Champaign County Correctional Center lineup room?

A.   Yes, there was, ma'am.

Q.   And was there a search warrant issued for

383

the Defendant to stand in that lineup?

    A.  Yes, there was.

    Q.  And was he told to be there at 3:30 p.m.?

    A.  Yes, he was.

    Q.  Was Lori Hansen present to view that lineup?

    A.  Yes, she was.

    Q.  And were you present as well?

    A.  Yes, I was.

    Q.  Were you able to conduct that lineup?

    A.  No, ma'am.

    Q.  Why not?

    A.  Mr. Moore did not show up.

    Q.  Did he, in fact, show up an hour later?

    A.  Yes, he did.

    Q.  At that point, had you canceled the lineup after waiting?

    A.  Actually, Lori Hansen had already left.

    Q.  Now, direct your attention to the next day, March 11th of 1998, was another search warrant issued again ordering the Defendant to stand in a lineup?

    A.  Yes, he was.

    Q.  And was a lineup then conducted on that date?

A.   Yes, ma'am.

Q.   Where was that lineup conducted then?

A.   It was at the Champaign County Sheriff's Office, the downtown facility which is on East Main Street across the street here.

Q.   Can you describe the room where the lineup was held?

A.   Yes.  There's a -- It's an interview room with a large table in the middle of the room, and on one side of the room is a large two-way glass so you can stand in that room and view out into a hallway and see people in the hallway, but people in the hallway can't look in and see you.  And in that hallway, there's a door on each end of the hallway that is closed, and there are six people that are walked in to conduct the lineup, and those doors are closed then.

Q.   Now, did you then before showing the lineup to Lori Hansen read her an instruction sheet?

A.   Yes, I did.

Q.   And did you also provide that to her so she could read with you?

A.   Yes, I did.

Q.   Like to show you what's been marked as People's Exhibit No. 73.  Detective, do you recognize that as the lineup sheet?

385

A.  Yes, that's it.

Q.  And was it filled out by Ms. Hansen at all when you read it to her initially?

A.  No, it was not.

Q.  And could you then read to us what it says in just the way you read to Ms. Hansen for the lineup?

A.  It's titled "Lineup Instructions for Witnesses.  No. 1, you will be asked to look at several persons who will each be displaying a number.  No. 2, look for the features that are permanent.  Disregard any temporary features such as the length and style of hair, clothing, jewelry, and makeup that they may have. No. 3, just because we asked you here does not mean we believe the person we are looking for is in this lineup. No. 4, for each lineup that you view, you will be asked whether you can identify one person, if any, from that lineup.  No. 5, if you identify or do not identify anyone, indicate it at the bottom of the form.  No. 6, the fact that other people may be here to view a lineup should not be of any concern to you whatsoever.  No. 7, do not discuss your case or this lineup with anyone else until after you have viewed the lineup and left the area of the lineup.  No. 8, please understand that to protect the integrity of the investigation, at the conclusion of the lineup, the police will not be able to provide any

386

information about who was in the lineup or other

possible witnesses or evidence."

Then there's a bold capitalized line that

says, "I," and then the word "do" is underlined,

"identify the suspect as the person with number," and

then there's a blank, and then there's parenthesis with

a blank for you to initial it.

Below that is another capitalized bold

sentence that says, "I" underlined "do not identify

anyone from this lineup."  Initials again.

And then the name of the witness is printed in

and in my handwriting.  Signature line with the witness'

signature and date.  Witness, which is my signature, and

date, and then the case number for the Champaign City

police report that was filed in reference to this case.

Q.  Now, after reading her that sheet, then,

did you conduct a lineup?

A.  Yes, I did.

Q.  In setting up the lineup, did you give the

Defendant the choice of what number he wanted to be?

A.  Yes.

Q.  And did -- what number did he choose?

A.  He chose number three.

Q.  Like to show you what's been marked as

People's Exhibit No. 74.  Is that a photograph of the

387

individuals in the lineup?

A.   Yes, it is.  I took that photograph.

Q.   And then does it truly and accurately depict the way they looked in the lineup?

A.   Yes, it does.

Q.   Now, when you conducted the lineup, was it just a visual lineup or did you actually have or also have the individuals speak?

A.   Yes, it was all -- audible as well as visual.

Q.   And did you tell them what to say?

A.   Yes, I did.

Q.   How did you conduct that part of it?

A.   I had a single piece of paper with three lines typed out.  There were three sentences.  I handed each of the six participants a copy of that piece of paper.  I instructed them when they were -- For instance, they would start with person number one in the lineup.  The six people walked in in single file, facing the glass.  Number one would step to the glass in front of the other five, holding a numbered card down in front of him, which was respective with his number.  He would face the window.  He would then turn to his left.  He would then do an about-face, face the opposite direction, stand back facing the window and recite the

388

three sentences that were printed on the page.

After doing that, then he would step back and take his place in line, and they would proceed in numerical order.

Q.  Was there any difficulty with the mechanism of having individuals speak?

A.  Yes, there was.

Q.  What was that?

A.  They have a little speaker on the inside of the room where Lori Hansen was to view and listen. And it was some kind of announcement system that was projecting the voice through, so you could not hear the voices real clearly, as well as there was a blower in the ventilation system that was blowing the entire time right above the little speaker where we were at.

Q.  Did you then conduct a lineup in the manner you described?

A.  Yes, we did.

Q.  And did Ms. Hansen ask to see anyone again?

A.  Yes, she did.

Q.  And did she focus on two individuals?

A.  Yes, she did.

Q.  Who were they?

A.  They were the person holding card number

389

three and the person holding card number six.

  Q. And who was card number three again?

  A. Dedric Moore.

  Q. And that's the same individual you identified here in court today?

  A. Yes, it is.

  Q. And who was the person holding number six?

  A. Andrew Pettigrew.

  Q. Now, how many times did she ask to see them again?

  A. She saw each of them five times.

  Q. After listening to them, she has the option of asking to see them again, in other words?

  A. Yes, she did.

  Q. And were those -- those two then the individuals she asked to see several more times?

  A. Yes, they were.

  Q. Did she then fill out the form?

  A. Yes, she did.

  Q. And, again, let me show you People's Exhibit No. 73 now.  Did she fill it out with her signature?

  A. Yes, she did.

  Q. Was she able to identify anyone positively?

390

1

2          A.   No, she was not.

3          Q.   Did she write comments on the back of the

4     form?

5          A.   Yes, she did.

6          Q.   And was that something she wanted to do?

7          A.   Yes, it was.

8          Q.   Do you recognize her handwriting then on

   that form?

9          A.   Yes, I do.   Excuse me.

10         Q.   What did she write?

11         A.   She wrote, "The sound was not good enough

12    in this room to clearly hear how the men's voices

13    sounded.   Numbers three and six came closest, but,

14    again, it's hard to tell in this room, only hearing

15    their voices through a small box.   If I could hear them

16    better, I might be able to definite" -- or, no, "might

17    be able to determine more certainly whatever" -- or

18    "whether one of them was the attacker."

19         Q.   Did you then talk to her about those

      comments?

20         A.   Yes, I did.

21         Q.   And what did she tell you?

22         A.   I asked her what it was about number three

23    and number six that stood out to her.   She told me that

24    number three looked like the face of the subject that

                          391

she'd encountered in this incident and the voice sounded like his -- the subject's voice; however, she couldn't tell for sure with that kind of system to listen to the voices. She also stated that she thought number three was taller than the actual subject that she encountered in this case.

Q. Then let me ask you, with regards to the other individual, number six, who was Andrew Pettigrew, did you determine that Mr. Andrew's date of birth was January 19th of 1968?

A. Yes, ma'am.

Q. At the conclusion of that lineup, then, did you take this sheet into evidence?

A. Yes, I did.

Q. And does it appear to be in substantially the same condition as when you took it into evidence?

A. Yes, it is.

Q. Like to direct your attention next to January 27th of 1999. Did you take photographs of the Defendant, Dedric Moore, pursuant to court order?

A. Yes, I did.

Q. And what particular part of his body were you asking him to show you?

A. His face, and the point of focus was the mouth, the shape of the mouth and the upper gum with the

392

teeth missing.

