**E-FILED**
Friday, 04 May, 2007  05:14:46 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| DEDRIC MOORE, | ) | |
| | ) | |
| Petitioner, | ) | No. 07-2015 |
| | ) | |
| v. | ) | The Honorable |
| | ) | Michael P. McCuskey, |
| DONALD HULICK, | ) | Judge Presiding. |
| | ) | |
| Respondent. | ) | |

## TO THE CLERK OF THE DISTRICT COURT

Pursuant to Rule 5, 28 U.S.C. sect. 2254, the below-named Exhibits are being filed:

Exhibit X:     Trial court record.

Respectfully submitted,
LISA MADIGAN
Attorney General of Illinois

BY:     /s/ Mary A. Fleming
MARY A. FLEMING
Assistant Attorney General
100 W. Randolph, 12th Floor
Chicago, Il. 60601
(312) 814-3692
Mfleming@atg.state.il.us
Atty. Reg. #6242892

1

2          IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT

3                      CHAMPAIGN COUNTY, ILLINOIS

4

5   THE PEOPLE OF THE STATE OF ILLINOIS, )
                                        )
                     Plaintiff,         )

6                                       )
                          v.            )     No. 98-CF-1558
                                        )
7   DEDRIC T. MOORE,                    )
                                        )
8                    Defendant.         )

9

10          REPORT OF PROCEEDINGS of the Continued Jury

11   Trial had in the above-entitled cause on March 17, 1999,

12   before the HONORABLE THOMAS J. DIFANIS, Judge Presiding.

13   APPEARANCES:

14          MS. HEIDI LADD
            Assistant State's Attorney
            for the People

15          MS. DIANA LENIK
16          Attorney at Law
            for the Defendant



17

18   **Vol. V**

19                       JUL 28 1999



20

21                    Melissa Clagg, RDR
22                    License No. 84-2876
                      Official Court Reporter
23               Champaign County Courthouse
                      Urbana, Illinois  61801

24

**4-99-0499**

MARCH 17, 1999

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  We're back on 98-CF-1558.

Ms. Ladd, are you ready for the jury to be brought out?

MS. LADD:  Yes.  Thank you.

THE COURT:  Ms. Lenik?

MS. LENIK:  I am.

THE COURT:  All right.  Mr. Rasmus, bring in the jurors, please.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Good morning, Ladies and Gentlemen.

Again, we've got a lot of windows open.  If the outside noise gets too loud, you can't hear, please let me know.

Ms. Ladd, call your next witness.

MS. LADD:  Thank you.  I'd call Rich Johnson.

(Witness sworn.)

RICHARD C. JOHNSON

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

460

## DIRECT EXAMINATION

### BY MS. LADD:

Q. Could you please state your name.

A. Richard C. Johnson, J-o-h-n-s-o-n.

Q. What is your occupation or profession?

A. I'm a question documents examiner for the Illinois State Police.

Q. Which laboratory are you employed at?

A. I work at the Springfield laboratory.

Q. Could you describe the nature of your work as a document examiner?

A. I examine handwriting, typewriting, office machine impressions, rubber stamp impressions, charred documents, primarily handwriting, as well as a few other exams.

Q. Could you describe for us then your education in this field?

A. I have a Bachelor of Science Degree from Southern Illinois University, and I was trained at the Illinois State Police Forensic Science Laboratory for three and a half years in various aspects of document examination.

Q. And how long have you been employed as a document examiner then with the Illinois state laboratory?

461

A.  About ten years.

Q.  Do you use any special equipment to examine question documents in your work?

A.  Yes.  We have a fully equipped laboratory.

Q.  What type of equipment do you use?

A.  Microscopes, specialized lighting filtering, photographic equipment.

Q.  And are you trained and experienced in the operation of all of those items as well?

A.  Yes.

Q.  Have you published within your field?

A.  Yes, I have.

Q.  And are you a member of any professional organizations then pertaining to that field?

A.  Yes, I am.  I'm a member of MAFS, and I'm a member of the International Association for Identification.

Q.  And what is MAFS?

A.  Midwest Association of Forensic Scientists.

Q.  Have you also given presentations within your field and area of specialty then?

A.  Yes, I have.

Q.  Have you testified and been qualified to testify as an expert in court on prior occasions?

462

A.  Yes.

MS. LADD:  At this time, Your Honor, I would tender Mr. Johnson to the Court as an expert in his field.

THE COURT:  Ms. Lenik, cross-examination?

MS. LENIK:  No questions on qualification.

THE COURT:  All right.  He may testify as an expert.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  Mr. Johnson, is handwriting a positive form of identification?

A.  Yes, it is.

Q.  And can you explain how is handwriting identified?

A.  Side-by-side comparison of questioned exhibits to known standards that are submitted by the police.

Q.  Is it always possible to identify a questioned writing?

A.  No.

Q.  What are some of the reasons that would make it impossible to identify?

A.  Inadequate known standards or printing compared to writing, disguise.  There's a lot of reasons why.

463

Q.   Did you have occasion in your professional capacity to examine several items of writings in this case that were submitted to you by the Champaign Police Department?

A.   Yes.

Q.   And did your work and your final conclusions and opinions on this case then undergo what's called a technical review?

A.   Yes.

Q.   What is that?

A.   One of my peers examines my report as well as my notes to insure that I did come to the correct conclusion.

Q.   And, in fact, were your results validated by that technical review?

A.   Yes.

Q.   Now, specifically, I'd like to direct your attention to February of 1999.  Did you receive a questioned writing that contained eight numbers?

A.   Yes.

Q.   What is a questioned writing?

A.   That's -- It's an unknown.

Q.   And is that what's submitted to you then for analysis?

A.   Yes.

464

Q.  I'd like to show you what's been marked as People's Exhibit 67, which is your lab Q1.

Your Honor, again, can I have continuing permission this morning and this afternoon to approach the witnesses?

THE COURT:  Yes.

MS. LADD:  Thank you.

Q.  (by Ms. Ladd)  And showing you People's Exhibit, again, No. 67, which is your Q1, I'd ask you, first of all, do you recognize that packaging as the packaging you received the exhibit in?

A.  Yes.  It bears my laboratory marks.

Q.  And then could you look at the item contained inside and tell us if you recognize that, please?

A.  Yes, I do.

Q.  And what is that?

A.  That's a piece of paper that's been processed for latent fingerprints and that bears my -- my laboratory marks as well as some numerical entries.

Q.  And what are those numerical entries?

A.  1972 and 2810.

Q.  As you look at that then, you indicated it was processed for fingerprints.  Did that affect your ability to examine this document at all?

465

1

2          A.   No.

3          Q.   And as you look at that, then, does it

4   appear to be in substantially the same condition as when

5   you examined it?

6          A.   Yes.

7          Q.   Thank you.   Now, did you also receive six

8   documents that were identified as known writings of a

9   Dedric Moore?

10         A.   Yes.

11         Q.   What is a known writing?

12         A.   That's either collected or voluntary

13   standards from a subject.

14         Q.   Now, known writings that you received in

15   this case, those six documents, were they actually of

16   two different types?

17         A.   Yes, they were both collected and

18   voluntary.

19         Q.   And were there three documents that were

20   identified as known writings that were made pursuant to

21   a sample that was taken or an exemplar?

22         A.   Yes.

23         Q.   And what does that mean?

24         A.   We ask for writing from the subject.

         Q.   Did you also have then three documents

     that were identified as request slips that contained

                              466

1

2    voluntary writing of Dedric Moore?

3    A.   Yes.

4    Q.   Like to show you these items.

5    MS. LENIK:   Your Honor, may we approach?

6    THE COURT:   Yes.

7    (A sidebar conference was held out of the hearing of the jury.)

8    MS. LADD:   Thank you, Your Honor.

9    THE COURT:   You may proceed.

10    Q.   (by Ms. Ladd)  I'd like to show you a

11    series of exhibits that have been identified as People's

12    exhibits.  And, first of all, I have People's Exhibits

13    71, and that's 71A, B, and C, and ask you if you could

14    take a look at those, Mr. Johnson, and tell us if you

15    recognize those.

16    A.   Yes, I remember these documents, and they

    bear my laboratory marks.

17    Q.   And do you recognize those as documents

18    that were submitted to you as request slips or known

19    writings of Dedric Moore?

20    A.   Yes.

21    Q.   Did you use those then in conducting your

22    examination and comparison?

23    A.   Yes.

24    Q.   Do they appear to be in substantially the

467

1

2          same condition as when you did that?

3                    A.   Yes.

4                    Q.   Thank you, sir.  Now, you also mentioned

5          exemplars or samples, and I'd like to show you three

6          additional exhibits, People's Exhibit 70A, B, and C, ask

7          you if you could take a look at those, please.  Do you

           recognize those?

8                    A.   Yes.

9                    Q.   And what are those?

10                   A.   These are voluntary standards taken from

11         the subject.

12                   Q.   As you look at those, do those also appear

13         to be in substantially the same condition then when you

14         conducted your examination?

15                   A.   Yes.

16                   Q.   And are those what you -- we refer to, I

17         asked you, what is called samples or exemplars?

18                   A.   Yes.

19                   Q.   And that's what you request then when

20         you're conducting analysis?

           A.   Yes.

21                   Q.   If I may have those?  Did you then use all

22         those items in conducting a comparison with the question

23         document that you identified as People's Exhibit 67,

24         your lab Q1?

                                   468

1

2          A.   Yes.

3          Q.   And what was your conclusion then as a

4   result of that?

5          A.   I found characteristics in common between

6   the question and known standards.

7          Q.   And when you're looking at that, do you

8   look at particular letters and numbers then and, in this
    case, numbers?

9          A.   Yes.

10         Q.   And were you limited in what you could do

11  by the fact that you only had eight numbers to examine?

12         A.   Yes.

13         Q.   Now, were you also limited in any way by

14  the quality of the known writings that were submitted to
    you?

15         A.   Yes.

16         Q.   Specifically, were these the request slips

17  or the exemplars or samples that were collected?

18         A.   The samples that were collected.

19         Q.   Now, with respect to the samples that were

20  collected then, People's Exhibits 70A, B, and C, what

21  did you determine about the handwriting of those

22  samples?

23         A.   That it was awkward and unnatural and that

24  it was inconsistent.

                      469

1

2          Q.   And when you say inconsistent, what do you

3     mean?

4          A.   Handwriting is free -- is freely written.

5     It's an unconscious act just like be riding a bicycle.

6     When a person makes a conscience effort to alter their

7     letters, it's considered disguised.

8          Q.   As you looked at these three exhibits,

9     then, in People's Exhibits 70A, B, and C, the collected

10    samples, identified as taken from Dedric Moore, what was

11    your opinion as to whether or not they were disguised?

12         A.   In my notes, I wrote that they were

13    awkward and unnatural and that there was a conscious

14    effort.

15         Q.   And would that be consistent then with

16    disguising that handwriting?

17         A.   Yes.

18         Q.   Now, with regards to the request slips

19    that you identified, People's Exhibit Group 71, were you

20    able to determine that the handwriting within those

21    exhibits was consistent with each other?

22         A.   Yes.

23         Q.   Did those appear to be freely written and

24    not awkward or unnatural?

           A.   Yes.

           Q.   Now, when you were looking at these

                              470

exemplars, then, were you able to identify specific

factors in the writing or the samples taken from Dedric

Moore that allowed you to form the conclusion the

writing was disguised?

A.  Yes.

MS. LADD:  Now, what I'd like to do at this

time, Your Honor, is ask permission to have the witness

step down, and because of the configuration of the

courtroom, I believe we'll set the easel up here, with

the Court's permission (indicating).

THE COURT:  Sure.

Q.  (by Ms. Ladd)  And, Mr. Johnson, I'm gonna

ask you if you could step down over here by where the

door is located.

Gonna ask you to look at what's been marked as

People's Exhibit No. 3, and perhaps easiest would be if

I step around here and you stand to the side, sir.

Can you tell us then if you recognize this.

A.  Yes.

Q.  And what is it?

A.  This is a photographic enlargement of

Exhibit K1-4 --

Q.  I'm sorry.

A.  -- known writing.

Q.  One of the exemplars or samples that was

471

submitted to you?

    A.  Yes.

    Q.  And is it a true and accurate blowup then of that?

    A.  Yes.

    Q.  Other than the enlargement, does it accurately depict everything that was on the original exemplar then?

    A.  Yes.

    Q.  As you look at that, can you see then factors that allow you to conclude that this handwriting was deliberately disguised?

    A.  Yes.

    Q.  And can you point out some of those to the Ladies and Gentlemen of the Jury, please?

    A.  The fact that there's zeros here with vertical streaks to make a line.  The sevens have a crossbar in them, but it's not consistent in height.  Sevens themselves are not consistent throughout.  They're different sizes and different shapes as well.

    Q.  When you look at, for example, this seven as the fourth one in (pointing), does that have any significance when you see that?

    A.  It's awkward and unnatural.

    Q.  As you look at, for example, the eights,

1

2          is there anything significant about that?

3                    A.  Yes.  This is a letter form that we see or

4          numerical form that is not taught at school; therefore,

5          it's a conscious effort.

6                    Q.  When you're looking then at the sixes, is

7          there anything that stands out there to show that's

          again being disguised?

8                    A.  Well, you can see that they're

9          inconsistent within themselves.

10                   Q.  As you look at them, then, do they also

11         appear awkward and changing configuration?

12                   A.  Yes.

13                   Q.  Now, for example, the one, again, on the

14         far edge on the bottom row, does that stand out to you

15         as significant?

16                   A.  Well, it doesn't stand out as significant

          any more than the others.

17                   Q.  You looking at all of them, then, you're

18         determining that they're deliberately disguised?

19                   A.  Yes.

20                   Q.  Did you also make that determination with

21         the other numbers?

22                   A.  Well, it's more difficult with a two or a

23         three or perhaps even a five, but some of these other

          numbers that we see are awkward and unnatural.

24
                                   473

Q.  Direct your attention to the fours, was there anything about the fours that you noticed as well?

A.  Well, there's extra strokes in here in these fours as if a person had forgotten how to make them.

Q.  Now, as you look at the totality of this then, is that what you based your conclusion as well as the other two exemplars on the fact that this individual is disguising their handwriting?

A.  All of the known writing indicated that, yes.

Q.  Thank you.  If you could resume the witness stand.

Mr. Johnson, was the fact that Dedric Moore's handwriting samples were disguised then, did that hamper your ability to make a comparison with the submitted questioned writing?

A.  Yes.

MS. LADD:  Thank you.  I'd tender this witness.

THE COURT:  Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.  You were not able to say that the handwriting on those -- that -- the sheet with those

474

numbers and the numbers up there belong to the same

person; correct?

        A.  That's correct.

        Q.  So that you made no identification --

        A.  That's correct.

        Q.  -- based on handwriting?

        Isn't it true that the way a person writes is

correlated with how they were schooled, where they were

schooled?

        A.  Yes.

        Q.  And isn't it true in most countries or

many countries around the world a seven is made with a

line through it?

        A.  That is a way that Europeans make sevens,

yes.

        Q.  And you don't have any way to know whether

the person was schooled in Europe or was familiar with

that; do you?

        A.  No.

        Q.  To you, it looks unnatural and artificial;

correct?

        A.  Yes.

        Q.  But if a person were schooled in Europe or

familiar with the scientific way that the number seven

is written, they would draw a line through it; correct?

475

A.   Yes.

Q.   And as far as the rest of the handwriting goes, if a person is in a hurry, that would change the way they were writing; correct?

A.   If they were in a hurry, it would be freely written, yes.

Q.   But it would change the -- perhaps the size and the distinctness of the letters or the numbers; correct?

A.   Well, you're asking me about a hypothetical, and I really -- I can guess an answer, but I don't know the answer to that.

Q.   Isn't it fair to say that there are many things that affect the way a person writes at any particular time?

A.   Yes.

Q.   One of those would be the instrument that the person was writing with; correct?

A.   Yes.

Q.   So that if he were writing with a wider instrument, you would have a different configuration than if you were writing with a smaller instrument or narrow instrument; correct?

A.   No.   The construction would be the same.

Q.   But it would appear different because of

476

the width of the instrument?

        A.  The width of the instrument would be different.

        Q.  And isn't it also true that if a person is being watched, that their handwriting might change because of nervousness?

        A.  Yes.

        Q.  And that would not be artificially, but simply as a part of the process of being watched?

        A.  Is that a question?

        Q.  Would you agree that that's a fair statement?

        A.  Yes.

        Q.  The information that -- Let me withdraw the question.

        You were not given any information about the circumstances under which these exemplars were taken; were you?

        A.  No.

        Q.  So that you don't know whether they were taken in the presence of police or in some other tense situation; do you?

        A.  No.

        Q.  Would that have an impact on your determination that the samples were faked in some way?

477

A.   Freely written writing is freely written. It's an unconscious act.  You mean can we make someone write some way; is that what your question is?

Q.   My question is would somebody's -- would the freeness of the act change if they were in a tense situation?

A.   It could.

Q.   Whether they wanted it to or not?

A.   Yes.

MS. LENIK:   No other questions.

THE COURT:   Ms. Ladd?

MS. LADD:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. LADD:

Q.   Mr. Johnson, when you were asked about the seven having a bar across it, that's not why you determined that it was disguised, is it, because it had a bar in it?

A.   No.

Q.   What were you looking at?

A.   I was looking at the height variations between where the position of that horizontal bar is in the seven.

Q.   So --

A.   It's not consistent.

478

1

2          Q.  And you were looking at all the sevens and

3  the way he made the sevens in relation to each other?

4          A.  Yes.

5          Q.  Now, you were asked about if someone was

6  in a hurry would that affect their writing.  In what way

7  would that affect their writing?

8          A.  It would have lighter pressure.

9          Q.  And you referred to freely written.  Is

   that what you're referring to as an unconscious act?

10         A.  Yes.

11         Q.  And does that mean you're not thinking

12  about what you're writing or how you're writing?

13         A.  Correct.

14         Q.  Now, when you look at the writing in this

15  sample and the other two samples, was it consistent with

   someone who was thinking about how they were writing?

16         A.  In my notes, I said that a conscious

17  effort was used.

18         Q.  In fact, is that your opinion then?

19         A.  Yes.

20         Q.  And that's thinking about how they're

21  forming their letters or their numbers in this case?

22         A.  Yes.

23         Q.  Now, when you talk about the width of an

24  instrument, that doesn't affect the configuration or the

                          479

1

2      forming of the number; does it?

3          A.   No.

4          Q.   And just if you use a fat pen, you get a

5      fatter number written on paper?

6          A.   Correct.

7          Q.   Now, when you receive exemplars, in fact,
       they're most often taken in the presence of police;

8      isn't that correct?

9          MS. LENIK:   Objection.

10         THE COURT:   I'm gonna sustain the objection.

11         Q.   (by Ms. Ladd)   When you make a request for

12     exemplars, you make the request of the police

13     department?

14         A.   The police usually submit questioning

15     known standards together.   I only make requests for
       additional standards if I feel that they may be useful.

16         Q.   As you look at these exemplars that you

17     saw then, they stood out not from nervousness, but

18     because of the deliberation that went into the making of

19     the numbers?

20         MS. LENIK:   Objection.

21         THE COURT:   Overruled.

22         A.   Would you repeat the question?

23         Q.   (by Ms. Ladd)   As you looked at the
       exemplars that we've discussed, they stood out not from

24
                            480

1

2    nervousness, but because of the deliberation that went

3    into the making of the numbers, if I understand you?

4              A.  I really can't answer that one way or the

5    other.

6              Q.  Was your opinion, in other words, I didn't

7    phrase that correctly, that they weren't freely written?

8              A.  My -- Yes, that's correct.

9              MS. LADD:  Thank you.  I have no further

     questions.

10             THE COURT:  Ms. Lenik?

11                     RECROSS-EXAMINATION

12                     BY MS. LENIK:

13             Q.  Well, you don't know the reasoning behind

14   why they were not freely written; do you?

15             A.  No.

16             Q.  So that your only response based on your

17   training and experience is that you believe that these

     numbers were not freely written; correct?

18             A.  Yes.

19             Q.  And the motivation or the purpose or the

20   situation behind the lack of freedom you can't

21   speculate; can you?

22             A.  No.

23             Q.  And you can't determine it based on what

     you see; right?

24
                              481

A.   Can't determine what based on what I see?

Q.   Why these numbers or letters were not freely written?

A.   No.

MS. LADD:   I believe that's been asked and answered, Your Honor.

THE COURT:   No, he may answer.

Q.   (by Ms. Lenik)   The answer was no?

A.   That's correct.

MS. LENIK:   No -- Nothing further.

FURTHER EXAMINATION

BY MS. LADD:

Q.   Just one point, I'm sorry, just so there's no misunderstanding, by freely written, you're not referring to under court order or request to do so; are you?   I mean, you're not talking about whether the person was told to do this writing?

A.   We -- We can't make people write.   We ask them to write.

Q.   And the freely part is going to their thought process that's going into it?

A.   Can I explain that a little bit?

Q.   If you would, please.

A.   If you think about when you write your own name, you're not thinking about where the person goes to

482

make the letters.  Handwriting is an unconscious act.

Once you've learned to write, you know what you're gonna

write.  You're not thinking of how the letters or the

numbers are made.  You're thinking about the content of

what you're writing.

MS. LADD:  Thank you.  I have no further

questions.

THE COURT:  Ms. Lenik?

MS. LENIK:  Yes.

FURTHER EXAMINATION

BY MS. LENIK:

Q.  So that when you say that these -- that

you don't believe these were freely written, you're --

what you're saying is that you don't -- that the person

was consciously watching himself as he wrote; correct?

A.  Yes.

Q.  But you don't know why he was consciously

watching himself as he wrote?

MS. LADD:  I believe that's been asked and

answered.

THE COURT:  Overruled.

A.  No.

MS. LENIK:  Nothing further.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

483

1

2                                    (Witness excused.)

3              THE COURT:  Call your next witness, please.

4              MS. LADD:  Call Paula Cardosi.

5                                    (Witness sworn.)

6                         PAULA CARDOSI

7         called as a witness on behalf of the People,

        being first duly sworn, was examined and testified as

8         follows:

9                    DIRECT EXAMINATION

10                    BY MS. LADD:

11              Q.  Could you please state your name.

12              A.  Paula Cardosi.

13              Q.  Can you spell your last name for us,

        please.

14

15              A.  C-a-r-d-o-s-i.

              Q.  And what is your occupation or profession?

16
               A.  I'm a forensic scientist with the Illinois

17
        State Police Laboratory at Springfield.

18              Q.  What's the nature of your work then in the

19        area of your practice?

20              A.  I'm assigned to the trace section of the

21        laboratory where I analyze things like paint, look for

22        ignitable liquids, also prescreen for glass and identify

23        other unknown material.

24              Q.  Now, how long have you been employed by

                                   484

the Illinois state lab then?

A.   Since 1965.

Q.   Could you describe your educational background for us, please?

A.   I have a Bachelor of Science Degree with a major in chemistry.

Q.   And could you outline the training that you've received in your field?

A.   I've attended a number of seminars, three days one week, two week on the kinds of equipment that I use and the analysis that I do.  I've also received on-the-job training.

Q.   And then with regards to your field, have you also published within that field?

A.   Yes, I've published one paper on the analysis of paints.

Q.   And have you also had occasion then to examine items for the presence of accelerants?

A.   Yes, I have.

Q.   And can you describe then what the techniques are used -- or used by you for that?

A.   Okay.  The technique that our laboratory uses is called absorption illusion technique.  And in that technique, the debris -- normally, there are debris samples that can also be clothing or whatever they're

485

looking for flammables, ignitable liquids on or in a sealed liquid type container.

The vapors that are emitted by the sample is collected on an activated charcoal packet which is placed inside the container.

That charcoal packet collects the volatiles emitted by the sample, then the packet is removed and the volatiles that were collected are stripped from that activated charcoal with a solvent.  We use carbon disulfide.

That carbon disulfide is evaporated down to a suitable portion and then a sample of that is injected into a gas chromatograph instrument.

Q.  Now, as part of your training and experience then, are you conversant and experienced in the operation of all of these pieces of equipment and these methods that you've described?

A.  Yes, I am.

Q.  And have you been qualified to testify previously as an expert within your field in court proceedings?

A.  Yes, I have.

MS. LADD:  At this time, Your Honor, I would tender the witness to the Court as an expert within her field.

486

1

2          THE COURT:  Ms. Lenik, cross-examination?

3                VOIR DIRE CROSS-EXAMINATION

4                    BY MS. LENIK:

5          Q.  Just out of curiosity, what's the name of

6     the publication in which you published?

7          A.  Journal of Forensic Sciences.

8          Q.  And is that a national publication?

9          A.  Yes.

10         MS. LENIK:  I have no other questions on

11    qualifications.

12         THE COURT:  The witness will be allowed to

13    testify as an expert.

14         Ms. Ladd.

15         MS. LADD:  Thank you.

16              DIRECT EXAMINATION (CONT'D)

17                    BY MS. LADD:

18         Q.  Ms. Cardosi, in your professional

19    capacity, did you have occasion to conduct analysis on

20    items of evidence that you received from the Champaign

21    Police Department in this case in March of 1998?

22         A.  Yes, I did.

23         Q.  Did that consist of two samples taken from

24    carpeting as well as a bra?

           A.  Yes, that's correct.

           Q.  I'd like to show you these three exhibits.

                              487

First of all, showing you what's been marked as People's
Exhibit 12B. Do you recognize that as I show you that
can?

     A.  Yes, I do.

     Q.  And how do you recognize that?

     A.  By my markings on the can.

     Q.  And what do you recognize that as?

     A.  My Exhibit No. 18, my case number S981498,
and then my initials, and then the date March 4th of
19 -- well, 3-4-98.

     Q.  Now, when you received this, was the red
seal on the top intact?

     A.  Yes, it was.

     Q.  Blue seal one you put on it when you
completed your analysis?

     A.  Yes, it is.

     Q.  When items are packaged in a metal can
like that, is there a reason for that?

     A.  Yes, because you're looking for volatile
material that's gonna evaporate.  Things like gasoline,
paint thinners, those all evaporate.  They're complex
mixture of compounds.  They're not an individual
compound.  And as they evaporate, they change
composition.

          If you're looking for that kind of a sample,

1
2      you have to preserve it properly, and that's put it in a
3      vapor type container.
4          Q.  Now, with regards to this sample then, I
5      notice that it's now open on the bottom.  Was it in a
6      sealed condition at all then when you received it?
7          A.  Yes, it was.  And we find that this
       happens with --
8          Q.  Well, actually --
9          A.  It looks like it's been cut open.
10         Q.  Yes, I opened it.  What I'm gonna do is
11     direct your attention to it.  I wanted to know if you
12     could look inside for a moment, and do you recognize
13     that as, in fact, the piece of carpet that you sampled?
14         A.  Yes.
15         Q.  Now, it's corroded the can since; is that
       correct?
16         A.  It's corroded, and sometimes you can get
17     the bottom of the can and the size of can, holes in them
18     or sometimes even pretty well rusted through.
19         Q.  And would that be consistent with a
20     chemical being present in there then?
21         A.  Well, that's consistent with water.  If
22     there's water in the sample, you can rust out the can,
23     because water will rust metal.
24         Q.  Now, with respect to Exhibit 12B, which
                            489

1

2        was your laboratory exhibit No. 17, then, when you

3        opened that, did you detect any odors?

4                A.  I thought that was 18.

5                Q.  I'm sorry.  That would be -- I misspoke.

6        That would be People's Exhibit No. 12B.  That would be

7        your laboratory exhibit No. 17.

8                A.  Yes, I did find an ignitable liquid in

         that sample.

9                Q.  Now, you received another rug exhibit

10       which was People's Exhibit No. 18.  I apologize for

11       misnumbering those.  And with regards to that one then,

12       that's People's Exhibit 12A.  Did you also receive that

13       in a sealed condition?

14               A.  Yes, I did.

15               Q.  Like to show you then 12A.  Do you

         recognize that?

16               A.  Yes, I do.

17               Q.  And, again, was the seal intact and the

18       bottom intact when you received it?

19               A.  Yes, it was.

20               Q.  Is that your blue seal that you put on it

21       subsequent to your examination?

22               A.  Yes, it is.

23               Q.  And as you look at that, again, I opened

24       the bottom so I can show you the contents, if I might,

                            490

1

2      and, again, as you look at that, do you recognize that

3      as another piece of the carpeting?

4              A.   The carpeting, yes.

5              Q.   Now, was this particular item, and that's

6      People's Exhibit 12A, your exhibit 18, is that what's

7      known as a control?

8              A.   Seventeen.

9              Q.   If you could look at it again.

10             A.   It's -- It's our exhibit 17.

11             Q.   Seventeen, then, is that known as a

12     control or is there a difference in these carpet

13     samples?

14             A.   Well, I don't know -- Whoever picked up

15     the carpet -- The only thing I know, it was listed as

16     two carpet samples on the receipt.

17             Q.   So --

18             A.   Whether they picked up one as a control or

19     not, I don't know that.

20             Q.   Then when it's submitted to you, what are

21     you testing for?

22             A.   It was submitted with request to look for

23     ignitable liquids, flammables.

24             Q.   Now, with regards to these rug samples,

       then, did you conduct an analysis in the method you

       described just a few minutes ago?

                            491

A.  Yes, I did.

Q.  Now, did you also receive the piece of clothing, a bra, that was in the can in the same type of packaging?

A.  Yes, I did.

Q.  Let me show you then People's Exhibit -- this is No. 11.  Ask you, again, do you recognize your seal on that?

A.  Yes, I do.

Q.  Did you put that on subsequent to your examination?

A.  Yes, I did.

Q.  And was it also in a sealed condition then with the red seal intact?

A.  Yes, it was.

Q.  And then as you -- Let me open it up, if I might, Mrs. Cardosi.  Ask you to, again, as you take a look at the contents, do you recognize --

A.  Yes.

Q.  -- as the bra you examined?

A.  The bra.

Q.  Now, when you received this particular item then, did you open it up and examine the contents?

A.  Yes.

Q.  And were you also alerted to looking for

492

1

2          any possible, possible unusual odors?

3                    A.   Yes.   The request for all three exhibits

4          was to look for flammables, ignitable liquids.

5                    Q.   And did you detect any odor with regards

6          to that Exhibit No. 11?

7                    A.   Yes, I did.

           Q.   And what was that?

8                    A.   I -- May I refer to my notes?   I don't

9          remember what --

10                   Q.   If you would, please.

11                   A.   Okay.   Okay.   I did not recognize the

12         odor, but there was an odor there.

13                   Q.   And how would you describe that odor?

14         What -- Like a food odor, a chemical odor, in other

15         words?

                     A.   A chemical odor, but since I couldn't

16         recognize it, I would have a hard time describing it.

17                   Q.   Once you made that determination and with

18         each of these items, did you conduct analysis

19         separately?

20                   A.   Yes, I analyzed each separately.

21                   Q.   And did you take steps to insure that

22         there was no contamination between the items?

23                   A.   Yes, I did.

24                   Q.   Then could you describe then what you did

                                    493

1

2      with each sample?

3              A.  Okay.  I sampled each separately.  The

4      first thing I did was the -- make a -- what is called

5      a -- a system blank which involves taking a -- that's --

6      was a can so I used a can, put in activated charcoal

7      packet in that can, seal it, then I do the same thing

       with the first exhibit, which was the bra.

8

9              I put a charcoal packet, opened that, put the

10     charcoal packet in, resealed it.  And I washed my hands

       between putting the packets in.

11

12             After I resealed that, I did the same thing to

13     the second exhibit that I examined and then I did the

       same thing to the third exhibit that I examined.

14

15             Q.  Did you then collect the items or the

       fumes that were being emitted?

16

17             A.  Yes.  That's what the charcoal packet that

       I put inside is for, collecting the vapors that are

18     emitted by the samples that are in the cans.

19             Q.  Now, did you then submit them to the

20     equipment or conduct analysis using the equipment that

       you described?

21             A.  Yes, I did.  I did this at room

22     temperature.  I left the packets in there for at least

23     five days.  Then when I do the analysis where I want to

24     strip that, I'll open each can separately, do them one

                            494

at a time.  I'll do the system blank first, take the
packet out, dilute any volatiles that are on that with
carbon disulfide, evaporate the carbon disulfide down to
the same volume that I am going to do in the sample and
then I take a sample of that and inject it into the gas
chromatograph, and then when I've finished with that
sample, I'll seal it and then go on to the next sample.

Q.  And then the piece of equipment, what is
that called?

A.  Gas chromatograph.

Q.  And then does that analyze the chemical
components within that sample?

A.  What the gas chromatograph does, it
separates -- These are complex mixtures that we're
looking for when we're looking for flammable, ignitable
liquids.  It separates the volatiles that you've
collected into the individual components that are
present; and as each individual component reaches the
detector, a signal is created and you'll end up with a
graph with a series of peaks and valleys.  You'll see a
base line at the bottom of the graph and then a peak,
which I guess I would call a hill, and then it will come
down into the valley, and then next component you'll get
another hill and then it will come down.

Q.  And then based on that analysis that you

495

1

2      conducted with each sample, first of all, were the

3      controls running correctly so that you could interpret

4      the results?

5              A.  Yes, the system blank that I ran showed

6      that there was no contamination on the activated

7      charcoal that I used for this analysis.

8              Q.  Did you receive results then from your

9      analysis that allowed you to draw conclusions as to what

       chemical components were in these items?

10              A.  Yes.  Well, except for the carpeting, I

11      found no -- nothing that I could identify the -- My

12      exhibit 17.  I could not identify any ignitable liquids

13      there.  There were components there, but they didn't fit

14      our profiles for an ignitable liquid.

15              Q.  And what do you mean when you say

       components?

16              A.  When you burn anything like carpeting or

17      clothing, you can get volatile material which are

18      chemical compounds off of that.  And that's called

19      background, if we cannot identify it as a flammable,

20      ignitable liquid, such as a light petroleum product,

21      gasoline, kerosene, heavy petroleum product, mineral

22      spirits.  There was a pattern there, but it did not fit

23      our profile for an ignitable liquid.

24              Q.  Would that be consistent with the

                                      496

1

2      existence of some flammable substance that was then

3      consumed by the fire or evaporated?

4              A.  My conclusion is that it probably was just

5      from the subtrait itself burning.

6              Q.  Now --

7              A.  Or something that fell, 'cause when you

8      have a fire, you have all kinds of debris that falls on

       these samples that they collect, and what was there in

9      that carpeting could either be from the carpeting itself

10     or something that fell on it.

11             Q.  Now, did you also analyze then the other

12     carpeting sample?

13             A.  Yes, I did.

14             Q.  And what did you determine about that?

15             A.  My exhibit number 18, I found that there

       was the characteristics of petroleum product

16     characteristic of gasoline, and I also found

17     characteristics of a medium petroleum product.

18             Q.  And when you describe a medium petroleum

19     product, what are you referring to?

20             A.  A medium petroleum product is something

21     like mineral spirits, paint thinners.  It's also used in

22     some charcoal lighters.

23             Q.  And with the existence of both of these,

       then, were you able to determine that there was

24

                                497

characteristics then of both the gasoline and the medium

petroleum product?

A.  Yes.  Both characteristics of the gasoline

and the medium petroleum product were present.

Q.  Would that be consistent with a mixture

then of the two?

A.  Yes, that would be consistent with a

mixture.

Q.  Would it also be consistent with someone

pouring gasoline and then some type of mineral spirits

or paint thinner on top of that?

A.  Well, it would be hard for me to say

whether they were mixed before they were poured or,

yeah, poured separately.  There's no way I would know

that.

Q.  So, your analysis just determines that

both were present within that rug sample?

A.  Yes.

Q.  Now, would it be possible for that to be

present within a rug sample and make the finding of

another rug sample few feet away that you did with the

other rug sample?  In other words, there's these

chemicals present and few feet away there's some

indications or components of those chemicals, but it

wasn't soaked into that portion of the carpet?

498

A.   I'm not sure I understand your question.

Q.   If you had a fire and there was gasoline and medium petroleum products like paint thinner put on a portion of the carpet and that was sampled, that would be consistent with the finding you made then in your exhibit, I believe it's 18?

A.   Yeah, yes.

MS. LADD:   And, for the record, that's People's Exhibit 12B, Your Honor.

Then if next to that a few feet away there was a rug that was involved in the fire, but not the source of the original accelerant, would that be consistent with the findings, in other words, you made with that other piece of carpeting?

A.   Yes, 'cause I did not find either gasoline or medium petroleum product in the other piece of carpeting.

Q.   But it could have been present during a fire that was burning in that area?

A.   It -- It could have, and then there's several reasons for -- can be several reasons for not finding.   First, it could be that there was none there to begin with.   Second reason could it was consumed in the fire.

Q.   Now, let me direct your attention to the

499

1

2       People's Exhibit No. 11, which is your lab number 16,

3       and that's the bra that you examined, did you conduct

4       the same analysis that you described to us with the rug

5       samples?

6               A.  Yes, I did.

7               Q.  And were the controls working properly on

        that analysis?

8               A.  Yes.

9               Q.  And what was the result of your analysis

10      then for the chemicals that were present in that bra?

11              A.  I also found petroleum product

12      characteristic of gasoline and also medium petroleum

13      product in that sample.

14              Q.  And, again, would that be consistent then

15      with charcoal starter or mineral spirits or paint

        thinner?

16              A.  Correct.

17              Q.  And, again, is it your opinion that both

18      of those were present on that item of clothing then?

19              A.  Yes, that's my opinion.

20              MS. LADD:  Thank you.  I'd tender this

21      witness.

22              THE COURT:  Ms. Lenik?

23              MS. LENIK:  Thank you.

24                          CROSS-EXAMINATION

                                 500

BY MS. LENIK:

Q.  In the sample that you didn't recognize the odor, do you know how far apart that would have been or could have been from the sample in which you did recognize the odor?

A.  I actually did not recognize -- Well, I -- in the one sample thought I smelled like the gasoline, kerosene, diesel fuel type of odor.  When you have a mixture, sometimes it's hard to characterize the odor because the mixture -- you've got a mixture of odors and we don't base our analysis on identifying odors.  We base the results of our analysis on the instrumental analysis that we do.  Odors are just something that we may make a note of so that when we are interpreting our data, it may lead us faster to look at a particular kind of flammable.

Q.  Well, in the -- in the exhibit 17, which was the piece of carpeting?

A.  Yes.

Q.  You found no ignitable liquids; correct?

A.  That's correct.

Q.  And in exhibit 18, which was also a piece of carpeting, you found the petroleum product characteristics of gasoline; correct?

A.  Correct.

501

1

2          Q.   My question is is there any way for you to

3    tell the distance between where those two pieces of

4    carpeting would have had to have been?

5          A.   Oh, no.  'Cause I wasn't involved in

6    collecting the samples.  Somebody else did that, so I

7    don't know how close together they were.

8          Q.   But I'm asking you by those findings, is

there any way to tell?

9          A.   No.  No.

10          Q.   Could you tell whether they were cut out

11    from the same original carpet?

12          A.   No.  I -- There's no way I would know

13    that, either.  The only way I would be able to make if

14    you get a physical fit where the pieces fit back

15    together.

16          Q.   And that didn't happen here; did it?

17          A.   There was no request for me to do that

kind of analysis.

18          Q.   So, they could have come from different

19    carpeting, they could have come from the same carpeting,

20    you wouldn't have any way to know that?

21          A.   That's correct.

22          Q.   And on the two items in which you did find

23    the petroleum product characteristic of gasoline and the

24    other petroleum product, you could not tell what those

502

specific products were; correct?  You couldn't tell if it were paint thinner or mineral spirits or what?

A.  No, because what we're looking at is a petroleum fraction, and what one company may call a mineral spirit, another company may call a charcoal starter.  So, we -- they're the same general class. They give the same profile, but what it was purchased as, I have no way of knowing that.

Q.  You also have no way of knowing how long it had been on the material; correct?

A.  That's correct.

Q.  Do you know generally how long the presence of those things is detectable by your equipment?

A.  It depends on a lot of variables, and there is no way I can estimate that.  It depends on the kind of material that it was deposited on, how much was deposited, how hot the fire was; and those are all things I don't know.  I do know that I have run some tests, I put some gasoline on a shoe and was able to detect it, oh, let's see, a week after I put it on.

Q.  So that it may be that the analysis would have -- it would have been up to a week, for example?

A.  I have no way of knowing that.  Too many variables for me to estimate that.

503

MS. LENIK:  I have no further questions.

THE COURT:  Ms. Ladd?

MS. LADD:  Nothing further.  Thank you.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

MS. LADD:  I'd call Dana Pitchford.

(Witness sworn.)

DANA PITCHFORD

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please tell us your name.

A.  Dana Pitchford.

Q.  And what is your occupation?

A.  I'm a forensic scientist.

Q.  And where are you so employed?

A.  I'm employed by the Illinois State Police Forensic Science Laboratory in Springfield.

Q.  What is your position with the Illinois State Police as a forensic scientist?  In other words, what's the nature of your work and responsibilities?

A.  I am a forensic scientist specialized in the area of forensic biology, and my duties include

504

screening and processing evidence for biological fluids, report on my findings, and, when necessary, testify in a court of law.

Q.  What is your educational background within that field then of forensic biology?

A.  I have a Bachelor's of Arts degree in biology from the University of Illinois in Springfield.

Q.  Have you also received any specialized training within that area of forensic biology?

A.  Yes, I have.  I've went through a focus training program which was offered by the Illinois State Police.  This training program consisted of a series of lectures and reading of journal articles which was followed by both written and oral exams, practical exams.

Upon passing each of these exams, I became proficient in the area of forensic biology and began supervised casework under the direct supervision of a senior analyst at the laboratory.

Q.  Now, how much of your time is spent now then in forensic biology?

A.  All of my time.

Q.  And how long have you been employed with the Illinois state lab as a forensic biologist?

A.  Since August of 1996.

505

Q. Now, have you also conducted research in the area of forensic biology?

A. Yes. I participated in a validation study for the Illinois State Police in which I validated a DNA extraction kit which has been used by the Illinois State Police indexing unit.

Q. And have you been qualified as an expert to testify on prior occasions in court?

A. Yes, I have.

MS. LADD: At this time, Your Honor, I would tender Ms. Pitchford to the Court as an expert within her field.

THE COURT: Ms. Lenik, cross-examination?

MS. LENIK: No, not on qualifications.

THE COURT: All right. She'll be allowed to testify as an expert.

MS. LADD: Thank you, Your Honor.

Q. (by Ms. Ladd) Now, Ms. Pitchford, what I'd like to do is ask you if you could be a little bit more specific about the types of things that a forensic biologist tests for. What types of bodily fluids, in other words?

A. Yes. As I said, I identify body fluids, and these body fluids include blood, semen, urine, vaginal secretions, and saliva.

506

Q.  And with regards to saliva, what is saliva?

A.  Saliva is the liquid substance found inside your mouth.  It's important for lubrication for chewing and talking.  It's also important for the breakdown of foods such as carbohydrates.

Q.  And what is it made up of then?

A.  It's made up of components such as majority of it is water.  It's also made up of salts, and other proteins can also be found in it.

Q.  Now, is there a method that you can use to identify or analyze the saliva stain?

A.  Yes, there is.  We do a test which looks at the proteins that are found in saliva, and this test reacts within a gel like substance, in which part of the gel is eaten away for a positive reaction.

Q.  Now, what's the importance or purpose of analyzing saliva stains then?

A.  Saliva also contains cells like skin cells in which DNA is present; and through DNA analysis, we can make associations between victim and suspect or victim, suspect, and crime scene.

Q.  Are you also able to make eliminations with that information?

A.  Yes, we are.

507

1

2          Q.   Now, are there environmental factors that

3     can affect the activity of a saliva stain?

4          A.   Yes.   One of the main environmental

5     factors is heat and humidity.   It can degrade a stain so

6     that I may not be able to identify it.   It would not

7     alter it in any way or change it, but I just -- it may

8     make it more difficult for me to identify.

9          Q.   Now, if you test for a particular stain

     such as saliva, do you always find it?

10          A.   No.

11          Q.   Does it depend on the amount of saliva

12     that's there and variable conditions?

13          A.   Yes, the environmental conditions and the

14     amount that could have been deposited.

15          Q.   Now, you also have the ability to test for

     the presence of blood; is that correct?

16          A.   Yes.

17          Q.   Are there preliminary tests that you

18     utilize if you observe a substance that appears to be

19     consistent with blood?

20          A.   Yes.   I do a preliminary test which allows

21     me to say that the stain appears to be blood, and it's a

22     real quick, easy chemical test in which I cut out a

23     small portion of what appears to be a red brown stain.

24     I put two chemicals on the stain, and a bright pink

508

1

2    color occurs, which allows me to say that blood is

3    indicated.

4         Q.   Now, if that blood instead of being soaked

5    into, say, a fiber or a cloth type item is on top of

6    something hard like glass, how do you collect it then?

7         A.   Normally, I would take a cotton swab,

8    moisten it slightly with some distilled water, and then

9    rub the swab over the slick surface such as glass.  And

     then cut a portion of that swab and test.

10        Q.   Now, you also have the ability to test for

11   the presence of urine; is that correct?

12        A.   Yes, we do.

13        Q.   And then can you describe what is urine

14   made up of?

15        A.   Urine, again, is made up of about 90,

16   95 percent water.  It also contains pigments and

17   nitrogenous gases, which these gases are like urea, uric

18   acid, and ammonia; and it also contains -- could contain

     semen or skin cells.

19        Q.   Does that always exist in urine or does it

20   again depend on different factors?

21        A.   Yes, it is dependent on factors.

22        Q.   Now, how do you locate or identify a urine

23   stain?

24        A.   The first step to identify a urine stain

                              509

on a light colored piece of evidence, I may visually be able to see a discolored area, but normally I use an alternate light source, and this light is just a real bright light similar to a UV light in which a urine stain glows very brightly a yellow color under the light.

Q.   Now, then is there a way to test chemically as well?

A.   Yes.   I perform a chemical test on a stain that may glow this bright color in which I cut out a small portion; and through a series of chemicals, the end result is a bright blue color which indicates that urine is present.

Q.   Now, as part of your work responsibility then, do you also analyze exhibits for the potential or the existence of potential fiber or hair evidence?

A.   Yes.   All evidence that comes into the laboratory, I tape each item, and I do this before I do any of the analysis that I had spoken about earlier so that I would not lose any hairs or fibers or miscellaneous debris.   I take a very large roll of tape and I roll it over each item and then I fold the tape sticky sides together and package in a coin envelope.

Q.   And is that, in fact, a forensically recognized and validated means of collecting that type

510

1

2    of fiber or hair evidence?

3            A.  Yes, it is.

4            Q.  Are you also responsible then for

5    processing and preparing blood standards so that they

6    can be analyzed further by the DNA unit?

7            A.  Yes, I am.  Sometimes blood standards come

8    into our laboratory already dried down on a filter paper

8    type material.  Other times, we get liquid bloodstains;

9    and to preserve that, I simply take a few drops of the

10   liquid blood and dry it down on filter paper and store

11   in the freezer for further analysis.

12           Q.  And why is blood stored, actually dried

13   onto sterile filter paper as opposed in the liquid form?

14           A.  We're able to keep it in much better

15   conditions suitable for DNA analysis.  This is the best

     way to preserve a bloodstain.

16           Q.  Again, is that a forensically recognized

17   and validated means of preserving that evidence?

18           A.  Yes, it is.

19           Q.  And is it, in fact, a more stable way of

20   preserving the evidence?

21           A.  Yes, it is.

22           Q.  I'd like to direct your attention to March

23   of 1998, and ask you if you had occasion in your

24   professional capacity as a scientist with the Illinois

                            511

state laboratory to receive various items of evidence

from the Champaign Police Department on this case?

    A.  Yes, I did.

    Q.  Now, did you then conduct initial analysis

of that evidence using some of the techniques you've

been describing to us?

    A.  Yes.

    Q.  Did you also prepare that evidence for

further analysis by other divisions of the state

laboratory?

    A.  Yes, I did.

    Q.  Did you receive three blood standards that

were identified as known standards from three named

individuals, Donrico Holtzclaw, Lori Hansen, and a

Dedric Moore?

    A.  Yes, I did.

    Q.  Like to show you those exhibits.  First of

all, with regards to the stain identified, or, I'm

sorry, the blood sample identified as from Donrico

Holtzclaw, I'd like to show you what's been marked as

People's Exhibit No. 65.  Do you recognize that box?

    A.  Yes, I do.  It has my markings on it.

    Q.  When you received it, was the red seal

intact?

    A.  Yes, it was.

Q. And, in fact, did you have to break the seal then?

A. Yes, I did.

Q. If you could open that up for us, please.

A. (Witness complies.)

Q. Is there a blood card inside of that kit?

A. This was the envelope in which the blood card was contained in. I removed this blood card and preserved it in our freezer and then sealed up the empty envelope and placed it back in inside it.

Q. And, for the record, is that People's Exhibit No. 66? If you'll turn the envelope over for us that you were holding up, and is that, in fact, People's No. 66?

A. Yes, it is.

Q. And was that also in a sealed condition?

A. Yes, it was.

Q. And did it contain the filter paper with the blood samples on that you've described?

A. Yes.

Q. Now, there was also whole blood in that as well; is that correct?

A. Yes, there were blood tubes in here, also. Since a stain card was made, this is the best way to preserve a blood standard, so I simply used this, a red

513

top tube.  It's not as well preserved as on the stain card.

Q.  Then after you broke open the seal and conducted your analysis, did you reseal it then with your blue seal?

A.  Yes, I did.

Q.  Thank you.  Did you then create an exhibit from this blood card for Donrico Holtzclaw to send on to the DNA unit?

A.  Yes, I did.  The blood card consists of, I believe, five holes in which I cut out two holes which were sent on for further analysis.

Q.  Now, when you're conducting this type of analysis and preparation on exhibits, do you take any precautions to insure that there's not any contamination of any of these items of evidence?

A.  Yes, I do.  I practice what we call at the laboratory clean technique in which I work with one exhibit at a time; and between going from one exhibit to the other, I bleach down my whole work area.  I also bleach down each of my tools which includes scissors and tweezers.

Q.  Like to show you then what's been marked as People's Exhibit 66A with regard to the blood card of Donrico Holtzclaw and ask you if you recognize that.

514

1

2          A.  Yes, it has my markings.

3          Q.  And what is that?

4          A.  This is a computer-generated lab number

5   and then my initials.

6          Q.  And, I'm sorry, within that packet, then,

7   is that the sample that you made from the blood card of

    Donrico Holtzclaw?

8          A.  Yes, it is.

9          Q.  And do you recognize your seal on that?

10         A.  I sealed it with this computerized tag.

11         Q.  And was the blue seal on it at the time or

12  was that intact as well?

13         A.  No.  The blue seal was made by the DNA

14  analysis.

15         Q.  Was this packet then preserved and later

    sent on for DNA analysis?

16         A.  Yes, it was.

17         Q.  Did you follow the same procedure then

18  with regards to the blood standard that was received

19  identified as from Lori Hansen?

20         A.  Yes, I did.

21         Q.  Like to show you what's been marked as

22  People's Exhibit No. 61.  Ask you if you could look at

23  that.  Do you again recognize that envelope?

24         A.  Yes, it has my markings.

                        515

Q.  And was it in a sealed condition when you received it?

A.  Yes.

Q.  And did it, in fact, contain a sterile filter paper with a blood sample in the very same manner as you've described previously?

A.  Yes.

Q.  Did you then process that and then reseal the envelope?

A.  Yes, I did.

Q.  In fact, is that your blue seal then?

A.  This is my seal markings.

Q.  Again, using that same technique, did you create a subexhibit to pass on to the DNA unit?

A.  Yes, I did.

Q.  I'd like to show you then what's been marked as People's Exhibit -- I believe it's going to be 61A, if I may have just a moment, Your Honor.  Yes. 61A.  Ask you as you look at this, and I believe that's laboratory 26A1, do you recognize that?

A.  Yes, I do.  It has my markings.

Q.  And, again, was that the packet that you used to contain that subexhibit you made for DNA analysis?

A.  Yes.

516

1

2          Q.  And was it sealed at the time that you

3   created it?

4          A.  Yes.  I sealed it with this blue evidence

5   tape.

6          Q.  And that would be the lighter blue?

7          A.  Yes.

8          Q.  And then was it totally sealed at the time

    without the darker blue seal?

9          A.  Yes.

10         Q.  Thank you.  And, finally, did you also

11   process blood samples identified as taken from Dedric

12   Moore?

13         A.  Yes, I did.

14         Q.  And did this come in in the form of whole

15   blood?

           A.  Yes, it did.

16
           Q.  And I'd like to show you then what's been

17   marked as People's Exhibit No. 64.  Ask you do you

18   recognize, in fact, that bag?

19         A.  Yes, it has my markings.

20         Q.  And, in fact, was that the bag that

21   contained the blood samples of Dedric Moore?

22         A.  Yes, it is.

23         Q.  Was it in a sealed condition with just the

24   red seal on it?

                        517

A.   Yes.

Q.   Did you then break it open and then subsequently reseal it with a blue seal?

A.   Yes, I did.

Q.   And do you recognize all the marks on that then?

A.   Yes, I do.

Q.   Now, did that contain, in fact, two vacutubes of whole blood?

A.   Yes, it did.

Q.   Then did you prepare any exhibit using those vacutubes?

A.   I prepared one stain card.

Q.   Thank you.  And if I might just show you the contents then, as you look at these, does that appear to be the blood tubes then with the markings on the tubes from Dedric Moore?

A.   Yes.  Those tubes also have my markings.

Q.   Again, did you follow the same techniques you described in creating that stain card?

A.   Yes, I did.

Q.   Now, I'd like to show you then what's been marked as People's Exhibit 64A, which is your laboratory exhibit 44A1, and ask you if you could take a look at that.  Is that, again, the packet then that you made

518

from the blood standards of Dedric Moore?

    A.  Yes, it has my markings.

    Q.  And do you recognize the lighter blue seal as yours?

    A.  Yes.

    Q.  And was it then intact and without the darker blue seal on it at the time?

    A.  Yes, it was.

    Q.  Now, after -- or in addition to preserving these known blood standards, then, did you also receive multiple items of clothing and evidence that you processed?

    A.  Yes, I did.

    Q.  And with these items, did you also process them for fibers or hairs in the manner you've described?

    A.  Yes.

    Q.  What I'd like to do then is show you several of these items.  Specifically, a jacket.  And this is People's Exhibit No. 8, and I believe that is laboratory number 33, and ask you do you recognize, first of all, the markings on that bag?

    A.  Yes, it has my markings.

    Q.  And was it sealed with the red seal only at the time that you received it?

    A.  Yes, it was.

519

Q.  Did you have to break open that seal?

A.  I cut at the opposite end of the bag.

Q.  And that's your blue seal on it now?

A.  Yes.

Q.  And did you then extract the item inside?

A.  Yes, I did.

Q.  Can you show us what's inside it?

A.  Mm-hmm.  May I stand?

Q.  If you need to, please.

THE COURT:  Yes.

A.  It's a gray jacket with an evidence tag in which I put my markings on.  I believe my markings are also up here on the collar, too.

Q.  (by Ms. Ladd)  And did you make any observations about any marks or stains on it?

A.  Yes.  There was a black red brownish stain on the back and also crusty like debris falling from it. I also taped this exhibit for any hairs, fibers, or miscellaneous debris.

Q.  And did you preserve that then for further analysis?

A.  Yes, I did.

Q.  Does that appear to be in substantially the same condition as when you conducted your analysis?

A.  Yes, it does.

520

Q.  Thank you.  With regards to that subexhibit, then, I'd like to show you what's been marked as People's Exhibit 8A.  And that's your laboratory number 33A.  And ask you to take a look at the packet.  That particular packet in that exhibit, do you recognize that?

A.  Yes.  The coin envelope has my markings on it.  I generated this exhibit.

Q.  And, again, is that the fiber and hair that you collected with the taping from the jacket you just identified?

A.  Yes, it is.

Q.  And was it in a sealed condition then with the lighter blue seal on it when you collected it?

A.  Yes.

Q.  And was it -- was the darker seal on it at the time?

A.  There's a yellow seal at the other end, and, no.

Q.  I'm sorry.  And what does the yellow seal tell you as opposed to the darker blue?

A.  Just that it comes from another laboratory.

Q.  And is that, in fact, the Carbondale laboratory?

521

A.   Yes, it is.

Q.   Now, there's another piece of cardboard in here.  Is that also then generated by the Carbondale lab for their analysis?

A.   Yes.

Q.   Now, did you also examine a shirt?

A.   Yes, I did.

Q.   And I'd like to show you then what's been marked as People's Exhibit No. 9.  And that's also laboratory number 36.  Ask you if you do again recognize the markings on that bag.

A.   Yes, it has my markings.

Q.   I'm sorry.  Was that in a sealed condition as well?

A.   Yes, it was.

Q.   And then what was contained inside of there, please?

A.   A green shirt in which also contained an evidence tag, and near the collar area I also have my markings.  I taped this exhibit for apparent hairs, fibers, and miscellaneous debris.

Q.   And did you make any observations about the general condition of that shirt?

A.   I may have to refer to my notes.  One of these exhibits had damage to the construction in which

522

1

2    there was a rubber tear.  I don't see it on this.  May I

3    refer to my notes?

4        Q.  If you need to.

5        A.  (Reviewing.)  The damage to the

6    construction was noted on the jacket.

7        Q.  And with regards to this, was it just in a

8    generally sooty or dirty condition then?

9        A.  Yes.

10       Q.  Does that appear then to be in

11   substantially the same condition as when you examined

12   it?

13       A.  Yes, it was.

14       Q.  Did you then also create a subexhibit for

15   fiber analysis from People's Exhibit No. 9?

16       A.  Yes, I did.

17       Q.  Like to show you what's been marked as

18   People's Exhibit No. 9A, which is laboratory exhibit

19   number 36A.  Is that that fiber exhibit prepared from

20   the shirt?

21       A.  Yes, it is.

22       Q.  And, again, do you recognize your seals in

23   the same manner as you described before?

24       A.  Yes, I do.

         Q.  And the blue seal was intact then when you

     prepared it?

                         523

1

2          A.   Yes.

3          Q.   Did you also receive a pair of blue jeans

4    then?

5          A.   Yes, I did.

6          Q.   Like to show you what's been marked as

7    People's Exhibit No. 10, and that's laboratory exhibit

     number 32.  Ask you if you could also look at those.

8    And, again, do you recognize the red seal on there and

9    your markings on the bag?

10         A.   Yes, it contains my markings, and it was

11   in a sealed condition when I received it.

12         Q.   Did you then open the seal and examine the

13   contents?

14         A.   Yes, I did.

15         Q.   Can you hold those up, please?  Do you

     recognize those?

16         A.   Yes, I do.  Again, they have an evidence

17   tag with my markings, and my markings are on the back.

18         Q.   Did you observe any damage to the lower

19   part of the pants or marks or stains?

20         A.   Yes, I noted that there were bloodstains

21   present.  Blood like stains were noted, excuse me, on

22   the jeans.

23         Q.   And could you hold those up so we could

     see the bottom as well?

24
                         524

1
2          A.  (Witness complies.)

3          Q.  Did you also observe any dirt or sooty

4     area?

5          A.  Yes, I did.

6          Q.  Was there also damage to one of the knees

7     of those pants?

8          A.  Yes, there was.

9          Q.  And could you show us where?

10         A.  It was in this area and then stains in
      this area (indicating).

11         Q.  When you say this, are you referring to

12    below the knee part of the pants on the left front?

13         A.  Yes.

14         Q.  And are those in substantially the same
      condition as when you look -- or examined them?

15         A.  Yes, substantially.

16         Q.  Did you again create a fiber exhibit from

17    those using that same technique?

18         A.  Yes.  I collected a taping to collect any

19    apparent hairs, fibers, and miscellaneous debris.  I

20    also checked the pockets for any possible debris.

21         Q.  Thank you.  And with regards to People's

22    Exhibit No. 10 and that fiber exhibit, I'll show you

23    10A.  Do you recognize that as the fiber exhibit then

24    that you created from those pants?

                           525

1

2          A.   Yes, it contains my markings.

3          Q.   And, again, was the blue seal on it when

4   you prepared it?

5          A.   Yes, it was.

6          Q.   Thank you.  Were you also examining then a

7   pair of shorts that had been submitted to you?

8          A.   Yes, I did.

9          Q.   Like to show you what's been marked as

10  People's Exhibit No. 17, and that's laboratory exhibit

11  number 4.  Do you again recognize the markings on the

    bag and the red seal on that bag?

12         A.   Yes.  It has my markings.  There's a red

13  seal across the top here.  It may not have been stuck

14  down well, so I also put my blue seal over the top of

15  it.

16         Q.   And was the bag sealed then when you

17  received it?

18         A.   Yes, it was.

19         Q.   And then what did it contain?

20         A.   It contained a pair of pink shorts.

21         Q.   And did you make any observations about

    those shorts?

22         A.   Yes.  They contained black sooty like

23  material.  And also after viewing under the bright light

24  or alternate light source, I viewed what appeared to be

a urine stain.  I tested for the presence of urine, and urine was found.

Q.  And where was the urine stain?

A.  You can see the markings that I made on the shorts.  It appears to be one continuous circle. The urine stain seemed to be covered throughout the shorts.  I cut out this larger area in the front which was glowing the darkest under the bright light, appeared to be the most concentrated stain.

Q.  Now, was that cut like that when you received it or were the shorts intact?

A.  No, they were intact.

Q.  Then that was cut as part of your analysis and extraction?

A.  Yes, it was.

Q.  And do they appear to be in substantially the same condition as when you received them with those obvious changes to them?

A.  Yes.

Q.  Thank you.  Did you then proceed to prepare a subexhibit for DNA analysis?

A.  Yes, I did.

Q.  And did you also prepare an exhibit from this item for fiber analysis in the manner you've described?

527

A.  Yes, I did.

Q.  And with regards then to People's Exhibit No. 17, the shorts, I'd like to show you two additional exhibits, 17A and 17B, and these would be your laboratory number 4A and 4B.  With regards to 17A, could you indicate to us what that is, please?

A.  Yes.  This is the taping that I collected from the shorts, and it has my markings on it and my seals.

Q.  And that's the blue seal again?

A.  Yes, it is.

Q.  And then with regards to 17B, is that a sample that you made for DNA?

A.  Yes, it is.  This is the cutout portion of the shorts that I preserved in this bag.  It has my markings and my seal.

Q.  That was the most concentrated area you described to us?

A.  Yes.

Q.  Did you simply cut that out and then repackage it then for further analysis?

A.  Yes, I did.

Q.  And these exhibits were both sealed then at the time?

A.  Yes.

528

Q.   Did you also receive then cords and laces that were balled up together?

A.   Yes, I did.

Q.   I'd like to show you then what's been marked as People's Exhibit No. 18 which is your laboratory exhibit number 2.  Ask you to take a look at that.  Again, did you receive that in a sealed condition with the red seal intact?

A.   Yes, it has my markings.  And it was sealed.

Q.   Did you unseal it?

A.   Yes, I did.  I unsealed it here where the blue seal is (indicating).

Q.   And can you describe what you found inside?

A.   It was exactly like this.  It contained, whoops, a group of different -- all different kinds of strings, cord like, ribbon like material.

Q.   And did you determine the approximate length of some of these strings?

A.   Yes.  I measured -- I believe I measured all of these that I could, and I put markings on some of the wider exhibits.  This wider exhibit has my markings on it.  Some like the black round one I knew I would not be able to identify markings on it, so I did not label

529

it.

Q.   What were the approximate lengths of those strings just in general?

A.   Oh, I'd have to refer to my notes.

Q.   If you could.

A.   (Reviewing.)  They ranged in size from 54 inches long to 9 inches, 20 inches, 31.  One was a hundred inches long.

Q.   As you look at these, do they appear to be in substantially the same condition as when you conducted your analysis then?

A.   Yes, they do.

Q.   And, again, do you use the same technique to collect hair and fiber evidence?

A.   Yes, I do.

Q.   Like to show you 18A which is your laboratory 2A.  Do you recognize that then as a subexhibit you created for further fiber analysis?

A.   Yes, this is a taping, and it has my markings on it.

Q.   And, again, was that your blue seal on it then?

A.   Yes, it is.

Q.   Thank you.  Did you also receive glass that had been located at the scene?

530

1

2          A.   Yes, I did.

3          Q.   I'd like to show you then what's been

4    marked as People's Exhibit No. 22, which is your

5    laboratory number 31.  Do you recognize that packet as

     well?
6
           A.   Yes, it has my markings.
7
           Q.   And was it in a sealed condition?
8
           A.   Yes, it was, and then this is where I
9
     opened the packet.
10
           Q.   I'm not sure if the exhibit's been opened
11
     yet or not.  Has not.  What I will do is open it
12
     slightly and then ask you if you could look inside and
13
     tell us if you recognize the contents.
14
           A.   (Witness complies.)  It contains -- There
15
     it is.
16
           Q.   And you can leave it in the bag if you
17
     need to, that's fine.

18         A.   Very small piece of glass in which has my

19   markings on it on one side.  On the other side, contain

     the bloodstain in which I removed with a swab.
20
           Q.   And, in fact, did you conduct a
21
     preliminary test then for the presence of blood?
22
           A.   Yes, I did.
23
           Q.   And was it positive?
24
           A.   Yes, it was.

Q.  Did you create a subexhibit then from People's Exhibit No. 22 for DNA analysis?

A.  Yes, I did.

Q.  And did you use that swab technique you've described to us?

A.  Yes.

Q.  I'd like to show you People's Exhibit 22A which is your laboratory 31A.  Is that the subexhibit that you created then?

A.  Yes, it is.  This contains the swab that I collected from the bloodstain on the glass.

Q.  And do you recognize your seal on that?

A.  Yes, it has my markings and my blue seal.

Q.  Thank you.  Finally, did you analyze a cigarette butt that was submitted to you from the scene?

A.  Yes, I did.

Q.  I'd like to show you what's been marked as People's Exhibit No. 19, which is your laboratory exhibit number 1, and ask you, first of all, as you look at that bag, do you recognize markings on that?

A.  Yes, I do.

Q.  And are those your markings?

A.  Yes.

Q.  And then was the red seal intact on that at the time?

532

1

2          A.  Yes, it was.

3          Q.  And then as you look inside, was there

4    anything -- another packet inside of there, in fact?

5          A.  Yes.  Inside was this coin envelope in

6    which the cigarette was contained inside this and --

7          Q.  And was that also sealed with the red

     tape?

8

9          A.  Yes, it was, and I cut through this top

     portion here.  Well, no, I cut through here where this

10   blue seal is.

11         Q.  And that's your seal now?

12         A.  Mm-hmm.

13         Q.  You have to say yes or no, I'm sorry.

14         A.  Oh, yes.  I'm sorry.

15         Q.  And as you look at that, does that appear

     to be in substantially the same condition as when you

16   conducted your analysis?

17         A.  Yes.  It was charred like.  It has my

18   markings on it, and I can identify a few of the initials

19   off of the name brand.

20         Q.  And is that a cigarette butt then?

21         A.  Yes, it is.

22         Q.  And what were the letterings that you can

     identify on it?

23

24         A.  A w-p-o-r-t.

                         533

Q. Now, did you conduct any tests on this then to determine if there was saliva present?

A. Yes, I did.

Q. And was it using the techniques you described to us earlier?

A. Yes.

Q. What were the results of that test?

A. It was positive or enables me to say that saliva is indicated.

Q. Did you then have occasion to, with regards to that, create again a subexhibit for DNA analysis?

A. Yes, I did.

Q. If I could show you then People's Exhibit 19A which is your laboratory number 1A. Is that that subexhibit?

A. Yes, it is. It has my markings.

Q. And, in fact, was your seal also on that?

A. Yes.

Q. And how did you create that exhibit from the cigarette butt?

A. I cut a small portion, approximately a half inch off of one end of the cigarette butt where you would expect the filter end where your mouth would be present on the cigarette butt.

534

Q.  And was that actually preserved then for that sample?

A.  Yes, it was.

Q.  Did you also process two pieces of black stocking?

A.  Yes, I did.

Q.  I'd like to show you then what's been marked, first of all, as People's Exhibit No. 20 which is your laboratory number 14.  Ask you do you recognize your markings on that?

A.  Yes, it has my markings.

Q.  And was it in a sealed condition with simply the red seal on it at the time?

A.  Yes, it was.

Q.  And did you open it and examine the contents?

A.  Yes, I opened at the opposite end.

Q.  And can you then pull out the contents for us, please.

A.  (Witness complies.)

Q.  And if you need to stand up, that would be fine.

A.  Okay.

Q.  What did you find inside that?

A.  One piece of pantyhose in which part of

535

the leg was missing.  It contained -- This was not

present on there (indicating).  This is generated by

another lab.

Q.  Is that the cardboard piece?

A.  Yes.  And then I have my markings here

around the waistband (indicating).  And I collected any

hairs, fibers, and miscellaneous debris.  I also noted

the red stain here on the back panel.

Q.  And then does that appear to be in

substantially the same condition as when you conducted

your analysis with the exception that there is now that

cardboard card?

A.  Yes.

Q.  Did you then reseal that with the blue

seal?

A.  Yes, I did.

Q.  And was the yellow seal on it at the time?

A.  No, it was not.

Q.  Then was it then intact and preserved for

further analysis?

A.  Yes, it was.

Q.  Did you also collect any fibers or hairs

from that exhibit?

A.  Yes, I did.

Q.  That would be, again, People's Exhibit

536

No. 20 which is your exhibit 14, I believe.  Did you have occasion then to create a subexhibit for hair and fiber analysis?

A.  Yes, I did.

Q.  Like to show you what's been marked as People's Exhibit 20A, your laboratory 14A.  Do you recognize that?

A.  Yes.  This is a taping.  It contains my markings and my blue seal.

Q.  And was it in a sealed condition then when you prepared it?

A.  Yes, it was.

Q.  Now, did you also receive another item that was a portion of a black stocking?

A.  Yes, I did.

Q.  Like to show you what's been marked as People's Exhibit 21 which is your laboratory number 12. Ask you as you look at that, again, do you recognize your markings on the outside of that bag?

A.  Yes.  Contains my markings.

Q.  And was it in a sealed condition with the red seal intact?

A.  Yes, it was.

Q.  Were there any other seals on it at the time you received it?

537

1

2          A.   No.

3          Q.   And did you then remove and examine the

4    contents?

5          A.   Yes, I removed from this end down here

6    (indicating).

7          Q.   And that's your blue seal that you put on

    it when you were done?

8          A.   Yes.

9          Q.   And can you tell us what you found and

10   show us?

11         A.   I observed --

12         Q.   And, again, if you need to stand up so

13   everyone can see, that would be fine.

14         A.   A small portion of black stocking in which

     I noted was similar to the exhibit that we just looked

15   at.  I'm not trained on physical match, so I did not

16   make a physical match.  It just appeared visually to be

17   very similar.  I have my markings on it.  I also have

18   markings here where I viewed this item under the

19   alternate light source (indicating).

20              This area also had a very faint glowing

21   appearance (indicating), which is very indicative of a

22   saliva stain.  I cut the stain out and tested for the

23   presence of saliva.

24              And this area up here (indicating) is --

                              538

there's written there a U1.  This is my unstain control.
This is a part of my analysis in which I cut out a
control which insures me that this stain is what is
causing the reaction to be positive for the presence of
saliva and that it's not the material itself.  I test an
unstain control on all items that I do any testing on.

Q.  Now, if that item had been exposed to,
say, saliva or mucus at other parts in the stocking,
could it react positively?

A.  Yes, it could.  The only difference
between this area and this area (indicating) was the
glowing under the alternate light source.  This was
brighter.  The whole object had a slight glow to it.
This was just a little bit lighter area (indicating).

Q.  Did you then use the amylase test for that
area that you've cut out?

A.  Yes, I did.  I did a test that we do
called amylase or radio gel.  It looks for a component
that's found in saliva in which I place a small portion
of this stain in a gel and it eats away at part of the
gel when saliva is present.  This area here (indicating)
gave a very strong positive control; however, my
unstained control also reacted, which enabled me to only
give out results that this was inconclusive for the
presence of saliva.  If this was a negative

539

(indicating), I would have been able to say that saliva was indicated.

Q. Now, with those tests then, is it correct that there was a much stronger reaction in the action you've cut out?

A. Yes. This was -- had a much stronger reaction, but because of the slight reaction here (indicating), I must -- I needed to call it inconclusive.

Q. And you want to be conservative and make sure that you're not calling it something it's not, in other words?

A. Correct.

Q. Did it -- The area that you cut out that reacted strongly to the presence of saliva then, did you preserve that for further DNA analysis?

A. Yes, I did.

Q. And that -- Let me ask you, if other portions of that stocking had been exposed to someone's face, say, in being pulled up or down so, again, bodily fluids got on it such as saliva, would that also account for the weaker finding that you found near the top part of that?

A. Yes, it would.

Q. With regards to that item, was it also

540

E-FILED
Friday, 04 May, 2007  05:16:13 PM
Clerk, U.S. District Court, ILCD

open at both ends?

A.  Yes, it is.  This end (indicating) is kind of rolled up, and this other end (indicating) is kind of unraveling.

Q.  And is this wider then at the bottom end that you're holding?

A.  Yeah.  It's kind of hard to see, but this end is the widened (indicating).  This end is much smaller (indicating).

Q.  And it's been stretched out by another laboratory over a card; is that right?

A.  Yes.

Q.  And you cut that circular portion out near the wider end that reacted strongly to the test for saliva?

A.  Yes.

Q.  And did you create a subexhibit then?

A.  Yes, I did.

Q.  And as you look at that, does that appear to be in substantially the same condition with the explanation of the changes you've effectuated to it?

A.  Yes, it does.

Q.  Did you then seal that up using that blue seal so that you could send it on for further analysis?

A.  Yes, I did.

541

1

2          Q.  And with regards to that subexhibit then,

3     I'd like to show you what's been marked as People's

4     Exhibit No. 21A and B, and ask you did you create both a

5     fiber and a DNA subexhibit from that item, that portion

6     of stocking?

7          A.  Yes, I did.

8          Q.  Showing you then what's been marked as

9     People's Exhibit, first, 21B with regards to the DNA,

10    and that's your laboratory 12B.  Do you recognize that

11    as an exhibit you created for the DNA analysis?

12         A.  Yes, I did.  This is the portion that I

13    cut out.  Has my markings and my seal.

14         Q.  And then the other seal was not on it at

15    the time?

16         A.  Correct.

17         Q.  And then did you also create the fiber

18    exhibit, and I'll show you 21A, which is your laboratory

19    12A?

20         A.  Yes, I did.  It has my markings and my

21    blue seal.

22         Q.  And was that, again, only with one seal at

23    the time?

24         A.  Yes.

          Q.  Now, there's also, again, a cardboard item

     contained inside of it.  Do you recognize that as

542

something created by the Carbondale lab later?

     A.  Yes, I do.

     Q.  All of these items then that you preserved for further analysis, I'd like to direct your attention, first of all, to all the exhibits you created for the fiber and hair analysis, were those later forwarded to Suzanne Kidd of the Carbondale laboratory?

     A.  Yes, they were.

     Q.  And then all of the items you've identified as being created for further DNA analysis, were those forwarded to Kevin Zeeb of the Morton laboratory?

     A.  Yes, they were.

     MS. LADD:  Thank you.  I'd tender this witness.

     THE COURT:  Counsel, why don't we take our mid morning break at this time.

     Ladies and Gentlemen, if you'll go with Mr. Rasmus to the jury room.  Take about at least 15 minutes and then we'll bring you back out here.

     (The following proceedings were had out of the presence and hearing of the jury.)

     THE COURT:  Show the following is out of the presence of the jury.

     And I'm gonna direct the witness not to

discuss your testimony with anyone during the break; all
right?

THE WITNESS:  Mm-hmm.

THE COURT:  We will be in recess.

(Recess taken.)

THE COURT:  Ms. Ladd, are you ready for the
jury to be brought out?

MS. LADD:  Yes.  Thank you.

THE COURT:  Ms. Lenik?

MS. LENIK:  I am.

THE COURT:  Ms. Ladd, do you have anymore
witnesses for the morning?

MS. LADD:  No.  Thank you, Your Honor.

THE COURT:  Mr. Rasmus, bring the jurors in.

Ms. Ladd, I don't have anything at 1 o'clock,
so I'm going to have the jurors at 1 o'clock, so we'll
start as shortly thereafter as possible.

MS. LADD:  I have a witness coming from out of
town, so.

THE COURT:  All right.

MS. LENIK:  This is -- Oh, this is the end of
the morning?

THE COURT:  Yes.

MS. LENIK:  Your Honor, is there something
else we can do productively with the time?

544

THE COURT:  This morning?  We'll see.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Ms. Lenik, cross-examination?

MS. LENIK:  Thank you.

CROSS-EXAMINATION

BY MS. LENIK:

Q.  Ms. Pitchford, it's true that you can get DNA from urine; isn't it?

A.  Yes, it is.

Q.  And you can get other bodily fluids besides saliva from -- I'm sorry.  You can get DNA from other bodily fluids besides saliva; correct?

A.  Yes, it is.

Q.  Now, you received an exhibit which you numbered 27 which contained fingernail scrapings from someone identified to you as Lori Hansen; correct?

A.  Correct.

Q.  And you found nothing of biological value in those fingernail scrapings; correct?

A.  Correct.

Q.  You also received an exhibit which you numbered 28 that contained -- was a sealed envelope containing head hair standard from a person identified

545

1

2        to you as Lori Hansen; correct?

3              A.   Correct.

4              Q.   And you noted that there was an inadequate

5        standard for comparison; correct?

6              A.   Correct.

7              Q.   What does that mean to you?

8              A.   I'm not a microscopist, but when I viewed

9        the hairs, I normally count them to send them on for

10      further analysis, and a microscopist will need hairs

11      that have been pulled, and these hairs appear to have

12      been cut.  They were all exactly the same size, and

13      not -- those are not suitable for further analysis by

14      the microscopist.

15             Q.   Why not?

16             A.   Because they need individually pulled

17      hairs and not cut hairs.

18             Q.   And why is that?

19             A.   I'm sorry, I don't know.  I'm not

20      specialized in that area.

21             Q.   Okay.  But you -- So, what this means

22      ultimately is that the known head hair which was given

23      from this woman identified as Lori Hansen could not be

compared to any of the hairs that were found in any of

the materials that you took hair from?

24             A.   In that exhibit, yes.

Q.  You also noted in your Exhibit 1 that you detected saliva on the cigarette butt; correct?

A.  Correct.

Q.  But the material which was contained in the saliva, the amylase, is also found in other bodily fluids; correct?

A.  Correct.

Q.  And what does that mean?

A.  It means that amylase is present in high concentrations in saliva.  It's found in low concentrations in other bodily fluids like vaginal secretions and breast milk.  They are very low.  This is why when I report out my findings I'm only able to say that saliva is indicated and not identified.

Q.  So that means that the cigarette butt could have had other bodily fluids and they would have given the same results?

A.  It's possible, yes.

Q.  Do you know how long a particular bodily fluid will last on a particular exhibit?

A.  No.  There are many factors, particularly environmental factors, that play a part in the degradation of a stain.

Q.  And so when you're presented with all of these exhibits that you worked on, you couldn't tell

547

1

2    when those stains were created; correct?

3         A.  No, I could not.

4         Q.  And you were not given any information

5    about when the -- when the stains were suspected to be

6    created; were you?

7         A.  Other than the evidence receipt simply

    stating the time of the assault, no, I'm not.

8         Q.  And that's something given to you on a

9    piece of paper from the police; correct?

10        A.  Or through phone conversations, yes.

11        Q.  And so they will say to you that they

12   believe the -- an assault took place on a certain date

13   and time?

14        A.  Correct.

15        Q.  And that's all the information that

    they'll give you regarding time; correct?

16        A.  Correct.

17        Q.  And the same would be true of the urine

18   indicated on the pink shorts; correct?  You couldn't

19   tell when that urine was made on those pink shorts?

20        A.  That's correct.

21        Q.  Let me ask you this in regard to the pink

22   shorts, would there be a difference if the person who

23   was wearing the shorts urinated in them herself or

24   whether somebody from the outside urinated on her?

                  548

1

2          A.   No, I identified urine.

3          Q.   Could you tell if it was from a male or a

4    female?

5          A.   No, I could not.

6          Q.   Could you tell if the stain was made, for

7    lack of a better word, from the inside or the outside?

8          A.   No, I could not.

9          Q.   And when you examined the black stocking

10   which you've identified and which is your exhibit number

11   12, you examined that for saliva; did you not?

12         A.   Yes, I did.

13         Q.   And that was an inconclusive

14   determination; correct?

15         A.   Yes.

16         Q.   And that means that it could have been

17   saliva and it could have been something else; correct?

18         A.   I have inconclusive results due to the

19   fact that my unstained control gave me a positive

20   result.

21         Q.   So that it could have been -- Whatever

22   fluid was on it was on the entire object?

23         A.   Possibly, yes.

24         Q.   Or at least on all of the object that was

tested?

         A.   Yes.

549

Q. And is that reaction the same -- or would that reaction be the same for other bodily fluids?

A. The difference between saliva and other body fluids is the saliva gives me a much stronger reaction, where other body fluids may be a lighter reaction.

Q. And so would you be able to say conclusively it was saliva on the entire stocking or would you simply be able to say that it's consistent with it being saliva on the entire stocking?

A. It appeared to be consistent with saliva.

Q. You don't know the age of that saliva; do you?

A. No, I do not.

Q. If you were told that the woman who owned the stocking had owned the stocking for a year or for at least a year prior to it being retrieved from her, would you be able to say when that saliva was put there?

A. No, I would not.

Q. You were also given an item which you numbered 29 which was said to contain the swab from hands of a person named Lori Hansen; correct?

A. Correct.

Q. And you did not do any analysis on that; did you?

550

A.   No, I did not.

Q.   What does a swab from hands mean to you?

A.   I believe the investigator or possibly someone in the medical field observed what appeared to be a bloodstain on her hand, and they took a swabbing of that stain.

Q.   And you did no analysis on that?

A.   Correct.

Q.   And the only analysis you did on your 31, which was a piece of glass with a stain, was that it contained human blood; correct?

A.   Exhibit 31, the piece of glass?

Q.   Yes.

A.   Yes.

Q.   You didn't do any further typing of that blood; did you?

A.   No.  I identified human blood and then preserved for further analysis.

Q.   And that was further analysis by -- by different scientists?

A.   Correct.

Q.   You were also given an exhibit which was numbered 38 which were -- which was a sealed envelope containing tapings said to be from the driver's seat of a truck; correct?

551

A.  Correct.

Q.  And you did no analysis on that; correct?

A.  Correct.

Q.  You were also given an exhibit which you numbered 41 which you were told was a sealed bag containing hairs from the interior driver's door; correct?

A.  Correct.

Q.  And you did no analysis on that; correct?

A.  Correct.

Q.  When you do -- When you don't do analysis on material that's given to you, what's the reason for that?

A.  The tapings that were collected, I cannot analyze those.  I'm not specialized in the area of microscopy, and they are simply sent on to a microscopist.  The hairs are collected are for the same reason.

Q.  You also didn't do any examination of an exhibit 47 that had a black shoestring in it; did you?

A.  Correct.

MS. LENIK:  May I have a moment?

THE COURT:  Yes.

MS. LENIK:  No further questions.

THE COURT:  Ms. Ladd?

552

MS. LADD:  No questions.  Thank you.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Ladies and Gentlemen of the Jury, because of some scheduling problems with the Court, that's going to conclude the testimony for the morning.

I don't have anything scheduled this afternoon, so I want you back in the jury room by 1 o'clock, and we'll get started as quickly thereafter as we can.

Don't discuss the case among yourselves or with anyone else.

We'll take a break now until 1 o'clock this afternoon.

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  We'll show the following is out of the presence of the jury.

Ms. Ladd, you've got two more witnesses this afternoon?

MS. LADD:  Correct.

THE COURT:  And as soon as they get here or as soon as you're ready, we'll begin.  I just wanted the jury back at 1 o'clock in case we can get started

earlier.

MS. LADD:  Thank you.

THE COURT:  Ms. Lenik, you indicated that you had possibly five or six witnesses?

MS. LENIK:  Your Honor, I have possibly one, two, three, four, five witnesses, plus Mr. Moore, if he chooses to testify.

THE COURT:  All right.  Well, will you have your witnesses available this afternoon?

MS. LENIK:  I have instructed my secretary to make sure they're here at 1:30.  Obviously, I don't know how successful she was.

THE COURT:  All right.

MS. LENIK:  We have some people without phones and that sort of thing.

THE COURT:  All right.  We will make whatever arrangements we need to make.

For scheduling purposes, counsel, we want to finish this case tomorrow and get it to the jury sometime tomorrow, hopefully in the morning.  I have a full day of city court in the morning on Friday and sentencing hearings Friday afternoon, so we will make whatever arrangements we need to make to make sure we get this to the jury as early as we can tomorrow.

Anything else for this morning at this point?

554

MS. LADD:  No.  Thank you, Your Honor.

THE COURT:  All right.  We'll be in recess.

Officer, if you could bring the Defendant over at 1 o'clock.

(Recess taken.)

THE COURT:  Ms. Ladd, are you ready for the jury?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  Yes, I am.

THE COURT:  Mr. Rasmus, bring in the jurors.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Ms. Ladd, call your next witness.

MS. LADD:  Thank you.  I'd call Suzanne Kidd.

(Witness sworn.)

SUZANNE KIDD

called as a witness on behalf of the People, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you please state your name and spell your last name for the Court.

555

1

2          A.   My name is Suzanne Kidd, K-i-d-d.

3          Q.   What is your occupation or profession?

4          A.   I'm a forensic scientist specializing in

5     the area of microscopy.

6          Q.   And where are you so employed?

7          A.   I'm employed at the Southern Illinois

      Forensic Science Center in Carbondale, Illinois.

8          Q.   How long have you been so employed?

9          A.   Over eight years.

10         Q.   Can you describe what your primary duties

11    and responsibilities are then?

12         A.   My primary duties include receiving

13    evidence, doing examinations on those evidence,

14    specializing in hairs and fibers and things of that

15    nature.  Then testifying in court when necessary.

16         Q.   And what is forensic microscopy and what

17    kind of evidence does it include or allow you to

      examine?

18         A.   Forensic microscopy includes the

19    examination and comparison of hairs, fibers, some soil,

20    wood, building material, particular unknowns, fabric

21    impressions.  I think that's it.

22         Q.   And have you received any specialized

23    training in the area of microscopy?

24         A.   Yes.  I went through one and a half years

                            556

of training in the area of microscopy given by the
Illinois State Police.

Q.   Have you also or could you describe for
us, rather, your educational background then?

A.   I have a Bachelor's Degree specializing in
medical science.  It's a biology degree from Southern
Illinois University at Edwardsville.

Q.   Now, have you also given professional
presentations then within your field?

A.   Yes.  I've given presentations at the FBI
fiber symposium.

Q.   And are you a member of any professional
academies or science societies related to forensic
science?

A.   Yes.  I'm a member of the Midwestern
Association of Forensic Scientists and the American
Academy of Forensic Scientists.

Q.   Have you been qualified to testify in
court as an expert in your field on prior occasions?

A.   Yes, I have.

MS. LADD:  At this time, I would tender this
witness to the Court as an expert within her field, Your
Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  No questions.

557

THE COURT:  All right.  She'll be allowed to testify as an expert.

MS. LADD:  Thank you.

Q.  (by Ms. Ladd)  Ms. Kidd, what I'd like to do is ask you, first of all, some preliminary questions about the work you do.

What type of instruments do you use to conduct hair and fiber examinations?

A.  Hair and fiber examinations are conducted mainly using microscopes, both a low power and a high powered microscope.  We do also some instrumental work.

Q.  And what is hair?

A.  Hair is a slender thread like outgrowth from the skin of mammals.

Q.  Is there anything about the structure of hair in its characteristics then to allow for different features and differentiate?

A.  Yes.  To explain that, I would like you all to -- if you have pencils available, a pen would work, too, but if you can imagine a pencil, I'll give you a little bit of an analogy of what the characteristics we look at are in a hair.

First of all, the overall demonstration of a hair is if you look at the pencil, the eraser area would be the root area of a hair.  The painted area of the

558

pencil would be --

MS. LENIK:  Your Honor, if the witness is going to demonstrate something, I would object.  I don't believe this calls for a demonstration.

THE COURT:  Overruled.

A.  The pencil or the painted part of the pencil is what would be consistent with your hair shaft, and then the tip of the pencil would be consistent with the tip of the hair.

Now, you can have -- the tip of the hair can be tapering like the pencil, a sharpened pencil would be.  It can be blunt cut like a -- like a pencil unsharpened would be, or it can be broken.

Those are gonna be the overall features of the hair.

And then under a high powered microscope, we'll look at the internal features of the hair, and a hair is made up of three main areas.  That's gonna be your cortical, your medulla, and your cortex.

The cortical is basically the outside layer like your paint on your pencil.  And it is just -- it resembles scales like scales of a fish or shingles on a roof.  It just has small scales that overlap each other.

Then the cortex, which is the main body area of the hair or would resemble like the wood of the

559

pencil, and this is where you're gonna find your pigment granules that gives hair its color.

You may also find in this area things like cortical fusi, which are just little small air pockets that may or may not be present.

Then running down the center part of the cortex is a medulla, and that is gonna be similar to head of your pencil.

Now, this may or may not be present.  All it is is central core cells in the hair.

And it's all of these features that we are gonna look at when we do a hair examination and comparison.

Q.  (by Ms. Ladd)  And what type of questions then can you answer through scientific examination of hairs?

A.  First of all, we can determine whether a hair is human or animal.  If it's animal, sometimes we can determine the species.  If it's human, we can determine what race.

We classify the features of the hair into three different scientific races, that being Caucasian, a Mongoloid, or Negroid.

Q.  And those are the scientific terminologies then?

560

A.   Yes.

Q.   Now, in contrast to hair evidence then,
what is a fiber?

A.   A fiber is a small unit -- smallest unit
of measure in textile fabrics.

Q.   Are fibers classified in some way?

A.   Yes.  Fibers are also classified in -- You
can determine first whether a fiber is natural or
man-made.  Natural fibers would be like your wool, your
silk, and your cotton.  Your man-made fibers are gonna
be your polyesters and your nylons and things of that
nature.

Q.   Now, are there characteristics and
features then about fibers that allow you to make
comparisons and examinations?

A.   Yes.  Very similar to hair is it's gonna
be the overall characteristics of the fiber.  The shape,
the color, the sometimes fibers may have a dye with
pigment granules in it, too, or it can be an even dye.

Sometimes fibers will also contain things
which is called delusterants, which give fibers an extra
glow or gloss, something that's added to the fibers by
fiber manufacturers.

All of these features are what we use to look
at when we do fiber examinations.

561

1

2          Q.   Now, does fiber examination also include

3     then comparison of cloth items or clothing items that

4     are made up of fibers?

5          A.   Yes.   And when you do comparisons of cloth

6     items, you may also look at the weave pattern or knit

7     pattern in which the structure of the cloth was

8     constructed.

           Q.   And from your examination and

9     determination of fiber evidence, then, are you sometimes

10    able to determine if a particular fiber originated from

11    a particular source?

12         A.   Yes, you can determine whether it could

13    have originated from that source.

14         Q.   Now, when you do work on a case such as

15    this one, is your work and are the conclusions that you

      arrived at then subject to technical review, in other

16    words, by another scientist within your lab?

17         A.   Yes.   Also, we have a thing called

18    verification in which that means if I found the transfer

19    which would be consistent -- a meaningful transfer in a

20    case which would connect two people to a crime scene or

21    two people to each other or something to a place, then

22    this comparison would have to be verified by another

23    hair and fiber analyst.

           Q.   And was your work validated by a technical

24
                              562

review on this case then?

A. Yes.

Q. Now, I'd like to direct your attention to this particular case and ask you if you received multiple items of evidence from Dana Pitchford of the Illinois State Police Science Laboratory?

A. Yes, I did.

Q. And in this case, what were you specifically looking for when you were examining that evidence?

A. In this case, we had a victim who was Caucasian and explained that the suspect was Negroid. So, in the items that I was looking for I was specifically looking to see if there were any Negroid hairs present.

Q. Now, if you identified Caucasian hairs, then, in this particular case, was there any point in doing any further examination of the Caucasian hairs?

A. No.

Q. And why not?

A. Because finding the victim's hairs on her own clothing or in her own environment would not be important in this case.

Q. Now, as part of those items that were submitted to you then, were there several exhibits that

563

were identified as evidence collected from clothing

items?

    A.  Yes, there were.

    Q.  I'd like to show you some of those.  First

of all, I'd like to show you People's Exhibit 10A, which

is your laboratory 32A, and it was identified as fibers

taken from jeans.  Do you recognize that, Ms. Kidd?

    A.  Yes, I do.

    Q.  And when you received it, was the blue

seal intact?

    A.  Yes, it was.

    Q.  And did you then conduct an examination of

the contents?

    A.  Yes, I did.

    Q.  And did you locate anything of any type of

value in that particular exhibit?

    A.  No, I did not.

    Q.  And, again, when you're saying anything of

any value, are you talking forensic value pertaining to

this case?

    A.  Yes.

    Q.  And, specifically, were you looking for

the Negroid hairs you were describing?

    A.  Yes, I was.

    Q.  Now, did you also receive another exhibit,

1

2    People's Exhibit 9A, which is your laboratory 36A, which

3    is fibers collected from a shirt?  Like to show you

4    People's Exhibit 9A.  Do you recognize that?

5            A.  Yes, I do.

6            Q.  And did you receive that exhibit as well

7    then?

8            A.  Yes, I did.

9            Q.  And was that in a sealed condition with a

10   blue seal intact?

11           A.  Yes, it was.

12           Q.  Again, did you conduct an examination of

13   the contents of that package?

14           A.  Yes, I did.

15           Q.  And did you locate anything of forensic

16   value in this case?

17           A.  On this exhibit, no.

18           Q.  Now, let me back up and say when you

19   conduct the analysis on each of these packets, what kind

20   of analysis were you conducting?

21           A.  These are -- The analyses are conducted

22   with the use of a low power microscope and a higher

23   powered microscope.

24           Q.  And did you actually examine then all the

     fibers or materials that were contained in those

     packages using the equipment you've described?

                              565

1

2          A.  Yes, I did.

3          Q.  Finally, I'd like to show you another

4     exhibit that was identified as taken from a jacket, and

5     that's People's Exhibit 8A, your exhibit 33A.  As you

6     look at that, do you recognize that?

7          A.  Yes, I do.

8          Q.  And is that, in fact, that material that

      was taken from the jacket?  Or identified to you as

9     such?

10         A.  Yes, it is.

11         Q.  And do you recognize, again, did that come

12    in with a blue seal intact?

13         A.  Yes, it did.

14         Q.  And now there's another exhibit that's

15    attached to it which is a cardboard container.  Can you

      describe what that is, please?

16         A.  This is called a slide mailer.  In the

17    samples that I produce such as hairs and fibers, I may

18    mount on slides in a permanent mount and then I will

19    keep those slides with the evidence that it originated

20    from.  And that's what this exhibit here is

21    (indicating).

22         Q.  Now, when you prepared that slide mount

23    then, did you find something of forensic value in that

24    particular exhibit that was collected from the jacket?

                              566

A.   Yes, I did.

Q.   And what was that?

A.   I found one Negroid body hair.

Q.   And approximately what size was it?  Was it whole or partial?

A.   It was a fragment, meaning it was partial and it was very small.

Q.   Then is that what's preserved on that slide?

A.   Yes, it is.

Q.   And then I'd also like to direct your attention to two additional items of evidence.  Did you receive evidence identified as recovered from a vehicle?

A.   Yes, I did.

Q.   And, specifically, were you given evidence that was identified as coming from the driver's door with tapings?

A.   Yes, I did.

Q.   Like to show you what has been marked as People's Exhibit 69, which is your laboratory exhibit 41.  And, in fact, do you recognize that bag?

A.   Yes, I do.

Q.   And when you received it, was it in a sealed condition with the red seal intact?

A.   Yes, it was.

567

1

2          Q.   Then did you open it up?

3          A.   Yes, I opened it and did my examinations.

4          Q.   And did you find anything of forensic

5     value in that taping that had been retrieved from the

6     side of the inside of the driver's door?

7          A.   No, I did not.

8          Q.   And if I can collect those exhibits from

      you then to make room.

9          Thank you.

10         Did you also receive another exhibit

11    pertaining to that truck that was identified as a taping

12    from the driver's seat?

13         A.   Yes, I did.

14         Q.   And with these tapings then, is that a

15    forensically validated method of collecting the fiber

      evidence?

16         A.   Yes, it is.  It's a very good method.

17         Q.   I'm sorry.  How do you remove the fibers

18    then from the tape without disrupting them?

19         A.   You can do it easily with a pair of

20    tweezers.  If the adhesive's in your way, we do use a

21    chemical to release it from the adhesive.

22         Q.   So, the tape didn't affect the validity of

23    any of your findings then?

24         A.   No, it did not.

                              568

Q. Then showing you again with respect to the
taping from the driver's seat, People's Exhibit 68,
which is your laboratory 38, do you again recognize that
package with your markings on it?

A. Yes, I do.

Q. And was it received in a sealed condition
with the red seal intact?

A. Yes, it was.

Q. And did you find anything from your
examination of the contents of that exhibit of forensic
value?

A. Yes, I did. I found two Negroid hair
fragments.

Q. And, again, were those whole or just
broken fragments?

A. Small fragments.

Q. Now, were you also asked to examine items
that were identified as coming from a group of cords and
laces?

A. Yes, I did.

Q. Like to show you what's been marked as
People's Exhibit 18A, which is your laboratory 2A. And
do you recognize your markings on that?

A. Yes, I do.

Q. And, in fact, is that what that exhibit

569

contains?

A. Yes, it does.

Q. And, again, was that in a sealed condition with the blue seal intact?

A. Yes.

Q. And from examining then the debris collected from the cords and fibers, did you find anything of forensic value?

A. No, I did not.

Q. Did you, in fact, make a finding of what appeared to be consistent with cat hair?

A. I found one animal hair that I did note as possible cat.

Q. Now, were you also given then fiber or potential fiber evidence that was collected from a pair of shorts or identified as such?

A. Yes, I did.

Q. And I'd like to show you People's Exhibit 17A, which is your laboratory 4A. And, in fact, is that what that is?

A. Yes, it is.

Q. Again, do you recognize your markings on that?

A. Yes.

Q. And was the blue seal intact on that

570

1

2      exhibit when you received it?

3            A.   Yes.

4            Q.   Did you also conduct analysis in the way

5      you described on that exhibit?

6            A.   Yes, I did.

7            Q.   And did you recover anything?

8            A.   Yes, I did recover one Negroid body hair
       from this exhibit.

9            Q.   And was that an entire hair or fragment?

10           A.   That was a fragment, too.

11           Q.   Now, did you also have occasion to examine

12     two additional fiber type packets or evidence that's

13     identified as potential fiber and hair evidence with

14     respect to a stocking and a piece of a stocking?

15           A.   Yes, I did.

16           Q.   And I'd like to show you then two

17     additional exhibits.  First of all, with regards to the

18     main portion of the stocking, were you asked to examine

19     Exhibit 20A, which is your laboratory 14A?  And I'll

       show that exhibit.  Do you recognize that?

20           A.   Yes, I do.

21           Q.   And is that, in fact, potential hair and

22     fiber evidence collected from the main piece of a black

23     stocking?

24           A.   Yes.

                           571

1

2          Q.  And did you examine that then?

3          A.  Yes, I did.

4          Q.  And was the seal in that intact before you

5     conducted the examination, the blue seal?

6          A.  Yes, it was.

7          Q.  And did you find anything of forensic

      value?

8          A.  No, I didn't.

9          Q.  Finally, did you also receive an exhibit

10    that was identified as potential fiber and hair evidence

11    collected from a piece of a black stocking?

12         A.  Yes, I did.

13         Q.  Then I'd like to show you what's been

14    marked as People's Exhibit 21A, which is your lab number

15    12A, Ms. Kidd, and ask you, again, do you recognize your

      markings on that?

16         A.  Yes, I do.

17         Q.  And is that what that exhibit contains,

18    collection of fiber and potential hair evidence from the

19    piece of the stocking mask?

20         A.  Yes.

21         Q.  Did you examine that, again, using the

22    techniques you've described?

23         A.  Yes, I did.

24         Q.  And was it in a sealed condition with the

                              572

1

2          blue seal intact when you opened it?

3                    A.   Yes.

4                    Q.   Did you find anything of forensic value?

5                    A.   Yes, I did find a Negroid hair fragment.

6                    Q.   And, again, that was just a broken

7          fragment then?

8                    A.   Yes.

9                    Q.   And did you preserve that again in that

           exhibit then?

10                   A.   Yes, that is preserved on a slide in the

11         slide mailer.

12                   Q.   And with regard to all those exhibits,

13         there's now a yellow seal on the bottom.  Is that an

14         exhibit you placed on there?

15                   A.   That's the evidence tape that I placed on

           there, yes.

16                   Q.   And that's on every exhibit you've

17         identified here in court?

18                   A.   Yes, it is.

19                   Q.   So, that's the other seal that was put on

20         at the conclusion of your examination?

21                   A.   Yes.

22                   Q.   Now, with regard to those two stocking

23         portions, did you also then examine the actual items

           themselves, not just the fiber evidence that was

24
                                      573

collected?

    A.  Yes, I did.

    Q.  I'd like to show you then what's been marked as People's Exhibit No. 20, which is your laboratory exhibit, I believe, number 14.  Ask you if you could take a look at that.  And if you need gloves, they're over to the side.  As you look at that, do you recognize that?

    A.  Yes, I do.

    Q.  And, in fact, it's attached to a card inside; is that correct?

    A.  Um --

    Q.  Give you a moment.

    A.  Yes, it is.

    Q.  Can you describe for us what it contains?

    A.  This is the main portion of the black stocking.

    Q.  And that card that it's hooked on to, then, where did that come from?

    A.  That is something that I placed on it to aid me in my examinations of the stocking.

    Q.  And then as you examine that, does it appear to be in substantially the same condition as when you conducted your analysis?

    A.  Yes, it does.

1

2          Q.   And when you received that, did it have

3    two seals on it, a red seal as well as a blue seal?

4          A.   Yes, it did.

5          Q.   And do you recognize that then from your

6    markings on it?

7          A.   Yes, I do.

8          Q.   Now, did you also receive then another

     item that was identified as a portion of a black

9    stocking?

10         A.   Yes, I did.

11         Q.   Let me show you People's Exhibit No. 21

12   which is your laboratory exhibit number 12.  Again, do

13   you recognize your markings on that bag?

14         A.   Yes, I do.

15         Q.   Was that bag in a sealed condition with

     both the red seal and the blue seal intact?

16         A.   Yes, it was.

17         Q.   And then when you opened it, what did it

18   contain?

19         A.   It contains a portion of a black stocking.

20         Q.   Again, is that hooked now to a cardboard

21   card that you put it on?

22         A.   Yes, it is.

23         Q.   And was that to assist in your

     examination?

24                           575

A.   Yes, it was.

Q.   Is that stocking then cut at both ends?

A.   Cut and torn, yes.

Q.   And when you examined it, then, did you determine the ends what -- if they're smooth cut or if they are an unraveling or jagged?

A.   Most of the ends are frayed, and there's also a lot of running at the ends of these fibers.

Q.   Would stress such as tugging on a piece of stocking like that or pulling it down over something like your head, would that cause that type of stress and in fraying?

A.   Yes, it can.

Q.   Now, the jagged edge that you saw, would that be consistent with cutting it with something such as a knife?

A.   It would be consistent with cutting and some tearing.

Q.   And I believe I asked you, but that is in substantially the same condition then as when you examined it?

A.   Yes, it is.

Q.   Now, did you have occasion then to take People's Exhibit No. 20, the large piece of the black stocking, and People's Exhibit No. 21, the smaller

576

1

2      piece, and make a comparison between the two of them?

3              A.   Yes, I did.

4              Q.   And when you did that, then, how did you

5      effectuate that?

6              A.   Well, you want to compare the fiber -- or

7      the fabric structure.   In this case, you have two knit

       fabrics, a combination of two different types of knit,

8      the rib knit and the jersey knit, done in different

9      combinations in order to get a particular effect.

10             Both exhibits, the piece of the stocking and

11     the larger, main portion of the stocking, had the same

12     type of knit.

13             Also, we do -- Also, I did fiber analysis to

14     determine if the composition of these two exhibits was

15     the same.   And, in fact, they are both composed of nylon

       and Spandex fibers.

16             Q.   And is that done using instrumental

17     analysis?

18             A.   Yes, it is.

19             Q.   And is that actually analyzing them in

20     chemical composition of the fiber?

21             A.   Yes.   It's a way that we identify man-made

22     fibers using the chemical composition.

23             Q.   Did you actually then decipher the knit

       design of the pattern of both of these pieces?

24
                            577

1

2          A.  Yes, I did.

3          Q.  What are you looking for when you're

4    talking about a pattern?

5          A.  Well, in this case, they used two

6    different types of knit.  If you use one plain type of

7    knit, you'll get a very plain pattern.  By using two

8    different types, they actually got a rib -- ribbing

9    effect.  And put a pattern into the stocking itself.  In

10   this case, it was a combination of a jersey knit and a

11   rib knit.

12         Q.  And are you also looking then at how those

13   fibers interweave and in what pattern?

14         A.  Yes, and to see how many fibers are

15   composed in each strand.  You look at the pattern as to

16   which strands are in the jersey knit, which strands are

17   in the rib knit, and you do that comparison on both the

18   piece of the stocking and the main portion of the

19   stocking, and that was found to be consistent.

20         Q.  Did you also look at the fiber width?

21         A.  Yes, I did.  Fiber width is done under the

22   microscope.  The fibers are very small pieces of textile

23   fabric, and that's done with the use of a microscope.

24         Q.  Now, based on the analysis and comparison

     that you conducted then, were you able to form an

     opinion as to whether that piece that was identified as

                          578

Exhibit 21, your lab exhibit 12, could have originated from the main portion of the stocking that's People's Exhibit 20, or your exhibit 14?

A.  Yes, I did.  And I did determine that exhibit -- the piece of stocking could have originated from the main portion of the stocking.

Q.  Now, did you determine if that piece was also approximately the same size as what was missing from the leg of the main piece?

A.  Yes, it was.  It fits within the area that is missing from the main piece of stocking.

Q.  With respect to that comparison, then, were the two pieces consistent with regards to color?

A.  Yes, they were.

Q.  Were they consistent with regards to composition and structure?

A.  Yes.

Q.  Were they consistent with regards to knit pattern and the makeup and component of that?

A.  Yes.

Q.  And they were also consistent in size?

A.  Yes.

Q.  Is it your opinion that the two pieces were consistent then in all respects of your analysis?

A.  Yes.

579

Q.  With regard to the Negroid hair fragments that you recovered on exhibits from the truck seat, the pink shorts, the gray jacket, and that piece of stocking then that you matched up to the main piece of stocking, were you able then to go on and make any further comparison other than determining that they were Negroid hairs?

A.  With those hairs, no, I was not.

Q.  And why is that?

A.  Because these were small fragments, and I could not determine, first of all, what body hair they originated from.

To do a comparison, we need hairs that originate from either the head, pubic, or facial area; and this is because these are the only three areas that lend enough individual characteristics to make them important for comparative purposes.  And if you cannot make that determination, then you cannot go on forward to do a comparison.

Q.  Now, was it your opinion they were from a Negroid origin?

A.  Yes, they are from a Negroid origin.

Q.  Now, were there any bulbs or cells or root, as you describe it, that would allow you to do any kind of PCR DNA analysis on those hair fibers then?

580

A.   All these hairs were fragments, and they did not contain a root area or any of the important cellular material that would be used for PCR DNA analysis.

MS. LADD:   Thank you.   I'd tender this witness.

THE COURT:   Ms. Lenik?

CROSS-EXAMINATION

BY MS. LENIK:

Q.   There's no way for a person to disguise his hair; is there?

A.   Well, you can use chemical treatments such as dyes and you can change some characteristics, but sometimes that makes it more helpful when doing a comparison, but you're not gonna change the determination as to what race you belong in by doing that.

Q.   And there isn't any way that a person could -- Well, let me ask it this way, there isn't any way that a person would be aware if he were leaving these hairs sufficient to be able to change them to -- to make your analysis -- Let me -- Let me think of a better way to put it.   There isn't any way to a person if he sees he's left hair on an area to do something to those hairs so that you can't later examine them; is

581

1

2          there?

3                  A.  If he -- If he knows that he left them,

4          which is -- which is difficult to know, they're very

5          small, but it is possible if they're damaged in some way

6          such as crushing, stepping on them could actually cause

7          enough damage that they wouldn't be suitable for

8          comparison; although, they would be -- they may be

           suitable for a racial determination.

9                  Q.  And there isn't any way from -- Well,

10         you -- when you looked at the hairs that you were given,

11         they didn't look to you like they were crushed or

12         stepped on or anything else; did they?

13                 A.  No, they did not exhibit any of that type

14         of damage.

15                 Q.  And there's a way for you, with your

           training and experience, to know when a hair looks like

16         it's been crushed or stepped on; right?

**Vol. XI**

17                 A.  Yes.

                   Q.  You could not tell anything about who the

19         person was who gave up those hairs; correct?

20                 A.  Other than the racial determination, no.

                   Q.  You couldn't tell if it was a man or a

**FILED**

21         woman?

22                 A.  No, I could not.

23                 Q.  You couldn't tell the age or the size or

**FILED**
SIXTH JUDICIAL CIRCUIT

**B**    JUL 2 8 1999

[signature] S. [illegible]
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

FILED
AUG 2 0 1999

Clerk of the
Appellate Court, 4th Dist.

582



4-99-0499

the weight or anything like that; could you?

A.  No.

Q.  Were you given known head -- I'm sorry. Were you given known hair of anybody to compare it to?

A.  Yes, I was.

Q.  And you did not make any comparisons with any known hairs you were given; correct?

A.  That's correct.

Q.  And that's true with all of the hairs that you were given, correct, not just the ones that you've testified to?

A.  Well, there were some Caucasian hairs in this case that were determined to be possible head hairs that, if they were relevant in the case, could have been compared.

Q.  And you were told not to look at Caucasian hairs to compare with the sample of known Caucasian hairs; correct?

A.  The only standard that I -- that was -- I received was that of the victim, and that was Caucasian. And determining that her hairs were present in her environment would not be relevant to this case.

Q.  You also found in some of the items of evidence that you examined soil particles, botanical material, and miscellaneous debris; correct?

583

A.   Yes, I did.

Q.   What's miscellaneous debris?

A.   That is -- Usually, it refers to something like a possible food particle.  In this case, there were also some burnt materials, ashes.  Often, it's something that's not of a morphological structure for me to identify.  So, I -- In this case, it was miscellaneous debris.

Q.   And what was the botanical material that you found?

A.   Often, you find small pieces of possible leaves.  This could be from grass or leaves outside or it could also be there are some food particles that you eat like lettuce that may also be determined as botanical material.

Q.   And you also found soil particles in some of this; did you not?

A.   Yes, I did.

Q.   And that's soil particles from dirt; right?

A.   Yes, basically, yes.

Q.   When you examined the clothing that was identified to you as belonging to a woman named Lori Hansen, that's the jeans, the gray jacket, and the white socks.  You did not find any Negroid hairs on the jeans

584

1

2    or the white socks; did you?

3        A.  No, I did not.

4        Q.  And you also examined hair of what were

5    described as Jockey underwear, and you didn't find any

6    Negroid hairs on that; did you?

7        A.  I did not find any Negroid hairs from the

8    debris of that exhibit, no.

9        Q.  And you didn't -- And that would be --

10    Well, and you didn't find any Negroid hairs in the

    debris from a long sleeve green shirt; did you?

11        A.  No, I did not.

12        Q.  And in the driver's seat -- Let me ask you

13    this, what does your abbreviation UBPO mean?

14        A.  Undetermined body part origin.

15        Q.  And on the taping of the driver's seat,

16    you found animal hair, Caucasian hair, fibers, soil

17    particles, miscellaneous debris, which were possibly

    food particles, and two Negroid hairs of undetermined

18    body part origin, very small tips; is that correct?

19        A.  Yes, it is.

20        Q.  What does very small tips mean?

21        A.  Means it was just the tip of the hair and

22    it was very small in size.

23        Q.  And that could be -- Could that occur when

24    somebody sits next to or brushes next to somebody in a

585

FORM IL-24A  ® PENGAD · 1-800-631-6989

public place?

       A.  You can get a hair transfer, yes, from sitting next to somebody in a public place, that is true.

       Q.  How else can you get hair transfers?

       A.  The easiest way to get a hair transfer is by direct contact with somebody.  There's also what's called secondary transfer which -- which means possibly if somebody sat down in an area and then moved and then you came and sat down in that same area, they may have left some hairs there, and then when you sit down, you could have picked those hairs up.  So, you either get it from direct contact or secondary contact.

       Q.  And there isn't any way to tell with these kinds of examinations how the hair got to where you're finding it; is there?

       A.  No, there is not.

       Q.  So that the hair that was found, these tiny pieces of hair that were found in this vehicle on these vehicle tapings, that could have happened if she was at a public place and sat down on some hair from someone else and then sat down in her truck; correct?

       A.  Yeah, that's -- what she's referring to would be a tertiary transfer, which would be a third transfer.  Every transfer is less and less likely.  In

586

other words, an initial transfer with direct contact is the type of transfer that you would expect most often.

A secondary transfer when you come into -- when somebody comes in contact with something and then somebody else comes in contact with that and then transfers that material onto them would be the second most likely.

In the description that she gave, you would have three contacts, in other words, the victim would have to come in contact with the Negroid hair in a different place and then have it transferred to her clothing and then her clothing transfer it again to the seat.

Q. And that -- And that's a possibility; correct?

A. It is a possibility.

Q. And you can't tell from the examinations that you've done whether any of those -- whether this material was -- got to where it was found by any of those means; correct?

A. That's correct.

Q. You also examined that stocking and you found no Negroid hairs on that stocking; correct?

MS. LADD: Objection, Your Honor, just as to which stocking, since there's two.

587

1

2          THE COURT:  Ms. Lenik, which one are we

3    talking about?

4          MS. LENIK:  What the State's Attorney has

5    called 14A.  I'm sorry.  What the State Police lab

6    report calls 14A, which is designated on the State

7    Police lab report as debris from Exhibit 14, and 14 is

     described as one pair of black tights.

8          A.   Okay.  Can you repeat the question?

9          Q.   (by Ms. Lenik)  Yes.  On that exhibit that

10   you examined, on June 3rd of 1998, you found no Negroid

11   hairs on that black stocking; correct?  Or is that the

12   debris from that black stocking?

13         A.   Yes, that's the main portion of the

14   stocking, and I did not find Negroid hairs on that

15   exhibit.

16         Q.   You did, however, on that exhibit find

17   animal hair, Caucasian body hair, fibers, soil

     particles, and miscellaneous debris?

18         A.   Yes, I did.

19         Q.   And you looked at those cords and laces or

20   the debris from those cords and laces in an item which

21   you designated as 2A; correct?

22         A.   Yes.

23         Q.   And you found no Negroid hairs on the

     debris from those cords and laces; correct?

24

588

A.   Yes.

Q.   And, however, you did find on those cords
and laces animal hair, possibly cat, Caucasian hair,
fibers, soil particles, and miscellaneous debris;
correct?

A.   Yes.

Q.   And you note in the fibers that that
included wool; correct?

A.   Yes, I do.

Q.   What is your abbrev -- Well, do you have
an abbreviation PLU or PLM?

A.   It's PLM.  And that abbreviation stands
for polarized light microscope, and that just notes that
I did mount this and look at it under a polarized light
microscope, and that's how I made the determination that
there were wool fibers there.

Q.   And so you found -- So, what you found on
the cords and laces was wool?

A.   Some of it, yes.

Q.   You were given in what you called exhibit
45 head hair standards from an individual who was
identified to you as Dedric Moore; correct?

A.   Yes.

Q.   And you were given -- Well, do you know
how many head hair standards you were given for Mr.

589

Moore?

A.  I never opened that packet, so I really don't know.

Q.  You never opened the packet at all?

A.  No, I did not.

Q.  Why didn't you open the packet?

A.  Because there were no suitable hairs, Negroid hairs on any of the exhibits that were useful for comparison.  So, if I didn't have any hairs to compare, there was no use to go back and look at that standard.

MS. LENIK:  That's all I have of this witness, Your Honor.

THE COURT:  Ms. Ladd?

MS. LADD:  Just briefly.

REDIRECT EXAMINATION

BY MS. LADD:

Q.  Ms. Kidd, what would you need in a hair then to make it suitable for comparison?

A.  You'd have to be able to determine the body part, the racial and the body part.  Body part --
Body parts that are suitable for comparison are the head region, the facial region, or the pubic region.  If you cannot make those determinations, then they are not suitable for comparison.

590

1

2          Also, there's a few other things that are not

3    suitable for comparisons.  Gray -- Gray hairs are not

4    suitable for comparison, 'cause there's no pigment

5    granules in them and we cannot -- we need that in our

6    comparison, so we can't do that.  Also, featureless

7    blond hairs are unsuitable for comparison.  For the

     similar type reason.
8
            Q.  Now, you've been asked about if you could
9
     see leaving these hairs on something.  You used a
10
     microscope to see these hairs; is that right?
11
            A.  Yes, I did.
12
            Q.  When you're saying these were small, what
13
     were the approximate size of the Negroid hairs that you
14
     recovered, say, from the stocking, the piece of
15
     stocking, Exhibit 21, which is your lab 12A?
16
            A.  Most of these hairs were under a half an
17
     inch.  A lot of them were closer to a quarter or an
18
     eighth of an inch.

19          MS. LADD:  Thank you.  I have no further

     questions.
20
            THE COURT:  Ms. Lenik?
21
            MS. LENIK:  No questions.
22
            THE COURT:  Thank you.  You may step down.
23
                          (Witness excused.)
24
            THE COURT:  Call your next witness.

                               591

1

2          MS. LADD:  Call Kevin Zeeb.

3                              (Witness sworn.)

4                    KEVIN L. ZEEB

5          called as a witness on behalf of the People,

6     being first duly sworn, was examined and testified as

7     follows:

8                    DIRECT EXAMINATION

9                    BY MS. LADD:

10          Q.  Let me interrupt for just a minute and

11     collect the exhibits from the previous witness.

12          Could you please tell us your name.

13          A.  Yes.  My name is Kevin L. Zeeb.  My last

14     name is spelled Z-e-e-b.

15          Q.  Where are you employed?

16          A.  I'm employed at the Illinois State Police

17     Morton Forensic Science Laboratory located at 1810 South

18     Main in Morton, Illinois.

19          Q.  And in what capacity then are you employed

20     by the state lab?

21          A.  I'm a forensic scientist specialized in

22     the field of forensic biology and forensic DNA analysis.

23          Q.  How long have you been employed then, Mr.

24     Zeeb?

          A.  A little over 12 1/2 years.

          Q.  Can you describe for us then what are your

                              592

1

2    primary duties?

3         A.  My primary duties include receiving

4    physical evidence from law enforcement agencies and

5    fellow biologists and fellow DNA analysts, conducting a

6    biological analysis or a DNA analysis on that evidence,

7    taking copious notes and writing a summary report

8    containing my findings and testifying in court when

     called upon.

9         Q.  Can you tell us what is forensic biology

10   and what types of evidence then does it include?

11        A.  Forensic biology is a study of blood,

12   semen, and other body fluids such as saliva, urine,

13   feces, perspiration, things of that nature.

14        Q.  Then what is forensic DNA analysis and

15   what type of evidence does that include?

16        A.  Forensic DNA analysis is a

17   state-of-the-art technique that has been well

18   established in the scientific, medical, and forensic

19   community that's a very sensitive and informative

     technique that gives me a vast amount of information

20   from a very small amount of sample.

21        Q.  Can you tell us then what type of

22   comparisons can be made in the area of forensic DNA

23   analysis?

24        A.  Yes.  DNA analysis generates genetic

593

information in the form of a DNA profile.  This DNA profile consists of genetic markers that have their own individual characteristics.  These characteristics are what I use to either include or exclude someone as a possible source of that bloodstain or stain.

Q.  And what percentage of your time then do you spend working in the area of forensic biology and forensic DNA analysis?

A.  I'm a full-time analyst.  I either spend -- I spend most of my time doing DNA analysis and a small amount of time doing biological analysis, but I'm a full-time analyst.

Q.  Can you describe your educational background for us?

A.  Yes.  I have a Bachelor of Science Degree in biology with a minor in chemistry.  I received my degree back in 1980 at McKendree College located in Lebanon, Illinois.

After that, I worked as a laboratory technician for five and a half years at St. Joseph's Hospital in Breese, Illinois.

In '91 and '92, I took a biochemistry class and a cell molecular biology class at Bradley University located in Peoria, Illinois.  And these two classes were two of three that are required in order for you to get

594

into DNA analysis.  The other class is genetics, and I had taken that class in college.

Q.  Now, can you outline then just in general your experience and training in the field, in addition to the educational background?

A.  Yes.  I had 26 months of intense formalized training at the Training and Applications Forensic Science Laboratory located in Carbondale, Illinois.

After I successfully completed my training, I was transferred to the Morton lab where I conducted seven years of biological analysis.

In April of '95, I attended a seven-day DNA workshop at the Perkin-Elmer Laboratory facility in Foster City, California.

After that, I received 11 months of training under the guidance of Dr. Pam Fish, who is a DNA coordinator in Chicago.

After that, I received six months of additional DNA training under Research and Development Coordinator William Frank.

In February of '96, I believe, I was sent to Lab Corporation of America.  It's a big commercial lab where they do paternity testing.  I was sent out there for a two-week visiting scientist program so that I

595

could observe how these people conduct their analysis, look at their files, look at their procedures manuals, their quality assurance, look at what kind of safety measures they entail and get a good feel for what other labs are doing.

Then I started in September of '97, I'm sorry, in '96 as a visiting scientist to the Research and Development Laboratory in Springfield.  There, I started my supervised casework in DNA analysis, and, at the same time, I was allowed to help assist the R & D staff in working on different kinds of research projects, and, eventually, I was -- received additional training in DNA analysis that I'm conduct -- that I conducted on this case.

Q.  Does your training include conducting the laboratory analysis as well as a statistical comparison and interpretation of DNA profiles then?

A.  Yes, it does.

Q.  Does it also include using the computer equipment and technology for the evaluations?

A.  Yes, it does.

Q.  How many DNA analyses have you conducted, if you can estimate?

A.  I'm guessing several thousand.

Q.  Do these analyses then include proficiency

596

testing of certification requirements?

A. Yes.

Q. And who actually requires you to take those?

A. There's -- There was a governed body called TWGDAM. TWGDAM is an acronym that stands for Technical Working Group on DNA Analytical Methods. This organization was founded back in 1988. This organization was overruled by another committee called DAB, or DNA Advisory Board; and, basically, they make sure that all DNA analysts and all laboratories are following proper protocol, using proper quality assurance measures, and things of that nature.

But TWGDAM and DAB require that each analyst take at least two external proficiency tests a year. I received my tests from Cellmark, which is an international quality assessment scheme. I also have to take a proficiency test that's given to me in-house. One of those a year.

Besides that, our laboratory has to take an SRM test, which stands for Standard Reference Material test, and this is given through NIST or National Institute of Standard and Technology. Basically, we're given ten extracts of samples, and we have to amplify and type those. We're also given two samples that we

597

have to extract, amplify, and type.  Once we get our results, we compare the results to the manual of the test to make sure that we have the right calls.  That procedure tests the laboratory.  It tests the analyst conducting the test.  It tests the instruments.  It tests the reagents.  And it tests how we interpret our results.

Q.  And have you successfully completed and passed all these tests and requirements?

A.  Yes, I have.

Q.  And has the lab where you conducted your analysis on this case also passed that testing and requirements?

A.  Yes.  And the Illinois State Police Laboratory Systems are accredited through a group called ASCLD LAB, American Society of Crime Lab Directors Lab Accreditation Board.  Every five years, all laboratories in Illinois are accredited by an inspection.  The last inspection that we had was in '97, September of '97, and we passed that one.

Q.  Now, are you also a member then of professional societies or academies related to forensic science?

A.  Yes, I am.

Q.  And what are some of these?

598

A.   I'm a member of the Midwestern Association of Forensic Scientists, the American Academy of Forensic Sciences, and the International Association of Blood Pattern Analysts.

Q.   Have you also conducted, participated in research within your area of expertise in DNA analysis in forensic biology?

A.   I participated in research, but it was under the guidance of research and development coordinators.

Q.   Have you also published papers in scientific journals and delivered presentations at scientific academies and societies within your field?

A.   No, I have not.

Q.   Now, have you taught courses or trained other scientists in your area of expertise?

A.   Yes.  I taught three clean technique classes to law enforcement agencies on the importance of clean technique and proper evidence collection, handling, and preservation.  I also taught two classes to Illinois State Police Division of Operations Personnel concerning the applications of forensic DNA analysis; and in these two classes, the clean technique procedure was also discussed.

Q.   Now, have you been qualified as an expert

599

in court on prior occasions then within your field?

A.  Yes, I have.

MS. LADD:  At this time, Your Honor, I would tender Mr. Zeeb to the Court as an expert within his field.

THE COURT:  Ms. Lenik?

MS. LENIK:  Oh, I have no questions.

THE COURT:  All right.  He may testify as an expert.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  Mr. Zeeb, I'd like to ask you some preliminary questions, first of all, to familiarize the jury with the principles of DNA.  Could you briefly explain what DNA is?

A.  Yes.  DNA stands for deoxyribonucleic acid.  It's referred to as the molecule of hereditary, or also as the genetic blueprint of all living things.

This is the molecule that determines if we're gonna be a plant or an animal.  It's gonna determine if we're gonna be a mammal, reptile, amphibian, fish, bird, et cetera.  So, it's gonna determine that we are gonna be human beings.  It's gonna determine our sex, if we are gonna be male or female.  It's gonna determine visual characteristics such as the color of your hair, color of your eyes, your stature, if you're gonna be

600

tall, short, big build, short build.

The DNA molecule is broken into 23 different compartments called chromosomes. Half the DNA that we receive comes from our mother. Half the DNA that we receive comes from our father. This is the molecule that determines if we're gonna inherit any kind of disease that our parents carry.

Q. Now, can I ask you then where is DNA found within the body, what type of cells?

A. DNA is found in all nucleated cells in the body. And that's basically all cells except fat cells that store nothing but fat and red blood cells that store nothing but hemoglobin. But it's found in all nucleated cells that contains the nucleus that contains the DNA. These cells would be the white blood cells in blood, sperm or spermatozoa in seminal material, and also in muscle tissue, in hair root sheaths, in bone marrow.

Q. Let me interrupt for just a moment. You now referred to hair roots. Would it be in the shaft of the hair?

A. It would be in the hair root sheath or the meaty portion of the hair. That is the portion that has actual tissue present.

Q. Then the shaft does not contain DNA?

601

1

2          A.   The shaft -- If it does contain genomic

3    DNA, it contains very little.   There's another kind of

4    DNA that the shaft contains, and that's referred to as

5    mitochondrial DNA.

6          Q.   With the hair shaft then, there's not

7    sufficient DNA to replicate using a PCR process?

8          A.   That's correct.   If -- If a microscopist

9    looks at a hair and determines that there is no hair

10    root sheath, then no further analysis is conducted in

11    Illinois through the DNA tests that we conduct.

12          Q.   Now, you mentioned red blood cells.   A

13    transfusion involves red blood then; is that correct?

14          A.   That's correct.

15          Q.   Would a transfusion then transfer DNA from

16    one person to another?

17          A.   No, it would not, because the transfusion

18    would not include white blood cells.

19          Q.   Does DNA vary then from tissue to tissue

20    within one person's body?

21          A.   No, it doesn't.   If I was to test one

22    pulled or plucked hair, I would get the same DNA results

23    as if I would test a swabbing of my mouth, a sample of

24    my seminal material, a sample of my blood, a sample of

my tissue, a sample from a pulled tooth, or a sample

from a cut piece of bone.

602

Q.  And does DNA remain the same then throughout an individual's lifetime?

A.  Yes, it does.

Q.  Is it possible to turn one person's DNA into another person's?

A.  No, it is not.

Q.  If a sample containing DNA were exposed to environmental conditions such as soil, plant material, dirt, water, heat, would that change the DNA profile into someone else's?

A.  It would not change the profile.  It would just change our ability to detect the DNA.  Basically, when DNA is broken down or degrades, this long strand is chopped up into smaller and smaller segments, and the segments get to so small that we're unable to work with the DNA molecule.

Q.  Now, how is DNA used then in forensic science?

A.  DNA is used -- We, as forensic scientists, look at characteristics within that DNA molecule.  As I said, DNA gives us visual characteristics, but looking at a bloodstain, I'm looking at characteristics that you visually can't see.

Q.  Does the Illinois State Police Laboratory have a protocol then to insure that the testing and

603

analysis that's conducted at your lab is reliable?

A. Yes, it does.

Q. Does that include then the regular testing and certification that you've described?

A. Yes, it does.

Q. Are there also precautions that you follow and are required to follow to insure that there's no contamination between samples?

A. Yes. As I mentioned before, clean technique. This is a procedure that Illinois State Police has adapted as well as other DNA laboratories. This clean technique has two main purposes. The main function is to preserve the integrity of the evidence. The second purpose is to protect analysts from bloodborne pathogens that might be present in that stain.

Things that would be included in clean technique would be always wearing latex gloves, never touching a sample with your bare hands. If you sneeze or cough, make sure that you have a mask on. Bleaching down the countertops, the utensils, the instrumentation with 10 percent household bleach. Using pipette tips that have cotton plugs in the middle of them so that liquid cannot be transferred from one tube to another. Using decappit tools to open up the tubes and close the

604

tubes without touching your -- the tube tops with your hands.

Q.  Well, let me ask you, when you're processing a series of exhibits or samples that are submitted to you, do you have a technique where you process them in a certain order so again that insures the integrity of what you're investigating?

A.  Yes.  I analyze question samples that have a smaller amount of material first, and then I analyze the samples from the standards or reference samples last.

I also would do my extractions in one area of the laboratory, my amplification setup in another area, and another area designated for amplified product.

I would also use different kinds of lab coats. In my extraction area, I would use a white lab coat, and that lab coat is used only in that area.  In the amplified product room, I would only use a blue lab coat, and that lab coat is only worn in that area.

Q.  In this case, then, in the analysis that you conducted on this case, did you follow all the laboratory guidelines and precautions that you've described?

A.  Yes, I did.

Q.  Did you conduct all the DNA analysis on

605

this case yourself?

      A.  Yes, I did.

      Q.  As part of the laboratory protocol, does every case undergo what's called a technical review then at the completion of your analysis or any scientist analysis?

      A.  Yes, it did.

      Q.  And who reviewed it in this case?

      A.  William Frank, the R & D coordinator, was my technical leader at the time, and he reviewed my case file.

      This case, with many other cases that are analyzed in an Illinois State Police lab, was reviewed by eight other STR analysts for peer review.

      Q.  And were the results and your conclusions in this case then validated by both of those reviews?

      A.  Yes, they were.

      Q.  Were the samples of the original evidence, the extracts and the amplified DNA, then, that you -- were they preserved, everything that you've worked on in this case?

      A.  Yes, they were.  They're presently being preserved in freezer storage.

      Q.  What is the importance then of preserving the evidence and the extracts that you created or drew

from the evidence?

A.  Yes, it's very important to preserve whatever extracted DNA that I have remaining for several reasons.  Number one, if somebody wants to have it -- this sample sent to another DNA lab for them to conduct their analysis, it would be available.  If somebody in my system would like to do a spot random reanalysis on my case, they could take that extract and do their DNA analysis to see if their results match mine.

Q.  Let me ask you, what type of DNA analysis did you conduct on this case?

A.  I conducted what's referred to as the PCR analysis.

Q.  And what's that mean?

A.  PCR is a term that stands for polymerase chain reaction.  This is a chemical method of copying or reproducing or replicating or amplifying specific areas of the DNA molecule that we're interested in, copying that segment over and over and over until we have millions and millions of copies to work with.

Q.  Now, is that PCR analysis you've described, is that accepted and validated in the scientific community then?

A.  Yes, it is.

Q.  And is PCR used in other fields of science

607

besides forensics?

      A.  Yes.

      Q.  What types of things is PCR analysis used for?

      A.  Well, in forensics, it's used to indicate who deposit different kinds of stains.  It's used in paternity testing to determine who is the biological father of an infant.  It's used in paternity testing to determine who is the biological mother of an infant, baby, or fetus.  It's also used for identification of skeletal remains.  It's also used for identification of casualties of war such as in Desert Storm.  It's also used in identification of victims of mass destructions such as train crashes, plane crashes, so on and so forth.

      It's used in the medical field to identify and diagnose inheritable diseases.  It's also used to monitor the success rate of tissue transplants or bone marrow transplants.

      In the scientific community, it's used in the genome project where they're trying to map the exact sequence of all three billion based pairs found in a DNA molecule.

      Q.  And is that PCR a new science then?

      A.  No, it's not.  PCR was discovered or

608

developed back in 1983 by Dr. Kerry Mullis, who, after ten years later, received a Nobel Prize in chemistry for that discovery.

Q. Can you then explain to us what the PCR method of DNA typing is?

A. First of all, DNA has to be extracted from a sample. So, I take a small portion of a stain, put it in some stain extraction buffer or detergent, add some other chemicals to it, put it in a -- well, incubator that's rather warm, and let it sit overnight.

The next day, I would come in and do an organic cleanup of it, in other words, to remove all impurities, and then I would isolate the DNA molecule and recover it in a buffer.

Once I've done that, I have to determine how much DNA is there and what quality is it.

So, the next thing I would do is what I -- what we call a yield gel which allows me to get a rough estimate of the quantity of DNA, and it also tells me the quality of the DNA, if it's molecular weight grade or if it's degraded DNA.

Then I would go ahead and do another quantitative test that's very more specific where I would identify anywhere between 10 nanograms of DNA down to .15 nanograms of DNA; and if I see any kind of

609

reaction, that then I know that human DNA is present.

Once I have identified how much DNA is present, then I would do the PCR technique. And basically what this means is I'm gonna take one to two and a half nanograms of DNA. A nanogram is one billionth of a gram. Okay? Very small amount.

I would take one -- one to two and a half nanograms, put it in some reaction mixture that comes in with these kits. I would put this sample in this instrument called a thermal cycler. This is a computerized instrument that heats and cools the tubes up on a program schedule, and it would go through 28 cycles of heating, cooling, warming up a little bit, heating, cooling, warming up a little bit. And during each one of these cycles, the DNA molecule is replicated by two.

Q. Now, let me interrupt. Does that change the DNA molecule at all or simply replicate it?

A. No, it doesn't change it. It just simply replicates nine specific areas of the DNA molecule that I'm interested in. It doesn't replicate all of it, just those nine areas. And it replicates it identically to the original template DNA.

Q. Is that duplicating the body's natural process when cells are reproduced?

610

1

2          A.   Yes.   This is something that happens in

3    our bodies.   The interesting thing about the DNA

4    molecule is that it can govern the repair of itself and

5    also the replication of itself, so this is something

6    that doesn't -- isn't out of the ordinary.   It occurs in

7    our bodies.

8          Q.   Now, when you're talking about identifying

9    portions of DNA, are there specific things that you're

     looking for then?

10         A.   Yes.   I'm looking for characteristics or

11   polymorphisms within a DNA molecule.   All right?

12         Let me jump back a little bit.

13         MS. LENIK:   Your Honor, I'm going to object to

14   this.

15         THE COURT:   To what?

16         MS. LENIK:   There's no question, and the

17   witness is simply giving a lecture.   I think that the

     witness has to answer the question that's asked.

18         THE COURT:   He is.   Over --

19         MS. LENIK:   And let me jump back a bit isn't

20   answering the question that's asked.

21         THE COURT:   He is.   Overruled.

22         A.   What I need to tell you is 99 percent of

23   our DNA is coating DNA, in other words, it has a

24   function of producing some kind of a chemical enzyme

                                611

protein or whatever.  But one percent of our DNA molecule is filler DNA.  Sometimes it's referred to as junk DNA.  And this is the DNA that forensic scientists look at because it differs from one person to another.  And there's two types of polymorphisms that we look at.

Poly -- Polymorphism, poly meaning many, morphism meaning different sizes and structures and shapes.

I have some beads that I'd like to use to demonstrate that.

MS. LENIK:  Your Honor, I'm going to object to a demonstration without there being some question pending regarding it.

THE COURT:  Overruled.

Q.  (by Ms. Ladd)  If you need to stand up, Mr. Zeeb.

A.  Okay.  Let's pretend that these are DNA -- this is strand of DNA and this is filler DNA or junk DNA that we all possess.  There's two types of polymorphisms, sequence polymorphism and length polymorphism.

Here we have a strand that's composed of our four building blocks present in DNA, adenine, guanine, cytosine, and thymine; and you could designate whatever color bead that you want, but we have two strands of 20

612

beads, this same length; okay?

If I was to try and tell the difference in length, I couldn't. They would be the same length. But I can tell the difference in their sequence.

This strand has blue, green, yellow, red. This strand red, yellow, blue, yellow, and so on and so forth, so you can see that the length is the same, but the sequence is different.

Another type of polymorphism is length polymorphism. And here we have the sequence is the same; blue, green, yellow, red; blue, green, yellow, red; blue, green, yellow, red. But the difference in these two strands is the length. This has three repeat regions of blue, green, yellow, red. This one has five. This is the type of polymorphism that I use in my analysis. We look at variations of different lengths of the DNA molecule at different areas, specific areas of the DNA molecule to get our characteristics in our DNA profile.

Q. And did the length of those repeat sequences then vary from individual to individual?

A. Yes.

Q. And is that how you use it then to make identifications or eliminations?

A. That's correct. And the type of DNA

613

analysis that I conduct is referred to as STR analysis.
STR stands for short tandem repeats.  Tandem means side
by side.

So, this would be a demonstration of STR's,
where we have three, four regions repeated.  And in this
strand, we have five regions.  And that's why they vary
in length.

Q.  Thank you, Mr. Zeeb.  Let me ask you then,
direct your attention to this case, in your professional
capacity, did you conduct that PCR analysis on various
items of evidence that were submitted to you from Dana
Pitchford of the Springfield laboratory in March through
December of 1998?

A.  Yes, I did.

Q.  Did this include various items of evidence
identified as samples taken from a cigarette butt,
material from a pair of shorts, a swab of blood from a
piece of glass, and a piece of black stocking?

A.  Yes.

Q.  What I'd like to do then is show you those
exhibits for identification purposes.  First of all,
showing you the portion identified from the cigarette,
which is People's Exhibit 19, your laboratory number 1A,
do you recognize that from looking at that packet?

A.  Yes, I do.

614

1

2    Q.  And, in fact, was it sealed with the blue

3    seal on it at the time with Dana's initials on it?

4    A.  Yes, it was.

5    Q.  And then did you open it and examine it to

6    conduct the analysis you've described?

7    A.  Yes, I did.

8    Q.  Thank you.  Now, also, with regards to the

item identified as a portion of shorts, I'd like to show

9    you what's been marked as People's Exhibit 17B, which is

10   your lab number 4B, again, ask you do you recognize your

11   markings on that package?

12   A.  Yes, I do.

13   Q.  And is that, in fact, what that item

14   contained?

15   A.  Yes.

16   Q.  And was that in a sealed condition with

Dana Pitchford's seal on it intact at the time?

17

18   A.  Yes, it was.

19   Q.  Thank you.  Now, also, with regard to

swabbing of blood from glass, I'd like to show you

20   what's been marked as People's Exhibit 22A which is your

21   lab 31A.  Ask you do you recognize that packet, Mr.

22   Zeeb?

23   A.  Yes, I do.

24   Q.  And does that contain, in fact, what was a

615

swabbing of blood taken from glass?

    A.  Yes, it does.

    Q.  Was that also sealed with Dana Pitchford's seal when you received it?

    A.  Yes, it was.

    Q.  And, finally, did you receive what would have been identified as an exhibit prepared from a piece of stocking?

    A.  Yes, I did.

    Q.  Like to show you what's been marked as People's Exhibit 21B which is your laboratory number 12B.  Again, sir, ask you if you could take a look at that, and do you recognize that?

    A.  Yes, I do.

    Q.  And is that, in fact, the packet containing that portion that was preserved by Dana Pitchford from a piece of stocking?

    A.  Yes, it is.

    Q.  Again, was her seal intact on it when you received it?

    A.  Yes, it was.

    Q.  Did you then open up these seals to conduct further analysis?

    A.  I opened up the packages in different areas.  I did not break Dana Pitchford's seals.

616

Q.  And then with regards to these items, is
the second seal now put on that your seal from when you
completed your analysis?

A.  Yes, they are.

Q.  When you conducted the analysis with each
type of -- or each one of these items of evidence, did
you conduct the preliminary testing you described to us
to determine, first of all, if human DNA was present?

A.  Yes, I did.

Q.  And then did you also conduct a
preliminary test to determine that if human DNA was
indicated there was a sufficient amount to conduct the
PCR analysis?

A.  Yes, I did.

Q.  Now, are there times when there is not a
sufficient amount to go on and conduct PCR analysis?

A.  Yes, there is.

Q.  And there is a threshold amount then that
you have to see to be able to continue?

A.  Yes.

Q.  Now, with respect then to the item that
was identified as the portion of the cigarette butt,
that would be your laboratory 1A or People's Exhibit 19,
what did you determine as far as the presence of human
DNA?

1

2          A.  I did not detect the presence of any human

3    DNA.

4          Q.  Now, with regard to that cigarette butt,

5    if you learned that that item had been exposed to

6    intense heat, for example, at the scene of a fire that

7    was capable of melting plastic, how would that affect

     any DNA that might have been left on it?

8          A.  The intense heat might have caused the DNA

9    molecule to adhere to the material to where I could not

10   extract it, so that is a possibility.

11         Q.  Now, with respect to the piece of -- or

12   the portion of DNA exhibit that was submitted to you as

13   identified coming from the shorts, and that would be

14   your laboratory 4B, People's Exhibit 17, did you

15   identify the presence of human DNA on that?

16         A.  Yes, I did.

           Q.  And was there a sufficient amount then to

17   conduct PCR analysis on that?

18         A.  There was an insufficient amount of DNA

19   for me to do further conducting of DNA analysis.

20         Q.  Again, would that be affected by factors

21   such as heat?

22         A.  That would be one factor.

23         Q.  Does moisture also affect whether or not

     DNA is going to break down or be recovered?

24
                              618

A.  Yes.  If the cigarette butt or the piece of short material was hosed down when they were putting out the fire, this could dilute the DNA material, causing it to wash away, so that might be a factor.

Q.  Now, is DNA normally found in urine?

A.  Yes, it is, because whenever we urinate, there's always some epithelial cells.  These are cells that line the ureter.  There's always some cells being sloughed off.  There's always occasional white blood cells in your urine.  If you have a bladder infection or a kidney infection, we would find a lot of white blood cells, so we would expect to find lots of DNA; but, generally speaking, there is DNA present; but, most of the time, it's so minute amount that we have a hard time detecting it.

Q.  Now, if urine was also diluted, say, by the consumption of beer, how would that affect the retrieval of any DNA?

A.  If the more fluids that you drink, soda, beer, water, whatever, then that would cause you to urinate more often, which would dilute the concentration of the urine down.

Q.  Would that then make it less likely to recover a sufficient amount of DNA to continue your testing?

619

A.  Yes, it would.

Q.  Now, with respect to the blood that was taken from the piece of glass, and that's your laboratory 31A, People's Exhibit 22, did you identify the presence of human DNA?

A.  Yes, I did.

Q.  And was there a sufficient amount of DNA that you could proceed with PCR analysis?

A.  Yes, there was.

Q.  Finally, with respect to the piece of evidence that was identified as being taken from a stocking, and that's your exhibit 12B, People's Exhibit 21B, and that's a portion of a stocking, did you identify human DNA?

A.  Yes, I did.

Q.  And was there a sufficient amount from that sample to proceed with your PCR analysis?

A.  Yes, there was.

Q.  Did you also then examine known standards that were submitted to you to compare the evidence to?

A.  Yes, I did.

Q.  And did this involve the known standards identified as being blood from Lori Hansen, blood of Dedric Moore, and blood of Donrico Holtzclaw?

A.  Yes.

620

1

2          Q.  I'd like to show you then what's been

3     marked as People's Exhibit 61A, with respect to the

4     blood of Lori Hansen, and that's your laboratory number

5     26A1, and ask you -- If you need a moment to -- As you

6     look at that, do you recognize that as a known standard

7     or sample of blood that was taken from Lori Hansen?

8          A.  Yes, I do.

9          Q.  And was that in a sealed condition when

      you received it?

10         A.  Yes, it was.

11         Q.  Thank you.  And you recognize your

12    laboratory markings on that?

13         A.  I recognize the exhibit number, the case

14    number, the date that I received it, and my initials.

15         Q.  And, also, did you receive a standard from

      Dedric Moore?

16         A.  Yes, I did.

17         Q.  And show you what's been marked as

18    People's Exhibit 64 which is your laboratory number

19    44A1.  64A.  I'm sorry, Your Honor.  And do you

20    recognize that?

21         A.  Yes, I do.

22         Q.  And is that the blood that was identified

23    to you -- or a portion as taken from Dedric Moore?

24         A.  Yes, it is.

                          621

Q.  And, again, do you recognize your markings on that?

A.  Yes, I do.

Q.  And was it in a sealed condition with the dark blue seal -- or is that your seal?

A.  The dark blue tape, evidence tape is my seal.

Q.  So, the lighter blue tape came from Springfield?

A.  That's correct.

Q.  And it was in a sealed condition then?

A.  Yes.

Q.  Finally, were you given a portion that was created from an exhibit identified as the known blood standard of Donrico Holtzclaw?

A.  Yes.

Q.  Like to show you 66A which is your lab 1A1A, and, again, sir, do you recognize that as well?

A.  Yes, I do.

Q.  And was that in a sealed condition when you received it?

A.  Yes, it was.

Q.  And is that, in fact, what that contains?

A.  Yes.

Q.  And you recognize again your markings on

622

it?

A. Yes.

Q. All these items then again contain your blue seal when you were completed -- had completed the analysis?

A. That's correct.

Q. And this particular item actually was sealed with a white seal from Springfield; is that correct?

A. That's correct.

Q. But they were all in a sealed condition when you received them?

A. Yes.

Q. Did you then proceed to extract DNA from the three known blood standards as well?

A. Yes, I did.

Q. Now, because they were a known blood standard, was there any need to determine if there was sufficient DNA or if it was human?

A. I analyzed questioned forensic samples just the same way as I analyze reference or blood standard samples.

Q. Now, with respect to the DNA that was extracted then both from the blood on the glass and the piece of the nylon as well as the three known samples,

623

did you then proceed to conduct the DNA analysis using
that PCR analysis you described?

A.  Yes, I did.

Q.  Once you've amplified the DNA using the
technique involving the thermal cycler that runs the 28
cycles, how much amplification goes on?  Can you just
describe the magnitude of what takes place?

A.  Yes.  Like I said, this amplification
process goes through 28 cycles.  Every cycle that the
amount of DNA is doubled.  So, I start out with 1 single
strand, the next cycle 2, the next cycle 4, the next
cycle 8, the next cycle 16, so on and so forth.  So,
after 28 cycles, there's millions and millions of copies
present in that amplified product.

Q.  After the DNA is amplified then, and each
sample is handled separately, again; is that correct?

A.  That's correct.

Q.  And did you take precautions to insure
throughout your analysis that there was no cross
contamination?

A.  Yes, I did.

Q.  Then after you have the amplified samples
for each exhibit, then, how are those pieces of DNA that
have been amplified detected and measured?

A.  Okay.  The next thing I would do is put a

624

small amount of that amplified product on an instrument called an ABI Genetic Analyzer 310 Capillary Electrophoresis Instrument.

Basically, what this instrument does is it separates out these fragments through what is called electrophoresis.  Electro meaning electric current, phoresis meaning separation.

This -- The instrument applies 15 kilovolts of electricity in the sample, forcing some of the DNA to go into this capillary that's filled with the polymer or a transport medium.

Q.  Now, why does DNA move in response to an electrical charge?

A.  DNA molecule is negatively charged.  So, whenever an electrical current is applied to it, it's gonna migrate towards the positive electrode or cathode.

Q.  And when you talk about a capillary, is that actually a little glass tube?

A.  That's a very thin glass tube that's a quarter of the diameter of a human head hair.

Q.  Is there a window then in that tube?

A.  Yes.  At the other end of the capillary, there's a window.  Through 25 minutes of electrophoresis with this electrical current, you've got all these different DNA fragment -- fragments that are migrating

625

through this capillary.  The smaller fragments are gonna migrate faster because there's less resistance.  The larger fragments are gonna migrate slower.

So, whenever these fragments go across or through the instrument, the window of the capillary, there's a lasered light that shines through the window; and what I forgot to mention was that during this amplification process, the chemicals that we use, each area of DNA that I'm interested in is tagged with a fluorescent dye, either a blue dye, green dye, or yellow dye.

So, when the DNA fragment migrates through that window, the laser hits it, and it's carrying a green dye, green fluorescence is exposed or produced.

The instrument picks up that fluorescent activity and converts it into numerical data.

The numerical data is what software uses to give it its size and eventually allelic designations.

Q.  Now, the results then of that process when the laser is measuring or reacting to these fragments, is that then being recorded and designated by a computer at the time?

A.  Yes, it is.

Q.  And, again, is it the length of the fragment that you're using to discriminate between the

626

different DNA types?

  A. Yes.

  Q. Now, does it measure the DNA then several different chromosomes?

  A. Yes.

  Q. How many?

  A. Nine different chromosomes we're looking at.

  Q. Can you explain then why the use of looking at nine different chromosomes helps identify or differentiate between individuals?

  A. Yes. The more different genetic marker systems that I look at, the more differentiating I can be to where I can add more and more weight to who the possible contributor of that stain is.

  Q. Now, when you conduct the PCR analysis as you've explained then, are there tests that are built into the analysis that you're running that tell you if, in fact, the procedure is operating correctly?

  A. Yes, there is.

  Q. Can you explain this, please?

  A. There's several internal controls that I have to run. I have to run an amplification positive control. This is some DNA that's in the kit that I have to amplify just like all of the other samples. This

627

positive control tells me if the amplification process
or the thermal cycler instrument worked properly.

There's also a neg -- amplification negative
control where I add nothing but water to the reagents.
This tells me that the reagents in the kit are pure,
pristine, and clean.  Okay?

If neither one of these work properly, then
all of my other tests are scratched, and I have to
troubleshoot to find out what the problem is and go back
and reamp new samples.

Q.  Were these controls then working as you
analyzed each one of these samples individually?

A.  Yes, they were.

Q.  And did they indicate to you that the
tests were running properly at the time?

A.  Yes, they did.

Q.  Now, using the PCR analysis you described,
then, were you able to identify DNA profiles on the
blood from the piece of glass and from the piece of
stocking?

A.  Yes, I was.

Q.  With respect to the blood on the piece of
glass, what was your conclusion?

A.  I identified a DNA profile that matches
the DNA profile of Lori Hansen.

628

Q.   Now, with respect to the piece of stocking, then, what was your conclusion?

A.   The piece of stocking I identified a mixture of DNA profiles.  One DNA profile matches the DNA profile of Dedric Moore.  Another DNA profile matches the DNA profile of Lori Hansen.  An additional DNA profile was identified that does not match Lori Hansen, Dedric Moore, or Donrico Holtzclaw.

Q.   Now, with respect to Donrico Holtzclaw, then, were you able to eliminate him as a source of any of that DNA on either of the glass or the mask?

A.   Yes.  Donrico Holtzclaw is excluded as being a possible contributor to the blood on the glass or to the DNA identified in the piece of black nylon stocking material.

Q.   Now, with respect to the three profiles that you identified then on the piece of the stocking, was -- Let me ask you this, is DNA found in saliva?

A.   Yes, it is.

Q.   And is it actually in the chemical of saliva, or what are you looking at when you're finding DNA in saliva?

A.   Well, in saliva, your mouth or your oral cavity is always sloughing off cells.  Again, these cells are called epithelial cells.  They're nucleated,

629

1

2      and there's lots and lots of DNA in saliva.

3              Q.  Now, do you also -- can you find DNA then

4      in skin cells such as facial skin?

5              A.  Yes.

6              Q.  Now, let me ask you then, for example, if

7      a woman with a DNA profile consistent with Lori Hansen's
       wore the stocking that that --

8              MS. LENIK:  Your Honor, I'm going to object to

9      this as an improper hypothetical, because this witness

10     never said that she wore those stockings.  She said they

11     hung around for approximately a year in her house.

12             THE COURT:  Overruled.

13             MS. LADD:  Thank you, Your Honor.

14             Q.  (by Ms. Ladd)  If a woman with a DNA
       profile consistent with Lori Hansen's wore the intact

15     pantyhose that that piece was later cut from,

16     especially, say, in the winter months when it's dry --

17             MS. LENIK:  Same objection.

18             THE COURT:  Overruled.

19             Q.  (by Ms. Ladd)  With her skin cells flaking

20     off onto it, would that be consistent with the DNA

21     profile that you found?

22             A.  Yes, it would.

23             Q.  If an individual then with a DNA profile

24     consistent with Dedric Moore's, say, then pulled a cut

                                630

portion of the pantyhose over his face, could his saliva
and his skin cells leave a DNA profile consistent with
what you found?

A.    Yes, they could.

Q.    Now, if the individual identified as
Dedric Moore or the individual using that as a mask had
recently kissed or rubbed faces with someone else, would
that third profile that you observed, would that be an
explanation for that?

A.    That would be a possibility, yes.

Q.    How else would you account for that third
profile?

A.    If somebody else wore those nylons at one
time, or if somebody touched those nylons throughout --
before the offense or after the offense with bare hands,
that would be another explanation.

Q.    Now, that third profile you identified,
was that the weakest profile?

A.    It was very weak, yes.

Q.    Once you identified the DNA profiles that
you've described then, did you compare them to
established population databases, in other words, to
calculate the statistical frequency of encountering
these profiles in the general population?

A.    Yes, I did.

631

Q.   Are those frequencies calculated
separately for different racial groups?

A.   Yes, they are.

Q.   Why is that?

A.   Because each racial group, the
characteristics are found in different frequencies.  The
frequencies found in Caucasians are different than
Blacks, which are different than in the Mexican race, or
the Native Indian race or Oriental race.

Q.   Now, did you then prepare two calculations
on this case?

A.   Yes, I did, because I have no means of
determining what race the sample came from.

Q.   Now, in addition to determining then a
calculation for both established racial groups that
would be black and white populations, did you prepare
two calculations with regards to the mixed profiles you
identified?

A.   Yes, I did.

Q.   First of all, did you treat all the
profiles the same, in other words, you didn't
distinguish or separate out three profiles?

A.   That's correct.

Q.   And when you combined all the profiles
together, what frequency did you determine with respect

632

to that total combined mixture?

     A.   The combined profiles, which is a very conservative estimate, could be found in approximately 1 in 27 hundred Blacks or approximately 1 in 5 thousand Caucasians.

     Q.   After that conservative calculation then, did you proceed to determine if there was one profile which could be identified as the major contributor, the one that stood out at the majority of the locations on the DNA?

     A.   Yes, I did.

     Q.   And could you identify, in fact, a major profile on this case at the majority of the location?

     A.   Yes, I did.

     Q.   Who did that match?

     A.   Dedric Moore.

     Q.   Were you also able to identify then a minor contributor at the majority of the locations of the DNA?

     A.   A medium contributor I identified as being consistent with Lori Hansen.

     Q.   And, finally, then, were you able to identify a leftover minor profiler, a weaker profile?

     A.   Yes, I was.

     Q.   And was that the one that was

633

unidentified?

    A.  Yes.

    Q.  Once you determined that you were able to differentiate or separate the profiles in the manner you've described then, were you able to calculate the frequency of those separate profiles in the general population?

    A.  Yes, I was.

    Q.  And for the DNA profile on the stocking then that matched Lori Hansen's, did you determine the frequency of finding that DNA profile in the general white population?

    A.  Yes, I did.

    Q.  And what was that?

    A.  That frequency would be found in approximately 1 in 1.6 trillion Caucasians.

    Q.  And did you also calculate it if you were to look for it in the general black population?

    A.  Yes, I did.

    Q.  And what was the frequency?

    A.  That frequency would be found in approximately 1 in 660 billion Blacks.

    Q.  Now, for the DNA profile on the stocking that was a major profile that matched Dedric Moore's, did you determine the frequency of finding that in the

634

general white population?

A.   Yes, I did.

Q.   And what would that be?

A.   That DNA profile would be expected to occur in approximately 1 in 720 billion Caucasians.

Q.   Did you also calculate the frequency of encountering that profile in the general black population?

A.   Yes, I did.

Q.   And what was that?

A.   That frequency of occurrence would have occurred in approximately 1 in 150 billion Blacks.

Q.   Now, when you talk about encountering that profile that was a major profile you identified on the piece of mask in the general black population being 1 in 150 billion, what does that mean in practical terms?

A.   That's about 25 times the number of people in the population of the earth.

MS. LADD:   Thank you.   I'd tender this witness.

THE COURT:   At this point, we're going to take a recess before cross-examination.

Ladies and Gentlemen, please go to the jury room with Mr. Rasmus.   Don't discuss the case.

(The following proceedings were had out of the

635

presence and hearing of the jury.)

THE COURT:  Direct the witness not to discuss your testimony during the break.

All right.  We'll take a recess.

(Recess taken.)

THE COURT:  Ms. Lenik, are you ready for the jury to be brought in?

MS. LENIK:  Yes.

THE COURT:  Ms. Ladd?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Rasmus, bring the jurors in, please.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Cross-examination, Ms. Lenik?

MS. LENIK:  Thank you.

CROSS-EXAMINATION

BY MS. LENIK:

Q.  There are other things which can eliminate the possibility of your finding DNA on materials submitted to you besides heat; correct?

A.  That's correct.

Q.  What would some of those other situations be?

636

A.  Any type of environmental insult; light, excess humidity, bacteria, a chemical, dirt, things of that nature.

Q.  You cannot tell when you see an item and cannot find DNA why it is that you can't find it; correct?

A.  That's correct.  I can only speculate at times, but I can't tell why I didn't find anything, because one reason is there might not be any DNA present.

Q.  Even if you have an item that a human being normally wears like clothing, if you don't find any DNA on it, you can't tell why that is; correct?

A.  That's correct.

Q.  And it could -- it's just as likely to be that you couldn't find it because of something like light, humidity, bacteria, or dirt than the heat; correct?

A.  That's correct.

Q.  And so heat was suggested to you by the State's Attorney, but that doesn't mean that that reason is any more likely than any other; correct?

A.  Well, I believe my understanding of the case is that heat was mentioned because there was a fire at the site of the offense.

637

1

2          Q.   And that's something that was told to you

3     by other people and that information was simply given to

4     you with other information regarding these examinations?

5          A.   That's true.

6          Q.   And there's nothing more scientifically

7     validated in your results about heat than some other

      reason; correct?

8          A.   That's correct.

9          Q.   When you looked at this pair of shorts and

10    you decided and concluded that there was insufficient

11    DNA to do your further analysis with, you don't know why

12    there's insufficient DNA to do your further analysis

13    with; do you?

14         A.   I can never tell the true reason for that.

15         Q.   Let me ask you this about the shorts,

      you -- there was urine indicated on those shorts;

16    correct?

17         A.   That's my understanding, yes.

18         Q.   And you could not tell how that urine got

19    on those shorts, excuse me; could you?

20         A.   That's correct.

21         Q.   So that you couldn't tell whether the

22    person wearing them urinated in them or whether

23    somebody, not her, urinated on her; correct?

24         A.   That's correct.

                                638

Q.  You also couldn't tell how fresh or recent any of this material was; could you?

A.  That's correct.

Q.  Does DNA fade over time?

A.  The DNA molecules are very stable, very rigid molecule.  It's been identified in mummies, mummified material; but if it does undergo these environmental insults, then, yes, it could fade away to where we are unable to detect it.

Q.  And is there any method of dating the DNA that you find on a material?

A.  No, there's not.

Q.  So that you don't know when you find DNA matching somebody on a material whether that happened two days earlier or a year earlier?

A.  That's correct.

Q.  So that, for example, on that stocking where you found DNA belonging to three different people, you don't know whose DNA got there first; do you?

A.  No, I don't.

Q.  And you don't know whose got there second or third; do you?

A.  No, I don't.

Q.  And you don't know whether the DNA that got there first got there six months before the DNA that

639

got there second or third?

        A.  That's correct.

        Q.  And just because the DNA might be lighter or weaker, that doesn't necessarily mean that that DNA got there last; does it?

        A.  By no means, no.

        Q.  It could have been that that DNA got there first, but the touching was insufficient to leave more DNA than it did?

        A.  That's correct.

        Q.  Let me ask you about these percentages. You did two completely different analyses of these same materials; did you not?

        A.  That's -- Different interpretations, yes.

        Q.  What does that mean?

        A.  I'm sorry, not different interpretations, different statistical calculations.

        Q.  And why is that?

        A.  The first -- When I originally worked the case and written up a report, our procedures was that if I cannot differentiate between the different contributors at all nine loci, then I would give a combination of all possible frequencies, and that's exactly what I did on the first set of statistics, and that's why the statistics are very small.

On the second set of statistics that I gave, after the report had gone out, our procedures changed to where we could add more weight to our interpretations, meaning that if we can identify at least at five or more loci, then we can go ahead and separate out the contributors and give them individual statistics.

Q.   And so the first ones that you gave, the first numbers that you gave that you gave on September 10, 1998, indicate that the mixture identified in this piece of black stocking matches the combined DNA profiles of Dedric Moore, Lori Hansen, and one other individual; and then you gave the combined profile index of 1 in 27 hundred Black people or 1 in 5 thousand Caucasians, that was looking at all three of those together?

A.   That was looking at all possible combinations of the characteristics that I identified, and that would include many, many people.

Q.   I don't -- All right.  Let me ask you a question about the numbers then.  If a town had -- If there were approximately a hundred thousand people in a city and you had these percentages, what would be the number of possible Black people or Caucasian people that this -- that this index or this profile would match?

A.   It -- About 30.

641

Q. So that in a town of about a hundred thousand people, there would be about 30 people whose DNA would be consistent with this profile that you found?

A. Thirty people that would -- Yes, that's correct.

Q. And would those be 30 black people, white people, or combination?

A. That would be 30 Black people.

Q. And do you have any idea who this unidentified person is?

A. No, I do not.

Q. And you do know that the unidentified person is a person, it's a human being; correct?

A. That's correct.

Q. I mean, it wouldn't be from an animal?

A. That's correct.

Q. Or -- Well, let's -- let me just stop it there.  It wouldn't be from an animal?

A. That's correct.

Q. If you knew that the woman named Lori Hansen had cats in her house, it couldn't have been from them; correct?

A. That's correct.

Q. And the exhibit that you numbered 31A

642

which is the swabbing of the piece of glass with the

bloodstain, that only came from the individual named

Lori Hansen; correct?

A.  The DNA profile that I identified matches

Lori Hansen, and it could not have originated from

Dedric Moore or Donrico Holtzclaw.

Q.  And, excuse me, but it matched close

enough that you would say it was hers and not an unknown

person?

A.  I'm not at liberty to say that that

bloodstain came from Lori Hansen, nobody else.  All I

can say is the DNA profile matches Lori Hansen.

Q.  And that's true generally when you do DNA

analysis, that you cannot say that it is the person; you

can only say that according to your training and

experience it matches the person; correct?

A.  I can say that it matches that person and

gives statistical weight to that match.

Q.  Then on -- Let me -- Let me ask you this,

in between September 10th of 1998, and February 25th of

1999, when you recalculated and got those completely

different percentages, did you receive any phone calls

from any law enforcement agencies or the Champaign

County State's Attorney's Office?

A.  Yes, I did.

643

Q.  Who did you receive phone calls from?

A.  I talked to Assistant State's Attorney Heidi Ladd.

Q.  And do you recall when you talked to her?

A.  What time frame are we talking about?

Q.  In between September 10th, 1998, and February 25th, 1999.

Are you refreshing your recollection with your notes?

A.  I'm sorry.  Yes, I am.

Q.  All right.  And what do your notes indicate when you talked to Ms. Ladd?

A.  I talked to Mrs. Ladd on October 8th of '98, to inform her the status of analyzing Donrico Holtzclaw's blood standard.

I called -- I talked to Mrs. Ladd on March 4th during a pretrial conference that was held at the Morton lab, where I explained my findings.

And I've been calling the State's Attorney's Office the last couple days to find out court status, court times and dates.

Q.  And in either of those, in any of those conversations, did you explain the percentages that you got in your first calculation before those second calculations were made?

644

A.  Yes.

Q.  Whose decision was it to create second calculations with these numbers?

A.  It was my decision to call my superiors and inform them that a case that was worked with conservative statistics originally was going to court and that since that time we gave more weight to the statistics or interpretations, and I inquired as to whether or not I should go ahead and submit a report stating those facts, and it was advised that I should.

Q.  And who made that -- who advised you of that?

A.  My technical leader, Barb Llewellyn.

Q.  And so that was to recalculate the numbers based on the same material.  Did you do any new evaluations of the material?

A.  No new evaluations or no new interpretations.  The only thing different are the statistical calculations.

Q.  And when you -- How did you redo the statistical calculations?

A.  Well, like I said before, before I added all possible types, combined profiles.  And the second go-around, I -- I determined that I can identify who was the major contributor, who was the medium contributor,

645

and who was the minor contributor.

Q.  And you couldn't do that the first go-around?

A.  I could do it the first go-around, but our policy was if I cannot differentiate between the contributors at all nine loci, then I had to give a combined statistics.

And in this particular case, I could differentiate between the major and the medium contributors in seven of the nine loci and not all nine.

Q.  And so then you recalculated it because your office policy changed regarding major, minor, and medium contributors; is that correct?

A.  Our office policy changed regarding when I can differentiate between contributors looking at five or more loci versus looking at all nine loci.

Q.  And so on March 5th, 1999, you submitted what you called an amended report looking at that same material; correct?

A.  That's correct.

Q.  And you -- And at that time, then, is it fair to say in these percentages or these numbers you gave greater weight to the fact that somebody was a major versus a moderate or a minor contributor?

A.  These interpretations were done

646

originally, but, yes, we did give more weight to this in the second report, and that's one of the things that our group decided was that with all this new technology, we can give more weight to our findings and we don't have to be as conservative as we were when we started out.

Q. What do you mean by not having to be as conservative?

A. In other words, we're seeing that we've got a lot of genetic information here that we could separate out contributors and add more weight to the statistics. Where, if you combine all the possible statistics or frequencies, then that would kind of dilute down the stats.

Q. And so the second go-around, you decided to increase those numbers from 1 in approximately 27 hundred Blacks or 5 thousand Caucasians to 1 in 150 billion Blacks or 1 in 720 billion Caucasians; correct?

A. That's correct.

Q. That's an awfully big difference; isn't it?

A. Yes, it is.

Q. And if you look at those huge numbers, there's nobody else on the face of the earth that would match those numbers now; correct?

A. Identical twin would.

647

Q.  Not a brother?

A.  An identical brother to whoever --

Q.  An identical twin, though?

A.  Identical twin, yes.

Q.  But not a natural brother?

A.  It would have to be identical, yes.  But I'm -- That doesn't -- Just because the numbers are very, very high doesn't mean that there's not someone out there that has that profile, but it just indicates to us that the chances of finding that person is very, very slim.

Q.  So, you're saying that there could be someone out there who has that profile?

A.  But highly unlikely.

Q.  And you don't know what the likelihood of that is?

A.  Only by the statistics that I've generated.

Q.  But just prior to your office policy changing, you would have been willing to say that there'd be 30 people in a town of a hundred thousand whose profile was consistent with the first numbers that you gave; correct?

A.  That's because I was combining all possible profiles into one lump group.

648

Q. But at the time that you -- If we had had this trial on September 11th of 1998, when you had those numbers, you would have told me that in a town of a hundred thousand, there would be 30 people who had that percentage; correct?

A. At that particular time, yes.

Q. And those would have been 30 Black people who had that percentage; correct?

A. Correct.

Q. You did not recalculate, when you recalculated the percentages on Mr. Moore and Ms. Hansen, you did not recalculate on the unknown person; did you?

A. No, because it was an open profile, and our policy is not to give statistics to open profiles, 'cause we -- we have -- we cannot say that it matches anybody.

Q. What's an open profile?

A. An open profile is a profile that we cannot match to anybody.

Q. And is that the same as you reported back in September?

A. When I said the mixture of DNA profiles was identified in exhibit 12B which matches the combined DNA profiles of Dedric Moore, Lori Hansen, and at least

649

one other individual, that's considered the open

profile.

Q. And it could have been more than one other

individual; correct?

A. That's correct.

Q. And is there a maximum number of other

individuals it could have been?

A. I'm sure there is, but I never calculated

it.

Q. Okay. Within a reasonable degree of

scientific certainty, could you state how many other

people it could have been?

A. No, I cannot.

MS. LENIK: No other questions.

THE COURT: Ms. Ladd?

MS. LADD: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. LADD:

Q. Mr. Zeeb, so to put this time line in some

kind of frame, in September of 1998, when you conducted

the first calculation, is it correct that you had all

the analyses and results that you have today as you

testified?

A. That's correct.

Q. And were you able to look at and clearly

650

1

2  see a major, a medium, and a minor profile at the loci

3  you've described?

4          A.  Yes, I was.

5          Q.  And loci is a chromosome location?

6          A.  Loci, it means loci is plural for locus.

7  Locus is a specific area or address of the DNA molecule.

8          Q.  And even though you were looking at what

8  was clearly three ability or three ways to distinguish

9  this and separate them out, was it the Illinois State

10  Police policy at that point to be absolutely

11  conservative and not do that?

12          A.  Yes.  Our policy was to be very

13  conservative in the beginning.  And through the

14  evolution of technology and the evolution of seeing

15  how -- how informative this technique is and the

16  instruments that we have, we later on agreed to add more

17  weight to profiles like this if we can differentiate at

18  five or more loci instead of all nine loci.

18          Q.  Now, even as you were producing the report

19  on this case, then, were validation studies being

20  conducted by the State of Illinois to determine if, in

21  fact, it was valid to look at who was the major, the

22  medium, and the minor contributor?

23          A.  Yes, they were.

24          Q.  Ironically, just a few weeks after you

                              651

authored a report, did those studies, the results come
through?

A.   Yes.   I believe the decision to look at,
give statistic at five or more loci came around
September 30th.

Q.   And was this based on validation studies
and research that was being conducted even as you were
conducting your analysis?

A.   Yes.   Based on validation studies and peer
review, discussion among ten analysts, and I was one of
those ten, as to how much weight we can apply to this.
Some analysts said we couldn't go any more, you know, if
you cannot differentiate between three or more loci.
Another one said, no, all nine.   And then checking
through the forensic community, it was established that,
yes, at five or more loci we can differentiate between
the different contributors.

Q.   Did I even talk to you at that point while
this was going on?

A.   No.

Q.   And was I even aware that this was going
on?

MS. LENIK:   Objection.

THE COURT:   Well --

MS. LENIK:   How could he state --

652

THE COURT:  Sustain the objection.

Q.  (by Ms. Ladd)  Well, did you have any conversation at all with our office or with me about that fact at that point?

A.  At that point in time, no.

Q.  And, again, this wasn't just people sitting in a room and deciding that they wanted to calculate statistics differently, this was based on validation studies and meetings in the forensic community?

A.  Right.  And after these meetings realized there was some cases that we worked that would have to be amended, but we were told to wait and address those issues if and when these cases go to court.

Q.  Now, in that first calculation, then, so there's no confusion, you're assuming that none of the profiles can be separated?

A.  That's correct.

Q.  Is that right?

A.  That's correct.

Q.  So, you're seeing a major, medium, and minor and just ignoring for those calculations?

A.  That's correct.

Q.  And putting every combination of those together?

653

1

2          A.  They're throwing everything together and

3    getting a combined frequency.

4          Q.  And is that why it appears still rather

5    rare, but more frequent in the population?

6          A.  Yes, that is.

7          Q.  Now, then, when you are able to determine,

     as you have, that there's the major profile, that

8    there's a medium profile, and a very minor profile,

9    then, does that allow you to discriminate or separate

10   out with far more accuracy the population statistics?

11         A.  Yes, it does.

12         Q.  And is that then how you arrived at your

13   conclusion then that it was 1 in 150 billion Black

14   individuals that would match the profile of Dedric Moore

15   and the profile that was the major contributor on that

     stocking mask?

16         A.  That's correct.

17         MS. LADD:  Thank you.  I have no further

18   questions.

19         THE COURT:  Ms. Lenik?

20                    RECROSS-EXAMINATION

21                    BY MS. LENIK:

22         Q.  When you say major, medium, and minor

23   contributors, you don't allocate any percentages to

     those words; do you?

24

                              654

A.   No, I don't.

Q.   And so you're only using those words for the convenience of speaking in the English language that that makes it easier for you to convey those concepts; right?

A.   Well, major contributor means that I'm picking up the most intensity from that profile.  That's why it's called major.  And then there's some other DNA fragments that don't exhibit that much intensity, so that's considered the medium.  It would normally be minor if there was only two profiles, but since there was a third profile identified that was very, very minute or very weak, then I refer to that as a minor contributor.

MS. LENIK:  No other questions.

MS. LADD:  Nothing further.  Thank you.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

THE COURT:  Does that conclude the testimony, Ms. Ladd?

MS. LADD:  Yes.  Thank you.

THE COURT:  Ladies and Gentlemen, I'm going to ask that you go with Mr. Rasmus to the jury room at this point.  We'll get you out as soon as we can.

(The following proceedings were had out of the

655

presence and hearing of the jury.)

THE COURT:  We'll show the following is out of the presence of the jury.

Ms. Ladd, is it your intention to move for admission of Exhibits 1 through 75 which includes several exhibits that have subexhibits attached to them?

MS. LADD:  That's correct, Your Honor.

THE COURT:  Ms. Lenik, any objection to any of the exhibits?

MS. LENIK:  Your Honor, I have no objection to the exhibits being admitted, and I would reserve argument on which, if any, will go back to the jury room.

THE COURT:  That's a separate and distinct determination that we have to make.

All right.  People's Exhibits 1 through 75 will be admitted.

People rest?

MS. LADD:  That's correct, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  Your Honor, I would move at this time for a directed verdict, and I would simply argue that the evidence on identification is insufficient.

I think it very interesting that the DNA expert discussed the possibility that there might be 30

656

black people in a community which we all know is about the size who would fit this profile, and it's a mere fluke that the calculations were reestablished. Had the trial been prompt, obviously, that would have been the only testimony, and I don't think Mr. Moore should suffer for it.

In any event, I think the evidence on identification is insufficient, and I would ask that there be a directed verdict in favor of the Defendant.

THE COURT: Well, there's more evidence on identification than merely the DNA testimony. There's sufficient amount of circumstantial evidence which I believe, when coupled with the DNA testimony, makes your motion not well-founded.

We'll show motion by the Defendant for directed verdict at the conclusion of the State's case, and that motion is denied.

Ms. Lenik, for scheduling purposes, I believe you probably have at least two witnesses out there.

MS. LENIK: I have four, Your Honor.

THE COURT: All right.

MS. LENIK: One of them is Officer Shipley who will be very brief. And then the other three are civilian witnesses.

THE COURT: And what about your client?

657

MS. LENIK:  My client, as I understand it, wishes to testify.  We will put him on last.

THE COURT:  All right.  Is there anything --

MS. LENIK:  Unless we have a witness problem for some reason tomorrow, we'll put him on last.

THE COURT:  All right.  Is there any reason why we can't get at least the four other witnesses on this afternoon?

MS. LENIK:  Not that I know of, unless we run too late.

THE COURT:  All right.  Is there anything you wish to say for the record concerning your client's wishes to testify?

MS. LENIK:  No -- Well, Your Honor, I suppose as long as we're doing this now, I would ask that you address him regarding his Fifth Amendment rights and ascertain his wishes on the record.

THE COURT:  All right.  Mr. Moore, as you've heard me tell the jury at the beginning of the trial, every citizen has an absolute right not to testify.  If he or she so chooses.

And if you were to choose not to testify, then the jury would get an instruction that says they must not consider that fact when they arrive at their verdict.

658

You've discussed with Ms. Lenik whether or not you should testify; is that correct?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you feel you've had enough time to discuss with her the pros and the cons of testifying and the tactical advantage and maybe the tactical disadvantage of testifying; is that correct?

THE DEFENDANT:  Yes, we have.

THE COURT:  And you, based upon the information and the advice given to you by Ms. Lenik, you will testify; is that correct?

THE DEFENDANT:  Yes, I will.

THE COURT:  All right.  Why don't we take about another five minutes, and, Ms. Lenik, I'll let you proceed with your witnesses.

(Recess taken.)

THE COURT:  Ms. Lenik?

MS. LENIK:  Shall I bring Officer Shipley in?

THE COURT:  No.  We'll bring them in one at a time.

For scheduling purposes, we'll finish with the four witnesses you have this evening.  And you can finish up with the Defendant tomorrow morning.

When did you want to do the jury instructions? After we finish --

659

MS. LENIK:  As soon as we finish Mr. Moore's testimony.

THE COURT:  Tomorrow morning?

MS. LENIK:  I'd like to get it done as soon as we can.  I have a 3:30 sentencing hearing.

THE COURT:  Well, Ms. Lenik, we'd all like to get it done as soon as we can.

What I'll do is have the jury back at 8:30 tomorrow morning so we can begin earlier.

MS. LENIK:  That's fine.

THE COURT:  All right.  All right.  Mr. Rasmus, bring the jurors in.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Ms. Ladd, do the People rest?

MS. LADD:  Yes, Your Honor, and People move to admit People's exhibits.

THE COURT:  Yes.

Ladies and Gentlemen, the People have now rested, and their exhibits numbered 1 through 75 with all of the subexhibits have been admitted into evidence.

Ms. Lenik, call your first witness.

MS. LENIK:  Thank you.

We would recall Officer Shipley, Your Honor.

660

THE COURT:  Officer Shipley, you're still under oath.  If you'll have a seat, please.

THE WITNESS:  Okay.

CHAD SHIPLEY

recalled as a witness on behalf of the Defendant, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LENIK:

Q.  Officer, will you state your name.

A.  Chad Shipley.

Q.  And you're the same Chad Shipley who testified earlier in this case?

A.  Yes, that's -- that's correct.

Q.  And you're a police officer for the City of Champaign?

A.  Yes.

Q.  And you conducted an investigation of this matter on the 25th of February of 1998; is that correct?

A.  Yes.

Q.  And as part of your investigation in this case, did you have a conversation with a woman named Lori Hansen?

A.  Yes, I did.

Q.  And did that conversation occur on the

661

25th of February of 1998, in the early morning hours?

      A.  Yes.

      Q.  Approximately what time did you have that conversation?

      A.  I don't have my report in front of me to tell you what time I arrived, but it would have been within five or ten minutes after I arrived there.

      Q.  Who was present during that conversation?

      A.  I talked to Lori in the ambulance with a couple different unknown paramedics.  I don't know their names.

      Q.  And did she tell you that she arrived home at her apartment --

      MS. LADD:  Objection, Your Honor.  I'm sorry, but I believe this is inappropriate.  There's been no foundation laid.

      THE COURT:  Well, I'll overrule the objection at this point.

      Q.  (by Ms. Lenik)  What time did she tell you she arrived home at her apartment that morning?

      A.  I believe it was a short -- I can't tell you how many minutes or anything, but it was a short time before we got there.

      Q.  If your report said 2:55, would that be correct?

662

A.   That's correct.

Q.   And she gave you an identification of a suspect; is that correct?

A.   That is not correct.

Q.   She did not give you any -- She did not -- I'm sorry.  She gave you a description of a suspect?

A.   That is correct.

Q.   Okay.  And did she suggest the description to you or did you suggest it to her?

A.   She suggested a description to me.

Q.   And what did she tell you that description was?

A.   A black male.  Again, I'd have to refer to my report.

MS. LENIK:  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q.   (by Ms. Lenik)  I'm handing you what's marked as Defendant's 1.

A.   Thank you.

Q.   Do you recognize that?

A.   Yes.

Q.   What is that?

A.   My report.

Q.   And what description does it say she gave

663

you?

A.  A black male, 20 to 30 years of age, five feet nine inches tall, 160 pounds, wearing baggie clothes, a red jacket with a hood pulled up, blue jeans, and green shoes.  She described him as being dark complected and having a low tone of voice.

Q.  Was that the only description that she gave?

A.  Yes, to my --

Q.  And she also told you that she could probably identify the suspect if she saw him again; correct?

A.  I don't recall.

Q.  I'm handing you again a copy of your report, Defendant's 1, and is that contained in this?

A.  Yes, that is correct.

Q.  Does that refresh your recollection about what she told you?

A.  Yes, it does.

Q.  And so did she, in fact, say she thought she could probably identify him if she saw him again?

A.  Yes, she did tell me that.

MS. LENIK:  May I have a moment?

THE COURT:  Yes.

Q.  (by Ms. Lenik)  And that's all she gave

664

you about the person; correct?

      A.   Yes.

      MS. LENIK:   No further questions.

      THE COURT:   Ms. Ladd?

               CROSS-EXAMINATION

               BY MS. LADD:

      Q.   This conversation that you had with Ms. Hansen then was while she was in the ambulance being treated by paramedics on the way to the hospital?

      A.   That's correct.

      MS. LADD:   No further questions.

      THE COURT:   Anything else, Ms. Lenik?

      MS. LENIK:   No, Your Honor.

      THE COURT:   You may step down.

                     (Witness excused.)

      THE COURT:   Call your next witness.

      MS. LENIK:   Thank you.

                     (Witness sworn.)

               IVORY BURRAGE

called as a witness on behalf of the Defendant, being first duly sworn, was examined and testified as follows:

               DIRECT EXAMINATION

               BY MS. LENIK:

      Q.   Would you state your name and spell it for

the court reporter.

A.  Ivory Burrage, I-v-o-r-y --

THE COURT:  Okay.  Ma'am, you are going to have to speak into the microphone.  It's a little bit noisy in the courtroom.

A.  Ivory Burrage, I-v-o-r-y, B-u-r-r-a-g-e.

Q.  (by Ms. Lenik)  What's your profession or occupation?

A.  Cosmetologist.

Q.  And where do you work?

A.  Taco Bell.

Q.  And are you also going to school?

A.  Yep.

Q.  What school do you go to?

A.  Mr. John's School of Cosmetology.

Q.  What year are you in?

A.  It's a one year course.

Q.  When do you graduate?

A.  June.

Q.  Of this year?

A.  Yep.

Q.  And do you know the Defendant, Mr. Moore, who's seated next to me in court?

A.  Yes.

Q.  How do you know him?

666

A.   Friends.

Q.   How long have you known him?

A.   A while.

Q.   More than a year?

A.   Yeah, more than a year.

Q.   How did you come to know him?

A.   I met him at my job.

Q.   And would you say you're good friends, very good friends?

A.   We very good friends.

Q.   Are you related in any way?

A.   Nope.

Q.   I want you to think back to February 25th of 1998, in the early morning hours.  Do you recall that day?

A.   Yeah.

Q.   Did you see Mr. Moore on that day?

A.   Yep.

Q.   And where did you see him?

A.   At my house.

Q.   And about what time?  If you recall?

A.   Um, about -- it was like 1 o'clock in the morning.

Q.   And what did you do with him at 1 o'clock in the morning on that day?

667

1

2          A.   We sat and talked.

3          Q.   Did he say anything to you about a

4    neighbor of his grandmother's?

5          A.   Not that I remember.

6          Q.   Did he seem out of breath or unusual to

7    you in any way?

8          A.   No.

9          Q.   Was he angry at all?

10         A.   No.

11         Q.   How long did he stay?

12         A.   For a couple hours.

13         Q.   Was anybody else there?

14         A.   No.

15         Q.   And did -- did you go anywhere besides

16    stay at your house?

17         A.   No.

18         Q.   What time did he leave?

19         A.   I can't remember.

20         Q.   Do you know what kind of transportation he

21    had?

22         A.   A bike.

23         Q.   Was it pretty warm that day, if you

24    recall?

           A.   It was cool.

           Q.   Do you recall if there was any snow?

                            668

A.  I can't remember.

Q.  Do you remember why he left?

A.  'Cause I had to be at school the next day.

Q.  Was he angry or upset with you when he left?

A.  No.

Q.  Did you see him leave?

A.  Yes.

Q.  Did he head -- Do you know, by the way, do you know where he was living at that time?

A.  No, not that I can remember.

Q.  Do you know whether -- whether when he left he headed off in the direction toward his home?

A.  He told me he was going home, so I really, I can't remember.

MS. LENIK:  Okay.  I have no other questions.

THE COURT:  Ms. Ladd?

MS. LADD:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. LADD:

Q.  How old are you?

A.  Nineteen.

Q.  And you work at Taco Bell?

A.  Mm-hmm.

Q.  You have to say yes or no.

669

A.  Yes.

Q.  And how do you pronounce your last name?

A.  Burrage.

Q.  Ms. Burrage, you said you're good friends, very good friends with the Defendant?

A.  Um, yes.

Q.  And you've known him for a while?

A.  Yes.

Q.  And you met him at Taco Bell then?

A.  Yes.

Q.  When did you meet him?

A.  I can't remember.

Q.  Now, well, when you say a while, do you remember a year, two years?

A.  It's been about a year and a half.

Q.  Now, when you say very good friends, then, you socialized with the Defendant?

A.  Yes.

Q.  And you do things with him, in other words?

A.  Things like what?

Q.  Have him visit or go over to visit him?

A.  Yeah, we have him visit, yeah.

Q.  And how often did he come over to visit?

A.  I say about three times.

670

Q.  Three times over how long a period?

A.  I can't remember.

Q.  So, you can't remember over how long a period that he visited you three times?

A.  It was like more than once a month, if that's what you mean.

Q.  So, when he visited you then, do you live with anyone where he visited?

A.  My parents.

Q.  And who are they?

A.  Carolyn and Tom Thomas.

Q.  And were they home on February 25th of 1998?

A.  In the bed.

Q.  What day of the week was that?

A.  I can't remember.

Q.  So, you can't remember anything about the day of the week?

A.  February 28th of '97?

Q.  February 28th of 19 --

A.  Of '98?  I can't remember.

Q.  What date do you think we're talking about here?

A.  February 25th.

Q.  And with regards to the times that you saw

671

him, where would you visit him at then?

       A.  You mean -- At my house.

       Q.  And then you didn't know where he was living?

       A.  I never went to his house.  It was always we -- he -- he came to my house or we went to the movies or something like that.

       Q.  Did you ever ask this very good friend where he was living?

       A.  Yeah.

       Q.  Did you know where he was living?

       A.  The last time I remember he was living in the apartments at Gardens Hills.

       Q.  And what was the address?

       A.  I don't know.

       Q.  Did you know his grandmother?

       A.  No.

       Q.  Did he talk to you about his grandmother living somewhere?

       A.  Yes.

       Q.  And where was that?

       A.  He never said.  He just told me his grandmother lived in Champaign.

       Q.  Now, you said he visited about once a month?

672

A.  I'd say more than once a month.

Q.  So, it actually was then more than once a month.  How many times a month then?

A.  I say it was like whenever I -- I have free time from going to school and work.

Q.  And how often was that?

A.  It wasn't really often, 'cause usually I be tired when I get off, so it was, like I say, about three times.

Q.  Three times a month then?

A.  Yeah.

Q.  And when he came over to visit then, when was the last time he came over to visit before February 25th?

A.  A week before that.

Q.  And then when was the time after that he came over to visit?  When's the last time you saw him for a visit?

A.  I can't remember.

Q.  Now, when did you find out that the Defendant had been charged with these crimes?

A.  When did I find out he was charged with murder or attempted murder?

Q.  Right.

A.  Today.

673

Q. And prior to that then, have you visited him or seen him at all?

A. Nope.

Q. And when is the last time you saw him then?

A. Right before he went to jail.

Q. And when was that, what date?

A. I can't remember.

Q. And then that -- the last time that you saw him then, you knew he went to jail?

A. No, I didn't. The last time I saw him we had went to the movies and it was like after that I didn't see him.

Q. And then you found out he was in jail?

A. Right.

Q. And that was some time ago?

A. Right.

Q. And, in fact, that was months ago?

A. (Nodding head affirmatively.)

Q. You have to say yes or no.

A. Yes.

Q. And you knew he was in jail for these serious crimes?

A. No, I didn't. When -- When he went to jail, he told me he went to jail for something else. He

674

never told me it was attempted murder.

Q. And you knew you'd been with him on February 25th as you're telling us?

A. Right.

Q. And you never called the police to tell them you were with him?

A. No.

Q. You never called the authorities to say, "Hey, I was with him. He couldn't have done this"?

A. I called his lawyer and I told her that it's -- I mean, I told her I was with him, but I couldn't remember how long I was with him.

Q. And when did you do that?

A. Like a week ago.

Q. And prior to that, then, you never contacted any authorities to say you were with him?

A. No, because I didn't know he was in jail for attempted murder.

MS. LADD:  I have no further questions.

THE COURT:  Ms. Lenik?

REDIRECT EXAMINATION

BY MS. LENIK:

Q. Did anybody call you when this first happened or when you first found out he was in jail to find out whether you knew anything about it?

675

A.   No.

Q.   You didn't know what day or time this was supposed to have happened when you first found out or believed that he was in jail; right?

A.   Right.

MS. LENIK:   I don't have any other questions.

MS. LADD:   No.   Thank you.

THE COURT:   You may step down.   Thank you.

                    (Witness excused.)

THE COURT:   Call your next witness.

If you'll step up.

                    (Witness sworn.)

              EMMANIEL MOORE

called as a witness on behalf of the Defendant, being first duly sworn, was examined and testified as follows:

              DIRECT EXAMINATION

              BY MS. LENIK:

Q.   Would you state your name and spell your first name for the court reporter.

A.   Emmaniel Moore, E-m-m-a-n-i-e-l.

Q.   What's your relationship to Dedric Moore?

A.   I'm his brother.

Q.   How old are you?

A.   Twenty-three.

676

Q.   And what's your current occupation?

A.   I'm a line cook at Cheddar's Casual Cafe at 2101 North Prospect.

Q.   And where do you currently live?

A.   Right now it's 507 North Fifth, Champaign.

Q.   In Champaign?

A.   Yeah, 61820.

Q.   Did you see your brother on February 25th of 1998, this brother?  How -- Let me ask you this, how many brothers do you have?

A.   I have two, you know, immediate brothers in my family.  Dedric Moore and Donrico Holtzclaw.

Q.   And those are -- And do you have any half brothers besides them?

A.   Um, yeah, on my sister's side, somewhere between like 17.

Q.   Okay.

A.   Stepbrothers and sisters.

Q.   Stepbrothers, but of your real brothers or your full brothers?

A.   Just --

Q.   Just two?

A.   Just two.

Q.   Okay.  Did you see this brother who's seated next to me in court, did you see him on February

677

25th of 1998?

    A.  Yes, ma'am.

    Q.  Did you see him in the late evening hours of February 24th?

    A.  Yes, I'd say yes, ma'am.

    Q.  Okay.

    A.  With me all night.

    Q.  Where were you living or staying at that time?

    A.  108 East Healey, Apartment 8.

    Q.  And did you -- were you staying somewhere else or were you staying at that residence?

    A.  At that residence.

    Q.  Okay.  Did anybody stay with you?

    A.  Mean like my roommates Tavaris Harriston (phonetic) and Dedric was staying there, you know, at the time, because there wasn't like any room over there like my mother's house and stuff, so he would like kind of -- kind of like maybe like had his clothes there, but he was like kind of staying, you know, at my apartment, you know, he was there most of the time anyway.

    Q.  Do you recall the late evening hours of February 24th?

    A.  Yeah.

    Q.  What were you doing?

1

2          A.  I would say I probably got off of work

3    about maybe 10, 10 or 11 o'clock, and my girlfriend had

4    came over and asked me to watch the kids.

5          Q.  And what's your girlfriend's name?

6          A.  Adrienna.

7          Q.  Pardon me?

7          A.  Adrienna.

8          Q.  How do you spell that?

9          A.  A-d-r-i-e-n-n-a.

10         Q.  And what's her last name?

11         A.  Adrienna Britt, B-r-i-t-t.

12         Q.  And how many children does she have?

13         A.  Two.

14         Q.  And what are their names?

15         A.  Kielan and Chadre.

16         Q.  How do you spell that?

17         A.  Kielan?  Kielan, K-i-e-l-a-n.  Chadre is

17    C-h-a-d-r-e.

18         Q.  And how old are those children?

19         A.  Kielan's probably -- well, at the time, he

20    was 5, and Chadre was probably maybe about 16, 17

21    months.

22         Q.  And did they stay with you or did they

23    just visit you?

24         A.  They -- She would bring them over, you

679

know, like at night and stuff, you know, 'cause she wanted to get sleep. She used to work with me, so she would bring them over and I would watch them, you know, she would go home and sleep and stuff, and they were with me all night.

Q. And do you recall what time she came over with the children?

A. About approximately about 11:30.

Q. Was anybody else there besides you and she and the children?

A. Dedric was there when she came.

Q. So, he was there about 11:30 on the 24th?

A. Yes, ma'am.

Q. Do you know the distance between your house and your grandmother's house?

A. About approximately --

Q. I'm sorry. I'm talking about the 108 East Healey address. Do you know the distance between that and your grandmother's house at 512 South New?

A. I would have to say maybe a mile, maybe a mile and a half to two miles.

Q. Did your brother have a car at that time?

A. No, ma'am.

Q. How was he getting around?

A. Like guess by foot.

680

Q.  Did he have a bicycle?

A.  No, not that I was aware of at the time.
Maybe, you know -- I don't recall.

Q.  Do you recall what time he left that
night?

A.  I'd have to say I couldn't -- Hum.  I --
I'd have to say the time that he left was about -- it
was like shortly before my mother and my grandmother
came over to my house, you know, they were like kind of
looking for all of us, 'cause when they -- they had went
out of town, and when they came back, you know, they had
seen all the fire department stuff out there, and they
came over to the house and they was looking for all of
us, 'cause they didn't know, you know, if we were all
right or anything, 'cause --

Q.  Did you go to sleep at some point?

A.  Not unless I would have dozed off or
something, you know, but I don't -- I don't recall.  I
was in the bed, laying in the bed with the children at
the time.

Q.  Did the kids go to sleep?

A.  Yeah, I'd have to say they were asleep
till my mother and grandmother came over, and I think it
probably was about 3 o'clock in the morning when they
came over and rung my buzzer, somewhere between 2:30 and

681

maybe 3:30.

Q.   And did you see your brother at home at
that time?

A.   Yes -- When?

Q.   Between 2:30 and 3:30, was he home?

A.   Yeah, pretty sure he was.  Yeah, I have to
say I did see him.

Q.   Did you see at that time, did you go to
your grandmother's house and see the fire?

A.   No.   They -- She was like -- She was just
so worried, 'cause she was looking, you know, for my
other little brother, and he didn't -- you know, he
didn't stay there anymore.  He had just got him an
apartment, so, you know, they went by there looking for
him, and he had left like maybe a minute or two, I
think -- I believe, before they had came over there and
said that there was a fire and stuff, so, you know, she
was kind of looking for both of them.

Q.   For both of the brothers -- of your
brothers?

A.   Yes, ma'am.

Q.   Okay.  But this brother was home with you
at about -- from 2:30 to 3:30 when they got there?

A.   Yeah.  He was -- He was at home with me
from like the time when I got off of work, 'cause he was

682

there.  I couldn't have got in the house without him

there, 'cause he had my house key, you know, so he had

my house key.  So, when I got there, he was there up

until like shortly right before my mother and

grandmother came over and said that the house and stuff

was on fire.

Q.  Do you recall spending -- Well, let me ask

you this, did you spend a lot of time at your

grandmother's house?

A.  I was over there from time to time, you

know, to like get something to eat or maybe bring my

clothes over there, they'd wash my clothes for me or

anything.

Q.  Do you remember a Caucasian woman who

lived next door whose name was Lori Hansen?

A.  I remember a Caucasian woman staying next

door.  I never, you know, really knew her name or

anything.

Q.  Did you ever have any conversation with

her?

A.  Maybe an occasional "Hi" if she went out,

you know, to her just outside if she was just outside

the house.  I can't remember if she had a car or a truck

at the time.  There was so many cars always parked back

there, I mean, I couldn't, you know, couldn't even be

683

sure if it was her, 'cause I said "Hi" to her.

Q.  Did you go back to the building after the fire?

A.  Like as in to see what was the damage or anything?  Yeah, I -- Yeah, I have to say I roll past there.

Q.  What did you see when you got back there?

A.  Just pretty much, it was pretty much boarded up, you know, you can just see smoke around the, you know, the apartment.  I mean, smoke, you know, how the smoke was just on the walls after the fire being put out, you could see it on the outside all around, you know, the yellow tape and stuff.

Q.  Was there any damage to your grandmother's apartment?

A.  Kind of -- Kind of looked like it, you know.

Q.  What kind of damage did it look like?

A.  It was enough to where -- to the point where they couldn't stay there, you know, like maybe smoke, you know, to the walls and stuff.

Q.  Was your brother pretty close to your grandmother?

A.  Awfully close.  I'd have to say close enough to where she would be our second mom.  I mean,

684

1

2      she practically raised us just as much my mom did.  We

3      stayed with her all our lives just about.

4              Q.  When you saw him on the late evening or

5      early -- the late evening of the 24th or the early

6      morning of the 25th, was he angry for any reason?

7              A.  No, not whatsoever.

8              Q.  Did he ever say anything to you about the

       lady who lived next door to your grandmother?

9              A.  No, no, not -- not that I can ever recall,

10     period.

11             Q.  When you saw him that morning, did he seem

12     out of breath to you?

13             A.  No.

14             Q.  Did he seem unusual to you in any way?

15             A.  No.

16             Q.  Did he tell you about the fire that

17     happened next door to your grandmother?

18             A.  He didn't even know anything about it --

       MS. LADD:  I'm gonna object, Your Honor, at

19     this point.

20             THE COURT:  Sustain the objection.

21             Q.  (by Ms. Lenik)  All right.  Did he tell

22     you anything about the fire?

23             A.  No, ma'am.

24             Q.  How did you learn about the fire?

                              685

A.  From my mother and grandmother.  They came -- When they came to my apartment at the time, the fire department said they couldn't even -- they said they couldn't turn the block or anything.  They didn't know what was going on, and they said there was a lot of fire trucks and stuff around there, and they told them they doesn't get to the house, and that's how I found out.  And that's when she came over and she was looking for them, you know, and I left -- my grandmother stayed there with the kids, and me and my mother went looking for my two brothers.  And --

MS. LADD:  I'm gonna object, Your Honor.  I don't believe there's a question at this point.

MS. LENIK:  He's responding to the question.

THE COURT:  Overruled.  He may continue.

MS. LENIK:  Go ahead.

A.  After she came back, after my grandmother had watched the kids and we came back, you know, like shortly after, you know, my grandmother and them had left, you know, Dedric came, you know, right to the house.  I just -- I figured that he might have been --

MS. LADD:  Same objection, Your Honor.  I believe we're well beyond how did you learn of the fire.

THE COURT:  All right.  I'll sustain the objection at this point.

686

Q.  (by Ms. Lenik)  All right.  What time did Dedric come back?

A.  I say probably about maybe 15, 20 minutes, 'cause every place that it was that was looking for him, it was only like two places that we went to.  That was the place where my other brother was staying.

Q.  What was that address?

A.  Um, between Fourth and Fifth.  It was on Clark Street between Fourth and Fifth Street.

Q.  I'm sorry, are you saying Clark or Clock?

A.  Clark.  It's right by -- It's a school right there.  I can't think of the school.  Off of Fourth Street.

Q.  Okay.  And where else did you go?

A.  We were all passes like -- I don't know if she was his girlfriend or not or his ex-girlfriend, but we go by her house to see if he might have been over there.

Q.  And where was that?

A.  West -- I believe it was West University, maybe.  Yeah, West University.

Q.  And that was around University and Mattis?

A.  Yes, ma'am.

Q.  Okay.  So, you went from Fourth and Clark to University and Mattis and then back to 108 East

687

Healey?

      A.  Yes, ma'am.

      Q.  And how long did that take?

      A.  Couldn't have been no more than 20 minutes, 15, 20 minutes.

      Q.  And when you got back to the house, who was there?

      A.  My grandmother and the kids were there.

      Q.  And after that little tour of the area, when did Dedric get back?

      A.  Like couple minutes after they left.  He like he just came.  I was like, "You just missed your mom and them.  They was looking for them, you know, they wanted to tell you that, you know, the house" --

      MS. LADD:  Objection, Your Honor.

      THE COURT:  I'm sustain the objection.

      Q.  (by Ms. Lenik)  And did he seem unusual, angry, out of sorts in any way?

      A.  No, not at all.

      Q.  Was he sweating or out of breath?

      A.  No, ma'am.

      Q.  Was he angry?

      A.  No, ma'am.  He was actually pretty happy, you know.

      Q.  Does your brother wear glasses?

1

2          A.  Um --

3          Q.  I mean, other than today, I know you can

4    see him with glasses, but have you seen your brother

5    wear glasses in the past?

6          A.  Um, not unless we're all, you know, being

7    formal, if we're all formal, you know, just maybe to

     church or something, but I can't see him wearing them

8    any other time.

9          Q.  But you have seen him wear glasses to

10   church?

11         A.  Yes, ma'am.

12         MS. LENIK:  Nothing further.

13         THE COURT:  Ms. Ladd?

14         MS. LADD:  Thank you, Your Honor.

15                   CROSS-EXAMINATION

16                   BY MS. LADD:

17         Q.  Mr. Moore, now, your brother was staying

     with you at the time then?

18         A.  I guess you could say that.

19         Q.  But he was sort of going back and forth

20   between your place and your grandmother's place?

21         A.  To pick up clothes, rather, yes.  He -- He

22   would go there like just as much as I would.

23         Q.  And that's Lillie Moore, just to be clear

     for the record?

24
                         689

A.   Lillie Moore.

Q.   And then is your mother also Patricia Holtzclaw?

A.   Yes, ma'am.

Q.   And she was also staying over at the residence at 512 New Street then with your grandmother, if I'm right?

A.   That's right, that's right.

Q.   And they were out of town during this time that this happened?

A.   Yes, ma'am.

Q.   In fact, they just got back that night and pulled up to the duplex as the fire department was putting out the fire?

A.   Wouldn't say putting out. Well, I don't know if they were putting out or if it just started or what. All I know is when they got to -- they came over to my apartment and they told me that there's a bunch of fire trucks out there and they don't know what's going on, they won't let them in.

Q.   So, they'd already been to the scene of the duplex?

A.   Yes, ma'am.

Q.   And they'd just been coming back into town from their trip?

690

A. Yes, ma'am.

Q. And they'd been gone for a couple days?

A. No, no, I couldn't -- I couldn't be honest if they were gone for a couple of days. I don't believe they were. I thought they had. My understanding was is that I believe that my mother had been out of town and my grandmother was still here. My mother had came back from out of town, then her and my grandmother went out of town. I believe -- I believe maybe to Peoria, maybe.

Q. Now, it wasn't unusual then for your brother to come and go from your residence, I mean, pass pretty --

A. To come and go from my residence?

Q. Right. It sounds like a lot of people were coming and going all the time?

A. I mean, what -- what make you say that?

Q. I'm asking you that, sir. It's not unusual to have your brother come and then show up and then leave to go do something else?

A. Yes, it is unusual, 'cause I work all the time.

Q. So, you're not there to see it?

A. Not there to see if people come and go all the time?

Q. Right.

691

A.  No, I couldn't be if I'm at work.

Q.  And you don't keep track of the times that your brother is coming out, normally?

A.  Yeah, I have to, 'cause the time that I get out is the time when I -- they have to let me in.

Q.  And that would be your girlfriend and her children?

A.  No, that would be my brother.  He would have to let me in, 'cause he would have my key.

Q.  What day of the week was this, February 24th?

A.  I mean, I guess February 24th is what you're saying.

Q.  Monday, Tuesday, Wednesday, Thursday, Friday?

A.  If I had a calendar, I could tell you.

Q.  But you don't remember as you sit there now?

A.  All I remember is February 24th.

Q.  Now, you, in fact, had a conversation with Detective Joe Johnston and Detective Robb Morris of the Champaign Police Department on March 5th of 1998, about this case; didn't you?

A.  If that's the day that they came to my apartment, yes, ma'am.

692

Q.  So, they came to your apartment about a week after the fire?

A.  They came to my apartment.  I don't know if it was a week after, but they came to my apartment and questioned me about it.

Q.  And you told them about some times that were involved?

A.  I told them that the times that he was here -- I told them that he was at my apartment at the time and what time I got off of work and what I was doing, the same thing -- same questions she asked me.

Q.  Now, I got confused.  You're telling us that your brother, the Defendant, Dedric Moore, was there earlier that evening on the 24th?

A.  That night?

Q.  Yes.

A.  Through the morning hours.

Q.  And what time did he get there?

A.  He was there from the time I got off work at which --

Q.  I understand -- When was that?

A.  I can give you an exact time.  I can go to my job and give you an exact time when I got off, and he was there from the time I probably got off.  It doesn't take him nothing but like 20 minutes to get home.

693

Q.  What time did you normally get off?

A.  Pending on what day of the week it is,
maybe 10 or 11 o'clock.  It doesn't -- You know, we
don't have any set times when we get off.

Q.  So, sometime between 10 and 11 o'clock,
you got home from work on February 24th?

A.  Could have been.  If I got off at 10, if I
got off at 11, it would have been between 11 and 12.

Q.  Then when you got home, it's your
testimony that your brother was there?

A.  Yes, ma'am, he -- he had to have been
there.  That's the only way I could have got in the
house.

Q.  And then he spent the night with you?

A.  Yes, ma'am, through the morning hours.

Q.  And he was there all the way until when?

A.  Up until like a couple of minutes before
my mother and grandmother had came over.

Q.  So, just before they came over to tell you
about the fire, your brother was at that house
continually?

A.  Yeah.

Q.  And that would be, just so I understand,
sometime before -- sometime around 11 o'clock the night
before all the way until probably around 3:30 the next

694

morning?

       A.  If that's around the time of the fire, I have to say so.

       Q.  And he didn't leave to go visit a friend?

       A.  If he did, I didn't -- I wasn't aware of it.

       Q.  You thought, in fact, he was there then the whole time is what you're telling us?

       A.  Yeah, I would have to say so.

       Q.  That's what you just testified to; is that right?

       A.  I just said, yes, ma'am.

       Q.  Now, in that statement that you gave to Detective Morris and Detective Johnston, that's not what you said at the time; was it?

       A.  I really don't even recall making the statement for them like that.  They came with -- What the detectives told me was they wanted to ask me a couple of questions.  I said it's fine.  One of them had like a tape recorder in his top pocket, and I said, "I'm not gonna let you record or anything like that."  I says, "You can ask me some questions and I try and answer them to the best of my ability."  I didn't like make any statements from what you're saying.  Not anything like that.

Q.  You didn't -- You didn't make a statement
at all to the police?

A.  Not a statement.  They made -- asked me
questions and --

Q.  And, in fact, they asked you about when
your brother was there and when he left; didn't they?

A.  Right.  We just went through and I said --

Q.  And, in fact, you told them --

MS. LENIK:  Your Honor, I'm going to object.
This is argumentative.  She's interrupting the witness.

THE COURT:  Overruled.  You may ask.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  You told them, "Bout the
last time I have seen him, you know, was like 20, 12:30
or 1:00.  And so after that, you know, he showed up like
shortly after they left and stuff.  You know, we went
looking for him and stuff.  And couldn't find him, but,
you know, he came shortly after, after my grandma and
them left."

And then the detective asked you, "What time
did your grandma leave?"  And you said, "About 4:30."

And so the detective asked you, "So, about
4:30 Dedric shows up?"  And then he clarified with you,
and he said, "You said the last time you saw Dedric was
between 12:30 and 1:00 in the morning."  And your answer

696

was "12:30 and 1:00."

      And then the officer asked again, "So, you think he'd been hanging out here all day and then about 12:30 or 1 o'clock in the morning he left.  And then he came back at 4:30 or so."  And your answer was, "Yeah, yeah, that's usual."

      Didn't you make that statement at the time?

      A.  I can't say that I would have made a statement like that, because at the time that I would usually get off, why would -- why wouldn't I know that he would not be there if I'm watching kids at the time?

      Q.  Mr. Moore, my question is, did you make that statement to the detectives at the time?

      A.  I can't recall that statement.

      Q.  You have a prior '95 conviction for armed -- for aggravated robbery; don't you?

      MS. LENIK:  Your Honor, I'm going to object to this.

      THE COURT:  Why?

      MS. LENIK:  May we approach?

      THE COURT:  She can cross on prior convictions.

      MS. LENIK:  Your Honor, I assumed it would be fact based on the earlier motion.

      THE COURT:  Witnesses, Ms. Lenik.  Difference.

1

2          You may ask.

3          Q.  (by Ms. Ladd)  In 1995, you were convicted

4    of aggravated robbery; weren't you, Mr. Moore?

5          A.  Yes, ma'am, I was.

6          MS. LADD:  Thank you.  I'd tender this

7    witness.

8          THE COURT:  Anything else, Ms. Lenik?

8          MS. LENIK:  Yes.

9                    REDIRECT EXAMINATION

10                    BY MS. LENIK:

11         Q.  You weren't watching on the clock -- Once

12   you got home from work, you weren't watching the clock

13   to see exactly what time any of these things happened;

14   were you?

15         A.  No, I couldn't say, I couldn't say that I

     was.

16         Q.  And so you know that your brother was

17   home, he was home for a while, he left and he came back;

18   right?

19         A.  Right.  It -- The time -- I can tell

20   you -- The reason I can say times is because when my

21   girlfriend came over, I could have swore it's 11:30.

22   That's the time that she had had me to watch them, so I

23   have to say that -- I have to say that I'm pretty -- I

24   was pretty much aware of the times, 'cause, you know, I

                              698

glance at the clock, you know, what time the kids supposed to be asleep and everything. He was laying there helping me watch them at the time, so --

Q. But you do know that he was with you, then he left, then he came back, and then your grandmother and your mother came; right? You know that for sure?

A. I know that he was -- he was there and he had left. The time that he had left was right before my grandmother and mother had came over and said that it was a fire. Then he came back after they left.

MS. LENIK: Okay. I don't have any further questions.

THE COURT: Ms. Ladd?

MS. LADD: May I approach for a moment, Your Honor?

THE COURT: Yes.

(A sidebar conference was held out of the hearing of the jury.)

THE COURT: Ladies and Gentlemen of the Jury, I'm going to ask that you go with Mr. Rasmus to the jury room, please.

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT: All right. You may be seated.

Mr. Rasmus, have court security come on up.

699

1

2          MS. LADD:  Your Honor, I have the court file

3     in 98-CF-1645 which indicates a warrant was issued on

4     February 10th of 1999.

5          MS. LENIK:  Your Honor, I'd like to see the

6     warrant.

7          THE COURT:  Ms. Lenik, that's my job.

           THE WITNESS:  I already knew.

8          MS. LENIK:  You already knew?

9          THE WITNESS:  Yeah, I was supposed to be in

10    court today for that warrant, but I came here and I

11    stayed.

12         MS. LENIK:  Do you know what the bond is on

13    the warrant?

14         THE WITNESS:  I believe it's a thousand.

15         MS. LENIK:  Do you have the money?

16         THE WITNESS:  No, ma'am.  But instead of not

17    showing up here and get this, you know, second warrant,

18    you know, I figure, you know, kill two birds with one

      stone.

19         (Recess taken.)

20         THE COURT:  All right.  Please be seated.

21    Ms. Lenik, you have another witness?

22         MS. LENIK:  I do, Your Honor.

23         THE COURT:  All right.

24         MS. LENIK:  Does he have a warrant out?

                              700

1

2          MS. LADD:  Your Honor, I do have one other

3    preliminary matter.  I don't want to send the jury out

4    again.

5          THE COURT:  What's that?

6          MS. LADD:  If Donrico Holtzclaw is the next

7    witness, he has an adjudication as a delinquent for a

8    '95 burglary conviction.

9          The case law has indicated that that is

10   appropriate impeachment if the Court determines it after

11   weighing it.

12         I don't want to get into it, like I said,

13   while the jury's here, and I don't know if that's the

14   next witness, so I'd like to bring that to --

15         MS. LENIK:  Your Honor?

16         MS. LADD:  -- says that is appropriate

17   impeachment.

18         MS. LENIK:  He is not the next witness.  I

19   don't intend to call him.  The witness I intend to call

20   is a gentleman named Karon Williams.

21         THE COURT:  All right.  Mr. Rasmus, bring in

22   the jurors, please.

23         (The following proceedings were had in the

24   presence and hearing of the jury.)

         THE COURT:  You may be seated.

         Call your next witness, please.

                          701

1

2                                    (Witness sworn.)

3                          KARON WILLIAMS

4         called as a witness on behalf of the

5    Defendant, being first duly sworn, was examined and

6    testified as follows:

7                          DIRECT EXAMINATION

8                          BY MS. LENIK:

9         Q.  Would you state your name and spell your
     first name.

10        A.  Karon Williams.

11        THE COURT:  All right.  My fault.  Try it

12   again.

13        A.  Karon Williams.

14        Q.  (by Ms. Lenik)  And spell your first name.

15        A.  K-a-r-o-n.

16        Q.  And what is your occupation?

17        A.  I'm -- Right now, I'm working for Adecco
     Temporary Service.

18        Q.  And what do you do for them?

19        A.  Different jobs, wherever they send me,

20   factory work, whatnot.

21        Q.  Mr. Williams, do you know Dedric Moore

22   who's seated next to me in court today?

23        A.  Yes, I do.

24        Q.  How do you know him?

                          702

A. He's a long-term friend of mine.

THE COURT: Sir, you're going to have to keep your voice up, so please speak into the microphone. We have all the windows open, so it's gonna be hard to hear.

A. He's a friend of mine.

Q. (by Ms. Lenik) How long has he been a friend of yours?

A. For like four or five years now.

Q. Would you call him a very good friend?

A. Yeah.

Q. Did -- Did he talk to you about a fire that occurred in the apartment next to his grandma's?

A. No.

Q. Pardon me?

A. No.

Q. He didn't tell you about that fire?

A. No.

Q. Okay. Are you familiar with his -- Well, are you and he friends with a group of people?

A. Yes.

Q. And are you familiar with his reputation in that group for being a peaceful and law-abiding person?

A. Yes.

703

Q.  What is his reputation with your group of friends for being a peaceful and law-abiding person?

A.  As far as I know, coming from me, Dedric's just a cool guy.

Q.  Does he have a good reputation?

A.  Yes.

MS. LENIK:  Nothing further.

THE COURT:  Ms. Ladd?

MS. LADD:  No questions.

THE COURT:  Thank you.  You may step down.

(Witness excused.)

THE COURT:  Counsel, want to approach?

MS. LENIK:  Yes.

(A sidebar conference was held out of the hearing of the jury.)

THE COURT:  Ladies and Gentlemen, that's going to conclude the testimony for this afternoon.  We intend to conclude this trial tomorrow.  So, I'm going to ask that you be back in the jury room a little bit earlier tomorrow.  I want you back in the jury room by 8:30 tomorrow morning, and we'll get started as quickly thereafter as we can.

Don't discuss the case among yourselves or with anyone else.  Same admonition about reading the newspaper.  There's been a reporter for the News-Gazette

704

faithfully sitting in, and you can read his version of the trial when the trial is over.  So, please don't look at that section of the newspaper.  The end of the day tomorrow, you'll have all the time you want to look at those papers.

So, you're excused for the rest of the evening.  Tomorrow morning, 8:30.

JUROR:  Eric, do you want us to pick you up?

MS. LENIK:  Judge --

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  What the juror said was, "Do you want us to pick you up tomorrow morning?" to the gentleman who's been historically late the last couple of days.

Officer, 8:30 tomorrow morning.

Thank you.

(The trial was continued to 8:30 a.m., Thursday, March 18, 1999.)

705

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, )
                                     )
                Plaintiff,     )
                                       )
                   v.             )    No. 98-CF-1558
                                       )
DEDRIC T. MOORE,                 )
                                       )
                Defendant.     )

                 REPORT OF PROCEEDINGS of the Continued Jury

Trial had in the above-entitled cause on March 18, 1999,

before the HONORABLE THOMAS J. DIFANIS, Judge Presiding.

APPEARANCES:

         MS. HEIDI LADD
         Assistant State's Attorney
         for the People

         MS. DIANA LENIK
         Attorney at Law
         for the Defendant



FILED
SIXTH JUDICIAL CIRCUIT

B   JUL 2 8 1999



CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

**Vol. XII**



FILED

AUG 2 0 1999

Clerk of the
Appellate Court

             Melissa Clagg, RDR
             License No. 84-2876
            Official Court Reporter
        Champaign County Courthouse
          Urbana, Illinois  61801

4-99-0499

MARCH 18, 1999

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT: All right. We're back on 98-CF-1558. This is out of the presence of the jury.

Ms. Lenik, you have one more witness, the Defendant, to testify; is that correct?

MS. LENIK: I do, Your Honor, and I would ask at this time that the leg shackles be removed so that he can walk freely up to the witness stand.

THE COURT: All right. Deputy, if you'll take the leg irons off him, please.

Ms. Ladd, will you have any rebuttal?

MS. LADD: Depends, Your Honor, on the testimony.

I think I do, I'm sorry, to perfect the impeachment.

THE COURT: Then will those witnesses be later on this morning?

MS. LADD: Yes, hopefully. I have -- Those are coming. It just depends, again. I've got others on standby.

THE COURT: All right. Ms. Lenik, are you ready for the jurors to be brought out?

MS. LENIK: Yes, Your Honor.

707

THE COURT:  Ms. Ladd?

MS. LADD:  Yes.  Thank you.

THE COURT:  All right.  Mr. Rasmus, bring the jurors in, please.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Morning, Ladies and Gentlemen.

THE JURY:  Morning.

THE COURT:  Ms. Lenik, call your next witness, please.

MS. LENIK:  We would call Mr. Moore.

THE COURT:  Mr. Moore, if you would step up over here, please.  Please raise your right hand.

(Witness sworn.)

DEDRIC MOORE

the Defendant herein, called as a witness on his own behalf, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LENIK:

Q.  Would you state your name, please.

A.  Dedric Moore.

Q.  Mr. Moore, how old are you?

A.  I'm 20.

708

Q.  How tall are you?

A.  About 6'4".

Q.  Could you stand up and sit down again?

A.  (Witness complies.)

Q.  Okay.  You can sit down.  Thank you.  What do you weigh?

A.  About 215.

Q.  Pardon me?

A.  About 215, 220.

Q.  And have you weighed that much since February of 1998?

A.  Yeah.  If not more.

Q.  So, you think you've lost a little weight since February of '98?

A.  Yes.

Q.  About what did you weigh February of '98?

A.  Last time I was weighed, I weighed 230, so I guess I lost between 10 and 12 pounds.

Q.  Do you have a physical problem with the way you walk?

A.  Yes.

Q.  What is it?

A.  I broke my leg like five years ago doing --

Q.  How many years ago?

709

A.   About five.  And during a football game, and it just -- it never -- never healed back the same.

Q.   And how do you walk?

A.   I walk with a limp.

Q.   Is that -- Is that a noticeable limp?

A.   Yes.

Q.   Do you have a problem with your teeth?

A.   Yes.

Q.   Show me what the problem is with your teeth.

A.   (Witness complies.)

Q.   Turn around and show --

A.   (Witness complies.)

Q.   Okay.  How would you describe that?

A.   I ran into a basketball pole like five years ago, the same time I broke my leg, and it chipped it, then I just got it tooken the rest of the way off.

Q.   Have you ever had replacements for those teeth?

A.   No, no, I haven't.

Q.   In February of 1998, particularly February 24th and 25th of 1998, were your teeth like that?

A.   Yes, it was.

Q.   Were you missing those same teeth?

A.   Yeah, but they not missing.  I mean,

710

they're not missing.  They're gone.

Q.  Okay.  And did you walk with a limp on February 25th of 1998?

A.  I've been walking with a limp for the past four or five years.

Q.  Do you wear glasses?

A.  Yes and no.  They're reading glasses.

Q.  Okay.  And do you -- do you wear them all the time?

A.  Only when I need to read.

Q.  And were you wearing glasses when you were asked to be photographed by the police?

A.  Which time?

Q.  Were you wearing glasses all of the times you were asked to be photographed by the police?

A.  I believe I was.

Q.  Why?

A.  I didn't know there was a reason for me even being called out to be photographed, so I didn't know if I had to read or not, so I just brought my reading glasses.

There's a problem, I'll take them off.

Q.  No, no, that's okay.  You can leave them on.

What were you doing on the late evening hours

711

of February 24th, 1998?

    A.  About what time?

    Q.  About 10 o'clock.

    A.  I was with my brother.  I was at my brother's house on Healey.

    Q.  Which brother?

    A.  My older one, Emmaniel.

    Q.  And that's Emmaniel who testified yesterday?

    A.  Yes, ma'am.

    Q.  How many brothers do you have?

    A.  I have two.

    Q.  And what are their names?

    A.  The oldest one is Emmaniel, and the youngest one is Donrico.

    Q.  And Donrico has a different last name from you; right?

    A.  Yes, ma'am.

    Q.  What's Donrico's last name?

    A.  Holtzclaw.

    Q.  And what's Emmaniel's last name?

    A.  Moore.

    Q.  The same as yours?

    A.  Yes.

    Q.  Okay.  What time did you see Emmaniel that

evening?

        A.  He returned home from work probably about 10:30.

        Q.  And what was the situation regarding him coming home from work?  Did you have the key to the house?

        A.  Yes, I did.

        Q.  And what house was that?

        A.  On Healey.

        Q.  Do you remember the address?

        A.  Yes, 108 East Healey, Apartment No. 8.

        Q.  When he came home at 10:30, who was home?

        A.  It was me and Jarray (phonetic).

        Q.  And who's Jarray?

        A.  He's just a mutual friend.

        Q.  How old is Jarray?

        A.  Jarray is 19.

        Q.  What time did Jarray leave?

        A.  Actually, Jarray stayed downstairs.  He stays in, I think, Apartment No. 4.

        Q.  Is he a neighbor then?

        A.  Yes.

        Q.  And so was he actually visiting in the apartment when Emmaniel came home from work?

        A.  Yes, he did.  Yes, he was.

713

Q.  Okay.  And what time did he leave then?
Do you remember?

A.  Probably like 11, shortly after.

Q.  Do you remember if he was there when
Emmaniel was there?

A.  Yeah.

Q.  Who did Emmaniel come home with?

A.  His, well, fiancee', girlfriend.

Q.  And what's her name?

A.  Adrienna.

Q.  And did she have children with her?

A.  Yeah, she has two.

Q.  What are their names?

A.  Kielan, and I'm not for sure, Cha -- they
call her just little lady.

Q.  Okay.  And were they all together when
they came into the apartment?

A.  Yes.

Q.  What were you doing in the apartment?

A.  Playing Play Station.  I was playing
arcade game.

Q.  Was that on the T.V. or just the little
pocket game?

A.  It's on the T.V.

Q.  Who were you playing with?

714

A.  Me and Jarray.

Q.  And what did they do when they came into the apartment?

A.  They went back to his room.

Q.  All of them, even the children?

A.  No, the children sat on the couch.

Q.  What did you do after that?

A.  I left -- I received a page about 12.

Q.  Who did you receive a page from?

A.  Actually, I received two pages.  I received one page from Jenny Stevens and one page from Angelique Decker.

Q.  Did you have a pager at that time?

A.  Yes, I did.

Q.  What was the number on that pager?

A.  If I'm not mistaken, it was -- I know the last four digits was 2400.  I don't know if it was 292 or 641.

Q.  You've heard some testimony that 292-2400 is not a good number; right?  You remember hearing that testimony?

A.  Yes, I did.

Q.  Okay.  Do you think you might be mistaken or have forgotten the beginning three digits of that phone number?

715

A.   Yes.   I know the last four digits was 2400.

Q.   But 292 might be a mistake?

A.   Yes, it could be.

Q.   What was the alternate number you suggested?

A.   It could have been 641.

Q.   How long had you had that pager?

A.   That particular pager, I bought it in November, and I had it all the way through the end of March, beginning of April.

Q.   Of 1998?

A.   Yes.

Q.   December of '97, to March of '98?

A.   No, November of '97, to end of March of '98.

Q.   Okay.   And where did you go, if anywhere, after you received those pages?   This was about midnight?

A.   Yes.

Q.   And where did you go after you received those pages?

A.   I went to a pay phone.

Q.   What pay phone?

A.   It's located right along Springfield and

716

First Street.  It's sit on the corner.  It like sits on
the corner.

Q.  Is it by anybody's store?

A.  It's like a Chinese store there that just
sell not cooked food, but food you cook.  I think it's
AM-KO, right on the corner of Springfield and First.

Q.  And after -- how long did you take to
receive those phone calls?

A.  What do you mean?

Q.  How long did the phone calls take?  Once
you got to the corner, how long were you on the phone?

A.  I don't know, maybe on the first call
maybe like five minutes.

Q.  And after the first call, did you
immediately make the second call?

A.  No, I didn't make the second call.

Q.  Where did you go after you made those
phone calls?

A.  I went over to Ivory house.

Q.  And that's Ivory Burrage who just
testified yesterday?

A.  Yes, ma'am.

Q.  Okay.  And how -- what transportation were
you using?

A.  It was a bicycle.  It was Jarray's

717

bicycle.

Q.  When did you get Jarray's bicycle?

A.  It was downstairs in front of the apartment complex.

Q.  And so did you just take it as you were leaving?

A.  Yes.

Q.  Did you stop at Jarray's to ask permission?

A.  No.

Q.  How long did it take you to get by bicycle from the apartment to the telephone?

A.  I don't know, like maybe a minute or two.

Q.  And how long did it take you to get by bicycle from the telephone to Ivory's house?

A.  Fifteen minutes, 15, 20.

Q.  Once you got to Ivory's house, what did you do?

A.  I threw some pebbles at her windows.

Q.  Pebbles?

A.  Yeah, well, rocks like little chips, wooden chips.

Q.  And did she get up or wake up at that time?

A.  Yes.  She was already up.

718

1

2          Q.   How did you know that?

3          A.   'Cause the window was cracked, and I heard

4    music.

5          Q.   When she got up -- Was this a first floor

6    or second floor building?

7          A.   It's second floor.

          Q.   When she got up, what did she do?

8          A.   She looked out the window and put one

9    finger out as in like saying, you know, one minute.

10         Q.   And then what happened?

11         A.   She came downstairs and we sat on the back

12   porch.

13         Q.   Was there anybody else on the back porch?

14         A.   No.

15         Q.   Do you remember seeing her parents or

     anyone who lives in the house?

16         A.   I think everybody was asleep.

17         Q.   How long did you stay at Ivory's?

18         A.   I think I left about 3:30, 3:45.

19         Q.   And where'd you go from there?

20         A.   I went back home.

21         Q.   Were you also on a bike?

22         A.   Yes.

23         Q.   The same bike?

24         A.   Yes.

                           719

Q.  And what home did you go back to?

A.  Healey.

Q.  At that time in your life, were you also staying at your grandmother's at 512 South New?

A.  Yes.

Q.  What would be the determination of whether you'd go to 108 East Healey or 512 South New?

A.  I moved out of my grandmother's house on Valentine's Day of '98.

Q.  And when you moved out of her house, where did you move into?

A.  108 East Healey.

Q.  And would you sometimes go back to 512 South New if you felt like it, even though you were actually living with your brother?

A.  Yeah, we go back every Sundays for dinner, and I was helping her help repair the house, also.

Q.  I'm sorry, helping her do what?

A.  Help repair the house.

Q.  Repair the house?

A.  Yeah.

Q.  What kind of repairs were you doing?

A.  I put in a new toilet stool, a new bathroom sink.  We painted all the rooms and new carpet in the southwest bedroom.

720

Q.   Were you close with your grandmother?

A.   Yes.

Q.   Do you consider your grandmother like another mother to you?

A.   Yes.

Q.   Would you do anything to hurt her or hurt her things?

A.   No.

Q.   You were asked in the course of this investigation to do some handwriting to write your name and some -- not -- well, to write some numbers and things like that?

A.   Yes, I was.

Q.   What were -- Well, were you trying to disguise or fake your handwriting?

A.   No, I wasn't.

Q.   What were the circumstances under which you were asked to do those things?

A.   Any signs of what?

Q.   Were you doing those things with the police standing right over you?

A.   Yes, ma'am.

Q.   And were you doing them in a hurry?

A.   Yes, ma'am.

Q.   Why were you doing them in a hurry?

721

1

2          A.  I felt pressured.

3          Q.  And did you think that something might

4  happen with the police if you didn't finish on time?  Or

5  finish at a particular time?

6          A.  Yeah.  I didn't think he would actually

7  hit me or nothing.  That wasn't there.

8          Q.  Were you familiar with the lady who

   testified on the first day of this trial, Lori Hansen?

9          A.  Yes, ma'am.

10         Q.  How were you familiar with her?

11         A.  Passing conversations.  I remember one

12  incident when her truck was stuck and, actually, she

13  needed the assistance, and she said, no, she'd be all

14  right, and I went back in the house.

15         Q.  Do you remember about when that was?

16         A.  Probably -- Probably end of January,

   beginning --

17         Q.  Of which year?

18         A.  Of '98.

19         Q.  Did you -- Do you recall having any other

20  conversation with her?

21         A.  Yes.

22         Q.  When was that?

23         A.  It was one conversation we had.  I was on

24  the top of the roof of the duplex.  We was playing

                            722

football, and the football got stuck up there between the heater, and I was scared to jump down, and she had pulled up in the back and 'cause she like pull the truck on the side if I could jump down on it, and it was in a joking way, but she walked in her house and I jumped down.

Q. Do you believe that -- Well, did you ever tell her your name?

A. I don't know. Not that I know of.

Q. And did you know her name?

A. No, I didn't.

Q. Did you know anything else about her?

A. No.

Q. Did you know that she was a student or where she went to school?

A. No.

MS. LENIK: May I have a moment?

THE COURT: Yes.

A. May I have some water?

Q. (by Ms. Lenik) Did you see her on the late evening hours of the 24th or the early morning hours of the 25th?

A. No.

Q. Okay. Do you remember the last time you saw her in February of 1998?

723

1

2          A.  It was probably after Valentine's Day.

3          Q.  So, would it be after you moved or before

4    you moved?

5          A.  It was after I moved.

6          Q.  Did you know the other neighbors, the Mr.

7    Perkinson who testified earlier?

8          A.  Yes.

9          Q.  And how did you know him?

10         A.  He would do lawn work and he was shovel --

11   shovel the walks and I guess, you know, do any repairs

12   that need to be done.

13         Q.  Did you know his name?

14         A.  No, not by name.

15         MS. LENIK:  May I have a moment, Your Honor?

16         THE COURT:  Yes.

17         Q.  (by Ms. Lenik)  Had you ever been in

18   Lori's house?

19         A.  No.

20         Q.  Did you know that she had a -- cats?

21         A.  No.

22         Q.  Did you ever see her with an automatic

23   teller card?

24         A.  No.

25         Q.  Did you know she had an automatic teller

     card?

                          724

1

2          A.   No.

3          Q.   At any time on the early morning hours of

4   the 25th of February, did you use her automatic teller

5   card?

6          A.   No.

7          Q.   Do you own a pair of gloves?

8          A.   No.

9          Q.   What do you wear when it's below zero out?

10         A.   I did own a pair of black leather gloves.

11         Q.   What happened to them?

12         A.   Nothing happened to them.  I believe my

13  grandma has them.

14         Q.   Were you there when they searched your

15  grandmother's house?

16         A.   Yes, I was.

17         Q.   And where did they search?

18         A.   I'm not for sure, but when I came back,

19  the beds was turned up, cabinets was open, everything

20  was thrown out, so I would imagine the whole duplex.

21         Q.   Did you see them take anything from your

22  grandmother's house?

23         A.   No.

24         Q.   Were your gloves in that house at that

25  time?

26         A.   Yes.

725

1

2          Q.  Where were they stored or kept?

3          A.  They was on the dining room table.

4          Q.  Did you see them in the same room with the

5     gloves?

6          A.  The police?  Yes.  They came through the

7     back door where the dining room's at.

8          Q.  What did the gloves look like?

           A.  They leather Wilson gloves.

9          Q.  Do you know what color they are?

10         A.  Black leather.

11         Q.  Are they smooth or rough?

12         A.  They're smooth.

13         Q.  Did the police ever ask you about any

14    gloves?

15         A.  No.

16         Q.  Do you remember which officers these were?

17         A.  There was a few of them.  I do remember

      Detective Don Shepard, and I do remember Detective Mark

18    Strzesak and Officer Ramsey.

19         Q.  Ramsey?

20         A.  Yes.

21         Q.  Do you know what kind of shoes or boots

22    you were wearing around the 25th of February?

23         A.  Yes, exact ones I have on now, and I had a

      pair of Air Max.

24
                                726

Q.  I'm sorry, Air what?

A.  Air Max.

Q.  Mac, M-a-c?

A.  M-a-x.

Q.  M-a-x, Air Max?

A.  Yeah.

Q.  Okay.  Did they ever -- Did the police ever ask you for a copy of your -- of your shoe print?

A.  Not that I know of, no.

Q.  Did they ever ask you to give them your boots or your shoes?

A.  No.

Q.  What kind of jacket did you have at that time?

A.  I had -- It was like a blue jean thick jacket.  It had a brown collar.

Q.  And did they ever ask to see your jacket?

A.  They seen me in it.

Q.  Was that -- Was it the only -- Did you only have one jacket?

A.  No.

Q.  How many jackets did you have?

A.  I had a white -- I had two, two total.

Q.  What did they look like?

A.  A blue jean jacket, then I had a white

727

jacket, but it was a trench like, came down like maybe to my calf.

Q.  Was that a dressy jacket?

A.  No.  It was like a first down feathery coat.  It had feathers in it.

Q.  Did the police ever ask to see your jackets?

A.  No, they seen them.

Q.  When did they see them?

A.  When they searched my grandmother house.

Q.  Did they take your jackets?

A.  No.

Q.  Did you volunteer to be in a lineup?

A.  Yes.  It was my idea.

Q.  How did that happen?

A.  I went to the police station and talked to Mr. Shepard.

Q.  Why'd you do that?

A.  He asked me would I come in to talk to him, and I went, "Yeah, sure."

Q.  Which Mr. Shepard?

A.  Don.

Q.  When did you do that?

A.  Talk to him?

Q.  Yeah.  The first time.

728

A.   The first time I actually talked to him or the first time I went to the police department to talk to him?

Q.   All right.  What happened the first time you went to the police department?

A.   We had -- He just asked me questions.

Q.   And do you remember what date and time that was?

A.   I think it was March 5th of '98.

Q.   And do you remember about what time of day it was?

A.   Yes, I do.

Q.   What time was it?

A.   Like 1:45, 2 o'clock.

Q.   Why do you remember the time?

A.   'Cause I had to pick my son up from day-care at 3:00, so I know it's 4:30.

Q.   What was the nature of that conversation?

A.   He just asked me did I know the lady, Ms. Hansen, did I ever talk to her.  He asked me would I take a polygraph test.

Q.   After that conversation, what happened?

A.   I left.

Q.   And then how long after that did you talk to him again?

729

A. I haven't talked to him since. The last time I heard about it. Sorry. I talked to him at the lineup. There was a lineup done maybe six days later, 11th or the 10th.

Q. And where did that lineup occur?

A. At the county jail right across the street.

Q. Did you get there on your own?

A. Yes.

Q. What time did you get there?

A. I got -- I got there actually at 4:05. I sat upstairs for like a half hour.

Q. How do you know you got there at 4:05?

A. 'Cause I called the bus, and the bus got to Lincoln Square at 3:55.

Q. And where did you go when you got to the police station?

A. I went upstairs in the Sheriff office, and the woman, she said she paged Detective Shepard and she called his office to try and locate him. He couldn't be found.

Q. Did you hear all that conversation going on?

A. Yes.

Q. Why did you go there and get there at that

730

1

2      time?

3              A.   When he brought the piece of paper asked

4      me to be in the lineup, the paper said 4:30, and when I

5      got there, he said, no, it was 3:30.

6              Q.   Did you purposely try to miss that lineup?

7              A.   No.

8              Q.   Did the lineup occur the way that it's

9      been testified to earlier, that there were six men and

10     each one came forward and turned around and saw them?

11             A.   Yes.

12             Q.   How many times did you have to go up to

13     the front window in that lineup?

14             A.   A couple.

15             Q.   And how many times, if you recall, did you

16     have to say the words that you were given to say?

17             A.   Each time I approached the window.

18             Q.   And when you were given the words to say,

19     did you try to disguise your voice?

20             A.   No.

21             Q.   Do you have any way of disguising your

22     voice?

23             A.   No.

24             Q.   What was the mechanism or the machine like

       that you had to talk into?

               A.   They had like two speakers like, you know,

                                  731

up in the ceiling, and Officer Glass told us speak loud
and clear each time we come up to the window.

Q.   And did you speak loud and clear?

A.   Yes.

Q.   And did you say the very words that were
on the piece of paper?

A.   Yes, I did.

Q.   Did some other person have to go back up
to the window with you?

A.   Yes.

Q.   At separate times, but during the same
lineup process?

A.   Yes.

Q.   Did he go up the same number of times that
you did?

A.   Yes.

Q.   And did he say the words the same number
of times that you did?

A.   Yes.

MS. LENIK:   May I have a moment?

THE COURT:   Yes.

Q.   (by Ms. Lenik)   When you -- When you drew
out the letters that you were asked to draw by the
officer, you made a seven with a line in it?

A.   Yes.

732

Q.  Why'd you do that?

A.  That's the way I was taught.

Q.  Did you change the ones when the officer told you to change the ones?

A.  Yes, I did.

Q.  And why did you make the ones with the little line on them?

A.  I thought -- That's the way I was taught. I thought it was proper.

Q.  Well, what is the -- Well, did you go back to your grandmother's after the fire?

A.  Yes, I did.

Q.  What did you see?

A.  In her apartment or the next -- the one next to it?

Q.  What did you see first in the one next to it?

A.  It was boarded up.

Q.  Did you -- Did you go inside it?

A.  No.

Q.  What did you see in your grandmother's apartment?

A.  It really wasn't -- Just smoke burn -- smoke on the wall.

Q.  Was there any damage to your grandmother's

733

apartment?

     A.  No.

     Q.  What time did you get there?

     A.  Maybe around five.

     Q.  Who did you go with?

     A.  I went with my girlfriend.

     Q.  And what's her name?

     A.  Jenny.

     Q.  Did you see your grandmother and your mother that morning?

     A.  Yes.

     Q.  And what time did you see them?

     A.  I'm not for sure.  I was -- They woke us up.  They rung the buzzer.  You have to ring a buzzer to get in, and it was pretty early.

     Q.  Were they together at that time?

     A.  Yes.

     Q.  Was there anyone else with them?

     A.  No.

     Q.  Who was in your apartment when your grandmother and your mother came?

     A.  Me, Emmaniel, and Tavaris.

     Q.  And Tavaris was Emmaniel's roommate at that time?

     A.  Yes.

1

2    Q.   Do you know where Tavaris is now?

3    A.   Right now?  No, I don't.

4    Q.   Had his girlfriend and the children left

5    by that time?

6    A.   Yes.

7    Q.   Do you remember what time they left?

     A.   No.  When I was woke -- When I woke up,

8    they was gone.

9    Q.   Were they there when you got back from

10   Ivory's?

11   A.   Yes.

12   Q.   So, sometime between the time you got back

13   from Ivory's and the time that your mom and grandma woke

14   you up, his girlfriend and her children left?

15   A.   Yes.

16   Q.   Did you enter Lori's apartment on the

     early morning hours of the 25th of February of 1998?

17   A.   I never entered her apartment at all.

18   Q.   You've never in your life entered her

19   apartment?

20   A.   No.

21   MS. LENIK:  I have no further questions.

22   THE COURT:  Ms. Ladd?

23   MS. LADD:  Thank you, Your Honor.

                    CROSS-EXAMINATION

24
                          735

E-FILED
Friday, 04 May, 2007  05:18:09 PM
Clerk, U.S. District Court, ILCD

BY MS. LADD:

Q.  You don't wear glasses regularly then, Mr. Moore?

A.  No, ma'am.

Q.  Those are just reading glasses?

A.  Yes, ma'am.

Q.  You don't need them to drive?

A.  No.

Q.  In fact, when you were booked in at the correctional center, you told them you didn't wear glasses; didn't you?

A.  Right.

Q.  You're not reading now; are you?

A.  No.

Q.  Could you please take them off?

A.  Yes, ma'am.  (Witness complies.)

Q.  Your grandmother's Lillie Moore?

A.  Yes.

Q.  And your mother's Patricia Holtzclaw?

A.  Yes.

Q.  And then you have a brother, Emmaniel Moore, who lives at 108 West Healey in Champaign?

A.  He did.

Q.  And Donrico Holtzclaw is your other brother?

736

A.  Yes.

Q.  Now, sometimes he'd stay at the 512 duplex as well; wouldn't he?

A.  Who, Donrico?

Q.  Donrico.

A.  He moved out, but, yes, he was staying there.

Q.  Right about February to March of 1999, in fact, he was staying there for a while; wasn't he?

A.  He moved out February 1st.

Q.  And then he moved to a place on Clark Street in Champaign?

A.  Yes.

Q.  Now, you also would stay on and off then at your grandmother's duplex?

A.  Yes.

Q.  And you kept things there?

A.  Yes.

Q.  And you would work on it like you'd described to us?

A.  Yes.

Q.  Enough, in fact, that you listed that as your address for your ID card; right?

A.  I was staying there.

Q.  And you knew Ms. Hansen lived on the other

737

1

2    side?

3          A.  Yes.

4          Q.  She lived alone; didn't she?

5          A.  Um, I guess so now.

6          Q.  And you're telling us you've never been in

the house?

7          A.  No.

8          Q.  And you've never been in the kitchen?

9          A.  No.

10          Q.  Never been inside any part of that

11    residence?

12          A.  No.  Not when she was staying there.

13          Q.  Now, on February 25th of 1998, when this

14    happened, then, your grandmother and your mom had been

15    out of town?

16          A.  Yes.

          Q.  For a couple days?

17          A.  Yes.  My mom doesn't stay in Illinois.

18          Q.  So, she -- she was just visiting then?

19          A.  Who, my mom?

20          Q.  Your mother.

21          A.  Yes.

22          Q.  So, then your grandmother had left the

23    duplex and there was no one there?

24          A.  Yes.

Q. Now, then, you're telling us you weren't with your brother, Emmaniel Moore, all night like he testified?

A. No.

Q. And you're telling us you left the residence?

A. Yes.

Q. And you're telling us that, in fact, you got a page while you were at your brother's?

A. Yes.

Q. And you went all the way to First and Springfield to a convenient store to use the phone?

A. No -- Yes, yes.

Q. And that's Ken Lee's Convenient Store?

A. No. It was on the corner of Prospect -- I mean, not Prospect, but Springfield and First.

Q. And there's a convenient store there with a phone?

A. Yes.

Q. And that's the phone you're telling us you used?

A. Yes.

Q. And your attorney asked you if you made the second call?

A. Yes.

739

Q.   You're referring to the phone records;
right?

A.   No, I was referring to my pager.

Q.   So, you got two calls on that pager?

A.   Yes.

Q.   And you don't remember the number?

A.   That I called?

Q.   No, I'm sorry, your pager number,
292-2400?

A.   It was either 292 or 2400.   I had several
different pagers.

Q.   Now, when you were getting interviewed by
the detective just a week after this happened, had you
already forgotten your pager number then?

A.   No.

Q.   In fact, you told them that was Jennifer's
pager number; didn't you?

A.   No.   It was a misunderstanding, I guess.

Q.   And you told them the number at that time
was 292-2400?

A.   That was my number.

Q.   And that's what you gave them?

A.   Yes.

Q.   Now, you're telling us that when you got
that page, you went to the pay phone then and called

740

1

2    Ivory back?

3        A.  No.  I called Jenny back.

4        Q.  And that's Jenny?

5        A.  Stevens.

6        Q.  And then the second call was not returned?

7        A.  It was my baby mother.

8        Q.  Then what's her name?

9        A.  Angelique.

10       Q.  Angelique Decker?

11       A.  Yes.

12       Q.  Then how did you know to go visit Ivory
Burrage?

13       A.  It was just a ritual thing we have.

14       Q.  Ritual?

15       A.  Yes.

16       Q.  How often did you do it?

17       A.  Well, she work and go to school every day
of the week, and I'm only off days or Mondays and
Sundays, so that's the only time she has free time for
me.

18
19
20       Q.  So, you would visit her on Mondays and
Sundays?

21

22       A.  Sundays, Mondays, yes.

23       Q.  And that was a regular thing?

24       A.  Yeah, it became regular.

741

Q.  Every week?

A.  No, not every week.

Q.  But how often?

A.  About a month, probably three, three times a month.  I go to her job and visit her.

Q.  So, you wouldn't visit her every Monday and Sunday, just pick about three days out of that month?

A.  Depends.  It varies.

Q.  What day of the week was February 24th?

A.  I don't know if it was -- I think it was on a Monday.  I mean, that's over a year ago.

Q.  It's hard to remember everything you did?

A.  No, it's not.  I don't remember what day my birthday was on.

Q.  Now, you are telling us that you went over and visited Ivory?

A.  Yes.

Q.  And you rode a bicycle?

A.  Yes.

Q.  Whose bike was that?

A.  Jarray's.

Q.  And it was kept then at Emmaniel Moore's?

A.  No.  It was kept in the hallway of the apartment duplex.

742

Q.  And was there snow on the ground?

A.  No.

Q.  You just sat and talked to Ivory for hours?

A.  Yes.

Q.  And on the porch?

A.  Yes.  She had a big patio back porch.

Q.  And no one else saw you?

A.  Not that I know of.  I didn't talk to anyone else.

Q.  So, there's no one else that could say you were there that night?

A.  I'm not for sure.

Q.  Now, thinking back to when this happened, about a week after the fire, detectives came to 512B, that duplex of your grandmother's; didn't they?

A.  Yes.

Q.  And, at that time, you happened to be there?

A.  Yes.

Q.  And your grandmother wasn't; was she?

A.  No.

Q.  Your girlfriend was Jennifer Stevens?

A.  Yes, she was.

Q.  And, at that time, then, the detectives

743

asked you where you'd been on the February 25th?

A. Yes.

Q. And you told them you'd been out of town; didn't you?

A. I was.

Q. Well, as a matter of fact, you were in Champaign; weren't you?

A. No. I was in Urbana.

Q. And then you told them when you were out of town you were referring to Urbana?

A. Yes.

Q. You never told them you were in Urbana; did you?

A. No. That's out of town. I never told them I left the state or I left the county. I was simply out of town.

Q. And, in fact, you repeated two or three times you were out of town?

A. No. I just remember once, but I was out of town, yes.

Q. You never told them you were in Urbana?

A. I was out of town.

MS. LENIK: Objection. Asked and answered, and argumentative.

THE COURT: Overruled.

744

Q.  (by Ms. Ladd)  You never told them you were in Urbana?

A.  They never asked, they never asked what out of town means.  I just said I was out of town.

Q.  Mr. Moore, you never told --

MS. LENIK:  Objection.  Asked and answered.

THE COURT:  Overruled.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  Mr. Moore, listen to my question.  You never told the officers that you were in Urbana; did you?

A.  Yes, I did.

Q.  You said, "I was in Urbana" during that first conversation when they came to the door?

MS. LENIK:  Objection.

THE COURT:  Overruled.

A.  I'm not sure if it was the first conversation or not, but I did tell them I was in Urbana, yes.

Q.  (by Ms. Ladd)  Well, think back to that first one at the door where you didn't let them come into the house.

MS. LENIK:  Objection.

A.  Yes.

THE COURT:  Overruled.

745

1

2          Q.  (by Ms. Ladd)  You never told them, "I was

3   in Urbana"; did you?

4          A.  I told them I was in Urbana.  Which time,

5   I don't know.

6          Q.  Well, you just told us you told them you

7   were out of town?

8          A.  I was.

9          Q.  And they never asked you anything more?

10         A.  I was out of town.

11         Q.  Did you tell them you were at Ivory

    Burrage?

12         A.  No.

13         Q.  You never mentioned getting a bicycle and

14  riding to a pay phone on Prospect; did you?

15         A.  I didn't go to a pay phone on Prospect.

16         Q.  That was at First and Springfield?

    A.  Yes.

17         Q.  Oh, I'm sorry.  You did correct that.

18  Then you never told them that, in fact, you got these

19  pages?

20         A.  Yes.

21         Q.  You're telling them you said that in the

22  first conversation?

23         A.  It could have been the first, yes.

24         Q.  And are you telling them that you got a

746

1

2      page from Jennifer Stevens and then another page from

3      Angelique Decker?

4          A.  I don't know if I told them who actually

5      paged me.

6          Q.  You never told them that you spent that

7      night on the porch with Ivory; did you?

8          A.  He never asked me about that night.

       Q.  So, you never mentioned it?

9          A.  No.  I was never asked.

10         Q.  Well, they were asking you about the night

11     of the fire; weren't they?

12         A.  They asked me where was I at last Tuesday.

13         Q.  And you never said, "I was sitting on a

14     porch with this lady named Ivory Burrage"; did you?

15         A.  They never asked.  They asked me where I

16     was at the prior Tuesday, and I told them where I was

       at.

17         Q.  Now, the next day you came down to the

18     Champaign Police Department?

19         A.  No.  It was a few days later like a week,

20     almost a week and a half later.

21         Q.  Now, you weren't under arrest at the time?

22         A.  No.

23         Q.  And you came in perfectly free?

       A.  Yes.

24                              747

1

2          Q.  And, at that time, you told them that you

3  were in Urbana?

4          A.  Yes.

5          Q.  And you told them that, in fact, you were

6  with Jennifer?

7          A.  Yes.

8          Q.  And you told them that you'd known her for

9  three years?

10          A.  Yeah, about three years.

11          Q.  That was a lie; you weren't with Jennifer;

12  were you?

13          A.  Yes, I was.

14          Q.  You were with Jennifer the night of

15  February 24th and 25th?

16          A.  No, I wasn't with her the night of the

17  24th or the 25th.

18          Q.  So, when you told them you were with

19  Jennifer Stevens and got a page from her that night

20  around 12:30, or Jennifer, that was wrong; wasn't it?

21          MS. LENIK:  Objection.  Compound question.

22  There's no way he could answer that.

23          THE COURT:  Overruled.

24          A.  Can you repeat it?

25          Q.  (by Ms. Ladd)  When you told detectives in

that second interview that you got a page from a

748

1

2      Jennifer that you'd known for three years?

3              A.   I didn't page from Jennifer, my

4      girlfriend.

5              Q.   Jennifer Stevens?

6              A.   Yes.

7              Q.   But you told the detectives you got a page
       from Jennifer, last name you didn't know; didn't you?

8              A.   No.

9              Q.   You never said that?

10             A.   No.  I said I got a page from Jennifer.

11             Q.   And they asked you her last name; didn't

12     they?

13             A.   Yes, and I said Stevens.

14             Q.   And you're telling us you told them

15     Stevens?

16             A.   Yes.

17             Q.   And you told them that you'd known her
       about three years?

18             A.   No.  I know Jennifer Stevens longer, but

19     the other Jennifer -- I know two Jennifers.

20             Q.   So, there was another Jennifer you were

21     talking about?

22             A.   One is my girlfriend, and one is a mutual

23     friend.

24             Q.   Which one were you telling the detectives

                              749

about?

A.  The mutual friend.

Q.  So, not Jennifer Stevens?

A.  No.  I got a page from Jennifer Stevens.

Q.  You told the detective it was a Jennifer with a last name you didn't know?

A.  Right.

Q.  Now, you said you got paged from Ken Lee's at around 12:30 that night?

A.  A page from Ken Lee's?

Q.  A store at Springfield and First Street?

A.  I never --

Q.  Convenient store?

A.  I never got a page from Ken Lee.  It was from First and Springfield.

Q.  And there's a pay phone there?

A.  Yes, on the corner.

Q.  And you said that you were paged by Jennifer?

A.  Jennifer Stevens.

Q.  And you're saying now that you told them Jennifer Stevens?

A.  Yes.  If I told them the last name, it was Jennifer Stevens.

Q.  So, you didn't tell them that this

750

Jennifer paged you, you said Jennifer Stevens paged you?

    A.  Yes.

    Q.  Did you call her back?

    A.  Yes.

    Q.  Now, you told the officers that, in fact, this Jennifer, last name unknown, picked you up; right?

    A.  Yes.

    Q.  In fact, that's a lie; isn't it?

    A.  No.

    Q.  So, you're testifying that while you were on the bicycle, Jennifer Stevens came by at 12:30 that night and picked you up?

    A.  No, it wasn't that night.  It was the Tuesday before that which was -- would have been probably the 17th or the 18th of February.

    Q.  Now, you didn't tell the detectives that; did you?

    A.  They asked me where I was at the following Tuesday, and that would have been the 18th of February.

    Q.  You're having a conversation with the Champaign Police Department about your whereabouts on the night of the fire, February 24th to 25th, and it's now your testimony that you were talking about a different Tuesday the week before?

    A.  That's what was the question he asked me,

751

Detective Don Shepard.

Q. He was asking about February 18th is what you're telling us?

A. He asked me about the following Tuesday, and I calculated it would have been February 18th or the 17th, maybe.

Q. Never asked you any questions about what you were doing the 24th; is that what you're telling us?

A. No.

Q. Did he ask you questions about what you were doing on the 24th and 25th?

A. Yes.

Q. And that's when you told them that, in fact, Jennifer picked you up on February 25th at 12:30?

A. No.

Q. You never said that?

A. No.

Q. Now, you also told them that you went to Malcolm's on Vine Street?

A. Yes.

Q. And that you started out to say was in Urbana; right?

A. No, it was on Vine in Champaign.

Q. And that you changed it to Champaign?

A. I never once said Urbana.

752

Q.  And you couldn't give them a last name?

A.  I don't know his last name.

Q.  And you didn't tell the officers that it was in Urbana initially?

A.  No.

Q.  And you said that you went that night, February 25th, to Hardee's after being with Malcolm until about 3:30?

A.  It wasn't the 25th.  It was the 17th.

Q.  That was the 17th now you were talking about?

A.  Yes.  Always relates back to the following Tuesday.

Q.  So, you were talking to them about the 18th and the 17th and all the activities you engaged in the week before; is that what you're telling us?

A.  Yes.

Q.  And then when you told them that they dropped you off at your brother's, you were talking about the week before?

A.  Yes, ma'am.

Q.  And they were never asking you about what happened the night of the fire?

A.  No.

Q.  Didn't even ask you where you were?

753

A.  Yes.

Q.  What'd you tell them?

A.  I told them where I was at.

Q.  It's your testimony that you told them you were at Ivory Burrage's house?

A.  I told them I was out of town.

Q.  In the second conversation then you're telling us that all this information you gave the detectives was really about the week before?

A.  Yes, it was.

Q.  And then all you would tell them about that night on the night of the fire was that you were out of town?

A.  Yes.

Q.  You still didn't tell them Urbana?

MS. LENIK:  Objection.

A.  Is Urbana out of town?

MS. LENIK:  Asked and answered about three or four times.

THE COURT:  Overruled.

A.  Isn't Urbana out of town?

Q.  (by Ms. Ladd)  Why didn't you just say, "I was in Urbana"?

MS. LENIK:  Objection.  Relevance.

A.  Is it out of town?

754

1

2          THE COURT:  Overruled.

3          Quiet, Mr. Moore.

4          Overruled, Ms. Lenik.

5          You may ask.

6          MS. LADD:  Thank you.

7          Q.  (by Ms. Ladd)  Mr. Moore, why didn't you
just tell them then "I was in Urbana"?

8          A.  I was out of town.  I mean, this incident
9  happened in Champaign, and I was in a different town.

10          Q.  Now, you're telling us that there was a
11  lady named Ivory Burrage who could say she was with you?

12          A.  Yes, ma'am.

13          Q.  But you never gave that name to the
14  detectives?

15          A.  No, ma'am.

16          Q.  You never told them where she lived?

17          A.  No, ma'am.

18          Q.  You never told them that's where you were?

19          A.  No, ma'am.

20          Q.  And everything you talked about was dates
the week before, the 17th, the 18th?

21          A.  Yes.

22          Q.  Now, you've read the police reports in
23  this case; haven't you?

24          A.  Yes.

                        755

Q.  Now, that lineup that you went to at the correctional center, you didn't volunteer to be in that lineup, actually; did you?

A.  It was my idea.

Q.  You had a court order that made you stand in that lineup; didn't you?

A.  Yes, I did.  It was my idea.

Q.  And, in fact, you were told that it was 3:30, and you're telling us now that you were told it was 4:30?

A.  Piece of paper said 4:30.

Q.  Do you have that piece of paper?

A.  No, I don't.

Q.  Then you got there at about 4:05, according to your testimony?

A.  Yes.

Q.  But it was too late to have the lineup, because Ms. Hansen had already left; hadn't she?

MS. LENIK:  Objection.

A.  I don't know.

THE COURT:  I'll sustain the objection.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  Now, there was another lineup then scheduled for the next day?

A.  Yes, it was.

756

1

2          Q.  Now, you didn't volunteer to stand in that

3  one; did you?

4          A.  I had no problem doing it.

5          Q.  That's 'cause you were in custody

6  because --

7          MS. LENIK:  Objection.

8          Q.  (by Ms. Ladd)  -- you missed the first
   one; isn't it?

9          A.  I had no problem doing the lineup.

10         THE COURT:  The objection is sustained.

11         Q.  (by Ms. Ladd)  Now, you were in custody

12  after you missed the first one; weren't you?

13         A.  Yes.

14         Q.  So, you had to stand in that lineup?

15         MS. LENIK:  Objection.  Argumentative.

16         A.  I had no problem --

       MS. LENIK:  Asked and answered.

17         THE COURT:  Mr. Moore.

18         I'm going to sustain the --

19         MS. LENIK:  Thank you.

20         THE COURT:  -- objection to the last question.

21         Q.  (by Ms. Ladd)  There was another court

22  order at that point compelling you to stand in the

23  second lineup?

24         MS. LENIK:  Objection.  Asked and answered.

757

THE COURT:  Ms. Lenik, the objection is overruled.

Please ask the question, Ms. Ladd.

Q.  (by Ms. Ladd)  Let me repeat that, Mr. Moore, there was another court order then compelling you to stand in that second lineup?

A.  Yes, there was.

Q.  And, at that point, then, you did participate in the lineup?

A.  Yes.

Q.  Now, the detectives also asked you at that second interview on March 5th if they could take your picture?

A.  Yes.

Q.  But you didn't want them to do that?

A.  No.

Q.  In fact, you left before they could do that?

A.  Right.

Q.  And, later, they took a picture with a court order?

A.  Yes.

Q.  You do smoke Newport cigarettes?

A.  I smoke cigarettes.  Whatever on sale, Newport, Kools, Marlboro Menthol.

758

1

2      Q.  But you didn't say you smoked Newport

3  cigarettes?

4      A.  I told them I smoked cigarettes, yes.

5      Q.  You never said Newport cigarettes?

6      A.  He saw the package of Newport cigarettes

7  on the kitchen table and asked me who was they, so he
   was like, "You smoke Newport?"  And I said --

8      Q.  You told them you like your beer and you

9  like to smoke cigarettes?

10     A.  No, I told him I drink beer.

11     Q.  Never said, "I like my beer"?

12     A.  I don't know if I did or not.

13     Q.  You're telling us when you prepared these

14  handwriting samples that you were in a hurry?

15     A.  Yes.

16     Q.  So, you felt like you were writing rushed?

       A.  Yes.

17     Q.  You did them quickly then?

18     A.  Excuse me?

19     Q.  You made the samples or the writings out

20  quickly?

21     A.  Yes.

22     Q.  It's also your testimony that you've never

23  been inside 512A?

24     A.  Not with Lori Hansen as a resident.

                    759

Q.  When did she live there?

A.  I guess she moved in in August.

Q.  Now, you're telling us that that night, February 24th to 25th, then, you were never inside the residence?

A.  No.

Q.  Never touched any of her clothing?

A.  No.

Q.  Never wore any of her clothing?

A.  No.

Q.  Or any parts of it?

A.  No.

Q.  Never touched any part of her stockings or pantyhose?

A.  No.

Q.  And you're telling us, in fact, you didn't even go back to the scene till 5 o'clock?

A.  No.

Q.  And that would be in the evening the next day after the fire; is that right?

A.  Yes.

Q.  There's no reason then for your DNA to be on a stocking mask?

MS. LENIK:  Objection.

THE COURT:  She may ask.

760

A.   No.

Q.   (by Ms. Ladd)  And you're telling us you were never at the drive-up at 812 West Springfield?

A.   No.

Q.   And there's no reason for you to have a photograph of you at that drive-up?

A.   No.

Q.   Now, you are missing a tooth in the upper left corner of your mouth?

A.   I'm not missing one, no.

Q.   Well, it's not there; is it?

A.   Right.  It's not missing, no.

MS. LADD:  No further questions.

THE COURT:  Ms. Lenik?

REDIRECT EXAMINATION

BY MS. LENIK:

Q.   Why didn't you tell the police about Ivory?

A.   They asked me where was I at the following Tuesday, which would have been the 17th.  Anything was just a merely misunderstanding.

Q.   Was there some reason why you wanted to protect Ivory and keep her out of this?

A.   Yes.

Q.   What would that be?

761

A.  Well, I didn't want my girlfriend, Jenny, to know about Ivory.  I mean, she knew about Ivory, but I just told her we was mutual friends through somebody.

Q.  Were you seeing a lot of women at that time?

A.  Not sexually.

Q.  Well, did you have a lot of girls that you would see at that time?

A.  Yes.

Q.  And were you trying not to make your main girlfriend jealous of those other girls that you would see?

A.  Yes, she was jealous.

Q.  Did you think if you gave Ivory's name to the police that somehow it would get back to Jennifer Stevens?

A.  Yes.  I didn't think I was even would be a suspect, you know.

Q.  Did you think it was funny or unusual that they would ask you about a date before this happened?

A.  No.

Q.  Why did you tell them that Urbana was out of town when you were in Champaign?

A.  Excuse me?

MS. LADD:  Objection.  I don't believe that

762

1
2      was the testimony that he told them Urbana was out of
3      town.  He told them he was out of town.
4              THE COURT:  I'm going to sustain the
5      objection.
6              Q.  (by Ms. Lenik)  Why did you tell them you
7      were out of town when you were in Urbana?
8              A.  Urbana is out of town.  Told me different
       town, different (unintelligible), different times.  It's
9      out of town.
10             Q.  You know, however, that Urbana and
11     Champaign are right next to each other and there's just
12     one street that divides them; right?
13             A.  Yes.
14             Q.  Did you think that you were being silly or
15     foolish when you made that comment?
16             A.  No.
               Q.  Were you trying to hide anything?
17             A.  No.
18             Q.  What were you trying to do when you gave
19     that statement?
20             A.  I was just answering questions, you know,
21     like I said, I didn't think I would even be a suspect or
22     even -- I thought the questions was ridiculous.
23             Q.  Were you under oath at that time?
               A.  No.
24
                                763

Q.  Were you free to go at that time?

A.  Yes.

Q.  Was that question asked of you only in the police station?

A.  Yes.

Q.  Was it asked of you any time after you were in the police station?

A.  No.

Q.  Until today, of course?

A.  Yes.

MS. LENIK:  I have no other questions.

THE COURT:  Ms. Ladd?

MS. LADD:  Nothing further.  Thank you.

THE COURT:  You may step down.

                              (Witness excused.)

MS. LENIK:  Rest, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, I'm going to ask that you go with Mr. Rasmus to the jury room.  Get you out here as quickly as we can.

            (The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  We'll show the following is out of the presence of the jury at this point.

The Defendant rests.

MS. LENIK:  Your Honor, I would renew my

764

motion for directed verdict and make the same argument.

THE COURT:  All right.  We'll show at the conclusion of the Defendant's testimony, Defendant's case, there's a motion for directed verdict.  The motion is denied.

Ms. Ladd, you've indicated that you will have some rebuttal testimony.

MS. LADD:  I need to make a phone call.  It probably would take about 10 to 15 minutes to get the witness here, Judge.

THE COURT:  All right.  That's fine.  We'll take a recess at this point.  Let me know when you're ready.

MS. LADD:  Thank you.

(Recess taken.)

THE COURT:  Ms. Ladd, you have those court files?

MS. LADD:  I do, Your Honor.

MS. LENIK:  Your Honor, again, I would remind the Court of the earlier motion that they will be fact based only.

THE COURT:  Yes, I will inform the jury that I've taken judicial notice of records in the Circuit Court of Champaign County and that the Defendant has prior felony convictions.

765

Ms. Ladd, are you ready for the jury to be brought out?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  I am.

THE COURT:  Mr. Rasmus, bring in the jurors, please.

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Rebuttal?

MS. LADD:  Thank you.  I'd recall Detective Donald Shepard.

THE COURT:  You're still under oath, Officer.

THE WITNESS:  Thank you, Your Honor.

DONALD SHEPARD

recalled as a rebuttal witness on behalf of the People, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LADD:

Q.  Could you state your name again for the record.

A.  Donald Shepard.

Q.  And you're the same detective who

766

testified earlier in this case?

          A.   Yes, ma'am.

          Q.   Again, like to direct your attention to
your interviews of the Defendant, Dedric Moore.  On
March 4th of 1998, did you have that first interview you
described at 512B South New Street?

          A.   Yes, ma'am.

          Q.   At that time, did the Defendant repeat to
you several times that he was out of town on February
24th to 25th of 1998?

          A.   Yes, ma'am.

          Q.   Were you able to have an extensive
discussion at that time about it?

          A.   No, we were not.  Actually, we asked to
step inside to talk to him because the door was open and
it was cold out that day, and he told us that the heat
was not working and that he didn't want us to come in
the house, so we left.

          Q.   Could you feel any heat coming out of the
door?

          A.   Yes.

          MS. LENIK:  Objection.  This was asked and
answered and gotten into on direct, and it's improper
rebuttal.  These exact questions and exact answers.

          THE COURT:  The objection is sustained as far

as that question is concerned.

Q.   (by Ms. Ladd)  Like to direct your attention next then to March 5th of 1998, did you have another interview then with the Defendant?

A.   Yes, I did.

Q.   Was this the one at the Champaign Police Department?

A.   Yes, ma'am.

Q.   And he came down not in custody, in other words, or not under arrest?

A.   Yes, ma'am, he came in voluntarily.

Q.   At that time, did you ask the Defendant about his whereabouts on the night of the fire, February 24th to 25th?

A.   Yes, ma'am.

Q.   What day of the week was February 24th?

A.   Twenty-fourth would have been a Tuesday.

Q.   Then how did you raise your questions or what date you were asking him about?

A.   I referred to the fire, the incident that had happened there on the north end of his grandmother's residence, and asked him, first of all, if he'd had any idea who had set the fire or had seen any suspicious activity around the dwelling, and he said that he had no idea, and responded that he was out of town.  So then

768

1

2 when I asked him where he was at, he told me that he was

3 in Urbana.

4   Q. Did he then proceed to tell you that he

5 was with Jennifer?

6   A. Yes. In fact, he told me that -- I asked

7 him specifically where he was in Urbana and how he got

 there, and he told me that a girl picked him up named

8 Jennifer, and completed his sentence by saying, "Not

9 Jennifer Stevens. This is another Jennifer that I know.

10 I know several women."

11   Q. Did you ask him the last name of Jennifer?

12   A. Yes, I did.

13   MS. LENIK: Your Honor, I'm going to object as

14 improper rebuttal. This was also gotten into in these

15 questions on direct.

16   THE COURT: Overruled.

17   Q. (by Ms. Ladd) And what did he tell you

 about the last name?

18   A. He told me that he did not know her last

19 name.

20   Q. Did he also talk about her paging him?

21   MS. LENIK: Same -- Your Honor, I would ask

22 for a continuing objection if this is what rebuttal is

23 going to be.

24   THE COURT: Your continuing objection will be

noted.  It's overruled.

You may ask.

MS. LADD:  Thank you, Your Honor.

Q.  (by Ms. Ladd)  Again, did he talk about Jennifer, last name unknown, paging him?

A.  No.  In fact, he said that he paged her with a phone number for her to return his call at and she called him back.

Q.  Did he give you a pager number that he used?

A.  Yes, he did.

Q.  What was that?

A.  That was 292-2400.

Q.  And was that his pager number or Jennifer's?

MS. LENIK:  Your Honor, I'm going to object again to this.

THE COURT:  Ms. Lenik, your objection is noted.  It's overruled.

A.  Yes, he did.  He said that that was her pager.  I specifically asked for her pager number that he called her at and where he called her from.  He gave me that pager number and said that she called him back at Ken Lee's on South First Street, close to the intersection of First and Springfield Avenue.

770

Q.  (by Ms. Ladd)  Now, is there a business named AM-KO or an oriental foods store there?

A.  Yes.  It's on the southeast corner of the intersection of First and Springfield Avenue.

Q.  Then you'd also testified earlier about Ken Lee's.  What is that?

A.  Ken Lee's is a convenient store.  It's on the northeast corner of that intersection, sits directly behind a small automobile repair shop.

Q.  And what else is located at that intersection?

A.  That's the only thing on the northeast corner, with the exception of a house which is on further north of Ken Lee's.  And across the street on the northwest corner of the intersection is a restaurant.  It's an Italian restaurant.

Q.  Is that Minneci's?

A.  Yes, ma'am.

Q.  And then, finally, as you complete that intersection then, what's on the other corner, the northeast corner?

A.  The southwest corner is the other intersection.

Q.  I'm sorry.

A.  The other corner of the intersection.

771

Southwest corner is an old garage.  It was a gas
station, and they just do a little bit of auto repair
work in there.

Q.  Now, with regards to that intersection,
then, were there any -- or did you check it specifically
in March of 1998, to see if there were any other pay
phones there?

A.  Yes, I did.

Q.  And where was the only pay phone?

A.  The only pay phone was at Ken Lee's
restaurant or Ken Lee's Convenient Store.

Q.  And that's the phone records that you
identified or described in your earlier testimony?

A.  Yes, ma'am.

Q.  How far is it from 108 East Healey Street
then to that intersection?

A.  108 would be on the north side of Healey
Street.  At about middle of the block.  And if you walk
out the back door, which would be the north end of the
building, you'd come into the alley, and Ken Lee's is on
the alley just north of Springfield Avenue.

Q.  Well, can you just --

A.  His back door would come out on the alley
just south of Springfield Avenue, so it'd be just about
one block.

772

Q.  Thank you.  How many blocks would it be to 512 South New or the duplex from 108 East Healey?

A.  If you go directly west and walk over the railroad tracks, because Healey is interrupted by the railroad tracks there along Neil Street, it's approximately nine blocks.

Q.  Are you able to cut across the railroad tracks or are there fences there?

A.  You'd have to walk around the construction site now where they're doing the Boneyard construction, and you could go north or south approximately three quarters of a block and then cut back to the west.

Q.  Now, when you were talking to the Defendant on March 5th of 1998, did you ever ask him about February 17th of 1998?

A.  No, ma'am, that date never came up.

Q.  Did you ever ask him about February 18th of 1998?

A.  No, ma'am.

Q.  Did the Defendant ever tell you he was stating or telling you about any activities on February 17th of 1998?

A.  No, ma'am.

Q.  Did he ever tell you he was talking about what he was doing on February 18th of 1998?

773

A.   No, ma'am.

Q.   Did you have any reason at all to ask the Defendant anything about February 17th or 18th of 1998?

A.   No, ma'am.

Q.   Did the dates ever even come up in your conversation?

A.   No, ma'am.   The only date that we discussed was the night of the fire.

Q.   Now, did you, during that conversation, did the Defendant ever mention to you the name Ivory Burrage?

A.   No, ma'am, I never heard that name.

Q.   Did he ever mention being with someone on a porch in Urbana for that evening?

A.   No, ma'am.

Q.   Did he ever mention being paged by another female named Angelique Decker that evening?

A.   No, ma'am.   I've never heard that name, either.

Q.   Did he ever tell you that he was paged by Jennifer Stevens at around 12:30 that night?

A.   No, ma'am.

MS. LADD:   Thank you.   I'd tender this witness.

THE COURT:   Ms. Lenik?

774

CROSS-EXAMINATION

BY MS. LENIK:

Q.  He did tell you after he gave you the vague answer that he was out of town that what he meant by out of town was that he was in Urbana instead of Champaign; correct?

A.  Yes, ma'am.

Q.  And that was in that same conversation; right?

A.  This second interview, yes, ma'am.

Q.  And although you might consider it silly, Urbana and Champaign are different towns; right?

A.  Urbana and Champaign are different towns, yes, ma'am.

Q.  And you didn't inquire further into why he would give you that silly answer that Urbana -- that he was out of town, meaning he was in Urbana instead of Champaign?

A.  Actually, what I did was when he told me he was in Urbana, and I asked him how he got there, who picked him up, and where he went.  He told me that he went to Malcolm's house, guy by the name of Malcolm.  He was a black male.  I asked him specifically the description and the age.  I asked him what the house looked like.  He didn't know the street address, but he

775

knew it was on Vine Street.  I asked him where at on

Vine Street.  He told me it was between Prairie and

Prospect Avenue.  I asked him if I was driving westbound

toward Prospect from Prairie which side of the street it

would be on, and he told me it would be on the left side

of the street.  He described it as a two-story gray

house, and I located that residence as 405 West Vine

Street in Champaign.

Q.  And you did, in fact, find out that there

was someone named Malcolm who did, in fact, live there

at some point and that that person had moved and that

that person was no longer there, but the information

that he gave you about Malcolm and Malcolm living in

that house was, in fact, correct?

MS. LADD:  Objection.  That calls for hearsay.

THE COURT:  Well, it's a compound question,

also.  I'm going to sustain the objection.

Q.  (by Ms. Lenik)  All right.  You found out

that there was a Malcolm who lived at that address;

correct?

A.  Yes, ma'am.

Q.  And you found out that the Malcolm who

lived at that address had moved at some point recent to

this conversation; correct?

MS. LADD:  Same objection.

776

1

2          THE COURT:  I'm gonna sustain the objection

3    now on the hearsay basis.

4          MS. LENIK:  He was -- Well, it's not for the

5    truth.

6          THE COURT:  It is.  The objection is

7    sustained.

8          MS. LENIK:  No other questions.

          MS. LADD:  Just one for clarification.

9                    REDIRECT EXAMINATION

10                   BY MS. LADD:

11         Q.  Detective Shepard, when you were asked if

12   the Defendant said, well, what he meant by out of town

13   was Urbana, is that how he phrased it?

14         A.  I'm sorry, please repeat your question.

15         Q.  When you were talking to the Defendant and

16   he said that he -- he said he was out of town and then

17   later he said he was in Urbana, did he say, "What I

     meant by out of town was Urbana"?

18         A.  No.  Actually, his comment was, "Oh, I was

19   in Urbana."

20         MS. LADD:  Thank you.  No further questions.

21         THE COURT:  Ms. Lenik?

22         MS. LENIK:  No questions.

23         THE COURT:  You may step down.

24         THE WITNESS:  Thank you, Your Honor.

                          777

(Witness excused.)

THE COURT:  Ms. Ladd, are you asking the Court to take judicial notice of the files?

MS. LADD:  Yes, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen of the Jury, the Court has taken judicial notice of some files from the Circuit Court of Champaign County concerning this Defendant, and I will inform you that the Defendant has prior felony convictions.

You will get an instruction as to what to do with that information.

Anything else, Ms. Ladd?

MS. LADD:  No.  Thank you, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  No, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen of the Jury, that's going to conclude the testimony in the trial.

We have some matters now that we have to take up outside of your presence, and I'm going to excuse you for a period of time.  We want to start the closing arguments as early as we can, so I'm going to ask that you be back in the jury room by 12:15.  I understand that's going to be a bit of a problem.  You may be eating lunch a little bit early, but if you'll be in the

778

jury room by 12:15, that will insure by 12:30 we will be able to get started with closing arguments and get this case to you at a reasonable hour this afternoon.

Between now and 12:15, don't discuss the case among yourselves or with anyone else.

If those of you who would like to have lunch provided this afternoon, it would probably be, with closing arguments, somewhere around 2:30 or so before the case would get to you, but anyone who wishes to order lunch can discuss that with Mr. Rasmus before you leave for the morning, but I need you back in the jury room by 12:15 this afternoon.

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  All right.  We'll show the following is out of the presence of the jury.

Counsel, let's take a couple of minutes, get our jury instructions ready.

The other thing we'll do after we get our jury instructions ready is decide which evidence, which physical evidence will go back to the jury.  I think it would be appropriate before closing argument that both sides know what's going to go back, so let's take a couple of minutes.

MS. LENIK:  Your Honor, may I ask a question?

779

THE COURT:  Certainly.

MS. LENIK:  There are only one or two of the instructions that I have any objections to at all. Could we do them in such a way that we'll do all of the ones without and then all of the ones with to speed the process?  There are 39 instructions that I've been tendered.

THE COURT:  No.  We'll do them my way.  We'll do them one at a time.

(Recess taken.)

THE COURT:  All right.  We'll show the following is out of the presence of the jury.

Do the jury instructions at this point.

Ms. Lenik, the reason I want to do them one at a time is I've done them the other way that you've suggested, and both as a judge and as a prosecutor, and I found that some surprising things crop up in the jury instructions that you don't anticipate if you go through them one at a time.

We'll show the People tender their Instruction No. 1, which is IPI 1.01.

MS. LENIK:  No objection.

THE COURT:  No objection.  That will be given.

People tender their Instruction No. 2, which is IPI 1.02.

780

MS. LENIK:  No objection.

THE COURT:  Which has both paragraphs.

MS. LENIK:  Yes.

THE COURT:  That will be given.

People tender their Instruction No. 3, which is IPI 1.03.

MS. LENIK:  No objection.

THE COURT:  No objection.  That's given.

Tender their Instruction No. 4, which is IPI 1.05.

MS. LENIK:  No objection.

THE COURT:  That will be given.

People tender their Instruction No. 5, which is IPI 2.01.

MS. LENIK:  No objection.

THE COURT:  No objection.  That will be given.

People tender their Instruction No. 6, which is IPI 2.02.

MS. LENIK:  No objection.

THE COURT:  No objection.  Six is given.

People tender their Instruction No. 7, which is IPI 2.03.

MS. LENIK:  No objection.

THE COURT:  No objection.  That's given.

People tender their Instruction No. 8A, which

781

1

2 is IPI 3.02.

3    MS. LENIK:  No objection.

4    THE COURT:  No objection.  That's given.

5    People tender their Instruction 8B, which is

6 IPI 3.06-3.07.

7    MS. LENIK:  No objection.

8    THE COURT:  No objection.  That'll be given.

9    People tender their Instruction No. 9, which

 is IPI 3.10.

10    MS. LENIK:  No objection.

11    THE COURT:  No objection.  That will be given.

12    People tender their Instruction No. 10, which

13 is IPI 3.11.

14    MS. LENIK:  No objection.

15    THE COURT:  No objection.  Ten is given.

16    People tender their Instruction No. 11, which

17 is IPI 3.13.

18    MS. LENIK:  No objection.

19    THE COURT:  No objection.  People's 11 is

 given.

20    People tender their Instruction No. 12, which

21 is IPI 3.15.

22    MS. LENIK:  No objection.  Oh, this is 12?

23    THE COURT:  Right.

24    MS. LENIK:  No objection.

1

2          THE COURT:  No objection.  Twelve is given.

3          People tender their Instruction No. 13, which

4   is IPI 14.13.

5          MS. LENIK:  No objection.

6          THE COURT:  No objection.  Thirteen is given.

7          People tender their Instruction No. 14, which

    is IPI 14.14.

8          MS. LENIK:  No objection.

9          THE COURT:  No objection.  Fourteen is given.

10         People tender their Instruction No. 15, which

11  is IPI 11.53.

12         MS. LENIK:  No objection.

13         THE COURT:  No objection.  Fifteen is given.

14         People tender their Instruction 16, which is

15  the issues instruction, 11.54.

16         MS. LENIK:  No objection.

17         THE COURT:  No objection.  Sixteen is given.

18         People tender their Instruction 17, which is

    IPI 4.08.

19         MS. LENIK:  No objection.

20         THE COURT:  No objection.  That will be given.

21         People tender their Instruction 18, which is

22  IPI 11.61 and 11.59.

23         MS. LENIK:  No objection.

24         THE COURT:  No objection.  Eighteen is given.

783

People tender their Instruction No. 19, which
is IPI 11.65C modified.  What's the modification?

MS. LENIK:  Yes, I would ask that question.

MS. LADD:  I think I took out some portion of
it.  If I can --

THE COURT:  Let me see what it is.

MS. LADD:  That didn't apply.

THE COURT:  11.65C.  "The term force or threat
of force."  Oh, you took out "Or threat of force."

MS. LADD:  Right.

MS. LENIK:  Well, this says "Or threat of
force means the use of force or violence, including when
the accused has overcome the victim by use of physical
restraint."

What's the language of IPI?

THE COURT:  All right.  The IPI says, "The
term force or threat of force means the use of force or
violence or the threat of force or violence, including
when the accused has overcome the victim by use of
physical restraint."

Ms. Lenik, here's the IPI.

MS. LADD:  "Threat of force" is out of there.

THE COURT:  Right.

MS. LADD:  Because I don't believe that was an
issue in this case.

784

THE COURT:  Let's take a look at it and --

MS. LADD:  I'll be glad to put it back in if --

THE COURT:  Well, let's see what Ms. Lenik thinks about it.

MS. LENIK:  Does the issues instruction say "Force or threat of force"?  If the issues instruction says "Force or threat of force," then I would object to this and ask that it be identical to the issues instruction.

MS. LADD:  I'll be happy to withdraw and resubmit with that language then, Your Honor.

THE COURT:  You're right, Ms. Lenik.  The second proposition says "Force or threat of force," so --

MS. LENIK:  Then I would object to this and ask that be consistent.

THE COURT:  So, then we'll just have the extra phrase "Or threat of force" in there.

People tender their Instruction No. 20, which is 11.65A modified.  What's the modification?

MS. LADD:  Again, there were things taken out. The full instruction reads, "The term bodily harm means physical harm and includes, but not limited to, sexually transmitted disease, pregnancy, and impotence."

785

None of those are at issue in this case.

MS. LENIK:  Yeah, I'm not gonna object in this case.  We are not gonna object to those things.

THE COURT:  No objection as to People's 20.  That will be given.

People tender their Instruction 21, which is 11.65D modified.  What's the modification?

MS. LADD:  Actually, that may be an error.  I think that is directly from -- That's not modified, Your Honor.  I apologize.  The one in front of it was.

THE COURT:  All right.  Ms. Lenik, do you have any objection to 11.65D?

You got my book there, so I assume it comes right out of the book.

MS. LENIK:  Your Honor, no, I have no objection.

THE COURT:  No objection.  Twenty-one is given.

People tender their Instruction No. 22, which is the issues instruction, 11.62.

MS. LENIK:  No objection.

THE COURT:  No objection.  Twenty-two is given.

People tender their Instruction 23, which is IPI 6.05X; is that it?

786

MS. LADD:  I believe that's it.

MS. LENIK:  Well, you know who wrote these.

THE COURT:  Yeah.

MS. LENIK:  No objection.

THE COURT:  No objection.  Twenty-three is given.

People tender their Instruction 24, which is 6.07X.

MS. LENIK:  No objection.

THE COURT:  No objection.  Twenty-four is given.

People tender their Instruction 25, which is IPI 15.03.

MS. LENIK:  No objection.

THE COURT:  No objection.  Twenty-five is given.

People tender their Instruction 26, which is 15.01 modified.  What's the modification?

MS. LADD:  I'm sorry, Your Honor, if I could have a moment.

I don't remember.  I'm sorry.

THE COURT:  Ms. Lenik, let me see my --

MS. LADD:  I believe it's the bottom.  There's a bracket at the bottom that says, "The phrase property of another means a building or other property, whether

787

1

2    real or personal."

3            I took out "or personal" because there's not

4    an issue here of personal property in this case.

5            THE COURT:  All right.

6            MS. LADD:  So, it's taking out any reference

7    to personal property.

8            MS. LENIK:  Your Honor, I would object to this

9    as being confusing and not edifying, in that there's

10    no -- the language "Other than the" -- well, "has an

11    interest which the Defendant has no authority to defeat

12    or impair, even though the Defendant may also have an

    interest in the building or property."

13            There's no evidence of that here, and I think

14    that that leads to speculation.

15            THE COURT:  Let me see the IPI.

16            MS. LENIK:  Yes.

17            THE COURT:  Ms. Ladd, that second paragraph,

18    the committee notes say, "Give the last bracketed

    paragraph only when the evidence shows the Defendant

19    claims some interest in the property."

20            What's your theory on that?

21            MS. LADD:  Your Honor, there's been extensive

22    testimony the Defendant stayed at the other side of the

23    duplex which is part of that building, that he kept his

24    items there.  There's been questioning along the lines

788

of if he loved his grandmother.

Certainly, I can see the argument of it's part of his building and where he stayed, too, and I think the State is entitled to show that this is all one comprehensive building.

If it was separate units in separate buildings, that would be different, but I could see the jury somehow drawing a conclusion that this is also his property, that he stays there, and occupants have an interest in property.

And so I think it is important to distinguish it, even if he stays in the adjoining portion of the same building, that there can be a sufficient interest to defeat that.

THE COURT:  Ms. Lenik?

MS. LENIK:  Your Honor, we never suggested that he had any right to burn it down.  As a matter of fact, our argument is the exact opposite; that there's no way in the world he would burn down his grandmother's house, because he loved his grandmother so much.  That's the argument.

No one's ever -- And we heard testimony from Harry Washburn who said he owns the whole building.  No one's ever suggested that Mr. Moore or his grandmother had a right to burn the building down.

789

And if you give this instruction, that's what the -- that's the idea of it, and there's been no testimony of that.

THE COURT:  Well, this instruction with the second paragraph would be carrying the property of another to almost an extreme.

The Defendant used, and I guess there's in evidence, an ID card with that as his address, that half of the duplex.  I don't think this would in any way clarify the situation, but I don't see how it can hurt, given the testimony that the Defendant, for a period of time, used that as his residence or that half of a duplex as his residence, and at least still had some interest in it by going over there.

I'm going to note the objection.  It will be overruled, and 26 will be given.

People tender their Instruction No. 27, which is 15.04.

MS. LENIK:  No objection.

THE COURT:  No objection.  Twenty-seven is given.

People tender their Instruction 28, which is the concluding instruction, 26.01.

MS. LENIK:  And I have no objection to that.

THE COURT:  No objection.  That will be given.

790

MS. LENIK:  And the following ten instructions
are simply verdict forms.

THE COURT:  Right.  No objection?

MS. LENIK:  No objection to the verdict forms.

THE COURT:  Ms. Lenik, do you have any
instructions?

MS. LENIK:  I do, and if --

MS. LADD:  I'm sorry.  We skipped one.
People's Instruction 39 is actually an additional IPI
that was added.  It's 3.12.  It's the impeachment of a
witness of an offense.

THE COURT:  It was at the very end.

MS. LADD:  Right.

THE COURT:  Ms. Lenik, the very last
instruction which was after the verdict instructions is
IPI 3.12?

MS. LENIK:  Your Honor, I'd like to note the
verdict forms first.

THE COURT:  All right.  We'll show People's 29
is not guilty of residential burglary.  People's 30 is
guilty of residential burglary.  People's 31 is not
guilty of home invasion.  People's 32 is guilty of home
invasion.  People's 33 is not guilty of aggravated
criminal sexual abuse.  People's 34 is guilty of
aggravated criminal sexual abuse.  People's 35 is not

791

guilty of attempt first degree murder.  People's 36 is

guilty of attempt first degree murder.  People's 37 is

not guilty of aggravated arson, and People's 38 is

guilty of aggravated arson.

We'll show those jury verdict forms are in

proper order.

MS. LENIK:  And I have no objection to their

39, which is 3.12.

THE COURT:  All right.  No objection.

Thirty-nine is given.

Ms. Lenik, any instructions on behalf of the

Defendant?

MS. LENIK:  Yes.  I have three instructions.

THE COURT:  Okay.

MS. LENIK:  I think, actually, one of them may

be a repeat.

MS. LADD:  It is.

MS. LENIK:  All right.  We would withdraw the

repeat.

MS. LADD:  Two are repeats.

MS. LENIK:  I'm sorry.

THE COURT:  That's okay.

MS. LENIK:  We can -- This is -- Your Honor,

my -- I have a mistake.  I don't have a -- Do you have

the blank one?

792

MS. LADD:  Which one?  I wrote on it.

MS. LENIK:  Oh.

MS. LADD:  We can white it out and copy it.

MS. LENIK:  Yeah.

THE COURT:  All right.  Defendant tenders their Instruction No. 1.

MS. LENIK:  Which is IPI 3.16.

THE COURT:  Do you have an extra copy of this?

MS. LENIK:  I do.  They're all marked, though.

MS. LADD:  I have no objection, Your Honor.

THE COURT:  All right.  Defendant's 1 will be given.

MS. LENIK:  And that's it.

THE COURT:  Wait a minute.  Wait a minute.  Wait a minute.

MS. LENIK:  Wait a minute?

THE COURT:  You handed me Defendant's 1 is the evidence?

MS. LENIK:  No, Your Honor, those -- all of those have been tendered by the State except this, so I want to renumber this as 1, because this is the only one that I want that hasn't been --

THE COURT:  Which one is it?

MS. LENIK:  3.16, evidence of reputation.

THE COURT:  Oh, all right.  All right.

MS. LADD:  I have no objection, Your Honor. However, I do have one additional matter to raise when we're done with that.

THE COURT:  All right.  So, Defendant's Instruction No. 1, which is IPI 3.16, there is no objection.  That will be given.  And I will need a clean copy for that one; okay?

MS. LENIK:  Yes, Your Honor.

THE COURT:  Any other instructions?

MS. LENIK:  No.

THE COURT:  Ms. Ladd?

MS. LADD:  Your Honor, having looked at Defendant's instruction, actually, I believe hers is more accurate with regards to she chose not to tender it 'cause we had tendered People's Instruction No. 9, which is 3.10, right of an attorney to interview a witness.

THE COURT:  Right.

MS. LADD:  I believe given the cross-examination of one of the witnesses that actually both paragraphs should be submitted now, so I'm gonna ask to withdraw and retender with both paragraphs or else use the one that Ms. Lenik prepared, either way.

MS. LENIK:  Your Honor, I have not tendered it in that manner, and, frankly, I don't object to the way it was tendered by Ms. Ladd.

794

1

2          THE COURT:  Ms. Ladd, you want to withdraw

3  then yours and retender another one?

4          MS. LADD:  Yes.  It would include the second

5  paragraph which says, "However, the law does not require

6  a witness to speak to an attorney's investigator before

7  testifying."

8          THE COURT:  All right.  Let me find it first
   here.

9          MS. LADD:  And it's People's Instruction

10  No. 9.

11          THE COURT:  All right.  We'll show People's

12  Instruction No. 9 withdrawn, and you want it submitted

13  with both paragraphs.

14          You object with both paragraphs, Ms. Lenik?

15          MS. LENIK:  No.

16          THE COURT:  All right.  If you will then
   provide me with a version of that, and I also need

17  the --

18          MS. LADD:  No. 19?

19          THE COURT:  -- 19 done, also.

20          MS. LADD:  I will.

21          THE COURT:  And we'll need a clean copy of Ms.

22  Lenik's 3.16.

23          All right.  The next issue that we need to

24  take up is the items of physical evidence that will go

795

1
2    back to the jury.

3         Counsel, is there any problem with the diagram
4    of the duplex and the diagram of the neighborhood going
5    back?

6         MS. LENIK:  No.

7         THE COURT:  All right.  What about the diagram
     of the handwriting exemplar?

8         MS. LENIK:  No.

9         THE COURT:  You have no problem with that
10   going back?

11        MS. LENIK:  No, I don't.

12        THE COURT:  We won't send the videotape back.

13        MS. LENIK:  I'm sorry, Judge, you will not
14   send the videotape back?

15        THE COURT:  It won't do any good without a
     machine.

16
17        MS. LENIK:  Well, I object to the videotape
     going back.  I just want to make sure that's accurate.

18        THE COURT:  It's not gonna go back.

19        MS. LENIK:  Okay.

20        THE COURT:  In case the issue comes up and the
21   jury wants to see it, we will bring them into the
22   courtroom and play it for them in the courtroom.  I'm
     not going to give them the machine and the videotape.
23
          A copy of portions of No. 4, these are the
24
                        796

photos taken from No. 4?

MS. LADD:  Your Honor, that's the videotape that included only the relevant portions of the camera.

THE COURT:  So, that will not go back.

Still photographs?  Any problem with those, Ms. Lenik?

MS. LENIK:  No.

THE COURT:  All right.  Enlarged still photographs, any problem?

MS. LENIK:  No.

THE COURT:  Bank records?

MS. LENIK:  No.

THE COURT:  Do we need to send the victim's jacket back?

MS. LENIK:  I don't think we need to send any of the clothing back.

MS. LADD:  I don't, either.

THE COURT:  All right.  And that would include the bags with the fibers and all of that.

What about the rug samples?

MS. LENIK:  No.  I don't know why they need it.

MS. LADD:  No.

THE COURT:  Extension cord?

MS. LENIK:  No.

797

1

2          MS. LADD:  I don't think so, if they ask for

3     it.

4          THE COURT:  Knife?  Roll of tape?

5          MS. LENIK:  No.

6          THE COURT:  Receipt?

7          MS. LENIK:  No.

8          THE COURT:  Photocopy of the ATM receipts?

9          MS. LADD:  I'm sorry, Your Honor, I would like
      that to go back.

10         THE COURT:  Photocopy?

11         MS. LADD:  Yes.  That goes along with the

12    business records.

13         THE COURT:  Did we send those back?

14         MS. LADD:  Yes.

15         THE COURT:  All right.  The photocopy will go

16    back.

17         MS. LENIK:  I'm sorry, the photocopy, that's
      16A or --

18         THE COURT:  16A.

19         MS. LENIK:  Or both?

20         THE COURT:  No, just 16A.

21         The shorts won't go back.  The fibers, the

22    sample of DNA.

23         We're now down to 18, cords and laces.

24         MS. LENIK:  No.

                          798

1

2          MS. LADD:  No.

3          THE COURT:  Fibers from the cords and laces?

4          MS. LENIK:  No.

5          THE COURT:  No cigarette butt.

6          MS. LENIK:  No.

7          THE COURT:  The sample from the cigarette
butt, no.

8

9          Black nylon stocking, No. 20?

          MS. LENIK:  No.

10          THE COURT:  No. 20A would be the fibers.

11          The piece of nylon stocking?

12          MS. LENIK:  No.

13          THE COURT:  Fibers.  No.

14          Sample of DNA, no.

15          Broken glass, no.

          Sample of DNA, no.

16          The cord, which cord was that, No. 23?

17          MS. LADD:  Oh, it was the roll of cord taken

18    from her house.

19          THE COURT:  Do you want that to go back?

20          MS. LENIK:  No.

21          MS. LADD:  I don't think it needs to.

22          THE COURT:  The camel purse and all of the

23    contents?

          MS. LENIK:  No.

24
                              799

1

2          MS. LADD:  I don't think they need to.

3          THE COURT:  All right.  Photographs.

4    Photographs of the victim?

5          MS. LENIK:  Your Honor --

6          THE COURT:  I haven't seen those, so do you

     have those, Ms. Ladd?

7          MS. LADD:  Twenty-six through 33.

8          THE COURT:  All right.  The photographs of the

9    victim are 26A, B, C, 27A, B, C, 28, 29A, B, C, 30, 31A,

10   B, 32, and 33.

11         Ms. Lenik, as to these photos?

12         MS. LENIK:  Your Honor, I don't believe they

13   all need to go back, because they're cumulative and

14   duplicative.

           I understand the State has a right for the

15   jury to view what the victim looked like, even though I

16   might think that it's prejudicial.

17         I understand the law is that that prejudice is

18   outweighed by the fact that the State has a right to

19   prove their case; however, I think that these are simply

20   cumulative, and I would ask that the Court not send them

21   all back, particularly the ones that are simply other

22   views of the other or -- or views of the same portion of

23   the body from a different angle, that kind of thing.

24         THE COURT:  Actually, the only duplicate view

                              800

is 26B and 26C of the victim's face.  26B shows her face

with what appears to be soot and black marks on it, and

26C shows her face after it was cleaned, and it does

show some abrasions, but I believe the other photographs

do not duplicate body parts.

As an example, 31A shows the back of her

hands.  31B shows the palms of her hands.

So, I will allow the photographs of the victim

to go back to the jury.

MS. LENIK:  All of them?

THE COURT:  Yes.

Next set of photographs are the scene

photographs, and these begin with 34A.

Ms. Lenik?

MS. LENIK:  Your Honor, I would object as

well.  There are so many views of the same thing in

this, and I believe that the sheer volume of them has

prejudicial effect, and I don't believe that there's

anything enlightening about many, if not most, of these

individual photos, and I suppose the Court could allow a

view to go back, maybe two or three showing basically

what the house looks like; although, since they have the

diagram, they know what the house looks like, but I

don't think that this sheer volume which are simply

repeats of each other ought to go back.

801

THE COURT:  Well, again, there are duplicates, in that we have a photograph and there may be a close-up, but most of the interior photographs or all of them were testified by Lieutenant Bain.

And since one of the charges is attempt first degree murder, and that attempt was by means of fire, I think the jury has a right to see the interior; and, again, all of the photos of the interior were testified to by Lieutenant Bain.

So, I will allow the photos of the interior to go back, and that will take us from 34A and B through and including 39.

Then we begin with the exterior, which would be, let's see, we're starting with No. 40.

All right.  We're starting with People's 40, which is a view of a dumpster and some plastic containers, exterior view of the duplex.

Ms. Ladd, is there any reason why the dumpster, the No. 40 has to go back?  That's the photograph of the dumpster that was testified to.

MS. LADD:  No.  That doesn't matter.

THE COURT:  Ms. Lenik?

MS. LENIK:  No.

THE COURT:  All right.  And there's another exterior picture of 512, and I guess this would be the

802

other half of the duplex.

MS. LENIK:  No.

MS. LADD:  I would like it to come in, Your Honor.

THE COURT:  Which, No. 41?

MS. LADD:  Yes.  It shows relationship to the residences to each other.  It shows, I think, uncollected newspaper on the doorknob.

MS. LENIK:  Well, there's been no evidence of that.  I mean, I don't know what kind of inference can be drawn from that, but I don't think it's a part of the trial.

THE COURT:  Well, 42 is a photograph of both of the duplexes which show their relationship one to the other, and then 41 would be a close-up of the one that wasn't damaged by fire; is that correct?

MS. LADD:  It is, Your Honor, and I believe it was testified to that's how it appeared that night.

THE COURT:  All right.  Well, I'll let 41 and 42 go back.

Now, looking at 43, 43 is the front door?

MS. LADD:  That's correct.

THE COURT:  Is there any reason why that has to go back?

MS. LADD:  I don't see what the harm is.  It

803

was testified to to show the progression of how they
went through the residence and the damage and the heat.

MS. LENIK: Your Honor, I believe the harm is
exactly as I have indicated, that the sheer volume and
weight of those photographs acts without anything
further to prejudice the Defendant.

The thinking being, "My God, they've got all
these pictures. He must be guilty." And I don't think
that's out of reason or outlandish.

I think that these photographs are cumulative,
and I would ask that the Court only send back those
which will be helpful to the jury and not simply about
whom the State's Attorney feels there'll be no harm.

MS. LADD: May I respond, Your Honor?

MS. LENIK: About which I should say the
State's Attorney --

THE COURT: Well, I'll let 43 go back.

I now have two photographs, 44A and 44B, which
appear to be the kitchen again, except the thing that I
note is that it's a different view of the kitchen, of
the fire damage, and this is a beer can in there, and
that was testified to; is that correct?

MS. LADD: It is, Your Honor. That's closer
views and perspective, all three of the 44 series.

THE COURT: Now, is there a need for the

804

close-up of the beer can to go back?  It can be seen

clearly --

            MS. LADD:  I don't care, Your Honor.

            THE COURT:  -- in 44B.

            I don't know that 44A, although the fact it's

got the intern in the picture, is of any use.

            MS. LADD:  Can I see it, Your Honor?

            THE COURT:  Sure.

            44B was the one I was proposing to send back.

            MS. LADD:  I would prefer to send both of

them, because it shows the melted plastic on top of the

cupboard.  There's no prejudice for sending these back.

It's not so inflammatory that it's gonna arouse a

passion to the jury.  Certainly, there was testimony it

was hot enough to melt plastic and that does affect the

forensics from later experts.

            THE COURT:  Ms. Lenik?

            MS. LENIK:  Same argument, Your Honor.

There's no point in sending all of these back.  If they

have a view, that's sufficient.

            THE COURT:  Well, I'll send 44A and B back.

            45A, 45B, and 45C, photos of the kitchen.  45A

has a bit more perspective as far as the relationship of

the other rooms.  The other two photographs then are

just more closer and closer views of some of the debris

805

on the floor.

Ms. Ladd, as to these three, anything --

MS. LADD:  I would ask that 45A and C go back to show the overall perspective, then the close-up of the black stocking piece that was testified to.

THE COURT:  Awe, I didn't notice the black stocking.  I didn't know what that was.

All right.  So, 45A and 45C will go back.

I didn't realize that was the significance of that close-up of the debris.  It is, obviously, the black stocking.

46 is an interior of the living room.

MS. LENIK:  Your Honor, so are the 37 series, which are four photographs.  I would object to 46 going back.

THE COURT:  Well, this is a different perspective on the living room.  This shows the photograph taken from the living room back toward the kitchen.  The others were facing the other way, so I'll let 46 go back.

47A, B, C, and D are the bathroom.  47D shows the cigarette butt.  47C shows the cord and the bathtub.  47B shows the view of the bathroom from the door which shows the soap dish.  And 47A shows it a little bit further out.

1

2          I don't see any problem with those going back.

3          We're now to 48A, B, C.  And these are the

4   hallway.  In 48C, there's the shorts that are admitted

5   into evidence.  48B also shows the shorts, but it's a

6   further view back.  And then 48A is almost around the

7   corner, different perspective on that area where the

8   utility closet was with the furnace, and I will allow

    those to go back.

9          49A shows, apparently, the bedroom.  There's a

10  knife on the floor.  49B shows the bedroom with the ball

11  of twine, cords, shoelaces.  49C is a close-up of those.

12  And there's also those pieces of paper in that photo,

13  the ones with the footwear impressions, Ms. Lenik?

14          MS. LENIK:  I believe so.

15          THE COURT:  All right.  49D is, again, a

    close-up of those.

16          50A is the broken out window, and 50B is the

17  pieces of glass.  I see no problem with these going

18  back.

19          MS. LENIK:  I'm sorry, Judge, what number did

20  you end at?

21          THE COURT:  I started with 49A, 49B, 49C, and

    D will go back.  50A and B will also go back.

22          51 is a receipt.  What receipt is that?

23

24          MS. LADD:  It's a picture of the receipt, Your



807

Honor, where it was found in the street.

THE COURT:  All right.

MS. LADD:  That's the ATM receipt.

THE COURT:  All right.  All right.  51 is a photograph of the receipt with, I believe it was, Detective Strzesak's knife on top of it.  Testimony as to that.  That can go back.

52 are the photographs of the truck and the lighter, perspective.  There was testimony to that, and there's some arrows on there written by the witness. That will go back.

53 can go back.  That looks like a close-up of the lighter.

54 is a photograph of the truck where it was parked.  That can go back.

56A --

MS. LENIK:  I'm sorry, what about 55, Judge?

THE COURT:  There's --

MS. LENIK:  There is no 55?

THE COURT:  There is a 55.  Let me see.  Is there a 55?

MS. LADD:  There should be somewhere in there.

Just another view of the truck.  Might be in a different group.

THE COURT:  Might be in a different one.

808

1

2    We'll get to that. Right now, there is no 55. We'll

3    get to it if it's there.

4         MS. LENIK: Okay.

5         THE COURT: 56A and 56B are the stocking.

6         MS. LENIK: The actual stocking or --

7         THE COURT: The stocking in the street is 56B

that's a close-up. 56A is a photo of the stocking and

8    the truck in the background. That's a perspective, and

9    those will go back.

10        All right. 58A is a photograph of the

11   exterior of the truck in the police impound bay. 58B is

12   a side photo of the truck.

13        59A is a photo of the interior taken from the

14   driver's side, showing the paper with, apparently, the

15   PIN numbers on it. 59B is a close-up of that area of

16   the truck. 59C is the floorboard on the driver's side,

17   showing a Camel, showing a pack of Camels and a cassette

     tape. I see no problem with those going back.

18        Photos 60A, 60B, C, D, and E are all

19   photographs of the Defendant. The first one shows the

20   Defendant showing his teeth with the gap. Second one

21   shows the Defendant with his mouth open, but no teeth

22   visible. The third one is just a photograph of the

23   Defendant. Second and third photograph show the

     Defendant without glasses. Fourth photo is the side

24

                              809

1

2      photo of the Defendant, again, no teeth showing, and the

3      fifth photo is the Defendant, again, showing the teeth

4      where the spot is missing.

5              Ms. Ladd, as to those photos?

6              MS. LADD:  I ask that they go back, Your

7      Honor.

8              THE COURT:  Ms. Lenik?

       MS. LENIK:  That's fine.

9              THE COURT:  All right.  Want the lineup photo

10     to go back?

11             MS. LENIK:  No.

12             MS. LADD:  No, Your Honor.

13             THE COURT:  Okay.

14             MS. LADD:  And that was 74; is that correct?

15             THE COURT:  Right.

16             All right.  Then we have 61, blood sample from

       the victim, DNA samples, those don't go back.

17             Newport cigarettes?

18             MS. LENIK:  No.

19             THE COURT:  No?

20             63, Defendant's ID card?

21             MS. LENIK:  No.

22             MS. LADD:  Actually, I don't see why the

23     Newport cigarettes can't go back.

24             THE COURT:  Well, there's been testimony about

                              810

them.  If the jurors want to see them, we'll send those
back there.

       Well, right, we won't send those back.

       What about the Defendant's ID card?

       MS. LENIK:  No.

       THE COURT:  Ms. Ladd?

       MS. LADD:  No, Your Honor.

       THE COURT:  Blood sample from the Defendant,
no.

       DNA, no.

       Evidence kit, no.

       Blood sample, no.

       DNA sample from 64, no.

       Note with the PIN numbers on it, No. 67?

       MS. LADD:  I would say not at this time.

       THE COURT:  Ms. Lenik?

       MS. LENIK:  Yeah, I would agree.  I don't
think that needs to go back.

       THE COURT:  All right.  Taping from the truck
seat, taping from the door, no.

       Defendant's handwriting exemplars?

       MS. LENIK:  Your Honor, I definitely don't
want those to go back.  That contains information
regarding jail matters.

       MS. LADD:  I believe that's 71.  70 is the

exemplars.  71 is the standards.

MS. LENIK:  The only -- I don't think they
need the real ones if they get the enlargement on the
exemplars.

THE COURT:  Is the enlargement that we're
sending back, diagram No. 3, an enlargement of 70A, B,
and C?

MS. LADD:  Just of one of them, so I would ask
they go back.  There's not an enlargement of all three.

THE COURT:  Let me see 70A, B, and C.

Well, there's been testimony as to these
three.  I have no problem with them going back.  They're
just merely the numbers and the letters, mostly numbers,
and that's about it.  There was testimony as to that.
So, 70A, B, and C can go back.

Now, the Defendant's handwriting standards,
those were from the notes from the jail; is that
correct?

MS. LADD:  It is, and I don't believe they
should go back.

THE COURT:  Those will not go back.

Telephone records?

MS. LADD:  Yes.

MS. LENIK:  I don't see the point.

THE COURT:  Well, they can go back.

812

1

2          The lineup sheet?

3          MS. LENIK:  No.

4          THE COURT:  Ms. Ladd?

5          MS. LADD:  I don't see why not.  It's been

6    testified to.

7          THE COURT:  Let me see the lineup sheet.

           Well, at this point, I won't send the lineup

8    sheet back.

9          The lineup photographs, no.

10          Booking records of Mr. Pettigrew, no.

11          All right.  Here's the photographs that are

12    going back.

13          Ms. Ladd, since you go first, you can grab

14    them and put them in whatever order you want.

15          MS. LADD:  Thank you.

16          THE COURT:  Officer, if you could bring the

     Defendant over about 12:15.

17          Thank you.

18          (Recess taken.)

19          THE COURT:  All right.  We're back on

20    98-CF-1558, out of the presence of the jury.

21          The State has retendered People's Instruction

22    19 with the language that Ms. Lenik suggested.  And that

23    will be given without objection.

24          The State has also retendered Instruction

                            813

No. 9, which is IPI 3.10.

And State has retendered People's 18, with a typographical error corrected.

Counsel, are you ready for the jury to be brought out for closing arguments?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  For the people --

MS. LENIK:  Your Honor, I am.

THE COURT:  Yes?

MS. LENIK:  I am ready for the jury.

THE COURT:  I said "Counsel" in the plural.

For the people in the courtroom, during closing arguments, I don't expect any sounds, any noises.  I don't want to see any nodding of heads or shaking of heads.

If you can't maintain your composure, I suggest you leave now, because if you create a scene or cause me to stop closing argument, then you will pay dearly for that experience.

An hour for closing.

Ms. Ladd, the only requirement is you don't take any longer in your rebuttal than you do in your closing.

MS. LADD:  Thank you, Your Honor.

THE COURT:  Mr. Rasmus, bring in the jurors.

814

(The following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Ms. Ladd, closing argument for the People.

MS. LADD:  Thank you, Your Honor.

If it please the Court?

THE COURT:  Ms. Ladd.

MS. LADD:  Counsel?

MS. LENIK:  Counsel.

MS. LADD:  Ladies and Gentlemen of the Jury, you've been sitting here now for four days, and I ask you to think back to when Lori Hansen testified.  It was some three days ago.  And not lose sight of that testimony in the wake of all the other evidence and testimony you've heard.  It's because of what she endured in that ordeal that she survived that we're here.  And that ordeal that she survived was inflicted on her by the Defendant, Dedric Moore.  And what he did to her that night is almost unfathomable.  I would suggest to you that the most difficult thing about this case for you is a realization and the acceptance that there's a human being who'd do this to another human being, who'd inflict that type of torture and suffering on someone else for no reason at all except because he could.

815

Now, there's a name for what Dedric Moore did to Lori Hansen. In fact, it's five things. And those are the five crimes that he's charged with. He's charged with residential burglary, home invasion, aggravated criminal sexual abuse, aggravated arson, and attempted first degree murder.

Now, it may seem complex when you hear that many crimes, but when you look at what happened, now that you've heard the evidence, you can see that it's a natural progression of what Dedric Moore did in that duplex that night. And you're gonna receive a packet of instructions from the Court. You're gonna have those in writing to take back with you. And some of those instructions are gonna describe the law that should be applied in this case, and some of the instructions are gonna define these offenses and the issues and propositions that you have to find beyond a reasonable doubt for each of these offenses.

Now, the Defendant is charged with residential burglary. The Court's gonna instruct you that a person commits the offense of residential burglary when he knowingly and without authority enters a dwelling place of another, with the intent to commit therein the offense of theft.

Clearly, you have that in this case. It's

816

evident from the testimony.  And I'd suggest that was

one of the reasons Dedric Moore went in there the first

time.  He saw an opportunity, and he took it.  Pushed

her down.  You remember she talked about how she was

grabbed from behind and pushed to the floor.  And after

he had her down on the floor and then tied her up and

bound her with the tape, he made himself at home in her

apartment.  He went through her things.  He ransacked

her purse.  He talked to her about her PIN numbers.  He

got her ATM card.  He got money from her pocket.  Her

truck keys.  His whole goal at that point was to help

himself to whatever he could get.  And he tried.  And

the ultimate thing was her ATM machine.  And the balance

in that account.

    And he was more sadistic than just that,

because he was enjoying what he was doing.  In fact, you

recall at one point he pretended to leave and shut the

front door, but then snuck back in and she heard him

again in the bathroom, and that's when she was tied up

in the bathtub, and then he checked on her to see what

she was doing; and just to be sure, he put a table on

top of her as she was hogtied in that bathtub.  And he

finally did leave and use that ATM machine, and you know

that because you have the records.

    You have the records from the receipt that was

817

E-FILED
Friday, 04 May, 2007 05:18:55 PM
Clerk, U.S. District Court, ILCD

found on the street not far from where the truck was recovered.  You have the business records of the bank that Mrs. Brooks explained to you.  And then you also have the videotape of that ATM transaction.  And that was one of the Defendant's first mistakes.  And when you put that all together, you can see that 2:31 and 2:32 on that date in the morning, he's using that ATM machine.  And he's in that drive-up.

And you're gonna have an opportunity to see the pictures, and the smaller ones are easier to see, because they're more detailed, but the bigger ones are actually easier to look at.  And you're gonna have all of these to take back with you.  The stills that were captured by that bank camera.  The pictures of Dedric Moore using her ATM card as she lay in the bathtub terrified, wondering if she was gonna survive this.  And with good reason, because when he came back, he started to change in his demeanor, and he wasn't happy about what had happened at the ATM machine.

Now, she'd given him her PIN numbers on that sheet of paper that he wrote them on that was found in the truck, but he came back angry, and he committed the offense of home invasion.  Because, at that time, he entered her home and he set out to hurt her, and he succeeded.  And a person commits the offense of home

818

invasion when he, not being a police officer acting in the line of duty, without authority --

MS. LENIK:  Your Honor, I'm going to object to the State's Attorney reading jury instructions to the jury.  I believe that's inappropriate.

THE COURT:  Overruled.

You may argue.

MS. LADD:  Thank you, Your Honor.

When he, not being a police officer acting in the line of duty, without authority, knowingly enters into the dwelling place of another, he knows or has reason to know that one or more persons is present, and intentionally causes any injury to any person within that dwelling place.

Well, he sure knew she was present.  He tied her up and left her in the bathtub.  He had no permission to enter.  He's clearly not a police officer acting in the line of duty.

And, in fact, you then heard extensive testimony about what he did to her.  And how he inflicted all those injuries that Dena Sawka described, and you are gonna see the photographs that show the ligature marks, the cuts, the abrasions, the cut to her head where she was kicked, the bruises, ligatures on both the arms and the ankles, the burns that she

819

suffered.

And he wasn't done with her even then. Because he was enjoying himself. It was almost a sadistic nature and what he entered into next because then he starts to grope her. She's tied up. He tells her she's cool. He's almost playing with her, toying with her, puts her down on the ground, cuts one of the cords and mentions that the knife is dull, and then he starts talking about the ATM numbers and his perception that they didn't work, and the next thing she feels is one of those cords going around her neck. And she can feel it starting to tighten and see the ligature marks as she was trying to loosen it and fight and choking and couldn't breathe, and he continued to strangle her, and then he stopped and she heard him move away, and he came back, and she felt her shirt lifted up, and she's still covered up. She still has the shorts on her head. She's still tied up and restrained, and he committed the offense of aggravated criminal sexual abuse.

A person commits the offense of aggravated criminal sexual abuse when he commits an act of sexual contact by the use of force or threat of force and causes bodily harm to the victim. The term sexual conduct means any intentional or knowing touching or fondling by the accused, either directly or indirectly,

820

through the clothing, of the breast of the victim, for the purpose of the sexual gratification or arousal of the victim or the accused.

As if he hadn't degraded and humiliated her enough, he then proceeds to fondle her breasts with both his hand and his mouth, as she's laying there restrained.

MS. LENIK:  Your Honor, going to object to this as not being in the evidence.

THE COURT:  Overruled.  She may argue.

MS. LADD:  Thank you, Your Honor.

The bodily harm, again, goes hand in hand with injuries she suffered.  The ligature marks, the other injuries the nurse described.

But he wasn't done even then.  Because now he had a witness and he couldn't risk that.  And so he commits two other related offenses.

A person commits the offense of attempt first degree murder when he, with the intent to kill an individual, does any act which constitutes a substantial step towards the killing of an individual.  The killing attempted need not have been accomplished.

Well, clearly, that's what the Defendant did here.  What he did is staggering.  He took two accelerants.  You know one is like a paint thinner.  He

821

took gasoline.  He spewed it or sprayed it or splashed it all over the living room area that blocked the only exit.  And that wasn't enough.  He walked over to where she was in that hallway, tied up, and he splashed it all over her.  And then he sets fire to that living room. And she can smell it and she can see the flames, eventually.  And she tries to get away.  And that's when he fights her and drags her back, and he's dragging her towards the flames, because she had the audacity to try to get away in that bedroom.

And then as she's fighting and resisting, he starts to punch and kick, and he beats her down to the ground.  And then you remember what she said, he took a lit cigarette and flipped it on her where he had doused her, not only doused, but, as you found out, soaked all the way through to her underwear with accelerant, and it's only because she was able to knock it off and she could see the embers as she knocked it onto the bathroom floor that it didn't ignite her.  Not because of anything that he held back on.

And then as if that wasn't enough, he leaves her there on the ground; and as he's exiting the residence, he turns on the gas burners.

You remember she fumbles around when she wasn't thinking clearly, was trying to save her cats.

822

Went back in to try and save those two pets and she saw the gas burners were on.

He did everything in his power to make sure that she didn't walk out of that residence alive. And the fact that she survived and lived through this is in no way because of his forbearance or any mercy he showed. It's a testimony to her resilience and her determination and her will to live that she got out of that residence at all.

And that goes hand in hand with the charge, which is the aggravated arson. A person commits the offense of aggravated arson when, in the course of committing arson, he knowingly damages, partially or totally, any building, and he knows or reasonably should know that one or more persons are present herein.

Obviously, that is the same evidence that you heard. You heard extensive testimony of Lieutenant Bain who was conducting the arson investigation.

A person commits the offense of arson when he, by means of fire, knowingly damages real property of another without his consent.

You heard testimony of Mr. Washburn who was the owner of the apartments. And I asked him to look at the person in court, because we have to prove that, that this person did not have consent. That's the way the

law is written.  And it's quite clear he didn't have consent to set that fire, and he knew darn well that Lori Hansen was tied up and restrained and where he had beaten her down to the ground in that hallway.  And he sure did everything he could to block every way out of there and turn that into a bomb so she couldn't get out.

When you look at those offenses and look back over the testimony that you've heard about what happened, think again about what Lori Hansen told you and now all the evidence, and that's why it was marked on the diagram, 'cause you can see that everything that was collected shows you almost as if you're watching it unfold what happened to her just as she described it.

You can see where 18 is, where the cords and laces were found, where 13 is, where that extension cord had been cut from the soap dish.  You can see where item 17 is, that those were the shorts that were soaked with urine, not her shorts, the shorts that were on her head, because what did he do to her?

Well, wasn't enough to grope her and fondle her.  He walked up to her at one point and said, "You drink enough beer, you got to take a piss," and he proceeded to urinate on her head.

He did everything he could to devalue her as a human being before he tried to take her life.

824

You can see where 19 is, that cigarette butt. And, sure enough, there it was recovered.  A Newport, just what the Defendant smokes, behind that bathroom door.  And you can see where all of these things pull together, in Lieutenant Bain's investigation, and, in fact, he sees where that fire is and where it's ignited, and you know the lab confirmed that there were two types of accelerants that were soaked into her clothing and soaked into that living room rug.  And there's no question that what this was was an aggravated arson.

And when you add up all the evidence and look at the testimony, I would suggest that there are some cases where you'll sit there and say, "Well, the police could have done a better job.  I wish they'd gone out and gotten this or gathered that."  But it's clear from this case that the investigation was exhaustive.  And the police made no assumptions, even as far as Donrico Holtzclaw.

There's a brother that also lives with Lillie Moore on occasion in the other side of the duplex.  They took his blood to eliminate it, to make sure that every accurate piece of information was there.

They looked for fiber evidence.  They looked for fingerprint evidence.  They gathered any possible evidence that they had.

825

1

2
3
4
5

        That's good for you as jurors when you're
deciding this case.  It's bad for the Defendant, because
he has to keep changing his story to fit that evidence
as it's produced.

6
7
8
9
10
11
12
13
14
15

        Now, certainly, Defendant did everything in
his power not to get caught.  That's evident.  He used
gloves.  Fingerprints are a great thing on T.V. and
they're very helpful, but criminals watch, too, and if
you wear gloves, you don't leave fingerprints, and you
know he's wearing gloves, because Lori tells you that
she can feel the cloth or the cotton when he first
covers her mouth, and you know he's wearing gloves
because when you look at the photograph in the ATM
machine in her truck at the time this was happening,
he's got white gloves on.

16
17
18
19
20
21
22

        So, you don't expect to find any fingerprints,
but just to be sure, the police sent everything in.
And, sure enough, there's none of the Defendant.
There's a few stray fingerprints on the truck and
there's one on a receipt in that bag, the camel bag that
the kids were going through that Mrs. Cummings found,
and that's to be expected.  That could be anyone, Lori's
friends, family, the kids who went through the bag.

23
24

        Certainly, people leave fingerprints, but you
know it wasn't gonna be Dedric Moore.

826

Well, what about the fiber evidence?  Well, when you look at the fiber evidence, you know that from several of those items, including those shorts that were put on her head that he urinated on, including that stocking mask, including the truck, that there were Negroid hairs.  But they're little.  They're too short to do any further analysis.  Although, it's interesting that one of those is in the stocking mask.

And you also know, though, from that fiber analysis that was conducted that that stocking mask that was found in the street where the truck was left matches up and is consistent in all regards then to that stocking piece, the full piece that was cut from.  And that was found back in the kitchen in all the debris that was left behind.  And, in fact, that was collected.

So, you know that stocking was cut from Lori Hansen's stockings.

And when you look at this evidence, you also have the handwriting evidence.  You know there are characteristics in common with the person who wrote those PIN numbers and Dedric Moore's known handwriting samples, the request slips that you heard about; but he doesn't help this investigation, 'cause he's still working to cover up and disguise and deceive, and he deliberately deceives in those handwriting exemplars.

827

And you saw the chart, and you'll have a chance to bring it back, and you can see the unnatural, awkward, stilted numbers and the description that the expert gave you, Mr. Johnson, about you can see that those weren't freely written.  And by freely written, he described it as handwriting is an unconscious act unless you're thinking about how to shape your numbers.

Now, you'd have no reason to disguise your handwriting unless you knew that you were the one that wrote those PIN numbers.  In fact, it'd be risky to disguise it, because you might end up disguising it to look like the note you'd never seen.  Unless you knew what that note said and what it looked like.  And then you'd try everything in your power not to look like that note, 'cause you know you wrote it.  That's exactly what Dedric Moore did.  He tried everything to disguise his handwriting.  And it looked almost ridiculous when you would see sixes going the wrong direction.

Now, he says he's hurried and he was rushed when he was writing those out, but you remember what Mr. Johnson said.  He said if you're hurried, it'll be more natural, because you don't have time to think about your writing.  So, being hurried would make it freely written.  You're thinking about the contents, but not about how you're forming those numbers.  So, if he was

828

hurried, they would be natural.  What they are is
distorted.  And, in fact, it's somewhat effective,
because the laboratory can say they're characteristics
in common, but he was able to stop an identification.
An expert said because they were disguised, he couldn't
make a conclusive determination.

Now, when you're looking over the deception in
this case and what the Defendant did in regards to that
case, I would suggest to you that the greatest deception
is from his statements.  He's doing everything he can
not to get caught.  He's making sure that he's not gonna
be photographed.  He's making sure that he has glasses
on when he's finally photographed.  First, he's asked
to, and he's not.  He's interviewed multiple times.  And
you will look at those in a minute, but he also, besides
the handwriting and the glasses and the fact that he
doesn't want to be photographed, is the lineup.  He's
told to be at a lineup.

Now, at this point, he knows that something's
up, something he didn't anticipate.  They're focusing on
him, and so he shows up late to the lineup, late enough
that, of course, the victim's gone and they can't have
it.

Now, he tells you he volunteered for that
lineup.  And, apparently, Dedric Moore's definition of

829

volunteer is pretty much like his definition of out of
town, because it turns out he was court ordered into
that lineup.

MS. LENIK:  Objection.  Misstates the
evidence.

THE COURT:  Overruled.  She may argue.

MS. LADD:  Thank you, Your Honor.

Taken into custody when he didn't show up for
and then court ordered the next day.  And that's how he
volunteered to be in this lineup.

And it turns out that, in fact, the victim did
look at him and she was able to make somewhat of an
identification, but not conclusive.  But he certainly
did everything in his power not to get viewed at that
lineup.

And even when he's interviewed then, you look
at that, the first time, that he opens the door on March
4th, he happens to be at Lillie Moore's residence.

Detective Strzesak told you they were going
there to the other side of the duplex hoping to find
Lillie Moore, and, lo and behold, they find Dedric
Moore, and they want to talk to him, and he says he was
out of town that night and he has the -- "Well, I think
the Mexican or Chinese mob must have done this."  That's
his explanation.  And they say, "Can we come in and talk

830

to you?"  And he has all kinds -- "No.  My heat isn't working."  Of course, they can feel it work, but, "No, you can't come in."

And then when they get the search warrant and go back hours later that evening, he's had every opportunity, if there's any evidence left over, to get rid of it now, 'cause he knows he's the focus.  So, if there were gloves or a jacket or anything he was careless enough to have kept, he's got hours to get rid of it, 'cause now he's been tipped off.

And then there's the statement.  There is statements.  There's that first one he gave at the door, and then he comes down the next day to the Champaign Police Department.  These are on his own terms.  He's coming down.  Nobody's making him talk.  And he gives a very detailed explanation of how he's with someone named Jennifer, not his girlfriend, times of how she paged him at 12:30 at the pay phone at the convenient store at First and Springfield, gives a pager number for her that he has no problem remembering until, of course, he finds out from the phone records that there is no such number.  He gives a detailed saying of a Malcolm, again, can't remember a last name.  Kind of describes the house in Urbana, changes his mind and it's in Champaign.  And describes meeting other friends and going to Hardee's.

831

And all these details that are just vague enough that you can't really find anybody to fit. In fact, he's clear it's not his girlfriend. He's making up different people.

And then he has an opportunity to sit in court and read the police reports and listen to the testimony. Now you hear his third version.

Well, he didn't say he said "Out of town. That meant Urbana." And that's what he was saying, and he didn't clarify that, 'cause nobody asked, is what he's telling you. And he gives an explanation of how he's at his brother's and then he leaves and he goes to a girl's house named Ivory Burrage and he gets paged by Jennifer Stevens; although, he denied that in the second statement. That's the one who pages him. And the pager number was actually his. And maybe it wasn't even 292-2400. Maybe it was something else. Maybe he just forgot it.

And he's dodging and ducking and trying to come up with all kinds of explanations, and the most preposterous one is, well, they never asked him about the right date. All this interview was about February 17th and 18th. And you had an opportunity to assess his credibility, and you'll be instructed that that's one of the things you have to do as a juror. And you

832

determine, because probably the most probative thing that came out of that testimony was how evasive and dissembling he was. He wouldn't answer a question. He changed his story and contradicted himself, and you go back and you recall how he was.

He would dodge and make excuses and change what he was saying, and that was probably the most valuable thing, because if you have nothing to hide, why wouldn't you just tell the truth from the very first interview on?

If you were with this person, that was the time to say it. And if you knew you could clear this up, if the police came at March 5th and said, "Who were you with?" there was the time to go, "I was with this girl, Ivory Burrage," or "I was with someone and I don't want to name them, 'cause I don't want to get them involved, but, believe me, I was with a woman in Urbana at her porch all night. I don't want to get my girlfriend mad, but that's where I was."

He doesn't do any of that because he hasn't made it up yet. He was still going with a second story until the phone records came in and showed that didn't happen.

And the irony is the phone records also show that the phone calls he's now telling you he made didn't

833

happen, either.  Unless Jennifer Stevens works at the
Spanish speaking ordering company that Detective Shepard
tried.  Then they didn't work.  So, now he makes up
another phone.  Okay.  Well, there's a phone at the
AM-KO mart as well.

Although, Detective Shepard clearly went out
that same day to double-check that so he would get the
right phone records.  And, again, the Defendant is
deceiving and covering up and changing the evidence.
Everything he's doing is trying to hide, but he can't
hide from the evidence he can't control.  And one of
those is the identification of Lori Hansen.

She didn't identify him.  She was very honest.
And you recall how that lineup worked when she was
finally able to look at him.  She did her best to be
honest.  And I suggest that's all you can ask of
someone.  She sure asked to look at him and Mr.
Pettigrew, the other person who you know was in custody
at the time, five times.  Something was sure sticking
out in her mind about Dedric Moore, and she told the
detective what it was.  His voice sounded the same, but
the county microphone system is so cheap and chintzy
that she couldn't hear it.

MS. LENIK:  Objection.

THE COURT:  She may argue.

834

MS. LADD:  Thank you, Your Honor.

So, she said on her form, "I wish I could, but I can't tell, and I can't compare it, and Mr. Pettigrew looks like his voice might be it," and she said his face is similar, Mr. Pettigrew, but she also says that the face of this person and his features and his voice all fit, but the difference is he's taller.

And I'll suggest to you height is a really tough thing to estimate, especially when you're on the ground looking up at somebody, and you have to put it in relative terms, and that was the only thing that she said was different.

And she came into court, and the lineup was just two weeks after this happened when all of this was fresh in her mind.  Now, court is a year later.  Ms. Hansen is an intelligent woman, and I don't think it would take a rocket scientist to know that the person on trial is gonna be sitting here at counsel table.  She knows that.  And she looked very hard at him.  Several times.  She thought it was him.  She didn't identify him.  She thought it looked like him.  And, again, I suggest that's the best she can do.

You remember what she said, "I wanted to be sure.  I didn't want to point out someone if it wasn't them."  And that's what everyone encouraged her to do,

835

to just be honest, to just testify to what she could;
but, again, she sure thought it looked like him, but
what?  Except the glasses that you know he doesn't need
and nobody ever saw him wearing until he came to court.

Now, you know that she -- when you're looking
at this identification that you're looking at a
subjective identification.  But you have the videotape
and you have the still photographs, and that's not
subjective.  That is a picture that was taken by a
camera.

And, again, look at the bigger ones and then
you'll have the smaller ones that have more detailed.
They're clearer, sharper.  And when you look at that
videotape and compare it to Dedric Moore, it looks just
like him.

Well, now, there's a lot of people that
probably have similar features.  So, again, it's a fuzzy
tape, because he's got the disguise on.  He's got his
hood.  He's got his cap pulled down.  He's sure trying
not to be seen.

But he makes a big mistake in one of those
shots at 2:34.  And you'll have a chance to see it on
the smaller picture.  There's a dark little spot in the
upper left portion of his mouth, and you'll have a
chance to take this back with you, because I know in the

836

back row you can't see this.  It's small, and I bet he
didn't even know he was opening his mouth as he was
driving up.  I bet he didn't even know he was in camera
range at that point.  And what do you know is there on
his mouth?  He's missing his front tooth right there,
little bit to the left, big gap right where that dark
gap is on that photograph.  He didn't even know that
that camera caught that.  And that's not subjective
testimony, and that's not what someone remembered.
That's a camera documenting it.

Now, you also know that even if you were to
disregard all of that, if you took the picture and her
identification and all the other testimony that's been
given and introduced and all the evidence and you set
that aside or you explained it away or you accepted
Dedric Moore's twisted, tortured versions of what
happened, either one, two, or three, whatever statements
you want to go with, even if you for one minute said,
"All right.  I'm going to accept that," there's one
thing that you can't explain away and Dedric Moore can't
explain away and that's the DNA.

And you heard extensive testimony about the
credentials and training of the scientist who processed
this evidence and the care that was taken in the
handling and the preparation so that those results would

be reliable, and you heard extensive testimony, and I'm
not gonna belabor it, about all the quality control and
the tests that are built-in to make sure the results are
reliable, the meetings in the forensic community before
any decisions are made, submitting the results then.  I
believe ten other scientists reviewed this particular
case to make sure that everything was reliable in this
technology.  A technology that's had uses not just for
criminal use, but medical applications.  A technology
that you heard is used all over the world for medical
reasons.

Now, when you look at this, you know that the
tests were reliable, because you have built-in controls.
Not just the controls the scientists told you were in
the tests, but the results.

You know that was glass broken there by 22.
You know now that was Lori trying to save her cats and
reaching in and trying to get the cats out of the fire.
And she cut herself.  So, you would expect her blood.
And, sure enough, now, the scientist doesn't know that,
but when the DNA tests are run, it turns out that the
DNA profile on the glass is consistent.  So, it's
showing you, you're getting the result that you now know
from the evidence is right.

You also know now that the stocking mask was

838

cut from the main piece of stocking that Lori described
was in her apartment.  Last she knew it was in her
bedroom.  And you know that the profile that matched
Lori Hansen was found in the stocking.  So, again, you
know the tests are running correctly.

And what you learn is when this evidence was
submitted, the cigarette butt didn't have enough that
you could do any analysis.  And you know that it was
exposed to very high heat.  You're gonna see those
photographs.  You heard the testimony.  It melted the
plastic.  In fact, Lori describes having the louvers of
the door start to fall on her, and you can see them in
the hall piled up as they melted.  It was that hot.  And
there was no DNA that survived it on the cigarette butt,
and there was insufficient DNA on those shorts for them
to do testing.

But that stocking mask was in the street.  It
didn't get destroyed by the fire.  And the one thing
that the Defendant didn't even know about, I'll submit
to you, was something called PCR analysis.

And on that stocking mask there were three
profiles.  And you heard about those profiles; and one
of those matched the Defendant, and one matched Lori
Hansen, and then there was a very weak third profile.
And the scientist gave several explanations, and he said

839

one explanation that would be consistent would be if
someone had pulled that down over their face as a mask
and that earlier in the evening had engaged in some type
of intimate contact that would exchange skin cells or
bodily fluid, such as kissing with someone else.

Well, you know from the Defendant's own
testimony that he had a lot of women around town that he
was seeing and paging and visiting that night.
Certainly fits that possibility.

And you know from the analysis that the lab
then said this is a match, and not just a match, but
this is the major profile on that stocking mask, and he
talked about the intensity.  This was the strongest
profile.  And there was a medium one for Lori Hansen,
which would be consistent with the skin cells as you
would put it on and off and you're wearing pantyhose.

And you remember the cut of the pantyhose.  It
was cut into the mask at both the top and bottom, and it
was a little frayed.  That was consistent with pulling
it down.

And then Kevin Zeeb calculated two
calculations and described how, first of all, the lab
looks at this mixture, and you know they're looking at
someone's DNA at nine different parts of DNA.  And you
know they calculated three profiles.  And he said, first

840

of all, they didn't separate out these profiles at all. They took these three profiles at nine pieces of DNA each, so that's 27 profiles, and they put it all in a big mixture for this calculation. Almost as if it was in a big pot. If you do just picture that.

And they said, well, rather than calculate or assume any particular profile, we'll just calculate any possible combination of these 27 types of DNA, and then they calculated, well, what's the possibility of finding someone in the population that would fit into one of those many combinations. And it's not as rare as you would expect. It's 1 in 2700. Still, 30 in a hundred thousand, I believe, was the cross-examination, that's still significant. When you look at a community this size and say this is someone who also would had to have access to Lori Hansen. Opportunity to do this. And happen to look like the Defendant.

But Kevin Zeeb wasn't calculating yet the profile of the Defendant. He just said of all that big mixture who would have similar profiles of any combination of the people in that mixture.

And then he said he could see a major profile and he could go on and do the next calculation to say, "All right. If I can establish how these nine pieces of DNA fit together for each of these three people,

841

obviously, that's gonna be a lot more specific than
every possibility."

And in order to do that instead of just
jumping in and doing it, he was very honest and he
explained again the State Police procedure they wanted
to validate this.  And so that's what they did.  They
presented it and went through validation tests, and they
had a forensic consensus with DNA laboratories and with
the state laboratories.

And they submitted that when you look at this
case and then the validation studies came through and it
was three weeks, I think, after it was calculated, he
then made another calculation because he could establish
by looking at these profiles that he didn't have just
three profiles, he had three that you could separate,
because of the difference in the intensity.  And he
could look at one and say that was a match to Dedric
Moore's and that was the major one; and once you pull
out that specific profile, then it gets a lot more
detailed, because you're differentiating and making it
specific to one person.  You're not talking about
possibilities.  You're looking at that profile.  And
what is the chance of encountering then that profile
rather than a range of possibilities?  And he said it
was 1 in 150 billion in the Black population.  What, 26

842

times the earth's population.

And that's the profile on that mask that matched this man, who has absolutely no reason to have touched that mask in that spot where it tested positive for the indication of saliva.

And when you put all this evidence together, I would submit to you that it's overwhelming.

You've got the identification.  You've got the videotape.  You've got the DNA profile.  You've got the Defendant's disguising and a lack of cooperation. You've got his lies and the changes in his story.

And when you add it all up together, it only adds up to one thing, it adds up to the fact the Defendant is guilty on each and every one of these charges.

And the presumption of innocence that you will be instructed on is a very important presumption, and it remains on the Defendant throughout the case, as it should.  But it doesn't prevent you from finding an individual guilty after you've reviewed the evidence and the law in the case and if you're convinced beyond a reasonable doubt that the Defendant is guilty of each and every one of these counts.

And I'll suggest to you the evidence is overwhelming in this case.  And the Defendant's guilty

843

of that residential burglary, that home invasion, the

aggravated criminal sexual abuse, the aggravated arson,

and the attempted murder.

Thank you.

THE COURT:  Ms. Lenik, closing argument for

the Defendant.

MS. LENIK:  Thank you.

May it please the Court?

THE COURT:  Ms. Lenik.

MS. LENIK:  Ms. Ladd?

MS. LADD:  Counsel.

MS. LENIK:  Mr. Moore?

Ladies and Gentlemen of the Jury, this will be

my only opportunity to speak to you after this long and

arduous week.  Ms. Ladd will have one other opportunity

when I'm through, but this will be Mr. Moore's last

opportunity to discuss with you through me what it is we

believe the evidence has shown and what we believe your

verdicts should be based on that.

The only question, the only question is

whether or not he's the one who did it, because as we

said in the beginning and as we'll say to you again now,

he is not denying that these horrible things happened to

her.  The things that happened to her were horrible.

They were tragic.  They were any possible combination of

844

words you want to use, but he's not the one who did them.

I know that there's a natural reaction among people when something really horrible happens to a person to want to blame somebody, to want to call somebody to account, to want to convict somebody; and you've only been presented with one person who's been charged and whom the State wants you to convict, and so the natural reaction is, well, he's charged, it's horrible, he must have done it.

But that's not your job as jurors. That's not the oath that you took. And, certainly, that's not what we expect after having put you through all of that evidence and that testimony for the last four days. You have to look at whether the State has proven him guilty beyond a reasonable doubt.

And beyond a reasonable doubt is the bench mark, it's the constitution, it's the rule that we have in this society. It's not just a phrase. It's not something that I say because I like to hear the sound of my voice. It has great meaning and it has meaning that you need to consider, because there might be a little bit of evidence, there might be a little more evidence; but if the evidence doesn't reach the standard of beyond a reasonable doubt, no matter how horrible the events

845

1

2    were, no matter how much we hate what happens to her,

3    you cannot convict Mr. Moore.

4         Now, there is some evidence, you've sat and

5    listened to four days' worth of evidence and testimony

6    about what happened.  And you know from Mr. Moore and

7    his witnesses that he wasn't there.  Nobody saw him in

8    the vicinity.  Nobody saw him earlier.  Nobody saw him

9    later.  There isn't a single person who picked him out

     as having been there.

10        Recall that one of the officers did what they

11   call a canvass of the area right before it happened, and

12   you know he went around to the different houses.  Nobody

13   gave him any information that led to Mr. Moore, and we

14   know that's true because Mr. Moore wasn't there.  We

15   know that Mr. Moore wasn't there because people said he

     wasn't there.  People saw him.

16        It would be nice if you were constructing a

17   made-up lie to get out of a crime to be with the mayor,

18   to be with the governor, to be with a judge, but that's

19   not who most people spend their time with.  Certainly,

20   that's not who Mr. Moore spends his time with.  He's

21   with his friends, he's with his brother, he's with those

22   other people.

23        The State would have you believe that because

24   he's with those other people that they're related or

                          846

that they're close to him, that they have an affinity with them, that they're all nonsense and they've all got to be lying, but that's not true, because that's who people spend their time with.

Who would -- Who would be your witness, if I accused you of a crime yesterday, who were you with yesterday?  You were with your coworkers.  Well, they'd lie for you.  They're your coworkers.  You were with your family.  Well, they'd lie for you.  They're your family.  But it is true that they are the only people we spend our time with.  And so just because they like Mr. Moore, because they're family, that doesn't necessarily mean they're lying.

Now, there was a problem with his brother's testimony; that his brother was trying to be a loving brother, and his brother didn't say exactly what he said to the police.  That doesn't mean that there is no truth in what his brother said, because what we do know is this:  Mr. Moore was home with his brother for a while, he left, he came back.  That was true when he testified in court, Emmaniel, the brother.  It was true when he told it to the police, and we know that it's true because Ivory Burrage came into court, swore under oath, and told you that it was true.

So that we know that that idea, that time

847

frame that he was home, he was at 108 East Healey with his brother, with his brother's girlfriend, with her children, with this neighbor of his, that he had some other things to do, he went to Ivory's house, he stayed there for a while, then he came back.

And we know that he came back at a certain time because we know that he wasn't there at the time of the fire, and we know that his mom and his grandma were looking for him; and we know that when his mother and his grandmother were looking for him, he wasn't where they were, because they didn't see him there.

Now, the thing that I think is interesting about the State's argument is that they don't want you to believe Mr. Moore about anything else except one thing, when it's convenient for the State, for you to believe Mr. Moore, then Mr. Moore's telling the truth.

What do they want you to believe that he said? That he had a lot of women. That he had a lot of girlfriends. Well, that's true, but that's not the only thing he told you that was true. But they want you to believe that one tiny thing out of his two hours of testimony, because it fits with their theory, because if he had a lot of girlfriends, if he was a ladies' man, then that explains the third profile, because the State, if they want you to believe it's him, and if they want

848

1
2    you to believe it's him, they've got to give you some
3    other reason for that third profile to be there.
4          And so the only thing they can give up is,
5    "Well, we're gonna ask you to believe him about this one
6    tiny thing, but the rest of what he says is just
7    nonsense."
8          And, of course, that can't be.  If he's
9    telling the truth about one thing, he's telling the
10   truth about everything.  And, of course, he's telling
11   the truth that he wasn't there at the time of the
     occurrence.
12         When you look at and consider the lab
13   testimony, the testimony of those things, it all sounds
14   so cut and dried.  We really want to believe it.  It's
15   scientific.  It's clean.  It wears a white coat, and it
     gives you big numbers.
16         You know, the State would like to have you
17   believe that we've got stacks and stacks of that
18   physical evidence pointing to Mr. Moore.  But what they
19   think is stacks and stacks of physical evidence with an
20   arrow pointing to Mr. Moore is really just sand blowing
21   in the wind.  Look at the DNA.
22         If this -- This occurred, this incident
23   occurred on the 25th of February, 1998.  The original
24   DNA analysis was done in early March of 1998.  If we had

849

had this trial in April of '98, you would have heard
with just as much certain, with just as much enthusiasm
and vigor that there would be 30 black men, 30 black
men, just in the cities of Champaign and Urbana alone.
That doesn't count Rantoul.  That doesn't count the rest
of the county.  That doesn't count somebody coming down
from Chicago or up from St. Louis.  That doesn't count
the population of the planet.  Thirty men in
Champaign-Urbana alone who would have fit this profile.
That's not beyond a reasonable doubt.  Thirty people.

         So, if we had had this trial a year ago,
that's the testimony you would have heard, and that
testimony would have been sworn to you with just as much
certainty as the testimony was today.  But because the
bureaucrats and the Department of State Police in
Springfield decided something for their own purposes
they're gonna change their office policy, now they want
some different numbers, and I would submit to you it's
reasonable to believe that they want different numbers
because they don't like those little numbers.  They
don't want you to be able to hear that that testing is
so inaccurate and inexact that in a city the size of
Champaign-Urbana there might be 30 people who have the
same profile.

         That -- That's not real helpful to the

850

prosecution, to say that 30 people in a town this size fit the profile.

So, now they're going to pick out some other way to recalculate it, a way that's gonna really, really surprise you.

Now, all of a sudden, well, we don't want to just say 30 anymore.  Now we're gonna tell you 1 in 6 billion, that's billion with a B.  That's a number that's so big that there's no other human being on the planet that would have those same profiles.  Does that make any sense to you?  Today, 30 people.  Tomorrow, no human being on the face of the planet.  With the same substance.  Nothing's changed about the material that they examined.  Nothing has changed.  It's the same quantity, the same quality, the same age.  It came from the same location at the same time, the same people, the whole business.

But because of the office policy change in the Department of State Police in Springfield, now they've got these big numbers, these -- these incomprehensible big numbers and they want you to say that that's enough; whereas, yesterday, they would have said 30 people.

It seems to me that it ought not be enough to convict Mr. Moore of very serious offenses just based on the whim of someone in the State Police in Springfield.

851

And remember that you can't tell the age of this hotshot material from the sample.  You can't tell whether these nylons had been sitting out on a window or in an apartment.  You can't tell where they had been sitting.  You don't know how old that sample is.

Remember that Ms. Hansen told you that she didn't pay very close attention to those stockings.  She said she didn't even know if she had seen them for a year.  She didn't know where they were.  She didn't know the last time she wore them.  She didn't know anything about those stockings.

We also know that Mr. Moore had done some work at his gram's next door; that he had been in and out.  There are a lot of possible ways, if you believe it's his, and we're not -- we're not saying to you that you've got to believe that it's his, 'cause it could have been 29 other people in the cities of Champaign-Urbana, 29 other black men, but even if you believe it's his, that's not enough for beyond a reasonable doubt, because we don't know where those stockings were.  She doesn't know where those stockings were, and she's the only one who'd know where those stockings were.  They could have been sitting out on a windowsill when he was cleaning his grandma's house and touched them.  They could have been out in the backyard

852

drying after being washed and he was doing yard work and
touched them.

There are a myriad of explanations, none of
which mean that he committed the offenses with which
he's charged.

Recall that they only found the DNA on two
things. They found it on the glass, and the DNA that
they found on the glass belonged to Lori Hansen. And
they found it on these stockings; and as I said before,
and I don't want to be ridiculous about it, but I am
gonna say it one more time, they found three people's
DNA on those stockings. They found three individual
characteristics of human beings. They found Ms.
Hansen's, they found one other, they found a third.

If -- If Mr. Moore committed the offense, how
did that third person's DNA get on there? And why
wasn't -- I mean, you know, where's the third person?
Who knows. That's another reason why this testing isn't
foolproof.

When human beings do something, human beings
are fallible. Nothing that's done by a human being is
perfect. And that's why there should be some suspicion
when somebody starts talking about how no human being on
the face of the planet ever had this same DNA. Because
we're talking about people. Yes, the lab people try to

853

do things to the best of their ability.  They have a lot of different protocols, a lot of different steps that they take when they do these things, but they're not perfect, either.  They're human.  They're fallible.  And the idea somehow that there's no other possibility just because of that seems to me to be wrong.

If -- If this DNA were just dripping all over the place, they would have found it on something else.  They looked at the shorts.  No DNA on the shorts.  They looked at the vehicle.  They did all of these tapings and all of these other things, and they found nothing.

And, by the way, they didn't find any other physical evidence, either.  They didn't find Mr. Moore's hair.  They didn't find his fingerprints.  They didn't find footprints.  They didn't find anything, anything at all.  And even if you think his hair was the Negroid hair that was found in those other places, it wasn't found in very many of those other places.

I'm not suggesting to you that Ms. Hansen is making it up.  All I'm suggesting to you is that there is no evidence beyond a reasonable doubt that makes Mr. Moore guilty.  That there's evidence of something, and we're not denying what happened, but it isn't him.

And, remember, they're the ones who have to prove it isn't him.  He doesn't have to prove his

854

innocence.

Really, the most important thing is what Ms. Hansen said when she came into the courtroom. "Do you see the person who did that to you in the courtroom?" She knows he's an African American male. She looks around the courtroom. There are two African American males in the courtroom, and one of them is a friend of hers. Well, who does that leave? That leaves Mr. Moore, and she also knows where he's going to be sitting.

She's had conversations with Ms. Ladd. She's been prepared. She's gone over her testimony. She knows he's supposed to be sitting next to his lawyer. He's supposed to be sitting next to a table. And what does she say? She says, "No." After all of this, after her great trauma, if it was him, she would have said, "Yes." She did not pick him out of the courtroom.

There's got to be an identification for you to find him guilty beyond a reasonable doubt.

MS. LADD: Objection, Your Honor. I don't believe that's the law, that she has to make an in-court identification to prove him guilty.

MS. LENIK: Your Honor, that's not --

THE COURT: Ms. Lenik may argue.

MS. LENIK: Thank you.

855

            There's got to be an identification for you to
find him guilty beyond a reasonable doubt.  There's got
to be some way for you to believe beyond a reasonable
doubt that this is the man, because, again, it's not
just that we don't like what happened and we want to
stick somebody with it, it's that they have to prove
that it was him.  They charged him, and before you sign
a guilty verdict, you've got to find that it was him,
and the easiest way for you to find that it was him is
for the person who is the victim to come in and say, "I
know who did it.  That's the person who did it."  And
she didn't do it.

            And not only did she not do it this week, a
year later, but she didn't do it at the time.

            When she went down to the police station or to
the jail about two weeks after this happened when you
would expect the ID to be fresh in her mind, she looked
at a series of men and she said, "No, I do not identify
anyone."

            And I believe that that sheet will go back to
you and you'll be able to look at it and you can see
that she checked the box and hand wrote her name next to
the printed material that says, "I do not identify
anybody in this lineup."

            She has never identified Mr. Moore as the

individual. That in and of itself ought to be enough.

And when she did the lineup, there were six men. She looked at them all. She looked at Mr. Moore five times. She looked at another man five times. She had them speak the line five times. And she still couldn't say it was him. And it may be that there's some distortions in the speaker box and maybe, as taxpayers in Champaign County, we don't give our county enough money to have fancy speaker boxes in the jail so that we can have the fine quality sound system that we each enjoy in our own homes. But that's not the point, 'cause if she couldn't ID him after seeing his face, seeing his body, and looking at him five times and couldn't tell the difference between him and a man who was in custody at the time, then she doesn't know who did this to her and you can't find Mr. Moore guilty.

But even beyond that, even beyond that business, we know a lot of things about Mr. Moore that he can't change. He's over six feet tall. You saw that. He can't be lying about his height. He cannot -- There's no way that you can -- that he can lie about his height. Yeah, I might lie about my height, 'cause I'd love to be five feet tall, and I'm not, but -- but he can't lie about his height, because you saw him stand up and you saw him sit down and you saw him walk into that

E-FILED
Friday, 04 May, 2007  05:19:18 PM
Clerk, U.S. District Court, ILCD

1

2    box and sit.  And if he wanted to say to you that he was

3    5'8" or 5'10", you would know otherwise, 'cause you saw

4    it.

5         And what else can't he lie about about his

6    physical appearance?  He's got two front teeth missing;

7    remember?  And he showed you that.  And he has one other

     interesting attribute.  He walks with a limp 'cause he

8    had an old football injury when he was a kid.

9         And when Ms. Hansen looked at him throughout

10   this whole -- She said this ordeal took an hour and a

11   half.  That's a long time to be looking at anybody.  If

12   you look at somebody for an hour and a half, think about

13   that, an hour and a half you're looking at someone, you

14   don't notice that they're 6'4" instead of 5'8", you

15   don't notice that they've got a little gap missing and

16   two front teeth missing, and you don't notice that they

17   walk with a limp, you don't notice that person at all.

18   Because there's no way that somebody could go through

     this ordeal and not have those things be noticeable if

19   this were the person.

20        He -- There's no way he could be clever enough

21   to disguise his gaping teeth, to disguise his limp, and

22   to hunch over and disguise his height for -- You might

23   be able to do it in the beginning.  You get in your mind

24   the notion you're gonna commit a horrible crime and

you're trying to figure out, "Well, if I do all these things, I won't get caught," so maybe you hunch over, maybe you try to walk a little bit better, maybe you put your lip over your tooth for the first ten minutes and then you can't keep it up for an hour and a half. And this ordeal took an hour and a half, so this isn't the man, and those are not things that he could hide or disguise or play with. Those are things which are his and his alone and things which he could not disguise.

She's gonna argue, well, she didn't really get a good look. But we know a lot of things about the scene; that we know that she should have gotten a good enough look and -- You know, if she didn't get a good look, you can't convict him. She has to get a good enough look to be able to say this was him, to be able to proffer that this was him beyond a reasonable doubt; but if you believe she didn't get a good enough look, what do we know? We know there was a light on. She came in and there was a light on. We know that, you know, well, she had shorts on her head after all. She didn't have the shorts on her head all the time. Half the time, she didn't have shorts on her head.

And even when she had the shorts on her head, what did she say? She could see shadows through a little hole. She could see something through a little

859

hole.  This was not an event where a blindfold was put on her and she was stuck someplace for an hour and a half.  This was a very bright, resourceful woman, and she was able to maneuver, she was able to move around, she was able to talk, she was able to see, and she did not see those things about Mr. Moore which are so characteristic that had it been Mr. Moore, she would have noted -- noticed and she would have said.

I do want to talk a little bit about the physical conditions, the things that happened in the event.  A lot has been made about this cigarette.  You can't start a fire from a lit cigarette.  If you flick a lit cigarette at somebody, it's not gonna start a fire, because it's wrapped in paper and it'll burn.  You can hurt someone with an ash, but you can't start a fire with a lit cigarette, so that's -- that's really a red herring.

But what else -- what else do we know about the fire and the fire situation?  This fire was next door to his grandmother's house.  You cannot control fire.  It's not like you can say, "I'm gonna set a fire in this tiny little space, but I don't want it to touch this other little space next to it."

He loved his grandmother.  He loves his grandmother now.  He's not gonna start a fire in his --

in a place next to his grandmother's house that you can't control.  What if he burns down his grandmother's house?  What if he burns down her things?  He knew she was expected home that night.  What if she were there ·when it was still burning?  That's another reason why it can't be him.

I mean, you know, we know, we know that his grandmother lived next door to Ms. Hansen.  We know that Ms. Hansen saw him on occasion.  And if it had been him, it would have been easy for her to say, you know, "He looks" -- "I'll bet it was the kids next door, the young men next door.  I've talked to them on occasion, and it looks like him."  Or "It could have been him," or some other thing, but she didn't pick him out; and if she'd seen him before and knew that connection, admitted she knew that connection, she would have said something, and that may be why she looked at the lineup and thought he looked familiar, by the way, because his grandma did live next door and he did spend time at her residence and she had seen him before; she just hadn't seen him in this context.

She told Officer Shipley that she could probably identify him, probably, identify him when she saw him again, and she never identified Mr. Moore.  Not in the courtroom, not in the lineup, not at any other

861

time.

They searched Mr. Moore's house. They searched his grandmother's house. They searched the area. They found nothing connecting him to it.

If all of these things had happened that way, there might have been something, there might have been a giveaway, but they did not find anything of his, and it was a close area. It was a small area.

We've heard -- Well, you've seen the pictures, and you've seen the diagram. You know that we're not talking about looking for a needle in a haystack here. We're talking about a very small city area, two small units, duplex units connected and the areas around them and then a very -- and a small apartment.

If he had been the one who did this, surely, they would have found something in one of those places connecting them up to him, and they never even found accelerant or cans or anything which contained something in -- They never smelled it. There was nothing in his apartment, in his grandma's, or where his brother stayed that connected him up with this at all.

And we didn't have any other physical evidence, either. Again, no fingerprints, no footprints, no fibers, no hairs, none of the other things that we might expect them to find if he were the

862

one who did it.

Now, there is some question about the handwriting, and that -- the handwriting comes down to what each and every one of us know from our own every day experience, because what my argument really amounts to is the little children's argument, "No, you didn't." "Yes, I did."  "No, you didn't."  "Yes, I did." Because, you know, the handwriting, the handwriting, the so-called expert says, well, looks fake to him.  I don't know why it looks fake to him.  People -- Some people write clearly and distinctly and slowly.  Other people write hurriedly.  Some people learn to make their sevens with a line the way they do in Europe or in the military.  Some people learn to make their sevens without a line.

You'll have the handwriting with you.  You'll be able to look at it.  You decide based on your experiences does it look fake to you.

Remember the conditions under which it was made.  Mr. Moore was in custody.  He was with the dep -- I'm sorry, he was with the police.  He was told he had to do this.

Your handwriting changes under pressure.  Your handwriting changes when you feel you're rushed.  You know that because of your every day experiences in life.

863

1

2          If you look at it, you're gonna see a bunch of

3    numbers.  That's all it is.  There's nothing magic about

4    the handwriting sample.  It doesn't say, all of a

5    sudden, in some hidden letters, "I did this crime."

6    It's just a bunch of numbers scrawled across the page;

7    and if you look at the individual numbers, they look

8    consistent, that is, the ones look like the ones, the

     twos look like the twos, and so on.

9          So, whether or not you know, to me that's a

10   wash.  It's a neutral.  There's nothing that you can

11   learn about that exhibit that says he did it; and if

12   there's nothing you can learn about that exhibit that

13   says he did it, you have to assume because he's presumed

14   innocent that he didn't do it.

15         You will also have the picture at the

16   automatic teller machine that a lot has been made of,

     and I have about as much to say about that.

17         First of all, one thing that is interesting is

18   a side note about that photograph.  The photograph says

19   it was taken at 2:34.  Ms. Hansen told the police,

20   according to the police, that the incident didn't happen

21   until 2:55, so I'm not sure that the timing makes a lot

22   of sense, but if you look at the person who's portrayed

23   in those photographs, that's also a wash.  It's a person

24   covered up.  Doesn't look like this man.  Doesn't

864

particularly look like anybody. And, certainly, the way
that the photographs are, the disguise that's used, the
covering up that's used, there's no way to tell when you
look at these pictures beyond a reasonable doubt that
this is the individual.

If you look at them, you might decide the
person has a more narrow face than Mr. Moore. You might
decide he has other features and a more prominent chin,
particularly a more narrow face; that he doesn't really
look like Mr. Moore; that there are a lot of other
people who might look more like the picture -- the
person who's portrayed in those pictures than this man
does.

And, again, you have to find that there was
a -- that there was an identification of him beyond a
reasonable doubt before you can find that he's the one.

Yes, Mr. Moore made some vague or misleading
statements to the police. He wasn't under oath. He
wasn't in court. He wasn't under arrest. There were
no -- no formal conditions under which he made them.

And I would submit to you one of the cardinal
principles of law in this country is found in the Fifth
Amendment to the Constitution which says that you have a
right to remain silent. We all know that. If we don't
remember it from school, we certainly see it on

865

television.  You have a right to remain silent.

And the right to remain silent means that you don't have to say everything about anything when the police come to your door and ask you.

If he was under oath like he was when he testified this morning, he'd have to tell the truth.  If he was in some other kind of proceeding, he'd have to tell the truth.  But when you -- when the police come to your door or stop you by the side of your car or come up to you in some other informal situation and say, "Hey, what do you know about this?" maybe we wish it were otherwise.  I'll bet we do.

I mean, it would be nice if when the police came up to you there was some kind of truth-o-meter (phonetic) where you had to tell the truth, where you couldn't mislead them or say something silly or lie, but that's not the system that we have.  Nobody has to talk to the police.

So, when they came up to him, he exercised his rights as a citizen of the United States and he told them some silly things and he told them some misleading things.  And what did he tell them?

Well, they asked him where he was the time of the fire, and the first thing he said was, "I was out of town."

866

Now, yes, technically, Urbana is out of town from Champaign, but, no, 99.9 percent of the people who live in Champaign-Urbana would not use that phrase to describe one town from the other. Many, if not most, of us live in one town or work in the other or vice versa. We traverse Wright Street every day and think nothing of it.

Yes, that was a silly and a stupid thing to say, but it doesn't mean he's guilty of the crime with which he's charged, because he wasn't -- he didn't have to tell them anything at all. So, he made that statement, then he said some other things. He doesn't have to tell them he's with Ms. Burrage; and, of course, we know why he didn't want to tell them with Ms. -- why he didn't want to tell them he was with Ms. Burrage.

He's a 19 year old young man at the time and probably fancies himself quite the ladies' man, and he doesn't want one of his girlfriends to know that he was with some other woman at the time.

Whatever we think of that kind of behavior, whether it comes from the President or some other person, we know that there's nothing illegal about that kind of behavior; and he also knows that if the police are involved, that information, if he divulges it, is going to get back to the person that he's trying to hide

867

it from, namely, his main girlfriend at the time, whose name was already given to the police, and he knew that.

Again, it may be wrong, it may be stupid, it may be silly, but it doesn't mean he's guilty of the crime with which he's charged.

Another possibility for why he was giving all of this other information is he might not know, he knows he didn't do it, but maybe his brother did it, maybe a friend did it, maybe somebody else did it. He doesn't have any reason to want to help the police, and we don't require people to help the police. It's not part of our law, and maybe it should be, that when the police come to you about a particular incident, you've got to do something affirmatively to help them. If they don't know who did something, you've got to say to them, "Well, maybe it was this one or maybe it was that one," or some other thing.

But he doesn't know at that time who did it, because he didn't do it; but because it happened next to his grandmother's and because he is around that area, maybe he's thinking, "Well, all right, maybe one of my brothers did it, maybe someone else I know. I'm not gonna help out the police because, in my neighborhood, that's not what one does."

And so there's nothing illegal about telling

868

them it might have been this one or it might have been that one or I was with somebody else.

We put on a witness, Mr. Williams, who told you that Mr. Moore has a good reputation for being a peaceful and law-abiding citizen. That in and of itself may be enough without more to cast doubt on his guilt of this charge.

A person, you know, when you're asked to weigh the credibility of the witnesses, what is one of the things that you want to know? Well, you've already been told that certain people have criminal records. And so that's gonna make you think less of somebody; "Well, the person's got to be a liar if they have a criminal record." But we know something else, even though he has a criminal record.

We know that Mr. Moore, among his own community, has a good reputation for being a peaceful and law-abiding citizen, and that says a lot about him.

Despite all of these other things, among the people who know him the best, he has a good reputation for being a peaceful and law-abiding citizen, and that might be enough.

Again, and in close, we all have a natural reaction when something tragic and horrible happens to somebody to want to convict the person who's charged,

869

simply to assuage ourselves that we're not gonna let people get away with horrible, horrible things that happen in our community.

But I'm asking you, Mr. Moore is asking you to put aside those natural feelings, the natural feelings of sympathy that you have for Ms. Hansen because of what happened to her, and to look only at the evidence that you have and the testimony that you heard in the courtroom.

There was no -- no ID, no identification.  The only physical evidence was very vague.  The only physical evidence could have been a bunch of other people and could have been something that was there for a long time before.  That's not enough.

You have to look at all of the evidence, or the lack thereof, and decide just based on that; and when you look at all of the evidence and you say, "Well, it sure looks like a lot in the courtroom," 'cause we've got boxes and we've got bags and we've got tape and we've got photographs and we've got all kinds of neat little diagrams, but you have to go beyond the sheer volume of the evidence to get to the meat of it, the heart of it.

What is it that that evidence says?  What is it that that evidence doesn't say?  And what that

870

evidence doesn't say is that Mr. Moore is the one who did it.

And so the only possible conclusion that you're going to be able to draw is that Mr. Moore is not the one who did it.

Thank you.

THE COURT:  Ladies and Gentlemen, at this point, we'll take a brief recess before Ms. Ladd does her rebuttal and I provide you with the instructions.

So, if you'll go with Mr. Rasmus to the jury room.  Don't discuss the case among yourselves.

(Recess taken.)

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  Ms. Ladd, are you ready for the jury to be brought out?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  Mr. Rasmus, bring out the jurors, please.

MS. LENIK:  Don't I get to be asked?

THE COURT:  At this point, Ms. Lenik, your participation has ended.  She's the one that has to do rebuttal.

MS. LENIK:  I'm feeling deprived, Your Honor.

(The following proceedings were had in the

871

presence and hearing of the jury.)

        THE COURT:  You may be seated.

        Rebuttal argument for the People.

        MS. LADD:  Thank you, Your Honor.

        You know, the first thing that comes to mind when you talk about Lori Hansen's identification is to be grateful that that is even an issue in this case.  To be thankful that Lori Hansen is alive and could come into court and even try and make an identification. Because everything that Dedric Moore did that night, every single thing that he did to her was designed to make sure that she didn't live to walk out of that residence or ever walk into this courtroom. Fortunately, it didn't work.

        And every act of this man sitting here from the beginning of the case even through today has been to cover up and disguise and lie and deceive and destroy anything that could connect him to the crime that he was aware of.  And one of those things was Lori Hansen in his eyes, just another piece of evidence, an eyewitness that he had to get rid of.  It's as simple as that.

        And when you evaluate her identification in court, you have to think about the circumstances.  She didn't come into court and say, "It's not him."  And you recall the testimony when you go back there.  She looked

872

at him and she looked at him and she said, "It looks like him." But she can't say for sure. That's a lot different than "It's not him."

And at that lineup, she said she could not positively identify anyone, and she wrote on the back that the voices sounded the same, but she wasn't able to do it because the speaker system was so bad. And she told Detective Shepard, "It looks like him, but I thought this person looked taller." That's not "It's not him."

And when you look at her identification and did she see a limp, did she see a missing tooth. She said she did not. She said she was trying to save her life. She saw him. She received an overall impression of him. She wasn't studying details.

Now, it's an interesting thing about identification, because you folks have been together now for many days. And if I said without looking at the person next to you tell me how tall they are, how would you describe how wide their face is, are they wearing glasses, facial hair, what kind of jewelry did they have on, got anything on their teeth, got a filling showing, missing a tooth? It'd be a tough thing to do without sneaking a peek at the person next to you.

But then, say, in a month or two or two weeks

873

you saw that person in the mall or on the street, you'd say, "Hi.  How are you doing?" 'cause you'd recognize them.

That's the way an identification works.  It's an overall impression that you receive.  It's very hard to say someone's 6'4" or six feet, especially when you're lying on the ground trying to save your life. She wasn't taking notes.

This is a woman she said she got there at about 1:30 to 1:45, as a matter of fact.  She said that was an error in the police report.  It was not 2:55. And she said that she spent about an hour and 15 minutes, as best she can recall.

The shorts slipped at times.  She was fighting, face-to-face, but she really wasn't looking at his face, and at times she didn't want him to think she was.  She did see him.  She did get an impression of him, and I'll suggest it's an overall impression, even a subconscious one.

This is a man who tortured her and degraded her and humiliated her and terrified her for an hour and 15 minutes.  There's gonna be a lasting impression of who this person is, and that's what she's reacting to when she sees him.

And it's not just her identification, but you

874

know what she said about his voice?  It was low.  It was unclear.  And that is exactly what came through in his testimony.  He has a low voice, soft-spoken, not clear. In fact, he was playing with the T.V. so she couldn't hear it clearly, but that stood out, and that's exactly what he sounds like when he talks.

It's not just her identification, though. It's not just Lori Hansen coming in here, because you have the ATM machine.  And that missing tooth is pretty compelling, but there's more than that, and you go back there and you look at these pictures and you compare them.  And you look at the chin, the mouth configuration, that missing tooth, and the nostril that flares up and flares up in that picture, and in the other pictures and the features, the distance between his nose and his chin, and this is a picture of Dedric Moore with his missing tooth and all.

And he was caught red-handed not only on that tape, but I would suggest to you who's in a better position to have done this crime?

This is a person who knows when Lori's -- . she's gonna be alone, who sees when she's coming in that night, who has a reason to be over there, and, most of all, who's gonna know there's nobody else home to hear her screams or to know what's going on.  He knows his

grandmother's out of town.  So, there's no one else there.  You know he has access to the duplex.  He's gonna know she's vulnerable.  He's gonna know no one's with her and no one is around to hear her screams.

Did he want to hurt his grandmother?  Well, he says he didn't.  I'll submit Dedric Moore was out for Dedric Moore that night.  And when he broke into her apartment and saw that opportunity and it escalated from there that he really wasn't thinking about who he was hurting or caring.

As a matter of fact, her apartment wasn't hurt or burned down, but what he was looking at was to cover up what he'd done, and I suggest in a twisted way he was enjoying making Lori Hansen suffer.  That's quite clear.

And when you look at this, what about that cigarette?  It's interesting that a lit cigarette doesn't cause a fire unless it's flicked onto gasoline and paint thinner.  Then you got a pretty combustible mix, by golly.  And what is it?  It's a Newport.  And what does he smoke?  He smokes Newports.  And what does he say when they come to the house that first time and he's caught off guard?  'Cause he doesn't think that anybody's associated him with this on March 4th.  They come to the door and he says it's got to be the mob because they are the ones who carry gasoline and set

876

fires.  He knows something the state lab doesn't even know yet, which is that gasoline was used to start that fire.  Not the furnace, not an accident.  He knows that gasoline was used.  He's the only one that knows that.  The detective doesn't even know that at that point.

And when you look at this evidence, I'll suggest that it's interesting, because when you compare it to what he has to say, I mean, he's got a little bit of a dilemma.  Now he's given two different versions of what happened.  He's read the police reports.  He's listened to the testimony and the evidence.  And he's got a problem, because his brother says, "Well, he was with me all night."  And Ivory Burrage says, "Well, he was with me all night."  So, that's causing a little bit of a dilemma, deciding what he's gonna tell you today, and he's got to go with one or the other, 'cause he couldn't have been in both places, and they're both his witnesses contradicting each other.

Well, he could go with Emmaniel Moore, but you know now Emmaniel Moore's given several different versions, and his credibility's a factor, 'cause he's been convicted of aggravated robbery.

So, best bet is to run with Ivory, and that's what he does when he takes the stand this afternoon or this morning.

877

But Ms. Burrage has her own problems, and you'll recall her testimony. Six or seven times her answer was, "I can't remember." "I can't remember." She can't remember when she met him. She can't remember where he lived, how often she saw him, when she saw him; next after February 25th, the next time she saw him, when he went to jail, how long he stayed that particular night, or whether it was even snowing that night. "I can't remember." "I can't remember." "I can't remember."

You have to ask yourself, at one point, she talks about a date nobody talked about. It was February of 1997, February 28th of 1997. She's losing her script at one point when she's testifying. And you're to believe that this woman who can't remember anything can remember that of all the visits this man made, she remembers clearly that visit on February 25th of 1998.

Well, I challenge anyone in this courtroom to remember what they were doing on February 25th of 1998, unless there was something major like getting married or having surgery. It's just not gonna stand out.

The Defendant says he only goes over there on Monday and on Sunday, and you know this was a Tuesday into a Wednesday morning. So, nothing fits.

And what about the reputation? Well, you know

878

according to a friend that the Defendant by him is a cool guy.  There's a reputation that's gonna overcome all this evidence.

And what about that third story?  You go back and evaluate it.  It's preposterous to suggest that Detective Don Shepard sat down at the Champaign Police Department with this man and suddenly forgot what he was interviewing him about and never asked him about the fire and never asked him about February 24th or 25th and for reasons that are never explained has a chat with the Defendant about the 17th and 18th and then goes home. That's absolutely absurd and incredible.  And it's the best the Defendant can do now that the evidence is locking him in.

There's only one thing really that emerged from his testimony that is true.  He said he never thought they'd think he was a suspect.  I concede, I bet he never did.  I bet he thought he got rid of all the evidence.  I'm sure he never thought that that video camera was capturing him, and I bet you he's never heard of PCR.  Or had any idea that it's found in high concentrations in saliva.

And what about that DNA?  Well, isn't that ironic that the Defendant's attempt to disguise himself is actually what gives him away.

879

You look at that stocking mask, and that pretty well ties it up as far as the DNA evidence, and that's that one piece cut from her nylon.

And I'll suggest that there was an argument made by Ms. Lenik that if this was a trial in April, then the statistics would have been different. There's no testimony to that. You remember the testimony.

Mr. Zeeb has only calculated statistics of finding the Defendant's profile once. That's 1 in 150 billion Blacks. That's never changed. That was never recalculated. That was not altered.

The calculation that is 1 in 2700 is the mixture. It's the mixture before he separated the major, the medium, and the minor profile. He's only calculated the profile that fits Dedric Moore once, and it's never wavered from 1 in 150 billion Blacks. And that's a statistic that the Defendant has to live with.

And what that tells you is that, in fact, this is the man who did it, when you look at the population of this planet.

None of the DNA evidence in this case is contradicted. Now, the evidence was described to you in detail. It's been reviewed by other scientists, and it is absolutely uncontradicted as it stands before you.

And that's why Mr. Zeeb is the expert, not Ms.

Lenik, not me.  Mr. Zeeb is the one who explained it to you.  And explained the process and retained the samples for further analysis if it was gonna be challenged.  And you agreed when you were selected not to speculate, but to look at the evidence in the case, and that's exactly why that evidence was presented.  And all of the evidence in the case supports that DNA finding.

And it's insulting to suggest that Mr. Zeeb came in here and somehow came up with that figure because he wanted big numbers when you listened to the care that he took and the review that he subjected himself to and the openness in which all his samples and work is retained.

Now, to somehow he's gonna walk in now and come up with results that are different, if that was a case, why would they have even done the conservative mixture calculation at all?  Why not just hide that?  Why wait for validation studies that were reviewed by the forensic community in the entire State of Illinois?  If this is all a big cover-up.  It's absurd.

What it is is exactly what you heard and what's uncontradicted, which is that is the match for the Defendant's profile.  And not from touching.  That was the third profile.  The Defendant's profile is the major one, and you know saliva contains a high

881

concentration of cells.  Of skin cells.  And I'll
suggest to you that, in fact, that's how these got on
there was the Defendant's saliva and skin cells.

And you can see how he did it when you pull
together all the evidence and you look at this case from
the perspective of all the physical evidence you have.

And this man was at his grandmother's duplex
and maybe he was watching Lori Hansen and waiting for
her and maybe he was just an opportunist, but she comes
home and she's alone and he sees his chance.  And he has
every ability to be in that area because that's right
next door, and he sees that she's defenseless, and he
pushes her down on the floor, and his fun begins, and it
started out as a property crime, but he gets a certain
boldness.  This man who helps himself to her beer and
smokes cigarettes, this man who told Detective Don
Shepard, "I like my beer and I smoke my cigarettes," who
said to Lori as he was urinating on, "If you drink your
beer, you got to take a piss."

That's the kind of man that was planning this,
and it became rather sadistic; but as it proceeded to
this property crime, I'll suggest that he was sitting
there thinking about her ATM card and getting her PIN
numbers and writing those down and repeating, having her
repeat them to make sure he had them right, and then he

882

was thinking.  I bet he thought, "There might be a camera or someone might see me."  So, he goes through her stuff.

She said she could hear him rummaging through things and ransacking and find those pantyhose in her bedroom, and he cuts off a piece of those, and he's gonna make himself a mask.  Puts it in his pocket, and he already helped himself to her ATM cards, gotten all the information, got her truck keys.

He takes her truck from where it is out front. He already asked her how to drive it and drives it just a few blocks over to that ATM machine at just about that right time frame.  And he tries to withdraw three times.

And first, he checks the account balance, so he knows there's 1700 some dollars.  You can see that on the receipt.  That was found blowing in the street.  And you could see it from the business records.  Mrs. Brooks described that.

And then he tries to make the withdrawals, and then he's heading back, but something happened at that video machine, because he got this mask out, and I'll suggest it's not such a great mask.  It's actually a pretty bad mask.  Pretty solid.  Be pretty hard to drive a truck or operate an ATM machine with something like that.

883

So, he decided not to use it, stuck it in his pocket along with the lighter that he had and the receipt that came back out of the machine that told him what her balance was, got whatever money he could from her ATM machine, and then came back down here by 717 Arlington where it says T2, parked the truck, took that junk out of his pocket that he didn't need, the receipt, 51, the lighter, and then threw this mask that hadn't worked as well as he thought on the ground, because when he pulled it down over his head to try it out, it didn't let him see what he needed to do.

And that's when he got his saliva on it, and that's when he got all of his skin cells on it, and that's when he pulled it off and he dropped it in the street, and he never had any idea that it was gonna tie back up to him, 'cause he was thinking fingerprints.

And little did he know that by putting that down over his mouth and trying it and then discarding it that that was gonna contain that evidence that identified him.

And that's when he comes back; and when he comes back into that residence, he's not the Defendant that you saw here on the stand, "Yes, ma'am," "No, ma'am."  He's the Defendant and he's the attacker that Lori Hansen saw, that was beating her and that was

884

molesting her and that was trying to drag her into the
flames and that took a piss on her head, as he put it,
and that put that gasoline and that accelerant all over
her and then put that cigarette on her.  That's the man
that Lori Hansen was dealing with.

        And then when he leaves her, he does that
coup de grace.  He turns on the burners.  He's already
blocked what he thinks is a way out, but he gets those
burners on and then he heads off with her purse and he
doesn't need what's left in it, so he dumps it as he is
heading back up to Healey Street, gets rid of that in
the alley, cuts up either -- comes back down Healey or
Springfield and heads to nine blocks to Emmaniel Moore's
house.

        That's how that evidence fits in.  And when
you step back and you look at all that evidence and you
look at everything before you, I'll suggest to you that
it's clear there is only one person who could have done
this, one person and one person only, and that's the
person who had access to that duplex and who had every
reason to know that Lori would be alone and there would
be no one else in that duplex.  That's the person who
Lori Hansen picked out of a lineup.  It's the person who
didn't want to stand in that lineup.  It's the person
who happens to smoke Newports, which was the instrument

885

1
2      that was the attempted murder.  It's the person who knew

3      that gasoline was used in that duplex when nobody else

4      in this case did.  It's the person who wrote down the

5      PIN numbers on that note.  It's the person who had every

6      reason to disguise his handwriting when there was a

7      court order to take it.  It's the person who had every

8      reason not to want to be photographed or seen and to try

9      and disguise it with glasses.  It's the person who had

10     every reason to lie every time that he was asked about

11     what happened.  It's the person who's photographed in

12     Lori's truck using her ATM card, and it's the person who

13     left his DNA on that mask on that street that morning

14     cut from her stockings.  And that person's sitting right

15     here in the courtroom before you.

16             I'd ask you to see that justice is done in

17     this case.

18             Thank you.

19             THE COURT:  Members of the Jury, the evidence

20     and arguments in this case have been completed, and I

21     now will instruct you as to the law.

22             The law that applies to this case is stated in

23     these instructions, and it is your duty to follow all of

24     them.  You must not single out certain instructions and

       disregard others.

               It is your duty to determine the facts and to

determine them only from the evidence in this case.  You
are to apply the law to the facts and in this way decide
the case.

From time to time, it has been the duty of the
Court to rule on the admissibility of evidence.  You
should not concern yourself with the reasons for these
rulings.  You should disregard questions which were
withdrawn or to which objections were sustained.

Neither sympathy nor prejudice should
influence you.  You should not be influenced by any
person's race, color, religion, or national ancestry.

Any evidence that was received for a limited
purpose should not be considered by you for any other
purpose.

You should disregard testimony which the Court
has refused or stricken.

The evidence which you should consider
consists only of the testimony of the witnesses and the
exhibits which the Court has received.

You should consider all the evidence in the
light of your own observations and experience in life.

Neither by these instructions nor by any
ruling or remark which I have made do I mean to indicate
any opinion as to the facts or as to what your verdict
should be.

887

1

2        Faithful performance by you of your duties as

3    jurors is vital to the administration of justice.

4        Only you are the judges of the believability

5    of the witnesses and of the weight to be given to the

6    testimony of each of them.  In considering the testimony

7    of any witness, you may take into account his ability

     and opportunity to observe, his memory, his manner while

8    testifying, any interest, bias, or prejudice he may

9    have, and the reasonableness of his testimony considered

10   in the light of all the evidence in the case.

11       You should judge the testimony of the

12   Defendant in the same manner as you judge the testimony

13   of any other witness.

14       Opening statements are made by the attorneys

15   to acquaint you with the facts they expect to prove.

     Closing arguments are made by the attorneys to discuss

16   the facts and circumstances in the case and should be

17   confined to the evidence and to reasonable inferences to

18   be drawn from the evidence.  Neither opening statements

19   nor closing arguments are evidence, and any statement or

20   argument made by the attorneys which is not based on the

21   evidence should be disregarded.

22       Those of you who took notes during trial may

23   use your notes to refresh your memory during jury

24   deliberations.

888

Each juror should rely on his or her recollection of the evidence.  Just because a juror has taken notes does not necessarily mean that his or her recollection of the evidence is any better or more accurate than the recollection of a juror who did not take notes.

When you are discharged from further service in this case, your notes will be collected and destroyed.  Throughout that process, your notes will remain confidential and no one will be allowed to see them.

The Defendant is charged with the offenses of residential burglary, home invasion, aggravated criminal sexual abuse, attempt first degree murder, and aggravated arson.  The Defendant has pleaded not guilty.

The charges against the Defendant in this case are contained in a document called the indictment.  This document is the formal method of charging the Defendant and placing the Defendant on trial.  It is not any evidence against the Defendant.

The Defendant is presumed to be innocent of the charges against him.  This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced

889

beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The Defendant is not required to prove his innocence.

Circumstantial evidence is proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the Defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.

You have before you evidence that the Defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the Defendant made the statements, and, if so, what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made.

It is proper for an attorney or an attorney's investigator to interview or attempt to interview a witness for the purpose of learning the testimony the witness will give.

However, the law does not require a witness to speak to an attorney or an attorney's investigator

890

before testifying.

The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

It is for you to determine what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made.

Evidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness.

Evidence of a Defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged.

When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following: The opportunity the witness had to view the offender at the time of the offense, the

891

witness' degree of attention at the time of the offense, the witness' earlier description of the offender, the level of certainty shown by the witness when confronting the Defendant and the length of time between the offense and the identification confrontation.

A person commits the offense of residential burglary when he knowingly and without authority enters the dwelling place of another with the intent to commit therein the offense of theft.

To sustain the charge of residential burglary, the State must prove the following propositions: First proposition, that the Defendant knowingly entered the dwelling place of another; and, second proposition, that the Defendant did so without authority; and, third proposition, that the Defendant did so with the intent to commit therein the offense of theft.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the Defendant not guilty.

A person commits the offense of home invasion

892

when he, not being a police officer acting in the line
of duty, without authority, knowingly enters the
dwelling place of another he knows or has reason to
know -- let me start that over, knowingly enters the
dwelling place of another he knows or has reason to know
that one or more persons is present, and intentionally
causes any injury to any person within the dwelling
place.

To sustain the charge of home invasion, the
State must prove the following propositions:  First
proposition, that the Defendant was not a police officer
acting in the line of duty; and, second proposition,
that the Defendant knowingly and without authority
entered the dwelling place of another; and, third
proposition, that he knew or had reason to know that one
or more persons was present; and, fourth proposition,
that the Defendant intentionally caused an injury to
Lori Hansen, a person within the dwelling place.

If you find from your consideration of all the
evidence that each one of these propositions has been
proved beyond a reasonable doubt, you should find the
Defendant guilty.

If you find from your consideration of all the
evidence that any one of these propositions has not been
proved beyond a reasonable doubt, you should find the

893

Defendant not guilty.

The term peace officer means any person who, by virtue of his office or public employment, is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses.

A person commits the offense of criminal sexual abuse when he commits an act of sexual conduct by the use of force or threat of force, and causes bodily harm to the victim.

A person commits the offense of aggravated criminal sexual abuse when he commits an act of sexual conduct by the use of force or threat of force, and causes bodily harm to the victim.

The term force or threat of force means the use of force or violence or the threat of violence, including when the accused has overcome the victim by use of physical restraint.

The term bodily harm means physical harm.

The term sexual conduct means any intentional or knowing touching or fondling by the accused, either directly or indirectly through the clothing, of the breast of the victim, for the purpose of sexual gratification or arousal of the victim or the accused.

To sustain the charge of aggravated criminal

894

sexual abuse, the State must prove the following propositions:  First proposition, that the Defendant committed an act of sexual conduct upon Lori Hansen; and, second proposition, that the act was committed by force or threat of force; and, third proposition, that the Defendant caused bodily harm to Lori Hansen.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the Defendant not guilty.

A person commits the offense of attempt first degree murder when he, with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual.

The killing attempted need not have been accomplished.

To sustain the charge of attempt first degree murder, the State must prove the following propositions: First proposition, that the Defendant performed an act which constituted a substantial step toward the killing of an individual; and, second proposition, that the

895

Defendant did so with the intent to kill an individual.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the Defendant not guilty.

A person commits the offense of aggravated arson when, in the course of committing arson, he knowingly damages, partially or totally, any building, and he knows or reasonably should know that one or more persons are present therein.

A person commits the offense of arson when he, by means of fire, knowingly damages real property of another without his consent.

The phrase property of another means a building or other real property in which a person other than the Defendant has an interest which the Defendant has no authority to defeat or impair, even though the Defendant may also have an interest in the building or property.

To sustain the charge of aggravated arson, the State must prove the following propositions:  First

896

proposition, that the Defendant, in the course of
committing an arson, knowingly damaged, partially or
totally, any building; and, second proposition, that
when the Defendant did so, he knew or should have known
that one or more persons were present therein.

If you find from your consideration of all the
evidence that each one of these propositions has been
proved beyond a reasonable doubt, you should find the
Defendant guilty.

If you find from your consideration of all the
evidence that any one of these propositions has not been
proved beyond a reasonable doubt, you should find the
Defendant not guilty.

When you retire to the jury room --

MS. LENIK:  Your Honor?

THE COURT:  -- you first will elect one of
your members as your foreperson.  He or she will preside
during your deliberations --

(A sidebar conference was held out of the
hearing of the jury.)

THE COURT:  The Defendant has introduced
evidence of his reputation of being a peaceful and
law-abiding citizen.  This evidence may be sufficient
when considered with the other evidence in the case to
raise a reasonable doubt as to the Defendant's guilt.

897

However, if from all the evidence in the case you are satisfied beyond a reasonable doubt of the Defendant's guilt, then it is your duty to find him guilty, even though he may have a good reputation for being a peaceful and law-abiding citizen.

When you retire to the jury room, you first will elect one of your members as your foreperson. He or she will preside during your deliberations on your verdict.

Your agreement on a verdict must be unanimous. Your verdict must be in writing and signed by all of you, including your foreperson.

The Defendant is charged with the offenses of residential burglary, home invasion, aggravated criminal sexual abuse, attempt first degree murder, and aggravated arson. You will receive ten forms of verdict. As to each charge, you will be provided with both a not guilty and a guilty form of verdict. From these two verdict forms with regard to a particular charge, you should select the one verdict form that reflects your verdict on that charge and sign it as I have stated. Do not write on the other verdict form on that charge. Sign only one verdict form on that charge.

And the verdict forms are as follows: "We, the jury, find the Defendant not guilty of residential

898

burglary."  "We, the jury, find the Defendant guilty of residential burglary."  "We, the jury, find the Defendant not guilty of home invasion."  "We, the jury, find the Defendant guilty of home invasion."  "We, the jury, find the Defendant not guilty of aggravated criminal sexual abuse."  "We, the jury, find the Defendant guilty of aggravated criminal sexual abuse."  "We, the jury, find the Defendant not guilty of attempt first degree murder."  "We, the jury, find the Defendant guilty of attempt first degree murder."  "We, the jury, find the Defendant not guilty of aggravated arson."  "We, the jury, find the Defendant guilty of aggravated arson."

At this point, Mr. Joop and Ms. Roberts, your service on this trial is concluded, and you're free to go.

If you've got anything in the jury room, please get it out now.

I want to thank you for your participation in this trial, and use the call-in number this evening; although, I think it's doubtful there'll be anyone picking a jury tomorrow.

Thank you.

(The alternate jurors exit the courtroom.)

THE COURT:  Mr. Rasmus, if you'll raise your

899

1
2     right hand.
3               (Bailiff sworn.)
4               THE COURT:  Ladies and Gentlemen, I'll get the
5     verdict forms to you in a couple of minutes.
6               If you'll go with Mr. Rasmus to the jury room.
7               (The jury retired to consider their verdict at
      2:31 p.m.)
8               THE COURT:  Counsel, I'm going to --
9               MS. LENIK:  Your Honor, I'd like to put
10    something on the record now that the jury's gone.
11              THE COURT:  Well, first, I'll clean up this
12    instruction and provide it to them.
13              Yes, Ms. Lenik, what's that?
14              MS. LENIK:  Your Honor, I would move for a
15    mistrial.
16              THE COURT:  Based on what?
17              MS. LENIK:  Based on the situation regarding
      the instruction.  They now know it was tendered by me;
18    and although the Court did not indicate by facial
19    gestures or others, it certainly didn't come where it
20    should have come, and it gives it somewhat lesser
21    connotation than the other instructions, and I don't --
22    I believe now they're not going to consider it at all.
23    And I don't see that there's any way that that can be
      remedied, and I would ask for a mistrial, and I'm very
24
                              900

serious about this.

THE COURT:  Motion denied.  You may be seated.

(Recess taken to await the verdict of the jury.)

(The following proceedings were had out of the presence and hearing of the jury.)

THE COURT:  We're back on 98-CF-1558.

Mr. Rasmus informed me about 20 minutes ago the jury reached a verdict.

Ms. Ladd, are you ready for the jury to be brought in?

MS. LADD:  Yes.  Thank you, Your Honor.

THE COURT:  Ms. Lenik?

MS. LENIK:  I am.

THE COURT:  Mr. Rasmus, bring in the jurors.

Again, for the people in the courtroom, I don't expect any outburst or comments when the verdicts are read.

(The jury returned to the courtroom at 6:41 p.m., and the following proceedings were had in the presence and hearing of the jury.)

THE COURT:  You may be seated.

Mr. Decker, has the jury reached verdicts?

MR. DECKER:  Yes, we have, Your Honor.

THE COURT:  Hand the forms to Mr. Rasmus,

901

please.

The jury returns the following verdicts into open court: "We, the jury, find the Defendant, Dedric T. Moore, guilty of residential burglary." "We, the jury, find the Defendant, Dedric T. Moore, guilty of home invasion." "We, the jury, find the Defendant, Dedric T. Moore, guilty of aggravated criminal sexual abuse." "We, the jury, find the Defendant, Dedric T. Moore, guilty of attempt first degree murder." "We, the jury, find the Defendant, Dedric T. Moore, guilty of aggravated arson."

Ladies and Gentlemen of the Jury, are these your verdicts?

THE JURY:  Yes, they are.

THE COURT:  Ms. Lenik, do you wish the jury polled?

MS. LENIK:  Yes, Your Honor.

THE COURT:  All right.  Ladies and Gentlemen, I am going to ask you individually were these and are these your verdicts.  A simple yes or no answer will suffice.

Ms. Schimmel, were these and are these your verdicts?

MS. SCHIMMEL:  Yes, they are, Your Honor.

THE COURT:  Mr. Guest, were these and are

902

these your verdicts?

        MR. GUEST:  Yes.

        THE COURT:  Mr. Decker, were these and are these your verdicts?

        MR. DECKER:  Yes.

        THE COURT:  Ms. Thompson, were these and are these your verdicts?

        MS. THOMPSON:  Yes.

        THE COURT:  Mr. Cox, were these and are these your verdicts?

        MR. COX:  Yes, they are.

        THE COURT:  Mrs. Williams, were these and are these your verdicts?

        MS. WILLIAMS:  Yes.

        THE COURT:  Ms. Roberts, were these and are these your verdicts?

        MS. ROBERTS:  Yes.

        THE COURT:  Ms. Rennels, were these and are these your verdicts?

        MS. RENNELS:  Yes.

        THE COURT:  Mr. Neathammer, were these and are these your verdicts?

        MR. NEATHAMMER:  Yes.

        THE COURT:  Ms. Esslinger, were these and are these your verdicts?

1

2          MS. ESSLINGER:  Yes, sir.

3          THE COURT:  Ms. Wieting, were these and are

4     these your verdicts?

5          MS. WIETING:  Yes.

6          THE COURT:  And, Mr. Edwards, were these and

7     are these your verdicts?

8          MR. EDWARDS:  Yes.

9          THE COURT:  All right.  We'll show the jury is

      polled in open court and they affirm the verdicts.

10          Ladies and Gentlemen, I want to thank you very

11     much for your participation in this trial.

12          As you probably figured out very early on,

13     this was going to be a rather lengthy trial.  Your

14     attention, your promptness are greatly appreciated.

15          You're obviously excused for the rest of the

      day.  Just, for old time sake, use that call-in number

16     this evening to see if your services will be needed

17     tomorrow.  I doubt that they will be.  But I haven't

18     gotten any other directions.

19          Again, thank you very much for your service in

20     this case, and you're excused.

21          MS. LADD:  Thank you.

22          (The jury exits the courtroom.)

23          THE COURT:  We'll show the judgments are

      entered on the verdicts.

24
                              904

1
2          I'm going to direct that post-trial motions be
3     placed on file within 30 days of today's date.
4          We'll set this matter for a hearing on the
5     post-trial motions and for sentencing, if the post-trial
6     motions are denied.
7          Ms. Lenik, do you have available the afternoon
      of Tuesday, May 25?
8          MS. LENIK:  May 25, Your Honor?
9          THE COURT:  Yes.
10         MS. LENIK:  No.
11         THE COURT:  When will you be gone?
12         MS. LENIK:  I'm going to be gone from May
13    22nd, which is a Saturday, until June 5th, which is a
14    Saturday, which means that I'll be gone the work weeks
15    of May 24th and May 31.
16         THE COURT:  What about the afternoon of May
      21?
17         MS. LENIK:  That -- Well, that's fine.
18         THE COURT:  Ms. Ladd?
19         MS. LADD:  Yes.  Thank you, Your Honor.
20         THE COURT:  Set this matter for sentencing
21    hearing Friday, May 21, back in this courtroom, at 1:30.
22         MS. LENIK:  How much time is the Court
23    allotting?
24         THE COURT:  How much time do you want?  This

                              905

1

2      is the only thing I've got set that afternoon right now.

3              MS. LENIK:  An hour?

4              THE COURT:  That's fine.

5              Ms. Ladd, how much time do you want?

6              MS. LADD:  That would be fine, Your Honor.

7              THE COURT:  Total of two hours or total of an
       hour?

8              You want an hour for your case?

9              MS. LENIK:  I don't know that it's gonna take

10     an hour, but I'd like an hour.

11             THE COURT:  All right.  I'll block out from --

12             MS. LENIK:  I mean, the Court's already

13     heard --

14             THE COURT:  Right.  I'll block out the

15     majority of the rest of the afternoon.

               MS. LENIK:  Thank you.

16             THE COURT:  Since the Defendant is now

17     convicted of a Class X and nonprobationable offenses,

18     I'm going to order that his bond order is vacated.  He's

19     to be held without bond.

20             Post-trial motions within 30 days.

21             All right.  We will be in recess.

22                              (PROCEEDINGS ADJOURNED.)

23

24
                                906

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

CHAMPAIGN COUNTY, ILLINOIS

       I, Melissa Clagg, an Official Court Reporter for the Circuit Court of Champaign County, Sixth Judicial Circuit of Illinois, do hereby certify that I reported the proceedings had in the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate Report of Proceedings had before the Honorable Thomas J. Difanis, Judge Presiding.

_Melissa Clagg_
Official Court Reporter

Dated this 28th

day of July, 1999

907

1
      IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
2
             CHAMPAIGN COUNTY, ILLINOIS
3

4
THE PEOPLE OF THE     )
STATE OF ILLINOIS     )
                   )
5
      vs           )   98-CF-1558
                   )
6
DEDRIC MOORE        )
                   )
7
    Defendant     )

8
    Report of Proceedings of the Post-Trial Motion and
9
Sentencing Hearing held in the above-entitled cause on the
10
21st day of May, 1999, before the Honorable Thomas J. Difanis,
11
Judge Presiding.

12
                  APPEARANCES:

13
MS. HEIDI LADD                MS. DIANA LENIK
Assistant State's Attorney     Attorney at Law
14
Appearing on behalf           Appearing on behalf
of the People               of the Defendant
15

16
Teresa R. Valdez,
Official Court Reporter,
17
Sixth Judicial Circuit,
State of Illinois,
18
  Certificate Number
     84-1358
19

20

21
**4-99-0499**
22

23

24
**VOL. XIV**

# FILED

JUN 11 1999

Linda S. Frank

CLERK OF THE CIRCUIT COURT
SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLS.

FILED

AUG 2 0 1999

Clerk of the
Appellate Court, 4th Dist.

1

1       THE COURT:  This is 98-CF-1558, People vs Moore.  The

2     defendant is present with his Attorney, Ms. Lenik.  Ms. Ladd is

3     here for the People.  This matter is set at this time for a

4     hearing on the post-trial motion.  Post-trial motion on file

5     March 22 of 1999.  Mr. Rasmus, I don't want anyone else coming

6     into the courtroom now.  Ms. Lenik, as to your post-trial

7     motion.

8        MS. LENIK:  Your Honor, I believe that the post-trial

9     motion speaks for itself.  I believe that it sets forth the

10    errors which were made during the trial.  I don't believe that

11    there is anything further that I need to add.  There were

12    certain errors made regarding pieces of evidence, which were

13    sent to the jury room, regarding the refusal to grant the

14    defendant's motion in limine to exclude from evidence certain

15    prior convictions and, also, that the Court erred in granting

16    the State's motion regarding the length of time between

17    occurrence and arrest and all of the lengthy arguments that we

18    had regarding another individual.  Since the question in the

19    trial was the identification of the accused, I believe that the

20    Court erred when it refused to allow the extended testimony that

21    we had regarding another suspect but, more particularly, not

22    just the fact that there was another suspect, but the closeness

23    of resemblance between that other suspect and Mr. Moore, and the

24    fact that that other suspect had the one particular physical



2

1

1    trait, which was argued extensively about Mr. Moore.  Namely,

2    the gap in his teeth and the missing tooth and, so, because that

3    was made much of, in terms of the identification, the fact that

4    somebody else had that, I believe, was relevant, and I believe

5    it was error, when the Court refused to allow it.  Other than

6    that, I would stand on the written motion.

7         THE COURT:  Ms. Ladd.

8         MS. LADD:   If it please the Court and Counsel.  Your

9    Honor, the Court fully resolved each of these motions and,

10   appropriately so, at the time they were raised.  With regard to

11   the specific comments about another suspect, I think that's

12   raising it or elevating it to a level far beyond what it was.

13   As the Court will recall, we dealt with that with pre-trial

14   motions.  One officer knew of another individual he had

15   encountered who was missing a tooth.  It turned out to be in a

16   different area of his mouth all together.  The Court reviewed

17   the cases that were applicable at the time and appropriately

18   ruled that that was irrelevant and not even close to the showing

19   that's required before you introduce evidence of any other

20   suspect.  So, in totality, I would ask that the motion be denied

21   as not well taken.

22        THE COURT:  All right.  Well, as Ms. Lenik and Ms. Ladd

23   have said, these were issues that were brought up during the

24   trial.  I see no reason, at this point, to change the rulings

3

1    that were made during the course of the trial.  The post-trial

2    motion filed March 22 of 1999 is denied.  I am going to call

3    this matter for a sentencing hearing.  I have received and

4    considered the pre-sentence report filed May 17, 1999.  I also

5    have a victim impact statement from the victim in this case.

6    Ms. Ladd, do you have copies of those reports and statement?

7         MS. LADD:  Yes, Your Honor.

8         THE COURT:  Any corrections to the pre-sentence report,

9    that you aware of?

10        MS. LADD:  Just one, Your Honor, on page two, under the

11   adult history of criminality.  For the forgery conviction, it

12   indicates paroled on August of 1998.  I believe that's a

13   typographical error.  It's corrected later in the body of the

14   report.  It obviously was August of 1997.

15        THE COURT:  All right.  Thank you.  Ms. Lenik, did you

16   get copies of the statement and of the pre-sentence report?

17        MS. LENIK:  Yes, Your Honor.

18        THE COURT:  Any corrections as to the pre-sentence

19   report?

20        MS. LENIK:  Your Honor, my client states that he did, in

21   fact, get his barber's license, and doesn't know why the

22   Department of Corrections didn't verify that.  Other than that,

23   we have no additions or corrections to the pre-sentence report.

24             THE COURT:  All right.  Thank you.  Mr. Rasmus, is there

4

1       one other person that needs to come in?

2               MR. RASMUS:   Yes.   And, I have a seat, if you would let

3       me.

4               THE COURT:   That's it then.   Ms. Ladd, evidence in

5       aggravation?

6               MS. LADD:   I have two witnesses.   I would call Don

7       Shepard.

8                           DONALD SHEPARD,

9       Called as a witness in behalf of the People and, having been

10      duly sworn under oath, testified as follows in answer to

11      DIRECT EXAMINATION BY MS. LADD:

12              Q    Would you, please, state your name?

13              A    Donald Shepard.

14              Q    What is your occupation?

15              A    I am a Detective for the City of Champaign Police

16      Department.

17              Q    Were you so employed in 1997?

18              A    Yes, ma'am.

19              Q    In your professional capacity, did you have

20      occasion to investigate multiple check forgeries done by Dedric

21      Moore?

22              A    Yes, I did.

23              Q    And, do you see Dedric Moore in the courtroom

24      today?

5

1       A       Yes, ma'am.

2       Q       Could you, please, point him out?

3       A       He is seated at the defendant's table with the

4   yellow and white striped suit.

5       MS. LADD:    May the record reflect identification of the

6   defendant?

7       THE COURT:    It will.

8   BY MS. LADD:

9       Q       Direct your attention, specifically to February

10  18th of 1997, did you take a report from Jerry's IGA on West

11  Kirby, in Champaign, Champaign County, Illinois?

12      A       Yes, ma'am.

13      Q       And, did you speak to an employee named Debbie

14  Miller?

15      A       Yes, I did.

16      Q       What did she report to you?

17      MS. LENIK:  Your Honor, I am going to object to this.    I

18  know that hearsay is permitted at a sentencing hearing.

19  However, this information, namely, that he has a forgery

20  conviction, is already reflected in the pre-sentence report, and

21  I think that, at this stage, to have Detective Shepard recall

22  what some other person told him two years ago, it's certainly

23  cumulative, and I think it's hearsay, which is too attenuated to

24  be probative on the issues that the Court needs to decide.

6

2    1        THE COURT:  Well, I am going to overrule the objection at

2    this point.  I am not sure what the witness is going to say and,

3    if it appears that it's not relevant, too attenuated, or the

4    hearsay isn't reliable, then, the Court will not consider it.

5    The objection is overruled.  You may ask.

6        MS. LADD:    Thank you, Your Honor.

7        Q    Again, what did she report to you?

8        A    She stated that there were several checks that had

9    been cashed at the Jerry's IGA Store on Kirby and in Round Barn

10   Center.  Those checks had been returned, stamped that the

11   accounts were closed, and those checks had been cashed with a

12   check cashing card issued by Jerry's IGA to a Lily Moore.

13       Q    And, with regard to your investigation, did you

14   discover how Lily Moore is related to the defendant?

15       A    Yes, I did.

16       Q    And, what is that?

17       A    She is his grandmother.

18       Q    Then, how was the card used?  Was it used for each

19   of those checks?

20       A    Yes.  There is a number that's given to the card,

21   when you get a Jerry's IGA check cashing card issued, and that

22   number was stamped on the back of each one of the checks.

23       Q    As part of your investigation on March 5th of 1997,

24   did you then interview Lily Moore?

7

| | | | |
|---|---|---|---|
| 2 | 1 | A | Yes, I did. |

2          Q    Did she confirm that she was, in fact, the

3     grandmother of the defendant?

4          A    Yes, she did.

5          Q    And, where did she reside?

6          A    She lived at 512 1/2 South New Street.

7          Q    Did she then confirm that that was her check card?

8          A    Yes, she did.

9          Q    And, did you actually retrieve that from Jerry's

10    IGA as part of your identification?

11         A    Yes, I had.

12         Q    And, what was the status of that card, according to

13    Mrs. Moore?

14         A    She told me that she had lost it

15    somewhere--sometime around the end of January of that year and

16    had no idea where it was at.  I specifically asked her if she

17    had given anyone permission to use the check cashing card.  She

18    told me that she had not.  And, then, I asked her if her

19    grandchildren had had permission.  She told me, no, they did

20    not.

21         Q    And, did you specifically ask her about this

22    grandchild, the defendant?

23         A    Yes, Dedric Moore was specifically named.

24         Q    Then direct your attention to the investigation,

8

1    did you locate a Rachel Hines, one of the employees who took the

2    checks?

3         A    Yes, I did.

4         Q    And, did she describe the man who was trying to

5    cash one of these checks?

6         A    Yes, she did.

7         Q    And, did you then, based on that description, show

8    her a series of photographs?

9         A    Yes, ma'am.

10         Q    And, was she able to pick out anyone's photograph?

11         A    Yes, she was.

12         Q    And, who was that?

13         A    That was Dedric Moore's booking photograph.

14         Q    Is the same person you have identified here in

15    court today?

16         A    Yes, ma'am.

17         Q    And, was that card used then for multiple checks?

18         A    Yes, it was used for every one of the checks.  I

19    believe it was six checks total.

20         Q    Did you then track down a Quinton Devall, one of

21    the individuals whose checks these were?

22         A    Yes, I did.

23         Q    And, what did he report about the status of the

24    check?

9

A    He stated that his check was stolen.  He had no

idea who had cashed it.  He did not write it.  He did not

authorize anyone else to cash it or fill it out.  He also told

me that his roommate knew Dedric Moore and that Dedric Moore had

been to their house on a previous occasion at a party and he

didn't know if Dedric had stolen the check at that time or not.

Q    And, this is multiple checks, is that correct?

A    Yes, ma'am.

MS. LADD:    Thank you.  I have no further questions.

THE COURT:  Ms. Lenik.

CROSS EXAMINATION BY MS. LENIK:

Q    Nobody was physically harmed in these check

forgeries, were they?

A    Not to my knowledge, ma'am.

Q    You didn't talk to the employee of IGA about--well,

let me rephrase that.  When you talked to the lady at the IGA,

she didn't say she was in fear as a result of this incident, did

she?

A    No, ma'am.

Q    She didn't indicate to you any concern about the

individual who had passed the checks, did she?

A    Not as far as physical danger, no.

Q    The checks, that you are referring to, there were

charges filed as a result of those checks, correct?

10

| | | | |
|---|---|---|---|
| 1 | A | No, ma'am. |
| 2 | Q | The checks, that you are referring to, led to |

3   matters relating to Mr. Moore's probation, did they not?

4   A   Not to my knowledge.

5   Q   You are telling me that you don't think they were

6   used to revoke his probation?

7   A   If they were, I have no knowledge of that, ma'am.

8   MS. LENIK:  No other questions.

9   THE COURT:  Ms. Ladd, anything else?

10   MS. LADD:  No.  Thank you, Your Honor.

11   THE COURT:  You may step down.

12   A   Thank you, Your Honor.

13   MS. LADD:  Call Investigator Charlie Shepard.

14                    CHARLES SHEPARD,

15   Called as a witness in behalf of the People and, having been

16   duly sworn under oath, testified as follows in answer to

17   DIRECT EXAMINATION BY MS. LADD:

18   Q   Would you, please, state your name?

19   A   Charles Shepard.

20   Q   And, what is your occupation?

21   A   I am a Detective with the Champaign Police

22   Department.

23   Q   Were you so employed in 1996?

24   A   Yes, I was.

11

3   1       Q      Did you know Dedric Moore?

2       A      Yes.

3       Q      And, do you see that person in court today?

4       A      Yes, I do.

5       Q      Could you, please, identify him?

6       A      It's the gentleman sitting here in the orange and

7   white suit.

8          MS. LADD:   May the record reflect identification of the

9   defendant, Your Honor?

10          THE COURT:  It will.

11   BY MS. LADD:

12       Q      How did you know Dedric Moore?

13       A      I had dealt with Dedric Dedric Moore through police

14   contacts when he was in high school and I was the juvenile

15   detective.

16       Q      And, can you describe the type of contacts you had

17   with him?

18       A      Yes, I had domestic violence contacts.   I also had

19   a credit card fraud contact.   Another contact where a bicycle

20   had been stolen and he was riding the bicycle.

21       Q      Did he make any comment to you--when was that--that

22   bicycle incident?

23       A      I believe it was in 1997 sometime.

24       Q      Did he make any comment to you when you were



12

3      1      investigating that incident about the police?

       2              A     Yes, he did.

       3              Q     What did he say?

       4              A     He told me that the police would never catch him,

       5      because he was too smart for the police to catch him doing

       6      anything.

       7              Q     Now, direct your attention to the domestic

       8      violence, did you become involved in 1996 in investigating

       9      reports made by Heather Cobb and her mother Becky Cobb?

      10              A     Yes, I did.

      11              Q     Can you describe the nature of the relationship,

      12      first of all, between Heather and Becky?

      13              A     Becky is Heather's mother.

      14              Q     Then did Heather Cobb and Becky Cobb report to you

      15      a relationship that existed with Dedric Moore, the defendant?

      16              A     Yes, they did.

      17              Q     And, what was that?

      18              A     Heather Cobb used to date Dedric Moore.

      19              Q     Now, specifically, then, in August, through the

      20      fall of 1996, did Mrs. Becky Cobb make reports concerning Dedric

      21      Moore?

      22              A     Yes, she did.

      23              Q     And, what were the nature of those reports?

      24              A     Domestic violence reports.

13

3    1         Q        And, were those threats directed at her or her

     2    daughter or both of them?

     3         A        Both of them.

     4         Q        Now, at that time, was Mrs. Cobb and Mr. Cobb,

     5    trying to have their daughter break off the relationship with

     6    the defendant?

     7         A        Yes, they were.

     8         Q        Direct your attention, then, to late that fall,

     9    October 4th of 1996, did you interview Heather Cobb,

     10   specifically, about that relationship?

     11        A        Yes, I did.

     12        Q        And, at that time, did she report to you, if she

     13   was afraid of the defendant?

     14        A        Yes.

     15        Q        Why?

     16        A        She said on at least 25 times that he had--when he

     17   would catch her talking on the phone to other men, that he would

     18   beat her over her hands, on her back, on her thighs.  He also

     19   pushed her up against a wall once and had told her that, if she

     20   did not discontinue talking to other men, that he would

     21   physically harm her or have his friends harm her.

     22        Q        Now, did he also make any threats to her, if she

     23   tried to leave the relationship?

     24        A        Yes, he did.

14

Q    And, what was that?

A    The same threats.  He said that he would harm her or have his friends harm her.

Q    Now, did you encourage her at that time to seek an order of protection?

A    Yes, I did.

Q    And, did she do so?

A    Yes, she did.

Q    Did she also seek counseling?

A    Yes.

Q    Do you continue to maintain contact with the family?

A    Yes, I have.

MS. LADD:    Thank you.  I would tender this witness.

THE COURT:  Ms Lenik.

CROSS EXAMINATION BY MS. LENIK:

Q    You didn't talk to Mr. Moore about that particular conduct or contact, did you?

A    Which one, ma'am?

Q    Regarding Ms. Cobb?

A    No, I did not.

Q    So, what you are saying is, what you heard from Ms. Cobb and her mother, and not Mr. Moore, correct?

A    That is correct.

15

Q      And, you weren't in court when any order of
protection was issued, were you?

A      I was not.

MS. LENIK:  No other questions.

THE COURT:  Anything else?

MS. LADD:  Nothing further.  Thank you.

THE COURT:  You may step down.

A      Thank you, Your Honor.

THE COURT:  Ms. Ladd, anything else?

MS. LADD:  Yes.  I would ask the Court to take judicial
notice of 96-OP-533, for the proceedings and orders entered, and
also for the petitions that was filed by the Petitioner, Heather
Cobb.

THE COURT:  Ms. Lenik, as to the request?

MS. LENIK:  Your Honor, I cannot object to the Court
taking notice of court orders.  Therefore, I do not object to
the Court taking notice of the order.  However, I would object
to the Court taking notice of the petition, because the petition
has contained in it unverified and untestified to matters
relating to the personal opinion of the person seeking the
order.  She asked for an immediate emergency order.  He was not
given notice and, at that point, was not given an opportunity to
respond.  Therefore, the matters contained simply in the
petition are, I believe, unreliable hearsay.  Certainly, there

4      1.    is a lot in there that's unreliable hearsay about previous

       2     incidents and about her opinions.  I would object to the Court

       3     taking notice of that, but those matters, which are court

       4     orders, I would not.  I would also like the Court to note that

       5     he was defaulted and then she didn't appear.  So, if the Court

       6     would note the docket sheet, there are several things in there

       7     regarding the order of protection and the seriousness with which

       8     she viewed it.

       9          THE COURT:  All right.  Well, the Court will take

       10    judicial notice of 96-OP-533.  The Court will take judicial

       11    notice of the orders that have been entered in this case and

       12    those orders refer to the verified petition that was on file at

       13    the time the request was made.  So, the Court will take judicial

       14    notice of 96-OP-533, and all of the orders and petitions

       15    contained therein.  Ms. Ladd, anything else on behalf of the

       16    People?

       17         MS. LADD:   No.  Thank you, Your Honor.

       18         THE COURT:  Ms. Lenik, do you have evidence?

       19         MS. LENIK:  I do, yes.

       20         THE COURT:  All right.

       21                    ROBERT AULER,

       22    Called as a witness in behalf of the Defendant and, having been

       23    duly sworn under oath, testified as follows in answer to

       24    DIRECT EXAMINATION BY MS. LENIK:

17

4   1          Q      Would you state your name, please?

    2          A      Robert Auler.

    3          Q      What is your occupation?

    4          A      I am a lawyer.

    5          Q      Mr. Auler, have you come to know the defendant, Mr.

    6   Moore?

    7          A      Yes, I have.

    8          Q      And, how is it that you know Mr. Moore?

    9          A      I met Dedric Moore when he was ten or eleven years

    10  old and he played for me as a little leaguer.  I didn't know him

    11  for several years and I met him again in his late teen years,

    12  maybe three or four years ago, and have had a brief acquaintance

    13  with him perhaps three, on three occasions since then.

    14         Q      And, under what circumstances did you see him on

    15  those three occasions?

    16         A      One time Mr. Moore just came by my office, but on

    17  two other occasions, he was incarcerated, and I spoke with him

    18  either on the telephone or at the county jail.

    19         Q      Were you aware at that time of what he was

    20  incarcerated for?

    21         A      I believe I was.  Yes, I was.

    22         Q      And, were they non-violent types of offenses?

    23         A      I believe--I was aware of drug offenses.

    24         Q      Had you ever known of him to be a violent person?



18

4   1        A      When I knew Dedric on a daily basis for the two

2    summers I coached him, Dedric was as far as from violent as any

3    of the young people that I ever had any dealings with.

4        Q      And, as he grew older, and as you saw him in those

5    later years, did you ever have any indication that he was a

6    violent person?

7        A      I had brief encounters with him in his later years,

8    as I said, but it always seemed, when I did speak with him,

9    particularly at the time he came to my office, that it was the

10   old Dedric that I knew and I didn't have any feeling of

11   apprehension or any feeling that I was dealing with a person who

12   was fundamentally different from the person that I had known as

13   a young person.

14       MS. LENIK:     No other questions.

15       THE COURT:  Ms. Ladd.

16   CROSS EXAMINATION BY MS. LADD:

17       Q      When he came to your office, was that for a legal

18   matter?

19       A      No.  It was just to drop by and talk about baseball

20   and having learned how to bunt the right way and how to conduct

21   himself and also to tell me that he was sorry.  That things had

22   happened in his life that he didn't intend to repeat.

23       Q      And, when was this?

24       A      I can't even tell you the year, but it was within

19

```
 4      1   the last three years.  When you get older, it all starts to

        2   compress.

        3          Q     So, within the last three years, he told you that

        4   he was sorry and he was going to change, in essence?

        5          A     That's my recollection.

        6          Q     And, then two times after that, you saw him in jail

        7   charged with crimes?

 5      8          A     No, I think this was between.  The thing at the

        9   office was after he had settled up whatever happened out of the

       10   first jail appearance.

       11          Q     And, when you saw him in jail, did he want to

       12   retain you?

       13          A     I didn't speak with him about that so much as, just

       14   visiting somebody that I knew who was in jail, and there were

       15   times when people in his family talked about retaining me, but

       16   it never got to be a serious discussion.  I told him that I

       17   was--that it was very close to me.  That it would have been a

       18   hard thing to represent him, because of my close feelings toward

       19   the little boy that I knew in the little league uniform.

       20          Q     And, that little boy that was far from violent, he

       21   was about ten years old?

       22          A     Ten to twelve.  I parted with Dedric when he was

       23   about twelve.

       24          Q     So, in just about the last eight to ten years, you
```

20

1    have had three contacts, two of them in jail?

2         A    That's correct.

3         MS. LADD:    No further questions.

4         THE COURT:  Ms. Lenik, anything else?

5         MS. LENIK:  No, Your Honor.

6         THE COURT:  Thank you.  You may step down.  Call your

7    next witness, please.

8                   ANGELIQUE MARIE DECKER,

9    Called as a witness in behalf of the Defendant and, having been

10   duly sworn under oath, testified as follows in answer to

11   DIRECT EXAMINATION BY MS. LENIK:

12        Q    Would you state your name, please?

13        A    Angelique Marie Decker.

14        Q    Could you spell your first name for the court

15   reporter?

16        A    A-N-G-E-L-I-Q-U-E.

17        Q    What's your relationship to Dedric Moore?

18        A    I am his baby's mother and we are also friends.

19        Q    When did you have a child by him?

20        A    July 1st of '97.

21        Q    And, have you seen him consistently both before and

22   after the birth of the child?

23        A    Well, with the birth of the child, he was in

24   prison, but then after he got out, yes.

21

```
5      1        Q      How long have you known him total?

       2        A      It will be three years in August.

       3        Q      And, how have you known him to be?  How is his

       4    character around you?

       5        A      He ain't never raised his voice.  Even if we was to

       6    get in an argument, he would walk away.  He is just an awful

       7    nice person.  I mean, he has never got mad at me for anything.

       8    He has never raised his hand to me.  He has never done anything.

       9        Q      Are you afraid of him?

      10        A      No, I am not.

      11        Q      Has he ever been violent toward you?

      12        A      No.

      13        Q      Has he ever threatened you?

      14        A      No.

      15        Q      Has he ever said to you, if you have another man or

      16    something like that, that he is going to harm you in any way?

      17        A      No.

      18        Q      Do you have another man in your life?

      19        A      No.

      20        Q      Have you since the time that you have known him?

      21        A      Yeah.

      22        Q      And, what happened in regard to that relationship?

      23    Did he ever threaten that man?

      24        A      No, he didn't.  He just said, you know, I would
```

22

1    appreciate it if, you know, if you would just let me be a father

2    to my son and, you know, he could be around him, but just let me

3    be a father to my son.

4         Q    How is he as a father to his son?

5         A    He writes me like every--once or twice a week--and

6    he asks me how is he doing.  I took him up to see him a couple

7    of times and he just--he is just ear to ear smiles when he sees

8    him.  He is just an awful good father.

9         Q    Were you surprised when you found out what this

10   charge was?

11        A    Yes, I was.

12        Q    Were you surprised when he was convicted?

13        A    Yes, I was.

14        Q    Why were you surprised when you found out what the

15   charge was?

16        A    Because the Dedric I know doesn't--I mean, like I

17   said before, I mean, if we was ever to get in a confrontation,

18   he would just walk away.  Walk in the opposite direction.  I

19   mean, there was a time that I got mad at him and I threw a

20   lighter at him and he just, you know, walked away.  I mean, he

21   is not the kind of person that, at least I know, not the kind of

22   person that even raised his voice at me.  I mean, there was a

23   couple of times that, before I got pregnant with my--with his

24   son Chermaine, I let him watch my older son.  And, I mean, a

23

couple of times.  So, he is just not a violent person to me.

Q    Did you trust him with your other child?

A    Yes, I did.

Q    And, that child is not his child?

A    No.

Q    Did he help you out with the child--with the child you have together, when he was out of jail?

A    Yes, he did.  I would call him up and tell him I needed either diapers or, you know, just regular baby stuff and he would say, you know, meet me at my house or meet me here at a store or something and he would give me either 20 or--either 15 or $20 to get it.

Q    Did he ever tell you that he didn't care or he wasn't going to do anything for his son?

A    Huh-uh.  No, he didn't.

Q    No?

A    No, he didn't.

Q    Do you--when you bring the child over to see him, does the child show that he recognizes him?

A    Yes.  Very much so, yes.

Q    What does he do?

A    He--daddy, daddy, look mommy, there is daddy, daddy, and it's daddy all the time.

Q    And, is it hard on your son to be away from his

24

6      1      father?

2                  A      At nighttime, you know, because he knows who he is

3      and stuff now.  He is at the age that he knows who he is.  At

4      nighttime, it's like, you know, well, I want a kiss from daddy.

5      I want a kiss from daddy and I got to explain to him, you know,

6      he is not here and, well, we will go up there and we will see

7      him and everything but, yeah, it's very hard on him.

8                  Q      Is it going to be a hardship for you when he is

9      moved to the Department of Corrections?

10                 A      Very much so because, you know, not only for our

11     son and everything but, you know, we are friends and I just

12     don't know how I am going to explain to a son, you know, that

13     every time we go and see him, he is going to be in a room and he

14     is not going to be able to come out with him or anything like

15     that.

16                 Q      Are you working outside the home?

17                 A      Not now.

18                 Q      Are you receiving public assistance?

19                 A      No, I am not.

20                 Q      How are you supporting yourself?

21                 A      I just quit my job Monday and I have an interview

22     today.  So, I got a job.

23                 Q      So, are you going to be able to make regular trips

24     to take him to the Department of Corrections?



25

6  1    A  Oh, yeah.  I live with my grandmother and she

  2  is--she lets me use the car when I come up here to see him.  So,

  3  she said there is no problem with me going up there, wherever he

  4  goes.

  5     MS. LENTK:    I have no other questions.

  6     THE COURT:  Ms. Ladd.

  7  CROSS EXAMINATION BY MS. LADD:

  8     Q  So, you were working to support your child?

  9     A  Yes, I was.

  10    Q  You are getting no court ordered support from him,

  11  are you?

  12    A  No.

  13    Q  And, he would pay you occasionally when he was out

  14  of prison?

  15    A  Uh-huh.

  16    Q  Well, he has been in prison most of last year,

  17  hasn't he?

  18    A  Yes, but when he was out, he was out for a couple

  19  of months and he helped me all he could.

  20    Q  With diapers or 15 or $20 here and there?

  21    A  And, he would also spend time with his son.  There

  22  was one time when I had to work, he watched him.  Him and his

  23  girlfriend watched him for me.

  24    Q  And, did you know he had two other girlfriends at



26

6    1    the time?

     2         A    Yes, I did.

     3         Q    That doesn't bother you?

     4         A    No, it don't.

     5         Q    Do you have any concerns about your son being

     6    exposed to someone who could set another human being on fire?

     7         MS. LENIK:  Objection.

     8         A    No.

     9         THE COURT:  Overruled.   You may ask.

     10   BY MS. LADD:

     11        Q    I am sorry.   I didn't hear your answer.

     12        A    No, because like I said, that's not the Dedric that

     13   I know.

     14        Q    And, you think he is a good role model for your

     15   little boy?

     16        A    Yes, I do.  He is his father.

     17        Q    You want your little boy to grow up to be just like

     18   him?

     19        MS. LENIK:  Objection.

     20        THE COURT:  I will sustain the objection.

     21        MS. LADD:   Thank you.  No further questions.

     22        THE COURT:  Ms. Lenik--ma'am, please sit down.  Ms.

     23   Lenik, do you have any other questions?

     24        MS. LENIK:  No, I have no others.

27

6    1            THE COURT:  Ms. Lenik, call your next witness.

2                        ANTHONY MOORE,

3    Called as a witness in behalf of the Defendant and, having been

4    duly sworn under oath, testified as follows in answer to

5    DIRECT EXAMINATION BY MS. LENIK:

6            Q    Would you state your name, please?

7            A    Anthony Moore.

8            Q    And, Mr. Moore, what's your relationship to Dedric

9    Moore?

10           A    I am his uncle.

11           Q    Have you known him all of his life?

12           A    Yes, I have.

13           Q    Have you ever seen him be a violent person?

14           A    No, I haven't.

15           Q    What is the nature of his relationship to your

16   family?

17           A    He is very--he was always the very protective one.

18   He is a good person.  Might have did some bad things in the

19   past, but he is not capable of setting another person on fire.

20   He has a great respect for human life, let alone, if he was to

21   set someone else on fire or their house, he would have burnt up

22   all of the possessions that he owns, his mother owns, and

23   everybody that he loves, and he wouldn't do nothing like that.

24           Q    Were you aware of the charge in this case?  Did you



1    know what he was charged with?

2         A    Not everything.

3         Q    Were you surprised when you heard what he was

4    charged with?

5         A    Yes, I was.

6         Q    Okay.  And, why did that surprise you and the

7    members of your family?

8         A    Because we know that Dedric would not and could not

9    have done anything like that.

10        Q    Did you know that his DNA was found in an article

11   of clothing that belonged to the young lady who resided in the

12   house?

13        A    I did not know until recently.  But, then--let's

14   see--does DNA tests take almost ten months to come back?

15        Q    Well, I am not--it isn't your opportunity to ask

16   any questions.  I am simply making sure that you knew what the

17   evidence was at the trial.  And, you are saying that you didn't

18   find out about the DNA until recently?

19        A    Yes.

20        Q    Is that correct?

21        A    Until after the trial, yes.

22        Q    He is close with his grandmother, is he not?

23        A    Yes, he is.

24        Q    And, to the best that you have been able to see, he


7    1    has been close with his grandmother his whole life, right?

2        A    Yes.

3        Q    And, as you were commenting, his grandmother lives

4    next door to the house that was burned down, right?

5        A    Yes.

6        Q    And, so, as you were commenting, a fire in the

7    house next door, would have burned up his grandmother's things,

8    right?

9        A    Yes.

10        Q    And, did that surprise your family?

11        A    Yes.  It scared everybody.

12        Q    Have you visited and talked to him in jail?

13        A    Yes, I have on a few occasions.  I have wrote

14    letters.

15        Q    And, does your family continue to support him?

16        A    Yes, they do.

17        Q    Does your--will your family be able to support him

18    when he is removed from the community?  Will you be able to go

19    see him?

20        A    It will be hard for his mother and his grandmother,

21    but the ones that's still in Illinois, I am sure we are going to

22    do everything we can to, you know, offer support.

23        Q    Let me ask you--that brings up another subject--how

24    old is his grandmother?

7

1          A        I would say about 56, 57.

2          Q        Do his grandmother and his mother reside in a

3     different state?

4          A        Yes, they do.

5          Q        Where do they live?

6          A        In Mississippi.

7          Q        And, are they able to get back and forth to see him

8     or to come to court proceedings?

9          A        No, they are not.

10          Q        Is there anything else, that you can think of about

11     Dedric, that you think the judge should know before sentencing

12     him?

13          A        I think the judge should know that he is a kind and

14     loving person.  A person that wasn't capable of doing the things

15     that he was charged with.  He is a good person.  He has loads of

16     potential, if he is given another chance.

17          MS. LENIK:        Nothing further.

18          THE COURT:  Ms. Ladd.

19     CROSS EXAMINATION BY MS. LADD:

20          Q        The grandmother that he is so protective of, is

21     that Lily Moore?

22          A        Yes.

23          Q        Did you know he stole her check card and was using

24     it to cash forged checks?