Q.  And what did you tell him?

A.  I told him that I needed to take photographs --

Q.  I'm sorry, what did you tell him to show you?

A.  I told him to, for instance, "Look at me. Part your lips a little bit.  Open your mouth.  Raise your upper lip."  Told him that I needed pictures of his teeth, of the -- of his mouth open of the teeth that were missing.

Q.  And did he have anything or put anything on his face for those pictures?

A.  He put a pair of glasses on his face.

Q.  Was he wearing them when you first approached him?

A.  No, he was not.

Q.  Then when you went to take the pictures, did he put them on?

A.  Yes, he did.

Q.  Like to show you then what's been marked as People's Exhibit 60A.  Do you recognize that?

A.  Yes, that's one of the photographs that I took that day.

Q.  And is it a true and accurate copy of that

393

1

2    photograph?

3        A.  Yes, it is.

4        Q.  Now, I'd like to direct your attention to

5    that same day, did you also take handwriting samples

6    pursuant to a court order?

7        A.  Yes, I did.

8        Q.  And what did you tell the Defendant to do?

9        A.  I handed him a piece of paper, and I asked

     him to write 20 exemplars of each number.  I wanted to

10   start with the number one and proceed on down the page,

11   listing each number in a straight row across the page.

12   He started with writing the number one, and he made the

13   one with a line off to the side straight down and then a

14   base across the bottom.  After he'd written that number

15   20 times, I then asked him to also write the number one

16   in a different fashion with just a straight slash, so he

     proceeded on with filling out the form.

17       Q.  Now, did you also give him a set of four

18   numbers to write or two sets, actually?

19       A.  Yes, I did.

20       Q.  And did you tell them to him?

21       A.  Yes, I did.  I told him I wanted 20

22   exemplars of the 1972 and then 20 exemplars of, I

23   believe it was, 2410.  Whatever the other PIN number was

24   that was written down on that card.  It would have been

                            394

2810.

Q.  And what was the significance of these numbers?

A.  This was for comparisons.  I wanted to send them to the state crime lab to compare handwriting samples.

Q.  And where had you seen these numbers?

A.  Those were the two 4-digit numbers that were on the piece of paper collected out of Lori Hansen's truck.

Q.  Like to show you then three exhibits that are People's Exhibits 70A, B, and C.  First of all, showing you what's been marked as 70C, is that the exemplar that contained all the numbers as you've described?

A.  Yes, it is.

Q.  And then showing you 70A, is that the exemplar for the number 1972?

A.  Yes, it is.

Q.  And then showing you 70B, is that the exemplars for the number, actually, is it, 2810?

A.  2810, yes, ma'am, that's it.

Q.  And all those exemplars, then, were those done by the Defendant in your presence?

A.  Yes, they were.

395

Q.  Do they appear to be in substantially the same condition, with the addition that there's now some lab notations?

A.  Yes, they are.

Q.  Did you allow the Defendant all the time he needed to complete these exemplars?

A.  Yes, I did.

Q.  Did you allow him to write them at his own speed, in other words?

A.  Yes, I did.

Q.  Now, I'd like to direct your attention next to March 1st of 1999, did you have occasion to take additional photographs of Dedric Moore?

A.  Yes, I did.

Q.  And, at that time, did you again tell him to show you his mouth and teeth?

A.  Yes, I did.

MS. LENIK:  Your Honor, may we approach on this?

THE COURT:  Ladies and Gentlemen, I want you to go with Mr. Rasmus to the jury room.  We'll get you out here as quickly as we can.

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  All right.  We'll show the

following's out of the presence of the jury.

Ms. Lenik?

MS. LENIK:  Your Honor, I would renew my -- if the State's Attorney asks any questions about this incident, I renew my motion to withdraw and I move for mistrial.

There is no way that anything that's elicited about this incident can be cross-examined on legitimately, because then I end up being a witness.

THE COURT:  Ms. Ladd, what's the line of questioning that you anticipate?

MS. LADD:  There's about two more questions, and I was gonna ask him what did he tell him to do with his mouth and teeth.  I anticipate the response, "I told him to open his mouth and show me his teeth."  And "Did you take these photographs I'd like to show you?"  And then have him identify the exhibits.  That's all I intend to do.

I understand the concerns that were raised in the motion, and I'm not gonna get into anything else that took place.

THE COURT:  All right.  Well, given that limitation, I don't see how this is any different than the other testimony.

MS. LENIK:  Your Honor, well, it may be I

397

would say, no, that's not what happened or that if

there's any implication or any later argument that it

had to be done three times and he didn't cooperate,

again, that puts me at risk.

THE COURT:  Ms. Lenik, "Did you tell him to

open his mouth?"  "Did you take the pictures?"  Those

are the only two questions that are gonna come out.

Now, if you want to ask something on

cross-examination that goes beyond that, I'm not sure

where that's going to take you.  I'm going to allow the

State to ask those questions.  And those are the two

questions that will be asked of this witness.

Ms. Ladd, how much more time do you believe

you have on direct?

MS. LADD:  That was the conclusion of my

direct.

THE COURT:  It's pretty uncomfortable in this

courtroom, and I think the jurors are having a little

bit of a problem right now.  Why don't we take ten

minutes and we'll bring the jury back out in about ten

minutes to three.

Officer, you're not to discuss your testimony

during the break with anyone.

THE WITNESS:  Yes, Your Honor.

MS. LADD:  Your Honor, may I have the Court's

398

permission to just stress to the officer that that's the
limitations of what we want to get into?

THE COURT:  Yes.

MS. LADD:  I think he understands that, but
I'm doing it in open court, but I want to make it clear
I don't want anything else responded to.

THE COURT:  I understand the question, and I'm
sure the officer does.

Mr. Rasmus, tell the jurors that we are gonna
take about ten minutes.

(Recess taken.)

THE COURT:  Ms. Ladd, are you ready for the
jury to be brought out?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  I am.

THE COURT:  All right.  Mr. Rasmus, bring out
the jury.

(The following proceedings were had in the
presence and hearing of the jury.)

THE COURT:  You may be seated.

Ladies and Gentlemen, we've opened up a few
more windows.  We may have some extra doors open.

Mr. Rasmus, you probably ought to shut that
door.

If, during the course of the afternoon, you can't hear because of the outside noise, please raise your hand and let me know.

Ms. Ladd.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  Detective Shepard, directing your attention again to March 1st of 1999, did you take additional photographs of the Defendant, Dedric Moore?

A.  Yes, ma'am.

Q.  What did you tell him to do with his mouth and teeth?

A.  I told him that I needed to see the upper row of teeth and also see where the teeth were missing.

Q.  Did you then take a series of photographs?

A.  Yes, I did.

Q.  Like to show you what's been marked as People's Exhibit 60B, C, D, and E.  First of all, showing you 60B.  Do you recognize that as a photograph you took?

A.  Yes, I do.

Q.  Showing you 60C, D, and E, are then those additional photographs you took on that date?

A.  Yes.  Yes, and yes.

Q.  And do those photographs truly and

400

accurately depict then the way he appeared when you

photographed him on March 1st of 1999?

A.   Yes, ma'am.

Q.   In all the photographs that you took in

this case and have identified here on the witness stand,

are they true and accurate depictions of the events as

they appeared on the date in which you were conducting

that portion of your investigation?

A.   Yes, ma'am.

MS. LADD:   Thank you.   I'd tender this

witness.

THE COURT:   Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.   Officer, you never found any gloves in

your investigation of this case; did you?

A.   No, ma'am, I did not.

Q.   And you thoroughly examined the residence

which was burned at 512 South New; correct?

A.   Yes, ma'am.

Q.   And you also examined the residence which

was next door, which was rented to a person named Lillie

Moore; correct?

A.   Yes, ma'am.

Q.   And you learned that Lillie Moore is the

401

grandmother of the gentleman who's seated next to me in court; correct?

A.  Yes, ma'am.

Q.  And so as a result of that, you thought it would be important to search that residence carefully; correct?

A.  Yes, ma'am.

Q.  And you searched every room of that residence; correct?

A.  Actually, I left with Mr. Moore to go to Carle Hospital, and there was Detective Don Atkins, Sergeant Eric McKee, and Sergeant Scott Swan that were there to conduct the entire search of that residence.

Q.  That was how many other officers, sir?

A.  There were three others.

Q.  And so you, plus those three, plus Detective Charles Shepard as well, or was he not --

A.  Detective Charles Shepard was not there. I entered the kitchen and entered the living room, and after that point, then we left with Mr. Moore.

Q.  And so between all of you then, no gloves were ever found; correct?

A.  Yes, ma'am.

Q.  And no gloves were ever found in Ms. Moore's apartment which was the portion of it that was

402

next door; correct?

        A.  Ms. Moore's, no, that's true.

        Q.  You -- You took a statement from Ms. Hansen regarding, and part of that statement -- in part of that statement, she told you what this person who attacked her looked like; correct?

        A.  Yes, she -- she provided the description.

        Q.  And the description she provided to you was a fairly vague description; was it not?

        A.  Yes, ma'am.

        Q.  And she just gave you general ideas for she said that he wasn't too old and wasn't too tall; correct?

        A.  No, that's not correct.

        Q.  She said he was young; right?

        A.  No, ma'am, that's not correct.

        Q.  All right.  Now, you were the one who suggested to her the age range by years; correct?

        A.  No, ma'am.

        Q.  It's your testimony that she told you that he was between the ages of something and something else?

        A.  Yes, ma'am.

        Q.  That you -- That she specifically gave you two ages?

        A.  I asked her how old she thought he was.

He -- She said that she thought he was between 18 and
32.  She thought he was probably younger than 30, but
wasn't sure.

Q.  And she started it at 18 and ended it at
32?

A.  Yes, ma'am.

Q.  And you gave her an approximate height
range because she said she thought that he was just
slightly taller than her; correct?

A.  No, ma'am.

Q.  So, it's your testimony that she gave you
a height range; she said he was between 5'8" and 5'10"
or 5'8" or 5'9"?

A.  Actually, I asked her how tall she thought
he was, and her response was 5'9" or 5'10", at least.
She said that she thought he was a little bit taller
than her, but she didn't think he was real tall.

Q.  Did she tell you how tall real tall is?

A.  No, she did not.  She said she thought he
was at least 5'9" or 5'10", he was a little bit taller
than her.

Q.  But she did say she thought he was a
little bit taller than her, and the phrase that she used
was a little bit?

A.  Yes, ma'am.

404

Q.  And she did not describe to you any spaces in between his teeth; did she?

A.  No, she did not.

Q.  And she did not describe to you any limp or any physical impediment when he walked; did she?

A.  No, she did not.

Q.  And you've seen the gentleman sitting next to me in court several times and you photographed him several times; correct?

A.  Yes, ma'am, since this incident.

Q.  And you know that he has two spaces in his teeth from two missing teeth; correct?

A.  Yes, ma'am.

Q.  And that's not something that you've ever seen him disguise in any way; is it?

A.  Not that I can recall, no.

Q.  You've never seen any device or any artificial teeth or anything like that in it; have you?

A.  No, I have not.

Q.  And you've seen him in his home; correct?

A.  Yes, ma'am.

Q.  And you've seen him when he has not been arrested or in custody; correct?

A.  Yes, ma'am.

Q.  And when you came to see him in his home,

405

he was not expecting you; correct?

          A.   Yes, ma'am, he was not.

          Q.   And so when -- You came and at the time
that you surprised him by your presence, he wasn't
wearing anything to cover up those two marks in his --
or those two holes in his -- his mouth; correct?

          A.   That's correct, ma'am.

          Q.   And she told you that she was not able to
identify anybody in the lineup; correct?

          A.   Yes, ma'am.

          Q.   And she had looked at both Mr. Moore and
this other individual many times or several times and
then decided she couldn't identify anyone; correct?

          A.   Five times she looked at them and could
not identify them.

          Q.   And that's unusual; is it not?

          MS. LADD:   Object --

          Q.   (by Ms. Lenik)   To look at sometimes five
times?

          MS. LADD:   Objection to what's unusual.
That's irrelevant.

          THE COURT:   I'm gonna sustain the objection to
what might be unusual in the lineup.

          Q.   (by Ms. Lenik)   How many times have you
done a lineup, Officer?

                         406

A.    Probably 30, 25 or 30 times.

Q.    When she asked to see these individuals again repeatedly, did anything different happen in the lineup than happened -- Let me withdraw that.

When she asked to see the individuals again, were they shown to her again the same way they were the first time?

A.    Yes, ma'am.

Q.    And so there wasn't any change in the process; they went to the window, they turned one way, they turned the other way, and then they went back; correct?

A.    And then they turned and faced the window and they recited the three lines on the page and then they returned to their place in line, yes, ma'am.

Q.    And so they each did that, both Mr. Moore and Mr. Pettigrew each did that five -- or a total of six times total; correct?

A.    A total of five times, ma'am.

Q.    Five times total?

A.    Yes, ma'am.

Q.    Once and then four repeats?

A.    Yes, ma'am.

Q.    And so she saw Mr. Moore and she saw Mr. Pettigrew five times each doing the same thing?

407

A.  Yes, ma'am.

Q.  And at the end of that, she was not able to pick out Mr. Moore as the individual who did this; correct?

A.  Yes, ma'am.

Q.  And as for Mr. Pettigrew, she said that he had features which resembled the individual; correct?

A.  Yes, she did.  She said the face was shaped like it.

Q.  You could understand what the individuals were saying when you listened to them in the lineup room; correct?

A.  Yes, ma'am, I understood the words they spoke.

Q.  And there wasn't any distortion that you could make out for their words; correct?

A.  It was amplified through the system.  It sounded different than speaking to someone in person. For instance, you speaking to me right now, if you'd been in that room talking to me, your voice would have sounded different than it does right now in this open room.

Q.  But you could understand the language they were speaking, you could understand the words?

A.  Yes, ma'am, they were speaking English and

408

they recited the three lines.

        Q.  And there wasn't anything obvious about --
about a disguise of the voice at that time?

        A.  I did not detect any disguise of a voice,
no, ma'am.

        Q.  By either of these -- By any of these
individuals?

        A.  That's correct.

        MS. LENIK:  May I have a moment?

        THE COURT:  Yes.

        Q.  (by Ms. Lenik)  When you searched the
duplex next door to the location of the fire, you didn't
find any automatic teller machine cards in that duplex;
did you?

        MS. LADD:  Could we have a date, Your Honor?

        THE COURT:  Well, what was the date of the
search, Ms. Lenik?

        Q.  (by Ms. Lenik)  When did you search the
apartment next door to the burned down apartment?

        A.  I believe it was the 4th day of March.

        Q.  Of 1998?

        A.  Yes, ma'am.

        Q.  And what time did you make that search?

        A.  About 7 p.m.

        Q.  And that was the search of the residence

1

2    which had been identified to you as Lillie Moore's

3    residence?

4        A.   Yes, ma'am.

5        Q.   And that is the grandmother of the

6    individual who's seated next to me today?

7        A.   Yes, ma'am.

8        Q.   And when you searched -- And you were also

9    given information that Mr. Moore stayed at his

9    grandmother's on occasion or from time to time?

10       A.   Yes, ma'am.

11       Q.   And you searched that residence

12   thoroughly; correct?

13       A.   Like I said, I was a participant in

14   searching two rooms and then I left.  Other officers

14   were there.  I wasn't there when they searched.

15       Q.   You didn't find nor did anybody bring to

16   you or find, to your knowledge, any automatic teller

17   machine cards?

18       A.   No, ma'am.

19       Q.   And nobody brought to you nor did you find

20   any green suede tennis shoes, white -- off -- white or

21   off-white gloves, or a black and red jacket; correct?

22       A.   That's correct.

23       Q.   None of those items which had been

24   described by Ms. Hansen were ever found in any search of

                            410

anything belonging to Mr. Moore; correct?

A.  That's correct.

Q.  Mr. Moore was cooperative with you in that he voluntar -- he voluntarily came to the police department to speak to you regarding this event; isn't that correct?

A.  Yes, ma'am, he came in of his own free will.

Q.  And he participated in a lineup of his own free will; correct?

A.  No, ma'am.

Q.  He -- At the -- In the initial -- He had come to appear in the lineup initially, but he was an hour late; correct?

A.  He was under a court order which -- a search warrant signed by this Court.

Q.  And that -- that was the initial lineup or that was the second lineup because he was late for the first one?

A.  That was both lineups, ma'am.

Q.  At the time that he cooperated with you and came to the police department, he was wearing glasses at that time; was he not?

A.  No, he was not.  He was carrying a briefcase, and that's all he had with him.

411

Q.  With regard to the nylon stocking, the black stocking which has been identified to you, were you the one who packaged that and put it into the various evidence materials?

A.  I don't recall having a nylon stocking identified to me, ma'am.

Q.  All right.  There's a black stocking that was shown -- I'm sorry.  There's a black stocking that was taken, and that stocking was sent to the lab.  Were you at all involved in that?

A.  I was involved in a piece of what I believe was a nylon stocking that was found in the street, close to where the truck was recovered, Lori Hansen's truck.

Q.  Where in the street was that found?

A.  I wasn't there, ma'am.

Q.  And what did you do with it?

A.  I opened the bag wearing rubber gloves and had Lori Hansen look into the bag and asked if she recognized the garment.  She stated that she thought it looked like a piece of nylons that came from her bedroom in her house.  Thought it looked like the leg part cut out of nylon pantyhose or nylon tights of some kind.

Q.  When you -- When it was found, you weren't present; is that -- I'm sorry, I missed --

412

A.   That's correct, ma'am, I was not.

Q.   So, you -- when it was shown to you or in front of you, it was in a bag; is that right?

A.   Yes, ma'am, it was sealed in a plastic bag.

MS. LENIK:   Okay.  Nothing further.

THE COURT:   Ms. Ladd?

MS. LADD:   Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. LADD:

Q.   With regards to the nylon stocking, is it correct that Detective Charles Shepard recovered that, both of those items?

A.   Yes, ma'am.

Q.   And would the piece that you're referring to, did you touch it in any way when you opened the bag?

A.   No, ma'am, it was in a sealed plastic bag.

Q.   So, nobody touched it or had access to it?

A.   That's correct.

Q.   And then was it turned back over to Detective Charles Shepard to repackage in the paper bag?

A.   Yes, it was.

Q.   Now, at the lineup when Lori Hansen was viewing these individuals, she indicated that Mr. Pettigrew had a face similar to the individual or the

413

1

2        shape of his face?

3             A.   She stated that the shape of his face was

4        similar to the subject that she encountered on the night

5        of this incident's face.

6             Q.   What did she say about the voice?

7             A.   She stated that it didn't sound like the

         voice.

8             Q.   And with regards to Defendant, number

9        three, what did she say about his face?

10            A.   She stated that it looked like the face.

11            Q.   And what --

12            A.   And that it sounded like the voice, but

13       she couldn't say for sure because of the amplification

14       system that was being monitored to hear them talk.

15            Q.   What was the only difference that she

16       found about the person number three, Dedric Moore?

17            A.   She stated that he looked like he was

         taller than the subject that she actually encountered.

18            Q.   And when you were talking to her about

19       height, did she say where she was when she was trying to

20       establish height during most of this ordeal?

21            A.   Yes.   In fact, I specifically asked her if

22       she got a good look at him or at his face during the

23       encounter.   She stated that she was laying on the floor

24       looking up at him the majority of the time, because he

                               414

had pushed her down on the floor as soon as he came into the front door behind her. And he got shorts and put over her head to obstruct the view. There was a couple of times that she would look up, for instance, saw him in the kitchen sitting and smoking a cigarette and drinking a can of beer, but she was conscious to not be looking at him because she was fearful that if he saw her looking at him he might kill her or seriously injure her.

I asked her if when he was dragging her down the hallway toward the flaming living room if she saw his face then, and she said, no, she didn't look at his face. She looked back behind her as she was trying to pull away to get away from him and go back down the hallway away from the fire.

Q. And what effect did she think that had on her ability to estimate height that she was on the ground?

A. It was also dim lighting, so she said that she really didn't get a good look at his face.

Q. About height, though. When she was on the ground, did she feel like that might have affected her ability to estimate height?

A. She didn't actually speculate on that, ma'am.

415

1

2      Q.   You did not ask specifically about that at

3  the time then?

4      A.   No, I just asked her what her view was,

5  and she said she was laying down looking up at him.

6      Q.   When she was talking to you at this

7  lineup, then, was there anything else different about

   the individual, the Defendant, other than his height

8  that she referred to?

9      A.   Not that I recall, no.

10     MS. LADD:   Thank you.   I have no further

11 questions.

12     THE COURT:   Ms. Lenik?

13              RECROSS-EXAMINATION

14              BY MS. LENIK:

15     Q.   She told you that there was a light on in

   the -- in the kitchen area the whole time?

16

17     A.   No, ma'am.   She stated that she opened the

   front door when she got home.   She turned the light on

18 in the living room, which was a dim light, and he came

19 in the door immediately behind her, turned her around,

20 pushed her down to the floor, and she was kept on the

21 floor the entire time.

22     Q.   And she did tell you there was a light on

   in the house the whole time; correct?

23

24     A.   Yes, she did, ma'am.

                        416

E-FILED
Friday, 04 May, 2007  05:10:58 PM
Clerk, U.S. District Court, ILCD

Q.   She didn't tell you why she thought that the person who did this to her was taller than the individual identified as Mr. Moore; did she?

A.   Please --

Q.   Rephrase?

A.   Rephrase, yes.  You lost me on that.

Q.   It's late in the day.  She did not tell you why she thought the person was taller than any of the people in the lineup; did she?  Or how she came to that idea?

A.   I'm not -- I don't understand which person you're talking about being taller, the person -- number three?

Q.   Yes.

A.   Or the person in the house?

Q.   Why she thought -- Well, did she tell you why she thought there was a height difference between the person in the lineup and the person who attacked her?

A.   Yes, she said she thought that number three looked like he was taller, just from what she remembered.

Q.   And that's all she said about that?

A.   Yes.

MS. LENIK:  Nothing further.

417

THE COURT:  Ms. Ladd?

MS. LADD:  Nothing.  Thank you.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Call your next witness.

MS. LADD:  Your Honor, at this time, I'd reask the Court to read two stipulations.

THE COURT:  All right.  Two of those?

MS. LADD:  That'd be the stipulation of Renee Patrick and the stipulation of William Kilpatrick.

THE COURT:  All right.  The following is a stipulation as to the testimony of Renee Patrick.

"Now come the People of the State of Illinois by Heidi Ladd, Assistant State's Attorney, and the Defendant, Dedric T. Moore, by his attorney, Diana Lenik, who hereby stipulate and agree to the following: That Renee Patrick is employed as keeper of the records for Ameritech, Chicago, Illinois, and she is responsible for keeping and maintaining business records of Ameritech telephone records.  No. 2, Renee Patrick would testify that People's Exhibit No. 72 is a true and accurate copy of the business records of February 23 through 25, 1998, for the telephone calls to and from 398-9671 in Champaign, Illinois.  No. 3, Renee Patrick

418

would testify that, A, it is the regular course of

business to make this record; B, the record was kept in

the regular course of business; C, the record was made

at or near the time of the matter recorded; D, the

record was made at or near the time of the events and

transactions recorded; E, the record was made by

recognized standard electronic computer equipment which

produces an accurate record when it is properly employed

and working, which it was on February 23 through 25,

1998.

You are to consider this stipulation of facts

in the same manner as if Renee Patrick had testified in

court."

The following is a stipulation as the

testimony of William Kilpatrick.

"Now come the People of the State of Illinois

by Heidi Ladd, Assistant State's Attorney, and

Defendant, Dedric T. Moore, by his attorney, Diana

Lenik, who hereby stipulate and agree to the following:

No. 1, that William Kilpatrick is employed as a Licensed

Registered Nurse in the State of Illinois and was so

employed on March 4 of 1998.  No. 2, that on March 4 of

1998, at Carle Hospital, Urbana, Illinois, Nurse

Kilpatrick collected blood specimens in a specialized

sterile vacutube from the Defendant, Dedric Moore,

419

following established medical and scientific procedures
to insure that the sample was not contaminated.  Nurse
Kilpatrick marked the specimen, which is identified as
People's Exhibit No. 64, and turned it over to
Investigator Don Shepard of the Champaign Police
Department, who was present during this collection of
specimens.

You are to consider this stipulation of facts
in the same manner as if William Kilpatrick had
testified in court."

Ms. Ladd, is that the stipulation?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  And, Ms. Lenik, are those the
stipulations?

MS. LENIK:  They are.

THE COURT:  All right.  Ms. Ladd.

MS. LADD:  Call Lieutenant Kim Johnston.

(Witness sworn.)

KIM JOHNSTON

called as a witness on behalf of the People,
being first duly sworn, was examined and testified as
follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

420

1

2          A.   Lieutenant Kim Johnston.

3          Q.   And what is your occupation?

4          A.   I'm the administrative lieutenant for the

5     correctional center.

6          Q.   Is that the Champaign County Correctional

7     Center?

8          A.   Yes.

9          Q.   And how long have you been with the

10    Champaign County Correctional Center?

11         A.   Little over 13 years.

12         Q.   As part of your job duties and

13    responsibilities, are you responsible then for

14    maintaining the records of the Champaign County

15    Correctional Center?

16         A.   Yes.

17         Q.   Would that include booking records of

18    inmates?

19         A.   Yes.

20         Q.   I'd like to show you what's been marked

21    People's Exhibit No. 75.  Do you recognize that?

22         A.   Yes.

23         Q.   And is that a booking record for Andrew

24    Pettigrew?

           A.   Yes.

           Q.   And does it reflect his date of birth as

                         421

1-19-68?

A.   Correct.

Q.   As you look at that business record, then,
do you recognize that as a record that was maintained in
the regular course of business of the Champaign County
Correctional Center?

A.   Yes.

Q.   And is it the regular course of business
to make that record?

A.   Yes.

Q.   And are those entries made at or near the
time of whatever event is being recorded on that record?

A.   Correct.

Q.   Does the record also reflect then
dispositions and locations of inmates as they are within
the custody of the Champaign County Correctional Center?

A.   Correct.

Q.   Now, is that record made by or are the
records and entries made by officers having knowledge of
the event that's appearing in the record?

A.   Correct.

Q.   And are each of those entries made at or
near the time of the event that's being recorded?

A.   Yes.

Q.   As you look over those records then of

422

Andrew Pettigrew, are you able to determine if he was in custody on February 24th to 25th of 1998?

A.   Yes.

Q.   And can you tell us when he was in custody?

A.   Last time he was in custody was January 5th of 1998, and stayed with us until April 16th of 1988.  1998.

Q.   Would that be 1998?

A.   Ninety-eight, yeah.

Q.   So, he was in custody during all of that time?

A.   Correct.

Q.   As you look at those records, are those true and accurate records then?

A.   Yes.

MS. LADD:  Thank you.  I have no further questions.

THE COURT:  Ms. Lenik?

MS. LENIK:  No questions.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

MS. LADD:  I would call Investigator Mark Strzesak, Your Honor.

(Witness sworn.)

423

MARK STRZESAK

called as a witness on behalf of the People,
being first duly sworn, was examined and testified as
follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name and spell
your last name for the Court.

A.  Mark Strzesak, S-t-r-z-e-s-a-k.

Q.  And what is your occupation?

A.  I'm an investigator with the Champaign
police.

Q.  And how long -- or how many years have you
been a police officer?

A.  Approximately seven.

Q.  Were you so employed as an investigator
with the Champaign Police Department in February of
1998?

A.  Yes, I was.

Q.  In your professional capacity, did you
assist in the investigation of an aggravated arson at
512A South New Street in Champaign?

A.  Yes, I did.

Q.  Specifically, did you package and seal
items of clothing that had been taken into evidence by

424

1

2    Officer Mary Bunyard of the Champaign Police Department?

3         A.   Yes, I did.

4         Q.   Had those items been secured in the

5    evidence area of the Champaign Police Department to dry?

6         A.   Yes, they were.

7         Q.   Did you then package the evidence and seal
     it to retain any potential fiber evidence?

8         A.   Yes, I did.

9         Q.   And did you handle these with gloves so

10   you wouldn't contaminate the items?

11        A.   Yes, I did.

12        Q.   I'd like to show you then three of those

13   items.

14        First of all, showing you what's been marked

15   as People's Exhibit No. 9.  Do you recognize that as a

16   shirt that was drying?

17        A.   Yes, I did.

18        Q.   And then as you look at that packaging, do
     you recognize your seal on that bag?

19        A.   The label on the front is mine, and on the

20   back I initialed and dated, and that's also my badge

21   number.

22        Q.   Was that item then sealed so there were no

23   other openings on it when you placed it into evidence

24   again?

                         425

1

2          A.  That's correct.

3          Q.  And the blue tape then is from the lab?

4          A.  That's correct.

5          Q.  Showing you two additional items then,

6   first of all, showing you People's Exhibit No. 8, do you

7   recognize that as a jacket that you then packaged?

8          A.  Yes, I did.

9          Q.  And, again, would you look at that,

10  Detective.  Do you recognize your markings on the

11  package as well as the seal?

12         A.  Yes, I do.

13         Q.  And was that also sealed then so there

14  were no other openings?

15         A.  Yes, it was.

16         Q.  And, finally, I'd like to show you a pair

17  of jeans.  Showing you People's Exhibit No. 10, again,

18  as you look in there, do you recognize those jeans?

19         A.  Yes, I do.

20         Q.  And all these items had Mary Bunyard's

21  tag, is that correct, on them?

22         A.  That's correct.

23         Q.  Do you again recognize your writing on the

24  packaging and seal of that?

           A.  Yes, I do.

           Q.  And was that sealed so there were no other

                          426

openings?

A.   Yes, it was.

Q.   Were these resecured in evidence for transportation to the lab?

A.   That's correct.

Q.   Now, on the morning of February 25th of 1998, did you meet with other officers of the Champaign Police Department at 512A South New Street?

A.   Yes, I did.

Q.   And did a Detective Charles Shepard direct your attention specifically to a truck that was in that location?

A.   Yes, he did.

Q.   Where was that vehicle?

A.   In front of 717 Arlington.

Q.   And, at that time, then, did you assume responsibility for that truck?

A.   Yes, I did.

Q.   What did you arrange to have done?

A.   We arranged for Don's Amoco to come to the scene and tow it to the Champaign Police Department.

Q.   And did you remain with the vehicle to make sure that it was secure?

A.   Yes, I did.

Q.   Did anyone else have access to that

427

vehicle or enter it?

        A.  No, they didn't.

        Q.  I'd like to show you what's been marked as People's Exhibit No. 54.  Do you recognize that, Detective?

        A.  Yes, I do.

        Q.  And what is that?

        A.  That's the vehicle -- the victim's vehicle, a Toyota pickup truck.

        Q.  And what is the license plate on that?

        A.  It's 1459 JD.

        Q.  And is that, in fact, the truck that you secured then on Arlington?

        A.  That's correct.

        Q.  Does that show that in place on that street?

        A.  Yes, it does.

        Q.  Did you, in fact, then follow that vehicle down to the impound bay as it was being towed?

        A.  Yes, I did.

        Q.  Was that to make sure no one had access to it?

        A.  That's correct.

        Q.  Was it then secured in the evidence area for vehicles for the Champaign Police Department?

A.   Yes, it was.

Q.   Now, while you were in that area where the truck was on Arlington Street, did you also locate a piece of paper in that area?

A.   Later on that day, yes, I did.

Q.   And did you go back to the scene then after the truck was towed?

A.   That's correct.

Q.   And so would it be the morning of February 25th of 1998, still?

A.   That's correct.

Q.   And, at that time, what did you locate?

A.   There's a white piece of paper blown in the south gutter of Arlington in front of 717.

Q.   Like to show you then what's been marked as People's Exhibit No. 51.  Do you recognize what's depicted in that photograph, Detective?

A.   Yes, I do.

Q.   And what is that?

A.   It's a cash station receipt with my knife placed on it.  It was windy that day, and the paper was blowing down the gutter, so I secured it where I first saw it.

Q.   Does that show then how you found it on the street?

429

1

2          A.  That's correct.

3          Q.  With the exception, obviously, of the

4     knife you placed on it?

5          A.  That's correct.

6          Q.  Did you then take it into evidence?

7          A.  Yes, I did.

8          Q.  I'd like to show you then that exhibit.

9          Showing you what's been marked as People's
      Exhibit No. 16, and ask you if you recognize that?

10         A.  Yes, I do.

11         Q.  And what is that?

12         A.  It's the receipt that I found in the

13    gutter.

14         Q.  Did you place it in that packaging and

15    seal it?

16         A.  Yes, I did.

17         Q.  Now, does it appear to have been altered

18    by processing for fingerprints?

19         A.  Yes, it does.  It appears dirtier -- a

20    darker color than when I found it.

21         Q.  Now, when you found it, then, were you
      able to read it more easily?

22         A.  Yes.

23         Q.  With that difference, then, other than

24    that, is it in substantially the same condition as when

                            430

1

2    you took it into evidence?

3          A.  Yes, it is.

4          Q.  Now, knowing that it was gonna be

5    forwarded on to the lab, did you then have occasion to

6    Xerox it so you could preserve the writing on it?

7          A.  Yes, I did.

8          Q.  Like to show you what's been marked as

9    People's Exhibit 16A, do you recognize that then as a

     Xerox copy of that receipt?

10         A.  Yes, I do.

11         Q.  And is this a true and accurate copy that

12   shows the writing that was on the receipt?

13         A.  Yes, it does.

14         Q.  What I'd like to do, with the Court's

15   permission, then, is ask you, Detective, to step down

     and look at People's Exhibit No. 2.

16         And, Detective Strzesak, if you could first

17   look at this.  Do you recognize that as an overall view

18   of the neighborhood surrounding 512 South New Street?

19         A.  Yes, I do.

20         Q.  And can you just point out where it says

21   T2, does that correspond to where you found the truck

22   you described?

23         A.  That's correct.  I think it was probably

     right in this area (indicating).

24
                         431

Q.  And is that in front of 717?

A.  That's correct.

Q.  Then with regards to that receipt that you took into evidence, can you just show us where that was on the street?

A.  (Indicating.)  That was just a little bit further west, probably right in this area here.

Q.  Could you take this marker and write a 51 and then draw an arrow to where it was since it's so crowded in that area?

A.  (Witness complies.)

Q.  Now, as part of your investigation, did you also have occasion to go to an ATM machine affiliated with the First Midwest Bank?

A.  Yes, I did.

Q.  Where was that located?

A.  That was located at 812 Springfield Avenue.

Q.  And do you see that depicted on this diagram as well?

A.  Yes, I do.

Q.  And can you show us where that is, please?

A.  It's right there (indicating).

Q.  Is that marked then at 812?

A.  That's correct.

432

Q.  And as this is marked, does it truly and
accurately depict then the area in relationship to each
other?

A.  Yes, it does.

Q.  Could you take this marker then and circle
where the bank was?

A.  (Witness complies.)

Q.  Thank you.  And as you've marked this
diagram, does it truly and accurately depict the events
you've described in your testimony?

A.  Yes, it does.

Q.  Thank you.  If you could resume the
witness stand.

Thank you, Mr. Rasmus.

Now, did you proceed to 812 West Springfield,
the First Midwest Bank, then, to meet with a Jo Brooks?

A.  Yes.

Q.  And were you accompanied by another
investigator?

A.  Yes, I was.

Q.  Who was that?

A.  At the time, Detective Brad Yohnka.

Q.  Did you then take possession of a
videotape from Ms. Brooks?

A.  Yes, we did.

433

Q.  And did you view that at the bank with her
to confirm that it had the right time frame?

A.  Yes, we did.

Q.  Then does it play on a regular VCR or do
you need to adjust the speed?

A.  It's a time-lapsed tape, meaning that
they -- when they videotape, the tape is slowed down
enough that they can get either 24, 48, or 72 hours on a
six-hour tape.  So, if you play it on a regular VCR, it
would -- you would play back so fast you wouldn't be
able to view it.

Q.  Now, did the bank have a special VCR so
that you could view it in its normal speed?

A.  Yes, they do.

Q.  And then I'd like to show you what's been
marked, first of all, as People's Exhibit No. 4.  Just
in looking at the marks on that video cassette, do you
recognize that as the tape that you took into evidence
from the bank?

A.  Yes, I do.

Q.  Now, was that then -- did you secure that
and take that back to the Champaign Police Department?

A.  Yes, I did.

Q.  And, subsequently, then, were still
photographs made from the views that are shown on the

434

1

2      videotape you've identified?

3              A.  Yes, they were.

4              Q.  Like to show you a series of still

5      photographs.  Showing you what's been marked as People's

6      Exhibit 5A through 5F.  And ask you if you recognize

       those.

7

8              A.  Yes, I do.

               Q.  And what are those?

9

10             A.  The first one, 5A, is the victim's vehicle

       as it pulls up to the ATM machine.  The second one is a

11     photo of the subject in the vehicle, the suspect in the

12     vehicle.  The third is the same.

13             Q.  And are these all stills that were taken

14     from the shots of the video camera on that tape?

15             A.  Yes, they are.

16             Q.  And they're the tape that you've

       identified as People's Exhibit No. 4?

17

18             A.  That's correct.

               Q.  Are they true and accurate copies then of

19     that frame that's depicted on the photograph?

20             A.  Yeah.

21             Q.  On, rather, the videotape?

22             A.  Yes, they are.

23             Q.  And as you look at these photographs,

24     direct your attention to People's Exhibit 5A, can you

                                435

see the license plate of that vehicle?

A.   Yes, I can.

Q.   And how does it correspond to the vehicle you recovered on Arlington Street that morning?

A.   It's the same license plate.

Q.   And what is the plate?

A.   1459 JD.

Q.   Also, I'd like to direct your attention to People's Exhibit 5B.  Was there anything significant in that photograph that you noticed?

A.   The subject in the photo, it appears that his lips are separated, indicating that there's an area where his teeth are showing.  In that photo, there's a dark spot which corresponds with, it appears, as teeth are missing.

Q.   And from what part?

A.   Of the upper left, center left.

Q.   Now, did you also have occasion to have enlargements prepared from these photographs?

A.   Yes, we did.

Q.   Like to show you an additional set of photographs then.  Those are People's Exhibit 6A through 6H.  Do you recognize those then as enlargements that were made, again, from the stills on People's Exhibit 4 of the original videotape?

436

A.  Yes, I do.

Q.  And are those true and accurate copies, as you look through those, are each of those true and accurate?  And I'll give you a moment to go through all of them.

A.  (Reviewing.)  Yes, they are.

Q.  And they're true and accurate copies then of the stills that were captured by the original videotape?

A.  That's correct.

Q.  When an enlargement is made like that, is there some loss of resolution because it's getting so big?

A.  That's correct.  It gets distorted.

Q.  And by distorted, just fuzzy, would that be --

A.  Fuzzy.

Q.  -- an accurate way?

A.  That's correct.

Q.  With that exception, is there anything else different about these photographs other than the size?

A.  No, they're not.

Q.  I'd like to direct your attention then to March 4th of 1998, did you accompany Don Shepard to

437

1

2        512B -- or 512 1/2 South New Street in Champaign?

3              A.   That's correct.

4              Q.   And is that the other side of the duplex

5     from 512A?

6              A.   That's correct.

7              Q.   And, at that time, what was your purpose
      in going there?

8              A.   We went there to speak with the resident,

9     Lillie Moore.

10             Q.   And who answered the door?

11             A.   Dedric Moore.

12             Q.   And do you see that person in court today?

13             A.   Yes, I do.

14             Q.   Could you please point him out?

15             A.   (Pointing.)   He is the subject sitting at
      the defendant's table wearing the plaid shirt, green

16    plaid shirt.

17             MS. LADD:   May the record reflect

18    identification of the Defendant, Your Honor?

19             THE COURT:   It will.

20             Q.   (by Ms. Ladd)   At that time, did you speak

21    with the Defendant?

22             A.   Yes, I did.

23             Q.   Did you make any observations about his
      teeth?

24
                              438

A.  Noticed that he was missing two teeth on the upper -- upper portion to the left, center left.

Q.  Now, did you -- was he wearing glasses at the time?

A.  No, he was not.

Q.  Did you and Detective Shepard then talk to him and ask him if he knew anything about the incident that had occurred at the duplex on February 25th?

A.  Yes, we did.

Q.  And did you ask him if he seen anyone in the area or know anything about it?

A.  Yes, we did.

Q.  What was his answer?

A.  He stated he was out of town at the time and didn't know anything about it other than what he heard.

Q.  Did you ask him who he thought might be responsible?

A.  Yes, we did.

Q.  And what did he tell you?

A.  He said either Chinese mob or the Mexican mob.

Q.  Now, when he said he was out of town, did he repeat that more than once?

A.  I believe he did.  Probably two, three

439

times.

Q. Now, when you were talking to him, did you ask him if you could step inside?

A. Yes, we did.

Q. And what did you tell him?

A. We just asked if we could step inside, it was kind of cold out, and his response was the heat wasn't working; he didn't want us to come in. Although, it was clearly working, 'cause there's heat coming out the door.

MS. LADD: Thank you. I'd tender this witness.

THE COURT: Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q. At the time that you went to that residence and spoke with him, you didn't have a warrant, either, a search warrant or an arrest warrant; did you?

A. At the time, no.

Q. And so at the time you went to the home, he didn't have to let you in; did he?

A. No, he did not.

Q. Those photographs that you've identified, all of the photographs, both the small ones and the larger ones come off of a video which is coming;

440

1
2    correct?

3         A.   That's correct.

4         Q.   And so you're taking still photographs

5    from something which is, in essence, a moving picture;

6    correct?

7         A.   It -- The still photos -- The way the bank

8    is set up, it takes pictures from different -- different

9    cameras in the bank, not only from the outside, but also

     the lobby, so it jumps from frame to frame.

10        Q.   And in the video form, that gives the

11   appearance of being moving; correct?

12        A.   I don't know what you -- you're getting

13   at.  As far as the subject moving, like a hand movement

14   or just jumping from frame to frame?

15        Q.   The effect of jumping from frame to frame

     gives the impression that it's moving; correct?

16        A.   I mean -- I don't know what you're getting

17   at.  I'm sorry.

18        Q.   When you take the still photographs from

19   the video, your -- What -- Did you take the still

20   photographs from the video or were they given to you?

21        A.   They were given to me.

22        Q.   All right.  And at the time that you

23   received them, they were in the small form; correct?

24        A.   That's correct.

                          441

Q.  They were in a small form and they were on paper; right?

A.  That's correct.

Q.  And the paper came out in kind of a long string form; correct?

A.  No.  One -- One picture at a time.  It'd be like a Polaroid picture.

Q.  And those pictures themselves were somewhat fuzzy; were they not?

A.  As far as camera angle and stuff like that, I mean.  The picture itself depicted what was on the T.V. screen.

Q.  And it was not a clear photograph, say, that would be taken with a 35 millimeter camera?

A.  Correct.

Q.  It was the -- The degree of clarity of that photograph was considerably less than what you would take with a 35 millimeter camera?

A.  Correct.

Q.  And so it would be harder to see who or what was depicted in those photographs than it would be with a regular 35 millimeter camera; correct?

A.  Correct.

Q.  And when the enlargements were made from the smaller photographs, that made the clarity even

442

worse; correct?

A.  Correct.

Q.  Because you would lose even some of the clarity that you had in the smaller photographs by the fact of the enlargement process; correct?

A.  Correct.

Q.  So, the large photographs are an even less clear depiction of that scene that morning; correct?

A.  As far as the quality goes, yes, but it still depicts the same image.

(Whereupon, music is heard playing outside the window.)

THE COURT:  It's a car waiting at the light, Ms. Lenik.

MS. LENIK:  Okay.  That was my question, Your Honor.  Thank you.

THE COURT:  Go ahead.

MS. LENIK:  Thank you.

Q.  (by Ms. Lenik)  Prior to your going to 512 South New, you did a canvass of the area in the vicinity of 512 South New; did you not?

A.  Yes, I did.

Q.  The purpose of that canvass was to see whether anybody saw anybody or anything that looked suspicious that morning; correct?

443

A.  I did a canvass around the area of the pickup truck, that's correct.

Q.  And you didn't find anything; did you?

A.  I -- The only -- only subject that actually --

MS. LADD:  Objection, Your Honor, if this is gonna get into hearsay.

THE COURT:  Well, as long as the officer doesn't testify as to what someone said, he can tell what it was he found.

You may answer.

A.  I was gonna testify what a subject told me.

THE COURT:  Then that'll be hearsay.  The objection will be sustained.

Q.  (by Ms. Lenik)  Did you receive any information which led you to Mr. Moore?

A.  Not that I can remember, no.

Q.  Did you receive any information that led you to another individual?

MS. LADD:  Objection, Your Honor.

THE COURT:  I'm gonna sustain the objection.

A.  Not that I can remember.

THE COURT:  The objection's sustained.

A.  Oh, I'm sorry.

444

Q.  (by Ms. Lenik)  When you walked around the truck, you didn't find any gloves; did you?

A.  No, I did not.

Q.  And you didn't find any cans of any type of accelerant; did you?

A.  No, I did not.

Q.  You didn't find anything that could be used as an accelerant, whether it was in a can or otherwise packaged; did you?

A.  No, I did not.

Q.  As a matter of fact, when you did your investigation in this entire matter, you never found any type of accelerant; did you?

A.  I did not.

Q.  Nor did you ever find any gloves?

A.  I did not.

Q.  And that would be either destroyed or in whole pieces; correct?  No glove, no accelerant?

A.  I didn't find any.

Q.  Did you find in your canvass of the area a stocking, a black ladies stocking?

A.  I did not.

Q.  Either in part or in whole?

A.  I did not.

Q.  Did you witness anybody else finding that

445

stocking?

    A.  Detective Charlie Shepard stated that he'd found it.

    Q.  But you weren't with him at that time?

    A.  No.

    Q.  So, you didn't see where it was found?

    A.  That's correct.

    Q.  Did you ever see the stocking?

    A.  I believe once it was collected.

    Q.  And that was in the evidence bag with the seal and the tape?

    A.  That's correct.

    MS. LENIK:  Nothing further -- Wait.  I'm sorry, Your Honor.  One moment.

    Nothing further.

    THE COURT:  Ms. Ladd?

    MS. LADD:  Just briefly for clarification.

            REDIRECT EXAMINATION

            BY MS. LADD:

    Q.  The original videotape that you saw, was the person actually moving or was it a series of stills?

    A.  It was a series of stills.

    Q.  And then those are what was actually turned into photographs then?

    A.  That's correct.

446

MS. LADD:  Thank you.  No further questions.

THE COURT:  Ms. Lenik?

MS. LENIK:  Nothing further.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

THE COURT:  Call your next witness.

MS. LADD:  Call Karen Anglin.

(Witness sworn.)

KAREN ANGLIN

called as a witness on behalf of the People,

being first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name.

A.  Karen Anglin.

Q.  And what is your occupation?

A.  Correctional Officer for the Champaign

County Sheriff's Department.

Q.  Were you so employed on December 22nd of

1998?

A.  Yes.

Q.  On that date, did you have occasion to

take a request slip from Dedric Moore?

A.  Yes.

447

1

2        Q.  And do you see that individual in the

3   courtroom today?

4        A.  Yes.

5        Q.  Could you please point him out?

6        A.  He's the gentleman sitting at the table

7   with the green and plaid shirt on.

8        MS. LADD:  May the record reflect

9   identification of the Defendant?

10       THE COURT:  It will.

11       Q.  (by Ms. Ladd)  I'd like to show you what's

12  been marked as People's Exhibit 71A, and do you

13  recognize that as a request slip that you took from the

14  Defendant?

15       A.  Yes.

16       Q.  And does it appear to be in substantially

17  the same condition with the exception that there may be

18  some lab markings?

19       A.  Yes.

20       Q.  Now, the top part, then, that's what's

21  filled out by the individual giving it to you?

22       A.  Yes, it is.

23       Q.  And then the bottom part is your

24  signature?

         A.  Yes.

         MS. LADD:  And, thank you.  I'd tender this

                         448

witness.

           MS. LENIK:  No questions.

           THE COURT:  Thank you.  You may step down.

                    (Witness excused.)

           MS. LADD:  I'd call Anthony Carpenter.

                    (Witness sworn.)

           ANTHONY CARPENTER

called as a witness on behalf of the People,

being first duly sworn, was examined and testified as

follows:

           DIRECT EXAMINATION

           BY MS. LADD:

    Q.  Could you please state your name.

    A.  Anthony Carpenter.

    Q.  And what is your occupation?

    A.  Correctional Officer with the Champaign

County jail.

    Q.  And were you so employed on January 16th

of 1999?

    A.  Yes, I was.

    Q.  At that time, did you take a request slip

from Dedric Moore?

    A.  I received a request slip.  I can't recall

if I took it off his person, but my name should be on

the bottom of it, and the time I took it from him, also,

449

1

2    should be on it.

3           Q.  Let me show you what's been marked as

4    People's Exhibit 71C, then.  Officer, do you recognize

5    that?

6           A.  Oh, yeah.

7           Q.  And is your handwriting on bottom?

7           A.  Yeah, that is my handwriting.

8           Q.  And the upper part, is that filled out by

9    the inmate making the request?

10          A.  Yes, it is.

11          Q.  And is that a request slip then from

12   Dedric Moore?

13          A.  Well, considering that I wrote 2300 hours

14   on it and they locked down at 10:30, I would have to get

15   them -- I would have had to get this request from him,

16   because he was in an individual cell at the time.

17          Q.  So, he would have been the only one who

18   would have handed it to you, in other words?

18          A.  Yes, ma'am.

19          Q.  Is it in substantially the same condition,

20   with the exception that there may be some laboratory

21   notations on the top?

22          A.  Yes.

23          Q.  And do you see the individual you know as

24   Dedric Moore related to this slip in the courtroom

                          450

today?

        A.  Yes, I do.

        Q.  Could you please point him out?

        A.  (Pointing.)  Right over here with his attorney.

        MS. LADD:  May the record reflect identification of the Defendant, Your Honor?

        THE COURT:  It will.

        MS. LADD:  Thank you.  I'd tender this witness.

        THE COURT:  Ms. Lenik?

        MS. LENIK:  No questions.

        THE COURT:  You may step down.

                (Witness excused.)

        MS. LADD:  Call Thomas Tarr.

                (Witness sworn.)

            THOMAS TARR

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

            DIRECT EXAMINATION

            BY MS. LADD:

        Q.  Could you please state your name.

        A.  Officer Thomas Tarr.

        Q.  And what is your occupation?

A.  Correctional Officer, Champaign County.

Q.  And were you so employed on January 20th of 1999?

A.  Yes, ma'am.

Q.  Did you have occasion on that date to take a request slip from Dedric Moore?

A.  Yes, I did.

Q.  Do you see that person in the courtroom today?

A.  Yes, I do.

Q.  Could you please point him out?

A.  (Pointing.)  Young man sitting right here.

MS. LADD:  And may the record reflect identification of the Defendant?

THE COURT:  It will.

Q.  (by Ms. Ladd)  Did you ever see the Defendant wearing glasses when he was in the correctional center?

A.  Not that I am aware of.

Q.  Like to show you then what's been marked as People's Exhibit 71B.  And do you recognize that?

A.  Yes, I do.

Q.  And what is that?

A.  That's a request slip from Mr. Moore, handed it to me.

452

Q.  And what date was that, that date I asked you about?

A.  On 1-20 of this year.

Q.  And do you recognize your signature and your writing on the bottom portion?

A.  Yes, ma'am, I do.

Q.  And was the upper part of that, namely, the request filled out by Dedric Moore, the Defendant?

A.  Yes, it was.

Q.  And does that appear to be in substantially the same condition, with the exception there may be some lab notations on it?

A.  Yes, it does.

MS. LADD:  Thank you.  I'd tender this witness.

THE COURT:  Ms. Lenik?

MS. LENIK:  Yes.

CROSS-EXAMINATION

BY MS. LENIK:

Q.  Officer, there are -- inmates can make request slips and leave them in portions and then have them collected later by members of the staff; correct?

A.  I won't pick up a request slip unless it's completely done.

Q.  And that can be picked up by somebody

453

other than the inmate; correct?

A.  The inmate would have to hand it to me, to
the officer.

Q.  Well, you're saying that there's never a
time when the request slip is left in the cell block at
some location and you pick it up?

A.  Me personally, no.  I will not pick up one
that's completely filled out correctly.

Q.  It could be filled out correctly and
completely and left somewhere and you come by and pick
it up?

A.  No, I'd have to take it from an individual
myself, me personally.

Q.  And you could -- you could also take a
group of request slips from other inmates on behalf of
other inmates; correct?

A.  They would have to hand the request slip
to myself, but that's just me personally.

Q.  And that's not a policy or a rule that the
jail has; is it?

A.  Not that I'm aware of.

Q.  That -- So that it is possible for inmates
to hand request slips either through other inmates or to
leave them in their cell and then have somebody else
pick them up later?

454

1

2    A.  They could possibly do that.

3    Q.  And so you would not actually have to have

4  seen the inmate do the writing of the request slip;

5  correct?

6    MS. LADD:  Objection to relevancy.  This

7  officer testified he took it from the Defendant.

8    THE COURT:  Well, she may ask.

9    A.  Me personally, I'd have to take the

   request slip from the individual.

10    Q.  (by Ms. Lenik)  But it would be possible

11  since it's not a violation of your policy to have a

12  request slip received that the officer did not see the

13  inmate actually write?

14    A.  That -- You have to ask other officers

15  that, 'cause that's not the way I do it.

16    MS. LENIK:  I have no other questions.

17    THE COURT:  Ms. Ladd?

     MS. LADD:  Nothing further.  Thank you.

18    THE COURT:  You may step down.

19    THE WITNESS:  Thank you.

20                        (Witness excused.)

21    MS. LADD:  Your Honor, may we approach?

22    THE COURT:  Counsel approach.

23    (A sidebar conference was held out of the

   hearing of the jury.)

24

                        455

THE COURT:  Ladies and Gentlemen, I'm going to read the stipulation as to the testimony of John Carnes.

"Now come the People of the State of Illinois by Heidi Ladd, Assistant State's Attorney, and the Defendant, Dedric T. Moore, by his attorney, Diana Lenik, who hereby stipulate and agree to the following: John Carnes is employed as a latent fingerprint examiner with the Illinois State Police Forensic Science Laboratory, Springfield, Illinois, and is qualified as an expert in fingerprint comparisons.  No. 2, John Carnes examined numerous pieces of evidence on this case, including beer can, a piece of yellow paper, two checks, two plastic cards, telephone, beer bottle, coin purse with pieces of wet paper inside, keychain, wallet, wet receipt, lighter, cash station receipt, cassette tape, Camel cigarette packs, utility knife and plastic bag, piece of onion, roll of tape, knife, latent print from exterior of driver's door between mirror and handle, latent print from turn signal lever.  No. 3, John Carnes also received the known fingerprints of the Defendant, Dedric T. Moore, and of Lori Hansen.  No. 4, John Carnes found latent prints suitable for comparison on the plastic bag that was with the utility knife, the latent print from the exterior of the driver's door, the latent print from the turn signal lever, a receipt that

456

was with the coin purse.  John Carnes found no latent prints suitable for comparison on any of the other evidence.  No. 5, comparison of the latent fingerprints found with the known fingerprints of Dedric T. Moore and Lori Hansen did not reveal an identification.

You are to consider this stipulation of facts in the same manner as if John Carnes had testified in court."

Ms. Ladd, is that the stipulation?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  It is.

THE COURT:  All right.  Ladies and Gentlemen, that's going to conclude the testimony for the day. You'll be excused for the rest of the day.  Don't discuss the case among yourselves or with anyone else. Please don't read the newspaper when you get home tonight, or confine yourself only to the sports section. Set the rest of the paper aside until you're finished with this trial.

I need you back in the jury room by 9 o'clock tomorrow morning.

You can be excused.

(The following proceedings were had out of the presence and hearing of the jury.)

457

1

2          THE COURT:  Officer, if you'll leave the

3   correctional center tomorrow morning with the Defendant

4   about 9 o'clock.

5          We'll be in recess.

6          (The trial was continued to 9:00 a.m.,

7   Wednesday, March 17, 1999.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24